APPEAL,CONFIDENTIALITY ORDER,STANDARD

# U.S. District Court
# District of Maine (Portland)
# CIVIL DOCKET FOR CASE #: 2:23–cv–00246–JAW

ST DOMINIC ACADEMY et al v. MAKIN et al
Assigned to: JUDGE JOHN A. WOODCOCK, JR
Referred to: MAGISTRATE JUDGE KAREN FRINK WOLF
 related Cases:  1:18–cv–00327–JAW
                1:23–cv–00146–JAW
Cause: 42:1983 Civil Rights Act

Date Filed: 06/13/2023
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**ST DOMINIC ACADEMY**
*doing business as*
ROMAN CATHOLIC BISHOP OF
PORTLAND

represented by  **ADELE KEIM**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: akeim@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BENJAMIN A. FLESHMAN**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: bfleshman@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DANIEL D. BENSON**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: dbenson@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JAMES B. HADDOW**

PETRUCCELLI, MARTIN & HADDOW
LLP
TWO MONUMENT SQUARE
SUITE 900
PORTLAND, ME 04101
207–775–0200
Email: jhaddow@pmhlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MARK L. RIENZI**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: mrienzi@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MICHAEL J. O'BRIEN**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: mobrien@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROMAN CATHOLIC BISHOP OF
PORTLAND**

represented by **ADELE KEIM**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BENJAMIN A. FLESHMAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DANIEL D. BENSON**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JAMES B. HADDOW**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MARK L. RIENZI**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MICHAEL J. O'BRIEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KEITH RADONIS**
*on his own behalf and as next friend of*
*children K.Q.R, L.R.R. and L.T.R.*

represented by **ADELE KEIM**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BENJAMIN A. FLESHMAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DANIEL D. BENSON**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JAMES B. HADDOW**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MARK L. RIENZI**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MICHAEL J. O'BRIEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**VALORI RADONIS**
*on her own behalf and as next friend of*
*children K.Q.R, L.R.R. and L.T.R.*

represented by  **ADELE KEIM**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BENJAMIN A. FLESHMAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DANIEL D. BENSON**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JAMES B. HADDOW**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MARK L. RIENZI**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MICHAEL J. O'BRIEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**A PENDER MAKIN**
*in her personal capacity and in her*
*official capacity as Commissioner of the*
*Maine Department of Education*

represented by  **CHRISTOPHER C. TAUB**
OFFICE OF THE ATTORNEY
GENERAL
STATE HOUSE STATION 6
AUGUSTA, ME 04333–0006
207–626–8800
Email: Christopher.C.Taub@maine.gov
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**

OFFICE OF THE ATTORNEY
GENERAL
SIX STATE HOUSE STATION
AUGUSTA, ME 04333–0006
207–626–8866
Email: sarah.forster@maine.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFERSON ASHBY**
*in his personal capacity and his official capacity as the Commissioner of the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EDWARD DAVID**
*in his personal capacity and his official capacity as the Commissioner of the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JULIE ANN O'BRIEN**
*in her personal capacity and her official capacity as the Commissioner of the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK WALKER**
*in his personal capacity and his official capacity as the Commissioner of the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**THOMAS DOUGLAS**
*in his personal capacity and his official capacity as the Commissioner of the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**

(See above for address)
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 06/13/2023 | 1 | | COMPLAINT against All Defendants with Jury Demand **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by VALORI RADONIS, KEITH RADONIS, ST DOMINIC ACADEMY, ROMAN CATHOLIC BISHOP OF PORTLAND. (Service of Process Deadline 9/11/2023) Fee due by 6/15/2023.(jad) (Entered: 06/14/2023) |
| 06/13/2023 | 2 | | CIVIL COVER SHEET. (jad) (Entered: 06/14/2023) |
| 06/13/2023 | 3 | | CORPORATE DISCLOSURE STATEMENT by ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY. (jad) (Entered: 06/14/2023) |
| 06/14/2023 | | | Set Deadlines : Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Adele Auxier Keim must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 6/21/2023. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (jad) (Entered: 06/14/2023) |
| 06/14/2023 | 4 | | Summons Issued as to All Defendants. **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.** **Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).** (Attachments: # 1 Summons Makin, # 2 Summons O'Brien, # 3 Summons Walker, # 4 Summons Ashby, # 5 Summons David)(jad) (Entered: 06/14/2023) |
| 06/14/2023 | 5 | | MOTION for Preliminary Injunction by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 7/5/2023. (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | | | Filing Fee Paid via Credit Card ( Filing fee $ 402 receipt number AMEDC−2814275.), filed by VALORI RADONIS, KEITH RADONIS, ST DOMINIC ACADEMY, ROMAN CATHOLIC BISHOP OF PORTLAND.(HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 6 | | CERTIFICATION for Admission Pro Hac Vice of Adele Auxier Keim filed by |

| | | |
|---|---|---|
| | | JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number BMEDC−2814282.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 7 | CERTIFICATION for Admission Pro Hac Vice of Mark L. Rienzi filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2814289.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 8 | CERTIFICATION for Admission Pro Hac Vice of Daniel D. Benson filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2814303.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 9 | CERTIFICATION for Admission Pro Hac Vice of Benjamin A. Fleshman filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2814313.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 10 | CERTIFICATION for Admission Pro Hac Vice of Michael J. O'Brien filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2814317.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | | Set Deadlines : Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Mark L. Rienzi must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 6/21/2023. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (jad) . (Entered: 06/14/2023) |
| 06/14/2023 | | Set Deadlines : Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorneys Daniel D. Benson, Benjamin A. Fleshman, Michael J. O'Brien must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 6/21/2023. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting |

| | | | |
|---|---|---|---|
| | | | e–filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (jad) (Entered: 06/14/2023) |
| 06/21/2023 | 11 | | WAIVER OF SERVICE Returned Executed A PENDER MAKIN waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 12 | | WAIVER OF SERVICE Returned Executed EDWARD DAVID waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 13 | | WAIVER OF SERVICE Returned Executed JEFFERSON ASHBY waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 14 | | WAIVER OF SERVICE Returned Executed JULIE ANN O'BRIEN waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 15 | | WAIVER OF SERVICE Returned Executed MARK WALKER waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 16 | | WAIVER OF SERVICE Returned Executed THOMAS DOUGLAS waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | | | Set Answer Deadline for All Defendants : Answer due by 8/14/2023 per waivers of service returned executed 11–16. (jad) Modified on 6/21/2023 to add reference to waivers (jad). (Entered: 06/21/2023) |
| 06/22/2023 | | | Set Deadlines as to 5 MOTION for Preliminary Injunction service papers executed on 6/20/2023: Responses due by 7/11/2023. (jad) (Entered: 06/22/2023) |
| 06/22/2023 | 17 | | NOTICE of Appearance by CHRISTOPHER C. TAUB on behalf of All Defendants (TAUB, CHRISTOPHER) (Entered: 06/22/2023) |
| 06/22/2023 | 18 | | NOTICE of Appearance by SARAH A. FORSTER on behalf of All Defendants (FORSTER, SARAH) (Entered: 06/22/2023) |
| 06/23/2023 | 19 | | NOTICE of Hearing: Telephone Conference set for 7/6/2023 11:00 AM before JUDGE JOHN A. WOODCOCK JR. Counsel have been provided with call–in information. (jad) (Entered: 06/23/2023) |
| 07/03/2023 | 20 | | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Plaintiffs (KEIM, ADELE) (Entered: 07/03/2023) |
| 07/03/2023 | 21 | | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Plaintiffs (KEIM, ADELE) (Entered: 07/03/2023) |
| 07/06/2023 | 22 | | Minute Entry for proceedings held before JUDGE JOHN A. WOODCOCK, JR: Telephone Conference held re: briefing on Preliminary Injunction Motion. Current response due 7/11/2023, Plaintiff's reply due 7/19/2023. (Court Reporter: Lori Dunbar) (jad) (Entered: 07/06/2023) |
| 07/06/2023 | 23 | | ORAL MOTION for Leave to File 4 additional pages to Response brief. by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER (jad) (Entered: 07/06/2023) |
| 07/06/2023 | 24 | | ORAL ORDER granting 23 Motion for Leave to File 4 additional pages to Response brief By JUDGE JOHN A. WOODCOCK, JR. (jad) (Entered: |

| | | |
|---|---|---|
| | | 07/06/2023) |
| 07/11/2023 | 25 | RESPONSE in Opposition re 5 MOTION for Preliminary Injunction filed by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. Reply due by 7/25/2023. (Attachments: # 1 Exhibit – 1 (PL 2023, ch. 188), # 2 Exhibit – 2 (LD 1688), # 3 Exhibit – 3 (Sneirson Testimony))(TAUB, CHRISTOPHER) (Entered: 07/11/2023) |
| 07/11/2023 | 26 | AFFIDAVIT of Megan Welter re 25 Response in Opposition to Motion, filed by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. (TAUB, CHRISTOPHER) (Entered: 07/11/2023) |
| 07/12/2023 | | Reset Deadlines as to 5 MOTION for Preliminary Injunction per telephone conference 7/6/2023: Reply due by 7/19/2023. (jad) (Entered: 07/12/2023) |
| 07/14/2023 | 27 | Unopposed MOTION for Leave to File *Reply Memorandum in Excess of Page Limit* by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 8/4/2023. (KEIM, ADELE) (Entered: 07/14/2023) |
| 07/14/2023 | 28 | ORDER granting 27 Motion for Leave to File Reply Memorandum in Excess of Page Limits. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 07/14/2023) |
| 07/19/2023 | 29 | REPLY to Response to Motion re 5 MOTION for Preliminary Injunction filed by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY. (Attachments: # 1 Declaration of Marianne Pelletier)(KEIM, ADELE) (Entered: 07/19/2023) |
| 08/11/2023 | 30 | ANSWER to 1 Complaint,, by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER.(TAUB, CHRISTOPHER) (Entered: 08/11/2023) |
| 08/11/2023 | 31 | MOTION to Dismiss for Failure to State a Claim *With Respect to Personal Capacity Claims* by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER Responses due by 9/1/2023. (TAUB, CHRISTOPHER) (Entered: 08/11/2023) |
| 08/11/2023 | 32 | SCHEDULING ORDER: Discovery due by 12/29/2023. Written Notice of Intent to File Summary Judgment Motion and Request for Pre–Filing Conference due by 1/5/2024. Motions due by 1/19/2024. Ready for Trial on 4/1/2024. By MAGISTRATE JUDGE KAREN FRINK WOLF. (jad) (Entered: 08/11/2023) |
| 09/01/2023 | 33 | RESPONSE in Opposition re 31 MOTION to Dismiss for Failure to State a Claim *With Respect to Personal Capacity Claims* filed by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY. Reply due by 9/15/2023. (KEIM, ADELE) (Entered: 09/01/2023) |
| 09/13/2023 | 34 | REPLY to Response to Motion re 31 MOTION to Dismiss for Failure to State a Claim *With Respect to Personal Capacity Claims* filed by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. (TAUB, CHRISTOPHER |

| | | | |
|---|---|---|---|
| | | | (Entered: 09/13/2023) |
| 10/16/2023 | 35 | | NOTICE/CORRESPONDENCE Re: Supplemental Authority by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY (KEIM, ADELE) (Entered: 10/16/2023) |
| 10/16/2023 | 36 | | ADDITIONAL ATTACHMENTS filed by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY re 35 Supplemental authority . Main Document: Exhibit 1: Opinion. (KEIM, ADELE) Modified on 10/23/2023 to change docket text to match language of linked document (jad). (Entered: 10/16/2023) |
| 10/23/2023 | 37 | | Joint MOTION to Amend Scheduling Order by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 11/13/2023. (KEIM, ADELE) (Entered: 10/23/2023) |
| 10/23/2023 | 38 | | ORDER granting 37 Motion to Amend Scheduling Order. Discovery to be completed by 2/27/2024. Written Notice of Intent to File Summary Judgment Motion and Request for Pre–Filing Conference due by 3/5/2024. Dispositive motions and Daubert/Kumho motions due by 3/19/2024. Ready for Trial on 6/3/2024. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 10/23/2023) |
| 01/11/2024 | 39 | | Joint MOTION for Confidentiality Order by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 2/1/2024. (Attachments: # 1 Proposed Consent Confidentiality Order)(KEIM, ADELE) (Entered: 01/11/2024) |
| 01/12/2024 | 40 | | CONSENT CONFIDENTIALITY ORDER granting 39 Motion for Confidentiality Order By MAGISTRATE JUDGE KAREN FRINK WOLF. (jad) (Entered: 01/12/2024) |
| 02/06/2024 | 41 | | Joint MOTION to Stay Scheduling Order Deadlines by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER Responses due by 2/27/2024. (TAUB, CHRISTOPHER) Modified on 2/6/2024 to modify motion type to Motion to Stay (jad). (Entered: 02/06/2024) |
| 02/27/2024 | 42 | | ORDER granting 41 Motion to Stay By JUDGE JOHN A. WOODCOCK, JR. (jad) (Entered: 02/27/2024) |
| 04/26/2024 | 43 | | Unopposed MOTION for Status Conference by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 5/17/2024. (KEIM, ADELE) (Entered: 04/26/2024) |
| 04/26/2024 | 44 | | ORDER granting 43 Motion for Status Conference By JUDGE JOHN A. WOODCOCK, JR. (jam) (Entered: 04/29/2024) |
| 04/29/2024 | 45 | | NOTICE of Hearing: Telephone Conference set for 5/10/2024 01:00 PM before JUDGE JOHN A. WOODCOCK JR. The parties have been provided the all–in information. (jam) (Entered: 04/29/2024) |
| 05/10/2024 | 46 | | |

| | | | |
|---|---|---|---|
| | | | Minute Entry for proceedings held before JUDGE JOHN A. WOODCOCK, JR: Telephone Conference held. (Court Reporter: Michelle Feliccitti) (jam) (Entered: 05/10/2024) |
| 06/20/2024 | 47 | | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Plaintiffs (KEIM, ADELE) (Entered: 06/20/2024) |
| 06/28/2024 | 48 | | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Plaintiffs (KEIM, ADELE) (Entered: 06/28/2024) |
| 06/28/2024 | 49 | | ADDITIONAL ATTACHMENTS filed by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY re 48 Notice (Other)/Correspondence . Main Document: Exhibit 1: Memorandum and Order. (KEIM, ADELE) (Entered: 06/28/2024) |
| 08/08/2024 | 50 | | ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION denying 5 Motion for Preliminary Injunction By JUDGE JOHN A. WOODCOCK, JR. (CCS) (Entered: 08/08/2024) |
| 08/09/2024 | 51 | | ORDER–Now that a decision has been issued on the Plaintiff's Motion for Preliminary Injunction, the parties are ORDERED to meet and confer regarding remaining discovery to be completed and to file with the Court by August 23, 2024, a Joint Status Report with proposed scheduling order deadlines. (Set Deadlines: Joint Status Report due by 8/23/2024.) By MAGISTRATE JUDGE KAREN FRINK WOLF. (clp) (Entered: 08/09/2024) |
| 08/09/2024 | 52 | | Now that a decision has been issued on the Plaintiffs Motion for Preliminary Injunction, the parties are ORDERED to meet and confer regarding remaining discovery to be completed and to file with the Court by August 23, 2024, a Joint Status Report with proposed scheduling order deadlines. By MAGISTRATE JUDGE KAREN FRINK WOLF. Status Report due by 8/23/2024. (nrg) (Entered: 08/09/2024) |
| 08/09/2024 | 53 | | NOTICE OF APPEAL as to 50 Order on Motion for Preliminary Injunction by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY . ( Filing fee $ 605 receipt number BMEDC–2990518.) <br><br> **NOTICE TO FILER:** A transcript Report/Order form **MUST** be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov. <br><br> **NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (KEIM, ADELE) (Entered: 08/09/2024) |
| 08/12/2024 | 54 | | APPEAL COVER SHEET Re: 53 Notice of Appeal (jam) (Entered: 08/12/2024) |
| 08/12/2024 | 55 | | CLERK'S CERTIFICATE Re: 53 Notice of Appeal, Documents sent to the U.S. Court of Appeals. (jam) (Entered: 08/12/2024) |

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

## APPEAL COVER SHEET

| D.C. # 2:23-cv-00246-JAW | C.C.A. # |
|---|---|
| CASE TITLE: ST DOMINIC ACADEMY et al v. MAKIN et al | |

| | |
|---|---|
| Name of Counsel for Appellant(s): | ADELE KEIM, ESQ.; BENJAMIN A. FLESHMAN, ESQ.; DANIEL D. BENSON, ESQ.; JAMES B. HADDOW, ESQ.; MARK L. RIENZI, ESQ.; MICHAEL J. O'BRIEN, ESQ. |
| Name of Counsel for Appellee(s): | CHRISTOPHER C. TAUB, ESQ.; SARAH A. FORSTER, ESQ. |
| Name of Judge: | JOHN A. WOODCOCK, JR. |
| Court Reporter(s) & Dates: | LORI DUNBAR 7/6/2023; MICHELLE FELICCITTI 5/10/2024 |
| Transcript Ordered? | ☐ Yes    ☒ No |
| Court Appointed Counsel? | ☐ Yes    ☒ No |
| Fee Paid? | ☒ Yes    ☐ No |
| In Forma Pauperis? | ☐ Yes    ☒ No |
| Motions Pending? | ☒ Yes    ☐ No |
| Guidelines Case? | ☐ Yes    ☒ No |
| Related Case on Appeal? | ☐ Yes    ☒ No |
| C. C. A. # (if available) | |
| Date of Last Appeal | |
| Special Comments: | |

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ST DOMINIC ACADEMY, et al.          )
                                    )
v.                                  )   CIVIL NO.  2:23-cv-00246-JAW
                                    )
A PENDER MAKIN, et al.              )

## CLERK'S CIVIL CERTIFICATE

I, Christa K. Berry, Clerk of the United States District Court for the District of Maine,

hereby certify that the following are hereby electronically transmitted to the First Circuit

Court of Appeals and constitute the Abbreviated record on appeal:

Documents Numbered:     54     Appeal Cover Sheet
                        55     Clerk's Certificate
                        53     Notice of Appeal
                        50     Order

I hereby certify that the record and docket sheet available through ECF to be the

certified record and docket entries. All non-electronic documents of record have been

forwarded this date with a copy of this Certificate.

