No. 24-1739

# In the United States Court of Appeals for the First Circuit

St. Dominic Academy, d/b/a Roman Catholic Bishop of Portland,
a corporation sole; Roman Catholic Bishop of Portland; Keith Radonis,
on their own behalf and as next friend of children K.Q.R., L.R.R.,
and L.T.R.; Valori Radonis, on their own behalf and as next friend of
children K.Q.R., L.R.R., and L.T.R.,

*Plaintiffs-Appellants,*

v.

A Pender Makin, in their personal capacity and official capacity as the
Commissioner of the Maine Department of Education; Jefferson Ashby,
in their personal capacity and official capacity as the Commissioner of the
Maine Human Rights Commission; Edward David, in their personal capacity
and official capacity as the Commissioner of the Maine Human Rights
Commission; Julie Ann O'Brien, in their personal capacity and official
capacity as the Commissioner of the Maine Human Rights Commission;
Mark Walker, in their personal capacity and official capacity as the
Commissioner of the Maine Human Rights Commission; Thomas L. Douglas,
in their personal capacity and official capacity as the Commissioner of
the Maine Human Rights Commission,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Maine
Hon. John A. Woodcock
(2:23-cv-00246-JAW)

## APPELLANTS' OPENING BRIEF

James B. Haddow
Petruccelli, Martin &
  Haddow LLP
Two Monument Square
  Suite 900
Portland, ME 04112
(207) 775-2360

Adèle Auxier Keim
  *Counsel of Record*
Mark L. Rienzi
Benjamin A. Fleshman
Michael J. O'Brien
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*akeim@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

**DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, St. Dominic Academy, a d/b/a of the Roman Catholic Bishop of Portland, and the Roman Catholic Bishop of Portland, a corporation sole, state that they do not have a parent corporation and do not issue any stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................... i

TABLE OF AUTHORITIES .................................................................. iv

REASON WHY ORAL ARGUMENT SHOULD BE HEARD .................. 1

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 4

ISSUES PRESENTED ........................................................................... 4

STATEMENT OF THE CASE ............................................................... 5

    A. Maine's Tuitioning Program ..................................................... 5

    B. Maine Loses *Carson* .................................................................. 6

    C. Maine's Response to *Carson* ..................................................... 7

    D. The Harm to St. Dominic and Parents ..................................... 12

    E. The Proceedings Below .............................................................. 15

SUMMARY OF THE ARGUMENT ....................................................... 17

STANDARD OF REVIEW .................................................................... 19

ARGUMENT ......................................................................................... 20

I. Appellants are likely to succeed on their Free
   Exercise claims. ............................................................................ 20

    A. The MHRA violates *Carson*. ...................................................... 20

    B. The MHRA is not neutral. ......................................................... 22

    C. The MHRA is not generally applicable. ................................... 26

    D. The MHRA does not pass strict scrutiny. ................................ 29

1. Maine's interest is not compelling.............................................30

2. Excluding St. Dominic is not the least restrictive way of advancing Maine's interests.........................33

E. The MHRA infringes on the Radonises' parental rights.................................................................................36

II. Appellants are also likely to succeed on their Free Speech claims.......................................................................37

A. The MHRA violates the Free Speech Clause right of expressive association. ..............................................37

B. Maine's religious expression rule compels speech by religious schools..........................................................40

III. The educational discrimination section violates St. Dominic's church autonomy rights by inviting excessive entanglement in internal religious affairs.......................47

IV. The hiring discrimination section violates St. Dominic's rights under the ministerial exception and church autonomy doctrines. ...........................................50

V. Maine's rules impose unconstitutional conditions on the program. ...................................................................53

VI. The remaining injunction factors favor Appellants..........................55

CONCLUSION ...........................................................................57

CERTIFICATE OF COMPLIANCE........................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ................................................................ *passim*

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) .............................................. 53, 54, 55

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens ex rel. Mergens,*
    496 U.S. 226 (1990) ....................................................... 45

*Billard v. Charlotte Catholic High Sch.,*
    101 F.4th 316 (4th Cir. 2024) ...................................... 52

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984) .................................................. 19-20

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ....................................................... 32

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ........................................ 31, 37, 39, 46

*Brox v. Hole,*
    83 F.4th 87 (1st Cir. 2023) ...................................... 27, 29

*Bryce v. Episcopal Church,*
    289 F.3d 648 (10th Cir. 2002) .................................... 51

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ....................................................... 34

*Capitol Square Rev. & Advisory Bd. v. Pinette,*
    515 U.S. 753 (1995) ....................................................... 42

*Carson v. Makin,*
    401 F.Supp.3d 207 (D. Me. 2019) .............................. 52

*Carson v. Makin,*
979 F.3d 21 (1st Cir. 2020) ..................................... 24, 52, 55

*Carson v. Makin,*
596 U.S. 767 (2022) ............................................... *passim*

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................... *passim*

*Circle Sch. v. Pappert,*
381 F.3d 172 (3d Cir. 2004) ............................................ 38

*Corp. of Presiding Bishop v. Amos,*
483 U.S. 327 (1987) ............................................... 30, 31

*Corp. Techs., Inc. v. Harnett,*
731 F.3d 6 (1st Cir. 2013) ............................................ 19

*Cuffley v. Mickes,*
208 F.3d 702 (8th Cir. 2000) ............................................ 55

*Democratic Party of U.S. v. Wisconsin ex rel. Follette,*
450 U.S. 107 (1981) ............................................... 46

*Does 1-6 v. Mills,*
16 F.4th 20 (1st Cir. 2021) ............................................ 20

*Dowd v. Soc'y of St. Columbans,*
861 F.2d 761 (1st Cir. 1988) ............................................ 48

*El Dia, Inc. v. Rossello,*
165 F.3d 106 (1st Cir. 1999) ............................................ 53

*Employment Division v. Smith,*
494 U.S. 872 (1990) ............................................... 20

*Espinoza v. Mont. Dep't of Revenue,*
591 U.S. 464 (2020) ............................................... 18, 32, 33

*Fellowship of Christian Athletes v. District of Columbia,*
No. 24-cv-1332, 2024 WL 3400104 (D.D.C. July 11, 2024) ............... 30

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) ............................................ 30, 31, 34, 38

*Fitzgerald v. Roncalli High Sch., Inc.*,
  73 F.4th 529 (7th Cir. 2023) ............................................................ 51

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ............................................................... *passim*

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ...................................................................... 34

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
  565 U.S. 171 (2012) ............................................................. 38, 51, 52

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
  515 U.S. 557 (1995) ............................................................... *passim*

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
  344 U.S. 94 (1952) ........................................................................ 47

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ........................................................... 25, 29, 33

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) .......................................................... 56

*Lowe v. Mills*,
  68 F.4th 706 (1st Cir. 2023) .................................................. 26, 33-34

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
  584 U.S. 617 (2018) ................................................................. 22, 25

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) .......................................................... 25

*Moody v. NetChoice, LLC*,
  144 S.Ct. 2383 (2024) ..................................................... 43-44, 45, 47

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................... 56

*NLRB v. Catholic Bishop*,
  440 U.S. 490 (1979) ........................................................... 50

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ........................................................... 32

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ..................................................... 47, 49

*PruneYard Shopping Ctr. v. Robins*,
  447 U.S. 74 (1980) ............................................................. 44

*Puffer's Hardware, Inc. v. Donovan*,
  742 F.2d 12 (1st Cir. 1984) ............................................... 57

*Rideout v. Gardner*,
  838 F.3d 65 (1st Cir. 2016) ............................................... 34

*Ridley v. Mass. Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004) ............................................... 42

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ........................................................... 37

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ............................................................. 55

*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006) ............................................................. 44

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*,
  426 U.S. 696 (1976) ........................................................... 48

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022) ........................................................... 40

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
  699 F.3d 1 (1st Cir. 2012) ....................................... 19, 55-56

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ............................................................ 30

*Swartz v. Sylvester*,
  53 F.4th 693 (1st Cir. 2022) ........................................... 22

*Tandon v. Newsom*,
  593 U.S. 61 (2021) ..................................................... *passim*

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ........................................................... 6

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ......................................................... 33

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ................................................... 36, 37

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ................................................... 45-46

*Yeshiva Univ. v. YU Pride All.*,
  143 S.Ct. 1 (2022) ..................................................... 38-39

*Youth 71Five Ministries v. Williams*,
  No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ............... 31

*Zelman v. Simmons-Harris*,
  536 U.S. 639 (2002) ........................................................... 6

**Statutes**

20 U.S.C. § 1681 ............................................................... 35

28 U.S.C. § 1292 ................................................................. 4

28 U.S.C. § 1331 ................................................................. 4

42 U.S.C. § 2000e-1 ............................................................ 35

5 M.R.S. § 4553 ....................................................... *passim*

5 M.R.S. § 4566 ............................................................... 14, 47, 50

5 M.R.S. § 4572 ..................................................................... 50

5 M.R.S. § 4573-A ............................................................ 10, 50

5 M.R.S. § 4602 ............................................................... *passim*

5 M.R.S. § 4612 ..................................................................... 14

5 M.R.S. § 4613 ..................................................................... 14

5 M.R.S. § 4621 ..................................................................... 14

20-A M.R.S. § 2901 ............................................................. 5, 12

20-A M.R.S. § 2902 ................................................................. 5

20-A M.R.S. § 2951 ......................................................... 5, 12, 14

20-A M.R.S. § 3252 ............................................................... 14

20-A M.R.S. § 3253-A ........................................................... 14

20-A M.R.S. § 4706 ................................................................. 5

20-A M.R.S. § 5203 ............................................................. 5, 14

20-A M.R.S. § 5204 ............................................................. 5, 14

2005 Me. Laws ....................................................................... 9

## Other Authorities

*Afford*, St. Dominic Academy ................................................. 12

*St. Dominic Academy – Auburn Campus*, New England
  Association of Schools and Colleges ................................... 12

*Diversity, Equity, Inclusion, and Belonging (DEIB)*, Gould
  Academy ............................................................................ 23

*Equity and Inclusion*, Phillips Exeter Academy ...................... 23

*List of Schools Approved for Tuition Purposes, 2023-24*, Maine Department of Education (Feb. 8, 2024)..................................28

*List of Schools Approved for Tuition Purposes, 2024-25*, Maine Department of Education (Sept. 23, 2024)............................28

Me. Const. ..........................................................................................5

**REASON WHY ORAL ARGUMENT SHOULD BE HEARD**

This is a constitutional challenge to Maine's policy of excluding schools from its town tuitioning program because of the schools' religious exercise. As the district court found, this case presents "constitutional issues" that should be considered by this Court for an "authoritative ruling." ADD75. Oral argument is appropriate to address the important rights at issue in this case.

**INTRODUCTION**

This case concerns Maine's transparent and failed attempt to circumvent *Carson v. Makin*. In 2022, the Supreme Court instructed Maine that excluding religious schools from its town tuition program because of the schools' religious practices violated the Free Exercise Clause. *Carson*'s rule is binding, whether Maine's exclusion is accomplished through Maine's education law (as in *Carson*) or its Human Rights Act (as here). Yet two years after *Carson*, Appellants Keith and Valori Radonis and their daughter are still out in the cold. They seek an injunction so that they can use their town tuitioning funds at St. Dominic Academy without facing exclusion because of their religious exercise.

For many years, Maine allowed parents to use town tuitioning funds at Appellant St. Dominic Academy, a Catholic high school in Auburn, Maine. In 1981 however, Maine excluded St. Dominic Academy and other religious schools by arguing that the Establishment Clause required exclusion of "sectarian" religious schools from its program. When

the Supreme Court made it clear in *Zelman v. Simmons-Harris* in 2002 that the Establishment Clause required no such thing, Maine pivoted.

For the next twenty years, Maine sought to justify its exclusion because of the religious "use" to which "sectarian" religious schools like St. Dominic might put tuition funds. The Supreme Court squarely and finally rejected Maine's use-based exclusion in *Carson v. Makin*, saying that "the prohibition on status-based discrimination under the Free Exercise Clause is not a permission to engage in use-based discrimination."

Anticipating its loss in *Carson*, but still wanting to exclude "sectarian" schools, Maine enacted a poison pill to keep excluding such schools even if it lost in the Supreme Court. Specifically, in *Carson*, Maine identified "sectarian" schools as those that incorporated religious perspectives in class, asked families to support their religious mission, and held traditional beliefs about sex, gender, and marriage. So while *Carson* was pending, Maine amended its Human Rights Act to forbid schools from participating in the program if they have these acknowledged attributes of a "sectarian" school. That is, Maine now excludes schools from the program if they engage in so-called "religious discrimination," if they refuse to allow student religious expression that contradicts the mission and message of the school, or if they refuse to toe the Human Rights Commission's line on matters of sexual orientation, gender identity, and marriage. Any school that has these attributes and nevertheless joins the program faces up to $100,000 in penalties.

Maine's newly-minted rules violate the Constitution in multiple ways. First, they violate *Carson* itself by simply re-enacting the same exclusionary practices in a different code section. Second, the new rules independently violate the Free Exercise Clause because they are neither neutral nor generally applicable—lacking neutrality because they facially regulate "religious" expression and so-called "religious" discrimination, and lacking general applicability because Maine currently funds many schools that aren't subject to its new rules at all. Third, they violate the Free Speech Clause because they compel religious schools to speak in ways that are contrary to their beliefs, and force them to include speakers who reject the schools' core commitments. Fourth, they violate the Establishment Clause, because they entangle Maine officials in judging the internal religious practices of religious schools and constrain religious schools' hiring rights in ways the Constitution forbids. Fifth, they impose unconstitutional conditions on St. Dominic's participation in the program. Because of all this, the rules must pass strict scrutiny, which they cannot even come close to doing. The Supreme Court has repeatedly rejected the same broadly-formulated interests Maine asserts here, and Maine itself doesn't treat those interests as compelling when it continues to exempt other schools.

*Carson* was clear: once Maine creates a program that allows parents to use town tuitioning funds at private schools, it cannot "exclude otherwise eligible schools on the basis of their religious exercise." But that is

precisely what Maine has done—to the continued detriment of faithful Maine families like Keith, Valori, and their daughter. Maine's ongoing efforts to evade *Carson* violate the Constitution and should be enjoined.

## JURISDICTIONAL STATEMENT

On August 8, 2024, the district court denied St. Dominic's motion for a preliminary injunction. ADD2. On August 9, 2024, St. Dominic timely appealed. JA10 The district court had jurisdiction because Appellants allege violations of the First Amendment of the United States Constitution. 28 U.S.C. § 1331. This Court has jurisdiction because Appellants appeal from the denial of their motion for a preliminary injunction. *Id.* § 1292(a)(1).

## ISSUES PRESENTED

I.   Does Maine's newest effort to exclude religious schools from the town tuitioning program violate the First Amendment's Religion Clauses?

II.  Does Maine's newest effort to exclude religious schools from the town tuitioning program violate the First Amendment's Free Speech Clause?

III. Does Maine's newest effort to exclude religious schools from the town tuitioning program violate the unconstitutional conditions doctrine?

IV.  Does § 4572 of the Maine Human Rights Act violate the First
     Amendment's Religion Clauses as applied to a private religious
     school that is approved to receive parent-directed tuition funds?

## STATEMENT OF THE CASE

### A. Maine's Tuitioning Program

Maine's Constitution guarantees each child a publicly-funded educa-
tion. *See* Me. Const. art. VIII. To fulfill this guarantee in rural areas with-
out public schools, Maine authorizes local school districts to pay tuition
for children to attend the public or private school of their parents' choice,
as long as the school is "approved" by the Department of Education. 20-
A M.R.S. §§ 5203, 5204, 2951.

To be "approved," private schools must meet basic requirements under
Maine's compulsory education law—such as being accredited, meeting
various curricular requirements, and maintaining a student-teacher ra-
tio of 30 to 1 or less. *Id.* §§ 2951(1), 2901(2), 2902, 2902(2), 2902(3),
4706(2), 2902(6)(C).

Maine's town tuitioning program ("the program") has no geographic
limitation; thus, Maine has paid tuition to schools as far away as Utah,
California, and Canada. ADD8. And in addition to paying tuition at ele-
mentary and secondary schools, Maine operates grant programs for stu-
dents attending any public or private college or university in Maine. *Id.*

**B. Maine Loses *Carson***

When first enacted, the program had no restrictions based on religion. Thus, many religious schools participated. JA14; JA24.

In 1981, citing Establishment Clause concerns, Maine imposed a new restriction that participating schools must be "nonsectarian." *Carson v. Makin*, 596 U.S. 767, 774 (2022) (quoting 20-A M.R.S. § 2951(2)). Although Supreme Court precedent later clarified that the Establishment Clause requires no such thing, *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002), and that restrictions based on "religious status" in fact violate the Free Exercise Clause, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 461 (2017), Maine's legislature nevertheless kept the "nonsectarian" restriction in place. *Carson*, 596 U.S. at 774-75.

Accordingly, in 2018, two families challenged Maine's "nonsectarian" restriction as unconstitutional. Unable to justify its "nonsectarian" restriction under the Establishment Clause, and needing to distinguish its restriction from one based on "religious status," Maine argued that its restriction was instead based on the "religious use" a school would make of the funds—namely, that "they will use state funds to promote religious views." *Id.* at 786-87; *id.* at 797 (Breyer, J., dissenting). Maine's goal, it said, was to ensure the education it funded was "religiously neutral," "not discriminatory." *See, e.g.* Transcript of Oral Argument at 48, 52, 54, 55, 69, 75, 82, 87, *Carson*, 596 U.S. 767 (No. 20-1088), https://perma.cc/Y2AF-

3C8K. Thus, Maine said it was restricting funds based on "religious activity." *Carson*, 596 U.S. at 787.

The Supreme Court rejected this distinction, explaining that denying funds based on religious "activity" or "use" is just as "offensive to the Free Exercise Clause" as denying funds based on religious "status." *Id.* "Any attempt to give effect to such a distinction," the Court said, would "raise serious concerns about state entanglement" and "denominational favoritism," because it would require "scrutinizing whether and how a religious school pursues its educational mission." *Id.* Thus, "[r]egardless of how the benefit and restriction are described," the government cannot "exclude otherwise eligible schools on the basis of their religious exercise." *Id.* at 789.

### C. Maine's Response to *Carson*

Maine anticipated its loss in *Carson*. But it still wanted to be able to exclude certain religious schools from the program. Thus, in June 2021, while *Carson* was pending, Maine changed the tuitioning conditions by enacting L.D. 1688, which amended existing law in ways specifically intended to exclude religious schools. JA29; *see also* Mot. for Prelim. Inj. at 6-7, ECF 5 ("Mot."); 5 M.R.S. § 4553(2-A).

L.D. 1688 makes several changes to the Maine Human Rights Act (MHRA). These changes implicate the town-tuitioning conditions because every private school that is "approved" for tuition purposes is sub-

ject to the MHRA. *See* 5 M.R.S. § 4553(2-A) (defining covered "Educational institution" under the MHRA to include "any private school … approved for tuition purposes"). L.D. 1688 made three changes to the MHRA, all in the section on "educational discrimination," *Id.* § 4602:

*First*, L.D. 1688 broadened the ban on "educational discrimination" to include the category of "religion," which had never been included before. *Id.* § 4602(1). Thus, religious schools can no longer limit "admission" or "financial assistance" based on "religion." *Id.* § 4602(1)(A), (D), (E). This makes it unlawful, for example, for a Catholic school to prefer Catholic students in admissions or financial aid—as St. Dominic and many other Catholic schools do. JA19; JA35; Appellant's Br. at ADD30, *Crosspoint Church v. Makin*, No. 24-1450 (1st Cir.) ("Crosspoint Br."). It also makes it unlawful for St. Dominic to require its admitted students to agree to support the school's Catholic mission. ADD34 ("[T]he Defendants do not contest that these policies and practices may violate the MHRA." (citing Opp'n to Prelim. Inj. at 8-9, ECF 25 ("Opp."))); *see also* Crosspoint Br. at ADD30.

*Second*, L.D. 1688 added a new "religious expression" rule. 5 M.R.S. § 4602(5)(D). It provides that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." *Id.* As Maine acknowledges, this means that religious schools must allow students to express "dissenting religious views," even when doing so is contrary to the school's religious mission. ADD46-47

(citing Opp. at 10). Thus, for example, a Catholic school that allows students to form a Catholic pro-life club or engage in eucharistic adoration must also let students form a pro-abortion "Catholics for Choice" club or a "Satanic Temple Club" to mock and denigrate Catholic religious practices. JA35.

*Third*, L.D. 1688 repealed a longstanding religious exemption that protected religious schools on matters of sexual orientation and gender identity. That exemption had provided: "The provisions in this subsection relating to sexual orientation do not apply to any education facility owned, controlled or operated by a bona fide religious corporation, association or society." 2005 Me. Laws 12-13, https://perma.cc/FX4T-64N8 (ch. 10, sec. 21, § 4602(4)) (repealed). But L.D. 1688 "struck" this exemption and added a new prohibition on "gender identity" discrimination for "religious" schools that "receive public funding." Opp. at 6; 5 M.R.S. § 4602(1), 5(C). Thus, if they want to be included in the program, religious schools must forgo helping students address sensitive issues relating to sexual orientation and gender identity in a way that reflects their faith commitments. JA36-37.

Concretely, this means that a Catholic school may no longer ask students and staff to live out Catholic moral teachings in their personal lives. *See* Crosspoint Br. at ADD32-33. Instead, as the Commission has explained, religious schools must now (1) facilitate a student's gender

transition over the objection of their parents and (2) discipline other students and staff who object to using a student's preferred pronouns—even if this contradicts the school's religious mission. JA72; *See also* Opp. at 10-11 (acknowledging the MHRA requires subject schools to "allow[] students to wear the clothes of their gender identity," "address[] them by their preferred names and pronouns," and "abide by the wishes of the student" over the parents).

In addition to these mid-*Carson* legislative changes, Commissioner Makin and the Human Rights Commission also changed their position on religious hiring. Prior to *Carson*, it was widely understood that Maine's employment laws allowed religious schools to require "all applicants and employees" to "conform to" the school's "religious tenets." 5 M.R.S. § 4573-A(2); *see also id*. § 4553(10)(G). But during *Carson*, Maine took the position that these protections apply "only to religious organizations 'that do[] not receive public funds.'" Br. of Resp't at 54, *Carson*, 596 U.S. 767, 2021 WL 4993533. Thus, according to Maine, "[a]ccepting public [tuition] funds would result in a significant change in how [religious schools] operate," as they "would no longer be free" to hire based on their religious tenets, including on matters of "sexual orientation." *Id*. at 53-54.

Maine officials were open about the reason for these mid-*Carson* changes. Maine's Speaker of the House boasted that Maine had "changed

the guidelines" for tuitioning because it "[a]nticipated the ludicrous [*Carson*] decision from the far-right SCOTUS." JA32; JA68. The Attorney General's merits brief on behalf of the Commissioner of Education in *Carson* closed by highlighting that L.D. 1688's changes had become effective just days prior and would deter religious schools from applying to the program even "if" the petitioners were to "prevail." Br. of Resp't at 54, *Carson*, 596 U.S. 767, 2021 WL 4993533. Then, after oral argument in *Carson*, the Attorney General issued a press statement explicitly connecting the purposes of the sectarian exclusion with L.D. 1688's amendments to the MHRA. The Attorney General explained that religious schools were "excluded [from the program] because the education they provide is not equivalent to a public education," and suggested that such schools would remain excluded because, even without the sectarian bar, religious schools would be "subject to the [MHRA]," which would keep them out because they "want to … discriminate." JA67. When *Carson* was decided, the Attorney General was even more pointed, criticizing "the schools at issue" in *Carson* as "inimical" to Maine's "values" because they "promote a single religion," "refuse to admit gay and transgender children," and "discriminate in hiring teachers and staff." JA30-31; JA63. He vowed to use "statutory amendments" to prevent such schools from receiving "public money," and again warned that any school seeking tuition funds must now "comply with anti-discrimination provisions of the

[MHRA], and this would require some religious schools to eliminate their current [religiously motivated] practices." JA30-31; JA63.

Maine's strategy was not lost on the public; two days later, the New York Times published a law professor's essay entitled, "There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It." JA31; JA64.

### D. The Harm to St. Dominic and Parents

Maine's changes to the program—(1) the ban on "religious" discrimination, (2) the religious expression rule, (3) the repeal of the religious exemption, and (4) the ban on religiously motivated hiring—have barred religious schools like St. Dominic from participating in the program, even though they are otherwise qualified. JA17; JA20.

St. Dominic is a pre-K through 12 school with campuses in Lewiston and Auburn. JA20. Before the 1981 sectarian exclusion, St. Dominic participated in Maine's program—and for decades, Maine parents have asked courts to let St. Dominic back in. JA24; JA27. St. Dominic meets Maine's academic requirements because it is accredited by the New England Association of Schools and Colleges.[1] And it is the most affordable private day school in the state.[2]

---

[1]  20-A M.R.S. §§ 2901, 2951; *see St. Dominic Academy – Auburn Campus*, New England Association of Schools and Colleges, https://perma.cc/C834-6CZX.

[2]  *Afford*, St. Dominic Academy, https://perma.cc/E8MB-QAZZ.

Because the school's purpose is to help students "become faith-filled Christians," the Catholic faith permeates every aspect of the school. JA19; JA35; JA37-38; JA49. All students attend Catholic religion classes and Mass. JA19. Each student must "understand, accept, and [be] willing to support the mission and goals of the school" and agree to uphold "Catholic Christian morals." JA19. Each employee must agree to "[l]ive personal lives in such a way that fundamental teachings of the Catholic Church are upheld." JA20. And although the school admits non-Catholics, the school gives preference to Catholics in admissions and financial aid. JA19.

These and other practices place St. Dominic in direct conflict with the mid-*Carson* changes to the program. St. Dominic prefers Catholics in admissions and financial aid in conflict with the "religious discrimination" ban. It prefers Catholic religious expression over other forms of religious expression in conflict with the religious expression rule. JA19; JA35. St. Dominic cannot in good conscience facilitate a student's gender transition, which, due to the repeal of the religious exemption, the Commission now says is required. JA69; JA36-37. And St. Dominic continues to require employees to uphold core Catholic teachings in conflict with the religious hiring ban. JA37-38; JA39. St. Dominic is thus excluded from the program—as Maine intended. JA14; JA16; JA35-37; JA39. Even if St. Dominic attempted to apply and was approved, it would immediately be subject to liability under the MHRA—including penalties up to $100,000

and enforcement by both the Maine Human Rights Commission and private citizens. 5 M.R.S. § 4613 (monetary penalties); *id*. § 4566 (Commission investigations); *id*. § 4612 (private party complaints with the Commission); *id*. § 4621 (private party lawsuits in the Superior Court).

Maine's rules also harm Catholic parents like Plaintiffs Keith and Valori Radonis, who rely on Catholic schools to help them fulfill their religious duty to educate their children in the faith. JA21; JA22. The Radonises' children, K.Q.R. and L.R.R., attend Diocesan schools St. Michael and St. Dominic. JA22. Because their town has no high school, it pays tuition for resident students attending elsewhere. JA21. Thus, were it not for Maine's exclusion of religious schools, St. Dominic would be "approved for tuition purposes," and the Radonises' town would have paid L.R.R.'s tuition at St. Dominic for 2023-24 and 2024-25. JA14; JA16; JA17; JA22; JA32; JA41. But because of Maine's rules, the Radonises remain barred from using their tuition dollars to provide their children with an education that is consistent with their religious beliefs. JA41; JA46.

