No. 24-1739

# In the United States Court of Appeals for the First Circuit

St. Dominic Academy, d/b/a Roman Catholic Bishop of Portland,
a corporation sole; Roman Catholic Bishop of Portland; Keith Radonis,
on their own behalf and as next friend of children K.Q.R., L.R.R.,
and L.T.R.; Valori Radonis, on their own behalf and as next friend of
children K.Q.R., L.R.R., and L.T.R.,

*Plaintiffs-Appellants,*

v.

A Pender Makin, in their personal capacity and official capacity as the
Commissioner of the Maine Department of Education; Jefferson Ashby,
in their personal capacity and official capacity as the Commissioner of the
Maine Human Rights Commission; Edward David, in their personal capacity
and official capacity as the Commissioner of the Maine Human Rights
Commission; Julie Ann O'Brien, in their personal capacity and official
capacity as the Commissioner of the Maine Human Rights Commission;
Mark Walker, in their personal capacity and official capacity as the
Commissioner of the Maine Human Rights Commission; Thomas L. Douglas,
in their personal capacity and official capacity as the Commissioner of
the Maine Human Rights Commission,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Maine
Hon. John A. Woodcock
(2:23-cv-00246-JAW)

## JOINT APPENDIX

James B. Haddow
Petruccelli, Martin &
  Haddow LLP
Two Monument Square
  Suite 900
Portland, ME 04112
(207) 775-2360

Adèle Auxier Keim
  *Counsel of Record*
Mark L. Rienzi
Benjamin A. Fleshman
Michael J. O'Brien
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*akeim@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Docket Sheet ........................................................ JA1

Notice of Appeal .............................................. JA10

Verified Complaint (Dkt. 1) ............................. JA13

Testimony of Amy Sneirson, Executive Director, Maine Human Rights Commission, before the Joint Standing Committee on Judiciary (Apr. 20, 2021) (cited in Dkt. 1 ¶10 & n.1) ........................................................ JA58

Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in Carson v. Makin, Office of the Maine Attorney General (June 21, 2022) (cited in Dkt. 1 ¶ 11 & n.2) ................................................ JA62

Aaron Tang, *There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It*, N.Y. Times (June 23, 2022) (cited in Dkt. 1 ¶ 12 & n.3) ........................ JA64

Statement from Attorney General Aaron Frey on Carson v. Makin oral argument, Office of the Maine Attorney General (Dec. 8, 2021) (cited in Dkt. 1 ¶ 114-116) ............................ JA67

Ryan Fecteau (@SpeakerFecteau), Twitter (June 26, 2022, 8:51 AM) (cited in Dkt. 1 ¶ 122 & n.11) ................................... JA68

Memorandum from Barbara Archer Hirsch, Comm'n Counsel, Me. Hum. Rts. Comm'n, to Amy Sneirson, Exec. Dire., Me. Hum. Rts. Comm'n (Jan. 13, 2016) (cited in Dkt. 1 ¶ 141-42 & n. 16) ........................ JA69

Exhibit 1 to Defendants' Opposition to Motion for Preliminary Injunction: Maine Pub. L. 2024, ch. 188 (Dkt. 25-1) .............................................................. JA73

Exhibit 2 to Defendants' Opposition to Motion for Preliminary Injunction: L.D. 1688, "An Act to Improve Consistency Within the Maine Human Rights Act" (Dkt. 25-2) ......................................................................................... JA74

Exhibit 3 to Defendants' Opposition to Motion for Preliminary Injunction: Testimony of Amy Sneirson, Executive Director, Maine Human Rights Commission, before the Joint Standing Committee on Judiciary (May 14, 2021) (Dkt. 25-3) ............................................................ JA86

Affidavit of Megan Welter (Dkt. 26) ................................................... JA92

Declaration of Marianne Pelletier (Dkt. 29-1) ................................... JA95

# U.S. District Court
## District of Maine (Portland)
## CIVIL DOCKET FOR CASE #: 2:23–cv–00246–JAW

ST DOMINIC ACADEMY et al v. MAKIN et al
Assigned to: JUDGE JOHN A. WOODCOCK, JR
Referred to: MAGISTRATE JUDGE KAREN FRINK WOLF
related Cases:  1:18–cv–00327–JAW
                    1:23–cv–00146–JAW

Case in other court:  First Circuit Court of Appeals, 24–01739
Cause: 42:1983 Civil Rights Act

Date Filed: 06/13/2023
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**ST DOMINIC ACADEMY**
*doing business as*
ROMAN CATHOLIC BISHOP OF
PORTLAND

represented by **ADELE KEIM**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: akeim@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BENJAMIN A. FLESHMAN**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: bfleshman@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DANIEL D. BENSON**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: dbenson@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JAMES B. HADDOW**
PETRUCCELLI, MARTIN & HADDOW
LLP
TWO MONUMENT SQUARE
SUITE 900
PORTLAND, ME 04101
207–775–0200
Email: jhaddow@pmhlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MARK L. RIENZI**

THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: mrienzi@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MICHAEL J. O'BRIEN**
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1919 PENNSYLVANIA AVE, NW
SUITE 400
WASHINGTON, DC 20006
202–955–0095
Email: mobrien@becketlaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| **ROMAN CATHOLIC BISHOP OF PORTLAND** | represented by | **ADELE KEIM** |
|---|---|---|

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BENJAMIN A. FLESHMAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DANIEL D. BENSON**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JAMES B. HADDOW**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MARK L. RIENZI**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MICHAEL J. O'BRIEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| **KEITH RADONIS** | represented by | **ADELE KEIM** |
|---|---|---|

*on his own behalf and as next friend of
children K.Q.R, L.R.R. and L.T.R.*

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**BENJAMIN A. FLESHMAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DANIEL D. BENSON**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JAMES B. HADDOW**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MARK L. RIENZI**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MICHAEL J. O'BRIEN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**VALORI RADONIS**
*on her own behalf and as next friend of children K.Q.R, L.R.R. and L.T.R.*

represented by **ADELE KEIM**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BENJAMIN A. FLESHMAN**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DANIEL D. BENSON**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JAMES B. HADDOW**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MARK L. RIENZI**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MICHAEL J. O'BRIEN**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**A PENDER MAKIN**
*in her personal capacity and in her*
*official capacity as Commissioner of the*
*Maine Department of Education*

represented by **CHRISTOPHER C. TAUB**
OFFICE OF THE ATTORNEY
GENERAL
STATE HOUSE STATION 6
AUGUSTA, ME 04333–0006
207–626–8800
Email: Christopher.C.Taub@maine.gov
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
OFFICE OF THE ATTORNEY
GENERAL
SIX STATE HOUSE STATION
AUGUSTA, ME 04333–0006
207–626–8866
Email: sarah.forster@maine.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFERSON ASHBY**
*in his personal capacity and his official*
*capacity as the Commissioner of the*
*Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EDWARD DAVID**
*in his personal capacity and his official*
*capacity as the Commissioner of the*
*Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JULIE ANN O'BRIEN**
*in her personal capacity and her official*
*capacity as the Commissioner of the*
*Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK WALKER**
*in his personal capacity and his official*
*capacity as the Commissioner of the*
*Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**THOMAS DOUGLAS**
*in his personal capacity and his official*
*capacity as the Commissioner of the*
*Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/13/2023 | 1 | COMPLAINT against All Defendants with Jury Demand **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by VALORI RADONIS, KEITH RADONIS, ST DOMINIC ACADEMY, ROMAN CATHOLIC BISHOP OF PORTLAND. (Service of Process Deadline 9/11/2023) Fee due by 6/15/2023.(jad) (Entered: 06/14/2023) |
| 06/13/2023 | 2 | CIVIL COVER SHEET. (jad) (Entered: 06/14/2023) |
| 06/13/2023 | 3 | CORPORATE DISCLOSURE STATEMENT by ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY. (jad) (Entered: 06/14/2023) |
| 06/14/2023 | | Set Deadlines : Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Adele Auxier Keim must register for a PACER account and/or request the appropriate e–filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 6/21/2023. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e–filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (jad) (Entered: 06/14/2023) |
| 06/14/2023 | 4 | Summons Issued as to All Defendants. **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.** **Note–If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).** (Attachments: # 1 Summons Makin, # 2 Summons O'Brien, # 3 Summons Walker, # 4 Summons Ashby, # 5 Summons David)(jad) (Entered: 06/14/2023) |
| 06/14/2023 | 5 | MOTION for Preliminary Injunction by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 7/5/2023. (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | | Filing Fee Paid via Credit Card ( Filing fee $ 402 receipt number AMEDC–2814275.), filed by VALORI RADONIS, KEITH RADONIS, ST DOMINIC ACADEMY, ROMAN CATHOLIC BISHOP OF PORTLAND.(HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 6 | CERTIFICATION for Admission Pro Hac Vice of Adele Auxier Keim filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number BMEDC–2814282.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 7 | CERTIFICATION for Admission Pro Hac Vice of Mark L. Rienzi filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC–2814289.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: |

| | | |
|---|---|---|
| | | 06/14/2023) |
| 06/14/2023 | 8 | CERTIFICATION for Admission Pro Hac Vice of Daniel D. Benson filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2814303.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 9 | CERTIFICATION for Admission Pro Hac Vice of Benjamin A. Fleshman filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2814313.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | 10 | CERTIFICATION for Admission Pro Hac Vice of Michael J. O'Brien filed by JAMES B. HADDOW on behalf of All Plaintiffs (Total admission fee $ 100 receipt number AMEDC−2814317.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HADDOW, JAMES) (Entered: 06/14/2023) |
| 06/14/2023 | | Set Deadlines : Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Mark L. Rienzi must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 6/21/2023. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (jad) . (Entered: 06/14/2023) |
| 06/14/2023 | | Set Deadlines : Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorneys Daniel D. Benson, Benjamin A. Fleshman, Michael J. O'Brien must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 6/21/2023. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (jad) (Entered: 06/14/2023) |
| 06/21/2023 | 11 | WAIVER OF SERVICE Returned Executed A PENDER MAKIN waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 12 | WAIVER OF SERVICE Returned Executed EDWARD DAVID waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 13 | WAIVER OF SERVICE Returned Executed JEFFERSON ASHBY waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 14 | WAIVER OF SERVICE Returned Executed JULIE ANN O'BRIEN waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 15 | WAIVER OF SERVICE Returned Executed MARK WALKER waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | 16 | WAIVER OF SERVICE Returned Executed THOMAS DOUGLAS waiver sent on 6/15/2023. (KEIM, ADELE) (Entered: 06/21/2023) |
| 06/21/2023 | | Set Answer Deadline for All Defendants : Answer due by 8/14/2023 per waivers of service returned executed 11−16. (jad) Modified on 6/21/2023 to add reference to waivers (jad). (Entered: 06/21/2023) |
| 06/22/2023 | | Set Deadlines as to 5 MOTION for Preliminary Injunction service papers executed on 6/20/2023: Responses due by 7/11/2023. (jad) (Entered: 06/22/2023) |

| Date | No. | Description |
|---|---|---|
| 06/22/2023 | 17 | NOTICE of Appearance by CHRISTOPHER C. TAUB on behalf of All Defendants (TAUB, CHRISTOPHER) (Entered: 06/22/2023) |
| 06/22/2023 | 18 | NOTICE of Appearance by SARAH A. FORSTER on behalf of All Defendants (FORSTER, SARAH) (Entered: 06/22/2023) |
| 06/23/2023 | 19 | NOTICE of Hearing: Telephone Conference set for 7/6/2023 11:00 AM before JUDGE JOHN A. WOODCOCK JR. Counsel have been provided with call–in information. (jad) (Entered: 06/23/2023) |
| 07/03/2023 | 20 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Plaintiffs (KEIM, ADELE) (Entered: 07/03/2023) |
| 07/03/2023 | 21 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Plaintiffs (KEIM, ADELE) (Entered: 07/03/2023) |
| 07/06/2023 | 22 | Minute Entry for proceedings held before JUDGE JOHN A. WOODCOCK, JR: Telephone Conference held re: briefing on Preliminary Injunction motion. Current response due 7/11/2023, Plaintiff's reply due 7/19/2023. (Court Reporter: Lori Dunbar) (jad) (Entered: 07/06/2023) |
| 07/06/2023 | 23 | ORAL MOTION for Leave to File 4 additional pages to Response brief. by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER (jad) (Entered: 07/06/2023) |
| 07/06/2023 | 24 | ORAL ORDER granting 23 Motion for Leave to File 4 additional pages to Response brief By JUDGE JOHN A. WOODCOCK, JR. (jad) (Entered: 07/06/2023) |
| 07/11/2023 | 25 | RESPONSE in Opposition re 5 MOTION for Preliminary Injunction filed by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. Reply due by 7/25/2023. (Attachments: # 1 Exhibit – 1 (PL 2023, ch. 188), # 2 Exhibit – 2 (LD 1688), # 3 Exhibit – 3 (Sneirson Testimony))(TAUB, CHRISTOPHER) (Entered: 07/11/2023) |
| 07/11/2023 | 26 | AFFIDAVIT of Megan Welter re 25 Response in Opposition to Motion, filed by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. (TAUB, CHRISTOPHER) (Entered: 07/11/2023) |
| 07/12/2023 | | Reset Deadlines as to 5 MOTION for Preliminary Injunction per telephone conference 7/6/2023: Reply due by 7/19/2023. (jad) (Entered: 07/12/2023) |
| 07/14/2023 | 27 | Unopposed MOTION for Leave to File *Reply Memorandum in Excess of Page Limit* by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 8/4/2023. (KEIM, ADELE) (Entered: 07/14/2023) |
| 07/14/2023 | 28 | ORDER granting 27 Motion for Leave to File Reply Memorandum in Excess of Page Limits. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 07/14/2023) |
| 07/19/2023 | 29 | REPLY to Response to Motion re 5 MOTION for Preliminary Injunction filed by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY. (Attachments: # 1 Declaration of Marianne Pelletier)(KEIM, ADELE) (Entered: 07/19/2023) |
| 08/11/2023 | 30 | ANSWER to 1 Complaint,, by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER.(TAUB, CHRISTOPHER) (Entered: 08/11/2023) |
| 08/11/2023 | 31 | MOTION to Dismiss for Failure to State a Claim *With Respect to Personal Capacity Claims* by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER Responses due by 9/1/2023. (TAUB, CHRISTOPHER) (Entered: 08/11/2023) |
| 08/11/2023 | 32 | SCHEDULING ORDER: Discovery due by 12/29/2023. Written Notice of Intent to File Summary Judgment Motion and Request for Pre–Filing Conference due by 1/5/2024. Motions due by 1/19/2024. Ready for Trial on 4/1/2024. By MAGISTRATE JUDGE KAREN FRINK WOLF. (jad) (Entered: 08/11/2023) |

| 09/01/2023 | 33 | RESPONSE in Opposition re 31 MOTION to Dismiss for Failure to State a Claim *With Respect to Personal Capacity Claims* filed by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY. Reply due by 9/15/2023. (KEIM, ADELE) (Entered: 09/01/2023) |
|---|---|---|
| 09/13/2023 | 34 | REPLY to Response to Motion re 31 MOTION to Dismiss for Failure to State a Claim *With Respect to Personal Capacity Claims* filed by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. (TAUB, CHRISTOPHER) (Entered: 09/13/2023) |
| 10/16/2023 | 35 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY (KEIM, ADELE) (Entered: 10/16/2023) |
| 10/16/2023 | 36 | ADDITIONAL ATTACHMENTS filed by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY re 35 Supplemental authority . Main Document: Exhibit 1: Opinion. (KEIM, ADELE) Modified on 10/23/2023 to change docket text to match language of linked document (jad). (Entered: 10/16/2023) |
| 10/23/2023 | 37 | Joint MOTION to Amend Scheduling Order by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 11/13/2023. (KEIM, ADELE) (Entered: 10/23/2023) |
| 10/23/2023 | 38 | ORDER granting 37 Motion to Amend Scheduling Order. Discovery to be completed by 2/27/2024. Written Notice of Intent to File Summary Judgment Motion and Request for Pre–Filing Conference due by 3/5/2024. Dispositive motions and Daubert/Kumho motions due by 3/19/2024. Ready for Trial on 6/3/2024. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 10/23/2023) |
| 01/11/2024 | 39 | Joint MOTION for Confidentiality Order by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 2/1/2024. (Attachments: # 1 Proposed Consent Confidentiality Order)(KEIM, ADELE) (Entered: 01/11/2024) |
| 01/12/2024 | 40 | CONSENT CONFIDENTIALITY ORDER granting 39 Motion for Confidentiality Order By MAGISTRATE JUDGE KAREN FRINK WOLF. (jad) (Entered: 01/12/2024) |
| 02/06/2024 | 41 | Joint MOTION to Stay Scheduling Order Deadlines by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER Responses due by 2/27/2024. (TAUB, CHRISTOPHER) Modified on 2/6/2024 to modify motion type to Motion to Stay (jad). (Entered: 02/06/2024) |
| 02/27/2024 | 42 | ORDER granting 41 Motion to Stay By JUDGE JOHN A. WOODCOCK, JR. (jad) (Entered: 02/27/2024) |
| 04/26/2024 | 43 | Unopposed MOTION for Status Conference by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY Responses due by 5/17/2024. (KEIM, ADELE) (Entered: 04/26/2024) |
| 04/26/2024 | 44 | ORDER granting 43 Motion for Status Conference By JUDGE JOHN A. WOODCOCK, JR. (jam) (Entered: 04/29/2024) |
| 04/29/2024 | 45 | NOTICE of Hearing: Telephone Conference set for 5/10/2024 01:00 PM before JUDGE JOHN A. WOODCOCK JR. The parties have been provided the all–in information. (jam) (Entered: 04/29/2024) |
| 05/10/2024 | 46 | Minute Entry for proceedings held before JUDGE JOHN A. WOODCOCK, JR: Telephone Conference held. (Court Reporter: Michelle Feliccitti) (jam) (Entered: 05/10/2024) |
| 06/20/2024 | 47 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Plaintiffs (KEIM, ADELE) (Entered: 06/20/2024) |
| 06/28/2024 | 48 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by All Plaintiffs (KEIM, ADELE) (Entered: 06/28/2024) |

| | | |
|---|---|---|
| 06/28/2024 | 49 | ADDITIONAL ATTACHMENTS filed by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY re 48 Notice (Other)/Correspondence . Main Document: Exhibit 1: Memorandum and Order. (KEIM, ADELE) (Entered: 06/28/2024) |
| 08/08/2024 | 50 | ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION denying 5 Motion for Preliminary Injunction By JUDGE JOHN A. WOODCOCK, JR. (CCS) (Entered: 08/08/2024) |
| 08/09/2024 | 51 | ORDER–Now that a decision has been issued on the Plaintiff's Motion for Preliminary Injunction, the parties are ORDERED to meet and confer regarding remaining discovery to be completed and to file with the Court by August 23, 2024, a Joint Status Report with proposed scheduling order deadlines. (Set Deadlines: Joint Status Report due by 8/23/2024.) By MAGISTRATE JUDGE KAREN FRINK WOLF. (clp) (Entered: 08/09/2024) |
| 08/09/2024 | 52 | Now that a decision has been issued on the Plaintiffs Motion for Preliminary Injunction, the parties are ORDERED to meet and confer regarding remaining discovery to be completed and to file with the Court by August 23, 2024, a Joint Status Report with proposed scheduling order deadlines. By MAGISTRATE JUDGE KAREN FRINK WOLF. Status Report due by 8/23/2024. (nrg) (Entered: 08/09/2024) |
| 08/09/2024 | 53 | NOTICE OF APPEAL as to 50 Order on Motion for Preliminary Injunction by KEITH RADONIS, VALORI RADONIS, ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY . ( Filing fee $ 605 receipt number BMEDC–2990518.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form MUST be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (KEIM, ADELE) (Entered: 08/09/2024) |
| 08/12/2024 | 54 | APPEAL COVER SHEET Re: 53 Notice of Appeal (jam) (Entered: 08/12/2024) |
| 08/12/2024 | 55 | CLERK'S CERTIFICATE Re: 53 Notice of Appeal, Documents sent to the U.S. Court of Appeals. (jam) (Entered: 08/12/2024) |
| 08/12/2024 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 53 Notice of Appeal (jam) (Entered: 08/12/2024) |
| 08/12/2024 | 56 | USCA Case Number 24–1739 for 53 Notice of Appeal,,, filed by ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY, KEITH RADONIS, VALORI RADONIS. (jam) (Entered: 08/12/2024) |
| 08/12/2024 | | COPIES of Notice of Appeal Sent to Counsel Re: 53 Notice of Appeal,,, filed by ROMAN CATHOLIC BISHOP OF PORTLAND, ST DOMINIC ACADEMY, KEITH RADONIS, VALORI RADONIS. (jam) (Entered: 08/12/2024) |
| 08/21/2024 | 57 | Unopposed MOTION to Stay *Further Proceedings Pending Appeal* by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER Responses due by 9/11/2024. (TAUB, CHRISTOPHER) (Entered: 08/21/2024) |
| 08/23/2024 | 58 | ORDER granting 57 Unopposed Motion to Stay Further Proceedings Pending Appeal. By JUDGE JOHN A. WOODCOCK, JR. (slg) (Entered: 08/23/2024) |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ST. DOMINIC ACADEMY, a d/b/a of the ROMAN CATHOLIC BISHOP OF PORTLAND, a corporation sole; ROMAN CATHOLIC BISHOP OF PORTLAND, a corporation sole; and KEITH and VALORI RADONIS, on their own behalf and as next friends of their children K.Q.R., L.R.R., and L.T.R., <br><br> *Plaintiffs*, <br><br> v. <br><br> A. PENDER MAKIN, in her personal capacity and in her official capacity as Commissioner of the Maine Department of Education, and JEFFERSON ASHBY, EDWARD DAVID, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS, in their personal capacities and in their official capacities as Commissioners of the Maine Human Rights Commission, <br><br> *Defendants*. | No. 2:23-cv-00246 |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs St. Dominic Academy, Roman Catholic Bishop of Portland, and Keith and Valori Radonis appeal to the United States Court of Appeals for the First Circuit from the Order on Plaintiffs' Motion for Preliminary Injunction (Dkt. 50) entered in this action on August 8, 2024.

