No. 24-1739

# In the United States Court of Appeals for the First Circuit

St. Dominic Academy, d/b/a Roman Catholic Bishop of Portland, a corporation sole; Roman Catholic Bishop of Portland; Keith Radonis, on their own behalf and as next friend of children K.Q.R., L.R.R., and L.T.R.; Valori Radonis, on their own behalf and as next friend of children K.Q.R., L.R.R., and L.T.R.,

*Plaintiffs-Appellants,*

v.

A. Pender Makin, in their personal capacity and official capacity as the Commissioner of the Maine Department of Education; Jefferson Ashby, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission; Edward David, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission; Julie Ann O'Brien, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission; Mark Walker, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission; Thomas L. Douglas, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission,

*Defendants-Appellees.*

## CORRECTED AMICUS CURIAE BRIEF OF THE HERZOG FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLANTS AND FOR REVERSAL

On Appeal from the United States District Court for the District of Maine (No. 2:23-cv-00246-JAW)

Edward M. Wenger
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
*emwenger@holtzmanvogel.com*

Jonathan P. Lienhard
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808 (phone)
*jlienhard@holtzmanvogel.com*

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

The undersigned certifies, under Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), that Amicus Curiae the Herzog Foundation is a not-for-profit corporation, does not have a corporate parent, does not issue stock, and no publicly held corporation owns 10 percent or more of it.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................... i

TABLE OF AUTHORITIES ................................................. iii

STATEMENT OF IDENTITY & INTEREST OF AMICUS CURIAE ................... 1

INTRODUCTION & SUMMARY OF THE ARGUMENT .................................. 3

    I.     PUBLIC FUNDING OF PRIVATE RELIGIOUS EDUCATION OCCURRED THROUGHOUT AMERICAN HISTORY. ..................................... 5

        A.    Public funding of religious charity schools predates the Founding. ............................................................ 6

        B.    Publicly funding religious schools continued after the Founding Era. ............................................. 8

        C.    Reconstruction relied on public funding of religious education to support equality................................. 11

        D.    The rise of the modern public-school system did not end public funding of religious schools.................................. 13

    II.    PRIVATE RELIGIOUS SCHOOLS PRODUCE BETTER OUTCOMES FOR LOWER COSTS. ....................................................... 15

        A.    Private-religious schools have outpaced their secular counterparts in the classroom................................... 15

        B.    Private-religious schools cultivate citizenship......................... 18

        C.    Private-religious schools cost less per student than the alternatives. ...................................................... 21

CONCLUSION.......................................................... 25

CERTIFICATE OF COMPLIANCE................................... 27

CERTIFICATE OF SERVICE ........................................ 28

# TABLE OF AUTHORITIES

<u>Cases</u>

*Abington School District v. Schempp,*
374 U.S. 203 (1963) .........................................................................14

*Carson v. Makin,*
596 U.S. 767 (2022) ......................................................................3, 5

*Engel v. Vitale,*
370 U.S. 421 (1962) .........................................................................14

*Espinoza v. Mont. Department of Revenue,*
591 U.S. 464 (2020) ........................................................ 5, 6, 10, 14

*Perrier-Bilbo v. United States,*
954 F.3d 413 (1st Cir. 2020) .............................................................6

*Stuart v. School District No. 1,*
30 Mich. 69 (1874) ...........................................................................13

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
582 U.S. 449 (2017) ............................................................... 5, 6, 14

*Troxel v. Granville,*
530 U.S. 57 (2000) .............................................................................2

<u>Statutes</u>

Act of July 16, 1866, § 13 .....................................................................12

<u>Rules</u>

Federal Rule of Appellate Procedure 26.1 ........................................... i

Federal Rule of Appellate Procedure 26.129(a)(4)(A) .......................... i

Federal Rule of Appellate Procedure 29(a)(2) ....................................1

Federal Rule of Appellate Procedure 32(f) ........................................27

First Circuit Rule 29(a)(5) ..................................................................27

First Circuit Rule 32(a)(5) ..................................................................27

First Circuit Rule 32(f) ........................................................................27

<u>Constitutional Provisions</u>

U.S. CONST. amend. I............................................................... 4, 5, 8

U.S. CONST. amend. XIV ....................................................................12

## Other Authorities

Alexis de Tocqueville, DEMOCRACY IN AMERICA
(Harvey C. Mansfield & Delba Winthrop eds., 2002) ..........................................9

*Best Maine Religiously Affiliated Private Schools*, PRIVATESCHOOLREVIEW.COM,
https://www.privateschoolreview.com/maine/religio
usly-affiliated-
schools#:~:text=Best%20Maine%20Religiously%20Affiliated%20P
rivate%20Schools%20(2024%2D25)&text=The%20average%20
tuition%20cost%20is,average%20tuition%
20cost%20of%20%2422%2C463. .......................................................................24

*CPI Inflation Calculator*, BUREAU OF LABOR STATISTICS, https://data.
bls.gov/cgi-bin/cpicalc.pl?cost1=1000000&year1=191301&year2=202409 ......10

