No. 24-1739

## UNITED STATES COURT OF APPEALS
### For The First Circuit

ST. DOMINIC ACADEMY, d/b/a Roman Catholic Bishop of Portland, a corporation sole; ROMAN CATHOLIC BISHOP OF PORTLAND; KEITH RADONIS, on their own behalf and as next friend of children K.Q.R., L.R.R., and L.T.R.; VALORI RADONIS, on their own behalf and as next friend of children K.Q.R., L.R.R., and L.T.R.,

Plaintiffs-Appellants,

v.

A. PENDER MAKIN, in their personal capacity and official capacity as the Commissioner of the Maine Department of Education; JEFFERSON ASHBY, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission; EDWARD DAVID, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission; JULIE ANN O'BRIEN, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission; MARK WALKER, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission; THOMAS L. DOUGLAS, in their personal capacity and official capacity as the Commissioner of the Maine Human Rights Commission,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE (CASE NO. 2:23-CV-00246-JAW)

### BRIEF OF DEFENDANTS-APPELLEES

AARON M. FREY
Attorney General

CHRISTOPHER C. TAUB
Chief Deputy Attorney General
SARAH A. FORSTER
Assistant Attorney General
Six State House Station
Augusta, ME  04333-0006
(207) 626-8800
Attorneys for Defendants-Appellees

# <u>TABLE OF CONTENTS</u>

Table of Authorities ........................................................................iii

Introduction.................................................................................. 1

Statement of the Issues................................................................. 3

Statement of the Case.................................................................. 3

Summary of the Argument........................................................... 18

Standard of Review..................................................................... 20

Argument.................................................................................... 21

I.     Because There Is Uncertainty Regarding the Meaning of the
       Relevant MHRA Provisions, the Court Should Abstain ................... 21

II.    Because There is No Imminent Risk of Enforcement,
       This Matter is Not Ripe ........................................................ 23

III.   The District Court Correctly Held That Section 4602 of the MHRA
       Does Not Violate the Free Exercise Clause ...................... 27

       A.    Section 4602 Does Not Burden St. Dominic's
             Religious Practices........................................................ 28

       B.    Section 4602 Is Neutral and Generally Applicable ................... 29

             1.     Section 4602 is Neutral...................................... 30

             2.     Section 4602 is Generally Applicable .............................. 34

       C.    Section 4602 Would Pass Strict Scrutiny ................................... 38

IV.    Section 4602 Does Not Violate Parental Rights................................ 42

V.     The District Court Correctly Held That Section 4602 Does
       Not Violate the Rights to Expressive Association and
       Free Speech ........................................................................ 44

VI.    The District Court Correctly Held That Section 4602 Does Not
       Violate the Establishment Clause ....................................... 49

VII.   The District Court Correctly Held That There is No Case or
       Controversy With Respect to the MHRA's Employment
       Provisions .......................................................................... 50

VIII.  The District Court Correctly Held the Unconstitutional
       Conditions Doctrine Is Not Applicable .............................. 52

IX.    The District Court Correctly Denied Preliminary
       Injunctive Relief ................................................................ 53

Conclusion ....................................................................................... 54

Certificate of Compliance ............................................................... 55

Certificate of Service ...................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) .................................................. 47

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ......... 52

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) ......................... 39

*Anderson v. Town of Durham*, 895 A.2d 944 (Me.) ........................................... 4, 31

*Bagley v. Raymond Sch. Dep't*, 728 A.2d 127 (Me.) ........................................... 4, 32

*Batterman v. Leahy*, 544 F.3d 370 (1st Cir. 2008) ............................................... 21

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) .................................. 40, 41

*Bowen v. Kendrick*, 487 U.S. 589 (1988) .............................................................. 49

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) .............................................. 44, 45

*Brox v. Woods Hole*, 83 F.4th 87 (1st Cir. 2023) .................................................. 29

*Bryce v. Episcopal Church*, 289 F.3d 648 (10th Cir. 2002) ................................. 51

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ...................................................... 28

*Carson v. Makin*, 596 U.S. 767 (2022) ............................................................... 4, 27

*Christian Legal Soc. Chapter of the Univ. of California, Hastings
    Coll. of the Law v. Martinez*, 561 U.S. 661 (2010) ...................................... 37, 38

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ......................................................... 29, 30, 34, 38

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) .................................. 39

*Deaton v. Town of Barrington*, 100 F.4th 348 (1st Cir. 2024) .............................. 21

*Employment Division v. Smith*, 494 U.S. 872 (1990) .............................................. 29

*Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004) ................................... 4

*Evans v. City of Berkeley*, 129 P.3d 394 (Cal. 2006)............................................. 53

*Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024)...... 26

*Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522 (2021) .... 30, 34, 41, 42

*Grove City Coll. v. Bell*, 465 U.S. 555 (1984)........................................................ 52

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
    565 U.S. 171 (2012) ........................................................................................ 50

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ............................................................................ 46, 47, 48

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ....................... 28, 30, 34, 38

*Lab. Rels. Div. of Constr. Indus. of Massachusetts, Inc. v. Healey*,
    844 F.3d 318 (1st Cir. 2016) ........................................................................... 24

*Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023) ........................................................... 35

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................ 26

*Lydon v. Loc. 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48 (1st Cir. 2014) ......... 20

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) .......................................... 23

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018)...... 30

*McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63 (1st Cir. 2003) ....................... 25

*McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121 (W.D. Wash. 2023)... 35, 36

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974)............................ 48

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024) ................................................ 48

*Murthy v. Missouri*, 144 S. Ct. 1972 (2024) ........................................................ 26

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1
    (1st Cir. 2002) ................................................................................................ 53

*Norwood v. Harrison*, 413 U.S. 455 (1973) ........................................................ 43

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) .............. 20

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020) ............................................................... 7, 45, 50, 51

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) ...................................... 47

*R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941) ........................................ 21

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017) .................................................... 24

*Regan v. Tax'n With Representation of Washington*, 461 U.S. 540 (1983) ............ 43

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26
    (1st Cir. 1999) ............................................................................................ 25, 26

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .......................................... 39, 41, 46

*Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78 (2013) ..... 24

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ....... 53

*Rumsfeld v. Forum or Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ...................................................................................... 47, 52

*Strout v. Albanese*, 178 F.3d 57 (1st Cir.) ........................................................ 4, 32

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ..................................................................................... 41, 42

*Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007) ...................................... 24

*Tandon v. Newsom*, 593 U.S. 61 (2021) ........................................................... 35, 37

*Texas v. United States*, 523 U.S. 296 (1998) ......................................................... 24

*Together Employees v. Mass Gen. Brigham Inc.*, 32 F.4th 82 (1st Cir. 2022)....... 20

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ........................... 48

*United States v. O'Brien*, 391 U.S. 367 (1968*)* ..................................................... 34

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................... 25

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ............................................................. 43

*Wooley v. Maynard*, 430 U.S. 705 (1977) ............................................................. 48

**Laws and Statutes**

U.S. Const. amend. I ............................................................................................ 28

Me. Const. art. VIII, pt. 1, § 1 ............................................................................... 3

1 M.R.S. § 71(8)................................................................................................... 29

5 M.R.S. §§ 4551-4634 ......................................................................................... 5

5 M.R.S. § 4552 .................................................................................................... 38

5 M.R.S. § 4553(2-A) ........................................................................................ 8, 10

5 M.R.S. § 4553(4)........................................................................................... 7, 50

5 M.R.S. § 4553(5-C) ............................................................................................. 7

5 M.R.S. § 4553(9-C)............................................................................................. 7

5 M.R.S. § 4553(10)(G) ..................................................................................... 9, 12

5 M.R.S. § 4573-A(2) ....................................................................................... 7, 45, 50, 51

5 M.R.S. § 4601 ........................................................................................... 39

5 M.R.S. § 4602 ..................................................................................... passim

5 M.R.S. § 4602(5)(C) ............................................................................ 11, 12

5 M.R.S. § 4602(5)(D) ........................................................................... passim

5 M.R.S. §§ 4611-4623 ............................................................................. 6, 25

20-A M.R.S. § 1001(8) ................................................................................... 3

20-A M.R.S. § 2701 ....................................................................................... 4

20-A M.R.S. § 2702 ....................................................................................... 4

20-A M.R.S. § 2951(2) ................................................................................... 4

20-A M.R.S. § 5001-A(3)(A)(2) .................................................................... 43

20-A M.R.S. § 5203(4) ................................................................................... 4

20-A M.R.S. § 5204(4) ................................................................................... 4

Pub. L. 1971, ch. 501 .................................................................................. 6, 7

Pub. L. 1973, ch. 347 ..................................................................................... 6

Pub. L. 1973, ch. 705 ..................................................................................... 6

Pub. L. 1975, ch. 358 ..................................................................................... 6

Pub. L. 1987, ch. 478 ..................................................................................... 8

Pub. L. 1987, ch. 578 ..................................................................................... 8

Pub. L. 1989, ch. 725 ..................................................................................... 8

Pub. L. 1991, ch. 100 .................................................................................. 6, 8

Pub. L. 1995, ch. 393 ............................................................... 7, 9

Pub. L. 2005, ch. 10 ................................................................ 6, 8

Pub. L. 2021, ch. 366 ................................................................ 12

Pub. L. 2023, ch. 188 ............................................................ 10, 33

## Rules

Fed. R. App. P. 25(d) ................................................................ 56

Fed. R. App. P. 32(a)(7)(B) ....................................................... 55

## Other Authorities

17A Charles Alan Wright & Arthur R. Miller, *Federal Practice
    and Procedure* § 4242 (3d ed. 2007) ..................................... 21

## __INTRODUCTION__

The issue in this appeal is whether a state can require a religious school to comply with provisions in the state's anti-discrimination law prohibiting educational discrimination when that school chooses to accept taxpayer funds to educate students at public expense.  The answer is yes.