Non-Electronic Documents:

Dated *August 12, 2024*.

                              CHRISTA K. BERRY, Clerk

                       By:   _____/s/ Joanne McCue_____
                             Case Manager

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ST. DOMINIC ACADEMY, a d/b/a of the ROMAN CATHOLIC BISHOP OF PORT-LAND, a corporation sole; ROMAN CATH-OLIC BISHOP OF PORTLAND, a corporation sole; and KEITH and VALORI RA-DONIS, on their own behalf and as next friends of their children K.Q.R., L.R.R., and L.T.R., | No. 2:23-cv-00246 |
| *Plaintiffs*, | |
| v. | |
| A. PENDER MAKIN, in her personal capacity and in her official capacity as Commissioner of the Maine Department of Education, and JEFFERSON ASHBY, EDWARD DAVID, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS, in their personal capacities and in their official capacities as Commissioners of the Maine Human Rights Commission, | |
| *Defendants*. | |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs St. Dominic Academy, Roman Catholic Bishop of Portland, and Keith and Valori Radonis appeal to the United States Court of Appeals for the First Circuit from the Order on Plaintiffs' Motion for Preliminary Injunction (Dkt. 50) entered in this action on August 8, 2024.

1

Respectfully submitted,

*s/ James B. Haddow*
James B. Haddow
Maine Bar No. 003340
Petruccelli, Martin & Haddow LLP
Two Monument Square, Suite 900
Portland, ME 04112-8555
Telephone: (207) 775-0200 x 6413
Fax: (207) 775-2360

*/s/ Adèle Auxier Keim*
Adèle Auxier Keim*
Mark L. Rienzi*
Benjamin A. Fleshman*
Michael J. O'Brien*†
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., NW
 Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

\* Admitted pro hac vice.
† Not a member of the D.C. Bar; admitted in
Louisiana. Supervised by licensed D.C. Bar
members.

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on August 9, 2024, I caused the foregoing to be served electronically via the Court's electronic filing system on all parties.

/s/ *Adèle Auxier Keim*
Adèle Auxier Keim

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ST. DOMINIC ACADEMY, d/b/a          )
the ROMAN CATHOLIC BISHOP           )
OF PORTLAND, et al.,                )
                                    )
        Plaintiffs,                 )
                                    )
    v.                              )          No. 2:23-cv-00246-JAW
                                    )
A. PENDER MAKIN, in her personal    )
capacity and in her official capacity )
as Commissioner of the Maine        )
Department of Education, et al.,    )
                                    )
        Defendants.                 )

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

A Catholic Diocese, a Catholic school, and a Catholic family seek to preliminarily enjoin certain educational and employment antidiscrimination laws, arguing that they violate the Free Exercise Clause, the Free Speech Clause, the Establishment Clause, and the unconstitutional conditions doctrine. Although the Court agrees that the plaintiffs have raised significant constitutional issues, the Court denies the motion, primarily because it concludes that the plaintiffs are unlikely to succeed on the merits. After rejecting the defendants' arguments against reaching the merits on *Pullman* abstention and ripeness grounds, the Court concludes that an injunction against the employment antidiscrimination provisions is unnecessary because the plaintiffs' proposed injunction would only reach conduct that is already protected by the plain text of the law. The Court further determines that the educational antidiscrimination provisions do not violate the Free Exercise

Clause because, despite not being generally applicable, they are neutral and survive strict scrutiny. In a similar vein, the Court rejects the plaintiffs' Free Speech Clause argument because the educational antidiscrimination provisions do not compel speech. Finally, the Court concludes that the plaintiffs have presented insufficient evidence that the educational antidiscrimination provisions invite excessive entanglement or impose unconstitutional conditions.[1]

## I.  PROCEUDRAL HISTORY

On June 13, 2023, the Roman Catholic Bishop of Portland, St. Dominic Academy (St. Dominic), and Keith and Valori Radonis—on their own behalf and as next friends of their children K.Q.R., L.R.R., and L.T.R—filed a civil action against Maine Department of Education Commissioner A. Pender Makin and Maine Human Rights Commission (MHRC) Commissioners Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas. *Verified Compl.* (ECF No. 1) (*Compl.*). The complaint broadly alleged that certain provisions of the Maine Human Rights Act (MHRA) effectively exclude St. Dominic from participating in Maine's school tuitioning program in violation of the Plaintiffs' rights under the Free Exercise, Free Speech, and Equal Protection clauses of the U.S. Constitution. *Id.* The Plaintiffs asked the Court to declare the challenged provisions of the

---

[1]       Although the parties requested oral argument, the Court has decided to issue this order without it. Although it is generally this Court's practice to hold oral argument when requested, the Court is conscious of the delay in issuing this opinion, and the parties' presumed determination to obtain a more authoritative decision from the Court of Appeals for the First Circuit. Moreover, the briefing for both sides of this lawsuit is thorough and excellent, and the Court is not convinced that oral argument would materially alter its conclusions.

MHRA unconstitutional and sought injunctive relief and damages. *Id.* at 40. All Defendants were sued in their official and personal capacities. *Id.* ¶¶ 20-25.

On June 14, 2023, the Plaintiffs moved for a preliminary injunction, asking the Court to enjoin the allegedly unconstitutional provisions of the MHRA. *Pls.' Mot. for Prelim. Inj.* (ECF No. 5) (*Pls.' Mot.*). On July 3, 2023, the Plaintiffs filed correspondence to supplement the record with two cases recently decided by the United States Supreme Court. *Notice of Suppl. Authority in Supp. of Pls.' Mot. for Prelim. Inj.* (ECF No. 20); *Notice of Suppl. Authority in Supp. of Pls.' Mot. for Prelim. Inj.* (ECF No. 21). On July 11, 2023, the Defendants opposed the Plaintiffs' motion for preliminary injunction. *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.* (ECF No. 25) (*Defs.' Opp'n*). On July 19, 2023, the Plaintiffs replied. *Pls.' Reply in Supp. of Mot. for Prelim. Inj.* (ECF No. 29) (*Pls.' Reply*).

On August 11, 2023, the Defendants answered the complaint. *Defs.' Answer to Pls.' Compl.* (ECF No. 30). That same day, the Defendants filed a motion to dismiss all claims against them in their personal capacities. *Defs.' Mot. to Dismiss Personal Capacity Claims* (ECF No. 31). On September 1, 2023, the Plaintiffs opposed dismissal of the personal capacity claims. *Pls.' Resp. in Opp'n to Mot. to Dismiss Personal Capacity Claims* (ECF No. 33). On September 13, 2023, the Defendants replied. *Defs.' Reply in Supp. of Their Mot. to Dismiss Personal Capacity Claims* (ECF No. 34).

On October 16, 2023, the Plaintiffs filed correspondence to supplement the preliminary injunction record with a case recently decided by the Court of Appeals

for the First Circuit. *Notice of Suppl. Authority in Supp. of Pls.' Mot. for Prelim. Inj.* (ECF No. 35). Similarly, on June 20, 2024, and again on June 28, 2024, the Plaintiffs filed correspondence to supplement the motion to dismiss record with recently decided cases from the United States Supreme Court and the District of Massachusetts. *Notice of Suppl. Authority in Supp. of Pls.' Resp. in Opp'n to Defs.' Partial Mot. to Dismiss* (ECF No. 47); *Notice of Suppl. Authority in Supp. of Pls.' Resp. in Opp'n to Defs.' Partial Mot. to Dismiss* (ECF No. 48).

## II.   FACTUAL BACKGROUND

### A.   The Parties

#### 1.   The Plaintiffs

The Roman Catholic Bishop of Portland is a Maine corporation that is the legal entity representing the Roman Catholic Diocese of Portland (Diocese). *Compl.* ¶ 17. The Diocese is part of the Roman Catholic Church, and it operates schools throughout Maine. *Id.*

St. Dominic Academy (St. Dominic) is a Roman Catholic school with campuses in Lewiston, Maine and Auburn, Maine that offers education from pre-kindergarten through twelfth grade. *Id.* ¶¶ 18, 40. It is an educational ministry of the Diocese, and the only Catholic high school operated by the Diocese in Maine. *Id.* ¶¶ 18, 46.

Keith and Valori Radonis are residents of Whitefield, Maine. *Id.* ¶ 19. They have three children: K.Q.R., age 16; L.R.R., age 15; and L.T.R., age 10. *Id.* K.Q.R. and L.R.R. are currently eligible to receive town tuitioning, as Whitefield has no

4

public high school.  *Id.* ¶¶ 19, 51.  L.T.R. will become eligible to receive town tuitioning upon entering the ninth grade in the 2027-2028 school year.  *Id.* ¶ 19.

Both Mr. Radonis and Ms. Radonis were raised in Catholic homes, and they strive to be faithful Catholics and to raise their children according to their Catholic faith.  *Id.* ¶ 52.  They believe that they have made a covenant with God to have and raise children according to the Catholic faith, that it is their religious responsibility as parents to plant, nurture, and cultivate their children's faith, and that a Catholic education is the best way to create a foundation of faith for their children.  *Id.* ¶¶ 58-59.

Before the Radonis family moved to Maine, Ms. Radonis homeschooled K.Q.R. and L.R.R. using a Catholic curriculum.  *Id.* ¶ 60.  Upon moving to Maine, Mr. Radonis and Ms. Radonis enrolled their children at St. Michael School (St. Michael), a Catholic school located approximately 30 minutes from the Radonis home.  *Id.* ¶¶ 61-62.

L.T.R. currently attends St. Michael.  *Id.* ¶ 62.  K.Q.R. and L.R.R. currently attend high school at Erskine Academy in China, Maine, approximately 25 minutes from the Radonis home.  *Id.* ¶ 63.  K.Q.R. and L.R.R.'s tuition at Erskine Academy is paid for by the tuitioning program.  *Id.* ¶ 64.  However, if St. Dominic were part of the tuitioning program, Mr. Radonis and Ms. Radonis would have used their town tuitioning dollars to send K.Q.R. and L.R.R. to St. Dominic for high school.  *Id.*  Mr. and Ms. Radonis would like to send L.R.R. to St. Dominic, where she has been

accepted, and to send L.T.R. to St. Dominic once he completes eighth grade at St. Michael. *Id.* ¶¶ 65, 67.

### 2.    The Defendants

A. Pender Makin is the Commissioner of the Maine Department of Education. *Id.* ¶ 20. Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas are members of the Maine Human Rights Commission (MHRC), an agency of the state of Maine, created and empowered under 5 M.R.S. § 4566 to "investigat[e] all forms of invidious discrimination, whether carried out legally or illegally, and whether by public agencies or private persons." *Id.* ¶¶ 21-25; 5 M.R.S. § 4566. All six Defendants are sued in their personal and official capacities. *Compl.* ¶¶ 20-25.

Commissioner Makin and the MHRC Commissioners both have authority to issue rules implementing the education provisions of the Maine Human Rights Act (MHRA). *Id.* ¶ 160. Under the MHRA, the MHRC is further empowered to investigate "alleged infringements upon human rights and personal dignity." *Id.* ¶ 161; 5 M.R.S. § 4566. A private party may file a complaint with the MHRC, which the MHRC will then investigate and, potentially, file suit in Maine Superior Court. *Compl.* ¶ 161; 5 M.R.S. §§ 4611-4612. Alternatively, private parties may independently file suit under the MHRA in Maine Superior Court. *Compl.* ¶ 161; 5 M.R.S. § 4621.

### B.    Maine's School Tuitioning Program

### 1.    The Pre-*Carson* Regime

6

Maine law provides that "[i]t is the intent of the Legislature that every person within the age limitations prescribed by state statutes shall be provided an opportunity to receive the benefits of a free public education." 20-A M.R.S. § 2(1). The "control and management of the public schools" is "vested in the legislative and governing bodies of local school administrative units [SAUs], as long as those units are in compliance with appropriate state statutes," *id.* § 2(2), and "[a] school administrative unit that neither maintains a secondary school nor contracts for secondary school privileges . . . shall pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student is accepted." *Id.* § 5204(4). A similar provision exists for elementary schools. *Id.* § 5203(4). The upshot is that Maine's tuitioning program permits SAUs—some of which are sparsely populated—to pay the tuition for students to attend other approved public or private schools, in lieu of maintaining their own.

To participate in the tuitioning program, a school need not be located in Maine. *Compl.* ¶ 74. Maine has paid tuition to schools in Vermont, New Hampshire, Massachusetts, Connecticut, New York, Pennsylvania, Virginia, Michigan, Colorado, Utah, California, and Quebec, Canada. *Id.* ¶ 75.

In addition to the tuitioning program for elementary and secondary schools, Maine operates grant programs for students attending postsecondary institutions. *Id.* ¶ 77. Such grants can be used at any public or private postsecondary institution in Maine, including those that are religious. *Id.*

7

When a SAU opts to pay students' tuition rather than maintain its own school(s), parents are solely responsible for selecting the school their children attend. *Id.* ¶ 72. To receive the tuitioning benefit, however, the parents must select an "approved" school satisfying certain statutory criteria. *Id.* Section 2951 of title 20-A of the Maine statutes, entitled "Approval for tuition purposes," provides in pertinent part:

> A private school may be approved for the receipt of public funds for tuition purposes only if it:
>
> **2. Nonsectarian.** Is a nonsectarian school in accordance with the First Amendment of the United States Constitution.

20-A M.R.S. § 2951(2).

## 2. The *Carson* Litigation

In 2018, three families sued Maine's Education Commissioner to challenge 20-A M.R.S. § 2951(2), the "sectarian exclusion," claiming that it violated the First Amendment's Free Exercise Clause. *See Carson v. Makin*, 979 F.3d 21, 26-27 (1st Cir. 2020); *Carson v. Makin*, 142 S. Ct. 1987, 1994-95 (2022). On June 21, 2022, the United States Supreme Court held that Maine's sectarian exclusion violates the Free Exercise Clause because it "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Carson*, 142 S. Ct. at 2002. Specifically, the Supreme Court held that the schools favored by the families in *Carson* "are disqualified from this generally available benefit 'solely because of their religious character.'" *Id.* at 1997 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017)). The Court continued, "[b]y 'condition[ing] the availability of benefits' in that manner, Maine's tuition

assistance program . . . 'effectively penalizes the free exercise' of religion." *Id.* at 1997 (first alteration in original) (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). Since *Carson* was decided, the Maine Department of Education has understood that private schools cannot be barred from receiving public funds solely because they are sectarian. *Aff. of Megan Welter* ¶ 4 (ECF No. 26) (*Welter Aff.*).

### 3. The Tuitioning Program After *Carson*

During the 2022-2023 school year, Cheverus High School (Cheverus) was the only sectarian school to participate in the tuitioning program. *Welter Aff.* ¶¶ 5, 7, 9. Cheverus is a Catholic school that is owned and operated by the Jesuits. *Pls.' Reply*, Attach. 1, *Decl. of Marianne Pelletier* ¶ 4 (*Pelletier Decl.*). It is operationally independent from the Diocese and establishes its own policies regarding admissions, hiring, curriculum, and student conduct. *Id.* ¶¶ 5-6.

The Maine Department of Education processed Cheverus' application in the same manner that it processes applications from any private school seeking tuitioning approval for the first time. *Welter Aff.* ¶ 6. During the 2022-2023 school year, five students attended Cheverus at public expense through the tuitioning program. *Id.* ¶ 8.

### C. The Maine Human Rights Act's Antidiscrimination Provisions

#### 1. The Maine Human Rights Act's Unlawful Educational Discrimination Provisions

The MHRA contains certain antidiscrimination provisions that apply to "educational institutions," defined as "any public school or educational program, any public postsecondary institution, any private school or educational program

approved for tuition purposes and the governing body of each such school or program." *See* 5 M.R.S. § 4553(2-A) (defining "educational institution"); *id.* § 4602 (discussing "unlawful educational discrimination"). Violations of 5 M.R.S. § 4602 carry civil monetary penalties of up to $20,000 for a first violation, up to $50,000 for a second violation, and up to $100,000 for subsequent violations, as well as attorney's fees in certain circumstances. *Id.* §§ 4613(2)(B)(7), 4614. The Maine Superior Court is also empowered to issue a cease-and-desist order, *id.* § 4613(2)(B)(1), to order reinstatement of a victim of unlawful employment discrimination with or without back pay, *id.* § 4613(2)(B)(2), and to award both compensatory and punitive damages. *Id.* § 4613(2)(B)(8).

The MHRA's definition of "educational institution" does not include private postsecondary institutions, *id.* § 4553(2-A), and although schools outside Maine can participate in the tuitioining program, the MHRA does not apply extraterritorially. *Compl.* ¶ 128; *Judkins v. Saint Joseph's Coll. of Me.*, 483 F. Supp. 2d 60, 65-66 (D. Me. 2007). When the Plaintiffs filed their complaint, the MHRA also exempted single-sex schools, even those participating in the tuitioning program, from its prohibitions on discrimination based on race, color, ancestry, national origin, sex, religion, sexual orientation, and gender identity. *Compl.* ¶ 129; *see Defs.' Opp'n* at 5 (acknowledging the omission but suggesting it was likely "inadvertent"). On June 15, 2023, however, the Governor of Maine signed Maine Public Law 2023, Chapter 188 (Chapter 188), which amended the MHRA to remove the exclusion of single-sex schools from the definition of "educational institution." P.L. 2023, ch. 188, § 1 ("An

Act to Amend the Definition of 'Educational Institution' Under the Maine Human Rights Act to Include Single-Sex Education Institutions"), 2023 Me. Laws 370.