Meanwhile, Maine continues to fund many private schools that are not subject to its new rules. None of the provisions of the MHRA apply against any private schools outside of Maine, even though Maine funds those schools under the same law. JA15; JA23-24; JA33; 20-A M.R.S. §§ 2951, 3252(1)-(7), 3253-A(1), 5203, 5204 (state tuition programs for K-

12 students). And within Maine, private post-secondary schools are eligible to receive student-directed state funding but are not covered by the educational discrimination provisions of the amended MHRA. JA15; JA24; JA33; 5 M.R.S. § 4553(2-A) (private postsecondary schools not covered).

### E. The Proceedings Below

On June 13, 2023, St. Dominic, the Bishop of the Diocese of Portland, and the Radonises filed this lawsuit alleging that Maine's continued exclusion of religious schools violates the Free Exercise and Free Speech Clauses; unconstitutionally entangles the state in religious affairs; imposes unconstitutional conditions on government funding; and violates St. Dominic's religious hiring rights under the ministerial exception and church autonomy doctrines. JA13, 28-39. The next day, they moved for a preliminary injunction allowing them to participate in the program without sacrificing their First Amendment rights. Mot. at 5. Over a year later, on August 8, 2024, the district court denied the motion. ADD2.

The district court acknowledged that the new MHRA would "effectively prohibit" St. Dominic from enforcing its "religiously motivated policies," many of which "plainly run afoul of the MHRA's antidiscrimination provisions." ADD50; ADD38. Thus, the law "put[] [Plaintiffs] to the choice of curtailing" their religious mission "or adopting policies and practices inconsistent with [their] religious beliefs." ADD49. Nevertheless, the court denied injunctive relief.

On the Free Exercise claim, the district court agreed that the MHRA was not generally applicable because it categorically exempts both "private postsecondary institutions" within Maine and secondary "schools located outside of Maine." ADD51. Nevertheless, the district court held that the law satisfied strict scrutiny—reasoning that Maine has a compelling "interest in eliminating discrimination within publicly funded institutions," and that the MHRA was narrowly tailored to achieve that goal because it "prohibit[s] only discriminatory conduct." ADD63-64.

The district court then rejected Plaintiffs' free-speech claims, reasoning that the equal expression provision would affect only student speech, which would not be attributable to St. Dominic. ADD67-68. It also rejected St. Dominic's religious autonomy and entanglement arguments because it could see no reason for the Commission to investigate St. Dominic's religious practices, and therefore no reason it should become entangled in religious affairs. ADD69-70. Next, the district court rejected Plaintiffs' unconstitutional conditions argument because it concluded that the MHRA did not burden Plaintiffs' religious exercise or speech in any way. ADD71-72. Finally, the court concluded that there was no conflict between St. Dominic's religious hiring rights and the MHRA because the statute contains an exemption for certain religious hiring practices. ADD42-43. Plaintiffs timely appealed. JA10.

## SUMMARY OF THE ARGUMENT

The district court's denial of Plaintiffs' motion for a preliminary injunction should be reversed and the case remanded with instructions to enter the requested injunction.

Maine's ongoing efforts to exclude religious schools from the program violate the Free Exercise Clause because they continue to bar religious schools from the program based on their religious practices, defying *Carson*'s prohibition on use-based discrimination. *Carson*, 596 U.S. at 786-88.

The MHRA further violates the Free Exercise Clause because it is neither neutral toward religion nor generally applicable. Maine changed its law with an eye toward the continued exclusion of as many religious schools as possible, meaning that the law is not neutral, and acts as a "religious gerrymander." These legislative changes were a publicly declared end-run around *Carson*'s prohibition on discriminating against religious schools and parents based on their religious practices.

Moreover, as the district court correctly held, the MHRA is not generally applicable under *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), and *Tandon v. Newsom*, 593 U.S. 61 (2021), because Maine funds many schools that are exempt from its mandates. For example, Maine spends tuition funds at out of state schools and gives student-directed grants to private postsecondary schools in Maine, all of which are exempt from the MHRA.

This lack of neutrality and general applicability means that the law is subject to strict scrutiny, which it fails. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020). Even if Maine had a compelling interest in excluding religious schools from the program, the MHRA is not narrowly tailored to achieve Maine's interests.

The MHRA's requirement that religious schools allow equivalent, countervailing religious expression also violates the Free Speech Clause. This requirement interferes with the expressive associational rights of both St. Dominic and Catholic families to partner together in imparting Catholic teachings to the next generation. And it compels speech by requiring participating schools to host speech with which they disagree.

Maine's rules also violate St. Dominic's First Amendment freedoms in many other ways. The MHRA intrudes on St. Dominic's right to decide for itself, free from government interference, internal matters of discipline, doctrine, and governance. For St. Dominic to participate in the program, it would need to relinquish control over its religious admissions; the religious messaging on its campus; its handling of sensitive questions involving sex, gender, and family life; and its religious hiring rights. These are the very intrusions the Supreme Court warned about if states tried to control how religious schools carry out their mission in *Carson*. 596 U.S. at 787. Because Maine requires St. Dominic to forfeit so many

of its constitutionally protected rights in order to participate in the program, Maine's statutory scheme acts as an unconstitutional condition on receiving a public benefit.

For 30 years, Maine parents have been asking to resume using their tuition funds at private religious schools. In *Carson* they won that right. The Radonises and other Maine families like them have waited long enough. This Court should reject Maine's end run around the Constitution and allow religious schools and parents in Maine to participate in the state tuition program on the same terms as private schools outside of Maine.

## STANDARD OF REVIEW

A preliminary injunction is warranted when a plaintiff shows (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent relief, (3) the equities favor relief, and (4) relief is in the public interest. *See Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012).

This court reviews the "denial of a preliminary injunction for abuse of discretion." *Id.* (quoting *United States v. Weikert*, 504 F.3d 1, 6 (1st Cir. 2007)). "[A] material error of law invariably constitutes an abuse of discretion." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013). Issues of law are reviewed de novo. *Fortuño*, 699 F.3d at 10. "First Amendment questions of 'constitutional fact'" also "compel this Court's de novo review" because they are mixed questions of law and fact. *Bose Corp. v.*

*Consumers Union of U.S., Inc.*, 466 U.S. 485, 508 n.27 (1984); *see also Does 1-6 v. Mills*, 16 F.4th 20, 29 & n.7 (1st Cir. 2021).

## ARGUMENT

## I. Appellants are likely to succeed on their Free Exercise claims.

Maine's new rules run afoul of the Free Exercise Clause in multiple respects. First, they contradict *Carson* by "exclud[ing] otherwise eligible schools on the basis of their religious exercise." 596 U.S. at 789. Second, they are not neutral because they facially regulate on the basis of "religion." Third, they are not generally applicable because they have broad exemptions allowing many other schools to engage in the same conduct. Finally, they cannot satisfy strict scrutiny.[3]

### A. The MHRA violates *Carson*.

*Carson* held that religious organizations may not be "disqualified from [a] generally available benefit 'solely because of their religious character.'" 596 U.S. at 780. This Free Exercise requirement cannot be "avoided" by arguing that the goal of a restriction is to prevent "religious organizations from putting aid to religious *uses*." *Id.* at 786. That is because "use-based discrimination is [no] less offensive to the Free Exercise Clause" than discrimination based on religious status. *Id.* at 787. And *Carson* also

---

[3] Although the challenged provisions of the MHRA are neither neutral nor generally applicable and thus not subject to the rule in *Employment Division v. Smith*, 494 U.S. 872, 884 (1990), Appellants preserve the argument that *Smith* was wrongly decided for Supreme Court review.

warned that "[a]ny attempt" to enforce a use/status distinction by "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism." *Id.*; *see infra* III.

Maine's new rules violate *Carson*. Once St. Dominic receives public funds, the Commission gains broad and entangling authority over its religious policies. The Commission may inquire into St. Dominic's religious life to assess whether St. Dominic has "permit[ted]" both Catholic and non-Catholic religious expression. 5 M.R.S. § 4602(5)(D). It may prohibit St. Dominic from providing special financial assistance to Catholic families. *Id.* § 4602(1)(E). And it may examine St. Dominic's admission policies, codes of conduct, and practices to see if any of these result in "discrimination" on the basis of religion, sexual orientation or gender identity. *Id.* § 4602(1)(A).

*Carson* forbids the Commission from making such judgments. All of these practices are examples of protected "religious uses" that together make up St. Dominic's "religious character" and should be shielded from government scrutiny. *Carson*, 596 U.S. at 779-80, 786-87. The Supreme Court rejected the Department of Education's effort to police schools' internal religious policies in *Carson*. That decision governs the Commission's efforts to do the same here.

**B. The MHRA is not neutral.**

Even setting *Carson* aside, the new MHRA fails the free-exercise requirement of neutrality. "[T]he minimum requirement of neutrality is that a law not discriminate on its face"—meaning a law cannot facially regulate "a religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Beyond that, a facially neutral law may not create a "religious gerrymander." *Id.* at 535; *accord Swartz v. Sylvester*, 53 F.4th 693, 700 (1st Cir. 2022). Nor may it be enforced with hostility towards religious beliefs and practices. *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). The MHRA is non-neutral in all three ways.

*Facial neutrality.* The MHRA lacks neutrality by regulating "religious … practices" and "religious expression" on its face. First, it says that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." 5 M.R.S. § 4602(5)(D). This facially singles out "religious expression"—and no other form of expression—and subjects it to uniquely burdensome regulation. It also penalizes religious schools, for whom allowing religious expression is unavoidable and central. Thus, while a public school or private secular school might avoid religious expression, a religious school faces a dilemma: you can only engage in the religious expression central to your mission *if you allow religious expression contrary to that mission*. *See infra* II.

Public schools and private secular schools have no religious mission and therefore encounter no special burden from this law. And there is no parallel rule requiring equal speech on any number of issues that might be central to other schools. Thus Gould Academy, which receives Maine tuition funds, is free to fully pursue its diversity, equity, and inclusion mission, which it regards as "not a goal to be achieved, but a state of being and a lifelong commitment."[4] And Philips Exeter Academy, which also receives Maine funds, may continue to "consciously infuse[] equity through all aspects of life."[5] Neither school has any legal obligation to give students who disagree with its mission equal opportunities to express their views. Maine offered no plausible neutral explanation for singling out religious expression for special rules; indeed it introduced no evidence on section 4602(5)(D) at all. ADD60-61.

The MHRA also lacks facial neutrality by subjecting religious schools to a ban on "religious discrimination" in admissions, financial aid, and codes of conduct. 5 M.R.S. § 4602(1)(A). Secular private schools may use admissions policies, speech codes, and other practices to reinforce their shared mission. But if the school's mission is religious, the same policies risk being considered forbidden "religious discrimination." Secular

---

[4] *Diversity, Equity, Inclusion, and Belonging (DEIB)*, Gould Academy, https://perma.cc/6SW8-K6BQ.

[5] *Equity and Inclusion*, Phillips Exeter Academy, https://perma.cc/E4N4-HN25.

schools may impose many different kinds of admission criteria: financial, academic, athletic, family legacy, and ability to advance the school's mission. *See Carson*, 596 U.S. at 783 (noting that private schools in Maine's program "do not have to accept all students" and may "charge several times the maximum benefit that Maine is willing to provide"). But when a religious school seeks to form a community around shared religious beliefs, it runs up against the MHRA. This kind of singling out of religious activity is "never permissible," and must be rejected without further scrutiny. *Lukumi*, 508 U.S. at 533.

*Religious gerrymander*. The same facts that establish non-neutrality also demonstrate gerrymander. The religious expression and religious nondiscrimination rules punish religious schools when they pursue their religious missions but leave secular private schools free to pursue their missions without fear.

There is more. The 2021 amendments removed a religious exemption that allowed religious schools latitude to handle sensitive issues surrounding gender and family life. The district court concluded that the removal of the religious exemption did not signal a lack of neutrality because prior to *Carson* it was "mere surplusage." ADD58. This is incorrect; Maine argued forcefully to this Court and the Supreme Court that religious but "nonsectarian" schools could participate in the program,[6]

---

[6]    *See Carson v. Makin*, 979 F.3d 21, 38 (1st Cir. 2020); Tr. at 63-65, 78-82, *Carson*, 596 U.S. 767 (No. 20-1088), https://perma.cc/Y2AF-3C8K.

and the record shows that they have done so.[7] Maine removed the MHRA's religious exemption only once became clear that Maine was likely to lose the ability to choose which religious schools to exclude. A law that singles out "religious conduct for distinctive treatment … will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. This is not one of them. *See infra* I.D.

Maine's many MHRA amendments—each launched in response to religious schools' litigation—also demonstrate non-neutrality. The 2021 changes anticipated Maine's defeat in *Carson*. *Supra* at 7-10. The 2023 changes were proposed a month after one of the *Carson* schools filed *Crosspoint*. *Infra.* at 27-28; JA33. Such "repeated changes in position" can show that the government was "using an evolving policy as pretext for targeting" religious beliefs, while trying to avoid legal accountability. *Meriwether v. Hartop*, 992 F.3d 492, 515 (6th Cir. 2021).

*Hostility*. Maine's amendments also lack neutrality because they were founded on a "negative normative 'evaluation'" of the specific religious practices at issue here. *Masterpiece,* 584 U.S. at 639. When Commissioner Makin lost *Carson*, the Attorney General, who represented her, openly criticized "the schools at issue" in *Carson* as "fundamentally at odds" with Maine's "values," because they "promote a single religion,"

---

[7] JA33 (Maine Coast Waldorf School, Anthroposophy); JA265, *Crosspoint Church v. Makin*, No. 24-1450 (1st Cir.) (Cardigan Mountain School, "universal moral and spiritual values").

"refuse to admit gay and transgender children," and "discriminate in hiring teachers and staff." JA30-31; JA63. He vowed to use "statutory amendments" to prevent such schools from receiving tuition funds, and characterized religious schools as "promot[ing] discrimination, intolerance, and bigotry." JA30-31; JA63. The speaker of the Maine Legislature confirmed that lawmakers had "changed the guidelines" to "exclude schools that discriminate" because they "[a]nticipated the ludicrous [*Carson*] decision from the far-right SCOTUS." JA32; JA68. These are precisely the sort of negative normative evaluations that fail neutrality and must be "set aside" without the need for strict scrutiny. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022).

### C. The MHRA is not generally applicable.

The district court correctly held that the challenged section of the MHRA is not generally applicable. ADD52. A law is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Lowe v. Mills*, 68 F.4th 706, 714 (1st Cir. 2023) (quoting *Tandon*, 593 U.S. at 62); *accord Fulton*, 593 U.S. at 534. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," and "[c]omparability is concerned with the risks various activities pose." *Lowe*, 58 F.4th at 714 (quoting *Tandon*, 593 U.S. at 62).

In *Lowe*, this Court held that Free Exercise plaintiffs had stated a claim to relief because they alleged that medical exemptions to Maine's COVID vaccination policy—which were permitted—undermined Maine's interest in protecting public health as much as religious exemptions, which were not permitted. *Id.* at 715. In *Brox v. Hole,* this Court applied *Lowe* to reverse the denial of a preliminary injunction where the Free Exercise plaintiffs' evidence showed that the state granted a medical exemption to one employee while denying a religious exemption to a different employee in the same role. 83 F.4th 87, 100 (1st Cir. 2023).

In this case, Maine has asserted just one interest in enforcing the MHRA against St. Dominic: eliminating discrimination at publicly-funded institutions. ADD51 (citing Opp. at 21-22). Yet Maine conceded that it funds many schools that are *not* bound by the MHRA. In particular, the challenged sections of the MHRA do not apply to private postsecondary schools or to schools outside of Maine—all of which are eligible for Maine's funds. ADD51 (citing Opp. at 14). As the district court correctly observed, "[b]oth private postsecondary schools and out-of-state schools are eligible to receive public funds from Maine" without "giving any assurances that they are not engaged in discrimination." ADD51; ADD53.

These schools are proper comparators under *Lowe* and *Tandon*. And Maine does not just tolerate the risk that these other schools *might* violate the MHRA—it knows that some of them actually do. After Crosspoint

Church pointed to the MHRA's express exemption for single-sex schools to show that the law was not generally applicable, the Maine Legislature rushed through an amendment to remove this exemption, with the Commission—by then a defendant in *Crosspoint Church*—testifying in support. JA33. Nevertheless, Maine has continued to pay tuition for an all-girls boarding school in Massachusetts whose single-sex admissions policies now concededly violate the MHRA. JA24.[8] That double standard is fatal.

Similarly, Maine has long paid state scholarship funds to private postsecondary schools in Maine. JA24. Yet private postsecondary institutions are not covered by the challenged section of the MHRA. 5 M.R.S. § 4553(2-A) (definition of "educational institutions"). Thus, Maine allows state funds to flow to private colleges (even religious colleges) without requiring them to comply with MHRA rules like religious expression *at all. See* ADD53 ("[S]ecular private postsecondary institutions are allowed to take public funds, including from the tuitioning program, without giving any assurances that they are not engaged in discrimination."). As the district court correctly found, that means "these schools could adopt any of St. Dominic's policies or practices that allegedly violate

---

[8]  *See List of Schools Approved for Tuition Purposes, 2023-24*, Maine Department of Education (Feb. 8, 2024): https://perma.cc/S6KL-Y6J9 (listing Dana Hall School, an all-girls school in Massachusetts, as approved); *2024-25* (Sept 23, 2024): https://perma.cc/94RG-7M8Z (same).

the MHRA without fear of enforcement actions or risk of losing access to public funds from Maine." ADD52. The district court held that these exceptions make the law not generally applicable, and thus subject to strict scrutiny. That is correct.

The MHRA's religious gerrymander also makes the law not generally applicable. *See supra* I.B. Among other things, secular private schools in Maine's tuition program may adopt a range of policies to teach and reinforce a common mission like advancing diversity, equity, and inclusion. But if St. Dominic joins the tuition program, the MHRA forbids it from maintaining religious policies that help it advance its religious mission in similar ways. *Id.*

### D. The MHRA does not pass strict scrutiny.

A law that burdens religious exercise "but is not either neutral or generally applicable must be narrowly tailored to achieve a compelling government interest." *Brox*, 83 F.4th at 93. The MHRA fails both parts of this strict scrutiny test.[9]

---

[9] The MHRA would still be unconstitutional even if it survived. Laws that single out religion for distinctive treatment or rely on negative normative evaluations of particular religious beliefs are "never permissible." *Lukumi*, 508 U.S. at 533; *Kennedy*, 597 U.S. at 525 n.1. As discussed, the MHRA does both. *Supra* I.B.

### 1. Maine's interest is not compelling.

The only interest that Maine has advanced is "ensuring that publicly-funded institutions do not discriminate." ADD23 (quoting Opp. at 21). This interest fails four times over.

*Not specific.* Maine cannot simply "rely on 'broadly formulated interests.'" *Fulton*, 593 U.S. at 541 (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431). Where, as here, the government discriminates based on a protected trait, the government must advance more than an "amorphous end to justify it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) ("*SFFA*"). Courts applying *SFFA* have already held that a government's general interest in "maintaining an 'equitable environment free of discrimination'" is too broad to justify excluding religious groups from benefits. *Fellowship of Christian Athletes v. District of Columbia*, No. 24-cv-1332, 2024 WL 3400104, at *8 (D.D.C. July 11, 2024).

*No legitimate interest in banning religious discrimination by religious schools.* Maine has no legitimate interest (much less a compelling one) in punishing "religious discrimination" by religious schools. Forming a religious community around shared religious beliefs is how a religious organization defines itself. *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 335-37 (1987). Maine cites no decision, and we are aware of none, that recognizes a compelling interest in stopping religious organizations from

giving preference to their own members in education or employment; all authority is to the contrary. *See id.*; *see also infra* III, IV.

*No compelling interest in preventing religious schools from following their religious beliefs about sexuality*. The Supreme Court has repeatedly held that a state's interest in combatting discrimination cannot justify violating specific claimants' First Amendment rights. *See, e.g., 303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023) (nondiscrimination could not be used to force website designer to speak in a way that contradicted her faith); *Fulton*, 593 U.S. at 533 (nondiscrimination could not be used to exclude Catholic foster-care agency from city foster-care program); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 578-79 (1995) (nondiscrimination could not be used to force parade organizers to include speakers with whom they disagreed); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (nondiscrimination could not be used to force youth organization to include a leader who objected to its mission); *Amos*, 483 U.S. at 335-37 (nondiscrimination could not be used to force a religious nonprofit to retain an employee who violated religious conduct policies); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 693-94 (9th Cir. 2023) (en banc) (nondiscrimination could not be used to exclude religious student group from high school forum); *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *3 (9th Cir. Aug. 8, 2024) (nondiscrimination could

not be used to exclude religious group from youth services grant program). To the contrary, the Supreme Court has recognized that religious groups are entitled to have their views on sexuality treated with respect. *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015); *Bostock v. Clayton County*, 590 U.S. 644, 681-82 (2020).

*Not treated as compelling in practice.* The same facts that establish a lack of general applicability are fatal to Maine on strict scrutiny. As *Fulton* explained, an interest in "equal treatment" may be "weighty," but "[t]he creation of a system of exceptions … undermines" the government's claim that its interest in equal access "can brook no departures." 593 U.S. at 542. In *Tandon v. Newsom*, the Court applied the same principle to a rule that included "myriad exceptions and accommodations for comparable activities." 593 U.S. at 64. And in the specific context of a state tuition subsidy like this one, the Supreme Court has held that a "law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Espinoza*, 591 U.S. at 486 (quoting *Lukumi,* 508 U.S. at 547).

The court below held that the MHRA survived strict scrutiny because it did not have *individualized* exemptions like those in *Fulton*. ADD63-64. But this analysis ignores a long line of cases, including *Tandon, Espinoza, Lukumi*, and many more, which have held that many kinds of rules that are "underinclusive to a substantial extent" will fail strict scru-

tiny. *Lukumi*, 508 U.S. at 547; *see also Tandon*, 593 U.S. at 64-65; *Espinoza*, 591 U.S. at 486. The law's underinclusivity is not in dispute: Maine admits that it allows families to use state tuition money to send their children to out-of-state (and even out-of-country) schools that do not have to comply with the MHRA, and which do not in fact do so. *Supra* I.C. It also allows college students to use state grants at private postsecondary schools in Maine without requiring those schools to submit to any part of the educational nondiscrimination law it is so eager to enforce against St. Dominic. *Id.* Maine does not enforce its allegedly compelling interest in "ensuring that publicly-funded institutions do not discriminate" against any of these schools. As in *Fulton, Tandon, Espinoza,* and *Lukumi*, that underinclusivity confirms that Maine's interest in denying an exception to St. Dominic is not compelling. *Fulton,* 593 U.S. at 542; *Tandon*, 593 U.S. at 64-65; *Espinoza*, 591 U.S. at 486; *Lukumi*, 508 U.S. at 547.

## 2. Excluding St. Dominic is not the least restrictive way of advancing Maine's interests.

Maine has also failed to show that its means of advancing its interest are "narrowly tailored." *Kennedy*, 597 U.S. at 525. Strict scrutiny requires that "[i]f a less restrictive alternative would serve the Government's purpose, [it] must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000). Maine must show both the "likely effects of including a religious exemption," and "give reasons why" accommodating St. Dominic would "prevent the state from achieving" its own goals.

*Lowe*, 68 F.4th at 718. A government's failure "to offer any showing that it has even considered less restrictive measures" means "it fails at least the tailoring prong of the strict scrutiny test." *Fellowship of Christian Athletes*, 82 F.4th at 694; *see also Rideout v. Gardner*, 838 F.3d 65, 74 (1st Cir. 2016) (law not narrowly tailored where government failed to show why existing laws were inadequate to accomplish its goals).

Both the government's own actions—and the actions of other governments pursuing similar interests—can show that a law is not narrowly tailored. Thus in *Burwell v. Hobby Lobby Stores, Inc.*, the Court held that the federal government's own accommodation scheme, which it extended only to certain religious nonprofits, established that there was a less-restrictive alternative to fining a family business millions of dollars a day for the same religious exercise. 573 U.S. 682, 728 (2014). And in *Holt v. Hobbs,* the Court required Arkansas to explain why the less-restrictive alternatives used by dozens of other prison systems pursuing the same interests were insufficient to protect its own interests as well. 574 U.S. 352, 368-69 (2015).

Below, Maine did not even attempt to meet its burden of establishing that "measures less restrictive of the First Amendment activity could not address its interest" in reducing discrimination. *Tandon*, 593 U.S. at 63. The most obvious less restrictive alternative is to exempt religious schools from the provisions on religious, sexual orientation, and gender identity

discrimination, and from the religious expression rule. Maine took this approach for decades prior to 2021, when the MHRA exempted religious schools from the rule banning sexual orientation and gender identity discrimination, did not ban religious discrimination, and had no religious expression rule at all. Indeed, to this day, out-of-state K-12 schools and private postsecondary schools are effectively exempt from the MHRA. Maine has never offered any evidence that its interests have been harmed by its pre-2021 rules or by its current exemption for out-of-state schools.

Nor has Maine ever distinguished its interests from the interests of other states or the federal government, which exempts religious schools from the sex nondiscrimination requirements in Title IX and from the religious nondiscrimination requirements in Title VII. 20 U.S.C. § 1681(a)(3); 42 U.S.C. § 2000e-1(a). Examples like Title IX and Title VII show that Maine may advance its interests in combatting discrimination while still respecting the autonomy of religious schools. Because Maine did not carry its burden to show that its rules were narrowly tailored, it failed strict scrutiny.

The district court ignored all of this. It concluded that the MHRA was narrowly tailored because it was written to prohibit only "discriminatory conduct." ADD64. This is wrong on the facts, since the religious expression rule includes no such limitation. 5 M.R.S. § 4602(5)(D). But it is also wrong on the law. Under strict scrutiny, the question is not whether the law accomplishes what it set out to do; it is whether the government has shown that its goal could not have been accomplished using *any* viable method

that was less restrictive of First Amendment activities. *Tandon*, 593 U.S. at 63. This Maine has failed to do.

\*　　\*　　\*

It is "unsurprising" that St. Dominic is "entitled to relief." *Id.* at 64. Maine's rules for participating in the program "contain[] myriad exceptions and accommodations for comparable activities, thus requiring the application of strict scrutiny." *Id.* "That standard 'is not watered down'; it 'really means what it says.'" *Id.* at 64-65 (quoting *Lukumi*, 508 U.S. at 546). The district court failed to scrupulously apply strict scrutiny, and it must be reversed.

### E. The MHRA infringes on the Radonises' parental rights.

Although the district court failed to reach the Radonises' parental rights claims (ADD65), they too require strict scrutiny. The MHRA impinges on "the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Yet the Commission requires schools subject to the MHRA to facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object. JA72. More fundamentally, the MHRA requires St. Dominic to abandon a whole host of practices intended to protect the religious educational mission that the Radonises and St. Dominic share. By imposing these conditions, Maine prevents tuition-eligible families

like the Radonises from exercising their right to direct the religious up-bringing of their children. *Yoder*, 406 U.S. at 235.

## II. Appellants are also likely to succeed on their Free Speech claims.

The religious expression rule independently violates St. Dominic's rights under the Free Speech Clause by (1) interfering with its freedom of expressive association and (2) forcing it to host speech that it disagrees with on its campuses.