1

JA10

Respectfully submitted,

_s/ James B. Haddow_

James B. Haddow
Maine Bar No. 003340
Petruccelli, Martin & Haddow LLP
Two Monument Square, Suite 900
Portland, ME 04112-8555
Telephone: (207) 775-0200 x 6413
Fax: (207) 775-2360

_/s/ Adèle Auxier Keim_

Adèle Auxier Keim*
Mark L. Rienzi*
Benjamin A. Fleshman*
Michael J. O'Brien*†
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., NW
 Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

* Admitted pro hac vice.
† Not a member of the D.C. Bar; admitted in
Louisiana. Supervised by licensed D.C. Bar
members.

_Counsel for Plaintiffs_

2

JA11

**CERTIFICATE OF SERVICE**

I certify that on August 9, 2024, I caused the foregoing to be served electronically via the Court's electronic filing system on all parties.

/s/ *Adèle Auxier Keim*
Adèle Auxier Keim

JA12

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ST. DOMINIC ACADEMY, a d/b/a of the ROMAN CATHOLIC BISHOP OF PORT-LAND, a corporation sole; ROMAN CATH-OLIC BISHOP OF PORTLAND, a corporation sole; and KEITH and VALORI RA-DONIS on their own behalf and as next friends of their children K.Q.R., L.R.R., and L.T.R. | Civil No. _____ |
| | **VERIFIED COMPLAINT** |
| _Plaintiffs_, | **INJUNCTIVE RELIEF SOUGHT** |
| v. | |
| A. PENDER MAKIN, in her personal capacity and in her official capacity as Commissioner of the Maine Department of Education, and JEFFERSON ASHBY, EDWARD DA-VID, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS in their personal capacities and in their official capacities as Commissioners of the Maine Human Rights Commission. | |
| _Defendants_. | |

JA13

**INTRODUCTION**

1.   For years, Catholic schools in Maine served rural families that participated in Maine's town tuitioning program. Under this program, Maine pays private school tuition for families who live in rural areas where there is no public school. But in 1980, Maine announced that it was excluding all "sectarian" religious schools—including Catholic schools—from its program. John Bapst, a Diocesan high school in Bangor, closed immediately. Between 1998 and 2019, Maine families filed five separate lawsuits challenging Maine's discriminatory rule. In *Carson v. Makin*, 142 S. Ct. 1987 (2022), the U.S. Supreme Court held that Maine's rule violated the Free Exercise Clause of the First Amendment.

2.   Nevertheless, Maine persists in its religious discrimination. In 2021, just after the parents in *Carson v. Makin* filed a petition for a writ of certiorari to the Supreme Court, Maine amended the section of the Maine Human Rights Act (the "Act") that applies to co-educational public and private K-12 schools that receive public funds. Maine implemented these changes to continue the exclusionary practices that the Supreme Court declared unconstitutional in *Carson*.

3.   Keith and Valori Radonis live in Whitefield, Maine. Their two oldest children use town tuitioning money to attend Erskine Academy—a nonreligious private school—and their youngest child attends St. Michael School, a parish school in St. Michael Catholic Parish in Augusta, Maine.

4.   Keith and Valori are faithful Catholics, and they would like to send their children to St. Dominic Academy, the only Diocesan high school in Maine.

5.   Likewise, St. Dominic Academy—and indeed all of the schools operated by the Roman Catholic Diocese of Portland—would like to resume serving the rural Maine families that participate in the town tuitioning program (the "program").

6.   However, they cannot do so, because in 2021, just after the parents in *Carson* asked the Supreme Court to review their case, Maine amended its human rights law to add more rules intended to keep religious schools out. Among other things, Maine:

1

- Imposed a **new** religious neutrality requirement on schools, stating that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing";

- Imposed a **new** religious nondiscrimination requirement on schools; and

- **Removed** the religious exemption that had previously allowed religious (but "nonsectarian") schools to handle sensitive issues relating to sexual orientation and gender identity in a way that reflected their faith commitments. 5 M.R.S. § 4602(5).

7.   Neither the provisions restricting schools' religious expression nor the provisions relating to sexual orientation and gender identity currently apply to the non-religious, single-sex private schools that also participate in the program. *Id*. § 4553(2-A).

8.   Private post-secondary schools, which are also eligible to receive student-directed Maine funding, are likewise not covered by these provisions of the Act. *Id*.

9.   And none of the provisions of the Act are enforceable against public and private schools outside of Maine, even though the same law that authorizes state funding for private schools in Maine also allows Maine to pay tuition at private schools in other states and public schools in Canada. 20-A M.R.S. § 3252.

10.   Maine's efforts to exclude religious schools were not confined to its Legislature. During the same spring 2021 timeframe when the *Carson* cert petition was pending, the Maine Human Rights Commission, the quasi-independent state agency charged with enforcing the Act, stated its view that, under the Act, religious schools that accept public funds lose their religious hiring rights.[1] The Commission adopted this interpretation knowing that it would discourage religious schools from accepting town tuitioning funds. The Commissioner of Education took a similar position in *Carson*, arguing that no school would accept town tuitioning funds because it would mean losing their religious hiring rights.

---

[1]    Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n to Hon. Anne Carney, Me. Senate Chair & Hon. Thom Harnett, Me. House Chair 3 (April 20, 2021), https://perma.cc/7B9E-2J2X.

11.   After the Supreme Court ruled in *Carson* that Maine could not exclude religious schools from the program, Maine's Attorney General Aaron Frey issued a statement. He denounced religious schools that "promote a single religion to the exclusion of all others" as discriminatory, vowed to work with the governor and legislature to prevent public money from going to these schools, and asserted that under the Act, religious schools could not receive public money unless they gave up their religious hiring practices—*Carson* notwithstanding.[2]

12.   Maine's attempts were open and blatant: craft a new policy to get out from under the clear pronouncement of *Carson*. In a June 2022 opinion piece in the New York Times, law professor Aaron Tang praised Maine for "outmaneuver[ing]" the Supreme Court by passing a "legislative fix" to "avoid the consequences of a ruling," and pointed out that, as a result of the revisions to the Maine Human Rights Act that were passed in 2021, two religious schools that were hoping to take part in Maine's town tuitioning after *Carson* had already backed out.[3]

13.   Maine continues its efforts today. After a religious school pointed out in litigation that Maine's present exemption for single-sex schools renders its rules not generally applicable, Maine rushed through an amendment to the Act to eliminate it. L.D. 1833, 131st Leg. (Me. 2023).

14.   Plaintiffs—a Catholic school, a Catholic diocese, and a Catholic family—seek declaratory and injunctive relief against Maine's ongoing efforts to "outmaneuver" the Supreme Court and continue to exclude religious schools from the program.

15.   The deadline for applying to take part in the program for the 2023-24 school year is **August 31**. St. Dominic is prepared to meet that deadline, and the Radonises' daughter L.R.R. is prepared to attend St. Dominic using town tuitioning funds.

16.   Plaintiffs request that this Court enforce the constitutional rule clearly established in *Carson*, enjoin the unconstitutional conditions that Maine officials continue to impose on the program, and allow the Diocese, St. Dominic, and the Radonis family to move forward without delay.

---

[2]   Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in *Carson v. Makin*, Office of the Maine Attorney General (June 21, 2022), https://perma.cc/544J-DAFN.

[3]   Aaron Tang, *There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It,* N.Y. Times (June 23, 2022), https://perma.cc/YUR2-YYZX.

## IDENTIFICATION OF PARTIES

17.   The Roman Catholic Bishop of Portland is a Maine corporation sole and the legal entity representing the ecclesiastical entity of the Roman Catholic Diocese of Portland (the "Diocese"). The Diocese is a canonical part of the Roman Catholic Church and operates Diocesan schools throughout the State of Maine.

18.   St. Dominic Academy is a Roman Catholic school located in Lewiston and Auburn, Maine. It is an educational ministry of the Diocese. With the exception of the provisions challenged in this lawsuit, St. Dominic meets or is capable of meeting the requirements to become approved for tuition purposes.

19.   Keith and Valori Radonis are residents of Whitefield, Maine. Their child K.Q.R. is 16 years old and is currently eligible to receive town tuitioning. Their child L.R.R. is 15 years old and is currently eligible to receive town tuitioning. Their child L.T.R. is 10 years old and will become eligible to receive town tuitioning when he enters ninth grade in the 2027-28 school year.

20.   Defendant A. Pender Makin is the Commissioner of the Maine Department of Education (the "Department"). She is sued in her personal and official capacities.

21.   Defendant Jefferson Ashby is a member of the Maine Human Rights Commission (the "Commission"), the quasi-independent state agency charged with enforcing the Act. He is sued in his personal and official capacities.

22.   Defendant Edward David is a member of the Commission. He is sued in his personal and official capacities.

23.   Defendant Julie Ann O'Brien is a member of the Commission. She is sued in her personal and official capacities.

24.   Defendant Mark Walker is a member of the Commission. He is sued in his personal and official capacities.

25.   Defendant Thomas Douglas is a member of the Commission. He is sued in his personal and official capacities.

## JURISDICTION AND VENUE

26.   This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

27.   The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

28.   Venue lies in this district under 28 U.S.C. § 1391(b)(1) because all Defendants reside in the District of Maine.

29.   Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the District of Maine.

## FACTUAL ALLEGATIONS

### Diocesan Schools in Maine

30.   Education is central to the Catholic faith. The Code of Canon Law—a code of ecclesiastical laws governing the Catholic Church—instructs that Catholic schools serve as "the principal assistance to parents" in forming children in the Catholic faith. 1983 Code c.795-96.

31.   Thus, canon law calls upon Catholics "to foster Catholic schools, assisting in their establishment and maintenance." *Id.* c.800 § 2. If Catholic schools are not available in a particular area, "it is for the diocesan bishop to take care that they are established." *Id.* c.801 § 1. The bishop also has the responsibility to "regulate and watch over" their operations. *Id.* c.802 § 1, c.804 § 1.

32.   Consistent with this religious obligation, the Diocese began founding schools in Maine more than 100 years ago. As the Catholic community in Maine grew, particularly through the arrival of significant numbers of French-Canadian immigrants in the 1870s, Diocesan schools grew with it. Today the Diocese operates eight schools, educating more than 2,100 students statewide.

5

33.  The Diocese's mission in operating these schools is "to strengthen the Catholic Church and to create an environment in which the faith is preserved, nourished, shaped and communicated" so that its "students will become faith-filled Christians" who contribute to the "Church and communities."[4]

34.  Catholic schools are part of the Catholic Church's evangelizing mission. Thus, the Diocese's policy is that "[s]tudents of other religious beliefs should be admitted whenever possible." Diocese of Portland, Student Handbook at 3 (June 30, 2017). But because the primary purpose of these schools is to assist Catholic parents in providing their children with a Catholic education, the Diocese gives preference in both admission and financial aid to Catholic students, and further preference to children who are members of the parish to which the school belongs.

35.  In all its schools and for all its students, whether Catholic or non-Catholic, the Diocese admits only students who "understand, accept, and [are] willing to support the mission and goals of the school," and who are willing to agree to attend religion classes, Mass, and other religious activities. *Id.* at 1-3.

36.  In line with this Diocesan policy, St. Dominic students must agree to uphold "Catholic Christian morals." St. Dominic Academy Addendum to the Maine Catholic School Student Handbook at 3 (July 2018).

37.  Consistent with federal law, the Diocese has adopted the following nondiscrimination policy for its schools:

> Maine Catholic Elementary and Secondary Schools within the Roman Catholic Diocese of Portland admit students of any race, color, national and ethnic origin to all the rights, privileges, programs, and activities generally accorded or made available to students at the school. They do not discriminate on the basis of race, color, national and ethnic origin in administration of their educational policies, admissions policies, scholarship and loan programs, and athletic and other school administered programs.

Diocese of Portland, Student Handbook at 3.

---

[4]   Roman Catholic Diocese of Portland, *Mission of Maine's Catholic Schools* (June 12, 2023), https://perma.cc/5L8E-JPGF.

38.  A primary characteristic of Catholic schools is "concern for teaching the integration of faith, culture, and life." Diocese of Portland, School Personnel Policies and Procedures Manual at 2 (Oct. 1, 2022). And the "personnel of a Catholic school are critical to achieving this ministry." *Id.* Each school employee shares the responsibility to form students in the faith by the knowledge they share and by the faith they model in action.

39.  Teachers and other employees are evaluated on how they maintain and promote the Catholic identity and mission of the school. And as a condition of employment, all employees must "[l]ive personal lives in such a way that fundamental teachings of the Catholic Church are upheld." *Id.* at 5.

**St. Dominic Academy**

40.  St. Dominic Academy is a Roman Catholic school with campuses in Lewiston and Auburn, Maine.

41.  St. Dominic offers education from pre-kindergarten through twelfth grade. Pre-kindergarten through fifth grade are offered at St. Dominic's Lewiston campus, and grades six through twelve are offered nearby at its Auburn campus.

42.  The first of several elementary schools that would eventually be consolidated into St. Dominic Academy were founded in the 1870s by the "Grey Nuns"—the Sisters of Charity of St. Hyacinthe—to educate children from French-speaking families who had come to work in local mills. French language secondary schools for men and women soon followed. By the 1880s, the schools began to offer evening classes to mill workers, who enrolled by the hundreds.

43.  St. Dominic's high school was founded in 1941 by Father Francois Drouin, OP as a hockey academy for boys. St. Dominic's hockey program has been highly successful, winning 26 state championships.

44.  Because of this long history, there are families in the Lewiston-Auburn area that have sent three generations of children to the Catholic schools now represented by St. Dominic Academy.

45.  St. Dominic has received Basic School Approval from the State of Maine.

7

JA20

46.   St. Dominic is the only Catholic high school operated by the Diocese in Maine. As a result, it is not unusual for students to commute from 30 to 60 minutes away to attend St. Dominic.

47.   Several towns that participate in town tuitioning are within an hour drive from St. Dominic, including Whitefield, Raymond, Fayette, Chelsea, Alna, Westport, Windsor, Vassalboro, Dresden, West Bath, and Hanover.

48.   Some of these towns are near Augusta, where St. Dominic has operated a bus for students in the past and plans to do so again when enrollment warrants it.

49.   Students eligible for town tuitioning have attended St. Dominic in recent years, and St. Dominic expects more such students to enroll in the future. On information and belief, there are additional families who would be eligible for town tuitioning and who would send their children to St. Dominic if it were approved for tuition purposes.

**The Radonis Family**

50.   Keith and Valori Radonis live in Whitefield, Maine with their three children, K.Q.R. (age 16), L.R.R. (age 15), and L.T.R. (age 10).

51.   Whitefield has no public high school, and the Radonis children are thus eligible to receive town tuitioning for grades 9-12.

52.   Both Keith and Valori were raised in Catholic homes, and they strive to be faithful Catholics today. They also strive to raise their children according to their Catholic faith.

53.   Valori was raised in Auburn, where her family was active in the local Catholic parish.

54.   Keith attended a Catholic high school, an experience that he regards as foundational for his faith and character as an adult.

55.   Keith is a retired Navy pilot. As a result of Keith's work in the Navy, the Radonis family has lived in Virginia, Rhode Island, and elsewhere in the U.S. and overseas. In each location, the Radonis family has found meaning and connection in the local Catholic community.

56.   After Keith retired from the Navy, the Radonis family moved to Maine to be close to Valori's parents.

57. The Radonis family owns and operates a small organic farm, where they raise organic poultry and bison to sell locally.

58. For Keith and Valori, providing a Catholic education is an expression of their faith. They believe that they have made a covenant with God to have and raise children according to the Catholic faith. It is their religious responsibility as parents to plant, nurture, and cultivate the seed of faith in their children.

59. They also believe that a Catholic education is the best way to create a foundation of faith for their children that will last a lifetime.

60. Prior to moving to Maine, Valori homeschooled her two oldest children using a Catholic curriculum.

61. When the family moved to Maine, they enrolled their children at St. Michael School, a school affiliated with St. Michael Catholic Parish, so that they could continue their Catholic education.

62. Their youngest child, L.T.R., is 10 years old and in the 2023-24 school year will be in fifth grade. He currently attends St. Michael, approximately 30 minutes from the Radonises' home.

63. Their two older children, K.Q.R. (who is 16 and will be in eleventh grade during the 2023-24 school year) and L.R.R. (who is 15 and will be in tenth grade during the 2023-24 school year), currently attend high school at Erskine Academy in China, Maine. Erskine is approximately 25 minutes from the Radonises' home.

64. Whitefield currently pays tuition for K.Q.R. and L.R.R. to attend Erskine Academy. But for Maine's illegal exclusion of religious schools from the program, the Radonises would have used their town tuitioning dollars to send K.Q.R. and L.R.R. to St. Dominic for high school instead.

65. The Radonis family would like L.R.R. to attend St. Dominic, and she has been accepted for the 2023-24 school year.

66. St. Dominic is about 55 minutes from the Radonises' home and is located in Auburn, where Valori's parents live.

9

JA22

67.  The Radonis family would like L.T.R. to continue at St. Michael through eighth grade, and then transfer to St. Dominic for high school.

**Maine's Town Tuitioning Program**

68.  The Maine Constitution requires each town in the state to provide its school-aged children with a free education. *See* Me. Const. Art. VIII.

69.  But Maine is the most rural state in the nation, and it isn't feasible for every small rural town to maintain its own schools from kindergarten through twelfth grade.

70.  Thus, since at least 1873, Maine has allowed towns without a public school serving particular grades—most often high school—to fulfill their constitutional obligation by paying tuition for students to attend a private school.

71.  Under current law, each Maine town or small group of towns is organized into a "school administrative unit" (or "SAU") that bears the legal responsibility to provide for the education of each child living in that area from kindergarten through twelfth grade. 20-A M.R.S. § 2(2).

72.  If the SAU does not maintain a school for a particular grade, it must either (1) contract with a particular public or private school to educate each student of that grade, or (2) pay tuition for each student of that grade at the public or private school of the parent's choice that is "approved for tuition purposes" and "at which the student is accepted." 20-A M.R.. §§ 5203, 5204, 2951.

73.  In the parts of the state that have no municipal government, the Department is similarly responsible either to maintain local public schools or pay tuition for school-aged children to attend another public or private school that is "approved for tuition purposes." 20-A M.R.S. §§ 3252(1); 3253-A(1).

74.  Under this program, Maine has approved and paid tuition to schools across the country and even internationally.

10

JA23

75.   For example, Maine or Maine towns have paid for Maine students to attend private schools in Vermont, New Hampshire, Massachusetts, Connecticut, New York, Pennsylvania, Virginia, Michigan, Colorado, Utah, California, and in Quebec, Canada.[5]

76.   Schools that wish to serve students who are eligible for town tuitioning during the 2023-2024 school year must apply for approval "for tuition purposes" from the Department by August 31, 2023.[6]

77.   Maine also operates state grant programs for students in post-secondary institutions. These grants may be used at any public or private post-secondary institution in Maine, including those that are religious.[7] And private post-secondary institutions are not subject to the educational discrimination provisions of the Maine Human Rights Act. 5 M.R.S. § 4553(2-A).