James E. Pustejovsky, *Meta-analysis with Robust Variance Estimation: Expanding
the Range of Working Models*, NAT'L LIB. OF MED. (May 7, 2021),
https://pubmed.ncbi.nlm.nih.gov/33961175/. ....................................................19

JAMES MADISON, MEMORIAL AND REMONSTRANCE AGAINST RELIGIOUS
ASSESSMENTS (1785), *reprinted in* THE WRITINGS OF JAMES MADISON 1783-1787
(Gaillard Hunt ed., 1901).....................................................................................3

Kurtis Karg, *As Chicago Public Schools Spending Per Student Continues to Rise,
Test Scores and Proficiency Levels Among Students Continue to Drop*, ILLINOIS
POLICY INSTITUTE (July 12, 2024), https://www.illinoispolicy.org/chicagos-
education-formula-is-to-spend-more-see-students-do-worse/. ...........................22

LAWRENCE A. CREMIN, AMERICAN EDUCATION:
THE NATIONAL EXPERIENCE, 1783-1876 (1980)...................................................9

Lawrence O. Picus, *Does Money Matter in Education? A Policymaker's Guide*,
NATIONAL CENTER FOR EDUCUATION STATISTICS,
https://nces.ed.gov/pubs97/web
/97536-2.asp. ......................................................................................................23

M. Danish Shakeel et al., *The Public Purposes of Private Education: A Civic
Outcomes Meta-Analysis*, 36 EDUC. PSYCHOL. REV. 40 (2024)........ 18, 19, 20, 21

Marjorie H. Parker, *Some Educational Activities of the Freedmen's
Bureau*, 23 J. NEGRO EDUC. 9 (1954) ................................................................12

Melanie Hanson, *Average Cost of Private School*, EDUCATIONDATA.ORG
(Aug. 29, 2024), https://educationdata.org/average-cost-of-
private-school ...................................................................................... 21, 23, 24

Melanie Hanson, *U.S. Public Education Spending Statistics*, EDUCATIONDATA.ORG (July 14, 2024), https://educationdata.org/public-education-spending-statistics .............. 21, 22, 23

MICHAEL W. MCCONNELL ET AL., RELIGION AND THE CONSTITUTION (4th ed. 2016)...................................................... 8, 11, 12

Roman Catholic Diocese of Portland, *Catholic Schools*, https://portlanddiocese.org/catholic-schools. ....................................................24

*Schools and Education During Reconstruction*, PBS: AM. EXPERIENCE, https://www.pbs.org/wgbh/americanexperience/features/reconstructio n-schools-and-education-during-reconstruction/..................................................13

*The History of Christian Schools*, NOAH WEBSTER EDUC. FOUND. (May 5, 2022), https://nwef.org/2022/05/23/the-history-of-christian-schools/. ...........................6

William H. Jeynes, *A Meta-Analysis on the Effects and Contributions of Public, Public Charter, and Religious Schools on Student Outcomes*, 87 PEABODY J. EDUC. 305 (2012)...................................................... 15, 16, 17, 18

WILLIAM H. JEYNES, AMERICAN EDUCATIONAL HISTORY: SCHOOL, SOCIETY, AND THE COMMON GOOD (2007) ......................................... 6, 7, 8, 9, 10, 11

WILLIAM H. JEYNES, SCHOOL CHOICE: A BALANCED APPROACH (2014) ....................................................... 7, 10, 11, 13, 14

# STATEMENT OF IDENTITY
# & INTEREST OF AMICUS CURIAE[1]

The Stanley M. Herzog Charitable Foundation is a non-profit, non-partisan organization headquartered in Smithville, Missouri that is dedicated to supporting the advancement and acceleration of nondenominational Christian education. Specifically, the Foundation aims to promote Christ-centered education that teaches and instills foundational Biblical values of commitment to God, family, and community in students so that families and culture flourish. It works to increase the availability of quality Christian education with a focus on K-12 schools, while also assisting with continuing education in colleges and trade schools. The Herzog Foundation partners with government decisionmakers and leaders in Christian education to identify areas of growth and gaps in the Christian education space to catalyze effective and scalable programs across the nation, and to help communicate and further the interests of Christian educators, parents, and students.

The Herzog Foundation has an interest in helping to protect the constitutional liberties of parents and students to attend the schools of their choice without government coercion, and the rights of religious schools to teach religious

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(2), counsel for both the Appellant and the Appellees have provided consent for Amicus Curiae to submit this brief for the Court's consideration. No party's counsel authored this brief in whole or in part, and no one besides Amicus Curiae contributed money to fund the brief's preparation or submission.

curriculum without discrimination. The Foundation thus offers this brief to outline America's time-honored history of public support for private-religious education. Also included is research demonstrating the superior performance of students attending private-religious schools compared to their secular counterparts, further demonstrating why this Court should affirm parents' fundamental right "to direct the upbringing of their children." *Troxel v. Granville*, 530 U.S. 57 (2000), by sending them to religious schools.