The Maine Human Rights Act (MHRA) prohibits discrimination in employment, housing, public accommodations, lending, and, as relevant here, education.  The law applies to all public schools.  Private schools, though, are only subject to the MHRA if they participate in a program in which some Maine towns pay the tuition for children to attend schools of their parents' choice.  So, if a private school receives public funds to educate children, it can no more discriminate in its educational programs that can a public school.

Appellant St. Dominic Academy ("St. Dominic") is a Catholic high school,[1] and, unlike another Catholic high school currently receiving public tuition payments, it has never applied to participate in the tuition program.  St. Dominic claims that complying with the MHRA would burden its religious practices and free speech.  It allegedly fears enforcement action if it were to participate in the

---

[1] There are other appellants – the Roman Catholic Bishop of Portland, which operates St. Dominic, and two parents who wish to send their children to St. Dominic at public expense.  For simplicity, and unless the context indicates otherwise, all appellants will be collectively referred to as "St. Dominic."

tuition program, and it preemptively seeks to enjoin state officials from enforcing the MHRA against it if it does participate.  The Court should abstain from this matter because a state court could interpret the relevant MHRA provisions in a manner obviating the need to reach St. Dominic's constitutional arguments. Moreover, St. Dominic's claims are not ripe.  Because of an incomplete factual record, lack of clarity regarding the scope of the MHRA provisions at issue, and the fact that enforcement largely turns on actions by third parties not before the court, the risk of an enforcement action is entirely speculative.

In any event, St. Dominic's claims fail on the merits.  The MHRA does not burden St. Dominic's religious exercise, but even if it did, the MHRA is a neutral and generally applicable anti-discrimination law.  The provisions easily pass the rational basis test and would, under Supreme Court precedent, survive strict scrutiny.  Nor do the provisions limit St. Dominic's expression – it remains free to express whatever messages it wants and teach students however it likes.  St. Dominic's other arguments fail, and the district court thus correctly held that St. Dominic is unlikely to prevail on the merits and is therefore not entitled to preliminary injunctive relief.

## STATEMENT OF THE ISSUES

I.   Whether the Court should abstain because of uncertainty regarding the meaning of the relevant MHRA provisions.

II.  Whether the matter is not ripe because there is no imminent risk of enforcement.

III. Whether the district court correctly held that Section 4602 of the MHRA does not violate the Free Exercise Clause.

IV.  Whether Section 4602 violates parental rights.

V.   Whether the district court correctly held that Section 4602 of the MHRA does not violate the rights to expressive association and free speech.

VI.  Whether the district court correctly held that Section 4602 does not violate the Establishment Clause.

VII. Whether the district court correctly held that there is no case or controversy with respect to the MHRA's employment provisions.

VIII. Whether the district court correctly held that the unconstitutional conditions doctrine is not applicable.

IX.  Whether the district correctly denied preliminary injunctive relief.

## STATEMENT OF THE CASE

**Participation of Private Schools in Maine's Public Education System**

Maine's Constitution requires local governments to provide a free public education.  Me. Const. art. VIII, pt. 1, § 1.  By statute, local school administrative units ("SAUs") must "either operate programs in kindergarten and grades one to 12 or otherwise provide for students to participate in those grades as authorized elsewhere [by statute]."  20-A M.R.S. § 1001(8).  Maine's Legislature has

provided two alternatives for an SAU to provide a public education to its resident students when it does not operate a public school for one or more grades. First, an SAU may contract with another public or approved private school for schooling privileges. 20-A M.R.S. §§ 2701, 2702. Second, an SAU "that neither maintains a secondary school nor contracts for secondary school privileges pursuant to chapter 115 shall pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student is accepted." 20-A M.R.S. § 5204(4); *see also* 20-A M.R.S. § 5203(4) (tuition provision for elementary school education).

For forty years prior to the Supreme Court's decision in *Carson v. Makin*, 596 U.S. 767 (2022), religious schools could not participate in the tuition program. 20-A M.R.S. § 2951(2)). This Court, Maine's Law Court, and the United States Supreme Court (by denying certiorari petitions three times) rejected multiple First Amendment challenges to the exclusion of religious schools from the tuition program. *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004); *Strout v. Albanese*, 178 F.3d 57 (1st Cir.), *cert. denied*, 528 U.S. 931 (1999); *Anderson v. Town of Durham*, 895 A.2d 944 (Me.), *cert. denied*, 549 U.S. 1051 (2006); *Bagley v. Raymond Sch. Dep't*, 728 A.2d 127 (Me.), *cert. denied*, 528 U.S. 947 (1999).

Two years ago, however, the Supreme Court held that the Free Exercise Clause of the First Amendment prevents Maine from excluding religious secondary schools from its school tuitioning program. *Carson*, 596 U.S. at 789.

4

Since that decision, the Maine Department of Education ("Maine DOE") has understood that it may not prevent private schools from receiving approval for the receipt of public funds for tuition purposes solely because they are sectarian. Welter Aff., ¶ 4 (JA92). Simply put, the Maine DOE interprets *Carson* to require it to treat sectarian schools exactly the same as non-sectarian schools.

On July 28, 2022, Cheverus High School, a sectarian high school in Portland, Maine, applied for approval for the receipt of public funds for tuition purposes. *Id*., ¶ 5 (JA92). The Maine DOE processed Cheverus' application in the same manner that it processed applications for any private school seeking approval for tuition purposes for the first time. *Id*., ¶ 6 (JA92-93). The Maine DOE approved Cheverus' application on September 16, 2022. *Id*., ¶ 7 (JA93). During the 2022-23 school year, five students attended Cheverus at public expense. *Id.,* ¶ 8 (JA93). No other sectarian school has applied for approval for the receipt of public funds for tuition purposes. *Id*., ¶ 9 (JA93).

### Maine's Anti-Discrimination Laws

#### *Employment, Housing, and Public Accommodation Discrimination*

The Maine Human Rights Act ("MHRA") broadly prohibits discrimination against various protected classes in the areas of employment, housing, public accommodations, lending, and, as relevant here, education. 5 M.R.S. §§ 4551-4634. The Maine Human Rights Commission ("MHRC") is charged with

administering the MHRA, and actions to enforce the MHRA may be brought by either the MHRC or an aggrieved person. 5 M.R.S. §§ 4611-4623.

The MHRA was first enacted in 1971. Me. Pub. L. 1971, ch. 501. As originally enacted, it prohibited only employment, housing, and public accommodations discrimination based on race, color, religion, ancestry, and national origin, and, with respect to employment, age. *Id*. In 1973, sex and physical disability were added to the protected classes. Me. Pub. L. 1973, ch. 347; Me. Pub. L. 1973, ch. 705. In 1975, mental disability was added to the protected classes. Me. Pub. L. 1975, ch. 358.[2]

In 2005, protection was extended to sexual orientation. Me. Pub. L. 2005, ch. 10.[3] "Sexual orientation" was defined as "a person's actual or perceived heterosexuality, bisexuality, homosexuality or gender identity or expression." *Id*., § 3. The prohibition against sexual orientation discrimination thus encompassed gender identity discrimination. But in recognition of the difference between sexual orientation and gender identity, the MHRA now has a separate definition for gender identity: "the gender-related identity, appearance, mannerisms or other gender-related characteristics of an individual, regardless of the individual's

---

[2] The 1973 and 1975 amendments referred to a physical or mental "handicap," but this was changed to "disability" in 1991. Me. Pub. L. 1991, ch. 99.

[3] As will be discussed, this added sexual orientation as a protected class not only in employment, housing, and public accommodations, but also in education.

assigned sex at birth."  5 M.R.S. § 4553(5-C).  And "sexual orientation" is now defined as "a person's actual or perceived heterosexuality, bisexuality or homosexuality."  5 M.R.S. § 4553(9-C).

As enacted, the MHRA expressly permitted (and continues to permit) non-profit religious organizations to limit employment to members of their own religion.  Me. Pub. L. 1971, c. 501*; see also* 5 M.R.S. § 4553(4) (exempting from the definition of "employer" any "religious or fraternal corporation or association, not organized for private profit and in fact not conducted for private profit, with respect to employment of its members of the same religion, sect or fraternity. . . ."). In 1995, the Legislature added a provision expressly stating that the provisions governing unlawful employment discrimination

> do[] not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities. Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization.

Me. Pub. L. 1995, ch. 393, § 21, *codified at* 5 M.R.S. § 4573-A(2).[4]

---

[4] In some ways, this provides <u>more</u> protection to religious organizations than the "ministerial exception," which exempts religious organizations from employment discrimination laws only with respect to employees "holding certain important positions."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020).

*Education Discrimination*

In 1983, the Legislature added Subchapter V-B to the MHRA to prohibit discrimination in education.  Me. Pub. L. 1987, ch. 578, § 3.  Initially, it prohibited only discrimination based on sex.  *Id*.  "Educational institution" was defined as "any public school or educational program, any public post-secondary institution, any private school or educational program approved for tuition purposes if both male and female students are admitted and the governing body of each such school or program."  *Id*., § 2, *codified at* 5 M.R.S. § 4553(2-A).  Excluding single-sex schools from this definition made sense inasmuch as such schools might otherwise have been unable to comply with the new anti-discrimination provisions (which, again, prohibited only discrimination based on sex).