### 2. The 2021 Amendments to the Maine Human Rights Act

While *Carson* was pending, the Maine Legislature enacted several amendments to the MHRA. *See Compl.* ¶ 106; P.L. 2021, ch. 366, § 19 ("An Act to Improve Consistency in Terminology and within the Maine Human Rights Act"), 2021 Me. Laws 766-67 (Chapter 366). Prior to the enactment of Chapter 366, the MHRA's educational antidiscrimination provisions did not include gender identity, religion, ancestry, or color as protected classes but did include a provision stating that "[t]he provisions in this subsection [prohibiting discrimination on the basis of] sexual orientation do not apply to any education facility owned, controlled or operated by a bona fide religious corporation, association or society." *See Compl.* ¶ 131; P.L. 2005, ch. 10, § 21 ("An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation").

Chapter 366, which took effect on October 18, 2021, added gender identity, religion, ancestry, and color as protected classes under the statute and narrowed the religious exception to state that "[n]othing in this section . . . requires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." *See Compl.* ¶¶ 107-09, 132; P.L. 2021, ch. 366, § 19, 2021 Me. Laws 767; 5 M.R.S. § 4602(5)(C). Chapter 366 provides no exemptions from the prohibition against religious discrimination and further requires that "to the extent that an educational

institution permits religious expression, it cannot discriminate between religions in so doing." *See Compl.* ¶¶ 107, 109, 132; P.L. 2021, ch. 366, § 19, 2021 Me. Laws 767; 5 M.R.S. § 4602(5)(D).

The Plaintiffs view Chapter 366 as an "attempt to keep religious schools out of the [tuitioning] program" in the absence of the sectarian exclusion invalidated in *Carson. Compl.* ¶ 106. As evidence, they point to Maine's statements during the *Carson* litigation, which "repeatedly described the purpose of the sectarian exclusion using language strikingly similar to the new prohibitions in [Chapter 366]." *Id.* ¶ 111.

The Plaintiffs further support their characterization of Chapter 366 by citing two press releases issued by Maine's Attorney General. The first, issued on the day the Supreme Court heard oral argument in *Carson*, reads in part:

> Schools that require students to undergo religious instruction are excluded [from the tuitioning program] because the education they provide is not equivalent to a public education.
> . . .
> Schools receiving taxpayer funds are appropriately subject to the Maine Human Rights Act (MHRA), which prohibits discrimination against individuals on the basis of several protected classes. The two religious schools that the parents in this case want to send their children to have made it clear that they are not interested in complying with the MHRA and, therefore, these schools have not even applied to the Maine Department of Education to be eligible to participate in Maine[']s tuition program. Put differently, these schools want to continue to discriminate against individuals based on their status in a protected class and that is inconsistent with the protections afforded to all Mainers under the MHRA.
>
> . . .
> It would be inappropriate if Maine taxpayers were forced to fund schools which exclude and discriminate against other Mainers, as that would erode the foundational principles of a public education that is diverse and accessible to all.

12

*Id.* ¶¶ 114-16.  The second press release, issued the day the Supreme Court issued its decision in *Carson*, further states, in relevant part:

> "I am terribly disappointed and disheartened by today's decision," said AG Frey.  "Public education should expose children to a variety of viewpoints, promote tolerance and understanding, and prepare children for life in a diverse society.  The education provided by the schools at issue here is inimical to a public education.  They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff.  One school teaches children that the husband is to be the leader of the household.  While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear.  I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry."
>
> While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so.  Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

*Id.* ¶ 119.

The Plaintiffs also point to a June 26, 2022 tweet by then-Speaker of the Maine House of Representatives Ryan Fecteau.  *Id.* ¶ 122.  An individual tweeted, "You know how SCOTUS said Maine couldn't exclude religious schools from their voucher program?  Maine just changed the guidelines to exclude schools that discriminate against LGBTQ+ students."  *Id.*  Speaker Fecteau responded, "Sure did.  Anticipated the ludicrous decision from the far-right SCOTUS."  *Id.*

Finally, the Plaintiffs cite an essay by U.C. Davis School of Law Professor Aaron Tang titled, "There's a Way to Outmaneuver the Supreme Court, and Maine

Has Found It," which appeared in the *New York Times* on June 23, 2022, two days

after the Supreme Court decided *Carson*. *Id.* ¶ 120. In the essay, Professor Tang

states:

> Let's start with the Carson case. Anticipating this week's decision,
> Maine lawmakers enacted a crucial amendment to the state's anti-
> discrimination law last year in order to counteract the expected ruling.
> . . .
> The legislative fix made by Maine lawmakers offers a model for
> lawmakers elsewhere who are alarmed by the court's aggressive swing
> to the right. Maine's example shows that those on the losing end of a
> case can often outmaneuver the court and avoid the consequences of a
> ruling.

*Id.* ¶ 121.

### 3. The Maine Human Rights Act's Unlawful Employment Discrimination Provisions

The MHRA's employment discrimination provision, which the Plaintiffs also

challenge, states that it is a violation of the Act "[f]or any employer to fail or refuse

to hire or otherwise discriminate against any applicant for employment because of

race or color, sex, sexual orientation or gender identity, physical or mental

disability, religion, age, ancestry, national origin or familial status." *Id.* ¶ 152;

5 M.R.S. § 4572(1)(A). However, the Act also clarifies that the employment

discrimination provisions do not:

> [P]rohibit a religious corporation, association, educational institution
> or society from giving preference in employment to individuals of its
> same religion to perform work connected with the carrying on by the
> corporation, association, educational institution or society of its
> activities. Under this subchapter, a religious organization may require
> that all applicants and employees conform to the religious tenets of
> that organization.

5 M.R.S. § 4573-A(2).

### D. St. Dominic Academy's Tuitioning Eligibility and Policies

#### 1. Diocesan Schools in Maine

Education is central to the Catholic faith, and diocesan bishops are responsible for ensuring that Catholic schools are established in a particular area. *Compl.* ¶¶ 30-31. The bishop is also responsible for overseeing the operations of local Catholic schools. *Id.* ¶ 31. The Diocese began founding Catholic schools in Maine over 100 years ago. *Id.* ¶ 32. Today, it operates eight schools, including St. Dominic, which collectively educate more than 2,100 students. *Id.*

#### 2. St. Dominic Academy's Tuitioning Eligibility

Except for the provisions of the MHRA challenged here, St. Dominic meets or is capable of meeting the requirements to become approved for tuitioning purposes. *Id.* ¶ 18. St. Dominic has received Basic School Approval from the state of Maine. *Id.* ¶ 45. But for the challenged provisions, St. Dominic would apply to participate in the tuitioning program, and the school believes it would be approved. *Id.* ¶ 124.

Because St. Dominic is the only Catholic high school operated by the Diocese in Maine, it not unusual for students to commute from 30 to 60 minutes away to attend St. Dominic. *Id.* ¶ 46. Several towns that participate in the tuitioning program are within an hour's drive of St. Dominic, including Whitefield, Raymond, Fayette, Chelsea, Alna, Westport, Windsor, Vassalboro, Dresden, West Bath, and Hanover. *Id.* ¶ 47. Some of these towns are near Augusta, where St. Dominic has operated a bus for students in the past and plans to do so again when enrollment warrants it. *Id.* ¶ 48.

Students eligible for town tuitioning have attended St. Dominic in recent years, and St. Dominic expects more to enroll in the future.  *Id.* ¶ 49.  According to St. Dominic, additional families would use tuitioning funds to send their children to St. Dominic if the school were approved.  *Id.*

### 3.      St. Dominic Academy's School Policies

The Diocese's mission in operating Catholic schools is "to strengthen the Catholic Church and to create an environment in which the faith is preserved, nourished, shaped and communicated" so that "students will become faith-filled Christians" who contribute to the "Church and communities."  *Id.* ¶ 33.

Because Catholic schools are part of the Catholic Church's evangelizing mission, Diocese policy provides that "[s]tudents of other religious beliefs should be admitted whenever possible."  *Id.* ¶ 34.  However, to ensure that Catholic schools continue to help Catholic parents give their children a Catholic education, the Diocese gives preference to Catholic students in both admissions and financial aid. *Id.*  Further preference is given to members of the parish to which the school belongs.  *Id.*

For all schools, the Diocese only admits students, whether Catholic or non-Catholic, who "understand, accept, and [are] willing to support the mission and goals of the school," and who agree to attend religion classes, Mass, and other religious activities."  *Id.* ¶ 35.  Students at St. Dominic must also agree to uphold "Catholic Christian morals."  *Id.* ¶ 36.

16

The Diocese has adopted the following nondiscrimination policy for all its
schools:

> Maine Catholic Elementary and Secondary Schools within the Roman
> Catholic Diocese of Portland admit students of any race, color, national
> and ethnic origin to all the rights, privileges, programs, and activities
> generally accorded or made available to students at the school. They
> do not discriminate on the basis of race, color, national and ethnic
> origin in administration of their educational policies, admissions
> policies, scholarship and loan programs, and athletic and other school
> administered programs.

*Id.* ¶ 37.

A primary characteristic of Catholic schools is a "concern for teaching the
integration of faith, culture, and life." *Id.* ¶ 38. Because the "personnel of a
Catholic school are critical to achieving this ministry," each school employee shares
the responsibility to form students in the faith by the knowledge they share and by
the faith they model in action. *Id.* Teachers and other employees are evaluated
based on how they maintain and promote the Catholic identity and mission of the
school. *Id.* ¶ 39. In addition, as a condition of employment, all employees must
"[l]ive personal lives in such a way that fundamental teachings of the Catholic
Church are upheld." *Id.*

## III.  THE PARTIES' POSITIONS

### A.  The Plaintiffs' Motion for Preliminary Injunction

In their motion, the Plaintiffs assert that "[a]fter *Carson*, it is clearly
established that excluding religious schools from Maine's tuition assistance
program is unconstitutional," and "[w]hether Maine accomplishes this through the
flat ban struck down in *Carson* or through the web of entangling laws enacted in

17

*Carson*'s shadow, Maine's rules are unconstitutional." *Pls.' Mot.* at 1.  According to the Plaintiffs, "Maine's ongoing efforts to exclude religious schools from the program violate Plaintiffs' First Amendment rights in nine different ways." *Id.* at 5.

The Plaintiffs initially argue the challenged provisions of the MHRA violate the Free Exercise Clause in four different ways.  First, in their view, "Maine's rules violate the Free Exercise Clause by targeting religion," *id.*, because "each piece of Maine's new regulatory scheme is intended to prevent religious schools like St. Dominic from participating in Maine's program, and actually does so." *Id.* at 9. Second, the Plaintiffs submit that "Maine's rules violate the Free Exercise Clause by re-imposing the same exclusion from a public benefits program invalidated in *Carson.*" *Id.* at 10.  Third, the Plaintiffs contend that "Maine's rules violate the Free Exercise Clause because they are not generally applicable." *Id.* at 12.  Finally, the Plaintiffs maintain that "Maine's rules violate the Free Exercise Clause by infringing on the rights of parents to direct the religious education of their children." *Id.* at 12.

Next, the Plaintiffs submit that the provision of the MHRA requiring "equal religious expression" runs afoul of the Free Speech Clause because "it compels speech by religious schools," *id.* at 13, and "violates the Free Speech Clause right of expressive association." *Id.* at 14.

Shifting away from the Free Speech and Free Exercise clauses, the Plaintiffs further contend that the challenged MHRA provisions violate three other First Amendment doctrines.  According to the Plaintiffs, "Maine's rules violate the

Establishment Clause because they invite excessive entanglement under *Carson*," thereby allowing "Maine officials to condone the actions of religious schools who have beliefs the government agrees with and sanction those who do not." *Id.* at 15. In addition, the Plaintiffs suggest that "Maine's rules violate the First Amendment right of religious autonomy." *Id.* at 17. Finally, the Plaintiffs submit that "Maine's rules impose unconstitutional conditions on the [tuitioning] program." *Id.* at 18.

In light of these alleged constitutional infirmities, the Plaintiffs declare that "Maine's rules cannot satisfy strict scrutiny" because "they are not narrowly tailored to serve a compelling government interest." *Id.* at 19. In particular, the Plaintiffs dispute Maine's asserted interest "in preventing discrimination in education" as being underinclusive. *Id.* Accordingly, the Plaintiffs submit that "Maine's interests [do not] justify its rules." *Id.*

The Plaintiffs conclude with a discussion of the other preliminary injunction factors, which they believe weigh in their favor. *Id.* at 19-20. The Plaintiffs assert that they are "suffering and will continue to suffer irreparable harm due to the ongoing violation of their First Amendment rights." *Id.* at 20. In addition, they submit that the Radonis family is irreparably harmed "by the loss of educational opportunities for L.R.R.," who they wish to enroll at St. Dominic. *Id.* Finally, the Plaintiffs maintain that the balance of equities favors injunctive relief and that the public interest is best served by protecting First Amendment rights. *Id.*

## B. The Defendants' Opposition

In their opposition, the Defendants initially submit that the Court should not reach the merits of the Plaintiffs' claims. *Defs.' Opp'n* at 7-9. The Defendants

19

assert that under the doctrine of *Pullman* abstention, the "Court should [] abstain from deciding this case, at least until Maine courts have had the opportunity to interpret the new amendments to the MHRA." *Id.* at 7. Further, the Defendants suggest this case is not ripe because "the extent to which the MHRA applies to St. Dominic should it accept public funds is a purely hypothetical issue," and the harms alleged by the Plaintiffs are based on contingent future events. *Id.* at 8-9.

The Defendants next argue that if the Court does reach the merits, it should conclude that the challenged provisions of the MHRA do not violate the Plaintiffs' rights under the Free Exercise Clause. *Id.* at 9-15. In the Defendants' view, the Plaintiffs "fail to demonstrate that application of the MHRA to St. Dominic would have any meaningful impact on it, much less burden or interfere with its religious practices." *Id.* at 9. "Even if there were some burden on Plaintiffs' religious practices," the Defendants contend the challenged provisions are both neutral and generally applicable. *Id.* at 11. Regarding neutrality, the Defendants maintain that the "2021 amendments to the MHRA were neither designed to impinge on religious practices nor motivated by any animus toward religion" and instead "made the educational provisions of the MHRA consistent with those addressing employment and housing." *Id.* at 13. With respect to general applicability, the Defendants dispute the Plaintiffs' arguments that the challenged provisions are not generally applicable because the MHRA does not apply extraterritorially or to private postsecondary institutions. *Id.* at 14. Finally, the Defendants submit that "[r]equiring private religious schools that accept public funds to comply with the

MHRA does not infringe on the rights of parents to raise their children and direct their religious upbringing." *Id.* at 16.

Turning to the Plaintiffs' claims under the Free Speech Clause, the Defendants aver that the challenged provisions do not compel speech. *Id.* at 17-18. Nor, in the Defendants' view, do the challenged provisions violate the Plaintiffs' right of expressive association. *Id.* at 18. "[E]ven if there is some interference with Plaintiffs' associational rights," the Defendants argue, "it is outweighed by the State's interest in ensuring that schools educating students at public expense do not discriminate." *Id.*

Regarding the Plaintiffs' remaining First Amendment claims, the Defendants initially deny that the challenged provisions result in excessive entanglement. *Id.* at 19. They also suggest the Plaintiffs' religious autonomy argument is unavailing because it only references the MHRA's unlawful employment discrimination provisions, yet "St. Dominic is free to employ only Catholics who subscribe to the Bishop's religious tenets." *Id.* Finally, with respect to the Plaintiffs' unconstitutional conditions argument, the Defendants submit that "[b]ecause the MHRA is a neutral and generally applicable law, it does not need to have any exceptions for religious schools (apart from exceptions to protect some employment practices)." *Id.* at 20. In the Defendants' view, "allow[ing] religious schools to exempt themselves from the MHRA's educational provisions by not accepting public funds . . . is not an unconstitutional condition. It is a benefit that give[s] religious

schools an option if their religious beliefs prevent them from complying with the MHRA." *Id.* at 20-21.

Concluding their discussion of the merits, the Defendants argue that the challenged provisions survive strict scrutiny. *Id.* at 21-23. The Defendants aver that "[t]here can be no dispute that states have a compelling interest in eliminating discrimination," and "[s]tates have an even greater interest in ensuring that publicly-funded institutions do not discriminate." *Id.* at 21. In the Defendants' view, this compelling interest "outweighs whatever interest St. Dominic might have in engaging in discrimination." *Id.* at 22.

Finally, the Defendants submit that the remaining preliminary injunction factors weigh in their favor. *Id.* at 23-24. The Defendants characterize the Plaintiffs' alleged irreparable harm as "speculative," and suggest that "even if the Court were to enjoin Defendants, that would not prevent the harm Plaintiffs are claiming." *Id.* The Defendants conclude by submitting that the balance of equities favors them, and that "the public interest would suffer if [their] efforts to eliminate discrimination were impeded." *Id.* at 24.

## C. The Plaintiffs' Reply

Beginning with the Defendants' abstention arguments, the Plaintiffs contend that "*Pullman* abstention does not apply" because "Plaintiffs' claims do not depend on any ambiguous provisions of state law." *Pls.' Reply* at 2. The Plaintiffs go on to assert that the case "is ripe." *Id.* at 3. This is so, they continue, because "St. Dominic [] has concrete plans to engage in proscribed activity that it believes to be constitutionally protected." *Id.* (internal quotations omitted).