### A. The MHRA violates the Free Speech Clause right of expressive association.

The First Amendment protects the rights of individuals, as well as institutions, to "associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, … and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984); *see also 303 Creative*, 600 U.S. at 586. That includes the decision "not to associate" with others if the forced association would "affect[] in a significant way the group's ability to advocate" its "viewpoints." *Dale*, 530 U.S. at 648. Applying this doctrine, the Supreme Court has held that notwithstanding state antidiscrimination laws, the Boy Scouts could dismiss an assistant scoutmaster whose beliefs and actions failed to reflect their opposition to homosexual conduct, *id.* at 647-48, and veterans' groups could exclude an LGBT group from a St. Patrick's Day parade, *Hurley*, 515 U.S. at 572-73, 581. That doctrine applies here, protecting Diocesan schools

from being forced to host messages inconsistent with the schools' religious message.

There is no question that Plaintiffs engage in expressive activity. St. Dominic was formed for the expressive purpose of partnering with Catholic families like the Radonises in proclaiming the Catholic faith to the next generation. JA18-19. "Religious groups" like the Diocese and its schools "are the archetype of associations formed for expressive purposes." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., joined by Kagan, J., concurring); *see also Circle Sch. v. Pappert*, 381 F.3d 172, 182 (3d Cir. 2004) ("By nature, educational institutions are highly expressive organizations, as their philosophy and values are directly inculcated in their students.").

Requiring St. Dominic to accommodate students who could, at any time, insist on a statutory right to engage in religious counter-speech would interfere with St. Dominic's religious message. Under the religious expression rule, for example, a Diocesan school that allows students to form a Catholic pro-life club, to express support for traditional marriage, or to engage in eucharistic adoration would be required to allow students to form a pro-abortion "Catholics for Choice" club, to protest the Church's teaching on marriage, or to form a Satanic Temple club to mock Catholic beliefs. JA35; *Fellowship of Christian Athletes*, 82 F.4th at 692 (discussing a "Satanic Temple Club" formed at a public high school to mock other students' religious beliefs); *cf. Yeshiva Univ. v. YU Pride All.*, 143 S.Ct.

1, 1-2 (2022) (Alito, J., dissenting from denial of stay) (stating it would be a "shocking" violation of the First Amendment to require a religious school to let students form a club that "vehemently disagreed" with the school's religious views). The same is true of requiring St. Dominic to accept students who are unwilling to agree to support the school's Catholic mission. ADD34 ("[T]he Defendants do not contest that these policies and practices may violate the MHRA." (citing Opp. at 8-9)); *see also* Crosspoint Br. at ADD30. Under *Dale*—which involved the implicit message conveyed by a single scoutmaster in a nationwide organization—this is more than enough to show a violation of the right to expressive association by "impair[ing] the ability of the [organization] to express those views, and only those views, that it intends to express." 530 U.S. at 648.

The district court skipped any analysis of Plaintiffs' expressive-association rights based on its erroneous strict scrutiny analysis. ADD65. But Maine's free-speech incursions flunk strict scrutiny for the same reasons as its other First Amendment violations. *See Dale*, 530 U.S. at 648 (applying strict scrutiny in freedom of association case). For all the reasons stated above, Maine's asserted nondiscrimination interests do "not justify such a severe intrusion on the [Plaintiffs'] rights to freedom of expressive association." *303 Creative*, 600 U.S. at 592.

## B. Maine's religious expression rule compels speech by religious schools.

No one denies that civil rights laws like the MHRA play a "vital role … in realizing the civil rights of all Americans." *Id.* at 590. But such laws "can sweep too broadly when deployed to compel speech." *Id.* at 592. It does not matter "whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *Id.* at 586; *accord Hurley*, 515 U.S. at 581. Both forms of compulsion violate the First Amendment.

Maine has crossed that line here. The MHRA requires that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." 5 M.R.S. § 4602(5)(D). This improperly singles out the viewpoint of religion for distinctive treatment. *See Shurtleff v. City of Boston*, 596 U.S. 243, 258-59 (2022) (Boston's refusal to allow Christian group to fly its flag under city flag-flying program for private groups "solely because" the flag "'promot[ed] a specific religion' … discriminated based on religious viewpoint and violated the Free Speech Clause"). Maine admits, and the district court agreed, that this provision ties St. Dominic's hands: because St. Dominic "permits religious expression" on its campus, it "would need to permit other religious expression" and allow students to express "dissenting religious views," no matter how disrespectful towards the Catholic faith. ADD46-

40

47 (citing Opp. at 10). While St. Dominic welcomes non-Catholics "willing to learn in a thoroughly Catholic educational environment," it cannot allow students to "publicly seek to dissuade other students from" the faith. JA35. But under the religious expression rule, St. Dominic could be forced to accommodate both "Catholics for Life" and "Catholics for Choice," student eucharistic adoration and a Satanic Temple club, Catechism study groups and evangelistic Baptist Bible studies. This compels speech by forcing religious schools like St. Dominic to modify their religious message by accommodating—on penalty of law—all other religious expression on campus.

*Hurley* is instructive. There, the Supreme Court unanimously held that the First Amendment protected the right of a private parade organizer to exclude a group from participating in the parade because of the message that the group sought to convey. *See* 515 U.S. at 570, 574. The Court explained that the parade was a form of protected expression. *Id.* at 569. "Since every participating unit affects the message conveyed by the private organizers," forcing the parade organizers to include an unwanted unit would "alter the expressive content of their parade." *Id.* at 572-73. The Court held that this would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573.

Religious schools like St. Dominic are entitled to even greater protection in collectively expressing their sincere faith convictions than are private parade organizers marching to an "eclectic" message. *Id.* at 562. Indeed, religious expression is "core" speech that has the highest level of protection available under the Free Speech Clause. *See, e.g.*, *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[A] free-speech clause without religion would be Hamlet without the prince."); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 100 (1st Cir. 2004) (Torruella, J., concurring in part and dissenting in part) (government interference with "[r]eligious speech," which goes to the "core of people's strongest beliefs," "strikes at the heart of the First Amendment's prohibitions against state regulation of speech.").

The religious neutrality Maine seeks to impose tramples those rights. Forcing Diocesan schools to allow religious expression that is contrary to the Catholic faith the schools exist to impart would alter the message the schools seek to convey to their students. St. Dominic exists "to strengthen the Catholic Church and to create an environment in which the faith is preserved, nourished, shaped and communicated." *See* JA19. Its primary goal is to assist parents in raising their children in the Catholic faith. JA18-19. Accordingly, it infuses Catholic teaching into all that it does. *See* JA19, 35. But under the religious expression rule, St. Dominic would be forbidden from "discriminat[ing]" against messages that contradict its

religious teachings. 5 M.R.S. § 4602(5)(D). That violates the school's right to "choose the content of [its] own message." *Hurley*, 515 U.S. at 573.

The district court rightly acknowledged that the MHRA's "prohibition on discriminating among religions in allowing religious expression" does "burden the Plaintiffs' religious exercise." ADD49-50. Under *Hurley*, the same is true of St. Dominic's *speech*. But the district court rejected the *Hurley* principle as being confined to "the inherent nature of parades." ADD67. Having sidelined *Hurley*, the district court determined that the law "does not reach the speech of educational institutions," and instead "only requires schools to refrain from suppressing any student's religious viewpoint." ADD66-67. But this is just another way of saying that the law doesn't directly "compel [schools] to speak," and instead "force[s] [them] to include other ideas" that they "would prefer not to include." *303 Creative*, 600 U.S. at 586. If government cannot impose that burden on a loosely themed parade, it certainly cannot do so on religious schools that build their expressive communities around one faith.

Continuing its parade exceptionalism, the district court applied an "attribution" gloss on *Hurley*, surmising that "it is unlikely that alternative religious expression … would be attributed to St. Dominic or the Diocese." ADD67-68. But that is not the standard. "[T]he First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." *Moody v. NetChoice, LLC*, 144 S.Ct.

2383, 2401 (2024). The Supreme Court "has never hinged a [speech] compiler's First Amendment protection on the risk of misattribution." *Id.* at 2406. Diocesan schools "do not lose their First Amendment protection just because no one will wrongly attribute to them the views" they are forced to host. *Id.*

Here, the district court misapprehended the import of two cases on the "flip-side" of *Hurley. Id.* at 2401. *See* ADD68 (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980); *Rumsfeld v. FAIR*, 547 U.S. 47 (2006)). The former rejected a 21-acre commercial shopping complex's compelled-speech challenge to a California law requiring it to allow visitors to distribute handbills in its public areas. *PruneYard*, 447 U.S. at 77, 86-88. The latter turned away a First Amendment challenge to a federal law denying funds to law schools that prohibited military recruiters on campus for interviews in which the schools had no involvement. *FAIR*, 547 U.S. at 64. As the Supreme Court recently emphasized, the challenges in these cases failed because neither the shopping center nor the law schools were "engaged in any expressive activity." *NetChoice*, 144 S.Ct. at 2401. These cases do not support the district court's "misattribution" test. *Id.* at 2406. Rather, "the key fact in those cases … was that the host of the third-party speech was not itself engaged in expression." *Id.*[10]

---

[10]  The district court also pointed to *FAIR*'s mention of an earlier case for the proposition that "high school students can appreciate the difference between speech a school sponsors and speech the school permits because

St. Dominic *is* engaged in quintessential expression when it curates religious expression on its campuses. *See id.* at 2401-02 ("[d]eciding on the third-party speech that will be included ... or excluded ... is expressive activity of its own"). The First Amendment's guarantee of the "right to proselytize religious ... causes must also guarantee the concomitant right to *decline to foster* such concepts." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (emphasis added). Compelling St. Dominic to add countervailing religious speech to the message it espouses and the "thoroughly Catholic educational environment" it seeks to create runs afoul of that principle regardless of whether observers perceive endorsement or duress from St. Dominic. JA35.

To top it off, having applied an incorrect "attribution" standard, the district court offered only the cold comfort that the MHRA "does not prohibit the school from *disavowing* religious expression that is contrary to Catholic teaching." ADD68 (emphasis added). But the Supreme Court rebuffed this argument in *Wooley*. There, the Court held that New Hampshire could not compel religious objectors to display the state motto "Live

_____

legally required to do so, pursuant to an equal access policy." ADD68 (quoting *FAIR*, 547 U.S. at 65). But that fractured decision had to do with a now-defunct "endorsement" analysis under the Establishment Clause, where the potential for misattribution *did* matter. *See Bd. of Educ. of Westside Cmty. Sch. v. Mergens ex rel. Mergens*, 496 U.S. 226, 250 (1990) (plurality op.) (Equal Access Act requirement that school permit students to form an after-school Christian club does not violate the Establishment Clause).

Free or Die" on noncommercial license plates. 430 U.S. at 715-17. In so holding, the Court rejected the dissent's (and the district court's) theory that citizens can be forced to host messages they find religiously objectionable so long as avenues exist for them to "display[] their disagreement." *Id.* at 722 (Rehnquist, J., dissenting).

The Court then bolstered the point in *Dale*. There, the Court held it could not second guess whether accommodating a gay scoutmaster would impair the Boy Scouts' message; instead, it gave "deference" to the Boy Scouts' account of "what would impair its expression." *Dale*, 530 U.S. at 653. That is because "a [s]tate, or a court, may not constitutionally substitute its own judgment for that of" the expressive association. *Democratic Party of U.S. v. Wisconsin ex rel. Follette*, 450 U.S. 107, 123-24 (1981); *see also Hurley*, 515 U.S. at 575 (same). Being forced to rely on serial disavowals of offending religious expression would itself undermine St. Dominic's mission of conveying a singular Catholic message. *See* JA19; JA35. Nor should St. Dominic be forced to go to such extreme lengths to safeguard its message: a school, just as much an "[a]n individual," "'does not forfeit constitutional protection simply by combining multifarious voices' in a single communication." *303 Creative*, 600 U.S. at 588 (quoting *Hurley*, 515 U.S. at 569).

"[I]t is no job for government to decide what counts as the right balance of private expression." *NetChoice*, 144 S.Ct. at 2394. Because the religious expression rule attempts just that, it cannot pass First Amendment scrutiny. *Id.*

## III. The educational discrimination section violates St. Dominic's church autonomy rights by inviting excessive entanglement in internal religious affairs.

The Supreme Court has long held that the First Amendment bars the government from interfering in "questions of discipline, or of faith, or of ecclesiastical rule, custom, or law." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115 (1952). Indeed, "any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Drawing on this long line of cases, *Carson* warned that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism." 596 U.S. at 787 (citing *Our Lady*, 591 U.S. at 759-62). But the educational discrimination section, 5 M.R.S. § 4602, doesn't just invite such entanglement; it requires it—as the commission is tasked with "the duty of investigating all conditions and practices within the State which allegedly" violate the MHRA. 5 M.R.S. § 4566.

The district court waived away these entanglement concerns because it had difficulty imagining "why the [Commission] would ever have to

look into" St. Dominic's internal religious operations "to determine whether the MHRA was violated." ADD70. Even setting aside the court's earlier holding that "St. Dominic's fear of MHRA enforcement is eminently reasonable," ADD37, if St. Dominic participated in the program, the MHRA would give the Commission authority over many of St. Dominic's internal religious policies.

Under the religious nondiscrimination clause, the Commission may oversee St. Dominic's religious admissions policies—even though a religious school's religious admissions criteria, just like a church's membership criteria, are entirely protected from government intrusion. *See, e.g.*, *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713-14 (1976); *Dowd v. Soc'y of St. Columbans*, 861 F.2d 761, 764 (1st Cir. 1988) (rejecting priest's membership rights claim against missionary society).

Under the gender identity and sexual orientation nondiscrimination clause, the Commission may dictate what students may wear and be called at school, whether parents' wishes will be honored, and when and whether students and staff must be disciplined for failing to follow the Commission's guidance about these matters. JA72; *See also* Opp. at 10-11. All this despite the First Amendment's flat prohibition on the government sitting in judgment on "the conformity of the members of the church to the standard of morals required of them" and on "church discipline." *Milivojevich*, 426 U.S. at 714.

The religious expression rule puts the Commission—not St. Dominic—in charge of deciding what kind of religious expression is allowed at a Catholic school. *See* 5 M.R.S. § 4602(5)(D). For example, St. Dominic could not discipline a non-Catholic student who repeatedly makes comments in class challenging Catholic teachings based on his own religious beliefs. If it did, the student could file a complaint with the Commission, who would then be obligated to investigate and could order St. Dominic to change its disciplinary practices. A similar situation might arise if St. Dominic told a Baptist student that he could not host his own school Bible study, or proselytize Catholic students while at school. As explained above, being forced to include this kind of religious counterspeech violates the Free Speech Clause. *Supra* II.B. It also inappropriately entangles the government in St. Dominic's internal religious affairs, including its religious messaging and disciplinary decisions. *See Carson*, 596 U.S. at 787; *Our Lady*, 591 U.S. at 746.

The court below acknowledged that if the MHRA gave the Commission authority to investigate such matters, it would "undoubtedly raise entanglement concerns." ADD70. But how else can the Commission determine whether St. Dominic is permitting "equal" religious expression if it does not investigate when a complaint is raised? This underscores the unique burden the MHRA places on religious schools. Secular private schools approved under the program may continue to impose admissions policies and student expression requirements that are related to their chosen

mission—be it environmental concern or diversity, equity, and inclusion. *See supra* I.B. But if religious schools do the same, they are subject to detailed Commission oversight, including investigations, hearings, prosecution, and fines. 5 M.R.S. § 4566; *see NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979) ("It is not only the conclusions that may be reached by" an administrative agency's investigations "which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."). The Constitution forbids such entanglement.

## IV. The hiring discrimination section violates St. Dominic's rights under the ministerial exception and church autonomy doctrines.

Maine conceded below that even if it accepted state funds, St. Dominic "would still be entitled to limit employment of all staff, including teachers, to Catholics conforming to the Bishop's religious tenets," because the MHRA includes a religious exemption for religious employers. Opp. at 9. The district court went a bit further, holding that the statute does not have a co-religionist gloss (i.e., staff do not need to be Catholic for St. Dominic's employment decisions to be protected) and that there was therefore no conflict between St. Dominic's hiring practices and the hiring discrimination section, 5 M.R.S. § 4572 and 4573-A(2). On that basis, it denied St. Dominic's injunction request. *See* ADD41-43.

The district court was correct to reject Maine's co-religionist interpretation of the statute, but it was wrong to conclude that there is no conflict

left to be resolved. The ministerial exception shields a religious school's employment decisions regarding ministers even when not made "for a religious reason." *Hosanna-Tabor*, 565 U.S. at 194. And religious organizations have a broad right under the church autonomy doctrine to make "personnel decision[s] based on religious doctrine" even when it comes to non-ministerial staff. *Bryce v. Episcopal Church*, 289 F.3d 648, 660 (10th Cir. 2002). Together, these doctrines protect St. Dominic's right to hire Catholics and non-Catholics alike, and to hold them all to Catholic standards of conduct while working for the school.

That second piece remains an open question under the district court's opinion, as demonstrated by Maine's arguments below. Maine insisted that, while religious schools "would still be free to employ only members of their religion who conform to their religious tenets," they would not "be allowed to discriminate in hiring based on sexual orientation or gender identity." Opp. at 20. This means that, according to Maine, St. Dominic could decline to hire a non-Catholic teacher. But St. Dominic could not dismiss an employee (even a Catholic one) who enters a same-sex union in violation of Catholic teachings—even though such a decision would be "based on religious doctrine" and therefore protected under both Religion Clauses. *Bryce*, 289 F.3d at 660; *see also, e.g.*, *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 531 (7th Cir. 2023) (ministerial exception pro-

tected Catholic school's dismissal of employee for entering same-sex union); *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 320 (4th Cir. 2024) (similar).

Maine has consistently threatened to use the MHRA to strip participating schools of this aspect of their religious hiring rights. Commissioner Makin argued throughout the *Carson* litigation that if religious schools "receive public funds, the Maine Human Rights Act will prohibit them from considering sexual orientation in their employment decisions." *Carson v. Makin*, 401 F.Supp.3d 207, 209 (D. Me. 2019) (describing Makin's argument); *see also Carson v. Makin*, 979 F.3d 21, 30 (1st Cir. 2020) (describing similar argument before this Court); Br. of Resp't at 54, *Carson*, 596 U.S. 767, 2021 WL 4993533 (making same argument before Supreme Court). The Commission has also insisted that "once the public funds to which all taxpayers contribute are utilized to subsidize the religious organization, the organization must not discriminate" in "employment." JA58. And following *Carson*, Maine's Attorney General warned religious schools that participating in the program would require them to "eliminate" their religious hiring practices. JA63.

St. Dominic's hiring rights are rooted in longstanding protections that stem from both Religion Clauses. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 181. Because the MHRA threatens to intrude on these rights, this Court

should enjoin any enforcement of the MHRA that would prevent St. Dominic from requiring all employees, whether they are themselves Catholic or not, to comply with all of the school's religious tenets.

## V. Maine's rules impose unconstitutional conditions on the program.

Under the unconstitutional conditions doctrine, "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected" rights—including by imposing a "funding condition" that requires the recipient to forfeit the exercise of their First Amendment freedoms. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*AOSI*") (quoting *FAIR*, 547 U.S. at 59); *see also El Dia, Inc. v. Rossello*, 165 F.3d 106, 110 (1st Cir. 1999) ("Clearly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests[.]"). Nor can the government "go[] beyond defining the limits of the [government] funded program to defining the recipient" by seeking to control the internal policies of the recipient itself. *AOSI*, 570 U.S. at 218.

The district court concluded that this doctrine did not apply because "the Plaintiffs ha[d] not shown that Chapter 366 actually restricts their speech or religious exercise" or that they were likely "to succeed on their other constitutional challenges." ADD72. This is wrong. For one thing, the district court had already concluded that the MHRA *does* restrict St.

Dominic's religious exercise. *See* ADD49-50. The district court's sudden pivot here is inconsistent with that prior conclusion.

Inconsistencies aside, the proper inquiry is not whether a law directly violates a program recipient's rights. If it were, then other claims would do all the work and the unconstitutional conditions doctrine would be superfluous. Instead, the doctrine exists to address situations where the government indirectly burdens constitutionally protected activity by requiring the forfeiture of a constitutional right in order to obtain some benefit. *See AOSI*, 570 U.S. at 214.

For example, in *AOSI*, a federal grant program required grant recipients to "explicitly agree with the Government's policy to oppose prostitution and sex trafficking" as a condition of receiving funding. *Id.* at 213. "Were [this condition] enacted as a direct regulation of speech" the Supreme Court noted, it "would plainly violate the First Amendment." *Id.* But because the government had sought to do indirectly what it could not do directly, the unconstitutional conditions doctrine came into play. The Supreme Court held that, while the government could require grant recipients to use federal money to promote the government's anti-AIDS message and to oppose legalized prostitution, it could *not* require grantees to adopt the government's policies opposing legalized prostitution as their own. *Id.* at 220-21. That condition would require the program participants to forfeit their own First Amendment rights. *See id.* at 218.

This case is no different. The court below held that the MHRA "would effectively prohibit St. Dominic from enforcing several of its religiously motivated policies" if St. Dominic chose to participate in the program. ADD50. That burden arises because Maine has put St. Dominic to a choice between the full and free exercise of its First Amendment rights and accepting town tuitioning funds. *See* ADD49-50; *see also Carson*, 979 F.3d at 34 n.1 ("The Court's analysis [in *Trinity Lutheran* and *Espinoza*] resonates with unconstitutional conditions doctrine in the First Amendment area more generally."), *rev'd and remanded*, 596 U.S. 767. This "funding condition" thus requires the forfeiture of Appellants' First Amendment rights, just as the condition in *AOSI* did. *AOSI*, 570 U.S. at 214. Maine "cannot condition participation in its … program on the manner in which a group exercises its constitutionally protected" First Amendment freedoms. *Cuffley v. Mickes*, 208 F.3d 702, 709 (8th Cir. 2000). Plaintiffs are therefore likely to succeed on this claim, as well.

## VI. The remaining injunction factors favor Appellants.

Each of the other preliminary injunction factors weigh in favor of granting an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). This is why "irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *For-*

*tuño*, 699 F.3d at 11. Because Appellants are likely to succeed on the merits of their First Amendment claims, they have established an irreparable injury.

The balance of equities and public interest likewise favor Appellants. Where the government is the defendant, these "factors merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court held that Maine's interest in combating discrimination outweighed Appellants' interests in the free exercise of their religion, particularly where the district court did not think that Appellants were likely to succeed in their claims. ADD74. This was incorrect. While the public has an interest in preventing discrimination, that interest also extends to preventing discrimination against the religious schools and families in Maine. Thus, both Appellants' interests and the public interest are served by an injunction protecting Appellants' First Amendment rights. *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). Because Maine has no legitimate interest in continuing to deny religious institutions and individuals their First Amendment rights, these factors strongly favor granting a preliminary injunction.

For the 2023-24 and 2024-25 school years, the Radonises have paid for L.R.R. to attend St. Dominic. Since this lawsuit was filed, many other families have approached St. Dominic wanting to know if they can use their town tuitioning funds to send their kids to the school, only to be told

no. Because the harm to Appellants is ongoing, and because Maine has conceded all the facts necessary to resolve St. Dominic's claims—including in joint factual stipulations in the parallel case *Crosspoint Church*—the Court should instruct the district court to enter the requested injunction rather than remanding for any additional factual development. *See, e.g.*, *Puffer's Hardware, Inc. v. Donovan*, 742 F.2d 12, 17-18 (1st Cir. 1984) ("[A] remand is unnecessary since the constitutional issue in this case does not depend on any factual questions, but rather is purely a question of law.").

## CONCLUSION

The judgment of the district court should be reversed, and the case remanded with orders to enter a preliminary injunction that allows St. Dominic to participate in the program without forfeiting its First Amendment freedoms.

Respectfully submitted,

JAMES B. HADDOW
PETRUCCELLI, MARTIN &
  HADDOW LLP
Two Monument Square
  Suite 900
Portland, ME 04112
(207) 775-2360

ADÈLE AUXIER KEIM
  *Counsel of Record*
MARK L. RIENZI
BENJAMIN A. FLESHMAN
MICHAEL J. O'BRIEN
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*akeim@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

October 8, 2024

**CERTIFICATE OF COMPLIANCE**

Pursuant to 1st Cir. R. 32(g)(1), I certify that this brief complies with the length limits permitted by Fed. R. App. P. 32(a)(7)(B) because it is 12,996 words, excluding the portions exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Adèle A. Keim*
Adèle A. Keim

**ADDENDUM**

**Page**

Order on Plaintiffs' Motion for Preliminary Injunction
(Dkt. 50) ................................................................... ADD2

5 M.R.S. § 4553 ............................................................ ADD77

5 M.R.S. § 4572 ............................................................ ADD86

5 M.R.S. § 4573-A ........................................................ ADD90

5 M.R.S. § 4602 ............................................................ ADD91

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ST. DOMINIC ACADEMY, d/b/a        )
the ROMAN CATHOLIC BISHOP         )
OF PORTLAND, et al.,              )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )        No. 2:23-cv-00246-JAW
                                  )
A. PENDER MAKIN, in her personal  )
capacity and in her official capacity )
as Commissioner of the Maine      )
Department of Education, et al.,  )
                                  )
          Defendants.             )

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

A Catholic Diocese, a Catholic school, and a Catholic family seek to preliminarily enjoin certain educational and employment antidiscrimination laws, arguing that they violate the Free Exercise Clause, the Free Speech Clause, the Establishment Clause, and the unconstitutional conditions doctrine. Although the Court agrees that the plaintiffs have raised significant constitutional issues, the Court denies the motion, primarily because it concludes that the plaintiffs are unlikely to succeed on the merits. After rejecting the defendants' arguments against reaching the merits on *Pullman* abstention and ripeness grounds, the Court concludes that an injunction against the employment antidiscrimination provisions is unnecessary because the plaintiffs' proposed injunction would only reach conduct that is already protected by the plain text of the law. The Court further determines that the educational antidiscrimination provisions do not violate the Free Exercise

Clause because, despite not being generally applicable, they are neutral and survive strict scrutiny. In a similar vein, the Court rejects the plaintiffs' Free Speech Clause argument because the educational antidiscrimination provisions do not compel speech. Finally, the Court concludes that the plaintiffs have presented insufficient evidence that the educational antidiscrimination provisions invite excessive entanglement or impose unconstitutional conditions.[1]

## I.   PROCEUDRAL HISTORY

On June 13, 2023, the Roman Catholic Bishop of Portland, St. Dominic Academy (St. Dominic), and Keith and Valori Radonis—on their own behalf and as next friends of their children K.Q.R., L.R.R., and L.T.R—filed a civil action against Maine Department of Education Commissioner A. Pender Makin and Maine Human Rights Commission (MHRC) Commissioners Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas. *Verified Compl.* (ECF No. 1) (*Compl.*). The complaint broadly alleged that certain provisions of the Maine Human Rights Act (MHRA) effectively exclude St. Dominic from participating in Maine's school tuitioning program in violation of the Plaintiffs' rights under the Free Exercise, Free Speech, and Equal Protection clauses of the U.S. Constitution. *Id.* The Plaintiffs asked the Court to declare the challenged provisions of the

---

[1]    Although the parties requested oral argument, the Court has decided to issue this order without it. Although it is generally this Court's practice to hold oral argument when requested, the Court is conscious of the delay in issuing this opinion, and the parties' presumed determination to obtain a more authoritative decision from the Court of Appeals for the First Circuit. Moreover, the briefing for both sides of this lawsuit is thorough and excellent, and the Court is not convinced that oral argument would materially alter its conclusions.