**<u>Maine's Ongoing Efforts to Exclude Religious Schools</u>**

78.   For over a century, the program served Maine and its students well. Private religious and nonreligious schools alike—including Diocesan schools like St. Dominic and its predecessors—participated in the program and assisted Maine's towns to fulfill their responsibility to provide an education for young Mainers.

79.   Then in the 1980s, Maine began to exclude certain religious schools from the program.

80.   In 1980, Maine's Attorney General issued an opinion concluding that the First Amendment's Establishment Clause prohibited the state from paying the tuition of students who attend "sectarian" schools. Me. Op. Att'y Gen., No. 80-2, 1980 WL 119258 (Jan. 7, 1980) ("1980 Opinion"). The 1980 Opinion relied heavily on the now-overruled decision in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

---

[5]   *See, e.g.*, List of Schools Approved for Tuition Purposes, 2014-15: https://perma.cc/5RXJ-TLTF; 2015-16: https://perma.cc/2GRS-NZW8; 2016-17: https://perma.cc/728J-CJUF; 2017-18: https://perma.cc/TB26-5MAP; 2018-19: https://perma.cc/J9QC-A5R9; 2019-20: https://perma.cc/8JT9-4SXQ; 2020-21: https://perma.cc/C6DV-WK62; 2021-22: https://perma.cc/3UDF-WPDJ; 2022-23: https://perma.cc/3RYC-EYE4; *see also* 20 M.R.S. § 3252(7) (authorizing the Commissioner of Education to pay tuition to public schools in Quebec).

[6]   *See Private School Approval*, Maine Department of Education, https://perma.cc/RDZ3-6GNE.

[7]   *See Maine State Grant Program*, The Finance Authority of Maine, https://perma.cc/CU5U-NEFW.

81.   The 1980 Opinion drew a line between "sectarian" schools (which the Opinion interpreted to include religious schools like those operated by the Diocese) and schools that were "religiously affiliated" but "not necessarily characterized by a pervasively religious atmosphere." 1980 Opinion, 1980 WL 119258, at *14. The 1980 Opinion concluded that aid to "sectarian" schools was unconstitutional, but left open the possibility of funding "religiously affiliated" schools that were not "pervasively sectarian." *Id.*

82.   Similarly, when defending the funding ban before the U.S. Supreme Court in *Carson*, Maine argued that "[a]ffiliation or association with a church or religious institution" was a "potential indicator" that a school might be sectarian, but it was not "dispositive." *Carson v. Makin*, 142 S. Ct. at 1994.

83.   This move—distinguishing between (acceptable) religious schools and those that are "sectarian"—is not new. Bans on state aid to "sectarian" schools have a "shameful pedigree." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020).

84.   At a time in the late-19th Century when readings from the King James Version of the Bible were mandatory in many public schools, House Speaker and later Senator James Blaine of Maine championed a constitutional amendment (called the "Blaine Amendment") that would have banned state aid to "sectarian" schools in order to prevent states from partnering with Catholic schools to carry out their educational mission. "[I]t was an open secret that 'sectarian' was code for 'Catholic.'" *Id.* at 2270.

85.   When Senator Blaine's federal constitutional amendment failed, he used his position in Congress to force territories seeking statehood to include so-called "Baby Blaines" in their proposed constitutions. These Blaine Amendments were "born of bigotry" and "arose at a time of pervasive hostility to the Catholic Church and to Catholics in general." *Id.* at 2259.

86.   It is ironic that, while Maine's senator was working to prevent other state governments from choosing to work with Catholic schools, Maine Catholics were educating thousands of Maine children—especially the children of recently-arrived immigrants—and in many cases partnering with the state to do so.

87.   It is against this historical background that the Maine Legislature added a new requirement to the program in 1982 that any school receiving tuition funds be "a nonsectarian school in accordance with the First Amendment of the United States Constitution." 20-A M.R.S. § 2951(2).

88.   Maine refused to give up the sectarian exclusion even after the U.S. Supreme Court made clear that the Establishment Clause does not bar the use of state tuition vouchers at religious schools. *See Zelman v. Simmons-Harris*, 536 U.S. 639 (2002).

89.   With the Establishment Clause justification for the sectarian exclusion eliminated, the Maine Legislature considered a bill in 2003 to repeal it. *See* L.D. 182, 121st Legislature, "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools," https://perma.cc/VFK9-WUPR.

90.   But opponents of the bill fashioned a new justification for the sectarian exclusion, arguing that religious schools should not receive tuition funds because they are "discriminatory." Legislative Record, Me. House of Representatives, 121st Legislature, at H-582-89 (May 13, 2003), https://perma.cc/YLG7-3Z5S.

91.   Since then, Maine, and Defendants specifically, have repeatedly explained that the purpose of the sectarian exclusion is to bar schools "that promote a particular faith" from the program because Maine viewed them as "discriminatory" rather than "religiously neutral." *Carson* OA Tr. at 48, 54, 69, 82;[8] *see also Anderson v. Town of Durham,* 2006 ME 39, ¶ 57, 895 A.2d 944, 960 (2006) (noting that Maine refused to extend tuitioning to religious schools to "avoid[ ] involvement in discrimination in admissions and hiring."); *Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344, 356 (1st Cir. 2004) (noting concerns about religious schools' "admission," "religious tolerance" and "participation in religious activities").

92.   This sectarian exclusion meant that Diocesan schools—including St. Dominic—were barred from the program. To remain in the program, a Diocesan school would be forced to give up much of its religious teaching and identity.

---

[8]     *See* https://perma.cc/Y2AF-3C8K.

93.   The sectarian exclusion also made it impossible for many religious parents in Maine to provide the religious education they desired for their children. These parents paid taxes that supported the SAUs in their towns. But they were barred from accessing the benefits to send their children to the schools of their choice simply because the schools were religious in a way that Maine disapproved of.

94.   Some such parents were able to make the financial sacrifice to pay their children's tuition themselves, while others simply could not afford it and were forced to send their children to schools that did not provide the type of education that the parents wanted for their children.

95.   For years, these Maine parents attempted to regain equal access to the program.

96.   Between 1994 and 2017, Maine parents seeking to use town tuitioning or similar program funds at private religious schools challenged Maine's program five times.[9] Three out of these five lawsuits involved parents who wished to send their children to St. Dominic Academy or its predecessor schools.

97.   Then in 2017, the U.S. Supreme Court decided in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), that excluding a religious organization "from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution." *Id.* at 467.

98.   With *Trinity Lutheran* showing that Maine's discrimination against religious education was unconstitutional, another group of religious Maine parents challenged the sectarian exclusion in *Carson*, 142 S. Ct. 1987.

99.   But Maine did not relent. Instead, it doubled down. Knowing that the sectarian exclusion in its education law was vulnerable to a Free Exercise challenge in light of *Trinity Lutheran*, Defendants began looking for ways to shore up their arguments and other ways to keep religious schools out of the program should the sectarian exclusion ultimately be held unconstitutional.

---

[9]     *Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999) (district court case filed in 1994; included parents who wished to send their children to St. Dominic); *Bagley v. Raymond Sch. Dep't*, 728 A.2d 127 (Me. 1999); *Anderson v. Town of Durham*, 2006 ME 39, ¶ 47, 895 A.2d 944, 958 (St. Dominic); *Joyce v. State*, 2008 ME 108, ¶ 4, 951 A.2d 69, 70; *Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344, 352 (1st Cir. 2004) (St. Dominic).

100. After the complaint in *Carson* challenged the sectarian exclusion in Maine's education law under *Trinity Lutheran*, the Defendants turned to a different law—the Maine Human Rights Act (the "Act")—to attempt to keep religious schools out of the program.

101. During *Carson*, Maine threatened to strip the Act's religious exemptions from any religious schools that sought to participate in the program. *See* Defendant's Motion for Summary Judgment at 13-14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. 2019) (No. 18-327). Maine used this threat to assert that the parents in *Carson* lacked standing, because the religious schools that the *Carson* plaintiffs wanted to attend would never choose to participate in the program if it meant giving up their right to hire employees that shared their faith. *Id.* The *Carson* plaintiffs argued that religious schools' employment decisions should remain protected under the Act. *See* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 8-10, *Carson*, 401 F. Supp. 3d 207 (No. 18-327).

102. But the district court was "doubtful" of the plaintiffs' interpretation of the Act and concluded that "[a]t the very least, the statute is ambiguous and might well deter the schools from proceeding to take public funds so as to avoid the risk." *Carson v. Makin*, 401 F. Supp. 3d at 209 & n.9.

103. At the First Circuit, the Department and the Attorney General repeated their argument about the Act. They insisted that religious schools accepting funds would be forced to make "a significant change to how [they] operate" because they would lose their statutory religious exemption from the employment provisions in the Act. Br. of Appellee at 23, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020).

104. The First Circuit questioned whether Defendants could use the Act to keep religious schools out of the program, noting the "free exercise concerns that might then arise." *Carson*, 979 F.3d at 31 (citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020) ("other employers in other cases may raise free exercise arguments that merit careful consideration")).

105. Once *Carson* reached the Supreme Court, Defendants took even more aggressive actions to keep religious schools out of the program.

15

JA28

106. While the Supreme Court considered *Carson*, the Commission proposed—and Maine enacted—sweeping changes to the Act's provisions on educational discrimination. This law, L.D. 1688, took a three-pronged approach to attempt to keep religious schools out of the program.

107. First, L.D. 1688 prohibits "educational institution[s]"—which include co-ed private schools that participate in the program—from discriminating in education on the basis of "religion." 5 M.R.S. § 4602(1), (5). Among other things, this appears to mean that a religious school cannot participate in the program if it gives preference in admissions to students who share the school's religious beliefs.

108. Second, L.D. 1688 repeals the religious exemption that religious schools participating in the program would have had from the Act's prohibition on sexual orientation and gender identity discrimination in education.

109. Third, L.D. 1688 adds a new religious neutrality rule barring religious schools from "discrimat[ing] between religions" in "permit[ting] religious expression." 5 M.R.S. § 4602(5)(D).

110. Maine's arguments before the Supreme Court in the *Carson* case made it increasingly clear that L.D. 1688 was intended to keep religious schools out of the program should the sectarian exclusion be struck down.

111. Defendants repeatedly described the purpose of the sectarian exclusion using language strikingly similar to the new prohibitions in L.D. 1688.

112. Defendants argued again and again that the "defining feature" of the schools allowed to participate in the program is "religious neutrality." *See* OA Tr. at 48, 52, 54, 69, 73, 82, 86.

113. They also argued that the sectarian exclusion was meant to keep out schools that "actively discriminate[] against certain protected classes," because Maine only wants schools that are "inclusive," and "not discriminatory." *Id.* at 69, 85.

114. Following the oral argument, the Attorney General issued a press statement that explicitly connected the purposes of the sectarian exclusion with L.D. 1688's amendments to the Act. He explained his view that "[s]chools that require students to undergo religious instruction are ex-

16

JA29

cluded [from the program] because the education they provide is not equivalent to a public education." Statement from Attorney General Frey on *Carson v. Makin* oral argument (Dec. 8, 2021), https://perma.cc/BGL4-YHLY.

115.   The Attorney General further stated:

> Schools receiving taxpayer funds are appropriately subject to the Maine Human Rights Act (MHRA), which prohibits discrimination against individuals on the basis of several protected classes. The two religious schools that the parents in this case want to send their children to have made it clear that they are not interested in complying with the MHRA and, therefore, these schools have not even applied to the Maine Department of Education to be eligible to participate in Maines tuition program. Put differently, these schools want to continue to discriminate against individuals based on their status in a protected class and that is inconsistent with the protections afforded to all Mainers under the MHRA.

*Id.*

116.   He concluded: "It would be inappropriate if Maine taxpayers were forced to fund schools which exclude and discriminate against other Mainers, as that would erode the foundational principles of a public education that is diverse and accessible to all." *Id.*

117.   On June 21, 2022, the Supreme Court issued its decision in *Carson*, holding that Maine's sectarian exclusion violates the Free Exercise Clause. The Court explained that the First Amendment does not permit "enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." 142 S. Ct. at 1998. The Court held that Maine's sectarian exclusion entailed further First Amendment problems because "scrutinizing whether and how a religious school pursues its educational mission would … raise serious concerns about state entanglement with religion and denominational favoritism." 142 S. Ct. at 2001.

118.   That same day, the Attorney General issued another statement to the press, again explaining that L.D. 1688's amendments to the Act would continue to keep religious schools out of the program in the absence of the sectarian exclusion.

119.   The statement read:

17

JA30

"I am terribly disappointed and disheartened by today's decision," said AG Frey. "Public education should expose children to a variety of viewpoints, promote tolerance and understanding, and prepare children for life in a diverse society. The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household. While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear. I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry."

While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so. Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

Statement of Attorney General Aaron Frey, https://perma.cc/544J-DAFN.

120.  The connection between the now-defunct sectarian exclusion and L.D. 1688 did not go unnoticed in the public. Just two days after the *Carson* decision, the New York Times published an essay by U.C. Davis Law Professor Aaron Tang entitled "There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It."[10]

121.  Writing about L.D. 1688, Professor Tang explained:

Let's start with the Carson case. Anticipating this week's decision, Maine lawmakers enacted a crucial amendment to the state's anti-discrimination law last year in order to counteract the expected ruling. … The legislative fix made by Maine lawmakers offers a model for lawmakers elsewhere who are alarmed by the court's aggressive swing to the right. Maine's example shows that those on the losing end of a case can often outmaneuver the court and avoid the consequences of a ruling.

*Id.*

---

[10]   Tang, *There's a Way to Outmaneuver the Supreme Court*, https://perma.cc/YUR2-YYZX.

18

JA31

122.  Maine's then-Speaker of the House also bragged publicly that Maine "changed the guidelines" with L.D. 1688 because it "[a]nticipated the ludicrous [*Carson*] decision from the far-right SCOTUS."[11]



123.  Defendants' efforts to outmaneuver the Supreme Court and undermine its holding in *Carson* have so far been largely successful. Since the Court struck down the sectarian exclusion, only one religious school has applied to the Department to be approved for tuition purposes.

124.  Were it not for L.D. 1688's amendments to the Act's education provisions and Defendants' reinterpretations of the Act's employment provisions, St. Dominic and other Diocesan schools would apply to be approved for tuition purposes and, on information and belief, would be approved. On information and belief, many other religious schools would also apply and be approved.

**Defendants' Current Exclusion of Religious Schools**

125.  Without judicial relief, St. Dominic and other Diocesan schools will continue to be excluded from the program by these unconstitutional education and employment provisions.

---

[11]  Ryan Fecteau (@SpeakerFecteau), Twitter (June 26, 2022, 8:51 AM), https://twitter.com/SpeakerFecteau/status/1541041572636237826 (replying to Santiago Mayer (@santiagomayer), Twitter (June 25, 2022, 10:24 AM), https://twitter.com/santiagomayer_/status/1540702357532442624).

*Education Provisions*

126.  The Act places certain conditions on "educational institution[s]." The Act defines "educational institution[s]" to include public elementary, secondary, and post-secondary schools as well as "any private school or educational program approved for tuition purposes if both male and female students are admitted." 5 M.R.S. § 4553(2-A).

127.  All private post-secondary schools are excluded, even though they may receive state funds through the Maine State Grant Program.

128.  In addition, schools outside Maine that participate in the program—including schools in neighboring states, like Massachusetts, and those in other countries, like Canada—are exempt because the Act does not apply extraterritorially.

129.  Single-sex private schools approved for tuition purposes are likewise exempt because they fall outside the statutory definition of "educational institution." 5 M.R.S. § 4553 (2-A). Thus, during the current 2022-23 school year, Maine paid tuition to two all-girls boarding schools in Massachusetts. *Supra* note 5.

130.  However, a month after the religious school in *Crosspoint Church*, a parallel case, cited this exemption, Maine lawmakers introduced a bill to remove it. The Commission testified in support of this bill. The revision passed on June 12, 2023, and is awaiting the governor's signature. Complaint, *Crosspoint Church v. Makin*, No. 1:23-cv-00146 (D. Me. Apr. 27, 2023); L.D. 1833, 131st Leg. (Me. 2023). On information and belief, the Commission supported and the Maine Legislature enacted this change for the purpose of trying to strengthen their arguments in *Crosspoint Church*.

131.  Until the Act was amended by L.D. 1688 in 2021, religiously affiliated schools that qualified as "nonsectarian" were likewise exempt from the rules regarding sexual orientation and gender identity discrimination.[12] Me. Pub. L. 2005, ch. 10, sec. 21, § 4602(4) ("[t]he provisions in

---

[12]   Nonsectarian, religiously affiliated schools are not a null set. As Maine emphasized to the Supreme Court in *Carson*, religiously affiliated schools that Maine did not regard as "sectarian" could still participate in the program.

this subsection relating to sexual orientation do not apply to any education facility owned, controlled or operated by a bona fide religious corporation, association or society."); *see also* Me. Pub. L. 2005, ch. 10, sec. 3, § 4553(9-C) (defining "sexual orientation" to include "gender identity.").

132.  As amended by L.D. 1688, the relevant portions of the Act's educational discrimination provision, 5 M.R.S. § 4602, now read:

> 1. Unlawful educational discrimination. It is unlawful educational discrimination in violation of this Act, on the basis of … sexual orientation or gender identity, … or religion, to:
>
>> A. Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity;
>>
>> B. Deny a person equal opportunity in athletic programs;
>>
>> C. Apply any rule concerning the actual or potential familial status or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity;
>>
>> D. Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or
>>
>> E. Deny a person financial assistance availability and opportunity….
>
> 5. Application. Nothing in this section …
>
>> C. Requires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity; or
>>
>> D. Requires an educational institution to participate in or endorse any religious beliefs or practices; to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing.

---

Thus, schools like the Maine Coast Waldorf School, which belongs to an educational movement that "has its foundations in Anthroposophy" and which offers a "non-sectarian and non-denominational" education "based on a belief that there is a spiritual dimension to the human being and to all of life," could and did participate over many years. Waldorf Education, FAQs About Waldorf, https://perma.cc/L3BB-95FG; *see also supra* note 5 (listing Maine Coast Waldorf School receiving tuition every year from 2015 to 2022).

133.  St. Dominic cannot comply with § 4602(5)(D)'s requirement that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing."

134.  Diocesan schools like St. Dominic teach about religion from a Catholic perspective. While Diocesan schools welcome children from all faiths and none, families that choose these schools for their children understand and agree that they will learn about religion from a Catholic perspective. So, for example, St. Dominic provides regular Mass that students are required to attend. To continue doing so, Maine's law would require St. Dominic to also allow schoolwide chapel services led by a rabbi, imam, or Protestant preacher. This is inconsistent with St. Dominic's commitment as a Catholic school.

135.  Similarly, while Diocesan schools welcome students from all faiths or no faith who are willing to learn in a thoroughly Catholic educational environment, Diocesan schools do place some limits on students' religious expression at school. For example, St. Dominic would not allow students to publicly condemn, mock, or denigrate Catholic beliefs or publicly seek to dissuade other students from believing in them. Nor would St. Dominic permit students to organize clubs or distribute literature for these purposes. St. Dominic's religious beliefs also require teachers and staff to uphold core Catholic teachings in word and deed, regardless of their individual beliefs. This requirement is rooted in Catholic theology, which asks teachers to "reveal the Christian message not only by word but also by every gesture of their behavior."[13]

136.  Diocesan schools also cannot comply with 5 M.R.S. § 4602(1), which prohibits discrimination on the basis of religion. While Diocesan schools welcome students of all faiths and none, as a Catholic school they invite families to join them in their Catholic educational mission and participate in the religious life of the school through practices like attending Mass, praying before meals, and participating in Church-led service projects. Diocesan schools also give preference to Catholic students in admissions and financial aid.

---

[13]   Sacred Congregation for Catholic Education, *The Catholic School* at ¶ 43 (1977).

137.  Diocesan schools also cannot comply with 5 M.R.S. § 4602(1), which says that educational institutions may not discriminate on the basis of sexual orientation or gender identity.