## INTRODUCTION &
## SUMMARY OF THE ARGUMENT

Years before the Constitutional Convention, James Madison wrote that matters of faith "must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate." JAMES MADISON, MEMORIAL AND REMONSTRANCE AGAINST RELIGIOUS ASSESSMENTS (1785), *reprinted in* THE WRITINGS OF JAMES MADISON 1783-1787, at 184 (Gaillard Hunt ed., 1901). "This right," by its nature, is "an unalienable right[,] . . . because the opinions of men, depending only on the evidence contemplated by their own minds, cannot follow the dictates of other men." *Id.* "It is unalienable also[,] because what is here a right towards men, is a duty towards the Creator," which makes it "the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him." *Id.* In other words, the Founders knew—and drafted the Religion Clauses to ensure—that the right of the religiously observant to exercise and practice their faith in accordance with the dictates of their religious beliefs would remain safeguarded.

Maine, however, took a contrary position when it sought to exclude "sectarian" schools from its otherwise generally available tuition-assistance program. The Supreme Court struck down this discriminatory policy as a violation of the Free Exercise Clause, *Carson v. Makin*, 596 U.S. 767 (2022), but Maine's

ahistorical, atextual, and unconstitutional position persists as it attempts to bypass the Court's decision through its Human Rights Act.

This Court should stop Maine's circumvention of the First Amendment. Considering (1) America's abundant historical tradition of public financing for private-religious education, and (2) parents' fundamental interest in directing the education of their children by sending them to schools that yield superior educational outcomes, Maine's ongoing constitutional violations should be enjoined.

The judgment of the District Court should be reversed.

**ARGUMENT**

I. **PUBLIC FUNDING OF PRIVATE RELIGIOUS EDUCATION OCCURRED THROUGHOUT AMERICAN HISTORY.**

In 2017, the Supreme Court "deemed it 'unremarkable in light of [its] prior decisions' to conclude that the Free Exercise Clause did not permit Missouri to 'expressly discriminate[ ] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017). In 2020, the Court reached the same "unremarkable" conclusion when it struck down a Montana provision "bar[ring] religious schools from public benefits solely because of the religious character of the schools" as a violation of the Free Exercise Clause. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020) (citing *Trinity Lutheran*, 582 U.S. at 462). And in 2022, the Court invoked the same "'unremarkable' principles applied in *Trinity Lutheran* and *Espinoza*" when it held that "Maine's 'nonsectarian' requirement for its otherwise generally available tuition assistance payments violate[d] the Free Exercise Clause of the First Amendment." *Carson*, 596 U.S. at 780, 789.

The unremarkable nature of these decisions stems from the substantial relationship between state governments and religious schools throughout American history. *See Espinoza*, 591 U.S. at 480. While opposition to policies that used public funds to support members of the clergy "lay at the historic core of the Religion

5

Clauses," *id.* (quoting *Trinity Lutheran*, 582 U.S. at 465), "no comparable 'historic and substantial' tradition supports [a state's] decision to disqualify religious schools from government aid." *Id.* On the contrary, America has a long and rich tradition of "governments provid[ing] financial support to private schools, including denominational ones." *Id.* This historical analysis is relevant because—as this Court recently recognized—"history plays a significant role in interpreting the [Religion Clauses] and determining whether a challenged action complies with [them]." *Perrier-Bilbo v. United States*, 954 F.3d 413, 423 (1st Cir. 2020).

## A. Public funding of religious charity schools predates the Founding.

Before the Revolution, "the public school system as we know it today did not exist." *The History of Christian Schools*, NOAH WEBSTER EDUC. FOUND. (May 5, 2022), https://nwef.org/2022/05/23/the-history-of-christian-schools/. Instead, "most children were educated at home." *Id.* The exception, however, was religious education—many colonists participated in "a vast network of private schools called 'charity schools.'" WILLIAM H. JEYNES, AMERICAN EDUCATIONAL HISTORY: SCHOOL, SOCIETY, AND THE COMMON GOOD 37 (2007) [hereinafter American Educational History].

The roots of the charity school system can be traced back to the Puritans in seventeenth century Europe. *See id.* Inspired by the Christian belief in the equality of all people before God, the Puritans established charity schools to make schooling

universally available, regardless of socioeconomic status. *See id.* at 37-39. They also viewed charity schools as a means to address the social and moral ills associated with poverty, to spread the gospel, to prepare children for success, and to form those children into citizens. *Id.* at 38. While not the first to provide free schooling for the poor, the Puritans were "the first group to successfully inaugurate a system that would make charity or free schools a widespread practice." *Id.*

The success of the European charity school system encouraged migrants to carry this model to the New World. *See id.* Charity schools were a prominent feature of the early American colonies, with the Society for the Propagation of the Gospel— a group that originated in England and soon expanded to colonial America—serving as their largest organizational sponsor. *Id.*

Organized around community needs and grounded in religious values, charity schools brought "both spiritual and intellectual development" to the children of colonial families. *Id.* at 40. An essential feature, moreover, was their availability to all pupils, no matter what their family could afford. WILLIAM H. JEYNES, SCHOOL CHOICE: A BALANCED APPROACH 3 (2014) [hereinafter School Choice]. "[I]n the vast majority of cases, this meant that the parents either paid nothing at all or very little"—a luxury "made possible by the generosity of individuals who had been blessed financially" or who, inspired by their faith, "were not particularly wealthy but were just very sacrificial in their giving." *Id.* Indeed, there was a shared

understanding in early America that those who could afford it had a responsibility to support other members of society, and often, the wealthiest settlers would fund the education of up to one-hundred students. American Educational History at 39.