Subsequently, the Legislature prohibited other forms of educational discrimination.  In 1987, discrimination based on physical or mental disability was prohibited.  Me. Pub. L. 1987, ch. 478.  In 1989, the Legislature prohibited educational institutions from discriminating based on national origin.  Me. Pub. L. 1989, ch. 725.  Discrimination based on race was added in 1991.  Me. Pub. L. 1991, ch. 100.  In 2005, the Legislature enacted "An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation."  Me. Pub. L. 2005, ch. 10.  Along with adding sexual orientation (which included gender identity) as a protected class in employment, public accommodations, and housing (as discussed

above), it also extended the protection to education. *Id.*, §§ 20-21. However, "education facility[ies] owned, controlled or operated by a bona fide religious corporation, association or society" were exempted from the provisions prohibiting education discrimination based on sexual orientation. *Id.*, § 21. With respect to employment and housing discrimination, on the other hand, only religious organizations that did not receive public funds were exempted from the prohibition against sexual orientation discrimination. *Id.*, § 6 (codified at 5 M.R.S. § 4553(10)(G)). [5] This inconsistency is likely because prior to *Carson*, religious schools were not eligible to receive public funds. There was thus no need to distinguish between religious schools receiving public funds and those that were not.

As additional categories of unlawful discrimination were added to the section prohibiting educational discrimination, the Legislature, for the most part, did revisit the definition of "educational institution." [6] As discussed above, this definition excluded single-sex schools, thus effectively exempting them not just

---

[5] This law also exempted non-profit religious organizations that do not receive public funds from the prohibition against sexual orientation discrimination in education, *id.*, § 6, but, as noted above, a separate provision exempted all religious organizations from that prohibition.

[6] The one exception was that in 1995, the Legislature added the following to the definition: "For purposes related to disability-related discrimination, 'educational institution' also means any private school or educational program approved for tuition purposes." Me. Pub. L. 1995 ch. 393, § 4.

from prohibitions against sex discrimination, but also from prohibitions against most other forms of discrimination. While it was understandable to exempt single-sex schools from prohibitions against sex discrimination, it made no sense to exclude them from the other prohibitions. Thus, it is likely that the failure of the Legislature to update the definition of educational institution was inadvertent. In any event, the oddity has now been fixed. On June 15, 2023, Maine's Governor signed into law Maine Pub. L. 2023, ch. 188, which removed the exclusion of single-sex schools from the MHRA's definition of "educational institution." *See* 5 M.R.S. § 4553(2-A).

### *2021 Amendments to the MHRA*

On May 6, 2021, the MHRC submitted L.D. 1688, "An Act to Improve Consistency Within the Maine Human Rights Act." JA74-85. The MHRC's Executive Director testified that the MHRA's provisions were "amended in a piecemeal fashion," resulting in "internal inconsistencies," often with no "logical rationale." JA86. The eleven-page bill addressed numerous parts of the MHRA, including the statement of policy, the definitions, and the provisions governing employment, housing, public accommodation, credit extension, and education discrimination. JA74-85.[7]

---

[7] It is thus not true, as St. Dominic claims, that "L.D. 1688 made three changes to the MHRA, all in the section on 'educational discrimination.'" App. Brief, 8.

Among the purposes of L.D. 1688 was to "clarify[] the scope of the Maine Human Rights Act application in education." JA85. Sections 18 and 19 addressed education discrimination, with Section 18 amending the MHRA's broad statement of the right to be free from discrimination in education and Section 19 amending the substantive provisions prohibiting such discrimination set forth in 5 M.R.S. § 4602. JA83-84. With respect to Section 19, the MHRC's Executive Director testified that "[t]he MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act." JA90. In addition to reformatting Section 4602, the bill added as protected categories ancestry, color, and religion, categories which were, since the MHRA's inception in 1971, protected in the areas of employment, housing, and public accommodations. JA83.[8] The bill struck the provision exempting all religious organizations from the prohibition against sexual orientation discrimination and replaced it with a provision stating: "Nothing in this section . . . [r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." JA84, *codified at* 5 M.R.S. § 4602(5)(C). While St. Dominic refers to this as a "poison pill," App. Brief, 2, it simply made the education

---

[8] Gender identity was also separately named, but this was not an addition since, as discussed above, sexual orientation was already defined as including "gender identity or expression." L.D. 1688 changed references to "sexual orientation" to "sexual orientation or gender identity" throughout the MHRA to make clear that gender identity is protected. JA87 n.3

discrimination provision pertaining to sexual orientation and gender identity discrimination consistent with the provisions governing employment and housing discrimination, which exempted only religious organizations that do not receive public funds. 5 M.R.S. § 4553(10)(G). The bill also clarified that educational institutions are not required "to participate in or endorse any religious beliefs or practices," but that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." JA84, *codified at* 5 M.R.S. § 4602(5)(D).

With some amendments not relevant here, L.D. 1688 was passed in both chambers of the Legislature on June 17, 2021 and signed into law by the Governor on June 24, 2021 as Maine Public Laws 2021, ch. 366 ("Chapter 366").[9] Under current law, then, only those religious schools that do not receive public funds may discriminate based on sexual orientation, gender identity, religion, and the other protected categories. 5 M.R.S. § 4553(10)(G)(3); 5 M.R.S. § 4602(5)(C).

### *The Roman Catholic Bishop of Portland and St. Dominic Academy*

The Roman Catholic Bishop of Portland is the legal entity representing the ecclesiastical entity of the Roman Catholic Diocese of Portland (the "Diocese"). Complaint, ¶ 17 (JA17). The Diocese operates schools throughout Maine. *Id*.

---

[9]https://legislature.maine.gov/LawMakerWeb/summary.asp?paper=SP0544&SessionID=14.

St. Dominic Academy is a Roman Catholic school located in Lewiston and Auburn, Maine and is operated by the Diocese. *Id*., ¶ 18 (JA17). It offers education from pre-kindergarten through 12th grade. *Id*., ¶ 41 (JA20). As a Diocesan school, St. Dominic "welcome[s] students from all faiths or no faith who are willing to learn in a thoroughly Catholic educational environment." *Id*., ¶ 135 (JA35). It gives preference to Catholic students in admissions and financial aid. *Id*., ¶ 136 (JA35). St. Dominic "do[es] not inquire about a student's sexual orientation or gender identity at the time of admission." *Id*., ¶ 138 (JA36). St. Dominic does not allege that it would expel or discipline a student who it later learned was gay or transgender.

Because little discovery was conducted before this interlocutory appeal, the relationship between the Bishop, St. Dominic, and Cheverus (the Catholic school participating in the tuition program) is not clear. Below, St. Dominic stated that Cheverus is operated by the Society of Jesus and suggested that it is independent of the Bishop and the Diocese. PI Reply Br., 1 (ECF 29). But on its website, the Diocese states that it "has two Catholic high schools, Saint Dominic Academy in Auburn and Cheverus High School in Portland." https://portlanddiocese.org/schools/high-schools (last visited Nov. 4, 2024). The Diocese includes Cheverus in its "find a school" tool. https://portlanddiocese.org/find-a-school (last visited Nov. 4, 2024). Articles about

Cheverus appear in the Diocese's "Maine Catholic School News."  *See, e.g.,*

https://portlanddiocese.org/news/105th-commencement-cheverus-high-school-

portland-set-june-5 (last visited Nov. 4, 2024).  And at Cheverus' most recent

graduation ceremony, it was the Bishop who handed out diplomas.

https://portlanddiocese.org/news/cheverus-high-school-celebrates-class-2024s-

graduation-along-bishop-james-ruggieri (last visited Nov. 4, 2024).  While the

precise relationship between the Diocese and Cheverus need not be determined for

purposes of this appeal, Cheverus' participation in the tuition program, at the very

least, casts doubt on St. Dominic's claim that the MHRA "make[s] it impossible

for religious schools to participate while maintaining their religious identity."

Prelim. Inj. M., 1; *see also id.*, at 10, 11 (ECF 5).

### *The Radonis Family*

Keith and Valori Radonis live in Whitefield, Maine with their three children.

Complaint, ¶ 50 (JA21).  Their children are eligible to receive town tuitioning for

grades 9-12.  *Id.*, ¶ 51 (JA21).  The Radonises would like to use "town tuitioning

dollars" to send their children to St. Dominic.  *Id.*, ¶¶ 62-67 (JA22-23).

### *Procedural History*

On June 13, 2023, St. Dominic filed a complaint against the DOE

Commissioner and the Commissioners of the MHRC, in both their official and

personal capacities.  JA13-57.  St. Dominic alleged that under the Free Exercise,

Establishment, and Free Speech Clauses of the First Amendment to the United States Constitution, it has the right to participate in the tuition program and not comply with the MHRA's provisions prohibiting educational discrimination. Complaint, ¶¶ 169-262 (JA41-51). St. Dominic also alleged that requiring it to comply with the MHRA if it participated in the tuition program violated the "unconstitutional conditions" doctrine. Id., ¶¶ 263-270 (JA51-52).[10] On June 14, 2023, St. Dominic filed a preliminary injunction motion seeking to enjoin defendants "from enforcing the provisions in the Maine Human Rights Act that conflict with Plaintiffs' religious beliefs." ECF 5, at 20.

On August 8, 2024, the district court denied the preliminary injunction motion, "primarily because it conclude[d] that the plaintiffs are unlikely to succeed on the merits." ADD2.[11] The district court first held that there was no case or controversy with respect to St. Dominic's claim that the MHRA would prevent it from limiting employment to individuals who conform to the Catholic faith. The court correctly found that the MHRA clearly protected St. Dominic's right to so limit employment, and that the defendants agreed with that. ADD38-43.