22

Turning to their free exercise arguments, the Plaintiffs contend that Chapter 366 targets religion because "Maine never disputes—and thereby concedes—that [Chapter 366 was] keyed to practices of religious schools." *Id.* at 4. They further suggest the Defendants' opposition does not "address Plaintiffs' argument that the Act reimposes the non-sectarian exclusion that *Carson* struck down, thus conceding the merits on this claim." *Id.* Regarding general applicability, the Plaintiffs submit that the fact that the MHRA does not apply to out-of-state or private postsecondary institutions "undermines Maine's asserted interests in the same way that an exemption for Plaintiffs would." *Id.* at 5. Finally, the Plaintiffs say that the provisions at issue infringe on the right of parents to direct the religious education of their children because "[c]omplying with the Act interferes with St. Dominic's ability to provide the Radonis' children with a Catholic education." *Id.* at 6.

With respect to their free speech claims, the Plaintiffs reiterate that the provision of the MHRA requiring "equal religious expression" compels speech by religious schools and forces them "to modify their religious message by allowing all other religious expression on campus." *Id.* The Plaintiffs further submit that this provision also "burdens Plaintiffs' association by precluding the Radonises from using town-tuitioning funds at St. Dominic unless St. Dominic is willing to modify its Catholic message by allowing an equal amount of non-Catholic religious expression at its school." *Id.* at 7.

The Plaintiffs then shift to their other First Amendment arguments. *Id.* at 7-9. In their view, it "is difficult to imagine a more entangling inquiry than one which

asks how much non-Catholic expression a Catholic school must permit." *Id.* at 8. Despite the Defendants' concessions regarding the MHRA's unlawful employment discrimination provisions, the Plaintiffs maintain they are entitled to a preliminary injunction in this respect based on Maine's prior statements. *Id.* Moreover, regarding unconstitutional conditions, the Plaintiffs argue that "*Carson* cannot be sidestepped by labeling participation [in the tuitioning program] by religious schools an 'option' and a 'benefit' such that Maine can dictate the details of who may carry out a school's religious mission and how they may do so." *Id.* at 9.

In the Plaintiffs' view, their identified constitutional violations "mean[] that Maine must pass strict scrutiny, which it cannot do." *Id.* According to the Plaintiffs, the Supreme Court "has repeatedly held that when an antidiscrimination law is applied in a way that violates First Amendment rights, the Constitution must prevail." *Id.* at 10. The Plaintiffs again dispute the Defendants' identified interests and suggest that "Maine often chooses not to pursue [these interests] at all, as when giving money to out of state schools and in-state private colleges not covered by the Act." *Id.*

Finally, the Plaintiffs reiterate that the remaining preliminary injunction factors favor them, and that "preventing Defendants from enforcing the challenged provisions would provide significant relief to Plaintiffs." *Id.*

## IV. LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med.*

*News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   A judge should grant such injunctive relief "sparingly."   *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

To determine whether to issue a preliminary injunction a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18.  "[T]rial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## V.   DISCUSSION

### A.   Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming

that this factor is "the most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007))).

## 1.    The Defendants' Arguments Against Reaching the Merits

Though the Plaintiffs bear the burden of demonstrating likelihood of success, the Defendants argue the Court should not even reach the merits of the preliminary injunction for two reasons.  First, the Defendants submit that the Court should abstain from deciding the merits under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), on the ground that the merits involve uncertain issues of state law.  Further, the Defendants contend that this dispute is not ripe.  The Court addresses both bases for bypassing the merits.

### a.    *Pullman* Abstention

Under the abstention doctrine announced by the United States Supreme Court in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), "declining to exercise jurisdiction is warranted where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." *Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008); *see also* 17A Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Vikram David Amar, Federal Practice and Procedure § 4242 (3d ed. 2007) (noting that under *Pullman* abstention, "a federal court may, and ordinarily should, refrain from deciding a case in which state action is challenged in federal court as contrary to the federal constitution if there are unsettled questions of state law that may be dispositive of the case and avoid the need for deciding the constitutional question"

(footnote omitted)).  In *Pullman* itself, for example, the Supreme Court held that abstention was appropriate because a "substantial" constitutional issue—a potential Fourteenth Amendment violation—could be avoided if a Texas state court concluded that the state's railroad commission lacked the authority under state law to promulgate the order at issue.  312 U.S. at 498-99, 501.

In the Defendants' view, *Pullman* abstention is appropriate here because "no state court has yet interpreted [Chapter 366], much less how [it] would be applied to a religious school."  *Defs.' Opp'n* at 7.  Accordingly, the Defendants say it is unclear whether Chapter 366 would actually lead to some of the consequences envisioned by the Plaintiffs.  *Id.*  The Defendants submit that state court interpretations of Chapter 366 would "better focus the constitutional inquiry" and could render it "unnecessary to decide the constitutional issues raised by Plaintiffs."  *Id.*

The Plaintiffs disagree, contending that the Defendants' "novel" abstention argument "fails because Plaintiffs' claims do not depend on any ambiguous provisions of state law."  *Pls.' Reply* at 2.  The Plaintiffs further argue that any state court interpretation of Chapter 366 would not resolve all the constitutional issues presented, and they suggest that the "only ambiguity Maine points to is whether the Act will be interpreted to burden Plaintiffs' religious exercise in each and every way that Plaintiffs identify."  *Id.* (footnote omitted).  In the Plaintiffs' view, "Maine concedes that the Act will burden Plaintiffs in at least some ways, and that is enough."  *Id.* (citation omitted).  The Court concludes the Plaintiffs have the better argument.

In cases subsequent to *Pullman*, the Supreme Court has emphasized that abstention is appropriate only if a state court interpretation could resolve the constitutional issues presented and the state law at issue is ambiguous. *Wisconsin v. Constantineau*, 400 U.S. 433, 437-39 (1971); *see also* WRIGHT, MILLER, COOPER & AMAR, *supra*, § 4242 ("Thus abstention is not indicated if the state law is clear on its face, or if its meaning has already been authoritatively decided by the state courts, or if the constitutional issue would not be avoided or changed no matter how the statute is construed" (footnotes omitted)). Indeed, "[w]here there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim." *Constantineau*, 400 U.S. at 439.

Here, the Defendants do not point to any ambiguity in the challenged provisions of the MHRA, nor do they demonstrate how the interpretation of these statutes by a Maine state court would obviate the need to reach the constitutional issues raised by the Plaintiffs. Instead, the Defendants merely suggest that a state court interpretation would further illuminate the scope of the challenged provisions, thereby "better focus[ing] the constitutional inquiry." *Defs.' Opp'n* at 7. As the Plaintiffs point out, however, the only ambiguity implicated by this argument "is whether the Act will be interpreted to burden Plaintiffs' religious exercise in each and every way that Plaintiffs identify." *Pls.' Reply* at 2. This is not sufficient ambiguity under *Pullman*, as the Supreme Court has explained that the abstention doctrine should not be applied so expansively as to obscure federal courts' jurisdiction to decide federal constitutional questions, even when those questions

are "enmeshed with state law." *Constantineau*, <u>400 U.S. at 437-39</u>. As the Defendants have not adequately shown how the interpretation of the challenged provisions by Maine state courts would resolve the constitutional issues presented, the Court rejects their *Pullman* abstention argument.

### b.    Ripeness

The United States Supreme Court has explained that the basic function of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, <u>387 U.S. 136, 148</u> (1967). "While the doctrine has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies." *Ernst & Young v. Depositors Econ. Prot. Corp.*, <u>45 F.3d 530, 535</u> (1st Ci<u>r. 1995</u>) (citing <u>U.S. CONST. art. III</u>., § 2; and *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, <u>344 U.S. 237, 242-45</u> (1952)).

"To determine whether a case is ripe for review, a federal court must evaluate the fitness of the issue presented and the hardship that withholding immediate judicial consideration will work." *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, <u>199 F.3d 26, 33</u> (1st Ci<u>r. 1999</u>). "To establish ripeness in a pre-enforcement context, a party must have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity," and "[a] showing that the challenged statute, fairly read, thwarts implementation of the plan adds the element of hardship." *Id.*

The Defendants contend that this case is not ripe because "the extent to which the MHRA applies to St. Dominic should it accept public funds is a purely

hypothetical issue." *Defs.' Opp'n* at 8. The Defendants point out that St. Dominic "has not yet applied to participate in the tuitioning program," and they further suggest that "even if it were to participate and be accepted, a claim would arise only if it then allegedly violated the MHRA and the aggrieved person or a staff member of the MHRC were to make a charge of discrimination." *Id.* According to the Defendants, that "this case is not ripe is further evidenced by the fact that" Cheverus, another Catholic high school, "participated in the tuitioning program for a full school year, and Plaintiffs do not claim that any charge of discrimination was made (or even threatened) against that school or that the school had to curtail any of its religious practices." *Id.* at 9.

The Plaintiffs, on the other hand, maintain that the "lawsuit is ripe." *Pls.' Reply* at 3. They argue that "the possibility of enforcement through individual complaints ma[kes] the likelihood of prosecution greater, not less" and that "the existence of a valid legal defense does not defeat ripeness." *Id.* (emphasis omitted). The Plaintiffs further represent that St. Dominic is preparing to apply for the tuitioning program but intends to continue engaging in activities that are arguably prohibited by the MHRA. *Id.* In other words, the Plaintiffs argue that St. Dominic "has concrete plans to engage in proscribed activity that it believes to be constitutionally protected." *Id.* (internal quotations omitted).

The Court finds *Whitehouse* instructive and agrees with the Plaintiffs. In *Whitehouse*, the First Circuit considered a First Amendment challenge to a law prohibiting the use of certain public records for commercial solicitation. 199 F.3d at

<u>28-29</u>.  The plaintiff association obtained protected records to use for commercial solicitations but feared prosecution under the law, despite no person having been criminally charged in its 20-year existence.  *Id.* at 28.  "Reluctant either to execute or to abandon its [plan], and seeing no other way of resolving the issue, the Association sued" to have the law enjoined as unconstitutional.  *Id.* at 29.  The state's Attorney General contended that the complaint "showed neither a sufficiently definite plan to engage in conduct that would transgress [the challenged law] nor a sufficiently imminent threat of prosecution."  *Id.*

The *Whitehouse* Court sided with the plaintiff.  Regarding fitness, the First Circuit observed that:

> This is not a case of statutory ambiguity but, rather, one that presents a single, purely legal question: Does Rhode Island's prohibition on using public records for commercial solicitation unconstitutionally restrain free expression?  The Association has described a concrete plan to recruit new members—an activity plainly proscribed by the text of section 38–2–6—and no one has suggested any valid reason why resolution of the apparent conflict should await further factual development.  Since the controversy was well-defined and amenable to complete and final resolution, it was fit for judicial review.

*Id.* at 34.

Like the plaintiff in *Whitehouse*, the Plaintiffs here have demonstrated their "concrete plans to engage immediately (or nearly so) in an arguably proscribed activity."  *Id.* at 33.  St. Dominic desires to apply for Maine's tuitioning program, a benefit the Supreme Court recently ruled the state could not deny to sectarian institutions, such as St. Dominic.  *Compl.* ¶¶ 5, 15.  However, the school believes that some of its policies and practices conflict with the MHRA, putting it at risk of enforcement actions should it participate in the tuitioning program.

For example, according to the Plaintiffs, because the Catholic faith views parents as the primary educators of their children, St. Dominic could not refer to a student using their preferred name and pronouns over the objections of the student's parents. *Id.* ¶¶ 140, 143. Likewise, St. Dominic would not discipline students and staff members who, after reflecting on the teachings of the Pope, decide they cannot use a student's preferred pronouns that conflict with the student's biological sex. *Id.* ¶¶ 145-46. Both these policies potentially violate the MHRA's prohibitions sexual orientation and gender identity discrimination. *See* Me. Hum. Rts. Comm'n, Interpretation of the Education Provisions of the MHRA 3-4 (2016), https://perma.cc/D5Z3-PMP8 (noting that if a student and their parent or guardian "do not agree with regard to the student's sexual orientation, gender identity, or gender expression, the educational institution should, whenever possible, abide by the wishes of the student," and "a pattern of refusal to acknowledge a student's gender identity by using their chosen name and pronouns may be considered to constitute such a violation").[2] While the Defendants do not outright concede that St. Dominic's policies violate the MHRA, they do acknowledge the possible conflict. *See Defs.' Opp'n* at 11 ("It is not clear how this guidance would apply to St. Dominic, or whether a state court would even agree with the guidance").

In a similar vein, St. Dominic, like all Diocesan schools, places some limits on students' religious expression. *Compl.* ¶ 135. Specifically, St. Dominic does not allow students to publicly condemn, mock, or denigrate Catholic beliefs or publicly

---

[2]      This document was cited in the Plaintiffs' motion for preliminary injunction. *See Pls.' Mot.* at 16 n.13.

seek to dissuade other students from believing in them. *Id.* Further, Diocesan schools only admit students who "understand, accept, and are willing to support the mission and goals of the school." *Id.* ¶ 35. Accordingly, St. Dominic does not believe it can comply with the MHRA's prohibition on religious discrimination or the statute's requirement that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." *Id.* ¶ 136; 5 M.R.S. § 4602(1), (5)(D). Again, the Defendants do not contest that these policies and practices may violate the MHRA. *See Defs.' Opp'n* at 8-9.

Instead, the Defendants posit that the Plaintiffs' claims are unripe because they are based on a pyramid of hypotheticals, with fear of sanction under the MHRA being dependent on applying for tuitioning, being approved, engaging in activity arguably proscribed under the MHRA, and then being charged, found liable, and punished by the MHRC. *Id.* at 8. In essence, the Defendants attempt to avoid *Whitehouse* by claiming that "[i]t is not clear that these [potential violations] would ever happen or, if they did, whether they would constitute violations of the MHRA." *Id.* at 9. Under this logic, *Whitehouse* is distinguishable because there, the plaintiff association could have faced legal liability as soon as it started soliciting new members, whereas St. Dominic must first engage in arguably proscribed activity and then face a MHRC complaint.

But the only way for St. Dominic to truly avoid liability is by refraining from acting. Once St. Dominic is approved for tuitioning, it could face any number of situations that would force it to either compromise its religious beliefs or violate the

statute and potentially face civil monetary penalties as well as a cease-and-desist order.[3]  Therefore, St. Dominic is in the same position as the *Whitehouse* plaintiff: do nothing or give up control over legal liability.  To accept the Defendants' chain of hypotheticals would be to confine *Whitehouse* to the type of statute at issue in that case.  The Defendants have provided no support for such a limited reading of *Whitehouse*, and the Court sees none.

By demonstrating an intent to apply to participate in the tuitioning program while maintaining policies that arguably violate the MHRA, the Plaintiffs have shown that they have "concrete plans to engage immediately (or nearly so) in an arguably proscribed activity."  *See Whitehouse*, 199 F.3d at 33.  The record does not reveal why "resolution of the apparent conflict should await further factual development."  *Id.* at 34.  Instead, the dispute presented offers a legal question of whether, after *Carson*, the state may require religious institutions with faith-motivated policies that arguably violate certain provisions of the MHRA to comply with those provisions as a condition of participating in the tuitioning program. Because this "controversy [is] well-defined and amenable to complete and final resolution," it is fit for judicial review.  *Id.*; *see also Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 830 (1st Cir. 2020) ("So long as th[e] uncertainty does not undermine the credible threat of prosecution or the ability of the court to evaluate

---

[3]     Specifically, if the Diocese or St. Dominic violate the MHRA, they could be subject to civil penalties not in excess of $20,000 in the case of the first order under the Act, and escalating civil penalties thereafter, not in excess of $100,000 for a third or subsequent order. 5 M.R.S. § 4613(2)(B)(7).  The MHRA also provides for an order to cease and desist.  *Id.* § 4613(2)(B)(1).  If the asserted violation involves employment, the Superior Court is further authorized to order reinstatement of the victim with or without back pay.  *Id.* § 4613(2)(B)(2).

the merits of the plaintiff's claim in a preenforcement posture, there is no reason to doubt standing" (alteration in original) (quoting *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 584, 594 (7th Cir. 2012))).

Turning to the hardship prong of ripeness, *Whitehouse* is again instructive. In *Whitehouse*, the plaintiff "refrained from carrying forward its plan because it reasonably feared prosecution" under the challenged statute (even though the state had never pursued criminal charges under that statute). 199 F.3d at 32, 34. The First Circuit observed that the plaintiff "thus faced the direct and immediate dilemma of choosing between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[d] to be constitutionally protected activity" and that "[b]ecause lost opportunities for expression cannot be retrieved, delaying or denying resolution of the issue would have worked a substantial hardship." *Id.* at 34 (first and second alterations in original) (internal citations and quotations omitted).

The Court reaches the same conclusion here. In *Carson*, the Supreme Court struck down the sectarian exclusion, holding that religious schools "are disqualified from this generally available benefit 'solely because of their religious character,'" 142 S. Ct. at 1997 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021), and that "[b]y 'condition[ing] the availability of benefits' in that manner, Maine's tuition assistance program . . . 'effectively penalizes the free exercise' of religion." *Id.* (first alteration in original) (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). St. Dominic now seeks to avail itself of the program and avers that "[w]ere it not for [Chapter

366's] amendments to the Act's education provisions and Defendants' reinterpretations of the Act's employment provisions, St. Dominic and other Diocesan schools would apply to be approved for tuition purposes and, on information and belief, would be approved." *Compl.* ¶ 124.