MHRA unconstitutional and sought injunctive relief and damages.  *Id.* at 40.  All Defendants were sued in their official and personal capacities.  *Id.* ¶¶ 20-25.

On June 14, 2023, the Plaintiffs moved for a preliminary injunction, asking the Court to enjoin the allegedly unconstitutional provisions of the MHRA.  *Pls.' Mot. for Prelim. Inj.* (ECF No. 5) (*Pls.' Mot.*).  On July 3, 2023, the Plaintiffs filed correspondence to supplement the record with two cases recently decided by the United States Supreme Court.  *Notice of Suppl. Authority in Supp. of Pls.' Mot. for Prelim. Inj.* (ECF No. 20); *Notice of Suppl. Authority in Supp. of Pls.' Mot. for Prelim. Inj.* (ECF No. 21).  On July 11, 2023, the Defendants opposed the Plaintiffs' motion for preliminary injunction.  *Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.* (ECF No. 25) (*Defs.' Opp'n*).  On July 19, 2023, the Plaintiffs replied.  *Pls.' Reply in Supp. of Mot. for Prelim. Inj.* (ECF No. 29) (*Pls.' Reply*).

On August 11, 2023, the Defendants answered the complaint.  *Defs.' Answer to Pls.' Compl.* (ECF No. 30).  That same day, the Defendants filed a motion to dismiss all claims against them in their personal capacities.  *Defs.' Mot. to Dismiss Personal Capacity Claims* (ECF No. 31).  On September 1, 2023, the Plaintiffs opposed dismissal of the personal capacity claims.  *Pls.' Resp. in Opp'n to Mot. to Dismiss Personal Capacity Claims* (ECF No. 33).  On September 13, 2023, the Defendants replied.  *Defs.' Reply in Supp. of Their Mot. to Dismiss Personal Capacity Claims* (ECF No. 34).

On October 16, 2023, the Plaintiffs filed correspondence to supplement the preliminary injunction record with a case recently decided by the Court of Appeals

for the First Circuit. *Notice of Suppl. Authority in Supp. of Pls.' Mot. for Prelim. Inj.* (ECF No. 35). Similarly, on June 20, 2024, and again on June 28, 2024, the Plaintiffs filed correspondence to supplement the motion to dismiss record with recently decided cases from the United States Supreme Court and the District of Massachusetts. *Notice of Suppl. Authority in Supp. of Pls.' Resp. in Opp'n to Defs.' Partial Mot. to Dismiss* (ECF No. 47); *Notice of Suppl. Authority in Supp. of Pls.' Resp. in Opp'n to Defs.' Partial Mot. to Dismiss* (ECF No. 48).

## II.   FACTUAL BACKGROUND

### A.   The Parties

#### 1.   The Plaintiffs

The Roman Catholic Bishop of Portland is a Maine corporation that is the legal entity representing the Roman Catholic Diocese of Portland (Diocese). *Compl.* ¶ 17. The Diocese is part of the Roman Catholic Church, and it operates schools throughout Maine. *Id.*

St. Dominic Academy (St. Dominic) is a Roman Catholic school with campuses in Lewiston, Maine and Auburn, Maine that offers education from pre-kindergarten through twelfth grade. *Id.* ¶¶ 18, 40. It is an educational ministry of the Diocese, and the only Catholic high school operated by the Diocese in Maine. *Id.* ¶¶ 18, 46.

Keith and Valori Radonis are residents of Whitefield, Maine. *Id.* ¶ 19. They have three children: K.Q.R., age 16; L.R.R., age 15; and L.T.R., age 10. *Id.* K.Q.R. and L.R.R. are currently eligible to receive town tuitioning, as Whitefield has no

public high school.  *Id.* ¶¶ 19, 51.  L.T.R. will become eligible to receive town tuitioning upon entering the ninth grade in the 2027-2028 school year.  *Id.* ¶ 19.

Both Mr. Radonis and Ms. Radonis were raised in Catholic homes, and they strive to be faithful Catholics and to raise their children according to their Catholic faith.  *Id.* ¶ 52.  They believe that they have made a covenant with God to have and raise children according to the Catholic faith, that it is their religious responsibility as parents to plant, nurture, and cultivate their children's faith, and that a Catholic education is the best way to create a foundation of faith for their children.  *Id.* ¶¶ 58-59.

Before the Radonis family moved to Maine, Ms. Radonis homeschooled K.Q.R. and L.R.R. using a Catholic curriculum.  *Id.* ¶ 60.  Upon moving to Maine, Mr. Radonis and Ms. Radonis enrolled their children at St. Michael School (St. Michael), a Catholic school located approximately 30 minutes from the Radonis home.  *Id.* ¶¶ 61-62.

L.T.R. currently attends St. Michael.  *Id.* ¶ 62.  K.Q.R. and L.R.R. currently attend high school at Erskine Academy in China, Maine, approximately 25 minutes from the Radonis home.  *Id.* ¶ 63.  K.Q.R. and L.R.R.'s tuition at Erskine Academy is paid for by the tuitioning program.  *Id.* ¶ 64.  However, if St. Dominic were part of the tuitioning program, Mr. Radonis and Ms. Radonis would have used their town tuitioning dollars to send K.Q.R. and L.R.R. to St. Dominic for high school.  *Id.*  Mr. and Ms. Radonis would like to send L.R.R. to St. Dominic, where she has been

accepted, and to send L.T.R. to St. Dominic once he completes eighth grade at St. Michael. *Id.* ¶¶ 65, 67.

### 2. The Defendants

A. Pender Makin is the Commissioner of the Maine Department of Education. *Id.* ¶ 20. Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas are members of the Maine Human Rights Commission (MHRC), an agency of the state of Maine, created and empowered under 5 M.R.S. § 4566 to "investigat[e] all forms of invidious discrimination, whether carried out legally or illegally, and whether by public agencies or private persons." *Id.* ¶¶ 21-25; 5 M.R.S. § 4566. All six Defendants are sued in their personal and official capacities. *Compl.* ¶¶ 20-25.

Commissioner Makin and the MHRC Commissioners both have authority to issue rules implementing the education provisions of the Maine Human Rights Act (MHRA). *Id.* ¶ 160. Under the MHRA, the MHRC is further empowered to investigate "alleged infringements upon human rights and personal dignity." *Id.* ¶ 161; 5 M.R.S. § 4566. A private party may file a complaint with the MHRC, which the MHRC will then investigate and, potentially, file suit in Maine Superior Court. *Compl.* ¶ 161; 5 M.R.S. §§ 4611-4612. Alternatively, private parties may independently file suit under the MHRA in Maine Superior Court. *Compl.* ¶ 161; 5 M.R.S. § 4621.

### B. Maine's School Tuitioning Program

#### 1. The Pre-*Carson* Regime

Maine law provides that "[i]t is the intent of the Legislature that every person within the age limitations prescribed by state statutes shall be provided an opportunity to receive the benefits of a free public education."  20-A M.R.S. § 2(1).  The "control and management of the public schools" is "vested in the legislative and governing bodies of local school administrative units [SAUs], as long as those units are in compliance with appropriate state statutes," *id.* § 2(2), and "[a] school administrative unit that neither maintains a secondary school nor contracts for secondary school privileges . . . shall pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student is accepted."  *Id.* § 5204(4).  A similar provision exists for elementary schools.  *Id.* § 5203(4).  The upshot is that Maine's tuitioning program permits SAUs—some of which are sparsely populated—to pay the tuition for students to attend other approved public or private schools, in lieu of maintaining their own.

To participate in the tuitioning program, a school need not be located in Maine.  *Compl.* ¶ 74.  Maine has paid tuition to schools in Vermont, New Hampshire, Massachusetts, Connecticut, New York, Pennsylvania, Virginia, Michigan, Colorado, Utah, California, and Quebec, Canada.  *Id.* ¶ 75.

In addition to the tuitioning program for elementary and secondary schools, Maine operates grant programs for students attending postsecondary institutions.  *Id.* ¶ 77.  Such grants can be used at any public or private postsecondary institution in Maine, including those that are religious.  *Id.*

When a SAU opts to pay students' tuition rather than maintain its own school(s), parents are solely responsible for selecting the school their children attend. *Id.* ¶ 72. To receive the tuitioning benefit, however, the parents must select an "approved" school satisfying certain statutory criteria. *Id.* Section 2951 of title 20-A of the Maine statutes, entitled "Approval for tuition purposes," provides in pertinent part:

> A private school may be approved for the receipt of public funds for tuition purposes only if it:
>
> **2. Nonsectarian.** Is a nonsectarian school in accordance with the First Amendment of the United States Constitution.

20-A M.R.S. § 2951(2).

### 2. The *Carson* Litigation

In 2018, three families sued Maine's Education Commissioner to challenge 20-A M.R.S. § 2951(2), the "sectarian exclusion," claiming that it violated the First Amendment's Free Exercise Clause. *See Carson v. Makin*, 979 F.3d 21, 26-27 (1st Cir. 2020); *Carson v. Makin*, 142 S. Ct. 1987, 1994-95 (2022). On June 21, 2022, the United States Supreme Court held that Maine's sectarian exclusion violates the Free Exercise Clause because it "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Carson*, 142 S. Ct. at 2002. Specifically, the Supreme Court held that the schools favored by the families in *Carson* "are disqualified from this generally available benefit 'solely because of their religious character.'" *Id.* at 1997 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017)). The Court continued, "[b]y 'condition[ing] the availability of benefits' in that manner, Maine's tuition

assistance program . . . 'effectively penalizes the free exercise' of religion." *Id.* at 1997 (first alteration in original) (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). Since *Carson* was decided, the Maine Department of Education has understood that private schools cannot be barred from receiving public funds solely because they are sectarian. *Aff. of Megan Welter* ¶ 4 (ECF No. 26) (*Welter Aff.*).

### 3.    The Tuitioning Program After *Carson*

During the 2022-2023 school year, Cheverus High School (Cheverus) was the only sectarian school to participate in the tuitioning program. *Welter Aff.* ¶¶ 5, 7, 9. Cheverus is a Catholic school that is owned and operated by the Jesuits. *Pls.' Reply*, Attach. 1, *Decl. of Marianne Pelletier* ¶ 4 (*Pelletier Decl.*). It is operationally independent from the Diocese and establishes its own policies regarding admissions, hiring, curriculum, and student conduct. *Id.* ¶¶ 5-6.

The Maine Department of Education processed Cheverus' application in the same manner that it processes applications from any private school seeking tuitioning approval for the first time. *Welter Aff.* ¶ 6. During the 2022-2023 school year, five students attended Cheverus at public expense through the tuitioning program. *Id.* ¶ 8.

### C.    The Maine Human Rights Act's Antidiscrimination Provisions

### 1.    The Maine Human Rights Act's Unlawful Educational Discrimination Provisions

The MHRA contains certain antidiscrimination provisions that apply to "educational institutions," defined as "any public school or educational program, any public postsecondary institution, any private school or educational program

approved for tuition purposes and the governing body of each such school or program."  *See* 5 M.R.S. § 4553(2-A) (defining "educational institution"); *id.* § 4602 (discussing "unlawful educational discrimination").  Violations of 5 M.R.S. § 4602 carry civil monetary penalties of up to $20,000 for a first violation, up to $50,000 for a second violation, and up to $100,000 for subsequent violations, as well as attorney's fees in certain circumstances.  *Id.* §§ 4613(2)(B)(7), 4614.  The Maine Superior Court is also empowered to issue a cease-and-desist order, *id.* § 4613(2)(B)(1), to order reinstatement of a victim of unlawful employment discrimination with or without back pay, *id.* § 4613(2)(B)(2), and to award both compensatory and punitive damages.  *Id.* § 4613(2)(B)(8).

The MHRA's definition of "educational institution" does not include private postsecondary institutions, *id.* § 4553(2-A), and although schools outside Maine can participate in the tuitioining program, the MHRA does not apply extraterritorially. *Compl.* ¶ 128; *Judkins v. Saint Joseph's Coll. of Me.*, 483 F. Supp. 2d 60, 65-66 (D. Me. 2007).  When the Plaintiffs filed their complaint, the MHRA also exempted single-sex schools, even those participating in the tuitioning program, from its prohibitions on discrimination based on race, color, ancestry, national origin, sex, religion, sexual orientation, and gender identity.  *Compl.* ¶ 129; *see Defs.' Opp'n* at 5 (acknowledging the omission but suggesting it was likely "inadvertent").  On June 15, 2023, however, the Governor of Maine signed Maine Public Law 2023, Chapter 188 (Chapter 188), which amended the MHRA to remove the exclusion of single-sex schools from the definition of "educational institution."  P.L. 2023, ch. 188, § 1 ("An

Act to Amend the Definition of 'Educational Institution' Under the Maine Human Rights Act to Include Single-Sex Education Institutions"), 2023 Me. Laws 370.

### 2.    The 2021 Amendments to the Maine Human Rights Act

While *Carson* was pending, the Maine Legislature enacted several amendments to the MHRA. *See Compl.* ¶ 106; P.L. 2021, ch. 366, § 19 ("An Act to Improve Consistency in Terminology and within the Maine Human Rights Act"), 2021 Me. Laws 766-67 (Chapter 366). Prior to the enactment of Chapter 366, the MHRA's educational antidiscrimination provisions did not include gender identity, religion, ancestry, or color as protected classes but did include a provision stating that "[t]he provisions in this subsection [prohibiting discrimination on the basis of] sexual orientation do not apply to any education facility owned, controlled or operated by a bona fide religious corporation, association or society." *See Compl.* ¶ 131; P.L. 2005, ch. 10, § 21 ("An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation").

Chapter 366, which took effect on October 18, 2021, added gender identity, religion, ancestry, and color as protected classes under the statute and narrowed the religious exception to state that "[n]othing in this section . . . requires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." *See Compl.* ¶¶ 107-09, 132; P.L. 2021, ch. 366, § 19, 2021 Me. Laws 767; 5 M.R.S. § 4602(5)(C). Chapter 366 provides no exemptions from the prohibition against religious discrimination and further requires that "to the extent that an educational

institution permits religious expression, it cannot discriminate between religions in so doing." *See Compl.* ¶¶ 107, 109, 132; P.L. 2021, ch. 366, § 19, 2021 Me. Laws 767; 5 M.R.S. § 4602(5)(D).

The Plaintiffs view Chapter 366 as an "attempt to keep religious schools out of the [tuitioning] program" in the absence of the sectarian exclusion invalidated in *Carson. Compl.* ¶ 106. As evidence, they point to Maine's statements during the *Carson* litigation, which "repeatedly described the purpose of the sectarian exclusion using language strikingly similar to the new prohibitions in [Chapter 366]." *Id.* ¶ 111.

The Plaintiffs further support their characterization of Chapter 366 by citing two press releases issued by Maine's Attorney General. The first, issued on the day the Supreme Court heard oral argument in *Carson*, reads in part:

> Schools that require students to undergo religious instruction are excluded [from the tuitioning program] because the education they provide is not equivalent to a public education.
> . . .
> Schools receiving taxpayer funds are appropriately subject to the Maine Human Rights Act (MHRA), which prohibits discrimination against individuals on the basis of several protected classes. The two religious schools that the parents in this case want to send their children to have made it clear that they are not interested in complying with the MHRA and, therefore, these schools have not even applied to the Maine Department of Education to be eligible to participate in Maine[']s tuition program. Put differently, these schools want to continue to discriminate against individuals based on their status in a protected class and that is inconsistent with the protections afforded to all Mainers under the MHRA.
>
> . . .
> It would be inappropriate if Maine taxpayers were forced to fund schools which exclude and discriminate against other Mainers, as that would erode the foundational principles of a public education that is diverse and accessible to all.

*Id.* ¶¶ 114-16.  The second press release, issued the day the Supreme Court issued

its decision in *Carson*, further states, in relevant part:

> "I am terribly disappointed and disheartened by today's decision," said
> AG Frey.  "Public education should expose children to a variety of
> viewpoints, promote tolerance and understanding, and prepare
> children for life in a diverse society.  The education provided by the
> schools at issue here is inimical to a public education.  They promote a
> single religion to the exclusion of all others, refuse to admit gay and
> transgender children, and openly discriminate in hiring teachers and
> staff.  One school teaches children that the husband is to be the leader
> of the household.  While parents have the right to send their children
> to such schools, it is disturbing that the Supreme Court found that
> parents also have the right to force the public to pay for an education
> that is fundamentally at odds with values we hold dear.  I intend to
> explore with Governor Mills' administration and members of the
> Legislature statutory amendments to address the Court's decision and
> ensure that public money is not used to promote discrimination,
> intolerance, and bigotry."
>
> While the Court's decision paves the way for religious schools to apply
> to receive public funds, it is not clear whether any religious schools will
> do so.  Educational facilities that accept public funds must comply with
> anti-discrimination provisions of the Maine Human Rights Act, and
> this would require some religious schools to eliminate their current
> discriminatory practices.

*Id.* ¶ 119.

The Plaintiffs also point to a June 26, 2022 tweet by then-Speaker of the

Maine House of Representatives Ryan Fecteau.  *Id.* ¶ 122.  An individual tweeted,

"You know how SCOTUS said Maine couldn't exclude religious schools from their

voucher program?  Maine just changed the guidelines to exclude schools that

discriminate against LGBTQ+ students."  *Id.*  Speaker Fecteau responded, "Sure

did.  Anticipated the ludicrous decision from the far-right SCOTUS."  *Id.*

Finally, the Plaintiffs cite an essay by U.C. Davis School of Law Professor

Aaron Tang titled, "There's a Way to Outmaneuver the Supreme Court, and Maine

Has Found It," which appeared in the *New York Times* on June 23, 2022, two days after the Supreme Court decided *Carson*. *Id.* ¶ 120. In the essay, Professor Tang states:

> Let's start with the Carson case. Anticipating this week's decision, Maine lawmakers enacted a crucial amendment to the state's anti-discrimination law last year in order to counteract the expected ruling.
> . . .
> The legislative fix made by Maine lawmakers offers a model for lawmakers elsewhere who are alarmed by the court's aggressive swing to the right. Maine's example shows that those on the losing end of a case can often outmaneuver the court and avoid the consequences of a ruling.

*Id.* ¶ 121.

### 3. The Maine Human Rights Act's Unlawful Employment Discrimination Provisions

The MHRA's employment discrimination provision, which the Plaintiffs also challenge, states that it is a violation of the Act "[f]or any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status." *Id.* ¶ 152; 5 M.R.S. § 4572(1)(A). However, the Act also clarifies that the employment discrimination provisions do not:

> [P]rohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities. Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization.

5 M.R.S. § 4573-A(2).

### D.      St. Dominic Academy's Tuitioning Eligibility and Policies

#### 1.      Diocesan Schools in Maine

Education is central to the Catholic faith, and diocesan bishops are responsible for ensuring that Catholic schools are established in a particular area. *Compl.* ¶¶ 30-31. The bishop is also responsible for overseeing the operations of local Catholic schools. *Id.* ¶ 31. The Diocese began founding Catholic schools in Maine over 100 years ago. *Id.* ¶ 32. Today, it operates eight schools, including St. Dominic, which collectively educate more than 2,100 students. *Id.*

#### 2.      St. Dominic Academy's Tuitioning Eligibility

Except for the provisions of the MHRA challenged here, St. Dominic meets or is capable of meeting the requirements to become approved for tuitioning purposes. *Id.* ¶ 18. St. Dominic has received Basic School Approval from the state of Maine. *Id.* ¶ 45. But for the challenged provisions, St. Dominic would apply to participate in the tuitioning program, and the school believes it would be approved. *Id.* ¶ 124.

Because St. Dominic is the only Catholic high school operated by the Diocese in Maine, it not unusual for students to commute from 30 to 60 minutes away to attend St. Dominic. *Id.* ¶ 46. Several towns that participate in the tuitioning program are within an hour's drive of St. Dominic, including Whitefield, Raymond, Fayette, Chelsea, Alna, Westport, Windsor, Vassalboro, Dresden, West Bath, and Hanover. *Id.* ¶ 47. Some of these towns are near Augusta, where St. Dominic has operated a bus for students in the past and plans to do so again when enrollment warrants it. *Id.* ¶ 48.

Students eligible for town tuitioning have attended St. Dominic in recent years, and St. Dominic expects more to enroll in the future. *Id.* ¶ 49. According to St. Dominic, additional families would use tuitioning funds to send their children to St. Dominic if the school were approved. *Id.*

### 3. St. Dominic Academy's School Policies

The Diocese's mission in operating Catholic schools is "to strengthen the Catholic Church and to create an environment in which the faith is preserved, nourished, shaped and communicated" so that "students will become faith-filled Christians" who contribute to the "Church and communities." *Id.* ¶ 33.

Because Catholic schools are part of the Catholic Church's evangelizing mission, Diocese policy provides that "[s]tudents of other religious beliefs should be admitted whenever possible." *Id.* ¶ 34. However, to ensure that Catholic schools continue to help Catholic parents give their children a Catholic education, the Diocese gives preference to Catholic students in both admissions and financial aid. *Id.* Further preference is given to members of the parish to which the school belongs. *Id.*

For all schools, the Diocese only admits students, whether Catholic or non-Catholic, who "understand, accept, and [are] willing to support the mission and goals of the school," and who agree to attend religion classes, Mass, and other religious activities." *Id.* ¶ 35. Students at St. Dominic must also agree to uphold "Catholic Christian morals." *Id.* ¶ 36.

The Diocese has adopted the following nondiscrimination policy for all its schools:

> Maine Catholic Elementary and Secondary Schools within the Roman Catholic Diocese of Portland admit students of any race, color, national and ethnic origin to all the rights, privileges, programs, and activities generally accorded or made available to students at the school. They do not discriminate on the basis of race, color, national and ethnic origin in administration of their educational policies, admissions policies, scholarship and loan programs, and athletic and other school administered programs.

*Id.* ¶ 37.

A primary characteristic of Catholic schools is a "concern for teaching the integration of faith, culture, and life." *Id.* ¶ 38. Because the "personnel of a Catholic school are critical to achieving this ministry," each school employee shares the responsibility to form students in the faith by the knowledge they share and by the faith they model in action. *Id.* Teachers and other employees are evaluated based on how they maintain and promote the Catholic identity and mission of the school. *Id.* ¶ 39. In addition, as a condition of employment, all employees must "[l]ive personal lives in such a way that fundamental teachings of the Catholic Church are upheld." *Id.*

## III. THE PARTIES' POSITIONS

### A. The Plaintiffs' Motion for Preliminary Injunction

In their motion, the Plaintiffs assert that "[a]fter *Carson*, it is clearly established that excluding religious schools from Maine's tuition assistance program is unconstitutional," and "[w]hether Maine accomplishes this through the flat ban struck down in *Carson* or through the web of entangling laws enacted in

*Carson*'s shadow, Maine's rules are unconstitutional." *Pls.' Mot.* at 1.  According to the Plaintiffs, "Maine's ongoing efforts to exclude religious schools from the program violate Plaintiffs' First Amendment rights in nine different ways." *Id.* at 5.

The Plaintiffs initially argue the challenged provisions of the MHRA violate the Free Exercise Clause in four different ways.  First, in their view, "Maine's rules violate the Free Exercise Clause by targeting religion," *id.*, because "each piece of Maine's new regulatory scheme is intended to prevent religious schools like St. Dominic from participating in Maine's program, and actually does so."  *Id.* at 9. Second, the Plaintiffs submit that "Maine's rules violate the Free Exercise Clause by re-imposing the same exclusion from a public benefits program invalidated in *Carson*."  *Id.* at 10.  Third, the Plaintiffs contend that "Maine's rules violate the Free Exercise Clause because they are not generally applicable." *Id.* at 12.  Finally, the Plaintiffs maintain that "Maine's rules violate the Free Exercise Clause by infringing on the rights of parents to direct the religious education of their children." *Id.* at 12.

Next, the Plaintiffs submit that the provision of the MHRA requiring "equal religious expression" runs afoul of the Free Speech Clause because "it compels speech by religious schools," *id.* at 13, and "violates the Free Speech Clause right of expressive association." *Id.* at 14.

Shifting away from the Free Speech and Free Exercise clauses, the Plaintiffs further contend that the challenged MHRA provisions violate three other First Amendment doctrines.  According to the Plaintiffs, "Maine's rules violate the

Establishment Clause because they invite excessive entanglement under *Carson*," thereby allowing "Maine officials to condone the actions of religious schools who have beliefs the government agrees with and sanction those who do not." *Id.* at 15. In addition, the Plaintiffs suggest that "Maine's rules violate the First Amendment right of religious autonomy." *Id.* at 17. Finally, the Plaintiffs submit that "Maine's rules impose unconstitutional conditions on the [tuitioning] program." *Id.* at 18.

In light of these alleged constitutional infirmities, the Plaintiffs declare that "Maine's rules cannot satisfy strict scrutiny" because "they are not narrowly tailored to serve a compelling government interest." *Id.* at 19. In particular, the Plaintiffs dispute Maine's asserted interest "in preventing discrimination in education" as being underinclusive. *Id.* Accordingly, the Plaintiffs submit that "Maine's interests [do not] justify its rules." *Id.*

The Plaintiffs conclude with a discussion of the other preliminary injunction factors, which they believe weigh in their favor. *Id.* at 19-20. The Plaintiffs assert that they are "suffering and will continue to suffer irreparable harm due to the ongoing violation of their First Amendment rights." *Id.* at 20. In addition, they submit that the Radonis family is irreparably harmed "by the loss of educational opportunities for L.R.R.," who they wish to enroll at St. Dominic. *Id.* Finally, the Plaintiffs maintain that the balance of equities favors injunctive relief and that the public interest is best served by protecting First Amendment rights. *Id.*

### B.   The Defendants' Opposition

In their opposition, the Defendants initially submit that the Court should not reach the merits of the Plaintiffs' claims. *Defs.' Opp'n* at 7-9. The Defendants

assert that under the doctrine of *Pullman* abstention, the "Court should [] abstain from deciding this case, at least until Maine courts have had the opportunity to interpret the new amendments to the MHRA." *Id.* at 7. Further, the Defendants suggest this case is not ripe because "the extent to which the MHRA applies to St. Dominic should it accept public funds is a purely hypothetical issue," and the harms alleged by the Plaintiffs are based on contingent future events. *Id.* at 8-9.

The Defendants next argue that if the Court does reach the merits, it should conclude that the challenged provisions of the MHRA do not violate the Plaintiffs' rights under the Free Exercise Clause. *Id.* at 9-15. In the Defendants' view, the Plaintiffs "fail to demonstrate that application of the MHRA to St. Dominic would have any meaningful impact on it, much less burden or interfere with its religious practices." *Id.* at 9. "Even if there were some burden on Plaintiffs' religious practices," the Defendants contend the challenged provisions are both neutral and generally applicable. *Id.* at 11. Regarding neutrality, the Defendants maintain that the "2021 amendments to the MHRA were neither designed to impinge on religious practices nor motivated by any animus toward religion" and instead "made the educational provisions of the MHRA consistent with those addressing employment and housing." *Id.* at 13. With respect to general applicability, the Defendants dispute the Plaintiffs' arguments that the challenged provisions are not generally applicable because the MHRA does not apply extraterritorially or to private postsecondary institutions. *Id.* at 14. Finally, the Defendants submit that "[r]equiring private religious schools that accept public funds to comply with the

MHRA does not infringe on the rights of parents to raise their children and direct their religious upbringing." *Id.* at 16.