138.  Diocesan schools firmly believe that everyone is created "in the image of God" and "possess an inalienable dignity which comes to them immediately from God their creator."[14] Accordingly, they believe that each person should be treated with dignity, compassion, and respect. And they do not inquire about a student's sexual orientation or gender identity at the time of admission.

139.  However, Diocesan schools cannot delegate their responsibility to make religiously grounded decisions regarding appropriate student conduct to the Maine Human Rights Commission.

140.  For example, the Catholic faith views parents as the primary educators of their children. "'The role of parents in education is of such importance that it is almost impossible to provide an adequate substitute.' The right and duty of parents to educate their children are primordial and inalienable."[15]

141.  But the Commission, the state agency responsible for enforcing the Act, has interpreted the gender-identity nondiscrimination provision to require a school to facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object.[16]

142.  The Commission has also interpreted the gender identity provision to require the school to use a student's preferred name and pronouns, and if the student so requests, to "require[]" all employees and "instruct" other students to do so as well. *Id.* at 3. The Commission warns that a "pattern" of refusing to use the student's preferred pronouns may be considered a violation of the Act. *Id.* at 3-4.

---

[14]   Catechism of the Catholic Church § 369.

[15]   Catechism of the Catholic Church § 2221.

[16]   *See* Me. Hum. Rights Comm'n, "Interpretation of the Education Provisions of the MHRA," at 4 (Jan. 13, 2016), https://perma.cc/D5Z3-PMP8.

143.  This approach, which requires Maine schools to do what students ask without consulting their parents, is inconsistent with the Diocese's commitment to respect parents' "primordial and inalienable" "right and … duty" to educate their children.[17]

144.  The Commission's approach would also require Diocesan schools to discipline staff and students who have a religious or conscientious objection to using a student's preferred pronouns if they do not correspond to the student's biological sex.

145.  Pope Francis, the head of the Roman Catholic Church worldwide, has counseled that Catholics must be "understanding of human weakness and the complexities of life," while emphasizing that "biological sex and the socio-cultural role of sex (gender) can be distinguished but not separated" and that "protecting our humanity" means first of all "accepting it and respecting it as it was created."[18]

146.  The Commission's rules compelling schools to enforce students' preferred pronouns—regardless of their parents' wishes, and without reference to the student's biological sex—would require Diocesan schools to discipline staff and students who, after reflecting on Pope Francis' words, conclude that they cannot do so. This is untenable.

### Employment Provisions

147.  Catholic educators must "bear witness to Christ" "by their life as much as by their instruction." *Gravissimum Educationis* § 8 (1965). And canon law requires them to be "outstanding in correct doctrine and integrity of life." 1983 Code c. 803, § 2.

148.  Accordingly, the employment handbook for Diocesan schools provides: "All employees must comply with the teachings of the Roman Catholic Church and must perform all agreed upon articles under the terms of employment. Since Maine Catholic schools are Catholic institutions, they should reflect the values and beliefs of the Catholic faith. Employee conduct and behavior

---

[17]   Catechism of the Catholic Church § 2221.

[18]   Pope Francis, *Amoris Laetitia*, no. 56 (2016) (quoting the *Relatio Finalis*, no. 58 (2015)).

should be consistent with the principles of the Catholic Church. The employee's personal and professional life shall reflect the philosophy of Catholic education and be in accordance with the policy of the diocese and onsite procedures." Diocese of Portland, School Personnel Policies and Procedures Manual at 27 (Oct. 1, 2022). Each school employee agrees to follow this handbook as a condition of employment.

149.  The Diocese also asks all teachers in its schools to enter into a "ministerial agreement," promising among other things that they "will exhibit the highest Christian ethical standards and personal integrity and demonstrate and exemplify Catholic teachings based on Christian principles, supporting the teachings, disciplines, and traditions of the Catholic Church while at work and in [their] personal life."

150.  The Supreme Court has recognized that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school[]." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020). For that reason, the Court has held that the First Amendment forbids courts from interfering in any way with a religious community's selection of its religious teachers, including through the application of employment nondiscrimination laws. *Id.* at 2064.

151.  The Act, like the federal employment nondiscrimination laws in *Our Lady*, is subject to this rule, which is known as the "ministerial exception."

152.  The Act makes it unlawful for "any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of … sexual orientation or gender identity." 5 M.R.S. § 4572(1)(A).

153.  But the Act also includes a religious exemption, which provides: "This subchapter [on employment discrimination] does not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities. Under this subchapter, a religious organization may require that all

25

JA38

applicants and employees conform to the religious tenets of that organization." 5 M.R.S. § 4573-A(2).

154.  Nothing in this text makes the religious exemption contingent on whether or not a religious employer receives public funds.

155.  But in *Carson*, the Department and Attorney General nonetheless took the position that a school that participates in the program forfeits its religious exemption to the sexual orientation and gender identity employment discrimination provisions, because of a separate, narrower version of the religious exemption in another part of the Act. *Carson*, 401 F. Supp. 3d at 207. The district court concluded that their reading was a "plausible" interpretation of Maine law. *Id.* at 209.

156.  The Commission has likewise interpreted the religious exemption to be limited to religious employers that receive no public funds. While the *Carson* cert petition was pending, the Commission submitted testimony to the Maine Legislature opposing a bill that would have clarified the rights of religious schools that receive town tuitioning funds and stating its view that, under the Act, "a religiously affiliated school … may continue to operate within its beliefs, at its own expense, but once public funds … are utilized … the organization must not discriminate" in "employment."[19]

157.  Notwithstanding Defendants' views to the contrary, Diocesan schools cannot constitutionally be required to give up their religious hiring rights as a condition of participating in the program. *See, e.g.*, *Carson v. Makin*, 979 F.3d at 31, *rev'd and remanded*, 142 S. Ct. 1987 (2022) (acknowledging that applying the Act in a way that abrogates religious schools' hiring rights would raise concerns under the Free Exercise Clause).

158.  However, the Commission and the Attorney General have repeatedly asserted that the Act does just that.

---

[19]    Letter from Me. Hum. Rts. Comm'n to Hon. Anne Carney, et al. at 3 (Apr. 20, 2021), https://perma.cc/8RXA-YTH6. The Commission appears to believe that even receiving pandemic recovery funds or money from federal school lunch programs is enough to strip religious organizations of their hiring rights under Maine law. *See id.*

26

***Enforcement of the Education and Employment Provisions***

159.  The Act is enforced in a variety of ways.

160.  The Commissioner of Education and the Maine Human Rights Commission both have authority to issue rules implementing the education provisions of the Act.

161.  On information and belief, schools applying to the Department to participate in the program must certify their compliance with the education and employment provisions in the Act as a prerequisite to being "approved for tuition purposes."

162.  On information and belief, the Department would not approve Diocesan schools for tuition purposes knowing that Diocesan schools will not violate their faith in order to comply with the education and employment provisions in the Act.

163.  Because Diocesan schools do not and cannot comply with the education and employment provisions as the Defendants interpret them, applying to be approved for tuition purposes would be futile.

164.  In the alternative, if the Department approved Diocesan schools for tuition purposes, they would immediately become subject to the Act's education and employment provisions as interpreted by the Defendants and would face a credible threat of enforcement.

165.  The Act empowers the Commission to investigate "alleged infringements upon human rights and personal dignity" using its independent subpoena power. 5 M.R.S. § 4566. A private party may file a complaint with the Commission, which may then conduct its own investigation and file suit in Maine Superior Court. 5 M.R.S. § 4612. And private parties may also file suit directly in Superior Court themselves. 5 M.R.S. § 4621. If the court finds that unlawful discrimination has occurred, it may impose penalties up to $100,000 for repeat offenders. 5 M.R.S. § 4613.

166.  In short, applying to be approved for tuition purposes would either be futile—because the Department would deny the application for failure to comply with the Act—or exceptionally risky—because upon approval each Diocesan school would immediately face a credible threat that the Commission or a private plaintiff would enforce the Act against it. Either way, Diocesan schools need judicial relief to protect their First Amendment rights before they can apply.

27

JA40

167.  By excluding the Diocese and its schools from participating in the program, Defendants have imposed harm by denying them funding and restricting their ability to serve Maine families.

168.  By depriving the Radonises of the right to use town tuitioning funds to send their children to Catholic schools, Defendants have harmed them and their children. In particular, the Radonises have had to send their children to non-Catholic schools and will have to spend their own resources to send their children to St. Dominic because Maine refuses to allow them to spend their town tuitioning funds at the school of their choice.

<div align="center">

**CLAIMS**

**Count I**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Religious Targeting**

</div>

169.  All preceding paragraphs are realleged and incorporated herein by reference.

170.  The Free Exercise Clause of the First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

171.  The Free Exercise Clause applies to states and their subdivisions and municipalities through the Fourteenth Amendment to the U.S. Constitution.

172.  "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran*, 582 U.S. at 466 n.4 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

173.  Because "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion," the government "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices," *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018).

174.  Maine has targeted the religious beliefs of both schools and Maine families by:

<div align="center">28</div>

<div align="center">JA41</div>

- Removing the single-sex school exemption and religious exemption from its educational nondiscrimination law;

- Adding new religious nondiscrimination and equal religious expression requirements; and

- Interpreting its employment discrimination law to hold that religious schools that receive government funds lose their religious exemption to the state employment discrimination law.

175. Maine's Human Rights Commission has publicly stated that religious schools that participate in Maine's program will lose their religious exemptions.

176. During the *Carson* litigation, Maine's Attorney General also took the position that religious schools that participate in Maine's program will lose their religious exemptions, and argued that, for that reason, parents seeking to send their children to religious schools that wished to retain their religious hiring rights lacked standing to sue. *Carson*, 401 F. Supp. 3d at 209; *Carson*, 979 F.3d at 30.

177. Maine's Attorney General made specific remarks disparaging the beliefs and practices of religious schools that seek to participate in Maine's program, including:

- "The education provided by the [religious schools in *Carson I*] is inimical to a public education."

- These religious schools provide "an education that is fundamentally at odds with values we hold dear" because "[t]hey promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff."

Statement of Attorney General Aaron Frey, https://perma.cc/544J-DAFN.

178. The Attorney General vowed "to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision [in *Carson I*] and ensure that public money is not used to promote discrimination, intolerance, and bigotry." *Id.*

29

JA42

179.  Maine and its officials do not have a compelling reason for their actions, and they have not selected the means least restrictive of religious exercise in order to further their interests.

180.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

181.  Plaintiffs have suffered and will suffer harm absent relief.

**Count II**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise of Religion—Categorical Exclusion from Otherwise**
**Available Government Benefits**

182.  All preceding paragraphs are realleged and incorporated herein by reference.

183.  Under the Free Exercise Clause, imposing "special disabilities on the basis of religious views or religious status" triggers strict scrutiny. *Trinity Lutheran*, 582 U.S. at 460-61.

184.  Thus, a system that precludes religious entities and families from obtaining generally available state benefits solely because of their religious character or beliefs is unconstitutional unless the government can satisfy strict scrutiny. *Espinoza*, 140 S. Ct. at 2261.

185.  St. Dominic's Catholic religious beliefs and identity permeate its entire school and mission. Its religious exercise is offering education from a distinctively Catholic perspective.

186.  The Radonises lives in an area that does not provide a public high school, and they are eligible to receive tuition assistance payments to cover the cost of educating their children.

187.  Their sincerely held religious beliefs require them to provide their children with a Catholic education to the best of their abilities.

188.  "Maine offers its citizens a benefit: tuition assistance payments for any family whose school district does not provide a public secondary school." *Carson*, 142 S. Ct. at 1997.

189.  Maine amended the Act while *Carson* was pending to add the new requirements that schools that take part in the program must not "discriminate" on the basis of religion and "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." 5 M.R.S. § 4602. Collectively, these are referred to as "religious nondiscrimination requirements."

30

JA43

190.  The religious nondiscrimination requirements closely track Maine's arguments at the Supreme Court, where Maine asserted that under its prior program "a school is excluded only if it promotes a particular faith and presents academic material through the lens of that faith." *Carson*, 142 S. Ct. at 2001.

191.  Thus, the religious nondiscrimination requirements amount to a "religious gerrymander[]" and have the effect of excluding religious schools like St. Dominic from the program. *Id.* at 2000.

192.  This also has the effect of precluding families like the Radonis family from using town tuitioning funds to obtain a religious education for their children.

193.  The religious nondiscrimination requirements require Plaintiffs to choose between exercising their religious beliefs and receiving an otherwise available benefit. Plaintiffs are thus "disqualified from this generally available benefit 'solely because of their religious character'" and beliefs. *Id.* at 1997.

194.  "By condition[ing] the availability of benefits in that manner, Maine's tuition assistance program … effectively penalizes the free exercise of religion." *Id.* (internal quotations omitted).

195.  Categorically excluding schools because of their religious exercise of "[e]ducating young people in their faith, inculcating its teachings, and training them to live their faith," *id.* at 2001, furthers no governmental interest.

196.  Discrimination against religious schools and families is not the least restrictive means of furthering a compelling governmental interest.

197.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

198.  Plaintiffs have suffered and will suffer harm absent relief.

**Count III**
**42 U.S.C § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause—Not Generally Applicable**

199.  All preceding paragraphs are realleged and incorporated herein by reference.

200.  State action "burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542.

201.  A law is not generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *see also Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021); *Lukumi*, 508 U.S. at 542-46.

202.  Under this rule, the Act's educational nondiscrimination rules are not generally applicable. 5 M.R.S. § 4602.

203.  As of today, the Act's rules regarding educational nondiscrimination do not apply to private single-sex schools, even if those schools receive state funds, because they are not covered by the Act's current definition of "educational institution" that will remain Maine law until and unless the governor signs L.D. 1833 and it goes into effect.

204.  The Act's rules regarding educational nondiscrimination also do not apply to private post-secondary schools, even if those schools receive state funds, because they are not covered by the Act's definition of educational institutions.

205.  The Act's rules are also unenforceable with respect to schools outside of Maine (whether in neighboring U.S. states or in Canada), because the Act does not apply extraterritorially.

206.  Thus, Maine law treats "comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296.

207.  The Act is therefore subject to strict scrutiny, requiring the State to have a compelling interest in discriminating against religious schools, and this rule must be the least-restrictive means of achieving that end. *Lukumi*, 508 U.S. at 531-32.

208.  Conditioning access to government funding on a school's willingness to give up its religious identity and exercise furthers no governmental interest.

209.  Moreover, by creating categorical exemptions for out-of-state schools and all private post-secondary schools, Maine has not treated its own interests as compelling.

210.  Discrimination against K-12 religious schools located in Maine is not the least restrictive means of furthering a compelling governmental interest.

211.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

212.  Plaintiffs have suffered and will suffer harm absent relief.

**Count IV**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause—Parental Right to Direct**
**Children's Education and Upbringing**

213.  All preceding paragraphs are realleged and incorporated herein by reference.

214.  "[T]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925)).

215.  Parent's' right to direct the education and upbringing of their children is not only deeply embedded in "[t]he history and culture of western civilization," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); it also has "a constitutional dimension," *Troxel*, 530 U.S. at 65.

216.  "[T]his traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Yoder*, 406 U.S. at 214; *see also Emp. Div. v. Smith*, 494 U.S. 872, 881 (1990) (citing *Yoder*, 406 U.S. 205). It is also "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65; *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

217.  Keith and Valori Radonis's sincere religious beliefs compel them to provide a Catholic education for their children to the best of their abilities.

218.  By prohibiting the Radonis family from using otherwise available town-tuitioning funds to send their children to a Catholic school unless that school abandons its religious identity, Maine has interfered with the Radonises' right to direct the religious upbringing of their children.

219.  Defendants do not have a compelling interest in interfering with religious families' ability to direct the upbringing of their children.

220.  Defendants' discriminatory policies are not the least restrictive means to further any governmental interest.

221.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

222.  The Radonis family has suffered and will suffer harm absent relief.

**Count V
42 U.S.C. § 1983
Violation of U.S. Const. Amend. I:
Ministerial Exception**

223.  All preceding paragraphs are realleged and incorporated herein by reference.

224.  "The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady*, 140 S. Ct. at 2055 (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

225.  An institution's right to religious autonomy "ensures that the authority to select and control who will minister to the faithful … is the church's alone." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194-95 (2012).

226.  "Applying this principle," the Supreme Court has repeatedly held that "the First Amendment bar[s] a court from entertaining an employment discrimination claim" regarding a teacher or other ministerial employee responsible for transmitting the faith to the next generation. *Our Lady*, 140 S. Ct. at 2055 (citing *Hosanna-Tabor*, 565 U.S. at 171).

227.  Nevertheless, during the *Carson* litigation, Maine threatened to use the Act's employment nondiscrimination policies to force any religious schools that participated in the program to abandon their religious hiring policies. *Carson*, 979 F.3d at 30, *rev'd and remanded*, 142 S. Ct. 1987.

228.  Likewise, while the cert petition for the *Carson* litigation was pending before the Supreme Court, the Maine Human Rights Commission submitted written testimony to the Maine

Legislature in which the Commission asserted that private religious schools that receive any government funds (including but not limited to town tuitioning funds) become subject to the Maine Human Rights Act's employment nondiscrimination requirements.[20]

229.  Similarly, the Attorney General of Maine, in his official statement issued the day that *Carson* was decided, accused some religious schools that sought to participate in Maine's program of "openly discriminating in hiring teachers and staff" and asserted that "[e]ducational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices."[21]

230.  Applying the Act's employment nondiscrimination provisions to school employees who have the "responsibility of educating and forming students in the faith … threatens the school's independence in a way that the First Amendment does not allow." *Our Lady*, 140 S. Ct. at 2069.

231.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

232.  The Diocese and its schools have suffered and will suffer harm absent relief.

<div align="center">

**Count VI**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Religious Autonomy**

</div>

233.  All preceding paragraphs are realleged and incorporated herein by reference.

234.  The First Amendment protects the right of a religious institution to make "personnel decision[s] based on religious doctrine" even when that decision does not involve a ministerial employee. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002).

235.  Maine and its officers intend to enforce the Act's employment nondiscrimination provisions against religious schools that accept town tuitioning funds.

---

[20]   Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n to Hon. Anne Carney, Me. Senate Chair, et al. 3 (April 20, 2021), https://perma.cc/7B9E-2J2X.

[21]   Statement by Attorney General Aaron Frey (June 21, 2022), https://perma.cc/544J-DAFN.

236.  St. Dominic maintains religious conduct standards for all employees, both ministers and non-ministers. Enforcing the Act to bar these religious standards infringes on the school's right to govern its own internal affairs, frame its own policies and doctrine, create and maintain a school environment that is faithful to its religious beliefs, and make employment decisions based on those religious beliefs free from government interference. This violates the First Amendment. *See Our Lady*, 140 S. Ct. at 2060.

237.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

238.  The Diocese and its schools have suffered and will suffer harm absent relief.

<div align="center">

**Count VII**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Excessive Entanglement with Religion**

</div>

239.  All preceding paragraphs are realleged and incorporated herein by reference.

240.  *Carson* explained that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism," both of which violate the Establishment Clause. 142 S. Ct. at 2001 (citing *Our Lady*, 140 S. Ct. at 2064; *Larson v. Valente*, 456 U.S. 228, 244 (1982)).

241.  If the Diocesan schools are approved for tuitioning purposes, they will become subject to the challenged portions of the Act.

242.  Enforcing the challenged portions of the Act against the Diocese will require the Commission and Maine Courts to sit in judgment on the internal religious policies of the Diocesan schools.

243.  This will result in excessive entanglement between Maine and the Diocesan schools.

244.  It will also open the door to allowing Maine to show denominational favoritism by approving religious schools whose religious beliefs align with Maine's beliefs about religious non-discrimination, gender identity, and sexual orientation.

245.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

246.  The Diocese and its schools have suffered and will suffer harm absent relief.

**Count VIII**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Speech—Compelled Speech and Expressive Association**

247. All preceding paragraphs are realleged and incorporated herein by reference.

248. Using government power to force a group that is formed for expressive purposes to include a message not its own "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

249. The Free Speech Clause prohibits the government from compelling people to speak messages against their will.

250. The Free Speech Clause also prohibits the government from forcing a group formed for expressive purposes to accept members who oppose those purposes. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 650, 659 (2000).

251. St. Dominic was formed for the expressive purpose of proclaiming the Catholic faith to the next generation. It is an expressive association within the meaning of *Hurley* and *Dale*.

252. Maine amended the Act in a way that would require religious schools that participate in the program to admit students and hire faculty and staff who are opposed to St. Dominic's religious views.