"One should not imagine that founding and continuing to support these schools was easy for the ministers and other educators who attended to them." *Id.* at 41. Even so, charity schools "ultimately prove[d] that they were quality institutions" and spread quickly from the Northeast throughout the rest of colonial America. *Id.* at 41-43. Having (among other achievements) "introduced a higher level of organization and professionalism to the teaching profession than had ever been witnessed before"; expanded educational access to families of all socioeconomic backgrounds; and inculcated early American youth with the religious values of charity, equality, and faithful service, colonial-era charity schools "helped form the foundation on which many future educational advances developed." *Id.* at 41.

**B.     Publicly funding religious schools continued after the Founding Era.**

Throughout the late 1700s and early 1800s—including the time that the First Amendment was drafted—most American schools remained both private and religious in identity and emphasis. *Id.* at 42; *see also* MICHAEL W. MCCONNELL ET AL., RELIGION AND THE CONSTITUTION 318 (4th ed. 2016) [hereinafter Religion and the Constitution]. In fact, charity schools, Sunday schools, and other forms of private religious schooling were so popular that "[t]he educative influence of the church

continued powerfully during the early national era, even more so than during the eighteenth century." LAWRENCE A. CREMIN, AMERICAN EDUCATION: THE NATIONAL EXPERIENCE, 1783-1876, at 378 (1980) [hereinafter American Education]. As Alexis de Tocqueville observed in the early nineteenth century, members of the clergy did not hold public office "[u]nless one gives this name to the offices that many of them occupy in the schools. The greater part of education" in America was "entrusted to the clergy." Alexis de Tocqueville, DEMOCRACY IN AMERICA 283 n.4 (Harvey C. Mansfield & Delba Winthrop eds., 2002).

"One fascinating factor in the increase of church influence" in the educational realm during the post-Revolutionary period "was that it occurred at precisely the time when state legislatures and constitutional conventions were acting to eliminate traditional compulsions in the realm of religion." American Education at 380. That said, citizens of the early Republic saw no contradiction between these developments. Instead, "to individuals living in the 18th and 19th centuries, education without religion was inconceivable," and "most educators of this era viewed moral education as the most important aspect of education," meaning "that religious instruction was required in the schools" because religion was viewed as morality's foundation. American Educational History at 42.

Moreover, many of the Founders were ardent supporters of private-religious schools, both financially and otherwise. For instance, John Jay and Alexander

Hamilton gave "countless millions of dollars specifically to support charity schools for African Americans," which is particularly impressive considering the inflation-adjusted value of that sum.[2] School Choice at 4-5. Indeed, support for charity schools—"the most common way that African American children were educated" during this period—became a priority for many abolitionist-minded members of the Founding Generation. *Id.* at 5; *see also* American Educational History at 45-46.

The Founders' early support for charity schools and the schools' equalizing effects shaped state- and local-government policy as the nineteenth century progressed. Faced with "the pressure of more and more poor immigrants coming to the United States in a nation that was not yet especially wealthy," private charity schools "look[ed] to the addition of public funds to [e]nsure that all who desired to be educated could be." School Choice at 5. State and local authorities heeded this call, offering financial support to private-religious schools that needed the resources to educate a growing population. *See id.*; *see also Espinoza*, 591 U.S. at 480-81.

Americans at the time saw no discrepancy between this arrangement and the country's political values. "Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy." School Choice at 5.

---

[2] Inflation data from the Bureau of Labor Statistics only dates to 1913. However, $1 million in that year is worth over $30 million in 2024, for reference. *CPI Inflation Calculator*, BUREAU OF LABOR STATISTICS, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=1000000&year1=191301&year2=202409 (last accessed Oct. 10, 2024).

"Even States with bans on government-supported clergy, such as New Jersey, Pennsylvania, and Georgia, provided various forms of aid to religious schools." *Id.* Likewise, "[e]arly federal aid (often land grants) went to religious schools": Congress gave financial support to religious schools in the District of Columbia until 1848, and the federal government paid churches to run schools for Native Americans through the end of the nineteenth century. *Id.* (citing Religion and the Constitution at 318-19). While these policies may seem foreign today, state (and even federal) support for private-religious schools was seen as essential by nineteenth century Americans who "believed that the presence of education was so important that it was imperative that the private and public sectors support one another for the greater good of the country." American Educational History at 49.