---

[10] St. Dominic also alleged that "excluding" religious schools from the tuition program violates the Equal Protection Clause. Complaint, ¶¶ 271-280 (JA52). In fact, religious schools are not excluded from the program (although they must comply with applicable provisions of the MHRA). In any event, St. Dominic did not brief this argument below or here and has apparently abandoned it.

[11] The court rejected defendants' abstention and ripeness arguments. ADD27-38.

The court then turned to St. Dominic's Free Exercise challenge to the MHRA's educational provisions.   The court found that the provisions burden St. Dominic's religious exercise.  ADD46-50.  The court held that while the provisions were neutral (because there was no evidence that they were enacted out of intolerance toward religion or to impede religious practices) they were not generally applicable (because out-of-state schools and private post-secondary schools are not subject to the MHRA's educational provisions).  ADD50-62.  The finding that the provisions are not generally applicable meant that strict scrutiny applies, but the court held that the provisions passed.  ADD62-65.  The court found that Maine has a compelling interest in eliminating discrimination within publicly funded institutions and that the provisions were narrowly tailored because they were "written to encompass discriminatory conduct, and nothing more."  ADD63-65.[12]

The court then took up, and rejected, St. Dominic's argument that the provision prohibiting schools from discriminating among religions when they allow religious expression compels speech in violation of the First Amendment. ADD65-68.  The court recognized that the provision does not compel anything – it "only requires schools to refrain from suppressing any student's religious

---

[12] The court did not reach St. Dominic's expressive association and parental rights arguments because even "if "meritorious, would simply trigger the application of strict scrutiny."  ADD65 n.13.

viewpoint." ADD66-67. The court also found that it was unlikely that religious expression by students would be attributed to St. Dominic. ADD68.

Next, the court rejected St. Dominic's excessive entanglement argument. ADD68-71. The court credited defendants' statements that in determining whether actions by St. Dominic violated the MHRA, there would be little reason to look into the school's internal religious practices. *Id*. The court held that the unconstitutional conditions doctrine does not apply because St. Dominic failed to show that complying with provisions at issue would restrict their speech or religious exercise. ADD71-72.

With respect to the remaining factors for injunctive relief, the court held that because St. Dominic failed to show a likelihood of success on the merits, the challenged MHRA provisions were unlikely to cause them irreparable injury. ADD72-73. The court held that the balance of equities and the public interest favored defendants, given the hardship on the State if it cannot fully enforce its anti-discrimination laws and the public's strong interest in combatting discrimination. ADD74. The court noted that "the Plaintiffs are free to practice their religion, including the teaching of their religion as they see fit, but cannot require the state to subsidize their religious teachings if they conflict with state antidiscrimination law." ADD74.

After the court denied St. Dominic's preliminary injunction motion, ADD75, St. Dominic appealed.  JA10.

## SUMMARY OF THE ARGUMENT

The district court correctly denied St. Dominic's preliminary injunction motion after concluding that St. Dominic is unlikely to prevail on any of its constitutional claims.  This Court, though, should exercise *Pullman* abstention.  St. Dominic's arguments turn on questionable interpretations of how the MHRA might be interpreted.  The MHRA could well be interpreted such that none of St. Dominic's current practices are unlawful, and there would thus be no need to reach any constitutional issue.  Moreover, St. Dominic's claims are not ripe.  Given that the risk of enforcement largely turns on the independent decisions of third parties not before the Court, and because it is unclear whether any of St. Dominic's practices run afoul of the MHRA, it is entirely speculative whether St. Dominic would ever face an enforcement action.

If the Court does reach the merits, all of St. Dominic's arguments fail. Section 4602 – the MHRA provision prohibiting discrimination by schools – does not violate the Free Exercise Clause.  As an initial matter, St. Dominic fails to demonstrate that complying with Section 4602 would burden its religious practices.  In any event, Section 4602 is neutral and generally applicable.  Its recent amendments were not intended to prevent religious schools from participating in

the tuition program (and one such school is currently participating) but to make the educational provisions consistent with the rest of the MHRA.  The fact that out-of-state and private post-graduate schools are not subject to Section 4602 is not relevant.  A law is not generally applicable when it treats religious conduct less favorably than its secular counterparts.  Here, out-of-state and postgraduate religious schools are exempt from Section 4602 to the exact same extent as their secular counterparts.  Moreover, potential discrimination by out-of-state and postgraduate schools does not implicate Maine's interests in the same manner as discrimination by in-state primary and secondary schools.  Finally, Section 4602 would pass strict scrutiny.  Maine has a compelling interest in preventing educational discrimination against children, and Section 4602 is narrowly tailored to achieve that goal.

All of St. Dominic's other arguments similarly fail.  Section 4602 does not violate parents' right to direct the religious upbringing of their children.  Parents are free to choose a religious education for their children, and there is no right to have the public subsidize such an education.  Section 4602 does not violate St. Dominic's expressive association or free speech rights.  The admission of students St. Dominic might not want would not affect its ability to express its own views.  To the extent St. Dominic must allow students to express religious views, its own expressive activity would be unaffected.  Nor is St. Dominic, as it seems to claim,

19

exercising "editorial discretion" when it decides which students to admit.

Application of Section 4602 would not result in excessive entanglement. Even if there were an investigation into whether St. Dominic violated the law, such an investigation would not delve into doctrinal matters or the internal workings of St. Dominic. There is no case or controversy with respect to the MHRA's employment provisions. Appellees agree that under both state and federal law, St. Dominic has broad autonomy in personnel matters. The unconstitutional conditions doctrine is inapplicable because Section 4602's application to St. Dominic is not unconstitutional. Finally, beyond that St. Dominic is unlikely to prevail on the merits, the remaining factors for preliminary injunctive relief favor Appellees.

## **STANDARD OF REVIEW**

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024). Under this "deferential standard," the court "'review[s] the district court's factual findings for clear error' and 'its legal conclusions de novo.'" *Id*., at 42-43 (quoting *Together Employees v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022)). The Court can affirm "on any basis supported by the record and the law." *Lydon v. Loc. 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir. 2014).

**ARGUMENT**

I. **Because There Is Uncertainty Regarding the Meaning of the Relevant MHRA Provisions, the Court Should Abstain.**

Pursuant to *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941) and its progeny, a federal court should abstain from exercising jurisdiction "where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." *Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008); *see also Deaton v. Town of Barrington*, 100 F.4th 348, 361 (1st Cir. 2024). "The usual situation for *Pullman*-type abstention is where the unclear issue of state law may make it unnecessary to decide a federal constitutional question." 17A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4242 (3d ed. 2007). Here, a state court could interpret the relevant MHRA provisions – Section 4602(1) and Section 4602(5)(D) – such that none of St. Dominic's current practices are unlawful, thus obviating the need to consider whether the MHRA can be constitutionally applied to St. Dominic.

With respect to Section 4602(1), which prohibits discrimination in the provision of educational opportunities, St. Dominic apparently does not discriminate – it will accept students of any religion (or none) and does not inquire about an applicant's sexual orientation or gender identity. Complaint, ¶¶ 136, 138 (JA35-36). It does not allege that it would expel or discipline a student who it later

learned was gay or transgender.  So the only conduct that is arguably proscribed by

Section 4602(1) is St. Dominic's practice of giving preference to Catholics in

admissions and financial aid.  *Id.*, ¶ 136 (JA35).  But it is not clear whether such a

preference system would violate Section 4602(1).  A state court could conclude

that if a religious school has more applicants than slots, it can prioritize based on

religion.[13]

Section 4602(5)(D) states that while educational institutions are not required

"to participate in or endorse any religious beliefs or practices; to the extent that an

educational institution permits religious expression, it cannot discriminate between

religions in so doing."  To defendants' knowledge, no state court has ever

interpreted this provision, and it is not clear what a school must do in order to

allow "religious expression."  Moreover, because of the limited factual record, the

extent to which St. Dominic presently allows non-Catholic religious expression is

---

[13] St. Dominic argues that the MHRA would require it to "facilitate a student's
efforts to change his or her gender identity even if the school knows that the
student's parents object."  Complaint, ¶ 141 (JA36).  By "facilitate," St. Dominic
means using a student's preferred name and pronoun.  It points to MHRC guidance
stating that "a pattern of refusal to acknowledge a student's gender identity by
using their chosen name and pronouns may be considered to constitute [a MHRA]
violation," and that when a parent objects, a school "should, whenever possible,
abide by the wishes of the student with regard their gender identity and expression
while at school."  JA71-72.  But a state court might not agree with this guidance.
It is thus unclear whether St. Dominic would be required to discipline a
(hypothetical) staff member or student who expressed religious objections to using
a student's preferred name or pronoun.  Complaint, ¶¶ 144, 146 (JA37).

unclear. For example, the record does not reflect whether St. Dominic allows students to wear non-Catholic symbols or privately speak to fellow students regarding non-Catholic beliefs.[14] Instead, St. Dominic hypothesizes extreme conduct it claims it would have to allow, like "schoolwide chapel services led by a rabbi, imam, or Protestant preacher," Complaint, ¶ 134 (JA35), and a "pro-abortion 'Catholics for Choice' club." App. Br., 38. But Section 4602(5)(D) expressly states that schools are not required to "participate in or endorse any religious beliefs or practices," and it is not clear how a state court might balance that against the need for a school to allow "religious expression." In short, a state court could interpret Section 4602(5)(D) as not reaching any of the conduct that St. Dominic claims it would have to allow in violation of its religious beliefs and practices.