Setting aside—for the moment—the constitutionality of the challenged provisions, St. Dominic's fear of MHRA enforcement is eminently reasonable. On the day the Supreme Court heard oral argument in *Carson*, the Maine Attorney General issued a press release asserting that "[s]chools receiving taxpayer funds are appropriately subject to the Maine Human Rights Act (MHRA), which prohibits discrimination against individuals on the basis of several protected classes." *Id.* ¶ 115. Likewise, on the day *Carson* was decided, the Attorney General issued another statement cautioning that "[e]ducational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices." *Id.* ¶ 119. Although the Attorney General's press releases focused on the schools in *Carson*, his statements concerning compliance with the MHRA applied to all religious schools. As the Maine Attorney General is the "chief law officer of the State," *Withee v. Lane & Libby Fisheries Co.*, 113 A. 22, 23 (Me. 1921), his statements could reasonably cause the Plaintiffs to conclude that he would pursue all religious schools for asserted violation of the MHRA's antidiscrimination provisions in light of the sectarian exclusion's invalidation.

In sum, St. Dominic may now apply for tuitioning, but its policies plainly run afoul of the MHRA's antidiscrimination provisions.  St. Dominic is thus fairly stuck between "the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[s] to be constitutionally protected activity."  *Whitehouse*, 199 F.3d at 34 (first alteration in original) (internal quotation omitted); *see also Trinity Lutheran*, 137 S. Ct. at 2022 ("To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties" (alterations in original) (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality opinion))).  The Plaintiffs have satisfied both the fitness and hardship prongs, and their claims are ripe for judicial review.[4]

### 2.  The Employment Discrimination Provisions of the Maine Human Rights Act

Having concluded that it is proper to reach the merits, the Court initially discusses the Plaintiffs' challenge to certain employment discrimination provisions in the MHRA.  Pursuant to 5 M.R.S. § 4572(1)(A), it is unlawful employment discrimination "[f]or any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment" because of, among other things, "sexual orientation or gender identity."  The Plaintiffs contend that applying this provision to St. Dominic would "strip" the school of its religious hiring rights.  *Pls.' Mot.* at 18;

---

[4]      The Defendants' insistence that this case is unripe because Cheverus has participated in the tuitioning program for a full school year without facing any MHRC complaints or, presumably, compromising its religious beliefs is misplaced.  Cheverus is a Jesuit, not a Diocesan, high school, and it establishes its own policies regarding admission, hiring, curriculum, and student conduct. *Pelletier Decl.* ¶¶ 4-5.  Accordingly, the fact that Cheverus' policies have not yet resulted in a MHRC complaint sheds no light on whether St. Dominic's policies arguably violate the MHRA.

*see also Compl.* ¶ 236 (arguing that application of the MHRA's employment discrimination provisions to St. Dominic would infringe the school's right to "make employment decisions based on [its] religious beliefs free from government interference").

As the Court understands it, the argument that the MHRA's employment discrimination provision would be applied to St. Dominic is premised entirely on statements by Maine officials during and immediately following the *Carson* litigation. *See Compl.* ¶¶ 155-58; *Pls.' Mot.* at 17-18. In *Carson*, the Maine Department of Education and Attorney General "took the position that a school that participates in the program forfeits its religious exemption to the sexual orientation and gender identity employment discrimination provisions." *Compl.* ¶ 155; *see also Carson v. Makin*, 401 F. Supp. 3d 207, 209 (D. Me. 2019) (summarizing Maine's argument that if religious schools "receive public funds, the Maine Human Rights Act will prohibit them from considering sexual orientation in their employment decisions"). Similarly, in 2021, the MHRC submitted a letter to the Maine Legislature taking the position that "once the public funds to which all taxpayers contribute are utilized to subsidize the religious organization, the organization must not discriminate against a group of those taxpayers in its public accommodations, housing or employment." *Letter from Me. Hum. Rts. Comm'n, to Hon. Anne Carney et al.* at 3 (Apr. 20, 2021), https://perma.cc/7B9E-2J2X.[5] Notwithstanding these prior statements, the Court concludes that the MHRA's employment discrimination

---

[5]     This letter was cited by the Plaintiffs in footnote 18 of their motion. *Pls.' Mot.* at 18 n.18.

provisions cannot be applied to strip St. Dominic of its religious hiring rights.[6]
Another provision of the MHRA, 5 M.R.S. § 4573-A(2) provides:

> This subchapter does not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities. Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization.

In their opposition, the Defendants concede that were St. Dominic to participate in the tuitioning program, "it would still be entitled to limit employment of all staff, including teachers, to Catholics conforming to the Bishop's religious tenets." *Defs.' Opp'n* at 9; *see also id.* at 23 (taking the position that all religious schools "are exempt from aspects of the MHRA's employment provisions").

The only relief sought by the Plaintiffs with respect to their employment discrimination challenge is the ability to make employment decisions in a manner already protected by the MHRA. The Plaintiffs represent that "as a condition of employment, all employees must live personal lives in such a way that fundamental teachings of the Catholic Church are upheld." *Compl.* ¶ 39 (internal quotation omitted). Further, the employment handbook for Diocesan schools provides that

---

[6]    Although not mentioned by the parties, Maine's Constitution contains a direct reference to the right of religious societies to employ "public teachers" of their own choosing. Article I, § 3 is entitled, "Religious Freedom; Sects Equal; Religious Tests Prohibited; Religious Teachers," and provides in part:

> [A]ll religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance.

ME. CONST. art. I, § 3. This state constitutional provision buttresses the Court's view that the state of Maine would face legal challenges if it interfered with St. Dominic's hiring practices.

"[a]ll employees must comply with the teachings of the Roman Catholic Church and . . . [e]mployee conduct and behavior should be consistent with the principles of the Catholic Church." *Id.* ¶ 148. In essence, these policies "require that all applicants and employees conform to the religious tenets" of the Catholic Church, and therefore, they are protected under the MHRA. *See* 5 M.R.S. § 4573-A(2).

Despite the Defendants' concession and the plain text of the MHRA, the Plaintiffs in their reply ask the Court to enjoin the challenged employment discrimination provisions for two reasons. First, they take issue with the Defendants' statement that St. Dominic can limit employment to "*Catholics* conforming to the Bishop's religious tenets," *see Defs.' Opp'n* at 10 (emphasis supplied), characterizing the reference to Catholics as a "'co-religionist' gloss" that is at odds with the plain text of the MHRA and Supreme Court precedent. *Pls.' Reply* at 8. The Plaintiffs are correct that the plain text of the MHRA allows a religious organization to require *all* applicants and employees to conform to the organization's religious tenets. *See* 5. M.R.S. § 4573-A(2). However, the Plaintiffs appear to read too much into the Defendants' choice of words, as the Defendants elsewhere state that religious organizations are "exempt" from certain of the MHRA's employment discrimination provisions. *See Defs.' Opp'n* at 23. The Court therefore does not read the Defendants' concession as limiting the exemption in 5 M.R.S. § 4573-A(2) to "co-religionists."

The Plaintiffs also suggest that a preliminary injunction is warranted because "Maine asserts that its concession regarding religious tenets only applies so

long as the Commission or a future state court *agrees* with those religious tenets."

*Pls.' Reply* at 8 (emphasis in original).  Here, Plaintiffs are referencing a footnote in the Defendants' opposition, which reads:

> Plaintiffs do not claim that homosexuals and transgender individuals are unable to conform to the Bishop's religious tenets, and, if they did make such a claim, [it] is not clear whether a state court would conclude that the Bishop's employment actions based on sexual orientation and gender identity are actionable under the MHRA.

*Defs.' Opp'n* at 20 n.16.  This footnote appears to be discussing a hypothetical scenario in which the Diocese takes a negative employment action based on sexual orientation or gender identity against an individual who conformed with the Diocese's religious tenets.  However, the Plaintiffs have not asked for an injunction allowing them to take such action; they have only asked for assurances that they may continue to hire individuals who conform to the Diocese's religious tenets.  Because the Court is reticent to wade into speculative and potentially complicated constitutional questions, the Court views the parties' dispute over this hypothetical as outside the scope of the present action and declines to address it.

In short, the Plaintiffs have asked that St. Dominic continue to be allowed to limit employment to individuals who conform with the Catholic faith.  This practice seems clearly protected by the plain text of the MHRA, and the Plaintiffs offer no legitimate justification for the Court to enjoin the hypothetical future enforcement of a statute (disclaimed by the state) in a manner that would appear to plainly violate the statute's own text.  In essence, on this narrow issue, the Court declines

to issue an injunction because there is no case or controversy between the parties.[7]
U.S. CONST. art. III, § 2.

### 3. The Educational Discrimination Provisions of the Maine Human Rights Act

In addition to these employment discrimination provisions, the Plaintiffs challenge two of the MHRA's educational discrimination provisions, both of which were enacted in Chapter 366.[8]  First, the Plaintiffs contend that 5 M.R.S. § 4602(1) is unconstitutional as applied to them insofar as it prohibits educational discrimination on the basis of religion, sexual orientation, and gender identity.  *Pls.' Mot.* at 6-7; *see also Compl.* ¶ 136 ("Diocesan schools also cannot comply with 5 M.R.S. § 4602(1), which prohibits discrimination on the basis of religion"); *id.* ¶ 137 ("Diocesan schools also cannot comply with 5 M.R.S. § 4602(1), which says that educational institutions may not discriminate on the basis of sexual orientation or gender identity").  Further, the Plaintiffs suggest that 5 M.R.S. § 4602(5)(D) is similarly unconstitutional.  *Pls.' Mot.* at 6, 10-11; *see also Compl.* ¶¶ 132-33 ("St. Dominic cannot comply with § 4602(5)(D)'s requirement that 'to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing'" (quoting 5 M.R.S. § 4602(5)(D))).

To begin, the Court briefly reviews the statutory scheme.  5 M.R.S. § 4602(1) provides:

---

[7]     In light of this conclusion, the Court does not reach the Plaintiffs' argument that the MHRA's employment discrimination provisions violate their First Amendment right of religious autonomy, *see Pls.' Mot.* at 17-18, as doing so would amount to issuing an advisory opinion.

[8]     To standardize terminology, the Court uses "Chapter 366" when referring to the challenged educational discrimination provisions as a unit.  When referring to only one of the challenged provisions, the Court uses the statutory section for that provision in the Maine code.

**Unlawful educational discrimination.** It is unlawful educational discrimination in violation of this Act, on the basis of sex, *sexual orientation or gender identity*, physical or mental disability, ancestry, national origin, race, color or *religion*, to:

A. Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity;

B. Deny a person equal opportunity in athletic programs;

C. Apply any rule concerning the actual or potential familial status or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity;

D. Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or

E. Deny a person financial assistance availability and opportunity.

5 M.R.S. § 4602(1) (emphasis supplied). 5 M.R.S. § 4602(5)(D) further provides that nothing in 5 M.R.S. § 4062 "[r]equires an educational institution to participate in or endorse any religious beliefs or practices; to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing."

The Plaintiffs launch a variety of constitutional challenges to Chapter 366. *See Pls.' Mot.* at 5 (outlining these theories of relief). The Court begins with their initial theory, which focuses on the Free Exercise Clause.

### a.     The Free Exercise Clause

"The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, 'protects religious observers against unequal treatment' and against

'laws that impose special disabilities on the basis of religious status.'" *Espinoza v. Mont. Dep't of Revenue*, <u>140 S. Ct. 2246, 2254</u> (2020) (quoting *Trinity Lutheran*, <u>137 S. Ct. at 2021</u>).  The Supreme Court has clarified that "the Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Trinity Lutheran*, <u>137 S. Ct. at 2022</u> (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, <u>485 U.S. 439, 450</u> (1988)).  "[I]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (quoting *Sherbert v. Verner*, <u>374 U.S. 398, 404</u> (1963)).  "To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties." *Id.* (alterations in original) (quoting *McDaniel*, <u>435 U.S. at 626</u> (plurality opinion)).

Pursuant to the Free Exercise Clause, the government cannot burden a plaintiff's "sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable' . . . unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, <u>142 S. Ct. 2407, 2421-22</u> (2022).  On the other hand, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, <u>141 S. Ct. 1868, 1876</u> (2021) (citing *Emp. Div. v. Smith*, <u>494 U.S. 872, 878-82</u> (1990)).

The "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* at 1877. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" *id.* (quoting *Smith*, 494 U.S. at 884), or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* Based on the record before it, the Court concludes that the challenged provisions of the MHRA are neutral, but not generally applicable, making them subject to strict scrutiny. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993) ("A law failing to satisfy [neutrality or general applicability] must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest").

### i. The Burden Imposed by the Challenged Provisions

As a preliminary matter, the Defendants suggest that the Court need not engage in a free exercise analysis because the Plaintiffs "fail to demonstrate that application of the MHRA to St. Dominic would have any meaningful impact on it, much less burden or interfere with its religious practices." *Defs.' Opp'n* at 9. The Defendants submit that the MHRA does not burden the Plaintiffs' religious exercise with respect to admissions because "Plaintiffs provide no evidence that St. Dominic would, in fact, end up denying admissions or scholarships to non-Catholics." *Id.* Further, while the Defendants concede St. Dominic "would need to permit other

religious expression" pursuant to the MHRA, they counter that St. Dominic need not endorse these alternative beliefs, and "it is not clear whether St. Dominic currently allows students to express religious views that differ from those of the Bishop or how allowing them to do so would burden Plaintiffs' religious practices." *Id.* at 10. Finally, the Defendants contend that complying with the MHRA's prohibitions on educational discrimination based on sexual orientation and gender identity would not burden the Plaintiffs because "it is difficult to see how allowing students to wear the clothes of their gender identity and addressing them by their preferred names and pronouns interferes with 'parents' primordial and inalienable right and duty to educate their children.'" *Id.* at 11 (quoting *Pls.' Mot.* at 16).

The Plaintiffs respond that the MHRA does burden them with respect to admissions because St. Dominic gives "preference to Catholic families for admission and scholarships," a practice "which is rooted in the school's religious beliefs." *Pls.' Mot.* at 10. The Plaintiffs also contend that the challenged provisions burden them by "requir[ing] St. Dominic to permit students to express 'dissenting religious views,' no matter how disrespectful towards the Catholic faith," *Pls.' Reply* at 5 (quoting *Defs.' Opp'n* at 10), and giving the MHRC "authority to determine what students 'are called or what they wear' while at the Bishop's schools." *Id.* (quoting *Defs.' Opp'n* at 11).

As it did in a parallel case, *see Crosspoint Church v. Makin*, No. 1:23-cv-00146-JAW, 2024 U.S. Dist. LEXIS 32975, at *39-42 (D. Me. Feb. 27, 2024), the Court finds *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), helpful on the

46

issue of burden. In *Fulton*, the Supreme Court considered the case of Catholic

Social Services (CSS), a private agency that had contracted with the city to provide

foster care services but refused to certify same-sex couples because it considered

"the certification of prospective foster families to be an endorsement of their

relationships." *Id.* at 1875. The city stated that it would not enter a future foster

care contract with CSS "unless the agency agreed to certify same-sex couples," and

CSS sued to enjoin the city from enforcing that directive. *Id.* at 1875-76. The

Supreme Court sided with CSS, stating:

> As an initial matter, it is plain that the City's actions have burdened
> CSS's religious exercise by putting it to the choice of curtailing its
> mission or approving relationships inconsistent with its beliefs. The
> City disagrees. In its view, certification reflects only that foster
> parents satisfy the statutory criteria, not that the agency endorses
> their relationships. But CSS believes that certification is tantamount
> to endorsement. And "religious beliefs need not be acceptable, logical,
> consistent, or comprehensible to others in order to merit First
> Amendment protection." *Thomas v. Review Bd. of Ind. Employment
> Security Div.*, 450 U.S. 707, 714 (1981). Our task is to decide whether
> the burden the City has placed on the religious exercise of CSS is
> constitutionally permissible.

*Id.* The Court went on to find that the city's policies triggered strict scrutiny

because they were not generally applicable and concluded that:

> CSS seeks only an accommodation that will allow it to continue serving
> the children of Philadelphia in a manner consistent with its religious
> beliefs; it does not seek to impose those beliefs on anyone else. The
> refusal of Philadelphia to contract with CSS for the provision of foster
> care services unless it agrees to certify same-sex couples as foster
> parents cannot survive strict scrutiny, and violates the First
> Amendment.

*Id.* at 1881-82.

Here, the Plaintiffs represent that St. Dominic cannot comply with the MHRA's prohibition on religious discrimination because the school's preference for Catholic families in admissions and financial aid is rooted in the Catholic faith. *Pls.' Mot.* at 10; *see also Compl.* ¶ 136 ("[B]ecause the primary purpose of [Catholic] schools is to assist Catholic parents in providing their children with a Catholic education, the Diocese gives preference in both admission and financial aid to Catholic students"). Similarly, the Plaintiffs contend that the MHRA's prohibitions on sexual orientation and gender identity discrimination conflict with Catholic teaching on the role of parents in education and the relationship between gender and sex. *See Pls.' Reply* at 5; *Compl.* ¶¶ 137-46 ("The [MHRC's] rules compelling schools to enforce students' preferred pronouns—regardless of their parents' wishes, and without reference to the student's biological sex—would require Diocesan schools to discipline staff and students who, after reflecting on Pope Francis' words, conclude that they cannot do so"). Finally, the Plaintiffs say that St. Dominic cannot follow 5 M.R.S. § 4602(5)(D)'s prohibition on discriminating among religions in allowing religious expression because of St. Dominic's mission as a Catholic school. *See Pls.' Reply* at 5; *Compl.* ¶¶ 35-36, 133-35 ("In line with this Diocesan policy, St. Dominic students must agree to uphold Catholic Christian morals" (internal quotation omitted)).

Like *Fulton*, this is therefore a case where the government is burdening an organization's religious exercise "by putting it to the choice of curtailing its mission" or adopting policies and practices inconsistent with its religious beliefs. *See* 141 S.