Turning to the Plaintiffs' claims under the Free Speech Clause, the Defendants aver that the challenged provisions do not compel speech. *Id.* at 17-18. Nor, in the Defendants' view, do the challenged provisions violate the Plaintiffs' right of expressive association. *Id.* at 18. "[E]ven if there is some interference with Plaintiffs' associational rights," the Defendants argue, "it is outweighed by the State's interest in ensuring that schools educating students at public expense do not discriminate." *Id.*

Regarding the Plaintiffs' remaining First Amendment claims, the Defendants initially deny that the challenged provisions result in excessive entanglement. *Id.* at 19. They also suggest the Plaintiffs' religious autonomy argument is unavailing because it only references the MHRA's unlawful employment discrimination provisions, yet "St. Dominic is free to employ only Catholics who subscribe to the Bishop's religious tenets." *Id.* Finally, with respect to the Plaintiffs' unconstitutional conditions argument, the Defendants submit that "[b]ecause the MHRA is a neutral and generally applicable law, it does not need to have any exceptions for religious schools (apart from exceptions to protect some employment practices)." *Id.* at 20. In the Defendants' view, "allow[ing] religious schools to exempt themselves from the MHRA's educational provisions by not accepting public funds . . . is not an unconstitutional condition. It is a benefit that give[s] religious

schools an option if their religious beliefs prevent them from complying with the MHRA." *Id.* at 20-21.

Concluding their discussion of the merits, the Defendants argue that the challenged provisions survive strict scrutiny. *Id.* at 21-23. The Defendants aver that "[t]here can be no dispute that states have a compelling interest in eliminating discrimination," and "[s]tates have an even greater interest in ensuring that publicly-funded institutions do not discriminate." *Id.* at 21. In the Defendants' view, this compelling interest "outweighs whatever interest St. Dominic might have in engaging in discrimination." *Id.* at 22.

Finally, the Defendants submit that the remaining preliminary injunction factors weigh in their favor. *Id.* at 23-24. The Defendants characterize the Plaintiffs' alleged irreparable harm as "speculative," and suggest that "even if the Court were to enjoin Defendants, that would not prevent the harm Plaintiffs are claiming." *Id.* The Defendants conclude by submitting that the balance of equities favors them, and that "the public interest would suffer if [their] efforts to eliminate discrimination were impeded." *Id.* at 24.

### C.   The Plaintiffs' Reply

Beginning with the Defendants' abstention arguments, the Plaintiffs contend that "*Pullman* abstention does not apply" because "Plaintiffs' claims do not depend on any ambiguous provisions of state law." *Pls.' Reply* at 2. The Plaintiffs go on to assert that the case "is ripe." *Id.* at 3. This is so, they continue, because "St. Dominic [] has concrete plans to engage in proscribed activity that it believes to be constitutionally protected." *Id.* (internal quotations omitted).

Turning to their free exercise arguments, the Plaintiffs contend that Chapter 366 targets religion because "Maine never disputes—and thereby concedes—that [Chapter 366 was] keyed to practices of religious schools." *Id.* at 4. They further suggest the Defendants' opposition does not "address Plaintiffs' argument that the Act reimposes the non-sectarian exclusion that *Carson* struck down, thus conceding the merits on this claim." *Id.* Regarding general applicability, the Plaintiffs submit that the fact that the MHRA does not apply to out-of-state or private postsecondary institutions "undermines Maine's asserted interests in the same way that an exemption for Plaintiffs would." *Id.* at 5. Finally, the Plaintiffs say that the provisions at issue infringe on the right of parents to direct the religious education of their children because "[c]omplying with the Act interferes with St. Dominic's ability to provide the Radonis' children with a Catholic education." *Id.* at 6.

With respect to their free speech claims, the Plaintiffs reiterate that the provision of the MHRA requiring "equal religious expression" compels speech by religious schools and forces them "to modify their religious message by allowing all other religious expression on campus." *Id.* The Plaintiffs further submit that this provision also "burdens Plaintiffs' association by precluding the Radonises from using town-tuitioning funds at St. Dominic unless St. Dominic is willing to modify its Catholic message by allowing an equal amount of non-Catholic religious expression at its school." *Id.* at 7.

The Plaintiffs then shift to their other First Amendment arguments. *Id.* at 7-9. In their view, it "is difficult to imagine a more entangling inquiry than one which

asks how much non-Catholic expression a Catholic school must permit." *Id.* at 8. Despite the Defendants' concessions regarding the MHRA's unlawful employment discrimination provisions, the Plaintiffs maintain they are entitled to a preliminary injunction in this respect based on Maine's prior statements. *Id.* Moreover, regarding unconstitutional conditions, the Plaintiffs argue that "*Carson* cannot be sidestepped by labeling participation [in the tuitioning program] by religious schools an 'option' and a 'benefit' such that Maine can dictate the details of who may carry out a school's religious mission and how they may do so." *Id.* at 9.

In the Plaintiffs' view, their identified constitutional violations "mean[] that Maine must pass strict scrutiny, which it cannot do." *Id.* According to the Plaintiffs, the Supreme Court "has repeatedly held that when an antidiscrimination law is applied in a way that violates First Amendment rights, the Constitution must prevail." *Id.* at 10. The Plaintiffs again dispute the Defendants' identified interests and suggest that "Maine often chooses not to pursue [these interests] at all, as when giving money to out of state schools and in-state private colleges not covered by the Act." *Id.*

Finally, the Plaintiffs reiterate that the remaining preliminary injunction factors favor them, and that "preventing Defendants from enforcing the challenged provisions would provide significant relief to Plaintiffs." *Id.*

## IV.   **LEGAL STANDARD**

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med.*

*News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   A judge should grant such injunctive relief "sparingly."   *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

To determine whether to issue a preliminary injunction a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor."   *Id.* at 18.   "[T]rial courts have wide discretion in making judgments regarding the appropriateness of such relief."   *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## V.   DISCUSSION

### A.   Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."   *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming

that this factor is "the most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007))).

### 1.     The Defendants' Arguments Against Reaching the Merits

Though the Plaintiffs bear the burden of demonstrating likelihood of success, the Defendants argue the Court should not even reach the merits of the preliminary injunction for two reasons.  First, the Defendants submit that the Court should abstain from deciding the merits under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), on the ground that the merits involve uncertain issues of state law.  Further, the Defendants contend that this dispute is not ripe.  The Court addresses both bases for bypassing the merits.

### a.     *Pullman* Abstention

Under the abstention doctrine announced by the United States Supreme Court in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), "declining to exercise jurisdiction is warranted where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." *Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008); *see also* 17A Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Vikram David Amar, Federal Practice and Procedure § 4242 (3d ed. 2007) (noting that under *Pullman* abstention, "a federal court may, and ordinarily should, refrain from deciding a case in which state action is challenged in federal court as contrary to the federal constitution if there are unsettled questions of state law that may be dispositive of the case and avoid the need for deciding the constitutional question"

(footnote omitted)).  In *Pullman* itself, for example, the Supreme Court held that abstention was appropriate because a "substantial" constitutional issue—a potential Fourteenth Amendment violation—could be avoided if a Texas state court concluded that the state's railroad commission lacked the authority under state law to promulgate the order at issue.  312 U.S. at 498-99, 501.

In the Defendants' view, *Pullman* abstention is appropriate here because "no state court has yet interpreted [Chapter 366], much less how [it] would be applied to a religious school."  *Defs.' Opp'n* at 7.  Accordingly, the Defendants say it is unclear whether Chapter 366 would actually lead to some of the consequences envisioned by the Plaintiffs.  *Id.*  The Defendants submit that state court interpretations of Chapter 366 would "better focus the constitutional inquiry" and could render it "unnecessary to decide the constitutional issues raised by Plaintiffs."  *Id.*

The Plaintiffs disagree, contending that the Defendants' "novel" abstention argument "fails because Plaintiffs' claims do not depend on any ambiguous provisions of state law."  *Pls.' Reply* at 2.  The Plaintiffs further argue that any state court interpretation of Chapter 366 would not resolve all the constitutional issues presented, and they suggest that the "only ambiguity Maine points to is whether the Act will be interpreted to burden Plaintiffs' religious exercise in each and every way that Plaintiffs identify."  *Id.* (footnote omitted).  In the Plaintiffs' view, "Maine concedes that the Act will burden Plaintiffs in at least some ways, and that is enough."  *Id.* (citation omitted).  The Court concludes the Plaintiffs have the better argument.

In cases subsequent to *Pullman*, the Supreme Court has emphasized that abstention is appropriate only if a state court interpretation could resolve the constitutional issues presented and the state law at issue is ambiguous. *Wisconsin v. Constantineau*, 400 U.S. 433, 437-39 (1971); *see also* WRIGHT, MILLER, COOPER & AMAR, *supra*, § 4242 ("Thus abstention is not indicated if the state law is clear on its face, or if its meaning has already been authoritatively decided by the state courts, or if the constitutional issue would not be avoided or changed no matter how the statute is construed" (footnotes omitted)). Indeed, "[w]here there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim." *Constantineau*, 400 U.S. at 439.

Here, the Defendants do not point to any ambiguity in the challenged provisions of the MHRA, nor do they demonstrate how the interpretation of these statutes by a Maine state court would obviate the need to reach the constitutional issues raised by the Plaintiffs. Instead, the Defendants merely suggest that a state court interpretation would further illuminate the scope of the challenged provisions, thereby "better focus[ing] the constitutional inquiry." *Defs.' Opp'n* at 7. As the Plaintiffs point out, however, the only ambiguity implicated by this argument "is whether the Act will be interpreted to burden Plaintiffs' religious exercise in each and every way that Plaintiffs identify." *Pls.' Reply* at 2. This is not sufficient ambiguity under *Pullman*, as the Supreme Court has explained that the abstention doctrine should not be applied so expansively as to obscure federal courts' jurisdiction to decide federal constitutional questions, even when those questions

are "enmeshed with state law." *Constantineau*, 400 U.S. at 437-39. As the Defendants have not adequately shown how the interpretation of the challenged provisions by Maine state courts would resolve the constitutional issues presented, the Court rejects their *Pullman* abstention argument.

### b. Ripeness

The United States Supreme Court has explained that the basic function of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). "While the doctrine has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995) (citing U.S. CONST. art. III., § 2; and *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242-45 (1952)).

"To determine whether a case is ripe for review, a federal court must evaluate the fitness of the issue presented and the hardship that withholding immediate judicial consideration will work." *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999). "To establish ripeness in a pre-enforcement context, a party must have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity," and "[a] showing that the challenged statute, fairly read, thwarts implementation of the plan adds the element of hardship." *Id.*

The Defendants contend that this case is not ripe because "the extent to which the MHRA applies to St. Dominic should it accept public funds is a purely

hypothetical issue." *Defs.' Opp'n* at 8.  The Defendants point out that St. Dominic "has not yet applied to participate in the tuitioning program," and they further suggest that "even if it were to participate and be accepted, a claim would arise only if it then allegedly violated the MHRA and the aggrieved person or a staff member of the MHRC were to make a charge of discrimination." *Id.*  According to the Defendants, that "this case is not ripe is further evidenced by the fact that" Cheverus, another Catholic high school, "participated in the tuitioning program for a full school year, and Plaintiffs do not claim that any charge of discrimination was made (or even threatened) against that school or that the school had to curtail any of its religious practices." *Id.* at 9.

The Plaintiffs, on the other hand, maintain that the "lawsuit is ripe." *Pls.' Reply* at 3.  They argue that "the possibility of enforcement through individual complaints ma[kes] the likelihood of prosecution greater, not less" and that "the existence of a valid legal defense does not defeat ripeness." *Id.* (emphasis omitted). The Plaintiffs further represent that St. Dominic is preparing to apply for the tuitioning program but intends to continue engaging in activities that are arguably prohibited by the MHRA. *Id.*  In other words, the Plaintiffs argue that St. Dominic "has concrete plans to engage in proscribed activity that it believes to be constitutionally protected." *Id.* (internal quotations omitted).

The Court finds *Whitehouse* instructive and agrees with the Plaintiffs.  In *Whitehouse*, the First Circuit considered a First Amendment challenge to a law prohibiting the use of certain public records for commercial solicitation.  199 F.3d at

28-29. The plaintiff association obtained protected records to use for commercial solicitations but feared prosecution under the law, despite no person having been criminally charged in its 20-year existence. *Id.* at 28. "Reluctant either to execute or to abandon its [plan], and seeing no other way of resolving the issue, the Association sued" to have the law enjoined as unconstitutional. *Id.* at 29. The state's Attorney General contended that the complaint "showed neither a sufficiently definite plan to engage in conduct that would transgress [the challenged law] nor a sufficiently imminent threat of prosecution." *Id.*

The *Whitehouse* Court sided with the plaintiff. Regarding fitness, the First Circuit observed that:

> This is not a case of statutory ambiguity but, rather, one that presents a single, purely legal question: Does Rhode Island's prohibition on using public records for commercial solicitation unconstitutionally restrain free expression? The Association has described a concrete plan to recruit new members—an activity plainly proscribed by the text of section 38–2–6—and no one has suggested any valid reason why resolution of the apparent conflict should await further factual development. Since the controversy was well-defined and amenable to complete and final resolution, it was fit for judicial review.

*Id.* at 34.

Like the plaintiff in *Whitehouse*, the Plaintiffs here have demonstrated their "concrete plans to engage immediately (or nearly so) in an arguably proscribed activity." *Id.* at 33. St. Dominic desires to apply for Maine's tuitioning program, a benefit the Supreme Court recently ruled the state could not deny to sectarian institutions, such as St. Dominic. *Compl.* ¶¶ 5, 15. However, the school believes that some of its policies and practices conflict with the MHRA, putting it at risk of enforcement actions should it participate in the tuitioning program.

For example, according to the Plaintiffs, because the Catholic faith views parents as the primary educators of their children, St. Dominic could not refer to a student using their preferred name and pronouns over the objections of the student's parents. *Id.* ¶¶ 140, 143. Likewise, St. Dominic would not discipline students and staff members who, after reflecting on the teachings of the Pope, decide they cannot use a student's preferred pronouns that conflict with the student's biological sex. *Id.* ¶¶ 145-46. Both these policies potentially violate the MHRA's prohibitions sexual orientation and gender identity discrimination. *See* Me. Hum. Rts. Comm'n, Interpretation of the Education Provisions of the MHRA 3-4 (2016), https://perma.cc/D5Z3-PMP8 (noting that if a student and their parent or guardian "do not agree with regard to the student's sexual orientation, gender identity, or gender expression, the educational institution should, whenever possible, abide by the wishes of the student," and "a pattern of refusal to acknowledge a student's gender identity by using their chosen name and pronouns may be considered to constitute such a violation").[2]  While the Defendants do not outright concede that St. Dominic's policies violate the MHRA, they do acknowledge the possible conflict. *See Defs.' Opp'n* at 11 ("It is not clear how this guidance would apply to St. Dominic, or whether a state court would even agree with the guidance").

In a similar vein, St. Dominic, like all Diocesan schools, places some limits on students' religious expression. *Compl.* ¶ 135. Specifically, St. Dominic does not allow students to publicly condemn, mock, or denigrate Catholic beliefs or publicly

---

[2]      This document was cited in the Plaintiffs' motion for preliminary injunction. *See Pls.' Mot.* at 16 n.13.

seek to dissuade other students from believing in them. *Id.* Further, Diocesan schools only admit students who "understand, accept, and are willing to support the mission and goals of the school." *Id.* ¶ 35. Accordingly, St. Dominic does not believe it can comply with the MHRA's prohibition on religious discrimination or the statute's requirement that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." *Id.* ¶ 136; 5 M.R.S. § 4602(1), (5)(D). Again, the Defendants do not contest that these policies and practices may violate the MHRA. *See Defs.' Opp'n* at 8-9.

Instead, the Defendants posit that the Plaintiffs' claims are unripe because they are based on a pyramid of hypotheticals, with fear of sanction under the MHRA being dependent on applying for tuitioning, being approved, engaging in activity arguably proscribed under the MHRA, and then being charged, found liable, and punished by the MHRC. *Id.* at 8. In essence, the Defendants attempt to avoid *Whitehouse* by claiming that "[i]t is not clear that these [potential violations] would ever happen or, if they did, whether they would constitute violations of the MHRA." *Id.* at 9. Under this logic, *Whitehouse* is distinguishable because there, the plaintiff association could have faced legal liability as soon as it started soliciting new members, whereas St. Dominic must first engage in arguably proscribed activity and then face a MHRC complaint.

But the only way for St. Dominic to truly avoid liability is by refraining from acting. Once St. Dominic is approved for tuitioning, it could face any number of situations that would force it to either compromise its religious beliefs or violate the

statute and potentially face civil monetary penalties as well as a cease-and-desist order.[3]  Therefore, St. Dominic is in the same position as the *Whitehouse* plaintiff: do nothing or give up control over legal liability.  To accept the Defendants' chain of hypotheticals would be to confine *Whitehouse* to the type of statute at issue in that case.  The Defendants have provided no support for such a limited reading of *Whitehouse*, and the Court sees none.

By demonstrating an intent to apply to participate in the tuitioning program while maintaining policies that arguably violate the MHRA, the Plaintiffs have shown that they have "concrete plans to engage immediately (or nearly so) in an arguably proscribed activity."  *See Whitehouse*, 199 F.3d at 33.  The record does not reveal why "resolution of the apparent conflict should await further factual development."  *Id.* at 34.  Instead, the dispute presented offers a legal question of whether, after *Carson*, the state may require religious institutions with faith-motivated policies that arguably violate certain provisions of the MHRA to comply with those provisions as a condition of participating in the tuitioning program. Because this "controversy [is] well-defined and amenable to complete and final resolution," it is fit for judicial review.  *Id.*; *see also Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 830 (1st Cir. 2020) ("So long as th[e] uncertainty does not undermine the credible threat of prosecution or the ability of the court to evaluate

---

[3]      Specifically, if the Diocese or St. Dominic violate the MHRA, they could be subject to civil penalties not in excess of $20,000 in the case of the first order under the Act, and escalating civil penalties thereafter, not in excess of $100,000 for a third or subsequent order.  5 M.R.S. § 4613(2)(B)(7).  The MHRA also provides for an order to cease and desist.  *Id.* § 4613(2)(B)(1).  If the asserted violation involves employment, the Superior Court is further authorized to order reinstatement of the victim with or without back pay.  *Id.* § 4613(2)(B)(2).

the merits of the plaintiff's claim in a preenforcement posture, there is no reason to doubt standing" (alteration in original) (quoting *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 584, 594 (7th Cir. 2012))).

Turning to the hardship prong of ripeness, *Whitehouse* is again instructive. In *Whitehouse*, the plaintiff "refrained from carrying forward its plan because it reasonably feared prosecution" under the challenged statute (even though the state had never pursued criminal charges under that statute). 199 F.3d at 32, 34. The First Circuit observed that the plaintiff "thus faced the direct and immediate dilemma of choosing between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[d] to be constitutionally protected activity" and that "[b]ecause lost opportunities for expression cannot be retrieved, delaying or denying resolution of the issue would have worked a substantial hardship." *Id.* at 34 (first and second alterations in original) (internal citations and quotations omitted).

The Court reaches the same conclusion here. In *Carson*, the Supreme Court struck down the sectarian exclusion, holding that religious schools "are disqualified from this generally available benefit 'solely because of their religious character,'" 142 S. Ct. at 1997 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021), and that "[b]y 'condition[ing] the availability of benefits' in that manner, Maine's tuition assistance program . . . 'effectively penalizes the free exercise' of religion." *Id.* (first alteration in original) (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). St. Dominic now seeks to avail itself of the program and avers that "[w]ere it not for [Chapter

366's] amendments to the Act's education provisions and Defendants' reinterpretations of the Act's employment provisions, St. Dominic and other Diocesan schools would apply to be approved for tuition purposes and, on information and belief, would be approved." *Compl.* ¶ 124.

Setting aside—for the moment—the constitutionality of the challenged provisions, St. Dominic's fear of MHRA enforcement is eminently reasonable.  On the day the Supreme Court heard oral argument in *Carson*, the Maine Attorney General issued a press release asserting that "[s]chools receiving taxpayer funds are appropriately subject to the Maine Human Rights Act (MHRA), which prohibits discrimination against individuals on the basis of several protected classes." *Id.* ¶ 115.  Likewise, on the day *Carson* was decided, the Attorney General issued another statement cautioning that "[e]ducational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices." *Id.* ¶ 119.  Although the Attorney General's press releases focused on the schools in *Carson*, his statements concerning compliance with the MHRA applied to all religious schools.  As the Maine Attorney General is the "chief law officer of the State," *Withee v. Lane & Libby Fisheries Co.*, 113 A. 22, 23 (Me. 1921), his statements could reasonably cause the Plaintiffs to conclude that he would pursue all religious schools for asserted violation of the MHRA's antidiscrimination provisions in light of the sectarian exclusion's invalidation.

In sum, St. Dominic may now apply for tuitioning, but its policies plainly run afoul of the MHRA's antidiscrimination provisions.  St. Dominic is thus fairly stuck between "the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[s] to be constitutionally protected activity."  *Whitehouse*, 199 F.3d at 34 (first alteration in original) (internal quotation omitted); *see also Trinity Lutheran*, 137 S. Ct. at 2022 ("To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties" (alterations in original) (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality opinion))).  The Plaintiffs have satisfied both the fitness and hardship prongs, and their claims are ripe for judicial review.[4]

## 2.  The Employment Discrimination Provisions of the Maine Human Rights Act

Having concluded that it is proper to reach the merits, the Court initially discusses the Plaintiffs' challenge to certain employment discrimination provisions in the MHRA.  Pursuant to 5 M.R.S. § 4572(1)(A), it is unlawful employment discrimination "[f]or any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment" because of, among other things, "sexual orientation or gender identity."  The Plaintiffs contend that applying this provision to St. Dominic would "strip" the school of its religious hiring rights.  *Pls.' Mot.* at 18;

---

[4]      The Defendants' insistence that this case is unripe because Cheverus has participated in the tuitioning program for a full school year without facing any MHRC complaints or, presumably, compromising its religious beliefs is misplaced.  Cheverus is a Jesuit, not a Diocesan, high school, and it establishes its own policies regarding admission, hiring, curriculum, and student conduct.  *Pelletier Decl.* ¶¶ 4-5.  Accordingly, the fact that Cheverus' policies have not yet resulted in a MHRC complaint sheds no light on whether St. Dominic's policies arguably violate the MHRA.

*see also Compl.* ¶ 236 (arguing that application of the MHRA's employment discrimination provisions to St. Dominic would infringe the school's right to "make employment decisions based on [its] religious beliefs free from government interference").

As the Court understands it, the argument that the MHRA's employment discrimination provision would be applied to St. Dominic is premised entirely on statements by Maine officials during and immediately following the *Carson* litigation. *See Compl.* ¶¶ 155-58; *Pls.' Mot.* at 17-18. In *Carson*, the Maine Department of Education and Attorney General "took the position that a school that participates in the program forfeits its religious exemption to the sexual orientation and gender identity employment discrimination provisions." *Compl.* ¶ 155; *see also Carson v. Makin*, 401 F. Supp. 3d 207, 209 (D. Me. 2019) (summarizing Maine's argument that if religious schools "receive public funds, the Maine Human Rights Act will prohibit them from considering sexual orientation in their employment decisions"). Similarly, in 2021, the MHRC submitted a letter to the Maine Legislature taking the position that "once the public funds to which all taxpayers contribute are utilized to subsidize the religious organization, the organization must not discriminate against a group of those taxpayers in its public accommodations, housing or employment." *Letter from Me. Hum. Rts. Comm'n, to Hon. Anne Carney et al.* at 3 (Apr. 20, 2021), https://perma.cc/7B9E-2J2X.[5] Notwithstanding these prior statements, the Court concludes that the MHRA's employment discrimination

---

[5]      This letter was cited by the Plaintiffs in footnote 18 of their motion. *Pls.' Mot.* at 18 n.18.

provisions cannot be applied to strip St. Dominic of its religious hiring rights.[6]
Another provision of the MHRA, 5 M.R.S. § 4573-A(2) provides:

> This subchapter does not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities.   Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization.

In their opposition, the Defendants concede that were St. Dominic to participate in the tuitioning program, "it would still be entitled to limit employment of all staff, including teachers, to Catholics conforming to the Bishop's religious tenets."   *Defs.' Opp'n* at 9; *see also id.* at 23 (taking the position that all religious schools "are exempt from aspects of the MHRA's employment provisions").

The only relief sought by the Plaintiffs with respect to their employment discrimination challenge is the ability to make employment decisions in a manner already protected by the MHRA.   The Plaintiffs represent that "as a condition of employment, all employees must live personal lives in such a way that fundamental teachings of the Catholic Church are upheld."   *Compl.* ¶ 39 (internal quotation omitted).   Further, the employment handbook for Diocesan schools provides that

---

[6]    Although not mentioned by the parties, Maine's Constitution contains a direct reference to the right of religious societies to employ "public teachers" of their own choosing.   Article I, § 3 is entitled, "Religious Freedom; Sects Equal; Religious Tests Prohibited; Religious Teachers," and provides in part:

> [A]ll religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance.

ME. CONST. art. I, § 3.   This state constitutional provision buttresses the Court's view that the state of Maine would face legal challenges if it interfered with St. Dominic's hiring practices.

"[a]ll employees must comply with the teachings of the Roman Catholic Church and . . . [e]mployee conduct and behavior should be consistent with the principles of the Catholic Church." *Id.* ¶ 148.  In essence, these policies "require that all applicants and employees conform to the religious tenets" of the Catholic Church, and therefore, they are protected under the MHRA.  *See* 5 M.R.S. § 4573-A(2).

Despite the Defendants' concession and the plain text of the MHRA, the Plaintiffs in their reply ask the Court to enjoin the challenged employment discrimination provisions for two reasons.  First, they take issue with the Defendants' statement that St. Dominic can limit employment to "*Catholics* conforming to the Bishop's religious tenets," *see Defs.' Opp'n* at 10 (emphasis supplied), characterizing the reference to Catholics as a "'co-religionist' gloss" that is at odds with the plain text of the MHRA and Supreme Court precedent.  *Pls.' Reply* at 8.  The Plaintiffs are correct that the plain text of the MHRA allows a religious organization to require *all* applicants and employees to conform to the organization's religious tenets.  *See* 5. M.R.S. § 4573-A(2).  However, the Plaintiffs appear to read too much into the Defendants' choice of words, as the Defendants elsewhere state that religious organizations are "exempt" from certain of the MHRA's employment discrimination provisions.  *See Defs.' Opp'n* at 23.  The Court therefore does not read the Defendants' concession as limiting the exemption in 5 M.R.S. § 4573-A(2) to "co-religionists."

The Plaintiffs also suggest that a preliminary injunction is warranted because "Maine asserts that its concession regarding religious tenets only applies so

long as the Commission or a future state court *agrees* with those religious tenets."

*Pls.' Reply* at 8 (emphasis in original).  Here, Plaintiffs are referencing a footnote in

the Defendants' opposition, which reads:

> Plaintiffs do not claim that homosexuals and transgender individuals
> are unable to conform to the Bishop's religious tenets, and, if they did
> make such a claim, [it] is not clear whether a state court would
> conclude that the Bishop's employment actions based on sexual
> orientation and gender identity are actionable under the MHRA.