253. Maine also amended the Act to prohibit "religious discrimination" and require equal religious expression.

254. These rules would alter the content of St. Dominic's Catholic message, against its will.

255. These rules would also force St. Dominic to change its own message by giving students and families that do not share St. Dominic's Catholic faith equal time with students and families that do.

256. These rules would also force St. Dominic to surrender control over the religious speech on its campuses to the State of Maine.

37

JA50

257.  These rules would therefore "significantly affect [the school's] ability to advocate" for its religious "viewpoints." *Dale*, 530 U.S. at 648.

258.  These rules would also infringe on the ability of St. Dominic and the Radonis family to join together to accomplish the expressive purpose of educating the Radonises' children in the Catholic faith.

259.  Coercing religious schools into altering their religious speech and expression serves no compelling government interest.

260.  Maine has not selected the means least restrictive of religious speech to further its interests.

261.  Defendants are persons within the meaning of 42 U.S.C. § 1983.

262.  Plaintiffs have suffered and will suffer harm absent relief.

<div align="center">

**Count IX**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Unconstitutional Conditions**

</div>

263.  All preceding paragraphs are realleged and incorporated herein by reference.

264.  The "unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

265.  "The 'unconstitutional conditions' doctrine limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006) (citations omitted); *see also Koontz*, 570 U.S. at 608 ("[W]e have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights." (citations omitted)).

266.  In order to participate in Maine's program, private religious schools must give up their religious identity by, among other things:

- Abandoning religious hiring rights that are protected by the First Amendment;

<div align="center">38</div>

<div align="center">JA51</div>

- Allowing all religious expression equally, even when it is inconsistent with the school's own religious beliefs;

- Abandoning religious requirements related to student and faculty behavior.

267.   In order to receive Maine's town tuitioning funds, the Radonis family and other families like them must abandon their religious beliefs by sending their children to a secular school.

268.   Such requirements violate the unconstitutional conditions doctrine.

269.   Defendants are persons within the meaning of 42 U.S.C. § 1983.

270.   Plaintiffs have suffered and will suffer harm absent relief.

**Count X**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. XIV:**
**Equal Protection—Discrimination Based on Religion**

271.   All preceding paragraphs are realleged and incorporated herein by reference.

272.   The Equal Protection Clause prohibits discrimination on the basis of religion.

273.   Maine's application of the Act to exclude religious schools like St. Dominic from the program penalizes St. Dominic because of its religious beliefs.

274.   It also penalizes the Radonis family for their religious beliefs.

275.   Private co-educational schools that do not share St. Dominic's religious beliefs are allowed to participate in Maine's program.

276.   Families who do not share the Radonis family's religious beliefs and who wish to send their children to private co-educational schools are allowed to participate in Maine's town-tuitioning program.

277.   Defendants do not have a compelling interest in discriminating on the basis of religion and denying religious schools equal protection.

278.   Defendants' religious discrimination is not the least restrictive means to further any governmental interest.

279.   Defendants are persons within the meaning of 42 U.S.C. § 1983.

280.   Plaintiffs have suffered and will suffer harm absent relief.

39

JA52

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

a. Declare that the religious expression, religious discrimination, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 violate the First Amendment to the United States Constitution as applied to Plaintiffs;

b. Declare that the religious expression, religious discrimination, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as applied to Plaintiffs;

c. Declare that applying 5 M.R.S. § 4553(10)(G) to strip the Diocese and its schools of their religious hiring rights if they accept public funds violates the First Amendment to the United States Constitution as applied to Plaintiffs;

d. Declare that applying 5 M.R.S. § 4553(10)(G) to strip the Diocese and its schools of their religious hiring rights if they accept public funds violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as applied to Plaintiffs;

e. Issue preliminary and permanent injunctive relief prohibiting Defendants from applying the religious expression, religious discrimination, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 to the Diocese and its schools if they accept public funds;

f. Issue preliminary and permanent injunctive relief prohibiting Defendants from applying 5 M.R.S. § 4553(10)(G) to strip the Diocese and its schools of their religious hiring rights if they accept public funds;

g. Award actual damages in an amount to be determined;

h. Award nominal damages;

i. Award Plaintiffs reasonable attorney's fees and costs; and

j. Award all such other relief as the Court may deem proper.

**JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated: June 13, 2023

40

JA53

Respectfully submitted,

*/s/ Adèle Auxier Keim*
Adèle Auxier Keim\*
Mark L. Rienzi\*
Daniel D. Benson\*
Benjamin A. Fleshman\*
Michael O'Brien\*†
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., NW
  Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

\* Application for admission *pro hac vice*
forthcoming
† Not a member of the DC Bar; admitted in Louisi-
ana. Practice limited to cases in federal court.

*/s/ James B. Haddow*
James B. Haddow
Maine Bar No. 003340
Petruccelli, Martin & Haddow LLP
Two Monument Square, Suite 900
Portland, ME 04112-8555
Telephone: (207) 775-0200 x 6413
Fax: (207) 775-2360

*Counsel for Plaintiffs*

41

JA54

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

    I, Keith Radonis, declare under penalty of perjury that the foregoing allegations that pertain to me and my family are true and correct to the best of my knowledge.


Dated: 6/13/2023_____


                              /s/ Keith Radonis_____
                              Keith Radonis

42

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Valori Radonis, declare under penalty of perjury that the foregoing allegations that pertain to me and my family are true and correct to the best of my knowledge.

Dated: 6/13/2023

/s/ Valori Radonis
Valori Radonis

43

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Marianne Pelletier, declare under penalty of perjury that the foregoing allegations that pertain to St. Dominic Academy and the Roman Catholic Diocese of Portland are true and correct to the best of my knowledge.

Dated: <u>6/13/2023     </u>

<div style="margin-left:50%">

<u>/s/ Marianne Pelletier                    </u>
Marianne Pelletier
Superintendent of Schools
Roman Catholic Diocese of Portland

</div>

44

JA57

# Maine Human Rights Commission
### # 51 State House Station, Augusta, ME 04333-0051

*Physical location: 19 Union Street, Augusta, ME 04330*
Phone (207) 624-6290 ▪ Fax (207) 624-8729 ▪ TTY: Maine Relay 711
*www.maine.gov/mhrc*



**Amy M. Sneirson**
EXECUTIVE DIRECTOR

**Barbara Archer Hirsch**
COMMISSION COUNSEL

April 20, 2021

The Honorable Anne Carney, Senate Chair
The Honorable Thom Harnett, House Chair
Joint Standing Committee on Judiciary
100 State House Station
Augusta, ME 04333

Re:  *An Act Clarifying the Acceptance of Public Funding by Community Benefit Organizations – LD 879*

Dear Senator Carney, Representative Harnett, and Members of the Joint Standing Committee on Judiciary:

The Maine Human Rights Commission ("Commission") is Maine's quasi-independent, neutral, apolitical State agency[1] charged with enforcing our state anti-discrimination law, the Maine Human Rights Act, 5 M.R.S. §§ 4551, *et seq*. ("MHRA" or the "Act"). The Commission is statutorily charged with the duties of:  investigating, conciliating, and at times litigating discrimination cases under the MHRA; promulgating rules and regulations to effectuate the MHRA; and making recommendations for further legislation or executive action concerning infringements on human rights in Maine.  5 M.R.S. § 4566(7), (11).  With those duties in mind, the Commission provides this testimony against LD 879, *An Act Clarifying the Acceptance of Public Funding by Community Benefit Organizations*.

### The MHRA's Purpose, and Backdrop to LD 879.

The policy of the Commission and the MHRA itself is to "keep continually in review all practices infringing on the basic human right to a life with dignity, and the causes of these practices, so that corrective measures may, where possible, be promptly recommended and implemented, and to prevent discrimination in employment, housing or access to public accommodations on account of race, color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin".  5 M.R.S. § 4552.  That breadth of purpose carries into the specified powers and duties of the Commission.  The MHRA provides that "[t]he commission has the duty of investigating all conditions and practices within the State which allegedly detract from the enjoyment, by each inhabitant of the State, of full human rights and personal dignity. Without limiting the generality of the foregoing, it has the duty of investigating all forms of invidious discrimination, whether carried out legally or illegally, and whether by public agencies or private persons. Based on its investigations, it has the further duty to recommend measures calculated to promote the full enjoyment of human rights and personal dignity by all the inhabitants of this State."  5 M.R.S. § 4566.

---

[1] The Commission itself is made up of five Commissioners, appointed by the Governor for staggered five-year terms.  By statute, there can be no more than three Commissioners from any political party.  5 M.R.S. § 4561.

From the MHRA's inception, discrimination was prohibited based on race, color, sex, religion, ancestry or national origin, with the only substantive change to protected classes being the addition of physical and mental disability in 1974/5.  The MHRA was amended in 2005 to include a new protected class based on sexual orientation (defined to include actual or perceived homosexuality, bisexuality, or heterosexuality, gender identity, and gender expression)(here "LGBTQ").  This amendment became effective after decades of rancorous public engagement and wrangling on the issue,[2] and this Legislature had many years' worth of discussion about how to accommodate religiously-affiliated employers, housing providers, places of public accommodation, and schools that might have faith-based objections to including LGBTQ people.

 The Legislature carefully and deliberately carved out an exemption to the MHRA non-discrimination mandate for religious organization employers, housing providers, and educational programs as follows:

…a religious corporation, association or organization that does not receive public funds is exempt from this provision with respect to:
(1) Employment, as is more fully set forth in section 4553, subsection 4 and section 4573-A;
(2) Housing; and
(3) Educational opportunity, as is more fully set forth in section 4602, subsection 4.
Any for-profit organization owned, controlled or operated by a religious association or corporation and subject to the provisions of the Internal Revenue Code, 26 United States Code, Section 511(a) is not covered by the exemptions set forth in this paragraph.

5 M.R.S. § 4553(10)(G). This exemption is the subject of LD 879, which would broaden the category of religious groups that can discriminate based on LGBTQ status in employment, housing, and education.

**The MHRA's Balance of Rights:**
**Publicly-Funded Groups Should Not Be Given Permission to Discriminate.**

This bill arises at the intersection where two rights protected in the MHRA – the right of people to access jobs, housing, education and public accommodations without discrimination based on innate characteristics and the right of persons to exercise their faith – appear to conflict. The MHRA has long protected both of these key rights in its non-discrimination principles, and has provisions to balance these rights and accommodate tension between them that LD 879 would upset.

---

[2] In 1981, the Legislature debated adding LGBTQ protection to the MHRA.  In 1983, the Maine Senate added LGBTQ protection to the MHRA but the House defeated it; in 1989, the Maine House added LGBTQ protection to the MHRA but the Senate defeated it. In early 1990's, Portland and Lewiston proposed banning LGBTQ discrimination. In 1993, the Legislature added LGBTQ protection to MHRA but the then-governor vetoed it. In November 1995, a citizens'-initiated ballot initiative sought to ban Maine state and local governments from passing anti-discrimination ordinances; this was defeated with 53% of the vote. In 1997, the Maine Legislature passed LGBTQ protection to the MHRA, and the then-governor signed it into law, but it never went into effect, as a February 1998 special election voter-initiated ballot initiative repealed it (52% vote to repeal). In 1999, the Legislature again passed LGBTQ protection to the MHRA, and it was again signed into law, but this, too, did not take effect; in November 2000 voters narrowly (51.3%) utilized a "people's veto" to reject it. In 2005, the Legislature yet again passed LGBTQ protection to the MHRA, and the then-governor signed it into law in March 2005; this amendment took effect in December 2005 after a ballot initiative seeking its repeal in November 2005 was rejected (45% repeal it to 55% keep it).

LD 879 proposes allowing a "religious corporation, association or organization" that is not for-profit under tax codes to discriminate against LGBTQ people even it operates using state or federal funds. This would allow an employer that aligns itself with a religious affiliation or belief (to the extent that a business entity can have a religious belief) to fire or refuse to hire someone LGBTQ even if the employer applied for and receives a federal or state pandemic economic recovery grant, and would allow a community shelter operated by a religious entity to refuse entry to someone based on their LGBTQ status even though the entity applied for and operates using community grant funds from Maine or the federal government, and would allow a school affiliated with a religious organization to fire a teacher or expel a student who is LGBTQ even though the school applied for and receives federal or state funds for instructional support or school lunch.

This proposal would upend the delicately-balanced standard in the MHRA, intended to allow for religious expression but also to require nondiscrimination in public. The MHRA provides that religiously-affiliated organizations that are not for-profit can pick and choose who to employ to carry out their ministries, and who to allow into housing they provide, and which children to educate. This is consistent with the free exercise of a genuinely-held religious belief. Within the MHRA, the organization's right to freely exercise religious beliefs only becomes circumscribed once the organization opens itself to the public or seeks out taxpayer funds. A religiously-affiliated school or shelter or employer may continue to operate within its beliefs, at its own expense, but once the public funds to which all taxpayers contribute are utilized to subsidize the religious organization, the organization must not discriminate against a group of those taxpayers in its public accommodations, housing or employment.

Issues surrounding religiously-affiliated organizations, government funding, and discrimination are being contested from local communities to the United State Supreme Court. All arise out of the same bedrock question, the extent to which church and state must remain separate in this country. We need not answer that larger question today, but we can determine whether the State of Maine should make a policy within its non-discrimination law that organizations that affirmatively seek out or accept state or federal monies paid by all Mainers should be expected to serve all Mainers regardless of protected-class status. Because LD 879 would allow religious organizations to seek out and use taxpayer dollars from LGBTQ taxpayers, while excluding those same taxpayers from their employment, housing, services and places, and education, this proposal would countenance invidious discrimination and should be rejected.

**Conclusion**

Thank you for this opportunity to provide testimony against LD 879. The Commission would be pleased to discuss these issues with you at your convenience, including at the work session on this matter.

Sincerely,

Amy M. Sneirson, Executive Director

Barbara Archer Hirsch, Commission Counsel

# Office of the Maine AG: News & Reports

 **maine.gov**/ag/news/article.shtml

## Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in Carson v. Makin

June 21, 2022

**FOR IMMEDIATE RELEASE**

Contact: Danna Hayes

Danna.hayes@maine.gov

Statement of Maine Attorney General Aaron Frey on

Supreme Court Decision in *Carson v. Makin*

AUGUSTA –  Maine Attorney General Aaron Frey expressed his disappointment today with a United States Supreme Court decision, issued this morning, striking down a Maine law prohibiting religious schools from receiving public funds.  Approximately 5,000 Maine children live in districts that neither have a public school nor contract with a school in a nearby district.   To ensure that these children have access to a free public education, they are permitted to attend at public expense a public or private school of their choice.  Public funds cannot be used to attend a private school that promotes religion because such schools, by definition, do not provide the equivalent of a public education.

Several families who wanted to send their children to religious schools at taxpayer expense challenged the law, arguing that it violated their constitutional rights, including their First Amendment right to the free exercise of religion.  Both the federal court in Maine and a unanimous panel of the First Circuit Court of Appeals rejected the challenge and upheld the law.  In today's decision, a divided Supreme Court struck down the law, rejecting Maine's argument that the purpose of the tuition program was to provide a public education for students who would otherwise be without, and concluding that Maine had created a school choice program that allowed a group of parents to select the secondary school of their choice. As a result, the Court held that their recent precedent dictates that excluding religious schools violates the Free Exercise Clause.  Justices Stephen Breyer, Sonia Sotomayor, and Elena Kagan dissented, noting that the Court had effectively eliminated the notion of their being any play in the joints between the Establishment Clause and the Free Exercise Clause and expressing concern that this decision would open the door to claims that states must fund the religious equivalent of other public programs.

"I am terribly disappointed and disheartened by today's decision," said AG Frey. "Public education should expose children to a variety of viewpoints, promote tolerance and understanding, and prepare children for life in a diverse society. The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household. While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear. I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry."

While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so. Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

# There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It

nytimes.com/2022/06/23/opinion/supreme-court-guns-religion.html

Aaron Tang                                                                                    June 23, 2022



What a week so far for conservatives. On Tuesday, the Supreme Court struck down a Maine law that prohibited religious private schools from receiving taxpayer dollars. On Thursday, it invalidated a New York State gun safety law limiting the public carry of firearms. And on Friday, it overturned Roe v. Wade. The outcome in these caseswas not surprising. The court has ruled in favor of religious litigants in an overwhelming number of cases; the gun case's outcome was clear from the oral argument before the justices in November; and the court's draft abortion decision was leaked in May.

What is surprising is how little the 6-to-3 decision in the Maine case, Carson v. Makin, will matter practically. And the reason offers a glimpse of hope for those who worry about a future dominated by the court's conservative supermajority — including the many Americans troubled by the court's decision in the gun case, New York State Rifle & Pistol Association v. Bruen.

Let's start with the Carson case. Anticipating this week's decision, Maine lawmakers enacted a crucial amendment to the state's anti-discrimination law last year in order to counteract the expected ruling. The revised law forbids discrimination based on gender identity and sexual orientation, and it applies to every private school that chooses to accept public funds, without regard to religious affiliation.

JA64

The impact was significant: The two religious schools at issue in the Carson case, Bangor Christian Schools and Temple Academy, said that they would decline state funds if, as Maine's new law requires, accepting such funds would require them to change how they operate or alter their "admissions standards" to admit L.G.B.T.Q. students.

The legislative fix made by Maine lawmakers offers a model for lawmakers elsewhere who are alarmed by the court's aggressive swing to the right. Maine's example shows that those on the losing end of a case can often outmaneuver the court and avoid the consequences of a ruling.

By enacting its law, Maine was able to assure its taxpayers that they will not be complicit in discriminating against L.G.B.T.Q. students, because private schools that discriminate will be ineligible for public funds. The law will limit church-state entanglement, assuming other religious schools decline funding for the same reasons as the schools in Carson. And although nondiscriminatory private schools can still receive public funds, Maine can eliminate that program at any point — a fact the court conceded. (Whether it *should* is a closer question that ought to turn on the program's impact on educational equity.)

Other states should follow Maine's lead. A handful of blue states — including Illinois, Maryland, Nevada and Vermont — provide vouchers or similar tax-credit scholarships to low-income students to enroll in private schools. None of them, however, enacted a statute prohibiting funds-receiving private schools from discriminating against L.G.B.T.Q. students. Legislation that would do so is pending in Maryland's legislature, the General Assembly. Lawmakers there should quickly enact it. Other states should also prohibit such discrimination.

And lawmakers troubled by the court's gun safety decision and worried about the looming ruling on abortion should also take a page from Maine's playbook.

Now that the court has struck down New York's limits on who may carry guns in public, state lawmakers there and in other states should pass new laws to deter gun violence. Justice Clarence Thomas's majority opinion made clear that the constitutionality of restrictions is historically "settled" in "sensitive places" such as legislatures, courtrooms and polling locations, and that "modern regulations" may "prohibit" the carry of firearms in "new" places. Given that, states should enact an expansive list of so-called sensitive places where guns may not be carried. Though Justice Thomas did not specify which those might be, during oral arguments in November, several justices pondered that they might include public transportation, crowded venues, university campuses and places where alcohol is served.

Justice Brett Kavanaugh noted in a concurrence joined by Chief Justice John Roberts, moreover, that while states may not impose restrictions that prevent "ordinary, law abiding citizens" from carrying a gun to defend themselves, states can still enact rigorous

requirements for a public carry permit, such as stringent background and mental health records checks and completion of regular training courses.

Another promising reform for states to consider would be to require gun owners to possess firearm liability insurance. Not only would such a requirement ensure that victims of gun violence can recover for their losses and "provide financial incentives for responsible arms carrying," but it also draws strong historical support from a host of 19th century "surety laws" recognized in the court's opinion.

And on Friday, the court eliminated the right to abortion. Because of the sweeping nature of the court's decision, there are some limits on what pro-choice states can do alone. But at a minimum, lawmakers should act vigorously to ensure that abortion providers are able to serve out-of-state patients unable to obtain care in their home states. Connecticut and New York have already passed such laws; others should follow suit.

As Justices Stephen Breyer, Sonia Sotomayor, and Elena Kagan noted in their dissent, "it is women who cannot afford" to travel to other states "who will suffer the most."

To protect these patients, lawmakers must act at the national level. So the Biden administration should argue that Food and Drug Administration rules permitting the use of mifepristone to terminate a pregnancy override contrary state laws. Promisingly, Attorney General Merrick Garland issued a statement on Friday advancing precisely this approach. Congress should also continue working to enact the Women's Health Protection Act to enshrine a right to abortion as a matter of federal law, even though the filibuster remains an obstacle.