## C. Reconstruction relied on public funding of religious education to support equality.

Public support for private-religious education continued throughout the second half of the nineteenth century. Although the Civil War increased the size and scope of the federal government and its institutions, "most Americans [still] believed that education was a responsibility of the church and not the government." School Choice at 33. So, the federal government turned to private-religious schools to support one of its most significant undertakings to date—the education of formerly enslaved persons in the American South during Reconstruction. *See* Religion and the Constitution at 323.

In 1865, Congress established the Bureau of Refugees, Freedmen, and Abandoned Lands, which is often called the Freedmen's Bureau. In 1866, the same year that it passed the Fourteenth Amendment, Congress also passed a law that instructed the Freedmen's Bureau to work through "private benevolent associations" to help educate formerly enslaved persons whenever such associations could provide suitable teachers. *Id.* (citing Act of July 16, 1866, § 13). Most of these "private benevolent associations" were missionary societies from the North that were affiliated with specific religious denominations. *Id.*

As such, public funds during Reconstruction regularly went to Presbyterian, Methodist, Baptist, Congregationalist, and other religious-educational societies to help establish and staff schools throughout the South. *See* Marjorie H. Parker, *Some Educational Activities of the Freedmen's Bureau*, 23 J. NEGRO EDUC. 9, 11-13 (1954). While some educators criticized the "missionary focus" of these schools, "the issue was never framed in terms of church-state separation, and the experience had little effect on the debate over aid to nonpublic [ ] schools in the rest of the country." Religion and the Constitution at 323. Many others believed that the efforts of Northern missionaries "embodie[d] the great hope of the founders of the republic, that the country would have and be based upon . . . a widely educated populace." *Schools and Education During Reconstruction*, PBS: AM. EXPERIENCE, https://www.pbs.org/wgbh/americanexperience/features/reconstructio

n-schools-and-education-during-reconstruction/ (last visited Oct. 8, 2024). In this view, public efforts to support private-religious education did not conflict with the Constitution; instead, they effectuated "the meaning of the word 'republicanism'" for those who had been excluded from its definition for too long. *Id.*

**D.    The rise of the modern public-school system did not end public funding of religious schools.**

Despite the deep history of publicly funded private-religious schools from colonial America through Reconstruction, the number of purely public schools as we currently understand them increased exponentially in the latter half of the nineteenth century. This phenomenon began in earnest in 1874, when the Michigan Supreme Court upheld public taxation for high schools in *Stuart v. School District No. 1*, 30 Mich. 69 (1874). School Choice at 33. As the total percentage of government funding of charity schools increased, the church-based schools gradually transformed into public schools, which would eventually become the dominant educational paradigm in the United States. *Id.* at 5. "To illustrate, by 1892, about 70 percent of American high school students attended public schools." *Id.* at 33.

With this transformation, schools "became less and less community based and more monolithic in their structure," which meant that the belief system advanced by public schools "became more and more detached from that of the parents." *Id*. at 4. By the turn of the twentieth century, public schools were instead becoming more

attached to state, local, and national government officials—a trend that "accelerated" during the 1920s and 1930s due to the influence of education theorist George Counts and educational reformer and scholar John Dewey. *Id.* at 4-5. By the mid-1960s, the American system of elementary and secondary education was more monolithic than ever before. *Id.* at 32.

The rise of monolithic public schools, however, did not entirely supplant America's robust tradition of private-religious education. After the Supreme Court removed voluntary prayer and Bible reading from public schools in *Engel v. Vitale*, 370 U.S. 421 (1962), and *Abington School District v. Schempp*, 374 U.S. 203 (1963), American parents (and social scientists) began reexamining the merits of private-religious schools. *Id.* at 34. While rising school taxes and tuition costs remain a barrier for parents who seek a private-religious education for their children, government programs in states like Missouri and Montana continue the time-honored tradition of allowing families to achieve this goal regardless of socioeconomic status. *See Trinity Lutheran*, 582 U.S. 449 (Missouri); *Espinoza*, 591 U.S. 464 (Montana).

Maine used to be part of this tradition, but that is no longer the case. Under the guise of "human rights," Maine now seeks to deprive parents of choice, deny students opportunities they deserve, and undermine one of America's most unique and celebrated educational practices.

II.  **PRIVATE RELIGIOUS SCHOOLS PRODUCE BETTER OUTCOMES FOR LOWER COSTS.**

Private-religious schools have long been integral to the American educational landscape. These schools offer robust academic programs, foster civic growth, and create inclusive, diverse environments ideal for education. In Maine, these institutions play a fundamental role in meeting the educational needs of students and developing the most complete and prepared graduates for an increasingly complex world.

   A.  **Private-religious schools have outpaced their secular counterparts in the classroom.**

Empirical research has consistently shown that private-religious schools deliver high-quality academic education. Students attending private-religious schools achieve higher academic outcomes than their public and secular private-school counterparts.