## II. Because There is No Imminent Risk of Enforcement, This Matter is Not Ripe.

"[T]he doctrine of ripeness has roots in both the Article III case or controversy requirement and in prudential considerations." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003). "The basic rationale of the ripeness inquiry is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements in violation of Article III's case or

---

[14] St. Dominic only alleges that it "would not allow students to <u>publicly</u> condemn, mock, or denigrate Catholic beliefs or <u>publicly</u> seek to dissuade other students from believing in them." Complaint, ¶ 135 (JA35) (emphasis added)

controversy requirement." *Lab. Rels. Div. of Constr. Indus. of Massachusetts, Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (cleaned up).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).  The plaintiff "bear[s] the burden of alleging facts sufficient to demonstrate ripeness," and "[e]ven a facial challenge to a statute is constitutionally unripe until a plaintiff can show that federal court adjudication would redress some sort of imminent injury that he or she faces." *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017).

"[W]hen free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements." *Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007).  *But see Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90 n.10 (2013) (stating that "we do not resolve today the question of whether relaxed First Amendment ripeness standards apply generally to claims predicated on alleged Free Exercise violations").  "Thus, when First Amendment claims are presented, reasonable predictability of enforcement or threats of enforcement, without more, have sometimes been enough to ripen a claim." *Sullivan,* 511 F.3d at 31 (cleaned up).

Here, enforcement is not reasonably predictable.  As a practical matter, whether St. Dominic ever faces an enforcement action depends on whether a

family alleges that their child was discriminated against by St. Dominic in violation of the MHRA.[15]  But it is not clear whether such allegations would ever arise.  St. Dominic does not allege that it has ever denied admission (or financial aid) based on membership in a protected class or that it has ever disciplined a student for expressing non-Catholic religious views.  It is entirely speculative whether a student would ever demand schoolwide imam-led prayer services or permission to form a "pro-abortion" club. And given that it is, at best, unclear whether the MHRA would require St. Dominic to accede to such demands, the risk of an enforcement action is remote.

Cases addressing standing when the actions of third parties are involved further demonstrate that St. Dominic's claims are not ripe.  A question of standing "bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975); *see also McInnis-Misenor v. Maine Med. Ctr.,* 319 F.3d 63, 69 (1st Cir. 2003) (stating that "[i]n general, standing and ripeness inquiries overlap," and "[t]he overlap is most apparent in cases that deny standing because an anticipated injury is too remote, for example."); *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999) (stating that ripeness "shares

---

[15] MHRC staff can themselves file complaint, 5 M.R.S. § 4611, but staff would likely not become aware of an alleged violation unless a family brought it to their attention.

standing's constitutional and prudential pedigree" and that the overlap between the two "is nowhere more apparent than in pre-enforcement challenges.").

In the standing context, the Supreme Court has recognized that when causation depends on the actions of third parties not before the court, "the plaintiff must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (cleaned up); *see also Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.") (cleaned up); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (when an essential element of standing depends on choices made by parties not before the court, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury"). Here, then, St. Dominic must show that if it participates in the tuition program, its practices will lead to families filing MHRA complaints. St. Dominic fails to do so.[16]

---

[16] Because here the risk of enforcement turns on the actions of third parties, this matter is distinguishable from *Whitehouse*, 199 F.3d 26, upon which the district court primarily relied in finding St. Dominic's claims are ripe. In *Whitehouse*, the plaintiff intended to use public records for commercial solicitation, in direct contravention of state law. *Id.*, at 28. It thus faced immediate enforcement action. Here, on the other hand, whether St. Dominic might face enforcement action is dependent on intervening choices by third parties not before the Court.

Moreover, a ruling in favor of St. Dominic will not redress its alleged injury. St. Dominic wants assurance that if it participates in the tuition program, it will not face enforcement actions if it engages in conduct prohibited by the MHRA. The Court cannot provide that assurance. Any ruling would not prevent a private party from bringing an action in state court alleging that St. Dominic violated their rights under the MHRA. At most, a ruling in St. Dominic's favor would remove the requirement that private parties exhaust their claims of discrimination before the MHRC; no ruling from this Court would bind a state court in a private cause of action. St. Dominic seeks assurance that it can violate the MHRA with impunity, and this Court cannot provide that assurance.

### III. The District Court Correctly Held That Section 4602 of the MHRA Does Not Violate the Free Exercise Clause.

St. Dominic argues that 5 M.R.S. § 4602 – the MHRA provision prohibiting discrimination in education – violates the First Amendment's Free Exercise Clause.[17] This Clause states: "Congress shall make no law . . . prohibiting the free

---

[17] As seemingly a separate argument, St. Dominic claims that the MHRA provisions at issue "violate" *Carson* because they would result in the MHRC becoming entangled in St. Dominic's religious policies. App. Brief, 20-21. But in the part of *Carson* St. Dominic's points to, the Supreme Court was observing that attempting to distinguish between religious status and religious use would "raise serious concerns about state entanglement with religion and denominational favoritism." 596 U.S. at 787. *Carson* did not address whether enforcing the MHRA might result in excessive entanglement (and, as discussed below, there would be no entanglement).

exercise" of religion.  U.S. Const. amend. I.[18]  A plaintiff can prove a free exercise violation by "showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).  St. Dominic fails to demonstrate that Section 4602 burdens its religious practices, but even if it did, Section 4602 is neutral and generally applicable.

### A. Section 4602 Does Not Burden St. Dominic's Religious Practices.

When it comes to admissions, St. Dominic apparently does not discriminate based on religion, sexual orientation, gender identity, or any other protected class. While it does give preference to Catholics in admissions and financial aid, it is not clear whether the MHRA would prohibit that.  Section 4602 would not require St. Dominic to change its educational practices – it could continue teaching from a religious perspective and instilling Catholic values in its students.  St. Dominic offers no support for its claim that Section 4602 would prevent it from "requir[ing] its admitted students to agree to support the school's Catholic mission" and stop it from "ask[ing]students and staff to live out Catholic moral teachings in their personal lives."  App. Brief, 8-9.  While Section 4602(5)(D) would require St. Dominic to permit non-Catholic religious expression, the scope of this, as

---

[18] The Free Exercise Clause is applicable to the states via the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

explained above, is unclear.  And given that this provision expressly states that St.

Dominic would not be required to "participate in or endorse any religious beliefs or

practices," 5 M.R.S. § 4602(5)(d), it hard to see how St. Dominic's religious

practices would be burdened.[19]

### B.  Section 4602 Is Neutral and Generally Applicable.

Even if there were some burden on St. Dominic's religious exercise,

Supreme Court cases "establish the general proposition that a law that is neutral

and of general applicability need not be justified by a compelling governmental

interest even if the law has the incidental effect of burdening a particular religious

practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520,

531 (1993) (citing *Employment Division v. Smith*, 494 U.S. 872 (1990)); *see also*

*Brox v. Woods Hole*, 83 F.4th 87, 93 (1st Cir. 2023) ("We review a law that

burdens religious exercise but that is neutral with respect to religion and generally

applicable only to ensure that it has a rational basis.").  If a law is not neutral and

generally applicable, it is subject to strict scrutiny and must be narrowly tailored to

---

[19] Because St. Dominic apparently does not have a discriminatory admissions policy, most of its arguments focus not on Section 4602(1), the substantive provision prohibiting discrimination, but on Section 4602(5)(D), the provision stating that a school that permits religious expression cannot discriminate between religions in so doing.  As explained above, this provision has not been interpreted and its scope is not clear.  That said, if the Court concludes that this provision violates any of St. Dominic's rights, it should only enjoin application of the second phrase in 5 M.R.S. § 4602(5)(D) and not any other MHRA provisions.  *See* 1 M.R.S. § 71(8).

serve a compelling state interest. *Kennedy*, 597 U.S. at 532; *Lukumi*, 508 U.S. at 546. Section 4602 is neutral and generally applicable, but, even if it were not, it would survive strict scrutiny.

### 1. Section 4602 is Neutral.

A law is not neutral when its object "is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533; *see also Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021) ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."). "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 639 (2018) (quoting *Lukumi*, 508 U.S. at 540).

St. Dominic argues that Section 4602 is not neutral because it singles out religious practices when it states that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." App. Brief, 22 (citing 5 M.R.S. § 4602(5)(D)). Read in context, religious practices are not being singled out for special regulation. The phrase is prefaced with the

statement that nothing in Section 4602 "requires an educational institution to participate in or endorse any religious beliefs or practices." 5 M.R.S. § 4602(5)(D). It thus preserves the autonomy of religious schools. And requiring schools to allow religious expression by students does not regulate the religious practices of the schools themselves.

St. Dominic argues that Section 4602 is not neutral because it prohibits religious schools from discriminating based on religion in admissions and financial aid, but allows secular schools to use criteria like academics, athletics, and family legacy. App. Brief, 23-24. Quite frankly, this argument makes no sense. Things like athletic ability are not a protected class. Moreover, religious schools are equally allowed to use these factors, and no school – religious or secular – is allowed to discriminate based on religion or any other protected class.

St. Dominic argues that hostility to religion was the motivation for the amendments to Section 4602. App. Br., 25-26. According to St. Dominic, Maine's Legislature enacted Chapter 366 because it "anticipated Maine's defeat in *Carson*." App. Br., 25. But Chapter 366 was enacted on June 24, 2021. At the time, both the district court and this Court had rejected the *Carson* plaintiffs' challenge to the religious exclusion, and the Supreme Court had not yet granted certiorari. Further, in three earlier failed challenges to the religious exclusion, the Supreme Court denied certiorari. *Anderson*, 549 U.S. 1051 (2006) (Mem.);

*Bagley,* 528 U.S. 947 (1999) (Mem.); *Strout*, 528 U.S. 931 (1999) (Mem.).  So, at the time Chapter 366 was enacted, it was uncertain whether the Supreme Court would even grant certiorari, much less reverse the lower court decisions.