<u>Ct. at 1875-76</u>.  To the extent the Defendants question the logic or sincerity of the Plaintiffs' asserted burden, this argument is foreclosed by the Supreme Court's observation in *Fulton* that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* at 1876 (quoting *Thomas*, <u>450 U.S. at 714</u>).  Accordingly, against the background of *Fulton*, the Court concludes that the challenged provisions of the MHRA—which would effectively prohibit St. Dominic from enforcing several of its religiously motivated policies—burden the Plaintiffs' religious exercise.[9]

## ii.    General Applicability

As noted above, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, <u>141 S. Ct. at 1877</u>; *see also Tandon v. Newsom*, <u>141 S. Ct. 1294, 1296</u> (2021) (per curiam) (explaining that laws are not generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise" (emphasis in original)).  "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the

---

[9]    The Defendants' final argument that the challenged provisions of the MHRA do not burden the Plaintiffs' religious exercise is that Cheverus, a different Catholic school, has been participating in the tuitioning program and presumably "would not have done so if it meant abandoning its religious identity." *Defs.' Opp'n* at 11.  As the Court explained above, Cheverus is not a Diocesan school but "[a]n inclusive Jesuit Catholic school." *Pls.' Reply* at 1 (quoting *Our Mission*, Cheverus High Sch., www.cheverus.org).  Further, Cheverus' interpretation of the Catholic faith does not control that of the Plaintiffs here. *See Thomas*, <u>450 U.S. at 715-16</u> ("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.  Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith").

asserted government interest that justifies the regulation at issue." *Tandon*, <u>141 S.</u>
<u>Ct. at 1296</u> (per curiam).

Here, the Plaintiffs assert that Chapter 366 is not generally applicable for
two reasons.[10]  First, the Plaintiffs point out that private postsecondary institutions
are not included in the MHRA's definition of "educational institution." *Pls.' Mot.* at
7; *Pls.' Reply* at 5.  Further, the Plaintiffs argue that the inclusion of schools located
outside of Maine in the tuitioning program renders Chapter 366 not generally
applicable.  *Pls.' Mot.* at 7-8; *Pls.' Reply* at 5.  According to the Defendants, the
government interest that justifies applying Chapter 366 to St. Dominic is the
interest in eliminating discrimination, particularly among publicly funded
institutions.  *Defs.' Opp'n* at 21-22.

There is no dispute that Chapter 366 does not apply to private postsecondary
institutions or to schools located outside of Maine.  *See Pls.' Mot.* at 7-8, 12; *Pls.'*
*Reply* at 4-5; *Defs.' Opp'n* at 14 ("Schools outside of Maine are not subject to the
MHRA because Maine has no jurisdiction over them . . . [and] post-secondary
private schools are exempted from the educational provisions of the MHRA").  Both
private postsecondary schools and out-of-state schools are eligible to receive public
funds from Maine.  *See Compl.* ¶ 77 (explaining that Maine operates a program

---

[10]     The Plaintiffs initially made a third argument against general applicability, premised on the
exclusion of private, single-sex schools from the MHRA's definition of "educational institution."
*Compl.* ¶¶ 202-03; *Pls.' Mot.* at 9.  However, on June 15, 2023, the Governor of Maine signed Maine
Public Law 2023, Chapter 188, which eliminated the exemption for single-sex educational
institutions.  *See* P.L. 2023, ch. 188, § 1, 2023 Me. Laws 370.  In their reply, the Plaintiffs
acknowledged the removal of this exclusion, *Pls.' Reply* at 4, and as the Court explained in
*Crosspoint Church*, the enactment of Chapter 188 moots any argument that the MHRA is not
generally applicable because of the exclusion of single-sex schools.  <u>2024 U.S. Dist. LEXIS 32975, at</u>
<u>*43-44</u>.

50

awarding grants that "may be used at any public or private post-secondary institution in Maine, including those that are religious"); *id.* ¶ 75 ("Maine or Maine towns have paid for Maine students to attend private schools in Vermont, New Hampshire, Massachusetts, Connecticut, New York, Pennsylvania, Virginia, Michigan, Colorado, Utah, California, and in Quebec, Canada").

In the Court's view, the combination of these two factors renders Chapter 366 not generally applicable. The Defendants do not claim that there is any mechanism for ensuring that schools not subject to the MHRA conform with the government's interest in eliminating discrimination. It appears that these schools could adopt any of St. Dominic's policies or practices that allegedly violate the MHRA without fear of enforcement actions or risk of losing access to public funds from Maine. In other words, Chapter 366 is "underinclusive," and therefore not generally applicable, because it "fail[s] to prohibit nonreligious conduct that endangers [Maine's] interests in a similar or greater degree than" St. Dominic's conduct. *See Lukumi*, 508 U.S. at 543.

The Defendants respond that Chapter 366 is generally applicable because all private postsecondary institutions and all out-of-state schools, even those that are religious, are exempt from the MHRA's educational discrimination provisions. *Defs.' Opp'n* at 14. This argument misconstrues how the Court is to assess general applicability. For a law to be generally applicable, it must not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. Here, secular out-

of-state schools and secular private postsecondary institutions are allowed to take public funds, including from the tuitioning program, without giving any assurances that they are not engaged in discrimination. The Defendants cannot avoid the conclusion that the laws are not generally applicable by drawing narrower categories, as they appear to have done by emphasizing that all private postsecondary institutions and all out-of-state schools are exempt.[11]

### iii. Neutrality

Although strict scrutiny is triggered by the Court's conclusion that Chapter 366 is not generally applicable, the Court addresses the Plaintiffs' neutrality[12] arguments for the sake of completeness.

---

[11]     The Defendants also contend that *Christian Legal Society Chapter of the University of California, Hastings College of Law v. Martinez*, 561 U.S. 661 (2010), supports their position that the challenged provisions of the MHRA are generally applicable. *See Defs.' Opp'n* at 14-16. While the *Martinez* Court did conclude that the policy at-issue was generally applicable, 561 U.S. at 697 n.27, that case is not factually analogous to this one. There, the challenged policy was applicable to all student organizations. *Id.* at 671-72. Here, by contrast, some educational institutions can take public funds from the state of Maine without subjecting themselves to the challenged provisions of the MHRA.

[12]     The Plaintiffs interchangeably argue that the challenged provisions are both not neutral and target religion. *Compare Pls.' Mot.* at 9-10 ("This religious gerrymander—adopted by government officials who boasted about their success in continuing to exclude Maine's religious schools—renders Maine's law not neutral" (internal quotation omitted)), *with id.* at 8 ("The historical background of Maine's discrimination against religious schools, the sequencing of its move to continue excluding religious schools from its public program by attaching religiously unacceptable conditions on their participation, and contemporaneous statements from Maine officials all demonstrate religious targeting").

Although religious targeting and neutrality are related, they are distinguishable. To prove religious targeting, a plaintiff must show that "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise." *Kennedy*, 142 S. Ct. at 2422 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018)). "[A] law targeting religious beliefs as such is never permissible," *Lukumi*, 508 U.S. at 533, whereas a law that is not neutral because its object is "to infringe upon or restrict practices because of their religious motivation" is sometimes permissible, if it can pass strict scrutiny. *Id.* Because the Court concludes that the challenged educational discrimination provisions of the MHRA are neutral, however, this distinction is immaterial.

The "[g]overnment fails to act neutrally when it proceeds in a manner
intolerant of religious beliefs or restricts practices because of their religious nature."
*Fulton*, 141 S. Ct. at 1877. "If the policy's objective is to impede or constrain
religion, the policy is not neutral." *Swartz v. Sylvester*, 53 F.4th 693, 700 (1st Cir.
2022) (citing *Lukumi*, 508 U.S. at 533). The First Circuit has noted that "the Free
Exercise Clause forbids subtle departures from neutrality and covert suppression of
particular religious beliefs" and "[w]hen assessing neutrality, a court must survey
meticulously the totality of the evidence, both direct and circumstantial. This
includes the series of events leading to the conduct, as well as the historical
background." *Id.* at 701 (internal citations and quotations omitted).

As evidence of Chapter 366's lack of neutrality, the Plaintiffs cite the
"historical background of Maine's discrimination against religious schools, the
sequencing of its move to continue excluding religious schools from its public
program by attaching religiously unacceptable conditions on their participation, and
contemporaneous statements from Maine officials." *Pls.' Mot.* at 8. Specifically, the
Plaintiffs contend that "Maine knew exactly which rules would create the most
significant conflicts for religious schools, because during discovery in *Carson* two
such schools described in detail the religious practices they wished to protect." *Id.*
at 6 (footnote omitted). The Plaintiffs point to statements by the Maine Attorney
General, a tweet by the former speaker of the Maine House of Representatives, an
essay published in the *New York Times*, and the timing of the enactment of Chapter
188 as further evidence that Chapter 366 is not neutral. *Id.* at 8-9.

The Defendants respond that Chapter 366 was "neither designed to impinge on religious practices nor motivated by any animus toward religion." *Defs.' Opp'n* at 13. Instead, the Defendants aver that Chapter 366 "made the educational provisions of the MHRA consistent with those addressing employment and housing." *Id.* In the Defendants' view, because Maine "has a compelling interest in ensuring that public money is not used to fund discrimination . . . it was entirely appropriate for it to ensure that religious schools . . . would comply with the MHRA's educational provisions if they chose to participate in the tuitioning program as a result of new legal precedent." *Id.* The Defendants further dispute the specific pieces of evidence cited by the Plaintiffs. *Id.* at 13-14.

In assessing neutrality, the Court finds it useful to separate 5 M.R.S. § 4602(1) from 5 M.R.S. § 4602(5)(D). With respect to 5 M.R.S. § 4602(1), the MHRA's history provides useful context for the recent amendments to its educational discrimination provisions. When the MHRA was enacted in 1971, it prohibited unlawful discrimination in employment, housing, and public accommodations—but not education. P.L. 1971, ch. 501. The initial version of the MHRA only prohibited discrimination based on race, color, religion, ancestry, national origin, and, with respect to employment only, age. *Id.* When enacted, the MHRA did not prohibit discrimination based on sex, sexual orientation, or gender identity. *Id.*

Later, the Legislature expanded the MHRA to prohibit discrimination in education (initially only prohibiting sex discrimination). P.L. 1987, ch. 578, § 3.

Between 1987 and 1991, the Legislature continued to expand the educational discrimination provisions to prohibit discrimination based on disability, race, and national origin. *See* P.L. 1987, ch. 478; P.L. 1989, ch. 725; P.L. 1991, ch. 100.

Then, in 2005, the Legislature again expanded the MHRA to prohibit discrimination based on sexual orientation in all areas covered by the Act (employment, housing, public accommodations, and education). P.L. 2005, ch. 10 ("An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation"). At that time, the definition of sexual orientation included gender identity. *Id.* ("'Sexual orientation' means a person's actual or perceived heterosexuality, bisexuality, homosexuality or gender identity or expression"). Religious organizations that did not receive public funds were exempted from the provisions on sexual orientation discrimination in employment, housing, and education. *Id.* (prohibiting "[d]iscrimination in employment, housing, public accommodation, credit and educational opportunity on the basis of sexual orientation, except that a religious corporation, association or organization that does not receive public funds is exempt from this provision"). Further, education facilities "owned, controlled or operated by a bona fide religious corporation, association, or society" were fully exempted. *Id.*

In short, the MHRA has prohibited religious discrimination in employment, housing, and public accommodations since 1971. Since 2005, the Act has prohibited sexual orientation and gender identity discrimination in employment, housing, public accommodations, and education but has also generally exempted religious

organizations that do not receive public funds.  From 2005 to 2021, the MHRA's educational discrimination subsection—5 M.R.S. § 4602—exempted religious organizations from the Act's prohibition on discrimination on the basis of sexual orientation, without distinguishing whether they received public funds.

In 2021, the Legislature enacted Chapter 366, "An Act to Improve Consistency within the Maine Human Rights Act."  Among other things, Chapter 366 newly prohibited educational discrimination based on religion and replaced the exemption for sexual orientation discrimination for religiously affiliated educational institutions with a provision stating that nothing in 5 M.R.S. § 4602 "[r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity."  *See* 5 M.R.S. § 4062(5)(C)

As noted above, the Defendants contend that these amendments primarily served to make the MHRA's educational discrimination provisions consistent with the rest of the Act.  *See Defs.' Opp'n* at 5-6.  Based on the record before it, the Court finds this argument persuasive.  Regarding the addition of religion as a protected class, the MHRC submitted testimony to the Legislature stating that the "MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act."  *Defs.' Opp'n*, Attach. 3, *Letter from Me. Hum. Rts. Comm'n, to Hon. Anne Carney et al.* at 5 (May 14, 2021).  According to the MHRC, the MHRA was "amended in a piecemeal fashion," often without any "logical rationale."  *Id.* at 1.

56

Similarly, the record supports the Defendants' explanation that the Maine Legislature fashioned Chapter 366 to keep the MHRA's provisions on educational discrimination in line with its broader scheme for exempting only religious organizations that do not receive public funding from certain antidiscrimination provisions. The tuitioning program's sectarian exclusion prohibited sectarian educational institutions from receiving public funding from 1981 up until its invalidation by *Carson* in 2022. 142 S. Ct. at 1994, 2002. The MHRA has, since 2005, exempted only religious organizations that do not receive public funds from its sexual orientation and gender identity provisions in other areas. *See* P.L. 2005, ch. 10. However, from 2005 until 2022, there would have been no reason to include a distinction based on public funding in the educational discrimination context. Because the sectarian exclusion blocked tuitioning funding for all sectarian educational institutions, distinguishing between those that did and did not receive public funding would have been unnecessary and redundant.

Once the sectarian exclusion was struck down, however, the public funds distinction was no longer mere surplusage. The current exemption, enacted in 2021, makes the educational discrimination provisions consistent with the text and purpose of the Legislature's 2005 Act, which broadly proscribed sexual orientation and gender identity discrimination "in employment, housing, public accommodation, credit and educational opportunity . . . except that a religious corporation, association or organization *that does not receive public funds* is exempt from this provision." P.L. 2005, ch. 10 (emphasis supplied).

Notwithstanding this background, the Plaintiffs submit that "each piece of Maine's new regulatory scheme is intended to prevent religious schools like St. Dominic from participating in Maine's program, and actually does so." *Pls.' Mot.* at 9. The Plaintiffs initially point to testimony from the *Carson* litigation, suggesting that "Maine knew exactly which rules would create the most significant conflicts for religious schools." *Id.* at 6. But there is no evidence that the Legislature was aware of this testimony, let alone considered it in enacting Chapter 366. Similarly, although the Plaintiffs' argument finds some support in Attorney General Frey's immediate negative response to *Carson*, Attorney General Frey was not a member of the Legislature when it enacted Chapter 366, and there is no evidence that he had a hand in proposing the legislation to a legislator.

Turning to then-Speaker Fecteau's statements, the United States Supreme Court has repeatedly cautioned against relying on the statements of one legislator to ascribe motivations to the entire legislative body. *See United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("Inquiries into congressional motives or purposes are a hazardous matter" and courts should not rely on statements made by individual legislators since "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it"); *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) (explaining that the subjective motivation of lawmakers is irrelevant when conducting analysis under the First Amendment and "it is virtually impossible to determine the singular 'motive' of a collective body"). Although the Plaintiffs attempt to buttress then-Speaker Fecteau's statement with

Professor Tang's essay in the *New York Times*, there is no evidence that Professor Tang has been affiliated with the state of Maine at any point or had any inside knowledge about the passage of Chapter 366.

Finally, although the Plaintiffs characterize the timing of the passage of Chapter 188 as a "litigation-driven decision," *Pls.' Mot.* at 12 n.12, which further evidences a lack of neutrality with respect to Chapter 366, *id.* at 10, the Court does not find the timing of one law to be probative of the intention behind a different law passed almost two years earlier. This is especially so here, because the Plaintiffs present no evidence to counteract the Defendants' explanation that the enactment of Chapter 188 served to correct a "mistake" in the statutory scheme. *See Defs.' Opp'n* at 14.

Accordingly, the Court concludes that the Plaintiffs have failed to present sufficient evidence that the addition of religion as a protected class and the limitation of the exemption from the MHRA's sexual orientation and gender identity provisions were passed with an objective to "impede or constrain religion." *See Swartz*, 53 F.4th at 700 (citing *Lukumi*, 508 U.S. at 533). Instead, based the record before it, the Court determines that it is more likely these changes were made to ensure uniformity in a legislative scheme that already prohibited these types of discrimination by organizations receiving public funds in the housing and employment contexts.

The neutrality of 5 M.R.S. § 4602(5)(D), which prohibits educational institutions that allow religious expression from discriminating among religions, is

a closer question. The Defendants do not provide any evidence concerning the background and purpose of this provision. Similarly, the Plaintiffs only discuss 5 M.R.S. § 4602(5)(D) in combination with the other challenged provisions and likewise do not provide any evidence specifically related to it. *See Pls.' Mot.* at 8-10.

Based on the paucity of evidence in the record, the Court cannot conclude that 5 M.R.S. § 4602(5)(D) was enacted "in a manner intolerant of religious beliefs or [to] restrict[] practices because of their religious nature." *See Fulton*, 141 S. Ct. at 1877. On its face, the statute applies not just to religious schools, but to all "educational institution[s]" that "permit[] religious expression." *See* 5 M.R.S. § 4602(5)(D). Furthermore, the inclusion of the provision in a bill titled, "An Act to Improve Consistency in Terminology and within the Maine Human Rights Act," suggests it was intended to remedy religious discrimination, not to "impede or constrain" religion as such. *See Swartz*, 53 F.4th at 700 (citing *Lukumi*, 508 U.S. at 533). The provision could also be interpreted as protecting students' rights to free expression, another non-neutral purpose. *See Crosspoint Church*, 2024 U.S. Dist. LEXIS 32975, at *52 n.7. In light of such countervailing evidence, the Plaintiffs' evidence is not sufficient to support a determination that 5 M.R.S. § 4602(5)(D) is not neutral at this preliminary stage.