*Defs.' Opp'n* at 20 n.16.  This footnote appears to be discussing a hypothetical

scenario in which the Diocese takes a negative employment action based on sexual

orientation or gender identity against an individual who conformed with the

Diocese's religious tenets.  However, the Plaintiffs have not asked for an injunction

allowing them to take such action; they have only asked for assurances that they

may continue to hire individuals who conform to the Diocese's religious tenets.

Because the Court is reticent to wade into speculative and potentially complicated

constitutional questions, the Court views the parties' dispute over this hypothetical

as outside the scope of the present action and declines to address it.

In short, the Plaintiffs have asked that St. Dominic continue to be allowed to

limit employment to individuals who conform with the Catholic faith.  This practice

seems clearly protected by the plain text of the MHRA, and the Plaintiffs offer no

legitimate justification for the Court to enjoin the hypothetical future enforcement

of a statute (disclaimed by the state) in a manner that would appear to plainly

violate the statute's own text.  In essence, on this narrow issue, the Court declines

to issue an injunction because there is no case or controversy between the parties.[7]
U.S. CONST. art. III, § 2.

### 3. The Educational Discrimination Provisions of the Maine Human Rights Act

In addition to these employment discrimination provisions, the Plaintiffs challenge two of the MHRA's educational discrimination provisions, both of which were enacted in Chapter 366.[8]  First, the Plaintiffs contend that 5 M.R.S. § 4602(1) is unconstitutional as applied to them insofar as it prohibits educational discrimination on the basis of religion, sexual orientation, and gender identity.  *Pls.' Mot.* at 6-7; *see also Compl.* ¶ 136 ("Diocesan schools also cannot comply with 5 M.R.S. § 4602(1), which prohibits discrimination on the basis of religion"); *id.* ¶ 137 ("Diocesan schools also cannot comply with 5 M.R.S. § 4602(1), which says that educational institutions may not discriminate on the basis of sexual orientation or gender identity").  Further, the Plaintiffs suggest that 5 M.R.S. § 4602(5)(D) is similarly unconstitutional.  *Pls.' Mot.* at 6, 10-11; *see also Compl.* ¶¶ 132-33 ("St. Dominic cannot comply with § 4602(5)(D)'s requirement that 'to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing'" (quoting 5 M.R.S. § 4602(5)(D))).

To begin, the Court briefly reviews the statutory scheme.  5 M.R.S. § 4602(1) provides:

---

[7]     In light of this conclusion, the Court does not reach the Plaintiffs' argument that the MHRA's employment discrimination provisions violate their First Amendment right of religious autonomy, *see Pls.' Mot.* at 17-18, as doing so would amount to issuing an advisory opinion.

[8]     To standardize terminology, the Court uses "Chapter 366" when referring to the challenged educational discrimination provisions as a unit.  When referring to only one of the challenged provisions, the Court uses the statutory section for that provision in the Maine code.

**Unlawful educational discrimination.**  It is unlawful educational discrimination in violation of this Act, on the basis of sex, *sexual orientation or gender identity*, physical or mental disability, ancestry, national origin, race, color or *religion*, to:

A. Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity;

B. Deny a person equal opportunity in athletic programs;

C. Apply any rule concerning the actual or potential familial status or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity;

D. Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or

E. Deny a person financial assistance availability and opportunity.

5 M.R.S. § 4602(1) (emphasis supplied).  5 M.R.S. § 4602(5)(D) further provides that nothing in 5 M.R.S. § 4062 "[r]equires an educational institution to participate in or endorse any religious beliefs or practices; to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing."

The Plaintiffs launch a variety of constitutional challenges to Chapter 366. *See Pls.' Mot.* at 5 (outlining these theories of relief).  The Court begins with their initial theory, which focuses on the Free Exercise Clause.

### a.   The Free Exercise Clause

"The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, 'protects religious observers against unequal treatment' and against

'laws that impose special disabilities on the basis of religious status.'" *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2254 (2020) (quoting *Trinity Lutheran*, 137 S. Ct. at 2021).  The Supreme Court has clarified that "the Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Trinity Lutheran*, 137 S. Ct. at 2022 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)).  "[I]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).  "To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties." *Id.* (alterations in original) (quoting *McDaniel*, 435 U.S. at 626 (plurality opinion)).

Pursuant to the Free Exercise Clause, the government cannot burden a plaintiff's "sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable' . . . unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022).  On the other hand, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021) (citing *Emp. Div. v. Smith*, 494 U.S. 872, 878-82 (1990)).

The "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* at 1877. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" *id.* (quoting *Smith*, 494 U.S. at 884), or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* Based on the record before it, the Court concludes that the challenged provisions of the MHRA are neutral, but not generally applicable, making them subject to strict scrutiny. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993) ("A law failing to satisfy [neutrality or general applicability] must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest").

### i.   The Burden Imposed by the Challenged Provisions

As a preliminary matter, the Defendants suggest that the Court need not engage in a free exercise analysis because the Plaintiffs "fail to demonstrate that application of the MHRA to St. Dominic would have any meaningful impact on it, much less burden or interfere with its religious practices." *Defs.' Opp'n* at 9. The Defendants submit that the MHRA does not burden the Plaintiffs' religious exercise with respect to admissions because "Plaintiffs provide no evidence that St. Dominic would, in fact, end up denying admissions or scholarships to non-Catholics." *Id.* Further, while the Defendants concede St. Dominic "would need to permit other

religious expression" pursuant to the MHRA, they counter that St. Dominic need not endorse these alternative beliefs, and "it is not clear whether St. Dominic currently allows students to express religious views that differ from those of the Bishop or how allowing them to do so would burden Plaintiffs' religious practices." *Id.* at 10.   Finally, the Defendants contend that complying with the MHRA's prohibitions on educational discrimination based on sexual orientation and gender identity would not burden the Plaintiffs because "it is difficult to see how allowing students to wear the clothes of their gender identity and addressing them by their preferred names and pronouns interferes with 'parents' primordial and inalienable right and duty to educate their children.'" *Id.* at 11 (quoting *Pls.' Mot.* at 16).

The Plaintiffs respond that the MHRA does burden them with respect to admissions because St. Dominic gives "preference to Catholic families for admission and scholarships," a practice "which is rooted in the school's religious beliefs." *Pls.' Mot.* at 10.   The Plaintiffs also contend that the challenged provisions burden them by "requir[ing] St. Dominic to permit students to express 'dissenting religious views,' no matter how disrespectful towards the Catholic faith," *Pls.' Reply* at 5 (quoting *Defs.' Opp'n* at 10), and giving the MHRC "authority to determine what students 'are called or what they wear' while at the Bishop's schools." *Id.* (quoting *Defs.' Opp'n* at 11).

As it did in a parallel case, *see Crosspoint Church v. Makin*, No. 1:23-cv-00146-JAW, 2024 U.S. Dist. LEXIS 32975, at *39-42 (D. Me. Feb. 27, 2024), the Court finds *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), helpful on the

issue of burden.  In *Fulton*, the Supreme Court considered the case of Catholic Social Services (CSS), a private agency that had contracted with the city to provide foster care services but refused to certify same-sex couples because it considered "the certification of prospective foster families to be an endorsement of their relationships." *Id.* at 1875.  The city stated that it would not enter a future foster care contract with CSS "unless the agency agreed to certify same-sex couples," and CSS sued to enjoin the city from enforcing that directive.  *Id.* at 1875-76.  The Supreme Court sided with CSS, stating:

> As an initial matter, it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs.  The City disagrees.  In its view, certification reflects only that foster parents satisfy the statutory criteria, not that the agency endorses their relationships.  But CSS believes that certification is tantamount to endorsement.  And "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981).  Our task is to decide whether the burden the City has placed on the religious exercise of CSS is constitutionally permissible.

*Id.*  The Court went on to find that the city's policies triggered strict scrutiny because they were not generally applicable and concluded that:

> CSS seeks only an accommodation that will allow it to continue serving the children of Philadelphia in a manner consistent with its religious beliefs; it does not seek to impose those beliefs on anyone else.  The refusal of Philadelphia to contract with CSS for the provision of foster care services unless it agrees to certify same-sex couples as foster parents cannot survive strict scrutiny, and violates the First Amendment.

*Id.* at 1881-82.

Here, the Plaintiffs represent that St. Dominic cannot comply with the MHRA's prohibition on religious discrimination because the school's preference for Catholic families in admissions and financial aid is rooted in the Catholic faith. *Pls.' Mot.* at 10; *see also Compl.* ¶ 136 ("[B]ecause the primary purpose of [Catholic] schools is to assist Catholic parents in providing their children with a Catholic education, the Diocese gives preference in both admission and financial aid to Catholic students"). Similarly, the Plaintiffs contend that the MHRA's prohibitions on sexual orientation and gender identity discrimination conflict with Catholic teaching on the role of parents in education and the relationship between gender and sex. *See Pls.' Reply* at 5; *Compl.* ¶¶ 137-46 ("The [MHRC's] rules compelling schools to enforce students' preferred pronouns—regardless of their parents' wishes, and without reference to the student's biological sex—would require Diocesan schools to discipline staff and students who, after reflecting on Pope Francis' words, conclude that they cannot do so"). Finally, the Plaintiffs say that St. Dominic cannot follow 5 M.R.S. § 4602(5)(D)'s prohibition on discriminating among religions in allowing religious expression because of St. Dominic's mission as a Catholic school. *See Pls.' Reply* at 5; *Compl.* ¶¶ 35-36, 133-35 ("In line with this Diocesan policy, St. Dominic students must agree to uphold Catholic Christian morals" (internal quotation omitted)).

Like *Fulton*, this is therefore a case where the government is burdening an organization's religious exercise "by putting it to the choice of curtailing its mission" or adopting policies and practices inconsistent with its religious beliefs. *See* 141 S.

Ct. at 1875-76.  To the extent the Defendants question the logic or sincerity of the Plaintiffs' asserted burden, this argument is foreclosed by the Supreme Court's observation in *Fulton* that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."  *Id.* at 1876 (quoting *Thomas*, 450 U.S. at 714).  Accordingly, against the background of *Fulton*, the Court concludes that the challenged provisions of the MHRA—which would effectively prohibit St. Dominic from enforcing several of its religiously motivated policies—burden the Plaintiffs' religious exercise.[9]

## ii.      General Applicability

As noted above, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  *Fulton*, 141 S. Ct. at 1877; *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (explaining that laws are not generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise" (emphasis in original)).  "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the

---

[9]      The Defendants' final argument that the challenged provisions of the MHRA do not burden the Plaintiffs' religious exercise is that Cheverus, a different Catholic school, has been participating in the tuitioning program and presumably "would not have done so if it meant abandoning its religious identity."  *Defs.' Opp'n* at 11.  As the Court explained above, Cheverus is not a Diocesan school but "[a]n inclusive Jesuit Catholic school."  *Pls.' Reply* at 1 (quoting *Our Mission*, Cheverus High Sch., www.cheverus.org).  Further, Cheverus' interpretation of the Catholic faith does not control that of the Plaintiffs here.  *See Thomas*, 450 U.S. at 715-16 ("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.  Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith").

asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296 (per curiam).

Here, the Plaintiffs assert that Chapter 366 is not generally applicable for two reasons.[10]  First, the Plaintiffs point out that private postsecondary institutions are not included in the MHRA's definition of "educational institution." *Pls.' Mot.* at 7; *Pls.' Reply* at 5.  Further, the Plaintiffs argue that the inclusion of schools located outside of Maine in the tuitioning program renders Chapter 366 not generally applicable.  *Pls.' Mot.* at 7-8; *Pls.' Reply* at 5.  According to the Defendants, the government interest that justifies applying Chapter 366 to St. Dominic is the interest in eliminating discrimination, particularly among publicly funded institutions.  *Defs.' Opp'n* at 21-22.

There is no dispute that Chapter 366 does not apply to private postsecondary institutions or to schools located outside of Maine.  *See Pls.' Mot.* at 7-8, 12; *Pls.' Reply* at 4-5; *Defs.' Opp'n* at 14 ("Schools outside of Maine are not subject to the MHRA because Maine has no jurisdiction over them . . . [and] post-secondary private schools are exempted from the educational provisions of the MHRA").  Both private postsecondary schools and out-of-state schools are eligible to receive public funds from Maine.  *See Compl.* ¶ 77 (explaining that Maine operates a program

---

[10]     The Plaintiffs initially made a third argument against general applicability, premised on the exclusion of private, single-sex schools from the MHRA's definition of "educational institution." *Compl.* ¶¶ 202-03; *Pls.' Mot.* at 9.  However, on June 15, 2023, the Governor of Maine signed Maine Public Law 2023, Chapter 188, which eliminated the exemption for single-sex educational institutions.  *See* P.L. 2023, ch. 188, § 1, 2023 Me. Laws 370.  In their reply, the Plaintiffs acknowledged the removal of this exclusion, *Pls.' Reply* at 4, and as the Court explained in *Crosspoint Church*, the enactment of Chapter 188 moots any argument that the MHRA is not generally applicable because of the exclusion of single-sex schools.  2024 U.S. Dist. LEXIS 32975, at *43-44.

awarding grants that "may be used at any public or private post-secondary institution in Maine, including those that are religious"); *id.* ¶ 75 ("Maine or Maine towns have paid for Maine students to attend private schools in Vermont, New Hampshire, Massachusetts, Connecticut, New York, Pennsylvania, Virginia, Michigan, Colorado, Utah, California, and in Quebec, Canada").

In the Court's view, the combination of these two factors renders Chapter 366 not generally applicable.  The Defendants do not claim that there is any mechanism for ensuring that schools not subject to the MHRA conform with the government's interest in eliminating discrimination.  It appears that these schools could adopt any of St. Dominic's policies or practices that allegedly violate the MHRA without fear of enforcement actions or risk of losing access to public funds from Maine.  In other words, Chapter 366 is "underinclusive," and therefore not generally applicable, because it "fail[s] to prohibit nonreligious conduct that endangers [Maine's] interests in a similar or greater degree than" St. Dominic's conduct.  *See Lukumi*, 508 U.S. at 543.

The Defendants respond that Chapter 366 is generally applicable because all private postsecondary institutions and all out-of-state schools, even those that are religious, are exempt from the MHRA's educational discrimination provisions. *Defs.' Opp'n* at 14.  This argument misconstrues how the Court is to assess general applicability.  For a law to be generally applicable, it must not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877.  Here, secular out-

of-state schools and secular private postsecondary institutions are allowed to take public funds, including from the tuitioning program, without giving any assurances that they are not engaged in discrimination. The Defendants cannot avoid the conclusion that the laws are not generally applicable by drawing narrower categories, as they appear to have done by emphasizing that all private postsecondary institutions and all out-of-state schools are exempt.[11]

### iii. Neutrality

Although strict scrutiny is triggered by the Court's conclusion that Chapter 366 is not generally applicable, the Court addresses the Plaintiffs' neutrality[12] arguments for the sake of completeness.

---

[11]    The Defendants also contend that *Christian Legal Society Chapter of the University of California, Hastings College of Law v. Martinez*, 561 U.S. 661 (2010), supports their position that the challenged provisions of the MHRA are generally applicable. *See Defs.' Opp'n* at 14-16. While the *Martinez* Court did conclude that the policy at-issue was generally applicable, 561 U.S. at 697 n.27, that case is not factually analogous to this one. There, the challenged policy was applicable to all student organizations. *Id.* at 671-72. Here, by contrast, some educational institutions can take public funds from the state of Maine without subjecting themselves to the challenged provisions of the MHRA.

[12]    The Plaintiffs interchangeably argue that the challenged provisions are both not neutral and target religion. *Compare Pls.' Mot.* at 9-10 ("This religious gerrymander—adopted by government officials who boasted about their success in continuing to exclude Maine's religious schools—renders Maine's law not neutral" (internal quotation omitted)), *with id.* at 8 ("The historical background of Maine's discrimination against religious schools, the sequencing of its move to continue excluding religious schools from its public program by attaching religiously unacceptable conditions on their participation, and contemporaneous statements from Maine officials all demonstrate religious targeting").

Although religious targeting and neutrality are related, they are distinguishable. To prove religious targeting, a plaintiff must show that "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise." *Kennedy*, 142 S. Ct. at 2422 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018)). "[A] law targeting religious beliefs as such is never permissible," *Lukumi*, 508 U.S. at 533, whereas a law that is not neutral because its object is "to infringe upon or restrict practices because of their religious motivation" is sometimes permissible, if it can pass strict scrutiny. *Id.* Because the Court concludes that the challenged educational discrimination provisions of the MHRA are neutral, however, this distinction is immaterial.

The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. "If the policy's objective is to impede or constrain religion, the policy is not neutral." *Swartz v. Sylvester*, 53 F.4th 693, 700 (1st Cir. 2022) (citing *Lukumi*, 508 U.S. at 533). The First Circuit has noted that "the Free Exercise Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs" and "[w]hen assessing neutrality, a court must survey meticulously the totality of the evidence, both direct and circumstantial. This includes the series of events leading to the conduct, as well as the historical background." *Id.* at 701 (internal citations and quotations omitted).

As evidence of Chapter 366's lack of neutrality, the Plaintiffs cite the "historical background of Maine's discrimination against religious schools, the sequencing of its move to continue excluding religious schools from its public program by attaching religiously unacceptable conditions on their participation, and contemporaneous statements from Maine officials." *Pls.' Mot.* at 8. Specifically, the Plaintiffs contend that "Maine knew exactly which rules would create the most significant conflicts for religious schools, because during discovery in *Carson* two such schools described in detail the religious practices they wished to protect." *Id.* at 6 (footnote omitted). The Plaintiffs point to statements by the Maine Attorney General, a tweet by the former speaker of the Maine House of Representatives, an essay published in the *New York Times*, and the timing of the enactment of Chapter 188 as further evidence that Chapter 366 is not neutral. *Id.* at 8-9.

The Defendants respond that Chapter 366 was "neither designed to impinge on religious practices nor motivated by any animus toward religion." *Defs.' Opp'n* at 13. Instead, the Defendants aver that Chapter 366 "made the educational provisions of the MHRA consistent with those addressing employment and housing." *Id.* In the Defendants' view, because Maine "has a compelling interest in ensuring that public money is not used to fund discrimination . . . it was entirely appropriate for it to ensure that religious schools . . . would comply with the MHRA's educational provisions if they chose to participate in the tuitioning program as a result of new legal precedent." *Id.* The Defendants further dispute the specific pieces of evidence cited by the Plaintiffs. *Id.* at 13-14.

In assessing neutrality, the Court finds it useful to separate 5 M.R.S. § 4602(1) from 5 M.R.S. § 4602(5)(D). With respect to 5 M.R.S. § 4602(1), the MHRA's history provides useful context for the recent amendments to its educational discrimination provisions. When the MHRA was enacted in 1971, it prohibited unlawful discrimination in employment, housing, and public accommodations—but not education. P.L. 1971, ch. 501. The initial version of the MHRA only prohibited discrimination based on race, color, religion, ancestry, national origin, and, with respect to employment only, age. *Id.* When enacted, the MHRA did not prohibit discrimination based on sex, sexual orientation, or gender identity. *Id.*

Later, the Legislature expanded the MHRA to prohibit discrimination in education (initially only prohibiting sex discrimination). P.L. 1987, ch. 578, § 3.

Between 1987 and 1991, the Legislature continued to expand the educational discrimination provisions to prohibit discrimination based on disability, race, and national origin.  *See* P.L. 1987, ch. 478; P.L. 1989, ch. 725; P.L. 1991, ch. 100.

Then, in 2005, the Legislature again expanded the MHRA to prohibit discrimination based on sexual orientation in all areas covered by the Act (employment, housing, public accommodations, and education).  P.L. 2005, ch. 10 ("An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation").  At that time, the definition of sexual orientation included gender identity.  *Id.* ("'Sexual orientation' means a person's actual or perceived heterosexuality, bisexuality, homosexuality or gender identity or expression").  Religious organizations that did not receive public funds were exempted from the provisions on sexual orientation discrimination in employment, housing, and education.  *Id.* (prohibiting "[d]iscrimination in employment, housing, public accommodation, credit and educational opportunity on the basis of sexual orientation, except that a religious corporation, association or organization that does not receive public funds is exempt from this provision").  Further, education facilities "owned, controlled or operated by a bona fide religious corporation, association, or society" were fully exempted.  *Id.*

In short, the MHRA has prohibited religious discrimination in employment, housing, and public accommodations since 1971.  Since 2005, the Act has prohibited sexual orientation and gender identity discrimination in employment, housing, public accommodations, and education but has also generally exempted religious

organizations that do not receive public funds.  From 2005 to 2021, the MHRA's educational discrimination subsection—5 M.R.S. § 4602—exempted religious organizations from the Act's prohibition on discrimination on the basis of sexual orientation, without distinguishing whether they received public funds.

In 2021, the Legislature enacted Chapter 366, "An Act to Improve Consistency within the Maine Human Rights Act."  Among other things, Chapter 366 newly prohibited educational discrimination based on religion and replaced the exemption for sexual orientation discrimination for religiously affiliated educational institutions with a provision stating that nothing in 5 M.R.S. § 4602 "[r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity."  *See* 5 M.R.S. § 4062(5)(C)

As noted above, the Defendants contend that these amendments primarily served to make the MHRA's educational discrimination provisions consistent with the rest of the Act.  *See Defs.' Opp'n* at 5-6.  Based on the record before it, the Court finds this argument persuasive.  Regarding the addition of religion as a protected class, the MHRC submitted testimony to the Legislature stating that the "MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act."  *Defs.' Opp'n*, Attach. 3, *Letter from Me. Hum. Rts. Comm'n, to Hon. Anne Carney et al.* at 5 (May 14, 2021).  According to the MHRC, the MHRA was "amended in a piecemeal fashion," often without any "logical rationale."  *Id.* at 1.

Similarly, the record supports the Defendants' explanation that the Maine Legislature fashioned Chapter 366 to keep the MHRA's provisions on educational discrimination in line with its broader scheme for exempting only religious organizations that do not receive public funding from certain antidiscrimination provisions. The tuitioning program's sectarian exclusion prohibited sectarian educational institutions from receiving public funding from 1981 up until its invalidation by *Carson* in 2022. 142 S. Ct. at 1994, 2002. The MHRA has, since 2005, exempted only religious organizations that do not receive public funds from its sexual orientation and gender identity provisions in other areas. *See* P.L. 2005, ch. 10. However, from 2005 until 2022, there would have been no reason to include a distinction based on public funding in the educational discrimination context. Because the sectarian exclusion blocked tuitioning funding for all sectarian educational institutions, distinguishing between those that did and did not receive public funding would have been unnecessary and redundant.

Once the sectarian exclusion was struck down, however, the public funds distinction was no longer mere surplusage. The current exemption, enacted in 2021, makes the educational discrimination provisions consistent with the text and purpose of the Legislature's 2005 Act, which broadly proscribed sexual orientation and gender identity discrimination "in employment, housing, public accommodation, credit and educational opportunity . . . except that a religious corporation, association or organization *that does not receive public funds* is exempt from this provision." P.L. 2005, ch. 10 (emphasis supplied).

Notwithstanding this background, the Plaintiffs submit that "each piece of Maine's new regulatory scheme is intended to prevent religious schools like St. Dominic from participating in Maine's program, and actually does so." *Pls.' Mot.* at 9. The Plaintiffs initially point to testimony from the *Carson* litigation, suggesting that "Maine knew exactly which rules would create the most significant conflicts for religious schools." *Id.* at 6. But there is no evidence that the Legislature was aware of this testimony, let alone considered it in enacting Chapter 366. Similarly, although the Plaintiffs' argument finds some support in Attorney General Frey's immediate negative response to *Carson*, Attorney General Frey was not a member of the Legislature when it enacted Chapter 366, and there is no evidence that he had a hand in proposing the legislation to a legislator.

Turning to then-Speaker Fecteau's statements, the United States Supreme Court has repeatedly cautioned against relying on the statements of one legislator to ascribe motivations to the entire legislative body. *See United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("Inquiries into congressional motives or purposes are a hazardous matter" and courts should not rely on statements made by individual legislators since "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it"); *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) (explaining that the subjective motivation of lawmakers is irrelevant when conducting analysis under the First Amendment and "it is virtually impossible to determine the singular 'motive' of a collective body"). Although the Plaintiffs attempt to buttress then-Speaker Fecteau's statement with

Professor Tang's essay in the *New York Times*, there is no evidence that Professor Tang has been affiliated with the state of Maine at any point or had any inside knowledge about the passage of Chapter 366.

Finally, although the Plaintiffs characterize the timing of the passage of Chapter 188 as a "litigation-driven decision," *Pls.' Mot.* at 12 n.12, which further evidences a lack of neutrality with respect to Chapter 366, *id.* at 10, the Court does not find the timing of one law to be probative of the intention behind a different law passed almost two years earlier. This is especially so here, because the Plaintiffs present no evidence to counteract the Defendants' explanation that the enactment of Chapter 188 served to correct a "mistake" in the statutory scheme. *See Defs.' Opp'n* at 14.

Accordingly, the Court concludes that the Plaintiffs have failed to present sufficient evidence that the addition of religion as a protected class and the limitation of the exemption from the MHRA's sexual orientation and gender identity provisions were passed with an objective to "impede or constrain religion." *See Swartz*, 53 F.4th at 700 (citing *Lukumi*, 508 U.S. at 533). Instead, based the record before it, the Court determines that it is more likely these changes were made to ensure uniformity in a legislative scheme that already prohibited these types of discrimination by organizations receiving public funds in the housing and employment contexts.

The neutrality of 5 M.R.S. § 4602(5)(D), which prohibits educational institutions that allow religious expression from discriminating among religions, is

a closer question.  The Defendants do not provide any evidence concerning the background and purpose of this provision.  Similarly, the Plaintiffs only discuss 5 M.R.S. § 4602(5)(D) in combination with the other challenged provisions and likewise do not provide any evidence specifically related to it.  *See Pls.' Mot.* at 8-10.

Based on the paucity of evidence in the record, the Court cannot conclude that 5 M.R.S. § 4602(5)(D) was enacted "in a manner intolerant of religious beliefs or [to] restrict[] practices because of their religious nature."  *See Fulton*, 141 S. Ct. at 1877.  On its face, the statute applies not just to religious schools, but to all "educational institution[s]" that "permit[] religious expression."  *See* 5 M.R.S. § 4602(5)(D).  Furthermore, the inclusion of the provision in a bill titled, "An Act to Improve Consistency in Terminology and within the Maine Human Rights Act," suggests it was intended to remedy religious discrimination, not to "impede or constrain" religion as such.  *See Swartz*, 53 F.4th at 700 (citing *Lukumi*, 508 U.S. at 533).  The provision could also be interpreted as protecting students' rights to free expression, another non-neutral purpose.  *See Crosspoint Church*, 2024 U.S. Dist. LEXIS 32975, at *52 n.7.  In light of such countervailing evidence, the Plaintiffs' evidence is not sufficient to support a determination that 5 M.R.S. § 4602(5)(D) is not neutral at this preliminary stage.

The First Circuit has directed that "[w]hen assessing neutrality, a court must survey meticulously the totality of the evidence, both direct and circumstantial." *Swartz*, 53 F.4th at 701 (internal citations and quotations omitted).  Nevertheless, even if some members of the Maine Legislature enacted Chapter 366 with the

*Carson* litigation in mind and even if Chapter 366 causes some religious institutions not to apply for tuition funding, this does not prevent the law itself from being neutral. Given the historical and circumstantial backdrop, the Court does not find sufficient evidence to suggest that Chapter 366 "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. The Court concludes that Chapter 366 is neutral.