Last fall, Justice Sotomayor, for whom I clerked in 2013-14, predicted that there would be "a lot of disappointment in the law" in the current court term. Now we see why. For understandable reasons, some critics of the current court have girded for a battle to expand the number of justices. Maine has shown another promising path. Sometimes, the best way to protect against overreaching by the conservative court is through good old-fashioned lawmaking.

Aaron Tang (@AaronTangLaw) is a law professor at the University of California, Davis, and a former law clerk to Justice Sonia Sotomayor.

# Office of the Maine AG: News & Reports

 **maine.gov**/ag/news/article.shtml

## Statement from Attorney General Frey on Carson v. Makin oral argument

December 8, 2021

AUGUSTA - Today, the United States Supreme Court held oral arguments in *Carson v. Makin*, a case which considers whether it is constitutional for Maine to refuse to allow religious schools to receive taxpayer funds for the education of Maine's children. Chief Deputy Attorney General Christopher Taub and Assistant Attorney General Sarah Forster argued the case in defense of Maines public education system.

Following today's oral arguments, Maine Attorney General Aaron M. Frey issued the following statement:

"All Maine children, regardless of where they live, are entitled to a free public education. Maine law requires that children are provided a free public education, and that public education by its very nature must be inclusive of all students, regardless of the differences in their diverse backgrounds. A small number of children live in districts that do not operate a secondary school or contract with a school to provide an appropriate education. Those districts can satisfy their obligation to provide a public education by paying for the childrens tuition at a public or approved private school. Schools that require students to undergo religious instruction are excluded because the education they provide is not equivalent to a public education. Maines program has survived legal challenge on prior occasions by the Maine Law Court, the Federal District Court of Maine, and the Federal First Circuit Court of Appeals."

"Schools receiving taxpayer funds are appropriately subject to the Maine Human Rights Act (MHRA), which prohibits discrimination against individuals on the basis of several protected classes. The two religious schools that the parents in this case want to send their children to have made it clear that they are not interested in complying with the MHRA and, therefore, these schools have not even applied to the Maine Department of Education to be eligible to participate in Maines tuition program. Put differently, these schools want to continue to discriminate against individuals based on their status in a protected class and that is inconsistent with the protections afforded to all Mainers under the MHRA."

"Attorneys from my office argued strongly today that *Carson v. Makin* is different from other cases the Supreme Court has considered recently; and made a compelling case for the constitutionality of Maines system of public education, and for how it benefits all Mainers. It would be inappropriate if Maine taxpayers were forced to fund schools which exclude and discriminate against other Mainers, as that would erode the foundational principles of a public education that is diverse and accessible to all."



**Santiago Mayer** @santiagomayer_ · Jun 25 ···
You know how SCOTUS said Maine couldn't exclude religious schools from their voucher program?

Maine just changed the guidelines to exclude schools that discriminate against LGBTQ+ students.

💬 1,411          🔁 18K          ♡ 124.9K          ⬆️



**Ryan Fecteau** 🏳️‍🌈 ✓ ···
@SpeakerFecteau

Replying to @santiagomayer_

Sure did. Anticipated the ludicrous  decision from the far-right SCOTUS.

7:51 AM · Jun 26, 2022 from Biddeford, ME · Twitter for iPhone

# Memo

Date:         January 13, 2016

To:           Amy Sneirson, Executive Director

From:        Barbara Archer Hirsch, Commission Counsel

Re:           Interpretation of the Education Provisions of the MHRA

_____

The Commission's Education Rule, which is a joint rule enacted with the Department of Education, has not been updated in any significant way in the past 15 years. Even the most recent amendment, enacted in 2000, did not amend the rule to include all of the then-protected classes which had been added to the MHRA: while race, national origin, and disability had been added to the education provisions in the late 1980s, those classes are not mentioned in our current rule.

Ten years ago, the education provisions of the MHRA were amended to make discrimination on the basis of sexual orientation (which includes gender identity and gender expression) unlawful. Soon thereafter, the Commission applied the sexual orientation protections in a claim by a transgender student's right to use the bathroom corresponding with her gender identity. The case became the subject of long-running litigation around the application of the MHRA's sexual orientation provisions in education. Because of the litigation, the Commission held off on rulemaking. The litigation was finally concluded about two years ago. *See Doe v. RSU 26*, 2014 ME 11. In the wake of *Doe,* we received a number of inquiries about the rights of students under the MHRA, specifically with regard to sexual orientation issues.

While we would like to propose changes to the current Education Rule, that avenue is unavailable at the moment. The public is in need of guidance as to the application of the education provisions of the MHRA generally, and how the Commission interprets the Act with regard to sexual orientation discrimination in particular. Those issues are addressed below.

***Introduction:***

As an initial matter, while the text of the Education Rule addresses sex discrimination only, its provisions are also applicable to unlawful education discrimination on the basis of race, national origin, physical or mental disability, and sexual orientation. The rules, like the MHRA itself, are meant to be interpreted broadly. In particular, with regard to discrimination on the basis of sex and sexual orientation, including gender identity and gender expression, the Commission's rules are intended to be liberally construed to facilitate inclusion and educational opportunity for transgender individuals. **Whenever educational or extra-curricular opportunities offered by a covered educational institution are offered separately to students based on sex and/or gender, students shall be allowed to participate in accordance with their gender identity.**
***Definitions:***

"Sexual orientation" is defined in the MHRA to mean a person's actual or perceived heterosexuality, bisexuality, homosexuality or gender identity or expression. The terms heterosexuality, bisexuality, and homosexuality should not be considered exclusive, however, and the statute should be interpreted to cover all orientations (including, for example, those who identify as asexual).

"Gender identity" means an individual's sincerely held core belief regarding their gender, whether that individual identifies as male, female, a blend of both, neither, or in some other way (such as, for example, students who identify as "queer", "genderqueer", "bi-gender", "intersex" or "gender fluid").

"Gender expression" means an individual's external expression of their gender identity, through such means as clothing, hair styling, jewelry, voice, and behavior.

"Transgender" is used as an umbrella term for people whose gender identity and/or expression is different from cultural expectations based on the sex/gender they were assigned at birth. Being transgender does not imply any specific sexual orientation.

### Determination of a Student's Gender Identity:

In general, an educational institution should accept a student's assertion of their gender identity when there is consistent and uniform assertion of the gender identity, or any other evidence that the student's gender identity is sincerely held as part of their core identity. If the educational institution has a credible, objective reason to believe that a student's gender identity is being asserted for an improper purpose, it may request additional evidence supporting the student's stated gender identity.

    (a) Satisfactory additional evidence may include, but shall not be limited to, the following:

        i. A written statement from a physician, physician's assistant, nurse practitioner, or nurse who has been involved with the student's health care;
        ii. A written statement from a psychologist, psychiatrist, or social worker who has met with the student;
        iii. Passports or other formal documents showing the student's gender identity;
        iv. Familial documents, such as family photographs or statements from the student's parent(s), guardian(s), or other adult relative(s);
        v. A statement from an adult who is close to the student and can speak to the student's core gender identity.

    (b) An educational institution may not require medical records as proof of a student's gender identity.

### Athletics:

Students should be allowed to compete on single-sex/gender teams based upon their gender identity.

In general, if a student's gender identity changes in concert with athletic seasons, the educational institution may request additional information supporting the student's stated gender identity, unless

the school is already aware that the asserted gender identity, which may be fluid, is the student's sincerely held core belief as to their gender.

If the participation of a transgender student on the single-sex/gender team that most closely matches the student's gender identity poses a significant risk of substantial physical harm to the student or to other participants, the educational institution and the student shall enter into interactive discussions to minimize or eliminate the threat of substantial harm, while also providing mutually-acceptable athletic opportunity for the student. The assessment that there is a significant risk of substantial physical harm cannot be based on generalizations or on assumptions about transgender athletes, or about sex/gender differences generally. Rather, the educational institution should engage in an individualized assessment of the individual student's participation on the particular team at issue.

*Comparable Facilities:*

Students must be permitted to use the toilet, locker room, and shower facilities corresponding to their gender identity. Facilities such as a curtained changing area or unisex facilities may be provided and made available to all students, but should not be used to isolate or segregate students based on their sexual orientation, gender expression, or gender identity. Students shall not be required to use facilities corresponding to their assigned birth sex/gender, where their assigned birth sex/gender and their gender identity are different.

If the educational institution offers housing in which students are separated or assigned by gender, students should be permitted to reside in the housing facilities corresponding to their gender identity.

*Harassment/Hostile Educational Environment:*

Educational institutions are subject to potential claims under the MHRA for harassment/hostile educational environment based on a student's sexual orientation. In the school context, the Commission has interpreted a hostile educational environment as involving harassment that a reasonable student of the same age and maturity as the student being harassed would consider severe or pervasive enough to create an intimidating, hostile, or offensive school environment. An educational institution may be held liable for the alleged hostile environment if it knew or should have known of the harassment and failed to take prompt, appropriate action.

*Student Names/Appearance:*

A student's official record shall bear their legal name, which may be changed only upon proof that the student's legal name has been changed pursuant to a court order. At the written request of a student, however, and consistent with the student's gender identity, the educational institution shall use the student's preferred name and pronouns consistent with their gender identity on all other documents.

If a student so chooses, the educational institution's employees should be required to address the student by the student's chosen name and use pronouns consistent with the student's gender identity. The educational institution should also, at the request of any student, instruct its students to address the student by the student's chosen name and use pronouns consistent with the student's gender identity. Inadvertent slips and honest mistakes will not be considered a violation of the Act, but a pattern of

3

refusal to acknowledge a student's gender identity by using their chosen name and pronouns may be considered to constitute such a violation.

Students should be permitted to dress in a manner consistent with the student's gender identity, subject to any dress code adopted by the educational institution. The dress code should be applied to the student consistent with their gender identity.

In the event that the student and their parent/legal guardian do not agree with regard to the student's sexual orientation, gender identity, or gender expression, the educational institution should, whenever possible, abide by the wishes of the student with regard their gender identity and expression while at school.

APPROVED

JUNE 15, 2023

BY GOVERNOR

CHAPTER

**188**

PUBLIC LAW

## STATE OF MAINE

———

### IN THE YEAR OF OUR LORD

### TWO THOUSAND TWENTY-THREE

———

### H.P. 1165 - L.D. 1833

### An Act to Amend the Definition of "Educational Institution" Under the Maine Human Rights Act to Include Single-sex Educational Institutions

**Be it enacted by the People of the State of Maine as follows:**

  **Sec. 1.  5 MRSA §4553, sub-§2-A,** as amended by PL 1995, c. 393, §4, is further amended to read:

  **2-A.  Educational institution.**  "Educational institution" means any public school or educational program, any public ~~post-secondary~~ postsecondary institution, any private school or educational program approved for tuition purposes ~~if both male and female students are admitted~~ and the governing body of each such school or program.  ~~For purposes related to disability-related discrimination, "educational institution" also means any private school or educational program approved for tuition purposes.~~

**EXHIBIT 2**



# 130th MAINE LEGISLATURE

## FIRST SPECIAL SESSION-2021

| | |
|---|---|
| **Legislative Document** | **No. 1688** |

S.P. 544                                                    In Senate, May 6, 2021

### An Act To Improve Consistency within the Maine Human Rights Act

---

   Submitted by the Maine Human Rights Commission pursuant to Joint Rule 204.
   Received by the Secretary of the Senate on May 4, 2021.  Referred to the Committee on Judiciary pursuant to Joint Rule 308.2 and ordered printed.

DAREK M. GRANT
Secretary of the Senate

Presented by Senator HICKMAN of Kennebec.
Cosponsored by Representative TALBOT ROSS of Portland and
Senators: CARNEY of Cumberland, SANBORN of Cumberland, VITELLI of Sagadahoc,
Representatives: DUNPHY of Old Town, HARNETT of Gardiner.

Printed on recycled paper

1    **Be it enacted by the People of the State of Maine as follows:**

2    **Sec. 1.  5 MRSA §4552,** as amended by PL 2005, c. 10, §1, is further amended to
3    read:

4    **§4552.  Policy**

5    To protect the public health, safety and welfare, it is declared to be the policy of this
6    State to keep continually in review all practices infringing on the basic human right to a
7    life with dignity, and the causes of these practices, so that corrective measures may, where
8    possible, be promptly recommended and implemented, and to prevent discrimination in
9    employment, housing, education, extension of credit or access to public accommodations
10    on account of an individual's actual or perceived race, color, sex, sexual orientation or
11    gender identity, physical or mental disability, religion, ancestry or national origin and in
12    employment, extension of credit and access to public accommodations on the basis of age;
13    and in employment and housing on the basis of familial status; and in employment,
14    discrimination on account of age or because of the previous assertion of a claim or right
15    against a prior employer under former Title 39 or Title 39-A and in housing because of
16    familial status; and to prevent discrimination in the extension of credit on account of age,
17    race, color, sex, sexual orientation, marital status, religion, ancestry or national origin; and
18    to prevent discrimination in education on account of sex, sexual orientation or physical or
19    mental disability and because of protected activity under Title 26, chapter 7, subchapter
20    5-B; and to prevent discrimination or retaliation on the basis of an assertion of rights under
21    this Act or interference with an individual's right to be free from discrimination prohibited
22    under this Act.

23    **Sec. 2.  5 MRSA §4553, sub-§5-A,** as amended by PL 2019, c. 464, §1, is further
24    amended to read:

25    **5-A.  Familial status.**  "Familial status" means that a family unit may contain one or
26    more individuals who have not attained 18 years of age and are living with that contains:

27    A.  A One or more individuals who have not attained 18 years of age and are living
28    with a parent or another person having legal custody of the individual or individuals or
29    the designee of the parent or other person having custody with the written permission
30    of the parent or other person; or

31    B.  The designee of the parent or other person having custody, with the written
32    permission of the parent or other person.

33    B-1.  One or more individuals 18 years of age or older who lack the ability to meet
34    essential requirements for physical health, safety or self-care because the individual or
35    individuals are unable to receive and evaluate information or make or communicate
36    decisions.

37    The protections afforded against discrimination on the basis of familial status apply to any
38    person who is pregnant or who is in the process of securing legal custody of any individual
39    who has not attained 18 years of age.

40    **Sec. 3.  5 MRSA §4553, sub-§10, ¶G,** as amended by PL 2019, c. 464, §1, is further
41    amended by amending subparagraph (3) to read:

42    (3)  Educational opportunity, as is more fully set forth in section 4602, subsection
43    4.

1  **Sec. 4.  5 MRSA §4571,** as amended by PL 2005, c. 10, §10, is further amended to
2  read:

**§4571.  Right to freedom from discrimination in employment**

4  The opportunity for an individual to secure employment without discrimination
5  because of race, color, sex, sexual orientation <u>or gender identity</u>, physical or mental
6  disability, religion, age, ancestry ~~or,~~ national origin <u>or familial status</u> is recognized as and
7  declared to be a civil right.

8  **Sec. 5.  5 MRSA §4572, sub-§1,** as amended by PL 2005, c. 10, §§11 and 12, is
9  further amended to read:

10  **1.  Unlawful employment.**  It is unlawful employment discrimination, in violation of
11  this Act, except when based on a bona fide occupational qualification:

12  A.  For any employer to fail or refuse to hire or otherwise discriminate against any
13  applicant for employment because of race or color, sex, sexual orientation <u>or gender</u>
14  <u>identity</u>, physical or mental disability, religion, age, ancestry ~~or,~~ national origin <u>or</u>
15  <u>familial status</u>, because of the applicant's previous assertion of a claim or right under
16  former Title 39 or Title 39-A or because of previous actions taken by the applicant that
17  are protected under Title 26, chapter 7, subchapter 5-B; or, because of those reasons,
18  to discharge an employee or discriminate with respect to hire, tenure, promotion,
19  transfer, compensation, terms, conditions or privileges of employment or any other
20  matter directly or indirectly related to employment; or, in recruiting of individuals for
21  employment or in hiring them, to utilize any employment agency that the employer
22  knows or has reasonable cause to know discriminates against individuals because of
23  their race or color, sex, sexual orientation <u>or gender identity</u>, physical or mental
24  disability, religion, age, ancestry ~~or,~~ national origin <u>or familial status</u>, because of their
25  previous assertion of a claim or right under former Title 39 or Title 39-A or because of
26  previous actions that are protected under Title 26, chapter 7, subchapter 5-B;

27  (1)  This paragraph does not apply to discrimination governed by Title 39-A,
28  section 353;

29  B.  For any employment agency to fail or refuse to classify properly, refer for
30  employment or otherwise discriminate against any individual because of race or color,
31  sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion, age,
32  ancestry ~~or,~~ national origin <u>or familial status</u>, because of the individual's previous
33  assertion of a claim or right under former Title 39 or Title 39-A or because of previous
34  actions taken by the individual that are protected under Title 26, chapter 7, subchapter
35  5-B; or to comply with an employer's request for the referral of job applicants if a
36  request indicates either directly or indirectly that the employer will not afford full and
37  equal employment opportunities to individuals regardless of their race or color, sex,
38  sexual orientation <u>or gender identity</u>, physical or mental disability, religion, age,
39  ancestry ~~or,~~ national origin <u>or familial status</u>, because of previous assertion of a claim
40  or right under former Title 39 or Title 39-A or because of previous actions that are
41  protected under Title 26, chapter 7, subchapter 5-B;

42  C.  For any labor organization to exclude from apprenticeship or membership or to
43  deny full and equal membership rights to any applicant for membership because of race
44  or color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,

religion, age, ancestry or, national origin or familial status, because of the applicant's previous assertion of a claim or right under former Title 39 or Title 39-A or because of previous actions taken by the applicant that are protected under Title 26, chapter 7, subchapter 5-B; or, because of those reasons, to deny a member full and equal membership rights, expel from membership, penalize or otherwise discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment, representation, grievances or any other matter directly or indirectly related to membership or employment, whether or not authorized or required by the constitution or bylaws of that labor organization or by a collective labor agreement or other contract; to fail or refuse to classify properly or refer for employment or otherwise discriminate against any member because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry or, national origin or familial status, because of the member's previous assertion of a claim or right under former Title 39 or Title 39-A or because of previous actions taken by the member that are protected under Title 26, chapter 7, subchapter 5-B; or to cause or attempt to cause an employer to discriminate against an individual in violation of this section, except that it is lawful for labor organizations and employers to adopt a maximum age limitation in apprenticeship programs, if the employer or labor organization obtains prior approval from the Maine Human Rights Commission of any maximum age limitation employed in an apprenticeship program.  The commission shall approve the age limitation if a reasonable relationship exists between the maximum age limitation employed and a legitimate expectation of the employer in receiving a reasonable return upon the employer's investment in an apprenticeship program.  The employer or labor organization bears the burden of demonstrating that such a relationship exists;

D.  For any employer, employment agency or labor organization, prior to employment or admission to membership of any individual, to:

   (1)  Elicit or attempt to elicit information directly or indirectly pertaining to race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry or, national origin or familial status, any previous assertion of a claim or right under former Title 39 or Title 39-A or any previous actions that are protected under Title 26, chapter 7, subchapter 5-B;

   (2)  Make or keep a record of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry or, national origin or familial status, any previous assertion of a claim or right under former Title 39 or Title 39-A or any previous actions that are protected under Title 26, chapter 7, subchapter 5-B, except under physical or mental disability when an employer requires a physical or mental examination prior to employment, a privileged record of that examination is permissible if made and kept in compliance with this Act;

   (3)  Use any form of application for employment, or personnel or membership blank containing questions or entries directly or indirectly pertaining to race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry or, national origin or familial status, any previous assertion of a claim or right under former Title 39 or Title 39-A or any previous actions that are protected under Title 26, chapter 7, subchapter 5-B.  This section does not prohibit any officially recognized government agency from keeping records

1      permitted to be kept under this Act in order to provide free services to individuals
2      requesting rehabilitation or employment assistance;

3      (4)  Print, publish or cause to be printed or published any notice or advertisement
4      relating to employment or membership indicating any preference, limitation,
5      specification or discrimination based upon race or color, sex, sexual orientation <u>or</u>
6      <u>gender identity</u>, physical or mental disability, religion, age, ancestry <s>or,</s> national
7      origin <u>or familial status</u>, any previous assertion of a claim or right under former
8      Title 39 or Title 39-A or any previous actions that are protected under Title 26,
9      chapter 7, subchapter 5-B; or

10      (5)  Establish, announce or follow a policy of denying or limiting, through a quota
11      system or otherwise, employment or membership opportunities of any group
12      because of the race or color, sex, sexual orientation <u>or gender identity</u>, physical or
13      mental disability, religion, age, ancestry <s>or,</s> national origin <u>or familial status</u>, the
14      previous assertion of a claim or right under former Title 39 or Title 39-A or because
15      of previous actions that are protected under Title 26, chapter 7, subchapter 5-B, of
16      that group; or

17      E.  For an employer, employment agency or labor organization to discriminate in any
18      manner against individuals because they have opposed a practice that would be a
19      violation of this Act or because they have made a charge, testified or assisted in any
20      investigation, proceeding or hearing under this Act.  <u>This paragraph does not limit the</u>
21      <u>liability of persons pursuant to section 4633.</u>

22      **Sec. 6.  5 MRSA §4573-A, sub-§3** is enacted to read:

23      **3.  Physical or mental disability.**  <u>This subchapter does not prohibit an employer from</u>
24      <u>discharging or refusing to hire an individual with a physical or mental disability or subject</u>
25      <u>an employer to any legal liability resulting from the refusal to employ or the discharge of</u>
26      <u>the individual with a physical or mental disability if the employer establishes that the</u>
27      <u>individual, because of the physical or mental disability, is unable to perform job duties or</u>
28      <u>to perform job duties in a manner that would not endanger the health or safety of the</u>
29      <u>individual or others.</u>

30      **Sec. 7.  5 MRSA §4581, first ¶,** as amended by PL 2011, c. 613, §10 and affected
31      by §29, is further amended to read:

32      The opportunity for an individual to secure housing in accordance with the individual's
33      ability to pay, and without discrimination because of race, color, sex, sexual orientation <u>or</u>
34      <u>gender identity</u>, physical or mental disability, religion, ancestry, national origin or familial
35      status is hereby recognized as and declared to be a civil right.