A meta-analysis by William H. Jeynes examined ninety studies on the effects of religious private schools, charter schools, and public schools. William H. Jeynes, *A Meta-Analysis on the Effects and Contributions of Public, Public Charter, and Religious Schools on Student Outcomes*, 87 PEABODY J. EDUC. 305, 305 (2012). Jeynes's thorough investigation of the literature revealed that among the three possible types of schooling, private-religious schools are "associated with the

highest level of academic achievement," even after controlling for socioeconomic status. *Id.*

The meta-analysis reported that the overall effect size for academic achievement was .28 to .29 for religious schools compared to public schools, signifying a significant difference in education outcomes. *Id*. at 318. The significance was further illuminated when private-religious schools were compared to private secular schools. In fact, "none of the effect sizes for public charter schools were statistically significant in *either* the positive *or* negative direction." *Id*.

A Meta-Analysis on the Effects and Contributions of Public, Public Charter, and Religious Schools on Student Outcomes
William H. Jeynes

https://doi.org/10.1080/0161956X.2012.679642

PUBLISHED ONLINE:
22 June 2012

Table 3 of 6
**TABLE 3** Effect Sizes for Religious School Students and Public Charter School Students Compared to their Counterparts in Traditional Public Schools for the 90 Studies in the Meta-Analysis

| | Religious Schools | Religious Schools | Charter Schools | Charter Schools |
|---|---|---|---|---|
| | Overall Academic Achievement | Achievement on Standardized Tests | Overall Academic Achievement | Achievement on Standardized Tests |
| U.S. & Foreign Without Sophisticated Controls using Model B | .26** (.07, .45) | .27** (.07, .47) | .01[a] | .01[a] |
| U.S. & Foreign Without Sophisticated Controls using Model A | .26** (.06, .46) | .27** (.07, .47) | .01[a] | .01[a] |
| American Schools Without Sophisticated Controls using Model B | .28** (.08, .48) | .29** (.08, .50) | .01[a] | .01[a] |
| American Schools Without Sophisticated Controls using Model A | .28** (.07, .49) | .29** (.08, .50) | .01[a] | .01[a] |
| U.S. & Foreign Using Sophisticated Controls using Model B | .14* (.02, .26) | .15* (.03, .27) | −.03[a] | −.03[a] |
| U.S. & Foreign Using Sophisticated Controls using Model A | .12* (.01, .23) | .13* (.02, .24) | −.03[a] | −.03[a] |
| American Schools Using Sophisticated Controls using Model B | .15* (.03, .27) | .16* (.03, .29) | −.03[a] | −.03[a] |
| American Schools Using Sophisticated Controls using Model A | .13* (.01, .25) | .14* (.02, .26) | −.03[a] | −.03[a] |
| U.S. & Foreign Without Sophisticated Controls using Model B excluding author's two studies | .26** (.06, .46) | .26** (.06, .46) | .01[a] | .01[a] |
| U.S. & Foreign Using Sophisticated Controls using Model B excluding author's 2 studies | .13* (.01, .25) | .14* (.02, .26) | −.03[a] | −.03[a] |
| Behavioral measures | .35** (.11, .59) | .34** (.10, .58) | Not applicable | Not applicable |

*Note.* Effect sizes include those for Overall Achievement and for Standardized Tests.

[a]All the charter schools were in the United States.

*p < .05. **p < .01.

*Id.* Not only have private religious schools been shown to lead to superior academic performance, but they narrow achievement gaps between advantaged and disadvantaged students. In the same meta-analysis, Jeynes found that minority

students in religious schools performed better academically than similar students in public schools, suggesting that these schools are more effective at addressing inequalities. *Id*. at 323. Specifically, the research indicated that "[w]hen sophisticated controls were applied, the effects sizes for African American and Latino students attending religious schools rather than public schools were .35 (p < .01) for overall academic achievement and .39 ( *p* < .01) for standardized tests," highlighting substantial gains for these groups. *Id.* Even more notably, this was not replicated when comparing non-religious charter schools to public schools. In that case, Jeynes's research found "no statistically significant difference" in academic performance among minorities. *Id*. Private-religious schools can catalyze education improvement in historically disadvantaged and underserved groups.

A Meta-Analysis on the Effects and Contributions of Public, Public Charter, and Religious Schools on Student Outcomes
William H. Jeynes

https://doi.org/10.1080/0161956X.2012.679642

PUBLISHED ONLINE:
22 June 2012

Table 5 of 6
TABLE 5 Effect Sizes for Religious School Students & Public Charter School Students, at Different Grade Levels and for Different Ethnicities, Compared to their Counterparts in Traditional Public Schools for the 90 Studies in the Meta-Analysis