But even if Chapter 366 was enacted in anticipation of an adverse Supreme Court ruling, the record evidence does not demonstrate that it was designed to exclude religious schools from the tuition program.  More likely is that it was intended to ensure that if religious schools were eventually allowed to participate in the program, they would comply with the MHRA's education provisions that are applicable to other schools accepting public funds.

As discussed above, for employment and housing, only those religious organizations that did not receive public funds were exempt from the provisions prohibiting discrimination based on sexual orientation and gender identity. Education was an outlier, where all religious schools were exempt from those provisions.  This was likely because there was no need to make a distinction between religious schools accepting public funds and those that did not, inasmuch as no religious schools were eligible to receive public funds.  If Maine's Legislature anticipated that the ongoing litigation might result in Maine being prohibited from excluding religious schools from the tuitioning program, it would have been entirely appropriate to then make the same distinction in education as the Legislature did for employment and housing and require religious

32

organizations that accept public funds to comply with the prohibition against sexual orientation and gender identity discrimination. *See* District Court decision, at ADD58 ("[T]he record supports the Defendants' explanation that the Maine Legislature fashioned Chapter 366 to keep the MHRA's provisions on educational discrimination in line with its broader scheme for exempting only religious organizations that do not receive public funding from certain antidiscrimination provisions.").[20]

Nor do the Attorney General's statements demonstrate hostility toward religion. In his June 21, 2022 press release, the Attorney General expressed no hostility toward religious schools, nor did he indicate an intent to preclude them from participating in the tuition program. What he did say is that schools accepting public funds should not be allowed to discriminate. JA62-63. Further, the Attorney General is not part of the Legislature, and his statements were made a year after the 2021 amendments at issue. It is impossible to see, then, how the Attorney General's statements shed light on the intent behind the amendments. *See* District Court Decision, at ADD59 ("Attorney General Frey was not a member

---

[20] Nor does Maine Pub. L. 2023, ch. 188, which removed the exclusion of single-sex schools from the MHRA's definition of "educational institution," demonstrate hostility toward religion. As the district court found, the record supports that it "served to correct a 'mistake' in the statutory scheme." ADD60.

of the Maine Legislature when it enacted Chapter 366, and there is no evidence that he had a hand in proposing the legislation to a legislator.").

In an effort to demonstrate legislative intent, St. Dominic cites to a single ten-word "tweet" from a state legislator.  App. Brief, 26; JA68.  The Court should give this no consideration.  *See United States v. O'Brien*, 391 U.S. 367, 384 (1968*)* ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) ("[I]t is virtually impossible to determine the singular 'motive' of a collective legislative body, . . . and this Court has a long tradition of refraining from such inquiries.").

### 2. Section 4602 is Generally Applicable.

A law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534.[21]  St. Dominic argues that Section 4602 is not generally applicable because some out-of-state schools and private postsecondary schools receive public funds but are not subject to the MHRA's educational provisions.  App. Brief, 27.  Courts have found laws to not be

---

[21] A law may also be not generally applicable if it "permit[s] the government to grant exemptions based on the circumstances underlying each application."  *Id*.; *see also Kennedy*, 597 U.S. at 526.  But St. Dominic does not argue that Section 4602 allows for the granting of exemptions.

generally applicable when they distinguish between religious and secular conduct that is otherwise similar.  In *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam), a state, during the COVID pandemic, restricted religious gatherings while allowing secular gatherings, such as sporting events and concerts.  In *Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023), the state allowed unvaccinated individuals to continue working in healthcare facilities based on medical exemptions while refusing to allow individuals to continue working while unvaccinated for religious reasons.  In both these cases, then, the state drew a line between secular conduct and religious conduct.  That is not the case here.  Here, the state is drawing lines based on state presence and education level, and religious schools fall on both sides of those lines.  So, out-of-state and private postsecondary religious schools are just as exempt from Section 4602 as are out-of-state and private postsecondary secular schools.

In *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121 (W.D. Wash. 2023), a religious employer argued that state and federal antidiscrimination laws were not generally applicable because they exempted small employers, Communists, and Indian reservations.  *Id.*, at 1142.  The court rejected this argument:

> Unlike the COVID restrictions in *Tandon*, however, [the employer's] cited exemptions do not demonstrate disparate treatment between comparable secular and religious activity. To illustrate, if [the laws] exempted small <u>religious</u> employers but not small <u>secular</u> employers, that would offend *Tandon*. But the mere existence of an exemption for <u>all small</u> employers—religious and secular alike—does not transform

[the laws] from neutral and generally applicable laws into those
triggering strict scrutiny.

*Id.*, at 1142-43 (emphasis in original). The same is true here. That Section 4602

does not apply to out-of-state and private postsecondary schools – religious and

secular alike – does not mean that it is not generally applicable.

But even if the treatment of out-of-state and private postsecondary schools

were somehow relevant, St. Dominic's argument still fails because the fact that

these schools are not subject to Section 4602 does not undermine Maine's interest

in the same way. The Legislature has not "exempted" out-of-state schools from

the requirement that they comply with the education provisions of the MHRA.

Rather, the MHRA simply does not, and cannot, apply to extraterritorial conduct.

Maine's interest in stopping entities outside of Maine from discriminating is

simply not the same as its interest in stopping entities inside Maine from doing so.

Nor does Maine have the same interest in preventing educational

discrimination by private postsecondary institutions. Postsecondary institutions are

not comparable to primary and secondary schools. In Maine, primary and

secondary education is compulsory for everyone within a prescribed age range,

while post-secondary education is entirely voluntary. Public education through

public or private elementary and secondary schools is provided at public expense,

while post-secondary education relies primarily on the student and their family for

funding. How and where a student accesses public elementary and secondary

36

education is largely dictated by where their parents reside, while students and their families are free to shop both within and outside of Maine for the post-secondary school that best fits their goals. Finally, post-secondary students are older and, for the most part, adults, making them more able than their younger counterparts to determine what instruction is appropriate for them or consistent with their knowledge and beliefs. *See Tandon*, 593 U.S. at 62 ("[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue.").[22]

Section 4602 is neutral and generally applicable and, in some ways, similar to a policy instituted by a public university conditioning student groups' eligibility for school funds and facilities on groups' agreements to open membership and leadership positions to all students (referred to as the "all-comers policy"). *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661 (2010).  A religious organization argued that this

---

[22] St. Dominic argues that Section 4602 is neither neutral nor generally applicable because it is "religious gerrymander."  App. Brief, 24, 29.  According to St. Dominic, secular private schools can engage in missions like advancing diversity, equity, and inclusion, while religious schools cannot advance their religious missions.  *Id*., at 29.  First, secular private schools cannot advance their missions in violation of Section 4602 by, for example, engaging in unlawful discrimination to promote diversity.  Second, it is simply not true that Section 4602 "forbids" St. Dominic from advancing its religious mission.  It remains free to teach how it likes, instill whatever religious values it deems appropriate, and express whatever views it chooses.

violated their rights to free speech, expressive association, and the free exercise of religion by requiring them, as a condition of financial support, to accept members who do not share their beliefs about religion and sexual orientation. *Id.*, at 667. After rejecting the free speech and expressive association claims, the Supreme Court summarily disposed of the free exercise claim, noting that "the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct." *Id.*, at 697 n.27. The Court concluded that the organization could not "moor its request for accommodation to the Free Exercise Clause" because in seeking an exemption from the all-comers policy it was seeking "preferential, not equal, treatment." *Id.* The same is true here. St. Dominic is seeking preferential, not equal, treatment – it wants the ability to deny educational opportunities to certain people while still receiving public funds. It can't have it both ways.

### C. Section 4602 Would Pass Strict Scrutiny.

Even if Section 4602 were not neutral and generally applicable, it would, as the district court held, survive strict scrutiny because it is narrowly tailored to serve a compelling state interest. *See Kennedy*, 597 U.S. at 532; *Lukumi*, 508 U.S. at 546. It is the stated policy of Maine to prevent discrimination in many aspects of society, including employment, housing, public accommodations, and, as relevant here, education. 5 M.R.S. § 4552. It is further Maine's policy to provide

opportunities for individuals "to participate in all educational, counseling and vocational guidance programs, all apprenticeship and on-the-job training programs and all extracurricular activities without discrimination because of sex, sexual orientation or gender identity, a physical or mental disability, ancestry, national origin, race, color or religion."  5 M.R.S. § 4601.  There can be no dispute that states have a compelling interest in eliminating discrimination.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982) (recognizing that a state has a substantial interest in protecting its citizens from "the political, social, and moral damage of discrimination"); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (eliminating discrimination "plainly services compelling state interests of the highest order").

Maine also has a compelling interest in preventing public funds from being used to fund discrimination, and Section 4602 is narrowly tailored to serve that interest.  *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice.").  Maine arguably could have made all religious schools, regardless of whether they accept public funds, subject to the MHRA.  Maine did not go that far, though, and instead used a least restrictive alternative requiring only those schools accepting public funds to comply with

Section 4602.  A religious school thus has options – it can decline public funds and continue to discriminate, or take public funds and comply with the same anti-discrimination law that other schools must comply with.

Section 4602 is not underinclusive.  While out-of-state and private postsecondary schools are not subject to 4602, such schools, as discussed above, are not appropriate comparators vis-à-vis in-state public and publicly-funded primary and secondary schools.  The only less restrictive alternative St. Dominic suggests is that religious schools be exempted from prohibitions against discrimination based on religion, sexual orientation, and gender identity.[23]  But exempting schools would not further the State's interest in preventing discrimination.