The First Circuit has directed that "[w]hen assessing neutrality, a court must survey meticulously the totality of the evidence, both direct and circumstantial." *Swartz*, 53 F.4th at 701 (internal citations and quotations omitted). Nevertheless, even if some members of the Maine Legislature enacted Chapter 366 with the

*Carson* litigation in mind and even if Chapter 366 causes some religious institutions not to apply for tuition funding, this does not prevent the law itself from being neutral. Given the historical and circumstantial backdrop, the Court does not find sufficient evidence to suggest that Chapter 366 "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. The Court concludes that Chapter 366 is neutral.

### iv. Strict Scrutiny

Having concluded that Chapter 366 is not generally applicable, the Court turns to whether it can nevertheless satisfy strict scrutiny. *See Kennedy*, 142 S. Ct. at 2422 ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny"). To satisfy strict scrutiny, the government must show "that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Id.* at 2426. "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881.

The Defendants argue that Chapter 366 satisfies strict scrutiny because Maine has a compelling interest in eliminating discrimination, especially with respect to publicly funded institutions. *Defs.' Opp'n* at 21-22. The Plaintiffs, relying on *Fulton*, respond that the "question is not whether Maine 'has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception' to schools like St. Dominic." *Pls.' Mot.* at 19 (quoting *Fulton*, 141 S. Ct. at 1881).

As a general matter, Maine's asserted interest in eliminating discrimination within publicly funded institutions is compelling.  *See Fulton*, 141 S. Ct. at 1882 ("We do not doubt that this interest is a weighty one, for '[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth'" (alteration in original) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018)). The Supreme Court explained in *Fulton*, however, that in the First Amendment context, a high-level compelling interest does not suffice and "courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'"  *Id.* at 1881 (quoting *Gonzales v. O Centro Espírita Beneficente União de Vegetal*, 546 U.S. 418, 431 (2006)).  In *Fulton*, for example, the Supreme Court held that "the interest of the City in the equal treatment of prospective foster parents and foster children" was not sufficiently compelling because the "creation of a system of exceptions" in the challenged policy "undermines the City's contention that its non-discrimination policies can brook no departures."  *Id.* at 1882.

The Plaintiffs assert that the *Fulton* Court's reasoning applies with equal force here.  *See Pls.' Mot.* at 19 ("Maine does not pursue its 'broadly formulated interest' when it pays grants to private post-secondary schools or pays tuition for out-of-state and out-of-country schools . . ..").  But the facts in *Fulton* differ from the facts of this case.  The contract at issue in *Fulton* explicitly provided for "a system of individual exemptions, made available . . . at the 'sole discretion' of the

Commissioner." 141 S. Ct. at 1878. Here, by contrast, the text of the MHRA does not provide for any exceptions. In the Court's view, Maine has a compelling interest in not creating a system of exemptions, as existed in *Fulton*, that would free in-state schools from complying with state antidiscrimination law.

Therefore, whether considered at face value or according to the rubric set forth in *Fulton*, the Defendants have advanced a compelling interest in enforcing Chapter 366. It is likewise clear that Chapter 366 is narrowly tailored. To this end, 5 M.R.S. § 4602(5)(C) exempts religious organizations that do not receive public funds from the MHRA's ban on sexual orientation and gender identity discrimination in education. Similarly, private schools that do not participate in the tuitioning program are excluded from the MHRA's definition of "educational institution," and therefore exempt from the educational discrimination provisions of the MHRA. *See* 5 M.R.S. § 4553(2-A).

Furthermore, all the challenged provisions are written to prohibit only discriminatory conduct. Under the provisions, "St. Dominic would still be free to conduct morning prayers however it wants, teach from a Catholic perspective, and promote Catholicism to the exclusion of all other religions." *Defs.' Opp'n* at 10. While the Plaintiffs put forth a number of policies and practices that arguably violate the challenged provisions, at this early stage—no state court has interpreted Chapter 366—it is not sufficiently clear the Act would reach any conduct that the state does not consider discriminatory. In the absence of any evidence to the

contrary, the Court concludes that Chapter 366 is narrowly tailored because it is written to encompass discriminatory conduct, and nothing more.

Accordingly, the Court concludes that Chapter 366 survives strict scrutiny. In reaching this result, the Court is mindful of the Supreme Court's admonition that a "law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. However, "rare" does not mean "never." Based on the record before it at this preliminary stage, the Court determines that the weighty interest advanced by the Defendants and the tailoring of Chapter 366 to fit that interest support a determination that Chapter 366 is likely to survive strict scrutiny.[13]

### b.   Compelled Speech

In addition to the Free Exercise Clause, the Plaintiffs attack the constitutionality of Chapter 366 under the Free Speech Clause. Specifically, the Plaintiffs contend that 5 M.R.S. § 4602(5)(D) is unlawful because it "compels speech by religious schools." *Pls.' Mot.* at 13-14.

The First Amendment "protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief."

---

[13]   Having concluded that the challenged educational discrimination provisions survive strict scrutiny, the Court does not reach the Plaintiffs' other constitutional challenges that, if meritorious, would simply trigger the application of strict scrutiny. *See Pls.' Mot.* at 12-13 (infringement of parents' right to direct the religious education of their children); *id.* at 14-15 (infringement of the First Amendment right of expressive association)

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (internal citations and quotations omitted). Therefore, "the government may not compel a person to speak its own preferred messages." *Id.* This is true "whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *Id.*

According to the Plaintiffs, "by forcing [religious schools] to allow speech that they disagree with on their school campuses," 5 M.R.S. § 4602(5)(D) "forces schools to express religious viewpoints with which they do not agree." *Pls.' Mot.* at 13. In other words, the Plaintiffs say that "forcing the Diocesan schools to allow religious expression—including religious expression that is *contrary* to the Catholic faith the school exists to impart—would alter the message the schools seek to convey to their students." *Id.* at 14 (emphasis in original).

The Defendants disagree. In their view, the speech implicated by 5 M.R.S. § 4602(5)(D) is "that of students, not the Plaintiffs." *Defs.' Opp'n* at 17. The Defendants further submit that it "is doubtful that the public would view a student's support of a religion other than Catholicism as representing the Bishop's views." *Id.* (footnote omitted). The Defendants have the better argument.

5 M.R.S. § 4602(5)(D) states that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." The statute does not reach the speech of educational institutions, nor does it compel individual students to "express religious viewpoints with which they

do not agree." *See Pls.' Mot.* at 13. The statute only requires schools to refrain from suppressing any student's religious viewpoint. The Defendants even concede that "St. Dominic would still be free to conduct morning prayers however it wants, teach from a Catholic perspective, and promote Catholicism to the exclusion of all other religions." *Defs.' Opp'n* at 10.

Still, the Plaintiffs protest that merely allowing other religious perspectives "would alter the message [Diocesan] schools seek to convey to their students." The Plaintiffs draw support for this argument from *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). *Hurley* involved a dispute over the refusal by a group of parade organizers to admit a group of "gay, lesbian, and bisexual" individuals, who wished to march in the parade "to express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals," among other things. *Id.* at 561. After classifying parades as "a form of expression," *id.* at 568, the Court held that "[s]ince every participating unit affects the message conveyed by the private organizers," inclusion of the additional group would force the organizers "to alter the expressive content of their parade." *Id.* at 572-73.

The Court is unconvinced that *Hurley* applies with equal force here. In reaching its holding, the *Hurley* Court was careful to focus on the inherent nature of parades. *See id.* at 577 ("[I]n the context of an expressive parade . . the parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole"). However, the potential for attribution recognized by the *Hurley* Court has not carried over

into other contexts. *See, e.g.*, *PruneYard Shopping Ctr. v. Robins*, <u>447 U.S. 74, 85-</u>
<u>87</u> (1980) (rejecting a shopping center's compelled speech claim because the "views
expressed by members of the public in passing out pamphlets or seeking signatures
for a petition [] will not likely be identified with those of the owner," and the owner
"can expressly disavow any connection with the message by simply posting signs in
the area where the speakers or handbillers stand"). Indeed, in a case subsequent to
*Hurley*, the Supreme Court reaffirmed its prior holding that "high school students
can appreciate the difference between speech a school sponsors and speech the
school permits because legally required to do so, pursuant to an equal access policy."
*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, <u>547 U.S. 47, 65</u> (2006).

Accordingly, the Court concludes that *Hurley* does not help the Plaintiffs
because it is unlikely that alternative religious expression, especially "religious
expression that is *contrary* to the Catholic faith," would be attributed to St. Dominic
or the Diocese. *See Pls.' Mot.* at 14 (emphasis in original). Further, to the extent St.
Dominic is concerned about potential misattribution, <u>5 M.R.S. § 4602(5)(D)</u> does not
prohibit the school from disavowing religious expression that is contrary to Catholic
teaching. Because <u>5 M.R.S. § 4602(5)(D)</u> only implicates student expression,
concerns speech that is unlikely to be attributed to St. Dominic, and allows St.
Dominic to disavow speech with which it disagrees, the Plaintiffs are unlikely to
succeed on their compelled speech challenge.

    **c.**    **Excessive Entanglement**

Next, the Plaintiffs argue they are likely to succeed on the merits because Chapter 366 violates the Establishment Clause by "creat[ing] excessive entanglement between the state of Maine and religious schools." *Pls.' Mot.* at 16. According to the Plaintiffs, Chapter 366 gives the MHRC authority to:

> [I]nvestigate and determine questions like where, when, and how often to allow prayer in school; whether a Catholic school must allow Protestant worship; what the school may teach about its own Catholic beliefs and the beliefs of other religions; whether families and students may be asked to support the religious mission of the school; and who is qualified to teach students in a Catholic school about Catholicism.

*Id.* at 15. In addition, the Plaintiffs suggest that Chapter 366 "requires a school to facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object," which conflicts with Catholic doctrine. *Id.* at 16. All told, the Plaintiffs suggest that Chapter 366 gives rise to "an entanglement that inevitably invites Maine officials to condone the actions of religious schools who have beliefs the government agrees with and sanction those who do not." *Id.*

In response, the Defendants contend that the Plaintiffs' argument lacks "any factual or legal support," and "[i]t is difficult to see why the MHRC would ever have to look into such matters to determine whether the MHRA was violated." *Defs.' Opp'n* at 19. The Defendants further submit that "when it comes to litigation, religious organizations do not have some sort of blanket immunity from relevant factual inquires." *Id.*

The Plaintiffs' argument relies upon the Supreme Court's statement in *Carson* that "scrutinizing whether and how a religious school pursues its

educational mission would [] raise serious concerns about state entanglement with religion and denominational favoritism." 142 S. Ct. at 2001; *see also Pls.' Mot.* at 15 (quoting this passage); *Pls.' Reply* at 7 (same). The *Carson* Court made this statement in response to an argument that the sectarian exclusion was permissible for merely "impos[ing] a use-based restriction," not "status-based religious discrimination." *Id.* at 2000 (quoting *Carson v. Makin*, 979 F.3d 21, 35, 37-38 (1st Cir. 2020)). In so doing, the Court highlighted the constitutional infirmities that would accompany a legal paradigm where discrimination based on religious status was forbidden, but discrimination based on the religious use of funding was allowed.

The Court is unconvinced by the Plaintiffs' attempt to transpose this argument to Chapter 366. To start, although the Plaintiffs claim that Chapter 366 gives the MHRC "authority to say how [religious] schools should be run," *Pls.' Mot.* at 15, they provide no evidence in support of this assertion. As far as the Court is aware, Chapter 366 has not yet been enforced, and the Defendants, who play key roles in enforcing the MHRA, have represented that it "is difficult to see why the MHRC would ever have to look into such matters to determine whether the MHRA was violated." *Defs.' Opp'n* at 19. While giving the MHRC "authority to investigate and determine questions like where, when, and how often to allow prayer in school," would undoubtedly raise entanglement concerns, the Court has no reason to conclude that Chapter 366 actually grants such authority.

Further, unlike the distinction in *Carson*—which concerned the state potentially condoning some religious uses and condemning others—Chapter 366

applies to religious and nonreligious schools alike.  *See* 5 M.R.S. § 4553(2-A) (defining "educational institution" to include "any public school or educational program" and "any private school or educational program approved for tuition purposes").  Accordingly, unlike *Carson*, Chapter 366 does not facially contemplate religious entanglement.  Because the Plaintiffs provide no evidence that such entanglement would accompany the enforcement of Chapter 366, the Court concludes there is insufficient evidence that the Plaintiffs are likely to succeed on the merits.[14]

### d.    Unconstitutional Conditions

Finally, the Plaintiffs submit that Chapter 366 is unlawful because it "impose[s] unconstitutional conditions" on schools participating in the tuitioning program.  *Pls.' Mot.* at 18-19; *Pls.' Reply* at 9.  Under the doctrine of unconstitutional conditions, "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'"  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (alteration in original) (quoting *F. for Acad. & Institutional Rts.*, 547 U.S. at 59).  Cases in which unconstitutional conditions have been found "involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus

---

[14]    As noted above, the Plaintiffs also suggest that excessive entanglement would result from St. Dominic being required to "facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object" or "discipline a Catholic teacher for following the teachings of Pope Francis on sex and gender."  *Pls.' Mot.* at 16 (footnotes omitted).  As the Defendants point out, these arguments concern "whether the MHRA burdens Plaintffs' religious practices."  *Defs.' Opp'n* at 19.

effectively prohibiting the recipient from engaging in protected conduct outside the scope of the federally funded program." *Rust v. Sullivan*, <u>500 U.S. 173, 197</u> (1991) (emphasis in original).

Because the Plaintiffs have not shown that Chapter 366 actually restricts their speech or religious exercise, the Court concludes that the doctrine of unconstitutional conditions is inapplicable. The Plaintiffs surmise that Chapter 366 "force[s] religious schools to stop being religious," and they accuse the Defendants of attempting "to control the internal operations of religious schools." *Pls.' Mot.* at 18. But the Court has already rejected the Plaintiffs' sweeping interpretation of Chapter 366's consequences, and in concluding that Chapter 366 is neutral, the Court found that the law was not motivated by a desire to control religious schools. As the Court has determined that the Plaintiffs are unlikely to succeed on their other constitutional challenges, the Court likewise concludes that the Plaintiffs have not carried their burden of showing a likelihood of success on their unconstitutional conditions claim.

### B.   Irreparable Harm

Having concluded that the Plaintiffs are not likely to succeed on the merits, the Court next considers the second prong of the preliminary injunction analysis. Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, <u>397 F.3d 56, 76</u> (1st Cir. 2005). To show irreparable harm, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not

merely that it is a possibility. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").

Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaquería Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 485 (1st Cir. 2009)). Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown," however, "at least some positive showing of irreparable harm must still be made." *Id.* at 43 (internal quotations omitted) (alteration in original); *see also Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief").

In other words, as the First Circuit has recently put it, "[i]f the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). The Court does not doubt that, if the Plaintiffs' constitutional claims were meritorious, they would suffer irreparable injury from their inability to participate in the tuitioning program. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (quoting

*Elrod v. Burns*, <u>427 U.S. 347, 373</u> (1976) (plurality opinion)). The Plaintiffs have not shown a likelihood of success on the merits, however, and the challenged provisions of the MHRA are therefore unlikely to cause them irreparable injury.

### C.  Balance of the Equities and the Public Interest

The Court must also weigh the balance of the hardships on the parties and the public interest. The Court does not discount the Plaintiffs' hardship related to not participating in the tuitioning program for fear of MHRA enforcement, but it also does not find that hardship to outweigh the potential hardship the state would face from being unable to fully enforce its educational antidiscrimination laws. The Plaintiffs may well view the breadth of the state's antidiscrimination laws as the triumph of the tenets of a state secular religion, enacting into law ever expanding categories of protected persons, over their exercise of the principles of ancient religious beliefs protected by the First Amendment. However, as the Court noted in *Crosspoint Church*, the Maine Legislature has the authority to define protected classes under its antidiscrimination laws, and the public also has a strong interest in the state being able to effectively combat discrimination. <u>2024 U.S. Dist. LEXIS 32975, at *59-60</u>. Moreover, the Plaintiffs are free to practice their religion, including the teaching of their religion as they see fit, but cannot require the state to subsidize their religious teachings if they conflict with state antidiscrimination law. Buttressed by the Court's conclusion about the Plaintiffs' likelihood of success on the merits, the balance of these factors favors the Defendants.

### D.    Summary

The Court concludes that the Plaintiffs are not entitled to a preliminary injunction.  However, as the Court observed in *Crosspoint Church*, the Plaintiffs are raising important legal questions.  *Id.*  Some resemble those in *Crosspoint Church*, while others differ.  Both cases implicate the fundamental tension that arises when the Maine Legislature's view of the categories of people meriting protected status conflicts with the sincerely held beliefs of religious communities.  Although the Diocese, St. Dominic, and Mr. and Ms. Radonis seek the protection the Supreme Court's decision in *Carson*, this tension has kept them from realizing the practical benefits of a landmark decision.

In reaching its conclusions, the Court has discussed and decided the difficult constitutional questions presented.  At the same time, the Court recognizes that this case poses novel constitutional issues and, as it did in *Crosspoint Church*, the Court has attempted to frame its opinion as a prelude to a challenge to the Court of Appeals for the First Circuit for a more authoritative ruling.  *See Carson*, 401 F. Supp. 3d at 212 ("It has always been apparent that, whatever my decision, this case is destined to go to the First Circuit on appeal, maybe even to the Supreme Court").