### iv.    Strict Scrutiny

Having concluded that Chapter 366 is not generally applicable, the Court turns to whether it can nevertheless satisfy strict scrutiny. *See Kennedy*, 142 S. Ct. at 2422 ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny"). To satisfy strict scrutiny, the government must show "that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Id.* at 2426. "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881.

The Defendants argue that Chapter 366 satisfies strict scrutiny because Maine has a compelling interest in eliminating discrimination, especially with respect to publicly funded institutions. *Defs.' Opp'n* at 21-22. The Plaintiffs, relying on *Fulton*, respond that the "question is not whether Maine 'has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception' to schools like St. Dominic." *Pls.' Mot.* at 19 (quoting *Fulton*, 141 S. Ct. at 1881).

As a general matter, Maine's asserted interest in eliminating discrimination within publicly funded institutions is compelling. *See Fulton*, 141 S. Ct. at 1882 ("We do not doubt that this interest is a weighty one, for '[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth'" (alteration in original) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018)). The Supreme Court explained in *Fulton*, however, that in the First Amendment context, a high-level compelling interest does not suffice and "courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Id.* at 1881 (quoting *Gonzales v. O Centro Espírita Beneficente União de Vegetal*, 546 U.S. 418, 431 (2006)). In *Fulton*, for example, the Supreme Court held that "the interest of the City in the equal treatment of prospective foster parents and foster children" was not sufficiently compelling because the "creation of a system of exceptions" in the challenged policy "undermines the City's contention that its non-discrimination policies can brook no departures." *Id.* at 1882.

The Plaintiffs assert that the *Fulton* Court's reasoning applies with equal force here. *See Pls.' Mot.* at 19 ("Maine does not pursue its 'broadly formulated interest' when it pays grants to private post-secondary schools or pays tuition for out-of-state and out-of-country schools . . . ."). But the facts in *Fulton* differ from the facts of this case. The contract at issue in *Fulton* explicitly provided for "a system of individual exemptions, made available . . . at the 'sole discretion' of the

Commissioner." 141 S. Ct. at 1878. Here, by contrast, the text of the MHRA does not provide for any exceptions. In the Court's view, Maine has a compelling interest in not creating a system of exemptions, as existed in *Fulton*, that would free in-state schools from complying with state antidiscrimination law.

Therefore, whether considered at face value or according to the rubric set forth in *Fulton*, the Defendants have advanced a compelling interest in enforcing Chapter 366. It is likewise clear that Chapter 366 is narrowly tailored. To this end, 5 M.R.S. § 4602(5)(C) exempts religious organizations that do not receive public funds from the MHRA's ban on sexual orientation and gender identity discrimination in education. Similarly, private schools that do not participate in the tuitioning program are excluded from the MHRA's definition of "educational institution," and therefore exempt from the educational discrimination provisions of the MHRA. *See* 5 M.R.S. § 4553(2-A).

Furthermore, all the challenged provisions are written to prohibit only discriminatory conduct. Under the provisions, "St. Dominic would still be free to conduct morning prayers however it wants, teach from a Catholic perspective, and promote Catholicism to the exclusion of all other religions." *Defs.' Opp'n* at 10. While the Plaintiffs put forth a number of policies and practices that arguably violate the challenged provisions, at this early stage—no state court has interpreted Chapter 366—it is not sufficiently clear the Act would reach any conduct that the state does not consider discriminatory. In the absence of any evidence to the

contrary, the Court concludes that Chapter 366 is narrowly tailored because it is written to encompass discriminatory conduct, and nothing more.

Accordingly, the Court concludes that Chapter 366 survives strict scrutiny. In reaching this result, the Court is mindful of the Supreme Court's admonition that a "law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. However, "rare" does not mean "never." Based on the record before it at this preliminary stage, the Court determines that the weighty interest advanced by the Defendants and the tailoring of Chapter 366 to fit that interest support a determination that Chapter 366 is likely to survive strict scrutiny.[13]

###  b.   Compelled Speech

In addition to the Free Exercise Clause, the Plaintiffs attack the constitutionality of Chapter 366 under the Free Speech Clause. Specifically, the Plaintiffs contend that 5 M.R.S. § 4602(5)(D) is unlawful because it "compels speech by religious schools." *Pls.' Mot.* at 13-14.

The First Amendment "protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief."

---

[13] Having concluded that the challenged educational discrimination provisions survive strict scrutiny, the Court does not reach the Plaintiffs' other constitutional challenges that, if meritorious, would simply trigger the application of strict scrutiny. *See Pls.' Mot.* at 12-13 (infringement of parents' right to direct the religious education of their children); *id.* at 14-15 (infringement of the First Amendment right of expressive association)

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (internal citations and quotations omitted). Therefore, "the government may not compel a person to speak its own preferred messages." *Id.* This is true "whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *Id.*

According to the Plaintiffs, "by forcing [religious schools] to allow speech that they disagree with on their school campuses," 5 M.R.S. § 4602(5)(D) "forces schools to express religious viewpoints with which they do not agree." *Pls.' Mot.* at 13. In other words, the Plaintiffs say that "forcing the Diocesan schools to allow religious expression—including religious expression that is *contrary* to the Catholic faith the school exists to impart—would alter the message the schools seek to convey to their students." *Id.* at 14 (emphasis in original).

The Defendants disagree. In their view, the speech implicated by 5 M.R.S. § 4602(5)(D) is "that of students, not the Plaintiffs." *Defs.' Opp'n* at 17. The Defendants further submit that it "is doubtful that the public would view a student's support of a religion other than Catholicism as representing the Bishop's views." *Id.* (footnote omitted). The Defendants have the better argument.

5 M.R.S. § 4602(5)(D) states that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." The statute does not reach the speech of educational institutions, nor does it compel individual students to "express religious viewpoints with which they

do not agree." *See Pls.' Mot.* at 13.  The statute only requires schools to refrain from suppressing any student's religious viewpoint.  The Defendants even concede that "St. Dominic would still be free to conduct morning prayers however it wants, teach from a Catholic perspective, and promote Catholicism to the exclusion of all other religions." *Defs.' Opp'n* at 10.

Still, the Plaintiffs protest that merely allowing other religious perspectives "would alter the message [Diocesan] schools seek to convey to their students."  The Plaintiffs draw support for this argument from *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995).  *Hurley* involved a dispute over the refusal by a group of parade organizers to admit a group of "gay, lesbian, and bisexual" individuals, who wished to march in the parade "to express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals," among other things.  *Id.* at 561.  After classifying parades as "a form of expression," *id.* at 568, the Court held that "[s]ince every participating unit affects the message conveyed by the private organizers," inclusion of the additional group would force the organizers "to alter the expressive content of their parade."  *Id.* at 572-73.

The Court is unconvinced that *Hurley* applies with equal force here.  In reaching its holding, the *Hurley* Court was careful to focus on the inherent nature of parades.  *See id.* at 577 ("[I]n the context of an expressive parade . . the parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole").  However, the potential for attribution recognized by the *Hurley* Court has not carried over

into other contexts.  *See, e.g.*, *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 85-87 (1980) (rejecting a shopping center's compelled speech claim because the "views expressed by members of the public in passing out pamphlets or seeking signatures for a petition [] will not likely be identified with those of the owner," and the owner "can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand").  Indeed, in a case subsequent to *Hurley*, the Supreme Court reaffirmed its prior holding that "high school students can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so, pursuant to an equal access policy." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65 (2006).

Accordingly, the Court concludes that *Hurley* does not help the Plaintiffs because it is unlikely that alternative religious expression, especially "religious expression that is *contrary* to the Catholic faith," would be attributed to St. Dominic or the Diocese.  *See Pls.' Mot.* at 14 (emphasis in original).  Further, to the extent St. Dominic is concerned about potential misattribution, 5 M.R.S. § 4602(5)(D) does not prohibit the school from disavowing religious expression that is contrary to Catholic teaching.  Because 5 M.R.S. § 4602(5)(D) only implicates student expression, concerns speech that is unlikely to be attributed to St. Dominic, and allows St. Dominic to disavow speech with which it disagrees, the Plaintiffs are unlikely to succeed on their compelled speech challenge.

### c.   Excessive Entanglement

Next, the Plaintiffs argue they are likely to succeed on the merits because Chapter 366 violates the Establishment Clause by "creat[ing] excessive entanglement between the state of Maine and religious schools." *Pls.' Mot.* at 16. According to the Plaintiffs, Chapter 366 gives the MHRC authority to:

> [I]nvestigate and determine questions like where, when, and how often to allow prayer in school; whether a Catholic school must allow Protestant worship; what the school may teach about its own Catholic beliefs and the beliefs of other religions; whether families and students may be asked to support the religious mission of the school; and who is qualified to teach students in a Catholic school about Catholicism.

*Id.* at 15. In addition, the Plaintiffs suggest that Chapter 366 "requires a school to facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object," which conflicts with Catholic doctrine. *Id.* at 16. All told, the Plaintiffs suggest that Chapter 366 gives rise to "an entanglement that inevitably invites Maine officials to condone the actions of religious schools who have beliefs the government agrees with and sanction those who do not." *Id.*

In response, the Defendants contend that the Plaintiffs' argument lacks "any factual or legal support," and "[i]t is difficult to see why the MHRC would ever have to look into such matters to determine whether the MHRA was violated." *Defs.' Opp'n* at 19. The Defendants further submit that "when it comes to litigation, religious organizations do not have some sort of blanket immunity from relevant factual inquires." *Id.*

The Plaintiffs' argument relies upon the Supreme Court's statement in *Carson* that "scrutinizing whether and how a religious school pursues its

educational mission would [] raise serious concerns about state entanglement with religion and denominational favoritism." 142 S. Ct. at 2001; *see also Pls.' Mot.* at 15 (quoting this passage); *Pls.' Reply* at 7 (same). The *Carson* Court made this statement in response to an argument that the sectarian exclusion was permissible for merely "impos[ing] a use-based restriction," not "status-based religious discrimination." *Id.* at 2000 (quoting *Carson v. Makin*, 979 F.3d 21, 35, 37-38 (1st Cir. 2020)). In so doing, the Court highlighted the constitutional infirmities that would accompany a legal paradigm where discrimination based on religious status was forbidden, but discrimination based on the religious use of funding was allowed.

The Court is unconvinced by the Plaintiffs' attempt to transpose this argument to Chapter 366. To start, although the Plaintiffs claim that Chapter 366 gives the MHRC "authority to say how [religious] schools should be run," *Pls.' Mot.* at 15, they provide no evidence in support of this assertion. As far as the Court is aware, Chapter 366 has not yet been enforced, and the Defendants, who play key roles in enforcing the MHRA, have represented that it "is difficult to see why the MHRC would ever have to look into such matters to determine whether the MHRA was violated." *Defs.' Opp'n* at 19. While giving the MHRC "authority to investigate and determine questions like where, when, and how often to allow prayer in school," would undoubtedly raise entanglement concerns, the Court has no reason to conclude that Chapter 366 actually grants such authority.

Further, unlike the distinction in *Carson*—which concerned the state potentially condoning some religious uses and condemning others—Chapter 366

applies to religious and nonreligious schools alike. *See* 5 M.R.S. § 4553(2-A) (defining "educational institution" to include "any public school or educational program" and "any private school or educational program approved for tuition purposes"). Accordingly, unlike *Carson*, Chapter 366 does not facially contemplate religious entanglement. Because the Plaintiffs provide no evidence that such entanglement would accompany the enforcement of Chapter 366, the Court concludes there is insufficient evidence that the Plaintiffs are likely to succeed on the merits.[14]

### d.   Unconstitutional Conditions

Finally, the Plaintiffs submit that Chapter 366 is unlawful because it "impose[s] unconstitutional conditions" on schools participating in the tuitioning program. *Pls.' Mot.* at 18-19; *Pls.' Reply* at 9. Under the doctrine of unconstitutional conditions, "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (alteration in original) (quoting *F. for Acad. & Institutional Rts.*, 547 U.S. at 59). Cases in which unconstitutional conditions have been found "involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus

---

[14]   As noted above, the Plaintiffs also suggest that excessive entanglement would result from St. Dominic being required to "facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object" or "discipline a Catholic teacher for following the teachings of Pope Francis on sex and gender." *Pls.' Mot.* at 16 (footnotes omitted). As the Defendants point out, these arguments concern "whether the MHRA burdens Plaintffs' religious practices." *Defs.' Opp'n* at 19.

effectively prohibiting the recipient from engaging in protected conduct outside the scope of the federally funded program." *Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (emphasis in original).

Because the Plaintiffs have not shown that Chapter 366 actually restricts their speech or religious exercise, the Court concludes that the doctrine of unconstitutional conditions is inapplicable. The Plaintiffs surmise that Chapter 366 "force[s] religious schools to stop being religious," and they accuse the Defendants of attempting "to control the internal operations of religious schools." *Pls.' Mot.* at 18. But the Court has already rejected the Plaintiffs' sweeping interpretation of Chapter 366's consequences, and in concluding that Chapter 366 is neutral, the Court found that the law was not motivated by a desire to control religious schools. As the Court has determined that the Plaintiffs are unlikely to succeed on their other constitutional challenges, the Court likewise concludes that the Plaintiffs have not carried their burden of showing a likelihood of success on their unconstitutional conditions claim.

### B.    Irreparable Harm

Having concluded that the Plaintiffs are not likely to succeed on the merits, the Court next considers the second prong of the preliminary injunction analysis. Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). To show irreparable harm, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not

merely that it is a possibility. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").

Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaquería Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 485 (1st Cir. 2009)). Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown," however, "at least some positive showing of irreparable harm must still be made." *Id.* at 43 (internal quotations omitted) (alteration in original); *see also Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief").

In other words, as the First Circuit has recently put it, "[i]f the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). The Court does not doubt that, if the Plaintiffs' constitutional claims were meritorious, they would suffer irreparable injury from their inability to participate in the tuitioning program. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (quoting

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  The Plaintiffs have not shown a likelihood of success on the merits, however, and the challenged provisions of the MHRA are therefore unlikely to cause them irreparable injury.

### C.    Balance of the Equities and the Public Interest

The Court must also weigh the balance of the hardships on the parties and the public interest.  The Court does not discount the Plaintiffs' hardship related to not participating in the tuitioning program for fear of MHRA enforcement, but it also does not find that hardship to outweigh the potential hardship the state would face from being unable to fully enforce its educational antidiscrimination laws.  The Plaintiffs may well view the breadth of the state's antidiscrimination laws as the triumph of the tenets of a state secular religion, enacting into law ever expanding categories of protected persons, over their exercise of the principles of ancient religious beliefs protected by the First Amendment.  However, as the Court noted in *Crosspoint Church*, the Maine Legislature has the authority to define protected classes under its antidiscrimination laws, and the public also has a strong interest in the state being able to effectively combat discrimination.  2024 U.S. Dist. LEXIS 32975, at *59-60.  Moreover, the Plaintiffs are free to practice their religion, including the teaching of their religion as they see fit, but cannot require the state to subsidize their religious teachings if they conflict with state antidiscrimination law.  Buttressed by the Court's conclusion about the Plaintiffs' likelihood of success on the merits, the balance of these factors favors the Defendants.

### D.    Summary

The Court concludes that the Plaintiffs are not entitled to a preliminary injunction.  However, as the Court observed in *Crosspoint Church*, the Plaintiffs are raising important legal questions.  *Id.*  Some resemble those in *Crosspoint Church*, while others differ.  Both cases implicate the fundamental tension that arises when the Maine Legislature's view of the categories of people meriting protected status conflicts with the sincerely held beliefs of religious communities.  Although the Diocese, St. Dominic, and Mr. and Ms. Radonis seek the protection the Supreme Court's decision in *Carson*, this tension has kept them from realizing the practical benefits of a landmark decision.

In reaching its conclusions, the Court has discussed and decided the difficult constitutional questions presented.  At the same time, the Court recognizes that this case poses novel constitutional issues and, as it did in *Crosspoint Church*, the Court has attempted to frame its opinion as a prelude to a challenge to the Court of Appeals for the First Circuit for a more authoritative ruling.  *See Carson*, 401 F. Supp. 3d at 212 ("It has always been apparent that, whatever my decision, this case is destined to go to the First Circuit on appeal, maybe even to the Supreme Court").

## VI.    CONCLUSION

The Court DENIES the Plaintiffs' Motion for Preliminary Injunction (ECF No. 5).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of August, 2024

### §4553. Definitions

As used in this Act, unless the context or subchapter otherwise indicates, the following words have the following meanings.  [PL 1995, c. 393, §1 (AMD).]

**1.  Commission.**  "Commission" means the Maine Human Rights Commission established by this Act.
[PL 1971, c. 501, §1 (NEW).]

**1-A.  Commercial facilities.**  "Commercial facilities" means facilities that are intended for nonresidential use.
[PL 1995, c. 393, §2 (NEW).]

**1-B.  Covered entity.**  For purposes of subchapter 3, "covered entity" means an employer, employment agency, labor organization or joint labor-management committee.  For purposes of subchapter 5, "covered entity" means any applicable private entity or public entity.
[PL 2019, c. 464, §1 (NEW).]

**1-C.  Direct threat.**  For purposes of subchapter 3, "direct threat" means a significant risk to the health or safety of others that can not be eliminated by reasonable accommodation.
[PL 2019, c. 464, §1 (AMD).]

**1-D.  Aggrieved person.**  "Aggrieved person" includes any person who claims to have been subject to unlawful discrimination on the basis of protected class status, including discrimination based on the person's known relationship or association with a member of a protected class and discrimination on the basis of perceived protected class status.  "Aggrieved person" also includes any person who claims to have been injured by unlawful housing discrimination.
[PL 2019, c. 464, §1 (AMD).]

**1-E.  Complainant.**  "Complainant" means a person who files a complaint under section 4611.
[PL 2019, c. 464, §1 (AMD).]

**1-F.  Conciliation.**  "Conciliation" means the attempted resolution after a finding by the commission that unlawful discrimination has occurred of issues raised by a complaint filed under section 4611 or by an investigation of such a complaint through informal negotiations involving the complainant, the respondent and the commission.
[PL 2019, c. 464, §1 (AMD).]

**1-G.  Conciliation agreement.**  "Conciliation agreement" means a written agreement setting forth the resolution of the issues in conciliation.
[PL 2011, c. 613, §4 (NEW); PL 2011, c. 613, §29 (AFF).]

**1-H.  Assistance animal.**  "Assistance animal" means, for the purposes of subchapter 4:

A.  An animal that has been determined necessary for an individual with a physical or mental disability to mitigate the effects of a physical or mental disability by a physician, psychologist, physician assistant, nurse practitioner, licensed social worker, licensed professional counselor or other licensed health professional with knowledge of the disability-related need for an assistance animal; or  [PL 2019, c. 464, §1 (AMD).]

B.  An animal individually trained to do work or perform tasks for the benefit of an individual with a physical or mental disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals who are deaf or hard of hearing to intruders or sounds, providing reasonable protection or rescue work, pulling a wheelchair or retrieving dropped items.  [PL 2015, c. 457, §1 (NEW).]
[PL 2019, c. 464, §1 (AMD).]

**2. Discriminate.** "Discriminate" includes, without limitation, segregate, separate or subject to harassment.

For purposes of subchapter 3, "discriminate" also includes:

A. Limiting, segregating or classifying a job applicant or employee in a way that adversely affects the opportunities or status of the applicant or employee because of the protected class of the applicant or employee;  [PL 2019, c. 464, §1 (AMD).]

B. Participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee to the discrimination prohibited by this Act. A relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity or an organization providing training and apprenticeship programs;  [PL 2019, c. 464, §1 (AMD).]

C. Utilizing standards, criteria or methods of administration:

(1) That have the effect of discrimination on the basis of protected class status; or

(2) That perpetuate discrimination on the basis of protected class status by others who are subject to common administrative control;  [PL 2019, c. 464, §1 (AMD).]

D. Excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known protected class status of an individual with whom the qualified individual is known to have a relationship or association;  [PL 2019, c. 464, §1 (AMD).]

E. Not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity;  [PL 1995, c. 393, §3 (NEW).]

F. Denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if the denial is based on the need of the covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;  [PL 1995, c. 393, §3 (NEW).]

G. Using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual or a class of individuals based on their protected class status unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and  [PL 2019, c. 464, §1 (AMD).]

H. Failing to select and administer tests concerning employment in the most effective manner to ensure that, when the test is administered to a job applicant or employee who has a disability that impairs sensory, manual or speaking skills, the test results accurately reflect the skills, aptitude or any other factor of the applicant or employee that the test purports to measure, rather than reflecting the impaired sensory, manual or speaking skills of the employee or applicant, except when the skills are the factors that the test purports to measure.  [PL 1995, c. 393, §3 (NEW).]
[PL 2019, c. 464, §1 (AMD).]

**2-A. Educational institution.** "Educational institution" means any public school or educational program, any public postsecondary institution, any private school or educational program approved for tuition purposes and the governing body of each such school or program.
[PL 2023, c. 188, §1 (AMD).]

**3. Employee.** "Employee" means an individual employed by an employer. "Employee" does not include any individual employed by that individual's parents, spouse or child, except for purposes of disability-related discrimination, in which case the individual is considered to be an employee.
[PL 1995, c. 393, §5 (AMD).]

ADD78

**4. Employer.** "Employer" includes any person in this State employing any number of employees, whatever the place of employment of the employees, and any person outside this State employing any number of employees whose usual place of employment is in this State; any person acting in the interest of any employer, directly or indirectly, such that the person's actions are considered the actions of the employer for purposes of liability; and labor organizations, whether or not organized on a religious, fraternal or sectarian basis, with respect to their employment of employees. "Employer" does not include a religious or fraternal corporation or association, not organized for private profit and in fact not conducted for private profit, with respect to employment of its members of the same religion, sect or fraternity, except for purposes of disability-related discrimination, in which case the corporation or association is considered to be an employer.

[PL 2019, c. 464, §1 (AMD).]

**5. Employment agency.** "Employment agency" includes any person undertaking with or without compensation to procure opportunities to work, or to procure, recruit, refer or place employees; it includes, without limitation, placement services, training schools and centers, and labor organizations, to the extent that they act as employee referral sources; and it includes any agent of such person acting in the interest of the person such that the agent's actions are considered the actions of the employment agency for purposes of liability.

[PL 2019, c. 464, §1 (AMD).]

**5-A. Familial status.** "Familial status" means a family unit that contains:

A. One or more individuals who have not attained 18 years of age and are living with a parent or another person having legal custody of the individual or individuals or the designee of the parent or other person having custody with the written permission of the parent or other person; or [PL 2021, c. 366, §2 (AMD).]

B. [PL 2021, c. 366, §2 (RP).]

B-1. One or more individuals 18 years of age or older who lack the ability to meet essential requirements for physical health, safety or self-care because the individual or individuals are unable to receive and evaluate information or make or communicate decisions. [PL 2021, c. 366, §2 (NEW).]

The protections afforded against discrimination on the basis of familial status apply to any person who is pregnant or who is in the process of securing legal custody of any individual who has not attained 18 years of age.

[PL 2021, c. 366, §2 (AMD).]

**5-B. Family.** "Family" includes, but is not limited to, a single individual.

[PL 2011, c. 613, §5 (NEW); PL 2011, c. 613, §29 (AFF).]

**5-C. Gender identity.** "Gender identity" means the gender-related identity, appearance, mannerisms or other gender-related characteristics of an individual, regardless of the individual's assigned sex at birth.

[PL 2019, c. 464, §1 (NEW).]

**6. Housing accommodation.** "Housing accommodation" includes any building or structure or portion thereof, or any parcel of land, developed or undeveloped, that is occupied, or is intended to be occupied or to be developed for occupancy, for residential purposes.

A. [PL 2011, c. 613, §6 (RP); PL 2011, c. 613, §29 (AFF).]

B. [PL 2011, c. 613, §6 (RP); PL 2011, c. 613, §29 (AFF).]

C. [PL 2011, c. 613, §6 (RP); PL 2011, c. 613, §29 (AFF).]

[PL 2011, c. 613, §6 (AMD); PL 2011, c. 613, §29 (AFF).]

**6-A. Normal retirement age.** "Normal retirement age" means the specified age, the years of service requirement or any age and years of service combination at which a member may become eligible for retirement benefits. This subsection may not be construed to require the mandatory retirement of a member or to deny employment to any person based solely on that person's normal retirement age.
[PL 2005, c. 10, §2 (AMD).]

**7. Person.** "Person" includes one or more individuals, partnerships, associations, organizations, corporations, municipal corporations, legal representatives, trustees, trustees in bankruptcy, receivers and other legal representatives, labor organizations, mutual companies, joint-stock companies and unincorporated organizations and includes the State and all agencies thereof.
[PL 2011, c. 613, §7 (AMD); PL 2011, c. 613, §29 (AFF).]

**7-A. Physical or mental disability.** "Physical or mental disability" has the meaning set forth in section 4553-A.
[PL 2007, c. 385, §1 (RPR).]

**7-B. Person with physical or mental disability.**

[PL 2007, c. 385, §2 (RP).]

**8. Place of public accommodation.** "Place of public accommodation" means a facility, operated by a public entity or private entity, whose operations fall within at least one of the following categories:

A.  An inn, hotel, motel or other place of lodging, whether conducted for the entertainment or accommodation of transient guests or those seeking health, recreation or rest;  [PL 1995, c. 393, §7 (NEW).]

B.  A restaurant, eating house, bar, tavern, buffet, saloon, soda fountain, ice cream parlor or other establishment serving or selling food or drink;  [PL 1995, c. 393, §7 (NEW).]

C.  A motion picture house, theater, concert hall, stadium, roof garden, airdrome or other place of exhibition or entertainment;  [PL 1995, c. 393, §7 (NEW).]

D.  An auditorium, convention center, lecture hall or other place of public gathering;  [PL 1995, c. 393, §7 (NEW).]

E.  A bakery, grocery store, clothing store, hardware store, shopping center, garage, gasoline station or other sales or rental establishment;  [PL 1995, c. 393, §7 (NEW).]

F.  A laundromat, dry cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, dispensary, clinic, bathhouse or other service establishment;  [PL 1995, c. 393, §7 (NEW).]

G.  All public conveyances operated on land or water or in the air as well as a terminal, depot or other station used for specified public transportation;  [PL 1995, c. 393, §7 (NEW).]

H.  A museum, library, gallery or other place of public display or collection;  [PL 1995, c. 393, §7 (NEW).]

I.  A park, zoo, amusement park, race course, skating rink, fair, bowling alley, golf course, golf club, country club, gymnasium, health spa, shooting gallery, billiard or pool parlor, swimming pool, seashore accommodation or boardwalk or other place of recreation, exercise or health;  [PL 1995, c. 393, §7 (NEW).]

J.  A nursery, elementary, secondary, undergraduate or postgraduate school or other place of education;  [PL 1995, c. 393, §7 (NEW).]

K.  A day care center, senior citizen center, homeless shelter, food bank, adoption agency or other social service center establishment;  [PL 2019, c. 464, §1 (AMD).]

L.  Public elevators of buildings occupied by 2 or more tenants or by the owner and one or more tenants;  [PL 1995, c. 393, §7 (NEW).]

M.  A municipal building, courthouse, town hall or other establishment of the State or a local government; and  [PL 1995, c. 393, §7 (NEW).]

N.  Any establishment that in fact caters to, or offers its goods, facilities or services to, or solicits or accepts patronage from, the general public.  [PL 1995, c. 393, §7 (NEW).]