36      **Sec. 8.  5 MRSA §4581-A, sub-§1,** as enacted by PL 2011, c. 613, §11 and affected
37      by §29, is amended to read:

38      **1.  Sale or rental of housing and other prohibited practices.**  For any owner, lessee,
39      sublessee, managing agent or other person having the right to sell or rent or manage a
40      housing accommodation, or any agent of these, to:

41      A.  Make or cause to be made any written or oral inquiry concerning the race or color,
42      sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion,

1   ancestry, national origin or familial status of any prospective purchaser, occupant or
2   tenant of the housing accommodation;

3   B.  Refuse to show or refuse to sell, rent, lease, let or otherwise deny to or withhold
4   from any person the housing accommodation because of race or color, sex, sexual
5   orientation or gender identity, physical or mental disability, religion, ancestry, national
6   origin or familial status;

7   C.  Make, print or publish or cause to be made, printed or published any notice,
8   statement or advertisement relating to the sale, rental or lease of the housing
9   accommodation that indicates any preference, limitation or discrimination based upon
10  race or color, sex, sexual orientation or gender identity, physical or mental disability,
11  religion, ancestry, national origin or familial status or an intention to make any such
12  preference, limitation or discrimination;

13  D.  Discriminate against any person because of race or color, sex, sexual orientation or
14  gender identity, physical or mental disability, religion, ancestry, national origin or
15  familial status in the price, terms, conditions or privileges of the sale, rental or lease of
16  any housing accommodations or in the furnishing of facilities or services in connection
17  with any housing accommodations; or

18  E.  Evict or attempt to evict any tenant of any housing accommodation because of the
19  race or color, sex, sexual orientation or gender identity, physical or mental disability,
20  religion, ancestry, national origin or familial status of the tenant;

21  **Sec. 9.  5 MRSA §4581-A, sub-§2,** as enacted by PL 2011, c. 613, §11 and affected
22  by §29, is amended to read:

23  **2.  Selling, brokering or appraising of housing.**  For any real estate broker or real
24  estate salesperson, or any agent of these, to:

25  A.  Fail or refuse to show any person a housing accommodation listed for sale, lease or
26  rent because of race or color, sex, sexual orientation or gender identity, physical or
27  mental disability, religion, ancestry, national origin or familial status;

28  B.  Misrepresent, for the purpose of discriminating because of race or color, sex, sexual
29  orientation or gender identity, physical or mental disability, religion, ancestry, national
30  origin or familial status, the availability or asking price of a housing accommodation
31  listed for sale, lease or rent or for such reason to fail to communicate to the person
32  having the right to sell, rent or lease the housing accommodation any offer for the same
33  made by any applicant;

34  C.  In any other manner to discriminate against any applicant for a housing
35  accommodation because of race or color, sex, sexual orientation or gender identity,
36  physical or mental disability, religion, ancestry, national origin or familial status;

37  D.  Make or cause to be made any written or oral inquiry or record concerning the race
38  or color, sex, sexual orientation or gender identity, physical or mental disability,
39  religion, ancestry, national origin or familial status of any applicant for or intended
40  occupant of a housing accommodation; or

41  E.  Accept for listing any housing accommodation when the person having the right to
42  sell, rent or lease the housing accommodation has directly or indirectly indicated an
43  intention of discriminating among prospective tenants or purchasers on the ground of

1     race or color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,
2     religion, ancestry, national origin or familial status, or when the broker or salesperson
3     knows or has reason to know that the person having the right to sell, rent or lease the
4     housing accommodation has made a practice of discrimination since July 1, 1972;

5     **Sec. 10.  5 MRSA §4581-A, sub-§3,** as enacted by PL 2011, c. 613, §11 and
6     affected by §29, is amended to read:

7     **3.  Making of loans; other financial assistance.**  For any person to whom application
8     is made for a loan or other form of financial assistance for the acquisition, construction,
9     rehabilitation, repair or maintenance of any housing accommodation, whether secured or
10    unsecured, or agent of the person, to:

11     A.  Make or cause to be made any oral or written inquiry concerning the race or color,
12     sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion,
13     ancestry, national origin or familial status of any applicant for financial assistance or
14     of existing or prospective occupants or tenants of housing accommodations; or

15     B.  Discriminate in the granting of financial assistance, or in the terms, conditions or
16     privileges relating to obtaining or the use of any financial assistance, against any
17     applicant because of race or color, sex, sexual orientation <u>or gender identity</u>, physical
18     or mental disability, religion, ancestry, national origin or familial status; or

19     **Sec. 11.  5 MRSA §4583,** as amended by PL 2007, c. 243, §4, is further amended to
20    read:

21    **§4583.  Application**

22     Nothing in this Act may be construed to prohibit or limit the exercise of the privilege
23    of every person and the agent of any person having the right to sell, rent, lease or manage
24    a housing accommodation to set up and enforce specifications in the selling, renting,
25    leasing or letting or in the furnishings of facilities or services in connection with the
26    facilities that are consistent with business necessity and are not based on the race, color,
27    sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion, country of
28    ancestral origin or familial status of or the receipt of public assistance payments by any
29    prospective or actual purchaser, lessee, tenant or occupant.  Nothing in this Act may be
30    construed to prohibit or limit the exercise of the privilege of every person and the agent of
31    any person making loans for or offering financial assistance in the acquisition, construction,
32    rehabilitation, repair or maintenance of housing accommodations to set standards and
33    preferences, terms, conditions, limitations or specifications for the granting of loans or
34    financial assistance that are consistent with business necessity and are not based on the
35    race, color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion,
36    country of ancestral origin or familial status of or the receipt of public assistance payments
37    by the applicant for a loan or financial assistance or of any existing or prospective owner,
38    lessee, tenant or occupant of <u>a</u> housing accommodation.

39     **Sec. 12.  5 MRSA §4591,** as amended by PL 2005, c. 10, §16, is further amended to
40    read:

41    **§4591.  Equal access to public accommodations**

42     The opportunity for every individual to have equal access to places of public
43    accommodation without discrimination because of race, color, sex, sexual orientation <u>or</u>

1   gender identity, age, physical or mental disability, religion, ancestry or national origin is
2   recognized as and declared to be a civil right.

3   **Sec. 13.  5 MRSA §4592, sub-§1,** as amended by PL 2005, c. 10, §17, is further
4   amended to read:

5   **1.  Denial of public accommodations.**  For any public accommodation or any person
6   who is the owner, lessor, lessee, proprietor, operator, manager, superintendent, agent or
7   employee of any place of public accommodation to directly or indirectly refuse,
8   discriminate against or in any manner withhold from or deny the full and equal enjoyment
9   to any person, on account of race or color, sex, sexual orientation or gender identity, age,
10  physical or mental disability, religion, ancestry or national origin, any of the
11  accommodations, advantages, facilities, goods, services or privileges of public
12  accommodation, or in any manner discriminate against any person in the price, terms or
13  conditions upon which access to ~~accommodation~~ accommodations, advantages, facilities,
14  goods, services and privileges may depend.

15  For purposes of this subsection, unlawful discrimination also includes, but is not limited
16  to:

17  A.  The imposition or application of eligibility criteria that screen out or tend to screen
18  out an individual with a disability or any class of individuals with disabilities from fully
19  and equally enjoying any goods, services, facilities, privileges, advantages or
20  accommodations, unless the criteria can be shown to be necessary for the provision of
21  the goods, services, facilities, privileges, advantages or accommodations being offered;

22  B.  A failure to make reasonable modifications in policies, practices or procedures,
23  when modifications are necessary to afford the goods, services, facilities, privileges,
24  advantages or accommodations to individuals with disabilities, unless, in the case of a
25  private entity, the private entity can demonstrate that making the modifications would
26  fundamentally alter the nature of the goods, services, facilities, privileges, advantages
27  or accommodations;

28  C.  A failure to take steps that may be necessary to ensure that no individual with a
29  disability is excluded, denied services, segregated or otherwise treated differently than
30  other individuals because of the absence of auxiliary aids and services, unless, in the
31  case of a private entity, the private entity can demonstrate that taking those steps would
32  fundamentally alter the nature of the good, service, facility, privilege or
33  accommodation being offered or would result in an undue burden;

34  D.  A private entity's failure to remove architectural barriers and communication
35  barriers that are structural in nature in existing facilities and transportation barriers in
36  existing vehicles and rail passenger cars used by an establishment for transporting
37  individuals, not including barriers that can be removed only through the retrofitting of
38  vehicles or rail passenger cars by the installation of a hydraulic or other lift, where the
39  removal is readily achievable~~;~~.

40  When the entity can demonstrate that the removal of a barrier under this paragraph is
41  not readily achievable, a failure to make the goods, services, facilities, privileges,
42  advantages or accommodations available through alternative methods if alternative
43  methods are readily achievable; and

1      E.  A qualified individual with a disability, by reason of that disability, being excluded
2      from participation in or being denied the benefits of the services, programs or activities
3      of a public entity, or being subjected to discrimination by any such entity;

4      **Sec. 14.  5 MRSA §4592, sub-§2,** as amended by PL 2005, c. 10, §17, is further
5      amended to read:

6      **2.  Communication, notice or advertisement.**  For any person to directly or indirectly
7      publish, display or communicate any notice or advertisement to the effect that any of the
8      accommodations, advantages, facilities and privileges of any place of public
9      accommodation are refused, withheld from or denied to any person on account of race or
10     color, sex, sexual orientation <u>or gender identity,</u> age, physical or mental disability, religion,
11     ancestry or national origin, or that the patronage or custom of any person belonging to or
12     purporting to be of any particular race or color, sex, sexual orientation <u>or gender identity,</u>
13     <u>age,</u> physical or mental disability, religion, ancestry or national origin is unwelcome,
14     objectionable or not acceptable, desired or solicited, or that the clientele is restricted to any
15     particular race or color, <u>sex,</u> sexual orientation <u>or gender identity,</u> age, physical or mental
16     disability, religion, ancestry or national origin.  The production of any communication,
17     notice or advertisement purporting to relate to any place of accommodation is presumptive
18     evidence in any action that the action was authorized by its owner, manager or proprietor;

19     **Sec. 15.  5 MRSA §4592, sub-§6,** as amended by PL 2007, c. 664, §5, is further
20     amended to read:

21     **6.  Association.**  For a covered entity to exclude or otherwise deny equal goods,
22     services, facilities, privileges, advantages, accommodations or other opportunities to an
23     individual or entity because of the known ~~disability~~ <u>protected class status</u> of an individual
24     with whom the individual or entity is known to have a relationship or association;

25     **Sec. 16.  5 MRSA §4595,** as amended by PL 2005, c. 10, §18, is further amended to
26     read:

27     **§4595.  Right to freedom from discrimination solely on basis of age, race, color, sex,**
28          **sexual orientation <u>or gender identity</u>, marital status, ancestry, religion or**
29          **national origin in any credit transaction**

30     The opportunity for every individual to be extended credit without discrimination
31     solely because of any one or more of the following factors: age; race; color; sex; sexual
32     orientation <u>or gender identity</u>; marital status; ancestry; religion or national origin is
33     recognized as and declared to be a civil right.

34     **Sec. 17.  5 MRSA §4596,** as amended by PL 2005, c. 10, §19, is further amended to
35     read:

36     **§4596.  Unlawful credit extension discrimination**

37     It is unlawful credit discrimination for any creditor to refuse the extension of credit to
38     any person solely on the basis of any one or more of the following factors: age; race; color;
39     sex; sexual orientation <u>or gender identity</u>; marital status; ancestry; religion or national
40     origin in any credit transaction. It is not unlawful credit discrimination to comply with the
41     terms and conditions of any bona fide group credit life, accident and health insurance plan,
42     for a financial institution extending credit to a married person to require both the husband
43     and the wife to sign a note and a mortgage and to deny credit to persons under ~~the age of~~

1 | 18 years of age or to consider a person's age in determining the terms upon which credit
2 | will be extended.

3 | **Sec. 18.  5 MRSA §4601,** as amended by PL 2005, c. 10, §20, is further amended to
4 | read:

5 | **§4601.  Right to freedom from discrimination in education**

6 | The opportunity for an individual at an educational institution to participate in all
7 | educational, counseling and vocational guidance programs ~~and~~, all apprenticeship and on-
8 | the-job training programs and all extracurricular activities without discrimination because
9 | of sex, sexual orientation or gender identity, a physical or mental disability, ancestry,
10 | national origin ~~or~~, race, color or religion is recognized and declared to be a civil right.

11 | **Sec. 19.  5 MRSA §4602,** as amended by PL 2005, c. 662, Pt. A, §1, is further
12 | amended to read:

13 | **§4602.  Unlawful educational discrimination**

14 | **1.  Unlawful educational discrimination ~~on the basis of sex.~~**  It is unlawful
15 | educational discrimination in violation of this Act, on the basis of sex, sexual orientation
16 | or gender identity, physical or mental disability, ancestry, national origin, race, color or
17 | religion, to:

18 | A.  Exclude a person from participation in, deny a person the benefits of, or subject a
19 | person to, discrimination in any academic, extracurricular, research, occupational
20 | training or other program or activity;

21 | B.  Deny a person equal opportunity in athletic programs;

22 | C.  Apply any rule concerning the actual or potential ~~family~~ familial status or marital
23 | status of a person or to exclude any person from any program or activity because of
24 | pregnancy or related conditions or because of sex or sexual orientation or gender
25 | identity;

26 | D.  Deny a person admission to the institution or program or to fail to provide equal
27 | access to and information about an institution or program through recruitment; or

28 | E.  Deny a person financial assistance availability and opportunity.

29 | **~~2.  Unlawful educational discrimination on the basis of physical or mental~~**
30 | **~~disability.~~**  ~~It is unlawful educational discrimination in violation of this Act solely on the~~
31 | ~~basis of physical or mental disability to:~~

32 | ~~A.  Exclude from participation in, deny the benefits of or subject to discrimination~~
33 | ~~under any educational program or activity any otherwise qualified individual with~~
34 | ~~physical or mental disability;~~

35 | ~~B.  Deny any person equal opportunity in athletic programs, provided that no~~
36 | ~~educational institution may be required under this subsection to provide separate~~
37 | ~~athletic programs to serve persons with physical or mental disability;~~

38 | ~~C.  Deny admission to any institution or program or fail to provide equal access to and~~
39 | ~~information about an institution or program through recruitment; or~~

40 | ~~D.  Deny financial assistance availability and opportunity.~~

1   ~~Nothing in this subsection may be construed to cover the rights of children with disabilities~~
2   ~~to special education programs under state or federal law.~~

3   **~~3. Unlawful educational discrimination on the basis of national origin or race.~~** ~~It~~
4   ~~is unlawful educational discrimination in violation of this Act, on the basis of national~~
5   ~~origin or race, to:~~

6   ~~A. Exclude a person from participation in, deny a person the benefits of, or subject a~~
7   ~~person to, discrimination in any academic, extracurricular, research, occupational~~
8   ~~training or other program or activity;~~

9   ~~B. Deny admission to the institution or program or to fail to provide equal access to~~
10  ~~and information about an institution or program through recruitment; or~~

11  ~~C. Deny financial assistance availability and opportunity.~~

12  **~~4. Unlawful education discrimination on the basis of sexual orientation.~~** ~~It is~~
13  ~~unlawful education discrimination in violation of this Act, on the basis of sexual~~
14  ~~orientation, to:~~

15  ~~A. Exclude a person from participation in, deny a person the benefits of or subject a~~
16  ~~person to discrimination in any academic, extracurricular, research, occupational~~
17  ~~training or other program or activity;~~

18  ~~B. Deny a person equal opportunity in athletic programs;~~

19  ~~C. Apply any rule concerning the actual or potential family or marital status of a person~~
20  ~~or to exclude any person from any program or activity because of their sexual~~
21  ~~orientation;~~

22  ~~D. Deny admission to the institution or program or to fail to provide equal access to~~
23  ~~any information about an institution or program through recruitment; or~~

24  ~~E. Deny financial assistance availability and opportunity.~~

25  ~~The provisions in this subsection relating to sexual orientation do not apply to any~~
26  ~~education facility owned, controlled or operated by a bona fide religious corporation,~~
27  ~~association or society.~~

28  **5. Application.** Nothing in this section:

29  A.   Requires an educational institution to provide separate athletic or other
30  extracurricular programs to serve a person with a physical or mental disability;

31  B. May be construed to affect the rights of a person with a physical or mental disability
32  to special education programs under state or federal law;

33  C. Requires a religious corporation, association or society that does not receive public
34  funding to comply with this section as it relates to sexual orientation or gender identity;
35  or

36  D. Requires an educational institution to participate in or endorse any religious beliefs
37  or practices; to the extent that an educational institution permits religious expression,
38  it cannot discriminate between religions in so doing.

39  **Sec. 20. 5 MRSA §4612, sub-§2-A,** as enacted by PL 2019, c. 465, §6, is amended
40  by amending the first blocked paragraph to read:

An administrative dismissal operates as an order of dismissal and has the same effect as a finding by the commission that no reasonable grounds exist to believe that unlawful discrimination has occurred, except that an administrative dismissal pursuant to paragraph C does not entitle the complainant to an award of attorney's fees, civil penal damages or compensatory and punitive damages.

**Sec. 21. 5 MRSA §4622, sub-§1, ¶A,** as amended by PL 2019, c. 465, §8, is further amended to read:

A.  Dismissed the case under section 4612, subsection 2 or subsection 2-A, paragraphs A and B and D to F;

**Sec. 22.  5 MRSA §4634,** as enacted by PL 2001, c. 206, §1, is amended to read:

**§4634.  Right to breast-feed**

Notwithstanding any other provision of law to the contrary, a mother person may breast-feed her that person's baby in any location, public or private, where the mother person is otherwise authorized to be.

# SUMMARY

This bill addresses inconsistencies in the protections provided in different areas of jurisdiction under the Maine Human Rights Act.  The bill provides more inclusive protection by:

1. Including adult family members dependent for care in the definition of "familial status";

2. Including familial status as a protected class in employment;

3. Including age as a protected class in public accommodations; and

4. Clarifying the scope of the Maine Human Rights Act application in education.

The bill also clarifies that the sexual orientation provisions in the Maine Human Rights Act extend to gender identity.