|  | Religious Schools | Religious Schools | Charter Schools | Charter Schools |
|---|---|---|---|---|
|  | Overall Academic | Achievement on | Overall Academic | Achievement on |
|  | Achievement | Standardized Tests | Achievement | Standardized Tests |
| American Elementary Schools Without Sophisticated Controls using Model B | .27** (.07, .47) | .28** (.08, .48) | –.04[a] | –.04[a] |
| American Elementary Schools Without Sophisticated Controls using Model A | .27** (.07, .47) | .28** (.08, .48) | –.04[a] | –.04[a] |
| American Secondary Schools Without Sophisticated Controls using Model B | .29** (.09, .49) | .30** (.09, .51) | .06[a] | .06[a] |
| American Secondary Schools Without Sophisticated Controls using Model A | .29** (.09, .49) | .30** (.09, .51) | .06[a] | .06[a] |
| American Elementary Schools With Sophiaticed Controls using Model B | .14* (.03, .25) | .15* (.03, .27) | –.06[a] | –.06[a] |
| American Elementary Schools With Sophisticated Controls using Model A | .12* (.01, .23) | .13* (.02, .24) | –.06[a] | –.06[a] |
| American Secondary Schools With Sophisticated Controls using Model B | .16* (.03, .29) | .17* (.03, .31) | .00[a] | .00[a] |
| American Secondary Schools With Sophisticated Controls using Model A | .14* (.01, .27) | .15* (.01, .29) | .00[a] | .00[a] |
| African American and Latino Students Without Sophisticated Controls using Model B | .35** (.11, .59) | .39** (.12, .66) | .01[a] | .01[a] |
| African American and Latino Students With Sophisticated Controls using Model B | .18* (.03, .33) | .21* (.06, .36) | –.03[a] | –.03[a] |

Note. Results listed for Overall Achievement and for Standardized Tests.

[a]All the charter schools were in the United States.

*p < .05, **p < .01.

*Id*. Taken as a whole, Jeynes concludes that there is "a substantial enough body of knowledge available . . . that demonstrates that faith-based schools contribute

17

something vital to the academic well-being of millions of American students." *Id*. at 329.

**B.      Private-religious schools cultivate citizenship.**

Private-religious schools not only excel academically, but they also play a crucial role in promoting the civic values that are essential to a democratic society. Empirical evidence demonstrates that these schools, more than their public counterparts, strongly correlate with "higher levels of political tolerance and political knowledge and skills." M. Danish Shakeel et al., *The Public Purposes of Private Education: A Civic Outcomes Meta-Analysis*, 36 EDUC. PSYCHOL. REV. 40, 3 (2024) [hereinafter The Public Purpose of Private Education].

First, students attending private schools exhibit higher levels of political tolerance. In an era of unprecedented political vitriol, private schools help facilitate understanding across cultural, ethnic, and religious backgrounds. The Shakeel meta-analysis found that private schooling is significantly associated with increased political tolerance, with an effect size of 0.120 standard deviations ($p < 0.01$). *Id*. at 22. This suggests a greater willingness among these students to respect and engage with differing political viewpoints, something more important today than ever before.

Second, private schools augment students' civic knowledge and skills. The study reported an effect size of 0.121 standard deviations for civic knowledge and

skills, indicating that students demonstrate a higher understanding of our country's fundamental institutional components. *Id.*

Third, private schools promote higher levels of volunteerism and social capital. *Id.* Private-school students are likelier to engage in community service, charitable activities, and civic organizations.

Religious schools are particularly effective at promoting many of these civic qualities. Shakeel and his colleagues found that "religious schooling seems to play a positive role in shaping civic outcomes." *Id.* at 23. The study, which included evaluations of not just Christian private schools but Islamic schools as well, found "[a] combined effect of any religious private schooling is positive (0.076 SD) and statistically significant (95% CI) in comparison to a null effect for secular schooling (0.015 SD)." *Id.* at 13, 23.

Using Robust Variance Estimation ("RVE"), Shakeel looked at dozens of studies to reach these results. RVE methods provide "a way to include all dependent effect sizes in a single meta-regression model," allowing researchers to account for dependent data in their models. James E. Pustejovsky, *Meta-analysis with Robust Variance Estimation: Expanding the Range of Working Models*, NAT'L LIBR. OF MED. (May 7, 2021), https://pubmed.ncbi.nlm.nih.gov/33961175/. Shakeel looked at 531 effects across 57 qualified studies comparing civic outcomes between schools. The Public Purposes of Private Education at 3. Of the effects with statistically

measurable outcomes, nearly 80 percent showed a positive correlation between private schooling and civic outcomes. *Id*. at 19.



Distribution of positive, null, and negative estimates. *Note:* Based off 90% confidence intervals

*Id.*

Notably, the meta-analysis does not demonstrate a Catholic school civic advantage, which other scholars have proposed. Instead, it suggests a broader religious school advantage that is not unique to any denomination or faith. *Id*. at 33. In other words, any religious school "appears to increase civic outcomes in comparison to its secular counterpart, whether public or private." *Id*.

Some (including, at times, Maine) contend that religious schools produce greater intolerance. This study dispels that notion. According to Shakeel, "[e]ven for the outcome of political tolerance, which, arguably, is the toughest test for religious

schooling effects on civics, our analysis suggests that the average effect of religious schooling is, at worst, null." *Id*.