As the Supreme Court's decision in *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) makes clear, Maine's compelling interest in eliminating discrimination outweighs whatever interest St. Dominic might have in refusing to

---

[23] St. Dominic argues that "Maine took this approach for decades prior to 2021, when the MHRA exempted religious schools from the rule banning sexual orientation and gender identity discrimination, did not ban religious discrimination, and had no religious expression rule at all."  App. Brief, 35.  But until the *Carson* decision in 2022, religious schools could not receive public funds.  Now that they can receive public funds, exempting them from Section 4602 is not a less restrictive alternative because it is no alternative at all.  To be an alternative, the measure must be one that still furthers a state's interest, and simply exempting some publicly funded schools from prohibitions against discrimination would not do that.

admit certain students.  At issue in *Bob Jones* was an IRS ruling making private schools with racially discriminatory admissions policies ineligible for tax-exempt status.  Two religious colleges challenged the ruling, arguing that their racially discriminatory policies were based on sincerely held religious beliefs and that applying the ruling to them would violate their rights under the Free Exercise Clause.  *Id*., at 579-585, 602-03.  The Supreme Court rejected the challenge, finding that the government had a "compelling," "fundamental," and "overriding" interest in eliminating racial discrimination in education.  *Id*., at 604.  The Court further concluded that this interest "substantially outweighs whatever burden denial of tax benefits places on [the colleges'] exercise of their religious beliefs" and that no less restrictive means were available to achieve the government's interest.  *Id*.  Similarly, in *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984), the Supreme Court held that a state's "compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms."

St. Dominic's reliance on *Fulton*, 593 U.S. 522 and *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*") is misplaced.  The problem in *Fulton* was that while a city had a "weighty" interest in preventing discrimination against gay people, its claim that this interest would be undercut if it gave an exemption to a Catholic foster care

41

agency was undermined by its "creation of a system of exceptions." 593 U.S. at 542. Here, there is no system of exceptions, and, as discussed above, the fact that out-of-state and private postsecondary schools are not subject to Section 4602 does not undercut Maine's interest. The problem in *SFFA* was that the interests being asserted – like "broadening and refining understanding" – were "not sufficiently coherent for purposes of strict scrutiny" and could not be measured by courts. 600 U.S. at 214. Whether or not educational opportunities have been denied on the basis of membership in a protected class, on the other hand, is concrete, and courts routinely consider whether a person has been discriminated against.

St. Dominic suggests that Maine has no legitimate interest in preventing religious organizations from "[f]orming a religious community around shared religious beliefs." App. Brief, 30. But nothing in the MHRA prevents this. St. Dominic argues that Maine does not have a compelling interest in "preventing religious schools from following their religious beliefs about sexuality." App. Brief, 31. Again, the MHRA does not prevent that. Section 4602 neither dictates nor restricts a school's speech. As the district court recognized, it only prohibits discriminatory conduct. ADD65.

### IV.  Section 4602 Does Not Violate Parental Rights.

The Radonises briefly argue that Section 4602 violates their parental rights because "it prevents tuition-eligible families like the Radonises from exercising

their right to direct the religious upbringing of their children."  App. Brief, 36-37.

It does nothing of the kind.  Parents who want a religion-based education are free

to send their children to appropriate schools, and these schools do not even need to

be approved by the State in order for attending students to satisfy Maine's

compulsory attendance law. 20-A M.R.S. § 5001-A(3)(A)(2).  That some parents

might not be able to afford to send their children to a particular religious school

because the school is not participating in the tuitioning program (because they do

not want to comply with Section 4602) is not a violation of their constitutional

rights.  *See, e.g., Regan v. Tax'n With Representation of Washington*, 461 U.S. 540,

549 (1983) ("We have held in several contexts that a legislature's decision not to

subsidize the exercise of a fundamental right does not infringe the right, and thus is

not subject to strict scrutiny.").[24]

---

[24] St. Dominic's reliance on *Wisconsin v. Yoder*, 406 U.S. 205 (1972) is misplaced. In *Yoder*, a state required all children to attend high school, which interfered with Amish families' exercise of their religious beliefs and "would do little to serve" the state's purported interests. 406 U.S. at 222. At the same time, the Court recognized that "activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare." *Id*., at 220; *see also Norwood v. Harrison*, 413 U.S. 455, 462 (1973) (while private schools have the right to exist and operate, this does not mean that they have the right to share in the "state largesse").

## V. The District Court Correctly Held That Section 4602 Does Not Violate the Rights to Expressive Association and Free Speech.

"The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  Here, though, there is no evidence in the record that Section 4602 would force St. Dominic to admit students it does not want.  It accepts students of any or no religion so long as they agree to support St. Dominic's mission and "uphold 'Catholic Christian morals,'" Complaint, ¶¶ 35-36 (JA19), and St. Dominic apparently does not discriminate based on sexual orientation or gender identity.  St. Dominic identifies no type of student it would be forced to admit that it does not currently admit.

But even if Section 4602 would require St. Dominic to admit students it otherwise would not, St. Dominic does not demonstrate that the admission of such students would "in a significant way" affect St. Dominic's ability to express its own views.  *Dale*, 530 U.S. at 648.  St. Dominic would remain free to express whatever viewpoints it likes, and it is impossible to see how the mere presence of certain students at the school would interfere with this.  This case is thus distinguishable from *Dale*, where the Supreme Court held that the Boy Scouts of America's right to expressive association would be violated if it were forced to take on a gay person (Dale) as an assistant scoutmaster.  Part of the duties of

assistant scoutmasters was to "inculcate [youth members] with the Boy Scouts' values—both expressly and by example." *Id*., at 649-50.  Homosexual conduct, the Boy Scouts believed, was "inconsistent with the values it [sought] to instill in its youth members." *Id*., at 654.  The Court concluded that Dale's presence "as an assistant scoutmaster would. . . surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs." *Id*.[25]

Here, on the other hand, the right of St. Dominic to decide who it wants to hire as leaders and adult role models for its youth is fully protected.  *See* 5 M.R.S. § 4573-A(2); *see also Our Lady of Guadalupe*, 591 U.S. 732.  The issue here is whether the right to expressive association allows St. Dominic to discriminate against children.  Because St. Dominic fails to show how admitting children it does not want (and allowing them at least some ability to express their own religious views) would significantly interfere with St. Dominic's ability to express its own views, its expressive association claim fails.

---

[25] The Supreme Court noted that it was <u>not</u> saying that "an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message."  *Id*., at 653.  The Court then noted that Dale was a "gay rights activist" and "one of a group of gay Scouts who have 'become leaders in their community and are open and honest about their sexual orientation.'"  *Id*.  It seems, then, that the case turned out as it did not simply because Dale was an assistant scoutmaster and gay, but also because he was an activist on gay rights.

And even if St. Dominic could show a significant impact on its expressive activity, Section 4602 would survive strict scrutiny, for the reasons stated above. *See also Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (holding that a state's "compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms.").

St. Dominic's free speech argument fares no better.  It claims that Section 4602(5)(D) compels St. Dominic's speech because it requires St. Dominic to permit students to express dissenting religious views.  App. Brief, 40.  But this provision has no impact whatsoever on St. Dominic's speech.  It simply imposes limits (the extent of which are unclear given the lack of judicial interpretation) on St. Dominic's limitation of the speech of its students.

St. Dominic's reliance on *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995) is misplaced.  Indeed, the Supreme Court recognized there that public accommodation statutes prohibiting discrimination "do not, as a general matter, violate the First or Fourteenth Amendments."  *Id*., at 572.  The Court did hold that a city could not force parade organizers to include marchers with whom they disagreed.  But this was because "parades are . . . a form of expression, not just motion," and "every participating unit affects the message conveyed by the private organizers."  *Id.*, at 568, 572-73; *see also id*., at 577

("[E]ach unit's expression is perceived by spectators as part of the whole."). Thus, forcing the parade organizer to include groups "violate[d] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.*, at 573. Here, on the other hand, there is no support in the record for the notion that the messages St. Dominic wants to convey will somehow be affected by the presence of certain students.

And unlike in *Hurley*, there is no risk here that a student's expression will be confused with that of St. Dominic. *See Rumsfeld v. Forum or Academic and Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006) ("[H]igh school students can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so, pursuant to an equal access policy.");[26] *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87-88 (1980) (rejecting shopping center's compelled speech challenge where views expressed by members of the public on its premises would not likely be identified with those of the shopping center itself).[27]

---

[26] It was in part because there was no risk of attribution that the Court held that colleges' First Amendment rights were not violated by being forced to host military recruiters who expressed messages with which they disagreed. *Id.*, at 63-65.

[27] The Supreme Court's decision in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) does not help St. Dominic. There, a website designer engaged in her own "pure speech" by creating wedding websites, and application of a state law requiring her to create websites for same-sex couples would "compel speech [she]

Also inapposite is *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), where the issue was the extent to which states could restrict the ability of social media platforms to moderate the content of their users. The First Amendment was implicated because the platforms, "when curating their feeds," were "combining 'multifarious voices' to create a distinctive expressive offering." *Id*., at 2405. In other words, the "expressive activity include[d] presenting a curated compilation of speech originally created by others." *Id*., at 2400. This was not a novel conclusion – well before *NetChoice* the Supreme Court found First Amendment implications when the government interfered with an entity's ability to express itself through its curation of other's messages. *See, e.g., Hurley*, 515 U.S. 557; *Turner Broadcasting System, Inc*. *v. FCC*, 512 U.S. 622 (1994); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974).