## VI.    CONCLUSION

The Court DENIES the Plaintiffs' Motion for Preliminary Injunction (ECF No. 5).

SO ORDERED.

        /s/ John A. Woodcock, Jr.
        JOHN A. WOODCOCK, JR.
        UNITED STATES DISTRICT JUDGE

Dated this 8th day of August, 2024

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

ST. DOMINIC ACADEMY, a d/b/a of )
the ROMAN CATHOLIC BISHOP OF )
PORTLAND, et al. )
     )
    Plaintiffs, )
     )
    v. )      Civil Action No. 23-cv-00246-JAW
     )
A. PENDER MAKIN, in her personal )
and official capacity as Commissioner of )
the Maine Department of Education, et al., )
     )
    Defendants. )

## DEFENDANTS' MOTION TO DISMISS PERSONAL CAPACITY
## CLAIMS, WITH INCORPORATED MEMORANDUM OF LAW

The central issue in this lawsuit is whether Maine may constitutionally apply its general anti-discrimination law – the Maine Human Rights Act ("MHRA") – to a religious school approved to receive public tuition payments. Seeking declaratory and prospective injunctive relief, plaintiffs sued the Commissioner of the Maine Department of Education ("DOE") and the five Maine Human Rights Commissioners in their official capacities. In that respect, this lawsuit is like many others where challengers of state laws sue government actors in their official capacities for declaratory and injunctive relief. *See Ex parte Young*, 209 U.S. 123 (1908). Plaintiffs go a step further, though, and seek to impose monetary damages on the defendants by suing them in their personal capacities. But plaintiffs do not allege that the defendants personally engaged in any unlawful conduct, and the personal capacity claims border on the frivolous and should be dismissed.

The claims against the DOE Commissioner are premised solely on an argument made by the State, as represented by its Attorney General, in prior litigation in which the DOE

Commissioner was sued in her official capacity. There are no allegations attributing this argument to the Commissioner and, in any event, making a legal argument to a court did not somehow violate the Constitution. The claims against the Maine Human Rights Commissioners are premised on certain actions taken by the Maine Human Rights Commission ("MHRC") as an official body – submitting testimony to a legislative committee, proposing amendments to the MHRA, and issuing guidance on interpreting the MHRA. Plaintiffs do not allege facts regarding any Commissioner's personal involvement in these actions. That aside, offering legislative testimony, proposing statutory amendments, and issuing interpretative guidance no more violate the Constitution than does making an argument in litigation. Plaintiffs thus fail to state a personal capacity claim against any defendant. And even if they were able to state such a claim, defendants would be entitled to qualified immunity because plaintiffs cannot establish that a reasonable state official should have been on notice that any of the alleged conduct was unlawful.

In further support, defendants rely upon the following Memorandum of Law:

## MEMORANDUM OF LAW

### Legal Background

In Maine, a school administrative unit ("SAU") that neither operates a secondary school nor contracts for schooling privileges "shall pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student is accepted." 20-A M.R.S. § 5204(4). By statute, a private school approved for the receipt of public funds for tuition purposes must be "a nonsectarian school." 20-A M.R.S. § 2951(2). Last year, though, the United States Supreme Court held that the nonsectarian requirement violates the First Amendment's Free

2

Exercise Clause. *Carson v. Makin*, 142 S. Ct. 1987, 2002 (2022). Sectarian schools may thus now be approved for the receipt of public funds.

At issue in this lawsuit is the application of the MHRA to sectarian schools participating in the tuition program. The MHRA prohibits discrimination against protected classes in, among other things, education and employment. 5 M.R.S. §§ 4571-4577, 4601-4604. A private school is an "educational institution" (and thus subject to the education discrimination provisions) only if it is approved for tuition purposes. 5 M.R.S. § 4553(2-A). Relevant to this lawsuit are three changes Maine's legislature made to the MHRA's education provisions in 2021 as part of a larger bill amending many parts of the MHRA. Maine Pub. L. 2021, ch. 366. First, the legislature added ancestry, color, and religion to the categories of protected classes. *Id*., § 19 (*codified at* 5 M.R.S. § 4602(1)). Second, the legislature struck a prior provision exempting all religious organizations from the prohibition against sexual orientation discrimination in education and replaced it with a provision stating: "Nothing in this section . . . [r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." *Id*. (*codified at* 5 M.R.S. § 4602(5)(C)). Third, the legislature declared that educational institutions are not required "to participate in or endorse any religious beliefs or practices," but that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." *Id*. (*codified at* 5 M.R.S. § 4602(5)(D)).

The MHRA's employment provisions are also relevant. These provisions prohibit discrimination based on, among other things, race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin, or familial status. 5 M.R.S. § 4572. However, a religious organization is permitted to give preference in

employment to members of its religion and may require that all applicants and employees conform to the organization's religious tenets.  5 M.R.S. § 4573-A(3); *see also* 5 M.R.S. § 4553(4).  Further, religious organizations that do not receive public funds are exempt from the provisions prohibiting employment discrimination on the basis of sexual orientation or gender identity.  5 M.R.S. § 4553(10)(G).

### Plaintiffs' Allegations

The plaintiffs are St. Dominic Academy (a Catholic school), the Roman Catholic Bishop of Portland, and a Catholic family who would like to send their children to St. Dominic (Keith and Valori Radonis and their three children).  Complaint, ¶¶ 4, 14, 17-19.  They allege that the MHRA's education and employment provisions deter St. Dominic from applying to be approved for tuition purposes.  *Id.*, ¶ 124.  They argue that the First Amendment and the Equal Protection Clause preclude Maine from applying these MHRA provisions to St. Dominic even if St. Dominic were approved for tuition purposes.  *Id.*, ¶¶ 169-280.

The plaintiffs name as defendants DOE Commissioner A. Pender Makin and Maine Human Rights Commissioners Jefferson Ashby, Edward Davis, Julie Ann O'Brien, Mark Walker, and Thomas Douglas.  *Id.*, ¶¶ 20-25.  All defendants are sued in both their personal and official capacities.  *Id.*  Plaintiffs assert ten claims, and all are brought pursuant to 42 U.S.C. § 1983.  *Id.*, ¶¶ 169-280.  Nine of the claims are premised on alleged violations of the First Amendment and one is premised on an alleged violation of the Equal Protection Clause.  *Id.*  Plaintiffs seek not only declaratory and injunctive relief, but also monetary damages.  Complaint's Prayer for Relief, ¶¶ g, h.  As discussed below, plaintiffs do not allege that any defendant personally violated the Constitution and the personal capacity claims should thus be dismissed.

## ARGUMENT

### Applicable Legal Standard

In ruling on a motion to dismiss, the Court "accept[s] as true all well-pleaded facts set forth in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011); *see also Román–Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 45 (1st Cir. 2011). Although there need not be "detailed factual allegations," a plaintiff must make "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 & 557 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570); *see also Lister v. Bank of America, N.A.*, 790 F.3d 20, 23-24 (1st Cir. 2015). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### *Plaintiffs Fail to State a Personal Capacity Section 1983 Claim Against Any Defendant.*

Section 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . ." 42 U.S.C. § 1983. It is well established that "vicarious liability is inapplicable to . . . § 1983 suits" and that a plaintiff must thus "plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution." *Iqbal*, <u>556 U.S. at 676</u>; *see also Grajales v. Puerto Rico Ports Authority*, <u>682 F.3d 40, 47</u> (1ˢᵗ Cir. 2012); *Marrero–Rodriquez v. Municipality of San Juan*, <u>677 F.3d 497, 503</u> (1st Cir. 2012). "As a general matter, liability for public officials under section 1983 arises only if 'a plaintiff can establish that his or her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization.'" *Grajales v. Puerto Rico Ports Authority*, <u>682 F.3d 40, 47</u> (1ˢᵗ Cir. 2012) (quoting *Ocasio–Hernández v. Fortuño–Burset*, <u>640 F.3d 1, 16</u> (1st Cir.2011)). Here, plaintiffs do not allege that Commissioner Makin or the Maine Human Rights Commissioners, through their own individual actions, violated the First Amendment or Equal Protection Clause.

<u>Commissioner Makin</u>

The only allegation of misconduct by Commissioner Makin is that in the *Carson* litigation, she "argu[ed] that no school would accept town tuitioning funds because it would mean losing their religious hiring rights." *Id.*, ¶ 10; *see also id.*, ¶ 155. Plaintiffs seem to allege that the Commissioner was wrong about the legal ramifications of a school accepting public funds. It is impossible to see, though, how an incorrect statement of law in an argument to a court could be a violation of the First Amendment or the Equal Protection Clause. Moreover, the statement was not wrong. The State never argued in *Carson* that schools approved for tuition purposes would "lose[] their religious hiring rights." Rather it argued that "the Maine Human Rights Act will prohibit them from considering sexual orientation in their employment

6

decisions." *Carson v. Makin*, 401 F. Supp. 3d 207, 209 (D. Me. 2019). This is undisputedly a correct statement of Maine law. 5 M.R.S. § 4553(10)(G).[1]

In any event, statements in briefs filed in the *Carson* litigation cannot be personally attributed to Commissioner Makin. The Commissioner was sued solely in her official capacity (as was the Attorney General). *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020). Thus, Commissioner Makin did not personally make any statements. Moreover, because the Commissioner was sued only in her official capacity, the Attorney General controlled the litigation pursuant to 5 M.R.S. § 191(3). *See Superintendent of Ins. v. Att'y Gen.*, 558 A.2d 1197, 1200 (Me. 1989). Plaintiffs make no allegations that Commissioner Makin somehow directed or influenced what the Attorney General chose to argue about the interplay between the MHRA and schools choosing to participate in the tuition program. Plaintiffs thus fail to state a personal capacity claim against Commissioner Makin.

<u>Maine Human Rights Commissioners</u>

Similarly, plaintiffs do not allege that any Maine Human Rights Commissioner personally violated the First Amendment or the Equal Protection Clause. Giving the Complaint the broadest and most generous reading, plaintiffs appear to attempt to impose personal liability on the Commissioners for the following:

- In testimony to a legislative committee in April 2021, the Commission "stated its view that, under the [MHRA], religious schools that accept public funds lose their religious hiring rights." Complaint, ¶ 10 (citing https://perma.cc/7B9E-2J2X); *see also id.*, ¶¶ 156, 175, 228.

---

[1] Schools approved for tuition purposes would still be allowed to limit employment to members of their religions and require that all applicants and employees conform to their religious tenets, 5 M.R.S. § 4573-A(2), and despite what plaintiffs suggest, the State never argued otherwise.

- In 2021, it was the Commission that proposed the three changes to the education provisions in the MHRA, as described above. *Id*., ¶¶ 106-109.

- In 2023, the Commission testified in support of a bill repealing a provision exempting single-sex private schools from the definition of "educational institution" and that "on information and belief," the Commission did so "for the purpose of trying to strengthen their arguments" in another lawsuit challenging application of the MHRA to sectarian schools. *Id*., ¶¶ 129-130.

- In 2016, the Commission "interpreted the [MHRA's] gender-identity nondiscrimination provision to require a school to facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object" and to require schools "to use a student's preferred name and pronouns, and if the student so requests, to 'require[]' all employees and 'instruct' other students to do so as well." Complaint, ¶¶ 141-142.

Notably, plaintiffs do not allege facts regarding any specific Commissioner's direct involvement in these actions and instead simply allege that they were conducted by the "Commission." It cannot simply be assumed that each of the five Commissioners is responsible for every action taken by the Commission. Indeed, plaintiffs do not even allege that every Commissioner held that position at the time of the alleged conduct. Without factual allegations regarding each individual Commissioner's personal conduct, plaintiffs fail to state a personal capacity claim.

But even assuming for the sake of argument that each of the Commissioners is personally responsible for each of the Commission actions alleged by plaintiffs, plaintiffs still fail to state a claim because, taking all of the allegations as true, none of the actions constitutes a constitutional

violation. Offering testimony to a legislative committee cannot possibly violate the First Amendment or the Equal Protection Clause, especially when the testimony is accurate. As discussed above, it is a correct statement of Maine law that religious schools approved for tuition purposes cannot discriminate based on sexual orientation when it comes to employment. 5 M.R.S. § 4553(10)(G). And as with their allegations regarding what the State argued in *Carson*, plaintiffs misstate the Commission's testimony. The Commission did not testify that religious schools approved for tuition purposes "lose their religious hiring rights." *See* https://perma.cc/7B9E-2J2X. [2]

Nor is it possible to see how the Commission violated the Constitution by proposing to the legislature that amendments be made to the MHRA's education provisions. Even if these amendments were unconstitutional (and, to be clear, they were not), defendants are aware of no precedent supporting the notion that a person violates the First Amendment or Equal Protection Clause by proposing legislation later determined to be unlawful.

Odder still is plaintiffs' suggestion that the Commissioners are personally liable because the Commission testified in support of a bill repealing a provision exempting single-sex private schools from the definition of "educational institution."[3] Even if it were true, as plaintiffs allege,

---

[2] Plaintiffs attached this document to their Complaint and, in ruling on a motion to dismiss, the court may consider such documents without converting the motion into one for summary judgment. *See, e.g., Freeman v. Town of Hudson*, 714 F.3d 29, 35-36 (1st Cir. 2013); *Stein v. Royal Bank of Canada*, 239 F.3d 389, 392 (1st Cir. 2001).

[3] Until this provision was repealed, the MHRA did not prohibit single-sex schools from discriminating on any basis other than disability. So, for example, such schools were not prohibited from discriminating on the basis of race or national origin. Repealing the provision eliminated this incongruity.

that the Commission did so "for the purpose of trying to strengthen their arguments in *Crosspoint Church*,"[4] that would not be a constitutional violation.

Finally, citing to interpretative guidance issued in 2016, plaintiffs allege that the Commission "interpreted the [MHRA's] gender-identity nondiscrimination provision to require a school to facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object" and to require schools to use a student's preferred name and pronouns, and if the student so requests, to 'require[]' all employees and 'instruct' other students to do so as well." Complaint, ¶¶ 141-142.[5] Once again, it is impossible to see how providing guidance regarding the interpretation of a state law somehow runs afoul of the First Amendment or Equal Protection Clause.

In sum, the plaintiffs do not make a single allegation regarding the specific conduct of any Maine Human Rights Commissioner. And even if conduct by the "Commission" can be attributed to each Commissioner, the conduct did not violate the Constitution. Plaintiffs thus fail to state a personal capacity claim against any Commissioner.

### Even if Plaintiffs Did State a Personal Capacity Claim Against Any Defendant, the Defendant is Entitled to Qualified Immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity

---

[4] This is a reference *to Crosspoint Church v. Makin*, No. 1:23-cv-00146 (D. Me. Apr. 27, 2023), which involves a similar challenge to the application of the MHRA to a religious school.
[5] "Facilitating" a change in gender identify apparently refers to the schools permitting students to dress consistently with their gender identify and using pronouns consistent with their gender identity. https://perma.cc/D5Z3-PMP8.

10

protects 'all but the plainly incompetent or those who knowingly violate the law.'" *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Officials are entitled to qualified immunity unless (1) 'the facts that a plaintiff has alleged or shown make out a violation of a constitutional right' and (2) 'the right at issue was 'clearly established' at the time of [their] alleged misconduct.'" *Walden v. City of Providence*, 596 F.3d 38, 52 (1st Cir. 2010) (quoting *Pearson*, 555 U.S. at 231). "[I]t is not mandatory that courts follow the two-step analysis sequentially." *Maldonado v. Fontanes,* 568 F.3d 263, 269-70 (1st Cir. 2009). The second step has two aspects. "One aspect . . . focuses on the clarity of the law at the time of the alleged civil rights violation" such that "to overcome qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Maldonado,* 568 F.3d at 269 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.* Considering the contours of the right at issue and the particular facts of the case, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id.*

"Qualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Castagna v. Jean*, 955 F.3d 211, 213 (1st Cir. 2020) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Thus, claims of qualified immunity ought to be resolved at the earliest practicable time." *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017). When a defendant asserts qualified immunity, "[t]he plaintiff bears the burden of demonstrating that the law was clearly

established at the time of the alleged violation, and it is a heavy burden indeed." *Mitchell v. Miller*, <u>790 F.3d 73, 77</u> (1st Cir. 2015). "[In] order to show that the law was clearly established, a plaintiff has the burden to identify controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal in the particular circumstances that he or she faced." *Penate v. Sullivan*, <u>73 F.4th 10, 18</u> (1st Cir. 2023) (cleaned up).

As is discussed above, plaintiffs have not alleged a constitutional violation. Quite simply, making arguments to a court, testifying before a legislative committee, proposing changes to the law, and offering interpretative guidance do not violate the First Amendment or the Equal Protection Clause. So plaintiffs fail to overcome qualified immunity at the first step. But even if the court were to address the second step, plaintiffs fail there too. Plaintiffs cannot point to any relevant caselaw that could have put the defendants on notice that their alleged conduct was unlawful. Defendants are entitled to qualified immunity with respect to the personal capacity claims asserted against them.

## <u>Conclusion</u>

For the reasons set forth above, defendants respectfully request that plaintiffs' claims against them in their personal capacities be dismissed.

Dated: August 11, 2023
      Augusta, Maine

Respectfully submitted,
AARON M. FREY
Attorney General

s/ Christopher C. Taub_____
Christopher C. Taub
Chief Deputy Attorney General
Sarah A. Forster
Assistant Attorney General
Office of the Attorney General
State House Station 6
Augusta, ME 04333
Telephone: (207) 626-8800
Email: christopher.c.taub@maine.gov
      sarah.forster@maine.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 11th day of August, 2023, I electronically filed the above document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record. To my knowledge, there are no non-registered parties or attorneys participating in this case.

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel. (207) 626-8800
Fax (207) 287-3145
Christopher.C.Taub@maine.gov