When a place of public accommodation is located in a private residence, the portion of the residence used exclusively as a residence is not covered by this subchapter, but that portion used exclusively in the operation of the place of public accommodation or that portion used both for the place of public accommodation and for the residential purposes is covered by this subchapter.  The covered portion of the residence extends to those elements used to enter the place of public accommodation, and those exterior and interior portions of the residence available to or used by customers or clients, including rest rooms.
[PL 2019, c. 464, §1 (AMD).]

**8-A.  Private entity.**  "Private entity" means any entity other than a public entity.
[PL 1995, c. 393, §8 (NEW).]

**8-B.  Public accommodation.**  "Public accommodation" means a public entity or private entity that owns, leases, leases to or operates a place of public accommodation.
[PL 2019, c. 464, §1 (AMD).]

**8-C.  Public entity.**  "Public entity" means:

A.  The State or any local government;  [PL 1995, c. 393, §8 (NEW).]

B.  Any department, agency, special purpose district or other instrumentality of the State, 2 or more states or a local government; and  [PL 1995, c. 393, §8 (NEW).]

C.  A state, local or private commuter authority as defined in the federal Rail Passenger Service Act.  [PL 2019, c. 464, §1 (AMD).]
[PL 2019, c. 464, §1 (AMD).]

**8-D.  Qualified individual with a disability.**  "Qualified individual with a disability" applies to only:

A.  Subchapter 3 (employment); and  [PL 2019, c. 464, §1 (AMD).]

B.  Subchapter 5 (public accommodations) with regard to public entities only.  [PL 2019, c. 464, §1 (AMD).]

For purposes of subchapter 3, "qualified individual with a disability" means an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires.

For purposes of subchapter 5, "qualified individual with a disability" means an individual with a disability who, with or without reasonable modification to rules, policies or practices, the removal of architectural, communication or transportation barriers or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.
[PL 2019, c. 464, §1 (AMD).]

**8-E. Pregnancy-related condition.** "Pregnancy-related condition" means a known limitation of an employee's ability to perform the functions of a job due to pregnancy, childbirth or related medical conditions, including but not limited to lactation.
[PL 2019, c. 490, §1 (NEW).]

***REVISOR'S NOTE:*** (Subsection 8-E as enacted by PL 2019, c. 464, §1 is REALLOCATED TO TITLE 5, SECTION 4553, SUBSECTION 8-F)

**8-F. (REALLOCATED FROM T. 5, §4553, sub-§8-E) Protected class.** "Protected class" means a class of individuals protected from unlawful discrimination under this Act.
[PL 2019, c. 464, §1 (NEW); RR 2019, c. 1, Pt. A, §5 (RAL).]

**8-G. Protective hairstyle.** "Protective hairstyle" includes braids, twists and locks.
[PL 2021, c. 643, §1 (NEW).]

**8-H. Race, for purposes of subchapters 3 and 5-B.** "Race," for the purposes of subchapters 3 and 5-B, includes traits associated with race, including hair texture, Afro hairstyles and protective hairstyles.
[PL 2021, c. 643, §2 (NEW).]

**9. Real estate broker and sales agent.** "Real estate broker" and "real estate sales agent" have the same meanings as in Title 32, sections 13198 and 13200 respectively; but include all persons meeting those definitions, whether they are licensed or required to be licensed.
[PL 2019, c. 464, §1 (AMD).]

**9-A. Reasonable accommodation.** For purposes of subchapter 3, "reasonable accommodation" may include, but is not limited to:

A. Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and [PL 1995, c. 393, §8 (NEW).]

B. Job restructuring, part-time or modified work schedules, reassignment to a vacant position, leaves of absence, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters and other similar accommodations for individuals with disabilities. [PL 2019, c. 464, §1 (AMD).]
[PL 2019, c. 464, §1 (AMD).]

**9-B. Undue hardship; undue burden.** "Undue hardship" or "undue burden" means an action requiring undue financial or administrative hardship. In determining whether an action would result in an undue hardship, factors to be considered include:

A. The nature and cost of the accommodation needed under this Act; [PL 1995, c. 393, §8 (NEW).]

B. The overall financial resources of the facility or facilities involved in the action, the number of persons employed at the facility, the effect on expenses and resources or the impact otherwise of the action upon the operation of the facility; [PL 1995, c. 393, §8 (NEW).]

C. The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of its employees and the number, type and location of its facilities; [PL 1995, c. 393, §8 (NEW).]

D. The type of operation or operations of the covered entity, including the composition, structure and functions of the work force of the entity, the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity; [PL 1995, c. 393, §8 (NEW).]

E. All the resources available to meet the costs of the accommodation, including any government funding or other grants available for making public accommodations and places of employment accessible; [PL 1995, c. 393, §8 (NEW).]

F. The extent to which current costs of accommodations have been minimized by past efforts to provide equal access to persons with disabilities; [PL 1995, c. 393, §8 (NEW).]

G. The extent to which resources spent on improving inaccessible equipment or service could have been spent on making an accommodation so that service or equipment is accessible to individuals with disabilities, as well as to individuals without disabilities; [PL 1995, c. 393, §8 (NEW).]

H. Documented good faith efforts to explore less restrictive or less expensive alternatives; [PL 1995, c. 393, §8 (NEW).]

I. The availability of equipment and technology for the accommodation; [PL 1995, c. 393, §8 (NEW).]

J. Whether an accommodation would result in a fundamental change in the nature of the public accommodation; [PL 1995, c. 393, §8 (NEW).]

K. Efforts to minimize costs by spreading costs over time; and [PL 1995, c. 393, §8 (NEW).]

L. The extent to which resources saved by failing to make an accommodation for persons who have disabilities could have been saved by cutting costs in equipment or services for the general public. [PL 1995, c. 393, §8 (NEW).]

"Undue hardship" or "undue burden" is a higher standard than "readily achievable" and requires a greater level of effort on the part of the public accommodation.
[PL 2019, c. 464, §1 (AMD).]

**9-C. Sexual orientation.** "Sexual orientation" means a person's actual or perceived heterosexuality, bisexuality or homosexuality.
[PL 2023, c. 41, §1 (AMD).]

**9-D. Service animal.**

[PL 2011, c. 369, §1 (RP).]

**9-E. Service animal.** "Service animal" means:

A. [PL 2015, c. 457, §2 (RP).]

B. For the purposes of subchapter 5, a dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual or other mental disability. Other species of animals, whether wild or domestic, trained or untrained, are not service animals for the purposes of this definition. The work or tasks performed by a service animal must be directly related to the individual's disability. Examples of such work or tasks include, but are not limited to, assisting an individual who is totally or partially blind with navigation and other tasks, alerting an individual who is deaf or hard of hearing to the presence of people or sounds, providing nonviolent protection or rescue work, pulling a wheelchair, assisting an individual during a seizure, alerting an individual to the presence of allergens, retrieving items such as medicine or a telephone, providing physical support and assistance with balance and stability to an individual with a mobility disability and helping a person with a psychiatric or neurological disability by preventing or interrupting impulsive or destructive behaviors. The crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort or companionship do not constitute work or tasks for the purposes of this definition. [PL 2011, c. 369, §2 (NEW).]
[PL 2015, c. 457, §2 (AMD).]

**9-F. Rent.** "Rent" includes to lease, to sublease, to let or otherwise to grant for a consideration the right to occupy premises not owned by the occupant.
[PL 2011, c. 613, §8 (NEW); PL 2011, c. 613, §29 (AFF).]

**9-G. Respondent.** "Respondent" means a person accused of unlawful discrimination in a complaint filed under section 4611.
[PL 2019, c. 464, §1 (AMD).]

**10. Unlawful discrimination.** "Unlawful discrimination" includes:

A. Unlawful employment discrimination as defined and limited by subchapter 3; [PL 2019, c. 464, §1 (AMD).]

B. Unlawful housing discrimination as defined and limited by subchapter 4; [PL 2019, c. 464, §1 (AMD).]

C. Unlawful public accommodations discrimination as defined by subchapter 5; [PL 2019, c. 464, §1 (AMD).]

D. Aiding, abetting, inciting, compelling or coercing another to do any of such types of unlawful discrimination; obstructing or preventing any person from complying with this Act or any order issued in this subsection; attempting to do any act of unlawful discrimination; and punishing or penalizing, or attempting to punish or penalize, any person for seeking to exercise any of the civil rights declared by this Act or for complaining of a violation of this Act or for testifying in any proceeding brought in this subsection; [PL 1983, c. 578, §2 (AMD).]

E. In determining whether a person is acting as an agent or employee of another person so as to make such other person responsible for that person's acts, the question of whether the specific acts performed were actually authorized or subsequently ratified is not controlling; [PL 2005, c. 10, §4 (AMD).]

F. Unlawful educational discrimination as defined and limited by subchapter 5-B; and [PL 2005, c. 10, §5 (AMD).]

G. Discrimination in employment, housing, public accommodation, credit and educational opportunity on the basis of sexual orientation or gender identity, except that a religious corporation, association or organization that does not receive public funds is exempt from this provision with respect to:

(1) Employment, as is more fully set forth in section 4553, subsection 4 and section 4573-A;

(2) Housing; and

(3) Educational opportunity.

Any for-profit organization owned, controlled or operated by a religious association or corporation and subject to the provisions of the Internal Revenue Code, 26 United States Code, Section 511(a) is not covered by the exemptions set forth in this paragraph. [PL 2021, c. 366, §3 (AMD).]
[PL 2021, c. 366, §3 (AMD).]

SECTION HISTORY

PL 1971, c. 501, §1 (NEW). PL 1973, c. 415, §1 (AMD). PL 1975, c. 182, §1 (AMD). PL 1975, c. 358, §2 (AMD). PL 1979, c. 350, §1 (AMD). PL 1983, c. 437, §1 (AMD). PL 1983, c. 578, §§1,2 (AMD). PL 1987, c. 478, §2 (AMD). PL 1989, c. 245, §2 (AMD). PL 1991, c. 99, §2 (AMD). PL 1991, c. 109 (AMD). PL 1995, c. 393, §§1-8 (AMD). RR 1999, c. 2, §2 (COR). PL 2005, c. 10, §§2-6 (AMD). PL 2007, c. 385, §§1, 2 (AMD). PL 2007, c. 664, §1 (AMD). PL 2011, c. 369, §§1, 2 (AMD). PL 2011, c. 613, §§1-9 (AMD). PL 2011, c. 613, §29 (AFF). PL 2015, c. 457, §§1, 2 (AMD). PL 2019, c. 464, §1 (AMD). PL 2019, c. 490, §1 (AMD). RR 2019,

c. 1, Pt. A, §5 (COR). PL 2021, c. 366, §§2, 3 (AMD). PL 2021, c. 643, §§1, 2 (AMD). PL 2023, c. 41, §1 (AMD). PL 2023, c. 188, §1 (AMD).

The State of Maine claims a copyright in its codified statutes. If you intend to republish this material, we require that you include the following disclaimer in your publication:

*All copyrights and other rights to statutory text are reserved by the State of Maine. The text included in this publication reflects changes made through the First Regular Session and the First Special Session of the131st Maine Legislature and is current through November 1, 2023. The text is subject to change without notice. It is a version that has not been officially certified by the Secretary of State. Refer to the Maine Revised Statutes Annotated and supplements for certified text.*

The Office of the Revisor of Statutes also requests that you send us one copy of any statutory publication you may produce. Our goal is not to restrict publishing activity, but to keep track of who is publishing what, to identify any needless duplication and to preserve the State's copyright rights.

PLEASE NOTE: The Revisor's Office cannot perform research for or provide legal advice or interpretation of Maine law to the public. If you need legal assistance, please contact a qualified attorney.

**§4572. Unlawful employment discrimination**

**1. Unlawful employment discrimination.** It is unlawful employment discrimination, in violation of this Act, except when based on a bona fide occupational qualification:

A. For any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, because of the applicant's previous assertion of a claim or right under former Title 39 or Title 39-A, because of previous actions taken by the applicant that are protected under Title 26, chapter 7, subchapter 5-B or because the applicant sought and received an order of protection under Title 19-A, section 4007; or, because of those reasons, to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment; or, in recruiting of individuals for employment or in hiring them, to utilize any employment agency that the employer knows or has reasonable cause to know discriminates against individuals because of their race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, because of their previous assertion of a claim or right under former Title 39 or Title 39-A, because of previous actions that are protected under Title 26, chapter 7, subchapter 5-B or because the applicant sought and received an order of protection under Title 19-A, section 4007.

(1) This paragraph does not apply to discrimination governed by Title 39-A, section 353; [PL 2021, c. 366, §5 (AMD); PL 2021, c. 476, §1 (AMD).]

B. For any employment agency to fail or refuse to classify properly, refer for employment or otherwise discriminate against any individual because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, because of the individual's previous assertion of a claim or right under former Title 39 or Title 39-A, because of previous actions taken by the individual that are protected under Title 26, chapter 7, subchapter 5-B or because the individual sought and received an order of protection under Title 19-A, section 4007; or to comply with an employer's request for the referral of job applicants if a request indicates either directly or indirectly that the employer will not afford full and equal employment opportunities to individuals regardless of their race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, because of previous assertion of a claim or right under former Title 39 or Title 39-A, because of previous actions that are protected under Title 26, chapter 7, subchapter 5-B or because the individual sought and received an order of protection under Title 19-A, section 4007; [PL 2021, c. 366, §5 (AMD); PL 2021, c. 476, §1 (AMD).]

C. For any labor organization to exclude from apprenticeship or membership or to deny full and equal membership rights to any applicant for membership because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, because of the applicant's previous assertion of a claim or right under former Title 39 or Title 39-A, because of previous actions taken by the applicant that are protected under Title 26, chapter 7, subchapter 5-B or because the applicant sought and received an order of protection under Title 19-A, section 4007; or, because of those reasons, to deny a member full and equal membership rights, expel from membership, penalize or otherwise discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment, representation, grievances or any other matter directly or indirectly related to membership or employment, whether or not authorized or required by the constitution or bylaws of that labor organization or by a collective labor agreement or other contract; to fail or refuse to classify properly or refer for employment or otherwise discriminate against any member because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age,

ADD86

ancestry, national origin or familial status, because of the member's previous assertion of a claim or right under former Title 39 or Title 39-A, because of previous actions taken by the member that are protected under Title 26, chapter 7, subchapter 5-B or because the applicant sought and received an order of protection under Title 19-A, section 4007; or to cause or attempt to cause an employer to discriminate against an individual in violation of this section, except that it is lawful for labor organizations and employers to adopt a maximum age limitation in apprenticeship programs, if the employer or labor organization obtains prior approval from the Maine Human Rights Commission of any maximum age limitation employed in an apprenticeship program. The commission shall approve the age limitation if a reasonable relationship exists between the maximum age limitation employed and a legitimate expectation of the employer in receiving a reasonable return upon the employer's investment in an apprenticeship program. The employer or labor organization bears the burden of demonstrating that such a relationship exists; [PL 2021, c. 366, §5 (AMD); PL 2021, c. 476, §1 (AMD).]

D. For any employer, employment agency or labor organization, prior to employment or admission to membership of any individual, to:

(1) Elicit or attempt to elicit information directly or indirectly pertaining to race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, any previous assertion of a claim or right under former Title 39 or Title 39-A, any previous actions that are protected under Title 26, chapter 7, subchapter 5-B or any previous actions seeking and receiving an order of protection under Title 19-A, section 4007;

(2) Make or keep a record of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, any previous assertion of a claim or right under former Title 39 or Title 39-A, any previous actions that are protected under Title 26, chapter 7, subchapter 5-B or any previous actions seeking and receiving an order of protection under Title 19-A, section 4007, except that, in relation to physical or mental disability, when an employer requires a physical or mental examination prior to employment, a privileged record of that examination is permissible if made and kept in compliance with this Act;

(3) Use any form of application for employment, or personnel or membership blank containing questions or entries directly or indirectly pertaining to race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, any previous assertion of a claim or right under former Title 39 or Title 39-A, any previous actions that are protected under Title 26, chapter 7, subchapter 5-B or any previous actions seeking and receiving an order of protection under Title 19-A, section 4007. This section does not prohibit any officially recognized government agency from keeping records permitted to be kept under this Act in order to provide free services to individuals requesting rehabilitation or employment assistance;

(4) Print, publish or cause to be printed or published any notice or advertisement relating to employment or membership indicating any preference, limitation, specification or discrimination based upon race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status, any previous assertion of a claim or right under former Title 39 or Title 39-A, any previous actions that are protected under Title 26, chapter 7, subchapter 5-B or any previous actions seeking and receiving an order of protection under Title 19-A, section 4007; or

(5) Establish, announce or follow a policy of denying or limiting, through a quota system or otherwise, employment or membership opportunities of any group because of the race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry,

national origin or familial status, because of the previous assertion of a claim or right under former Title 39 or Title 39-A, because of previous actions that are protected under Title 26, chapter 7, subchapter 5-B or because of any previous actions seeking and receiving an order of protection under Title 19-A, section 4007, of that group; or  [PL 2021, c. 293, Pt. B, §2 (AMD); PL 2021, c. 366, §5 (AMD); PL 2021, c. 476, §1 (AMD).]

E.  For an employer, employment agency or labor organization to discriminate in any manner against individuals because they have opposed a practice that would be a violation of this Act or because they have made a charge, testified or assisted in any investigation, proceeding or hearing under this Act.  This paragraph does not limit the liability of persons pursuant to section 4633.  [PL 2021, c. 366, §5 (AMD).]

[PL 2021, c. 293, Pt. B, §2 (AMD); PL 2021, c. 366, §5 (AMD); PL 2021, c. 476, §1 (AMD).]

**2.  Unlawful discrimination against qualified individual with a disability.**  A covered entity may not discriminate against a qualified individual with a disability because of the disability of the individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training and other terms, conditions and privileges of employment.  A qualified individual with a disability, by reason of that disability, may not be excluded from participation in or be denied the benefits of the services, programs or activities of a public covered entity, or be subjected to discrimination by any such covered entity relating to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training and other terms, conditions and privileges of employment.

A.  The prohibition of this subsection against discrimination includes medical examinations and inquiries.  [PL 1995, c. 393, §13 (NEW).]

B.  Except as provided in paragraph C, a covered entity may not conduct a medical examination or make inquiries of a job applicant as to whether the applicant is an individual with a disability or as to the nature or severity of the disability.  A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.  [PL 1995, c. 393, §13 (NEW).]

C.  A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of the applicant and may condition an offer of employment on the results of the examination, if:

(1)  All entering employees are subjected to the same examination regardless of disability;

(2)  Any medical and disability information and history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that:

(a)  Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(b)  First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(c)  Government officials investigating compliance with this Act are provided relevant information on request; and

(3)  The results of the examination are used only in accordance with this Act.  [PL 2019, c. 667, Pt. A, §7 (AMD).]

D.  A covered entity may not require a medical examination and may not make inquiries of an employee as to whether the employee is an individual with a disability or as to the nature or severity of the disability, unless the examination or inquiry is shown to be job-related and consistent with business necessity.  [PL 1995, c. 393, §13 (NEW).]

E.  A covered entity may conduct voluntary medical examinations, including voluntary medical and disability information and history, that are part of an employee health or wellness program available to employees at that work site.  A covered entity may make inquiries into the ability of an employee to perform job-related functions.  Information obtained under this paragraph regarding the medical and disability information and history of an employee is subject to the requirements of paragraph C, subparagraphs (2) and (3).  [PL 2019, c. 667, Pt. A, §8 (AMD).]

F.  For purposes of this subsection, a test to determine the illegal use of drugs may not be considered a medical examination.

(1)  A covered entity:

(a)  May prohibit the illegal use of drugs and the use of alcohol at the workplace by all employees;

(b)  May require that employees may not be under the influence of alcohol or be engaging in the illegal use of drugs at the workplace;

(c)  May require that employees behave in conformance with the requirements established under the federal Drug-free Workplace Act of 1988, 41 United States Code, Section 701 et seq.; and

(d)  May hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior to which that entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of the employee; provided that an employer shall make reasonable accommodation to an alcoholic or drug user who is seeking treatment or has successfully completed treatment.  [PL 1995, c. 393, §13 (NEW).]

[PL 2019, c. 667, Pt. A, §§7, 8 (AMD).]

SECTION HISTORY

PL 1971, c. 501, §1 (NEW). PL 1973, c. 347, §6 (AMD). PL 1973, c. 705, §6 (AMD). PL 1975, c. 355, §6 (RPR). PL 1975, c. 358, §§7-10 (AMD). PL 1975, c. 770, §33 (RPR). PL 1977, c. 565 (AMD). PL 1987, c. 55, §1 (AMD). PL 1987, c. 559, §B2 (AMD). PL 1987, c. 782, §1 (AMD). PL 1989, c. 251, §1 (AMD). PL 1991, c. 99, §7 (AMD). PL 1991, c. 885, §E7 (AMD). PL 1991, c. 885, §E47 (AFF). PL 1995, c. 393, §§12,13 (AMD). PL 2005, c. 10, §§11,12 (AMD). PL 2019, c. 667, Pt. A, §§7, 8 (AMD). PL 2021, c. 293, Pt. B, §2 (AMD). PL 2021, c. 366, §5 (AMD). PL 2021, c. 476, §1 (AMD).

The State of Maine claims a copyright in its codified statutes. If you intend to republish this material, we require that you include the following disclaimer in your publication:

*All copyrights and other rights to statutory text are reserved by the State of Maine. The text included in this publication reflects changes made through the First Regular Session and the First Special Session of the 131st Maine Legislature and is current through November 1, 2023. The text is subject to change without notice. It is a version that has not been officially certified by the Secretary of State. Refer to the Maine Revised Statutes Annotated and supplements for certified text.*

The Office of the Revisor of Statutes also requests that you send us one copy of any statutory publication you may produce. Our goal is not to restrict publishing activity, but to keep track of who is publishing what, to identify any needless duplication and to preserve the State's copyright rights.

PLEASE NOTE: The Revisor's Office cannot perform research for or provide legal advice or interpretation of Maine law to the public. If you need legal assistance, please contact a qualified attorney.

### §4573-A. Defenses

**1. General provisions.** It is a defense to a charge of discrimination under this subchapter that an alleged application of qualification standards, tests or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual based on protected class status has been shown to be job-related and consistent with business necessity, and such performance can not be accomplished by reasonable accommodation, as required by this subchapter.
[PL 2019, c. 464, §3 (AMD).]

**1-A. Qualification standards defined.** For the purposes of this section, the term "qualification standards" may include a requirement that an individual does not pose a direct threat to the health or safety of other individuals in the workplace.
[PL 1995, c. 511, §1 (NEW); PL 1995, c. 511, §3 (AFF).]

**1-B. Physical or mental disability.**
[PL 2019, c. 464, §4 (RP).]

**2. Religious entities.** This subchapter does not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion for work connected with the carrying on by the corporation, association, educational institution or society of its activities. Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization.
[PL 1995, c. 393, §21 (NEW).]

**3. Physical or mental disability.** This subchapter does not prohibit an employer from discharging or refusing to hire an individual with a physical or mental disability or subject an employer to any legal liability resulting from the refusal to employ or the discharge of the individual with a physical or mental disability if the employer establishes that the individual, because of the physical or mental disability, is unable to perform job duties or to perform job duties in a manner that would not endanger the health or safety of the individual or others.
[PL 2021, c. 366, §6 (NEW).]

SECTION HISTORY

PL 1995, c. 393, §21 (NEW). PL 1995, c. 511, §1 (AMD). PL 1995, c. 511, §3 (AFF). PL 2019, c. 464, §§3, 4 (AMD). PL 2021, c. 366, §6 (AMD).

The State of Maine claims a copyright in its codified statutes. If you intend to republish this material, we require that you include the following disclaimer in your publication:

*All copyrights and other rights to statutory text are reserved by the State of Maine. The text included in this publication reflects changes made through the First Regular Session and the First Special Session of the131st Maine Legislature and is current through November 1, 2023. The text is subject to change without notice. It is a version that has not been officially certified by the Secretary of State. Refer to the Maine Revised Statutes Annotated and supplements for certified text.*

The Office of the Revisor of Statutes also requests that you send us one copy of any statutory publication you may produce. Our goal is not to restrict publishing activity, but to keep track of who is publishing what, to identify any needless duplication and to preserve the State's copyright rights.

PLEASE NOTE: The Revisor's Office cannot perform research for or provide legal advice or interpretation of Maine law to the public. If you need legal assistance, please contact a qualified attorney.

**§4602. Unlawful educational discrimination**

**1. Unlawful educational discrimination.** It is unlawful educational discrimination in violation of this Act, on the basis of sex, sexual orientation or gender identity, physical or mental disability, ancestry, national origin, race, color or religion, to:

A. Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity; [PL 1985, c. 797, §1 (AMD).]

B. Deny a person equal opportunity in athletic programs; [PL 1983, c. 578, §3 (NEW).]

C. Apply any rule concerning the actual or potential familial status or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity; [PL 2021, c. 366, §19 (AMD).]

D. Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or [PL 2021, c. 366, §19 (AMD).]

E. Deny a person financial assistance availability and opportunity. [PL 2021, c. 366, §19 (AMD).]

[PL 2021, c. 366, §19 (AMD).]

**2. Unlawful educational discrimination on the basis of physical or mental disability.**

[PL 2021, c. 366, §19 (RP).]

**3. Unlawful educational discrimination on the basis of national origin or race.**

[PL 2021, c. 366, §19 (RP).]

**4. Unlawful education discrimination on the basis of sexual orientation.**

[PL 2021, c. 366, §19 (RP).]

**5. Application.** Nothing in this section:

A. Requires an educational institution to provide separate athletic or other extracurricular programs to serve a person with a physical or mental disability; [PL 2021, c. 366, §19 (NEW).]

B. May be construed to affect the rights of a person with a physical or mental disability to special education programs under state or federal law; [PL 2021, c. 366, §19 (NEW).]

C. Requires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity; or [PL 2021, c. 366, §19 (NEW).]

D. Requires an educational institution to participate in or endorse any religious beliefs or practices; to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing. [PL 2021, c. 366, §19 (NEW).]

[PL 2021, c. 366, §19 (NEW).]

SECTION HISTORY

PL 1983, c. 578, §3 (NEW). PL 1985, c. 797, §1 (AMD). PL 1987, c. 478, §4 (AMD). PL 1989, c. 725, §2 (AMD). PL 1991, c. 99, §28 (AMD). PL 1991, c. 100, §2 (AMD). PL 2005, c. 10, §21 (AMD). PL 2005, c. 662, §A1 (AMD). PL 2021, c. 366, §19 (AMD).

The State of Maine claims a copyright in its codified statutes. If you intend to republish this material, we require that you include the following disclaimer in your publication:

*All copyrights and other rights to statutory text are reserved by the State of Maine. The text included in this publication reflects changes made through the First Regular Session and the First Special Session of the131st Maine Legislature and is current through November 1, 2023. The text is subject to change without notice. It is a version that has not been officially certified by the Secretary of State. Refer to the Maine Revised Statutes Annotated and supplements for certified text.*

The Office of the Revisor of Statutes also requests that you send us one copy of any statutory publication you may produce. Our goal is not to restrict publishing activity, but to keep track of who is publishing what, to identify any needless duplication and to preserve the State's copyright rights.

PLEASE NOTE: The Revisor's Office cannot perform research for or provide legal advice or interpretation of Maine law to the public. If you need legal assistance, please contact a qualified attorney.