EXHIBIT 3

# Maine Human Rights Commission



# 51 State House Station, Augusta, ME 04333-0051

*Physical location: 19 Union Street, Augusta, ME 04330*
Phone (207) 624-6290 ▪ Fax (207) 624-8729 ▪ TTY: Maine Relay 711
*www.maine.gov/mhrc*

**Amy M. Sneirson**
EXECUTIVE DIRECTOR

**Barbara Archer Hirsch**
COMMISSION COUNSEL

May 14, 2021

The Honorable Anne Carney, Senate Chair
The Honorable Thom Harnett, House Chair
Joint Standing Committee on Judiciary
100 State House Station
Augusta, ME 04333

*Re:  An Act to Improve Consistency within the Maine Human Rights Act  – LD 1688*

Dear Senator Carney, Representative Harnett, and Members of the Joint Standing Committee on Judiciary:

The Maine Human Rights Commission ("Commission") - the quasi-independent, neutral, apolitical State agency[1] charged with enforcing the Maine Human Rights Act, 5 M.R.S. §§ 4551, *et seq.* ("MHRA" or the "Act") - has the duty of: investigating, conciliating, and at times litigating discrimination cases under the MHRA; promulgating rules and regulations to effectuate the MHRA; and making recommendations for further legislation or executive action concerning infringements on human rights in Maine.  5 M.R.S. § 4566(7), (11).

The MHRA has a long and distinguished history, influenced by time and public acceptance of certain protected groups, but its provisions have been amended in a piecemeal fashion.  As a result, the scope of the MHRA's protection varies based on which area of its jurisdiction is invoked:

| Area of Jurisd. | Protected Classes |
|---|---|
| Employment | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, age, and religion, as well as retaliation for engaging in activity protected by the Maine Whistleblowers' Protection Act ("WPA") and for having made a workers' compensation claim against a previous employer. |
| Housing | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, religion, familial status, and receipt of public assistance. |
| Public accommodation | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, and religion. |
| Education | sex, sexual orientation, race, national origin, and physical or mental disability. |
| Extension of Credit | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, religion, age, and marital status. |

While there are some entirely appropriate reasons for these internal inconsistencies,[2] often there is not a logical rationale for them. LD 1703 attempts to update the balance of the MHRA's protections across areas of application so the Act is internally consistent, and more understandable and user-friendly for the public. To that end, the Commission is pleased to provide this testimony in support of LD 1703.

---

[1] The Commission itself is made up of five Commissioners, appointed by the Governor for staggered five-year terms.  By statute, there can be no more than three Commissioners from any political party.  5 M.R.S. § 4561.

[2] For example, the WPA applies only in employment. Even so, tenants often file Commission complaints alleging whistleblower retaliation for reporting unsafe or unlawful housing conditions, which is not covered in housing.

## Section 1

This section, the overall statement of the MHRA's "Policy", would be amended to reflect changes to coverage that are discussed below. Those changes include adding "familial status" protection in employment, updating education protections to include routine protected classes, and adding age to the protected classes covered in public accommodations.[3]  We will discuss each in detail below.

Another amendment within this Policy statement makes clear that the Act prohibits discrimination on the basis of both protected class status and perceived protected class status, meaning a person can file a complaint if they are subjected to discrimination because they are in the protected class or because they were perceived to be in the protected class.

➢ Currently, the MHRA explicitly protects against discrimination based on perceived disability: the definition of "physical or mental disability" includes "being regarded as having or likely to develop" a disability.  5 M.R.S. § 4553-A(1)(D).  "Perceived disability" claims are common at the Commission, especially in the employment context: for example, employees who are injured at work are often regarded as disabled even if their injury resolves within six months and they have no remaining restrictions.

➢ While these are the most common perception claims, they are not the only such claims filed with the Commission, and the Commission has interpreted the MHRA to include other perception-based claim. For example, the Commission has seen a number of claims from individuals alleging they were discriminated against based on their perceived sexual orientation.  In these cases, individuals who do not conform to gender stereotypes allege that they are perceived as gay and are harassed or otherwise discriminated against as a result.  In one such case, a student was bullied and harassed because his classmates perceived him to be gay; the harassment began as mocking his "man-boobs", making sexual comments, and repeatedly conducting a "gay test" by seeing how long it took him to react to being touched, and eventually escalated to alleged sexual assault.[4]

➢ The Commission believes it is important to make clear in the statute itself that discrimination on the basis of perceived protected class status is unlawful: otherwise, an individual engaged in blatant discriminatory conduct would be excused if they happened to target someone in error.

## Sections 2, 4 and 5

The MHRA already bars discrimination in housing based on "familial status", which currently is defined as a familial unit containing one or more individuals under the age of 18 and which prohibits housing providers from denying housing to families with minor children.  LD 1688 would make two changes to

---

[3] The Policy section also reflects amendments made to the MHRA in 2019 to add a distinct MHRA definition for "gender identity" separate from the definition of "sexual orientation".  Gender identity already is protected under the MHRA, but is included in the definition of sexual orientation; this is confusing for two distinct reasons. First, gender identity is not a type of sexual orientation, and should not be defined as such.  Second, because the text of the nondiscrimination provisions of the Act (as opposed to the definition section) refers only to sexual orientation, members of the public frequently do not comprehend that gender identity is protected under the MHRA.  This word change will make it easier for people to understand what the Act covers and prohibit. The Policy proposal here simply carries that definition forward by changing references to sexual orientation to "sexual orientation or gender identity".  This update is applied in many sections of the Bill, including 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, and 16 - 19.

[4] The student's mother (for herself and the student) and the Commission filed suit against the school unit, alleging a hostile educational environment based on sex and perceived sexual orientation.  The case eventually resolved.  *See Doe et al. v. Brunswick School Department*, Docket No. 15-CV-00257-DBH, U.S. District Court for the District of Maine.

familial-status coverage: (a) expand the definition of familial status to include caring for a dependent adult; and (b) make familial status discrimination unlawful in the employment context as well as housing.

➢ *Section 2 would amend the definition of "familial status" to include care for a dependent adult*:
  o The proposed change would include in the definition of familial status a familial unit containing "[o]ne or more individuals who lack the ability to meet essential requirements for physical health, safety or self-care because the individual or individuals are unable to receive and evaluate information or make or communicate decisions".
  o This definition was drawn from the definitions section of the Adult Protective Services Act, and uses language which became effective 7/1/19.  *See* 22 M.R.S. § 3472(10) ("Incapacitated adult").
  o This change is intended to reflect the reality of today's families, which often include not only minor children, but elderly or incapacitated adults who require assistance from family members.  This is particularly true in Maine, with the oldest population in the country.
  o A person's need to care for dependent family members should not be used as a reason to deny them access to housing or employment, whether that care is required for a child or incapacitated adult.

➢ *Sections 4 and 5 would add "familial status" to the protected classes in employment*:
  o This change would prohibit employers from discriminating based on an employee's need to care for dependent family members, whether those are children or adults. This is not intended to create a new type of leave for workers[5], but rather is intended to stop employers from making stereotypical assumptions about employees with family care obligations.
  o An employer would not be required to excuse an employee from their work responsibilities; if an employee is unable to perform their work because of family responsibilities, they would still be subject to the employer's usual disciplinary process.  The employer would not, however, be able to (for example) refuse to hire an applicant who lives with their disabled sibling based on the assumption that the applicant would need time off from work to care for their family member.
  o Again, this change is intended to reflect the reality of today's families, where employees are often responsible for minor children and incapacitated or elderly adults.

➢ The Commission notes that these changes are not a substantial change to the scope of the MHRA, but rather a change in terminology and an effort to make the Act clearer.
  o Whether in employment or housing, the sort of discrimination covered under "familial status" might also be alleged as discrimination based on association with an individual with a disability.  The Commission purposely chose the definition of "incapacitated adult" rather than "dependent adult" in an effort to balance the rights of caretakers and families against the rights of employers and housing providers.  *Compare* 22 M.R.S. § 3472(10) *with* § 3472(6).
  o As for employment discrimination on the basis of having minor children, many potential claims could already be covered based on sex (disparate impact claims: claims that neutral policies have the effect of discriminating on the basis of protected class) or age (association with minor child).

## Section 6

In 2019, the MHRA was updated in several places, both via agency bills that the Commission introduced and via other proposals.  One of the changes made in a Commission agency bill was the removal of

---

[5] With the federal Family and Medical Leave Act and its Maine counterpart already protecting employees who need time away from work to care for a newborn child or a sick family member, and this Legislature's action in 2019 requiring employers to provide earned paid leave, it would be understandable (but incorrect) for employers to warily view the proposal in LD 1688 as another attempt to build employee leave requirements.

5 M.R.S. § 4573-A(1-B), which had provided that employers did not have to employ individuals with disabilities who could not travel to and from and/or remain at the workplace.[6]  The Commission initiated this amendment related to clarify a ruling by the Maine Supreme Judicial Court, sitting as the Law Court, that the statutory section in question meant that a leave of absence was not a potential reasonable accommodation for individuals with disabilities.  *See Carnicella v. Mercy Hospital,* 2017 ME 161.  The *Carnicella* decision, which arose in a case where an employee sought indefinite leave from employment, was inconsistent with the MHRA's protections, the Commission's longstanding interpretation of the MHRA that temporary or finite leave *could* be a reasonable accommodation, and the ADA.  At the Commission's behest, the Legislature removed 5 M.R.S. § 4573-A(1-B) from the MHRA.

Unfortunately, the removal of § 4573-A(1-B) in its entirety had the unintended consequence of casting doubt on the continued existence of the employer's so-called "safety defense" that arose from the removed section.  The removed language had been interpreted to permit employers not to hire/retain disabled individuals if the employer proved that the individual caused a risk to the health and safety of themselves or others.  Because of this uncertainty, the Commission has proposed reinserting language spelling out the contours of the safety defense in the statute.  This will promote clarity and consistency of interpretation of the MHRA.

### Sections 12-14

Places of public accommodation are privately- or  publicly-owned places, privileges or services that are offered or open to the public. The MHRA currently does not prohibit discrimination on the basis of age in places of public accommodation, and there is no logical rationale for excluding people based on age from Maine's publicly-offered spaces, privileges, and services. The Commission believes that it is important to add this coverage, both to make the MHRA more consistently applicable throughout the State and to address an issue that is important to Maine's aging population. In 2019, 21.9% of Mainers were age 65 or older, and Maine had the largest share of population in that age group in the country. *See* https://www.census.gov/newsroom/press-releases/2020/65-older-population-grows.html. Maine continues to have the highest median age (44.7 years old) in the country.  *See* https://worldpopulationreview.com/en/state-rankings/median-age-by-state.

### Section 15

Another 2019 update to the MHRA confirmed the Commission's longstanding interpretation that the MHRA bars discrimination because of a person's association with another person who is in a protected class by amending the 5 M.R.S. § 4553(1-D) definition of an "aggrieved person" who could bring a MHRA claim, and the proposal in Section 15 would update references in the Act's public accommodation section to reflect that.

---

[6] Under the framework of disability employment laws, a person with a disability is allowed to request that their employer change how a policy is applied if necessary because of the employee's disability, which leads to an interactive dialogue between employer and employee about the request, its reasonableness, and its relationship to the employee's disability. The Commission always has interpreted the MHRA to acknowledged that a *temporary* leave of absence can be a reasonable accommodation that allows an employee with a disability to address a disability issue and then to return to work. This is consistent not only with the purpose of the MHRA, but with other state law (such as the Maine Family Medical Leave Act) and federal employment laws like the federal Family and Medical Leave Act and the Americans with Disabilities Act ("ADA"). Whether *open-ended* leave can be a reasonable accommodation is another question altogether, and the Commission, again consistent with state and federal law. has repeatedly held that indefinite leave is not a reasonable accommodation.

This aligns with the Commission's longstanding interpretation of the MHRA coverage as including associational claims, an interpretation upheld by courts reviewing MHRA actions.[7] There are circumstances when a person who is not themselves in a protected class is targeted for discrimination in a place of public accommodation because they are associated with someone who is in a protected class. Some examples could include a person who is denied service at a restaurant because someone else in their party has a service animal, or a family which was turned away from staying at a hotel because the mother wore a hijab. The discrimination still occurs **because of** the protected class, so the 2019 amendment to the "aggrieved person" definition and the proposed amendment to the MHRA in Section 15 allow the associated person who also was impacted by the discrimination to bring a claim related to it.

The proposal in this section would simply make clear to all reading the Act that the Commission's interpretation applies in places of public accommodation.

### Section 19

The MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act.  The Act's education provisions currently prohibit discrimination on the basis of race (but not color), national origin (but not ancestry), sex and sexual orientation, and physical or mental disability.  This is confusing for at least two reasons.

First, there is no reason to cover race and national origin, but not color and ancestry.  These most likely were simply drafting oversights due to the piecemeal amendment process mentioned above.

Second, most Maine educational institutions are also covered as places of public accommodation[8], as the MHRA specifically includes a "nursery, elementary, secondary, undergraduate or postgraduate school or other place of education" and an "establishment of the State" in its "public accommodation" definition. As public accommodations schools also are prohibited from discriminating on the basis of color, ancestry and religion.[9]  Because those prohibitions are not currently made explicit in the education provisions of the Act, however,  students, parents, and schools may not know of this coverage.

This proposed change would make the Act clearer and more consistent.

### Sections 20-21

In 2019, the Legislature added a new subsection to 5 M.R.S. § 4612 which spelled out the Executive Director's previously implicit (although found in the Commission's rules) authority to administratively dismiss certain claims without the need for investigations, such as cases falling outside the Commission's limited jurisdiction, or cases in which the complaining party refuses to cooperate with the Commission's process.  One

---

[7] For example, in May 2017, the Commission prevailed in litigation establishing that both a Caucasian woman and an African American man were discriminated against based on race when they were denied the opportunity to rent housing once the housing provider learned of the man's race by observing and speaking with their biracial children. *Maine Human Rights Commission et al. v. Megunticook Management and Realty Corp.*, KEN-CV-15-135 (Me. Super. Ct. Ken. Cty., May 15, 2017)(*Murphy, J*).

[8] Schools are also covered as employers, but this aspect appears to the Commission to be fully understood both by schools and by their employees.

[9] The MHRA specifically excludes from its definition of "educational institution" single-sex schools. See 5 M.R.S. § 4553(2-A). It also provides that the sexual orientation protections in education do not apply to education facilities owned, controlled or operated by a bona fide religious corporation, association or society. Id. at § 4602(4).

such reason for administrative dismissal is failure to file a claim within the Commission's 300-day statute of limitations. *See* 5 M.R.S. § 4612(2-A)(C). We have since learned that this change created some confusion with regard to the award of attorneys' fees and costs in subsequent court cases. The Act provides that attorneys' fees are available only if the plaintiff establishes that they had previously filed a complaint with the Commission, which had taken on of several specific enumerated actions on their complaint; the changes to the Act in 2019 added administrative dismissal to that list of actions. *See id.* at § 4622(1)(A). The Commission did not intend to amend the act to allow the award of attorneys' fees to individuals who had failed to timely file their Commission complaint. This result would leave complaining parties with no incentive to file a timely complaint with the Commission, since the failure to do so would have no consequence in court. It would also undermine the Commission's function of screening and evaluating cases before litigation is initiated, which is intended to easy the burden on Maine's courts. This revision addresses any misunderstanding about the impact of an administrative dismissal for failure to timely file with the Commission.

## Section 22

A 2019 amendment of the MHRA revised wording about pregnancy to be gender-neutral, so that the reference is to a pregnant person rather than to a pregnant woman. This change was made in recognition of the fact that individuals whose gender is male or nonbinary can be pregnant. The proposal in Section 22 related to the right of a person to breast-feed wherever they may lawfully be reflects that wording update.

## Conclusion

Thank you for this opportunity to provide testimony in support of LD 1688. The Commission takes seriously its duty to protect the people of Maine from discrimination, and its duty to safeguard the MHRA itself, and approaches these substantive amendments after much consideration. We greatly appreciate the Committee's attention at this late date in the session, and would be pleased to discuss these issues with you at your convenience, including at the work session on this matter.

Sincerely,

Amy M. Sneirson, Executive Director

Barbara Archer Hirsch, Commission Counsel

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| ST. DOMINIC ACADEMY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-cv-00246-JAW |
| | ) | |
| A. PENDER MAKIN, in her official | ) | |
| capacity as Commissioner of the | ) | |
| Maine Department of Education, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF MEGAN WELTER

I, Megan Welter, being duly sworn, do depose and state as follows:

1. I am the Associate Commissioner of Public Education for the Maine Department of Education. I have held this position since July 1, 2022. Prior to becoming an Associate Commissioner, I was the Department's Director of Policy and Governmental Affairs.

2. I make this affidavit based on my personal knowledge and my review of information in the possession of the Department of Education.

3. One of my official duties is to oversee the approval of private schools for the receipt of public funds for tuition purposes.

4. From the date that the Supreme Court issued its decision in *Carson v. Makin*, the Department has understood that it may not prevent private schools from receiving approval for the receipt of public funds for tuition purposes solely because they are sectarian.

5. On July 28, 2022, Cheverus High School, a sectarian high school in Portland, Maine, applied for approval for the receipt of public funds for tuition purposes.

6. The Department processed Cheverus' application in the same manner that it processed

1

JA92

applications for any private school seeking approval for tuition purposes for the first time.

7. Cheverus' application was approved on September 16, 2022.

8. During the 2022-23 school year, five students attended Cheverus at public expense with their tuition paid by a school administrative unit or Education in the Unorganized Territory.

9. In the 2022-2023 school year, no other sectarian school applied for approval for the receipt of public funds for tuition purposes.

10. On September 23, 2022 Marianne Pelletier, the Superintendent of Maine Catholic Schools, contacted the Department to inquire about St. Dominic Academy applying for approval for the receipt of public funds for tuition purposes. A representative of the Department informed Superintendent Pelletier that the deadline for approval for the 2022-23 school year had passed, but that the school was welcome to apply for approval for tuition purposes for the 2023-24 school year.

11. The Department treated Superintendent Pelletier's inquiry in the same manner that it treated any private school that sought approval after the August 31, 2022 deadline. While the Department continued to work with private schools that had applied prior to the deadline to assist them in securing approval, no new applications were accepted after August 31, 2022.

12. St. Dominic Academy has not applied for approval for the receipt of public funds for tuition purposes for the 2023-24 school year.

I declare under penalty of perjury that the foregoing statements are true and correct.

2

JA93

Executed on June 28, 2023

/s/ Megan Welter
 Megan Welter

## **CERTIFICATE OF SERVICE**

I hereby certify that on this, the 11th day of July, 2023, I electronically filed the above

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to all counsel of record.  To my knowledge, there are no non-registered parties or attorneys

participating in this case.

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145
Christopher.C.Taub@maine.gov

3

JA94

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ST. DOMINIC ACADEMY, a d/b/a of the ROMAN CATHOLIC BISHOP OF PORT-LAND, a corporation sole; ROMAN CATH-OLIC BISHOP OF PORTLAND, a corpora-tion sole; and KEITH and VALORI RA-DONIS, on their own behalf and as next friends of their children K.Q.R., L.R.R., and L.T.R., | No. 2:23-cv-00246-JAW |
| *Plaintiffs*, | **DECLARATION OF MARIANNE PELLETIER** |
| v. | |
| A. PENDER MAKIN, in her personal capac-ity and in her official capacity as Commis-sioner of the Maine Department of Education, and JEFFERSON ASHBY, EDWARD DA-VID, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS, in their personal capacities and in their official capacities as Commissioners of the Maine Human Rights Commission, | |
| *Defendants*. | |

1

JA95

I, Marianne Pelletier, am a U.S. citizen over eighteen years of age and I make the following declaration under 28 U.S.C. § 1742(2):

1. I am the Superintendent of Schools for the Roman Catholic Diocese of Portland in the state of Maine. I have held this position since June 10, 2019.

2. I am responsible for overseeing all of the schools operated by the Diocese. I oversee Diocesan schools' policies regarding admission, hiring, curriculum, and student conduct.

3. St. Dominic Academy is the only high school operated by the Diocese in the state of Maine.

4. Cheverus High School has been owned and operated by the Society of Jesus (Jesuits) since the 1940s.

5. As a Jesuit school, Cheverus establishes its own policies regarding admission, hiring, curriculum, and student conduct.

6. Although Cheverus is operationally independent of the Diocese, for informational purposes and as a resource for parents, the Diocese lists Cheverus on its online "Find a School" directory.

7. As part of my official duties, I sign the State of Maine Department of Education annual private school approval form for each of the schools operated by the Diocese.

8. On information and belief, Cheverus files an annual private school approval form with the State of Maine as well.

9. I have never filed a Department of Education annual private school approval form on behalf of Cheverus.

10. In September 2022, I learned that Cheverus had been approved for tuition purposes.

11. On September 23, 2022, I called the Maine Department of Education to request information about the requirements for participating in the town tuitioning program.

12. I was told by a Maine Department of Education employee that the deadline for applying to participate for the 2022-23 school year had passed.

2

JA96

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 18, 2023.

/s/ Marianne Pelletier

JA97