## C. Private-religious schools cost less per student than the alternatives.

Nationally, private schools often operate at a lower per-student cost than public schools. Melanie Hanson, *Average Cost of Private School*, EDUCATIONDATA.ORG (Aug. 29, 2024), https://educationdata.org/average-cost-of-private-school [hereinafter Average Cost of Private School]; Melanie Hanson, *U.S. Public Education Spending Statistics*, EDUCATIONDATA.ORG (July 14, 2024), https://educationdata.org/public-education-spending-statistics [hereinafter U.S. Public Education Spending Statistics]. According to the Education Data Initiative, the average total public-school expenditure per student in the United States was approximately $17,280 in 2023. In contrast, average private-school tuition was roughly $12,790. At the same time, public-school spending per student has skyrocketed nationwide, with little academic return on investment.



Nationwide Public K-12 Spending Per Pupil Per Year

Education Data Initiative source: U.S. Census Bureau

U.S. Public Education Spending Statistics.

In one particularly damning example, the Chicago Public School System doubled spending between 2012 and today, but student scores in reading and math simultaneously plummeted by more than 60 percent. Kurtis Karg, *As Chicago Public Schools Spending Per Student Continues to Rise, Test Scores and Proficiency Levels Among Students Continue to Drop*, ILL. POL'Y INST. (July 12, 2024), https://www.illinoispolicy.org/chicagos-education-formula-is-to-spend-more-see-students-do-worse/. Higher spending has never been shown to consistently improve student outcomes. According to research by Lawrence O. Picus from the University of Southern California, "[d]espite the substantial increases in per pupil spending

observed over the last 30 to 35 years, there has not been a commensurate improvement in student performance as measured by scores on standardized tests." Lawrence O. Picus, *Does Money Matter in Education? A Policymaker's Guide*, NAT'L CTR. FOR EDUC. STAT., https://nces.ed.gov/pubs97/web /97536-2.asp (last visited Oct. 9, 2024).

At first glance, school spending in Maine seems to rebuke some of this. Average private-school tuition in the state exceeds per-student public-school spending by $3,000 annually. Average Cost of Private School; U.S. Public Education Spending Statistics. But these figures vary dramatically, with some private schools costing less than their public counterparts and others costing more. When looking specifically at private-religious schools, the numbers are starkly different. In Maine, the average per-student spending for public school per year is $19,310, but for private-religious schools the figure is a fraction of that. Across sixty-one religious private schools serving more than 6,300 students, the average annual tuition is $6,956. *Best Maine Religiously Affiliated Private Schools*, PRIVATESCHOOLREVIEW.COM, https://www.privateschoolreview.com/maine/religio usly-affiliated-schools#:~:text=Best%20Maine%20Religiously%20Affiliated%20P rivate%20Schools%20(2024%2D25)&text=The%20average%20tuition%20cost%2 0is,average%20tuition%20cost%20of%20%2422%2C463 (last visited Oct. 9, 2024). Though nonreligious private schools in Maine cost slightly more on average

than public schools, private-religious schools cost significantly less. Private religious schools are consistently one of the least expensive educational opportunities nationwide.



Average Cost of Private School.

Private-religious schools tend to operate at a lower cost, despite producing better academic and civic outcomes. These schools benefit from significant community and institutional support. In Maine, private faith-based schools receive tremendous support from their religious communities. For example, Maine Catholic schools are supported by the Roman Catholic Diocese of Portland, which provides financial assistance to schools and families, enabling tuition rates to remain affordable without impacting educational outcomes. Roman Catholic Diocese of Portland, *Catholic Schools*, https://portlanddiocese.org/catholic-schools (last visited

Oct. 9, 2024). This support allows private-religious schools to offer quality education at a lower cost than their counterparts in nonreligious private schools and in public schools.

Private schools in Maine, particularly faith-based institutions, demonstrate that quality education can be provided at a lower per-student cost compared to public schools. The cost-effectiveness of these schools, combined with superior outcomes, supports robust policies that ease access to these institutions.

## CONCLUSION

Private-religious schooling is a bedrock institution that predates the birth of our nation. These schools make a unique and substantial contribution to the country by producing superior academic outcomes and promoting robust civic engagement while operating at a fraction of the cost of their public and nonreligious private-school counterparts. This Court should recognize the unquestionable benefits that flow through these institutions and stop Maine's efforts to circumvent the Supreme Court.

Dated: October 23, 2024

Respectfully submitted,

*/s/ Edward M. Wenger*
Edward M. Wenger
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
*emwenger@holtzmanvogel.com*

Jonathan P. Lienhard
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Highway
Haymarket, VA 20169
(540) 341-8808
(540) 341-8809
*jlienhard@holtzmanvogel.com*

*Counsel for Amicus Curiae
the Herzog Foundation*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume and word-count limits of First Circuit Rule 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and First Circuit Rule 32(f), this document contains 4,513 words.

2.  This document complies with the typeface and type-style requirements of First Circuit Rule 32(a)(5) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 23rd day of October 2024, a true copy of the Brief of Amicus Curiae was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
EDWARD M. WENGER