Here, though, nothing in the record supports the notion that St. Dominic's expression depends on what students it accepts or what views those students may themselves express. To be sure, it might be a problem if Maine were to require St. Dominic to provide certain information in its newsletter, morning announcements, or class lectures. But no case supports the notion that deciding what students to

---

does not wish to provide." *Id*., at 587-88. Application of the MHRA to St. Dominic would not compel any speech.

admit is "editorial discretion" entitled to First Amendment protection.[28]  And if

Section 4602 did interfere with St. Dominic's free speech rights, it would pass

strict scrutiny for the reasons discussed above.

### VI.  The District Court Correctly Held That Section 4602 Does Not Violate the Establishment Clause.

The Establishment Clause prohibits "excessive entanglement between

church and state." *Bowen v. Kendrick*, 487 U.S. 589, 602 (1988).  Simply ensuring

that St. Dominic (or any religious school) is complying with the MHRA would not

result in excessive entanglement.  There is no reason that the MHRC would need to

look into such matters as how St. Dominic teaches its classes, what religious values

it instills in students, the manner in which it engages in religious practices and

observances, or any other doctrinal matters.  It is possible that the MHRC might

have to investigate whether, for example, a student was denied admission based on

being a member of a protected class.  This, though, would not involve an

examination of St. Dominic's religious beliefs or practices.  The question would

simply be why the student was not admitted.[29]  St. Dominic seems to suggest that

---

[28] Another case relied upon by St. Dominic is *Wooley v. Maynard*, 430 U.S. 705 (1977).  There, though, a statute requiring motorists to display "Live Free or Die" on their license plates effectively required them to "use their private property as a 'mobile billboard' for the State's ideological message." *Id.*, at 715.

[29] St. Dominic claims that a "religious school's religious admissions criteria, just like a church's membership criteria, are entirely protected from government intrusion."  App. Brief, 48.  The cases it cites to do not support such a proposition,

religious organizations can never be the subject of any state inquiry, but no case

supports such a proposition.  To the contrary, it is clear that when it comes to

litigation, religious organizations do not have some sort of blanket immunity from

relevant factual inquiries.  For example, in *Our Lady of Guadalupe*, 591 U.S. 732,

the Supreme Court examined the religious missions of the schools at issue and the

specific duties and responsibilities of two teachers to determine whether they were

"ministers."  Presumably, this inquiry did not violate the Establishment Clause.

## VII. The District Court Correctly Held That There is No Case or Controversy With Respect to the MHRA's Employment Provisions.

Appellees do not dispute that St. Dominic has broad autonomy when it

comes to hiring.  For all positions, it may limit employment to members of its

religion and require all applicants and employees to conform to its religious tenets.

5 M.R.S. §§ 4553(4), 4573-A(2).  And for employment positions falling within the

"ministerial exception," St. Dominic is not subject at all to the MHRA's

employment provisions.  *See Our Lady of Guadalupe*, 591 U.S. 732; *Hosanna-

Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012).[30]

---

and, in any event, St. Dominic apparently does not have religious admissions
criteria.
[30] It is simply not true, as St. Dominic claims, that after *Carson*, Maine's Attorney
General stated that religious schools participating in the tuition program would
have to eliminate their religious hiring practices.  App. Brief, 52 (citing JA63).
Nor is it true that in her Supreme Brief in *Carson*, the DOE Commissioner stated
that 5 M.R.S. § 4573-A(2) does not apply to religious organizations that do not

Citing a single case from the Tenth Circuit, St. Dominic seems to argue that under the "church autonomy doctrine," employment decisions based on religious doctrine are entirely immune from state regulation regardless of the nature of the position. App. Brief, 51 (citing *Bryce v. Episcopal Church*, 289 F.3d 648 (10th Cir. 2002)). But the plaintiff in *Bryce* was the church's youth minister.  289 F.3d at 651.  And since *Bryce*, the Supreme Court decided *Our Lady of Guadalupe Sch.* and *Hosanna-Tabor*, where it held that religious organizations have autonomy when it comes to ministerial positions.  St. Dominic cites no case in which a court held that the same autonomy exists with respect to non-ministerial positions.  In any event, as explained above, St. Dominic is free to limit employment to members of its religion who conform to its religious tenets.

St. Dominic argues that the MHRA might prevent it from dismissing an employee who enters a same-sex union.  App. Brief, 51.  But nowhere in its Complaint does St. Dominic allege that persons in same-sex unions are not eligible for employment.  In any event, if St. Dominic did terminate an employee for being in a same sex union, a court would need to decide whether the action was based on the employee's nonconformance with St. Dominic's religious tenets.  *See* 5 M.R.S. § 4573-A(2).  Finally, when it comes to positions qualifying for the ministerial

---

receive public funds.  App. Brief, 10.  St. Dominic cannot create a case or controversy by misstating the record.

exception, St. Dominic has broad autonomy in employment decisions, including terminating someone for being in a same-sex marriage.

## VIII.  The District Court Correctly Held the Unconstitutional Conditions Doctrine Is Not Applicable.

Citing to *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ("*AOSI*"), St. Dominic claims that Maine is imposing unconstitutional conditions by requiring religious schools taking public funds to comply with the MHRA.  App. Brief, 53-55.  But as St. Dominic acknowledges, the unconstitutional conditions doctrine applies when the government conditions a benefit on "forfeiture of a constitutional right."  *Id*., at 54.  As discussed above, application of the MHRA to St. Dominic does not infringe on any of its First Amendment rights.  So St. Dominic would forfeit nothing.

Moreover, unconstitutional condition concerns arise when the government tries to "reach outside" the subsidized program.  570 U.S. at 217.  In *AOSI*, the government was reaching outside when it required recipients of funds combatting HIV/AIDS to have policies opposing prostitution.  *Id*., at 208.  Maine is not reaching outside the tuition program when it conditions a school's receipt of public funds to educate children on the school's agreement to not discriminate in providing that education.  *See Grove City Coll. v. Bell*, 465 U.S. 555, 575-76 (1984) (holding that federal law requiring colleges receiving federal financial assistance to comply with Title IX's prohibition against sex discrimination did not

violate college's First Amendment rights because college was free to avoid the requirement by not accepting federal funds*); Evans v. City of Berkeley*, 129 P.3d 394, 400-02 (Cal. 2006) (holding that "a government entity may constitutionally require a recipient of funding or subsidy to provide written, unambiguous assurances of compliance with a generally applicable nondiscrimination policy").

## IX.  The District Court Correctly Denied Preliminary Injunctive Relief.

The "sine qua non" of the preliminary injunction analysis is likelihood of success on the merits – "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  For the reasons set forth above, St. Dominic is unlikely to succeed on the merits.  But the remaining factors also support denial of injunctive relief.  To warrant injunctive relief, the alleged irreparable harm must be more than speculative.  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).  Because it is not clear whether any of St. Dominic's current practices run afoul of the MHRA, St. Dominic cannot establish the requisite likelihood of irreparable harm.  And if there were a risk of irreparable harm, an injunction in this case would not remove the risk because St. Dominic would remain subject to suit from private parties.

The balance of equities and the public interest cut against St. Dominic.  As is discussed above, St. Dominic has failed to demonstrate that application to it of the

53

MHRA would burden its religious practices or stifle religious expression.  On the other hand, Maine has a compelling interest in the broad application of its anti-discrimination laws, especially those provisions that prohibit educational discrimination against children.  And the public has an interest in those laws being properly enforced.  The public interest would suffer if Maine's efforts to eliminate discrimination were impeded.

## CONCLUSION

For the reasons discussed above, Appellees respectfully request that the Court affirm the district court's denial of St. Dominic's preliminary injunction motion.

Dated:  November 7, 2024
Augusta, Maine

Respectfully submitted,

AARON M. FREY
Attorney General


s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Bar Number 65217
SARAH A. FORSTER
Bar Number 63176
Six State House Station
Augusta, ME  04333-0006
(207) 626-8800
Attorneys for Defendants-Appellees

## <u>CERTIFICATE OF COMPLIANCE</u>

The within Appellees' Brief is submitted under Federal Rule of Appellate

Procedure 32(a)(7)(B).  I hereby certify that the brief complies with the type-

volume limitation prescribed by Rule 32(a)(7)(B)(i).  For this Certification, I relied

on the word count function of the word-processing software used to prepare this

brief (Microsoft Word 2007), which has counted 13,000 words in this brief.  I

further certify that all text in this brief is in proportionally spaced Times New

Roman Font and is 14 points in size.

<u>s/ Christopher C. Taub</u>
Christopher C. Taub
Chief Deputy Attorney General
Bar No. 65217
Six State House Station
Augusta, Maine  04333-0006
(207) 626-8800

<u>**CERTIFICATE OF SERVICE**</u>

Pursuant to Fed. R. App. P. 25(d), I, Christopher C. Taub, Chief Deputy Attorney General for the State of Maine, hereby certify that on this, the 7th day of November, 2024, I filed the above brief electronically via the ECF system.  I further certify that on this, the 7th day of November, 2024, I served the above brief electronically on the following party, who is an ECF Filer, via the Notice of Docket Activity:

- James B. Haddow
  jhaddow@pmhlegal.com

- Adele Keim
  akeim@becketlaw.org

- Mark L. Rienzi
  mrienzi@becketlaw.org

- Benjamin Fleshman
  bfleshman@becketlaw.org

- Michael Joseph O'Brien
  mobrien@becketlaw.org

<u>s/ Christopher C. Taub</u>
Christopher C. Taub
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
Bar No. 65217
Six State House Station
Augusta, Maine  04333-0006
(207) 626-8800
