No. 24-1739

---

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

ST. DOMINIC ACADEMY, D/B/A ROMAN CATHOLIC BISHOP OF
PORTLAND, A CORPORATION SOLE; ROMAN CATHOLIC BISHOP OF
PORTLAND; KEITH RADONIS, ON THEIR OWN BEHALF AND AS NEXT
FRIEND OF CHILDREN K.Q.R., L.R.R., AND L.T.R.; VALORI RADONIS, ON
THEIR OWN BEHALF AND AS NEXT FRIEND OF CHILDREN K.Q.R., L.R.R.,
AND L.T.R.,

*Plaintiffs-Appellants*,

v.

A PENDER MAKIN, IN THEIR PERSONAL CAPACITY AND OFFICIAL
CAPACITY AS THE COMMISSIONER OF THE MAINE DEPARTMENT OF
EDUCATION; JEFFERSON ASHBY, IN THEIR PERSONAL CAPACITY AND
OFFICIAL CAPACITY AS THE COMMISSIONER OF THE MAINE HUMAN
RIGHTS COMMISSION; EDWARD DAVID, IN THEIR PERSONAL
CAPACITY AND OFFICIAL CAPACITY AS THE COMMISSIONER OF THE
MAINE HUMAN RIGHTS COMMISSION; JULIE ANN O'BRIEN, IN THEIR
PERSONAL CAPACITY AND OFFICIAL CAPACITY AS THE
COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION; MARK
WALKER, IN THEIR PERSONAL CAPACITY AND OFFICIAL CAPACITY AS
THE COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION;
THOMAS L. DOUGLAS, IN THEIR PERSONAL CAPACITY AND OFFICIAL
CAPACITY AS THE COMMISSIONER OF THE MAINE HUMAN RIGHTS
COMMISSION,

*Defendants-Appellees*.

---

Appeal from the U.S. District Court for the District of Maine,
Case No. 2:23-cv-00246-JAW; Hon. John A. Woodcock, Jr.

---

**BRIEF OF *AMICI CURIAE* PUBLIC FUNDS PUBLIC SCHOOLS,
NATIONAL EDUCATION ASSOCIATION, NATIONAL SCHOOL
BOARDS ASSOCIATION, AMERICAN FEDERATION OF TEACHERS,**

**IN THE PUBLIC INTEREST, FREEDOM FROM RELIGION FOUNDATION, AMERICAN ATHEISTS, COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, NETWORK FOR PUBLIC EDUCATION, PASTORS FOR CHILDREN, DISABILITY RIGHTS MAINE, AND MAINE EDUCATION ASSOCIATION, IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

ADAM J. HUNT
TAMARA WIESEBRON
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Tel.: (212) 468-8000
AdamHunt@mofo.com
TWiesebron@mofo.com

JENNY XIN
JUSTIN KAREEM REZKALLA
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel.: (415) 268-7000
JXin@mofo.com
JRezkalla@mofo.com

*Counsel of Record for Amici Curiae*

ROBERT KIM
JESSICA LEVIN
WENDY LECKER
EDUCATION LAW CENTER
60 Park Place, Suite 300
Newark, NJ 07102
Tel: (973) 624-1815
RKim@edlawcenter.org
JLevin@edlawcenter.org
WLecker@edlawcenter.org

*Counsel of Record for Public Funds Public Schools*

November 14, 2024

KRISTEN L. HOLLAR
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W., Suite 819
Washington, DC 20036
Tel: (202) 822-7035
KHollar@nea.org

*Counsel of Record for the National Education Association and Maine Education Association*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................... ii

CORPORATE DISCLOSURE STATEMENT ...................................... vii

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ....................................................................................4

    I.    Abstention Is Proper Here Given Uncertain Issues of State Law ........4

    II.    The State's Core Education Goals Can Only Be Met in
Nondiscriminatory Schools ........................................................6

        A.    In Some Districts, Maine Fulfills Its Duty to Provide
Education Through Private "Town Tuitioning" Schools,
Which Are Subject to Neutral, Generally Applicable
Education Standards ...............................................................7

        B.    Requiring Maine to Fund Discrimination Defeats the
Purpose of Maine's Tuitioning Program and Harms
Maine's Children .................................................................10

        C.    The MHRA's Antidiscrimination Provisions Do Not
Infringe on Parental Rights ..................................................19

    III.    Conditioning Public Funds on Compliance with
Nondiscrimination Standards Is Proper ...........................................20

        A.    The MHRA's Antidiscrimination Provisions Are Subject
to Rational Basis Review Because They Are Neutral and
Generally Applicable ...........................................................20

        B.    The MHRA's Antidiscrimination Provisions Also
Withstand Strict Scrutiny ....................................................25

CONCLUSION ................................................................................27

APPENDIX – STATEMENTS OF INTERESTS ...................................29

CERTIFICATE OF COMPLIANCE ...................................................34

CERTIFICATE OF SERVICE ............................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)................................................................18

*AID v. Alliance for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)................................................................23

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982)................................................................25

*Bankr. Est. of Everest v. Bank of Am., N.A.*,
    2015 ME 19, 111 A.3d 655 (2015)........................................6

*Batterman v. Leahy*,
    544 F.3d 370 (1st Cir. 2008)..................................................4

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986)................................................................11

*Blount v. Dep't of Educ. & Cultural Servs.*,
    551 A.2d 1377 (Me. 1988)....................................................26

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983)..................................................24, 26, 27

*Bowen v. Roy*,
    476 U.S. 693 (1986)................................................................24

*Brown v. Bd. of Educ.*,
    347 U.S. 483 (1954)................................................................6

*Brown v. Crown Equip. Corp.*,
    2008 ME 186, 960 A.2d 1188 (2008)....................................6

*Carson v. Makin*,
    596 U.S. 767 (2022)......................................................3, 5, 19, 23

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
    561 U.S. 661 (2010) ..................................................................................... 11

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ..................................................................................... 24

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ..................................................................................... 20

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) ......................................................................... 20, 24, 25

*Does 1-6 v. Mills*,
    16 F.4th 20 (1st Cir. 2021) .......................................................................... 24

*Doherty v. Merck & Co.*,
    2017 ME 19, 154 A.3d 1202 (2017) ............................................................... 6

*Donahoe v. Richards*,
    38 Me. 379 (1854) ................................................................................. 25, 26

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
    494 U.S. 872 (1990) ..................................................................................... 27

*Fellowship of Christian Athletes v. District of Columbia*,
    No. 24-cv-1332 (DLF), 2024 WL 3400104 (D.D.C. July 11, 2024) ............... 25

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021) ..................................................................................... 21

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*,
    580 U.S. 386 (2017) ..................................................................................... 15

*Mangual v. Rotger-Sabat*,
    317 F.3d 45 (1st Cir. 2003) ............................................................................ 4

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*,
    584 U.S. 617 (2018) ................................................................................ 17, 18

*Illinois ex rel. McCollum v. Bd. of Ed. of Sch. Dist. No. 71*,
    333 U.S. 203 (1948) ..................................................................................... 16

*Norwood v. Harrison,*
413 U.S. 455 (1973) ..........................................................................25

*Prince v. Massachusetts,*
321 U.S. 158 (1944) ..........................................................................10

*Railroad Commission of Texas v. Pullman Co.,*
312 U.S. 496 (1941) ............................................................................4

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984) ..........................................................................25

*Runyon v. McCrary,*
427 U.S. 160 (1976) ..........................................................................19

*Rust v. Sullivan,*
500 U.S. 173 (1991) .....................................................................20, 24

*Santa Fe Indep. Sch. Dist. v. Doe,*
530 U.S. 290 (2000) ..........................................................................16

*Thornton Acad. v. Reg'l Sch. Unit 21,*
2019 ME 115, 212 A.3d 340 (2019) ....................................................6

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) ..........................................................................10

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ..........................................................................10

**United States Constitution**

U.S. Const. amend. I ...........................................................................16

**Maine Constitution**

Me. Const. art. VIII (1820) ...................................................................6

Me. Const. art. VIII, pt. 1, § 1 (2023) .............................................*passim*

**Federal Statutes**

20 U.S.C. § 1400 ................................................................................15

20 U.S.C. §§ 1681-1688 ........................................................................21

42 U.S.C. § 2000d ...............................................................................21

**Maine Statutes**

20-A M.R.S. § 2901(2) .....................................................................8, 20

20-A M.R.S. § 2902 .........................................................................8, 20

20-A M.R.S. § 4704 .........................................................................8, 20

20-A M.R.S. § 5001-A(3)(A)(2) ..........................................................19

20-A M.R.S. § 6209. ........................................................................8, 20

20-A M.R.S. § 7201 ..............................................................................15

5 M.R.S. § 4553(2-A) .............................................................................9

5 M.R.S. § 4601 ...............................................................................9, 22

5 M.R.S. § 4602 .............................................................................15, 27

ME LEGIS 188 (2023), 2023 Me. Legis. Serv. Ch. 188 (H.P. 1165)
(L.D. 1833) (WEST) .......................................................................9

ME LEGIS 643 (2022), 2022 Me. Legis. Serv. Ch. 643 (S.P. 237)
(L.D. 598) (WEST) .........................................................................9

**Other State Statutes**

La. Rev. Stat. Ann. §§ 17:4011, 4013, 4021 ........................................20

Ohio Rev. Code Ann. §§ 3301.16, 3310, 3313 .....................................20

**Maine Public Laws**

P.L. 1873, ch. 124, § 4 ...........................................................................7

P.L. 1987, ch. 578, § 3 ...........................................................................8

P.L. 2021, ch. 366, § 19 .......................................................................22

**Executive Orders**

Exec. Order No. 12250, 45 Fed. Reg. 72995 (Nov. 4, 1980) ..................................21

**Federal Publications**

Nat'l Ctr. for Educ. Stat., U.S. Dep't of Educ., *The Condition of Education 2024*, https://nces.ed.gov/programs/coe/pdf/2024/CGG_508c.pdf .............................15

Office for Civil Rights, U.S. Dep't of Educ., *2020-21 Civil Rights Data Collection, A First Look: Students' Access to Educational Opportunities in U.S. Public Schools* (Nov. 2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/crdc-educational-opportunities-report.pdf ...............................................11

**State Publications**

Me. Dep't of Educ., *LGBTQ+ Resources* (2020), https://bit.ly/3AIyuMI......................................................................8, 12

**Other Authorities**

Jaana Juvonen et al., *When and How Do Students Benefit From Ethnic Diversity in Middle School?*, Nat'l Library of Medicine: Nat'l Center for Biotech. Info. (Jun. 20, 2017), https://pubmed.ncbi.nlm.nih.gov/28631304/.....................................11

Julia Donheiser, *Choice for most: In nation's largest voucher program, $16 million went to schools with anti-LGBT policies*, Chalkbeat (Aug. 10, 2017)....................................................13

Katie Reilly and Madeleine Carlisle, *The Supreme Court Could Let Religious Schools Take Taxpayer Money.  LGBTQ Alumni Say That's a Mistake*, Time Magazine (Jan. 3, 2022) ...............................14

*Religious private schools most segregated in U.S.*, Harvard Gazette (June 25, 2002).................................................................13

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *Amici*

state that they have no parent corporations and do not issue stock.


DATED:      November 14, 2024          Respectfully submitted,


By: */s/ Adam J. Hunt*
    Adam J. Hunt
    250 West 55th Street
    New York, NY  10019-9601
    Telephone:    (212) 468-8000
    Facsimile:    (212) 468-7900
    AdamHunt@mofo.com

    *Counsel of Record for Amici Curiae*

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* Public Funds Public Schools, the National Education Association, the American Federation of Teachers, the National School Boards Association, American Atheists, the Council of Parent Attorneys and Advocates, Disability Rights Maine, the Freedom From Religion Foundation, In the Public Interest, the Network for Public Education, Maine Education Association, and Pastors for Children are committed to ensuring that public education remains the cornerstone of our nation's social, economic, and political structure, and that children of all backgrounds have the right to a public education that gives them a meaningful opportunity to succeed in school and in life, free from discrimination. Detailed statements of interest for each of the *Amici* are set forth in Appendix A.

All parties have consented to the filing of this brief.

---

[1] No party or its counsel had any role in authoring this brief. No person or entity— other than *Amici curiae* and their counsel—contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

Appellants are asking this Court to sanction unlawful discrimination by requiring the State to reward them with public funds, even as they deny educational opportunities to children based on protected characteristics, including sexual orientation, gender identity, and religion. Maine's Constitution explicitly articulates the State's "duty" to provide children access to a free public education. Me. Const. art. VIII, pt. 1, § 1 (2023). As a natural extension of this duty, public education in Maine—whether provided in public schools or through the "town tuitioning" program—has historically been subject to neutral, generally applicable standards that further the State's objective of providing quality education for all students, free from inequality or disparate treatment. The Maine Human Rights Act ("MHRA") is one such standard, establishing requirements to ensure that all students have the opportunity to participate in publicly funded educational programs free from discrimination based on sex, sexual orientation, gender identity, religion, disability, or race.

Appellants St. Dominic Academy ("St. Dominic"), a ministry of the Roman Catholic Diocese of Portland ("Diocese")—along with the Bishop of Portland and Catholic parents—have brought a pre-enforcement action seeking to be excused from compliance with the MHRA's nondiscrimination requirements, claiming that these requirements "regulate religious expression" and impact their free exercise of

2

religion.

The MHRA amendments at issue were enacted a year before the U.S. Supreme Court's decision in *Carson v. Makin*, 596 U.S. 767 (2022), and the Maine Supreme Court has not yet had an opportunity to decide how they apply to religious schools now eligible for town tuitioning funds. As such, *Amici* argue that this Court should abstain from ruling on Appellants' claims and should certify a question to the Maine Supreme Court about the scope and applicability of the MHRA to private religious tuitioning schools.

If this Court does address Appellants' claims, however, this court should find Maine's policy conditioning receipt of public tuition funds on compliance with the MHRA's antidiscrimination provisions constitutional. The MHRA's antidiscrimination provisions are neutral and generally applicable, and therefore subject to rational basis review. But even if this Court applies a strict scrutiny standard, these provisions should be upheld. Maine has a compelling interest of the highest order in ensuring that publicly funded educational institutions do not discriminate. Moreover, the MHRA's antidiscrimination provisions are narrowly tailored, as they are written to solely encompass discriminatory conduct and, critically, do not apply to religious schools that do not accept public funds.

The MHRA is vital to preserving the right to public education for all Maine children, particularly those in rural areas who only have access to a state-funded

education at private town tuitioning schools.  Antidiscrimination laws enable the State to remove obstacles—such as bullying, harassment, and unfair discipline—that often prevent the most vulnerable students from accessing their right to education. Moreover, these protections promote democratic values that are a fundamental goal of public education in Maine.  Exempting town tuitioning schools from antidiscrimination requirements would gravely harm Maine's students and violate their core education rights under Maine's constitution, and undermine the State's ability to protect its citizens' civil rights.  If religious entities have an unconditional right to public funds free of any neutral, generally applicable rules the government may impose, many such programs will become untenable.

## ARGUMENT

### I.    Abstention Is Proper Here Given Uncertain Issues of State Law

Abstention under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), is appropriate here given that "(1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." *Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008).[2]

---

[2] The First Circuit has cautioned against applying *Pullman* abstention to cases involving First Amendment challenges for fear of chilling free expression.  *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 64 (1st Cir. 2003).  But here, there is no evidence that Appellants' religious expression has been or would be chilled by

Appellants are challenging amendments to the MHRA's antidiscrimination provisions that were enacted in 2021. At the time, the Supreme Court had not yet issued its decision in *Carson*, holding that Maine's requirement that schools participating in its town tuitioning program be nonsectarian violated the federal Free Exercise Clause. 596 U.S. at 789. Accordingly, the Maine Supreme Court has not had an opportunity to interpret the amended MHRA as it applies to the tuitioning program, which has been updated to allow religious schools to participate. Appellants nevertheless speculate that the MHRA might be interpreted to violate their constitutional rights. For example, Appellants claim that the 2021 amendments will require religious schools to allow leaders of other religions to conduct on-campus prayer sessions, require Catholic schools to allow Protestant worship, and bar religious schools from limiting financial assistance to students who share the school's religion. Appellants' Brief at 8, 13; Plaintiffs' Motion for Preliminary Injunction at 15-16. But no Maine court has addressed *any* of these arguments. And if a Maine state court determines that the MHRA applies differently than Appellants assume, their challenge could be moot. In other words, Appellants' hypotheticals have raised "substantial uncertainty" concerning the application of the MHRA, and

---

abstention because only the ability to receive funds is at issue in this case; their religious expression is not impacted by the status quo.

a decision by the Maine Supreme Court—or another lower state court—could obviate the need to reach the federal questions implicated in this case.

This Court should therefore abstain from hearing Appellants' claims and certify a question to the Maine Supreme Court as to the scope and applicability of the MHRA to private religious schools.[3] *Amici*'s remaining arguments in this brief apply to the extent that this Court considers these claims now.

## II.    The State's Core Education Goals Can Only Be Met in Nondiscriminatory Schools

Providing education is "perhaps the most important function of state and local governments." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).  Since its inception, the Maine Constitution has deemed the "general diffusion of the advantages of education [to be] essential to the preservation of the rights and liberties of the people," requiring that every town "support and maint[ain] [] public schools" such that every child in Maine may receive the benefits of a public education.  Me. Const. art. VIII (1820); Me. Const. art. VIII, pt. 1, § 1 (2023); *see also Thornton Acad. v. Reg'l Sch. Unit 21*, 2019 ME 115, ¶ 6, 212 A.3d 340, 342 (2019) ("By constitutional

---

[3] Maine courts generally will consider certified questions "if (1) there is no dispute as to the material facts at issue; (2) there is no clear controlling precedent; and (3) [the court's] answer, in at least one alternative, would be determinative of the case." *Bankr. Est. of Everest v. Bank of Am., N.A.*, 2015 ME 19, ¶ 13, 111 A.3d 655, 659 (2015) (citation omitted); *see also, e.g.*, *Doherty v. Merck & Co.*, 2017 ME 19, ¶ 8, 154 A.3d 1202, 1205 (2017); *Brown v. Crown Equip. Corp.*, 2008 ME 186, ¶ 12, 960 A.2d 1188, 1192 (2008).

and statutory mandate, every municipality in Maine must provide for a free public education from kindergarten through grade twelve for all children whose parents reside in that municipality.").  Maine has historically met its constitutional obligation to provide education in some areas through its town tuitioning program.

Appellants ask to be excused from the MHRA's requirements so that they may both receive public funds through town tuitioning and expressly discriminate against children and families.  The Court cannot rule in Appellants' favor without jeopardizing scores of civil rights laws, as well as the government's ability to place important neutral and generally applicable conditions on publicly funded programs. If Maine is not permitted to regulate town tuitioning in this manner, it is questionable whether Maine can continue to operate the program at all.

### A.  In Some Districts, Maine Fulfills Its Duty to Provide Education Through Private "Town Tuitioning" Schools, Which Are Subject to Neutral, Generally Applicable Education Standards

For geographic and historical reasons, many school districts in Maine do not operate their own public schools.  Maine launched its town tuitioning program in 1873, pursuant to which School Administrative Units ("SAUs") without a local public school could use public funds to subsidize resident students' tuition at an approved private school of the parents' choice.  P.L. 1873, ch. 124, § 4, https://bit.ly/2ZnLudY.

To ensure that the program achieves its educational ends, Maine has long required all participating private K-12 schools to comply with neutral, generally applicable requirements in order to receive the public funds made available through town tuitioning. For instance, schools participating in the program must adhere to health and safety laws, teacher certification requirements, class size limits, curriculum guidelines, and other requirements governing the quality of education. *See* 20-A M.R.S. §§ 2901(2), 2902, 4704, 6209. These requirements do not target religious practices, nor are they motivated by religious animus.

The MHRA's antidiscrimination provisions are no different. Maine's education system operates from the core value that "*every* student deserves a safe and equitable school environment."[4] Accordingly, Maine schools have been required to comply with the MHRA since the Act was expanded to prohibit discrimination in education in 1987. P.L. 1987, ch. 578, § 3. The MHRA has since been amended to explicitly guarantee students the opportunity to participate in all educational programs without discrimination because of sex, sexual orientation, physical or mental disability, national origin, or race.[5] P.L. ch. 366, Laws of the

---

[4] Me. Dep't of Educ., *LGBTQ+ Resources* (2020), https://bit.ly/3AIyuMI (last visited Oct. 29, 2024) (emphasis added).

[5] Though the MHRA amendments on gender identity were codified in 2021, Maine has long been committed to protecting different gender identities. The definition of "sexual orientation" that was added to the MHRA in 2005 included gender identity. *See* Ord. re: Mot. for Prelim. Inj., ECF No. 50 at 55 ("'Sexual orientation' means a

State of Maine, 130th Legislature, 5 M.R.S. § 4601.[6]  In 2021, the Maine Legislature

amended the MHRA to add explicit protections for students of different "gender

identit[ies]," "ancestr[ies]," "color[s]," and "religion[s]."  *Id.*  This was not a one-off

amendment:  Maine's legislature regularly updates the MHRA as it becomes aware

of specific needs.[7]  Moreover, the MHRA's provisions concerning "[e]ducational

institution[s]" include "any public school or educational program," including those

that are private but are "approved for tuition purposes," whether they are affiliated

with a religious organization or not.[8]  5 M.R.S. § 4553(2-A).  Thus, these neutral

and generally applicable civil rights requirements apply to *all* Maine K-12 schools

that participate in the tuitioning program, ensuring that *all* Maine students can

receive a publicly funded education free from discrimination.

---

person's actual or perceived heterosexuality, bisexuality, homosexuality or gender identity or expression" (quoting P.L. 2005, ch. 10)).

[6] https://lldc.mainelegislature.org/Open/Laws/2021/2021_PL_c366.pdf.

[7] In 2022, Maine amended the MHRA to clarify that discriminating based on traits associated with particular races, such as hairstyles, constitutes race discrimination under the Act.  ME LEGIS 643 (2022), 2022 Me. Legis. Serv. Ch. 643 (S.P. 237) (L.D. 598) (WEST).  And in 2023, Maine altered its definition of "[e]ducational institution" to include single-sex private schools approved for tuition purposes. *See* ME LEGIS 188 (2023), 2023 Me. Legis. Serv. Ch. 188 (H.P. 1165) (L.D. 1833) (WEST).

[8] Prior to 2021, religious schools received an exemption from antidiscrimination requirements pertaining to sexual orientation.  The 2021 amendment to the MHRA revoked this exemption for schools receiving public funding.  P.L. ch. 366, https://lldc.mainelegislature.org/Open/Laws/2021/2021_PL_c366.pdf; Ord. re: Mot. for Prelim. Inj., ECF No. 50 at 56-57.

**B.    Requiring Maine to Fund Discrimination Defeats the Purpose of Maine's Tuitioning Program and Harms Maine's Children**

The State's obligation to provide public education is one of its most fundamental responsibilities.  Maine Const. art. VIII, pt. 1, § 1 (2023).  As the U.S. Supreme Court has acknowledged, education is the gateway to participating fully in our democracy.  *See Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("Providing public schools ranks at the very apex of the function of a State."); *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944) ("A democratic society rests . . . upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies.").  The Court has also long affirmed the value in keeping schools free from discrimination, writing that "[f]ree public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).  Eliminating discrimination in publicly funded education both instills fundamental democratic values in all students and protects students from discriminatory practices—including bullying, harassment, exclusion from school, unfair discipline, or unequal treatment—that are antithetical to those democratic values.

Antidiscrimination laws also promote diverse student bodies conducive to the communal educational experience.  Diversity helps instill those "fundamental values . . . essential to a democratic society . . . includ[ing] tolerance of divergent political

10

and religious views." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986). The Supreme Court has acknowledged that when schools adopt and enforce antidiscrimination policies, they allow all students to participate, in turn promoting the goals of education for all students. *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 688 (2010). For example, research has shown that ethnic diversity in schools makes students of color feel safer and less lonely, increases perceptions that teachers are treating students fairly and equally, and reduces the degree to which students prefer their own ethnic group relative to other groups.[9] There is no way for the State to further its educational goals if it grants broad exemptions to the perpetrators of discrimination, regardless of the grounds they cite to justify that discrimination.

Permitting state-funded discrimination directly undermines the goals of public education, requiring the State to pay for a message that certain students and their families are not entitled to the same rights and respect as others. Public education is particularly vital to students of color, students with disabilities, and LGBTQ+ students, who depend on publicly funded schools at higher rates than their peers.[10]

---

[9] Jaana Juvonen et al., *When and How Do Students Benefit From Ethnic Diversity in Middle School?*, Nat'l Library of Medicine: Nat'l Center for Biotech. Info. (Jun. 20, 2017), https://pubmed.ncbi.nlm.nih.gov/28631304/.
[10] *See* Office for Civil Rights, U.S. Dep't of Educ., *2020-21 Civil Rights Data Collection, A First Look: Students' Access to Educational Opportunities in U.S. Public Schools* (Nov. 2023),

Antidiscrimination protections for these vulnerable groups are crucial for student safety and educational achievement. Yet, the logic that Appellants advance in their effort to force Maine to provide public funding to schools that explicitly discriminate threatens a slippery slope of publicly funded discrimination against LGBTQ+ students, as well as other vulnerable and protected classes of students, such as students with disabilities and students of other religions. Compelling Maine to issue wholesale exemptions from the MHRA's neutral and generally applicable requirements to any religious school that objects to these requirements will lead to increased bullying and harassment of marginalized students, as well as subject them to discriminatory school admissions and disciplinary policies funded by the State. This is fundamentally inconsistent with Maine's constitution and laws.

### 1. LGBTQ+ students

LGBTQ+ students in particular are more likely to be bullied or harassed and report more anxiety and depression than students who do not identify as LGBTQ+.[11] That bullying and harassment is directly related to pervasive cultural stigma and negative stereotypes about their identity.[12] Private schools, including some of those

---

https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/crdc-educational-opportunities-report.pdf (last visited Oct. 30, 2024).

[11] Me. Dep't of Educ., *LGBTQ+ Resources* (2020), https://bit.ly/3AIyuMI (last visited Oct. 29, 2024) (finding that 37% of Maine LGBTQ+ students were bullied and/or harassed on school property in 2019, compared to 21% of all students).

[12] *Id.*

in Maine, routinely use policies that either explicitly discriminate or use proxies like dress codes to exclude students based on gender and gender identity. [13] Discrimination against LGBTQ+ students is especially prevalent in religious private schools. [14] For example, LGBTQ+ students at Bangor Christian School have reported instances of targeted harassment and bullying from administrators and teachers, including being threatened with expulsion unless they promised to hide

---

[13] *See, e.g.*, *Religious private schools most segregated in U.S.*, Harvard Gazette (June 25, 2002), https://bit.ly/3pGQGEW; Lisbon Falls Christian Academy, *Student Handbook* at 10 (updated Aug. 3, 2017), https://bit.ly/3mp4Jg3 (stating that the school "supports the emphasis of the Christian home in matters of modesty of dress, hair styles, and good grooming"); Hartland Christian Academy, 2021-2022 *School Handbook* at 19, https://bit.ly/3molPKY.

[14] *See* Julia Donheiser, *Choice for most: In nation's largest voucher program, $16 million went to schools with anti-LGBT policies*, Chalkbeat (Aug. 10, 2017), https://www.chalkbeat.org/2017/8/10/21107318/choice-for-most-in-nation-s-largest-voucher-program-16-million-went-to-schools-with-anti-lgbt-polici/ (finding that one in 10 of Indiana's voucher schools, which received over $16 million in public funds in 2016, publicly shared a policy suggesting or declaring that LGBT students were not welcome); Lisbon Falls Christian Academy, *supra*, at 5; *see also* Greater Houlton Christian Academy, *GHCA Family Handbook* 2024-2025 at 3, https://www.ghca.com/images/forms_docs/2024-2025GHCAFamilyHandbook.pdf ("We also believe that any form of homosexuality, lesbianism, bisexuality, bestiality, incest, fornication, adultery and pornography are sinful perversions of God's gift of sex . . . "); Pine Tree Academy, *Handbook* at 8-9 (Sept. 10, 2021), https://bit.ly/3EuPoB4 (stating that the school "does not admit individuals who engage in sexual misconduct, which includes . . . homosexual conduct"); Open Door Christian Academy, *2024-2025 Student Handbook* at 7, https://odbc-school.com/wp-content/uploads/2022/04/2024-2025-Student-Handbook-EDIT-1.pdf ("We believe that God disapproves of and forbids any attempt to alter one's gender by surgery or appearance.").

their sexuality, being offered conversion therapy, and being told that they could not be both Christian and gay.[15]

In this case, St. Dominic has indicated that it is unwilling to comply with the MHRA to the extent that it conflicts with its religious beliefs concerning sexual orientation and gender identity. *See* Plaintiffs' Reply to Motion for Preliminary Injunction at 6; Compl. ¶¶ 137-46. Forcing Maine to issue St. Dominic an exemption from the MHRA's neutral and generally applicable requirements will subject students of certain sexual orientations and gender identities to discriminatory disciplinary policies funded by the State, and will likely lead to increased bullying and harassment of marginalized students.

### 2. Pregnant students

Some private religious schools have also threatened to suspend or expel pregnant students, who are protected under the MHRA, for religious reasons. For example, one religious school in Maine states that "[p]ossible consequences" for student pregnancy include "suspension," "expulsion," or a requirement to complete all education from home, in which case the student must forfeit all student leadership

---

[15] Katie Reilly and Madeleine Carlisle, *The Supreme Court Could Let Religious Schools Take Taxpayer Money. LGBTQ Alumni Say That's a Mistake*, Time Magazine (Jan. 3, 2022), https://time.com/6129283/bangor-christian-schools-lgbtq-carson-makin/.

positions. [16]    That policy not only violates the MHRA's antidiscrimination requirements, which prohibit the "exclu[sion] [of] any person from any program or activity because of pregnancy or related conditions," 5 M.R.S. § 4602(1)(C), but also undermines Maine's constitutionally mandated duty to provide public education for all children in the state.  Me. Const. art. VIII, pt. 1, § 1.

### 3.    Students with disabilities

Granting town tuitioning schools a pass on MHRA compliance also threatens to excuse—and even condone—publicly funded discrimination against and segregation of students with disabilities.  Federal law requires the State to make available a free, appropriate public education to eligible children with disabilities. [17] Yet many private schools have a track record of overt discrimination against students with disabilities.  *See, e.g.*, Greater Portland Christian School Catalog at 47, https://tinyurl.com/9dckj3tc (stating that the school does not accept "children with current major learning difficulties (i.e., children who have been involved in special

---

[16] Greater Houlton Christian Academy, *supra GHCA Family Handbook* 2024-2025 at 28.

[17] *See* Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400; *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017).  Maine law too recognizes this requirement.  *See* 20-A M.R.S. § 7201. And Maine has one of the highest percentages of students receiving IDEA services, as measured in the 2022-23 school year.  *See* Nat'l Ctr. for Educ. Stat., U.S. Dep't of Educ., *The Condition of Education 2024* at 2, https://nces.ed.gov/programs/coe/pdf/2024/CGG_508c.pdf (last visited Oct. 29, 2024) (noting that 21% of public school students in Maine receive services under the IDEA, the highest percentage in all 50 states).

education programs) . . . [or] major emotional problems"); Sanford Christian Academy, 2020-2021 Parent-Student Handbook at 3, https://bit.ly/3jMb7fL (last visited Oct. 29, 2024) ("The academic programs at SCA are designed for average and above average students. No provisions are available for mentally handicapped children or children with severe learning or behavioral [*sic*] (IEP) disabilities.").

### 4. Students from different religions

The MHRA's antidiscrimination provisions aim to eradicate a form of discrimination that even Appellants acknowledge has no place in publicly funded school systems—religious discrimination. Public education has long been a protected right for students of all religious backgrounds. While the Free Exercise Clause protects the ability of religious schools to educate in accordance with their faith, the Establishment Clause prohibits public schools from discriminating against students based on their religion. *See* U.S. Const. amend. I; *Illinois ex rel. McCollum v. Bd. of Ed. of Sch. Dist. No. 71*, 333 U.S. 203, 232 (1948) (invalidating practice of having religious instructors enter public schools to offer religious lessons during the school day to students whose parents requested them); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000) (holding student-led, student-initiated prayer at football games violates the Establishment Clause).

St. Dominic's policies give preference to Catholic students in admissions and financial aid, particularly members of the parish to which the school belongs. *See*

Compl. ¶ 34.  If admitted, students must "understand, accept, and [be] willing to support the mission and goals of the school," including by upholding "Catholic Christian morals."  *Id.* ¶¶ 35-36.  Appellants are not prohibited wholesale from enacting such discriminatory policies; they are merely prohibited from doing so while receiving public funds through the tuitioning program.  Contrary to Appellants' argument, the MHRA does not target schools with "sectarian" bents. Rather, the MHRA targets discrimination by any school, religious or not.  In fact, another school operated by the Roman Catholic Bishop of Portland complies with the MHRA and receives tuitioning funds.[18]  It is not St. Dominic's religious status, but its discriminatory policies, that prevent it from receiving subsidies.

*    *    *

Permitting Maine's town tuitioning schools to discriminate against children and families on the basis of sexual orientation or gender identity is not only abhorrent in and of itself, but also just the tip of the iceberg; the logic used to excuse it threatens a slippery slope of publicly funded discrimination against other vulnerable groups of students.  The U.S. Supreme Court has acknowledged that this is unacceptable. *See Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 631

---

[18] As Appellees have outlined in their opposition, on July 28, 2022, Cheverus High School (a sectarian school in Portland operated by the Bishop) applied to participate in the tuitioning program, and its application was approved on September 16, 2022. Welter Aff., ¶¶ 5-7; https://portlanddiocese.org/find-a-school.  During the 2022-23 school year, five students attended Cheverus at public expense.  Welter Aff., ¶ 8.

(2018) (recognizing that "while . . . religious and philosophical objections are protected, it is a general rule that such objections do not allow [actors] in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law" (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n. 5 (1968))).[19]  In *Masterpiece Cakeshop*, the Court understood that broad exceptions to antidiscrimination laws would result "in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." *Id.* at 632.

The same principle applies here:  adopting Appellants' reasoning threatens to thrust society back into a long rejected era of discrimination in schools justified by religion.  The MHRA's prohibitions against discrimination are engineered to prevent this backsliding and to ensure the protection of all students receiving a publicly funded education.  Critically, no school is obligated to participate in the tuitioning program.  But if a school does desire to participate, it must comply with the program's requirements.  To permit anything else would defeat the very purpose of

---

[19] Unlike the situation in *303 Creative LLC v. Elenis*, here, Appellants are not being compelled to speak or promote views inconsistent with their religious commitments. 600 U.S. 570, 595 (2023).  In this instance, there is no arrangement between private parties.  Instead, Maine is the purchaser of an essential service (e.g., public education) that it is constitutionally obligated to provide for its citizens.  Maine not only can, but must be able to, set reasonable limits on the types of education it will pay for to fulfill this constitutional duty.

the tuitioning program, which is to provide a publicly funded education to Maine students that allows each of them to participate fully in school and society.

### C. The MHRA's Antidiscrimination Provisions Do Not Infringe on Parental Rights

Requiring private religious schools that accept public funds to comply with the MHRA does not infringe on the rights of parents to raise their children and direct their religious upbringing. *See Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (holding that even if parents had a right to send their children to schools promoting discriminatory beliefs, it does not follow that schools practicing such beliefs are protected by the same principles). Parents who want a religious education for their children are free to send their children to religious schools. 20-A M.R.S. § 5001-A(3)(A)(2).

The MHRA does not prevent parents from sending their children to religious schools. Rather, the MHRA only prohibits religious schools that accept public funds from engaging in discrimination, just like any other school accepting public funds. Appellants nevertheless argue that Maine is improperly using the MHRA to disqualify private religious schools from receiving subsidies solely because they are "sectarian," in violation of *Carson*. *See* Plaintiffs' Reply to Motion for Preliminary Injunction at 4-6. As discussed above, that argument is belied by the facts. *See supra* Section II.B.4.

### III. Conditioning Public Funds on Compliance with Nondiscrimination Standards Is Proper

### A. The MHRA's Antidiscrimination Provisions Are Subject to Rational Basis Review Because They Are Neutral and Generally Applicable

It is well established that states have the power to condition public funding on compliance with neutral, generally applicable nondiscrimination requirements. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989); *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *see also City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) ("[N]eutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest."), *superseded by statute as stated in Ramirez v. Collier*, 595 U.S. 411, 424 (2022). Such requirements are particularly appropriate where the government uses public funds to provide a core state function, such as K-12 education.

Just as a state may constitutionally condition tuition assistance on a private institution meeting curriculum standards, as Maine and other states do,[20] it may also require compliance with neutral, generally applicable nondiscrimination requirements. Indeed, the federal government and the states have long required that publicly funded programs not discriminate on the basis of race, color, national origin, sex, religion, disability, age, and, in many cases, sexual orientation and

---

[20] *See* 20-A M.R.S. §§ 2901(2), 2902, 4704, 6209; *see also, e.g.*, Ohio Rev. Code Ann. §§ 3301.16, 3310, 3313; La. Rev. Stat. Ann. §§ 17:4011, 4013, 4021.

identity. *See, e.g.*, 42 U.S.C. § 2000d (Title VI, § 601 of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance); 20 U.S.C. §§ 1681-1688 (Title IX, prohibiting sex-based discrimination in any school or education program that receives federal funds); Exec. Order No. 12250, 45 Fed. Reg. 72995 (Nov. 4, 1980) (providing for the consistent and effective implementation of various laws prohibiting discrimination on the basis of race, color, national origin, sex, disability, or religion in programs and activities receiving federal financial assistance); Appellants' Opening Br. at 17 (discussing Maine's prohibition on public funding of private schools that discriminate on the basis of sexual orientation in hiring).

States cannot apply nondiscrimination conditions unevenly, such as allowing exceptions for secular but not religious reasons. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021). But governments are not required to compromise their "weighty" interest in ensuring that the benefits of public funds are available on an equal basis. *See id.*

The MHRA's antidiscrimination provisions are facially neutral. They do not target religious practice, nor are they motivated by religious animus. Any suggestion to the contrary is unsupported by the MHRA's legislative history. *See supra* Section II.A (detailing multiple amendments made to the MHRA's

nondiscrimination provisions since its introduction in 1987); *see also* Appellees' Br. at 30-34.

The provisions are also generally applicable. They apply to all Maine K-12 schools that receive public funding from the State, without exception—whether public or private, religious or not.[21]   *See* P.L. 2021, ch. 366, § 19. Simply put, a religious tuitioning school that discriminates would receive the *same* treatment under the MHRA as a secular tuitioning school that discriminates. Accordingly, Appellants' suggestion that the MHRA's antidiscrimination provisions cannot be neutral are directly controverted by the law's plain language. Although Appellants suggest that the MHRA *perpetuates* religious discrimination, Appellants' Br. at 17, its provisions in fact explicitly *prohibit* discrimination based on religion. *See* 5 M.R.S. § 4601. Moreover, given the posture of this case—a pre-enforcement challenge to the application of nondiscrimination requirements that Appellants fear

---

[21] The MHRA's provisions are generally applicable even if they do not apply to schools outside Maine or to private in-state postsecondary schools. First, Maine has no jurisdiction to regulate conduct outside of its borders. Appellees' Br. at 36-37. More importantly, the MHRA applies equally to religious and non-religious schools. *Id.* Out-of-state religious schools and out-of-state nonsectarian schools are equally exempt from the MHRA; the same is true for in-state private religious post-secondary schools and in-state private nonsectarian post-secondary schools. *Id.* Second, post-secondary institutions (and the regulations surrounding them) are not comparable to primary and secondary schools. *Id.* While primary and secondary schools are compulsory for everyone within a prescribed age range, dependent on residence, and provided at public expense, post-secondary education is fully voluntary, not based on residence, and relies primarily on students for funding. *Id.*

may someday prevent them from an unspecified exercise of religious faith—the ruling that Appellants seek would effectively create a blanket exemption from the MHRA for any school for any religious purpose.

Appellants' attempts to liken this case to *Carson v. Makin* are inapposite. In *Carson*, the Supreme Court prohibited barring religious schools from the receipt of publicly funded tuition based on their religious status. 596 U.S. at 787. But here, religious schools can receive *and are receiving* public funds from the State and may use those funds to provide religious education for students. It is not St. Dominic's religious identity or practice that prevents it from receiving public funds; it is St. Dominic's insistence on discriminating. Indeed, if a school "objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the [school's] exercise of its First Amendment rights." *AID v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

The MHRA does not burden, even incidentally, St. Dominic's religious practices in violation of the Free Exercise Clause.[22] Even if it did, Appellants' suggestion that incidental effects on their religious exercise render the MHRA's antidiscrimination provisions unconstitutional is contrary to binding precedent.

---

[22] As Appellees make clear, St. Dominic is still free to teach however it likes, including by instilling its religious beliefs in its students. Appellees' Br. at 28-29.

"When a religiously neutral and generally applicable law incidentally burdens free exercise rights, [this Circuit] will sustain the law against constitutional challenge if it is rationally related to a legitimate governmental interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021) (citing *Fulton*, 593 U.S. at 531-32); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Importantly, a burden on religious expression (incidental or not) is not in and of itself cause to render a law unconstitutional. *See, e.g.*, *Bowen v. Roy*, 476 U.S. 693, 702 (1986); *Bob Jones Univ. v. United States*, 461 U.S. 574, 603 (1983).

While private schools are entitled to hold values inconsistent with a state's antidiscrimination laws, they are not entitled to the government's financial assistance in discrimination. *See Rust*, 500 U.S. at 193 ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." (alteration in original and citation omitted)). Public tuitioning funds are collected from all citizens. Maine has a legitimate interest in ensuring that those funds are made available to constituents free from discrimination. *See City of Richmond*, 488 U.S. at 492 ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."). And the State has more than a legitimate interest in fulfilling the state constitutional duty of providing education that is open and accessible to all. *See supra* Section II; Me.

Const. art. VIII, pt. 1, § 1; *Donahoe v. Richards*, 38 Me. 379, 391 (1854).

## B. The MHRA's Antidiscrimination Provisions Also Withstand Strict Scrutiny

Even if this Court finds that the MHRA is not neutral or generally applicable, the law should still be upheld because it passes strict scrutiny.

Maine's interest in eliminating discrimination within publicly funded institutions is compelling. As demonstrated above, *supra* Section II.A, there can be no dispute that states have a compelling interest in eliminating discrimination. *See also Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982) (finding that states have a "substantial interest" in protecting their citizens from "the political, social, and moral damage of discrimination"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (eliminating discrimination "plainly serves compelling state interests of the highest order").[23] Indeed, states have an even greater interest in ensuring that publicly funded institutions do not discriminate. *See City of Richmond*, 488 U.S. at 492; *Norwood v. Harrison*, 413 U.S. 455, 463 (1973) ("That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination.").

---

[23] Appellant's reliance on *Fellowship of Christian Athletes v. District of Columbia*, No. 24-cv-1332 (DLF), 2024 WL 3400104 (D.D.C. July 11, 2024), is inapposite. Appellants' Br. at 30. *Christian Athletes* involved a *school's* antidiscrimination policy and a *school's* interest in combating discrimination; by contrast, the MHRA is a law, and the State's compelling interest is grounded in the education clause of the Maine constitution. *See supra* Section II.

Moreover, Maine has a compelling interest, under the education clause of the state constitution, Me. Const. art. VIII, pt. 1, §1, in ensuring that all children receive an adequate education. *Blount v. Dep't of Educ. & Cultural Servs*., 551 A.2d 1377, 1382 (Me. 1988). An essential component of the State's affirmative constitutional duty is the guarantee that the education options it provides are open to all children. *Donahoe*, 38 Me. at 390 ("[U]nder our constitution, every child has a right to receive instruction at the public schools; . . . every parent has a right to have his child there taught . . . ."). Thus, the nondiscrimination requirements in the MHRA further Maine's compelling interest to provide publicly funded education to all students.[24]

The U.S. Supreme Court's decision in *Bob Jones University* is instructive. There, private religious universities challenged an IRS policy that made private schools with racially discriminatory admissions policies ineligible for tax-exempt status. In so doing, the universities argued that their discriminatory policies qualified as protected free exercise based on sincerely held religious beliefs, not unlike the Appellants in this case. *See* 461 U.S. at 579-85, 602-03. But the Supreme Court rejected the religious college's challenge, finding that the government had a

---

[24] If Appellants succeed, some students will have few to no public education options, particularly if they live in rural areas where they might only have access to public education at private institutions approved to receive state funds through Maine's "town tuitioning" program. As outlined above, forcing students of certain identities to be subject to discriminatory practices in order to access education will cause irreparable harm to those students. *See supra* Section II.B.

"compelling," "fundamental," and "overriding" interest in eliminating racial discrimination in education. *Id.* at 604.[25]

The MHRA is also narrowly tailored. Its antidiscrimination provisions do not apply to religious schools that do not accept public funds. 5 M.R.S. § 4602(5)(C). And, as noted above, private religious schools are not barred from the tuitioning program due to religious status, nor prohibited from engaging in religious activity. They are only ineligible for the program if they insist on discriminating against students in violation of the MHRA. *See id.* Simply put, the antidiscrimination provisions are narrowly tailored because they are written to encompass discriminatory conduct within the confines of participation in state-funded programs, and nothing more. *See Bob Jones Univ.*, 461 U.S. at 604 (finding "no less restrictive means are available" to eradicate discrimination in education than denying tax benefits (internal citation and quotation marks omitted)).

Accordingly, this Court should still uphold the MHRA under a strict scrutiny standard.

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

DATED: November 14, 2024                    Respectfully submitted,

---

[25] Because *Bob Jones University* was decided before *Employment Division of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Court applied strict scrutiny. Today, the IRS ruling would likely be upheld as a neutral law of general applicability.

By: */s/ Adam J. Hunt*
    Adam J. Hunt
    250 West 55th Street
    New York, NY  10019-9601
    Telephone:    (212) 468-8000
    Facsimile:    (212) 468-7900
    AdamHunt@mofo.com

    *Counsel of Record for Amici Curiae*

## APPENDIX – STATEMENTS OF INTERESTS

**Public Funds Public Schools** ("PFPS") is a national campaign to ensure that public funds for education are used to maintain, support, and strengthen public schools.  PFPS opposes all forms of private school vouchers and other diversions of public funds to private education.  PFPS is a partnership between Education Law Center ("ELC") and the Southern Poverty Law Center ("SPLC").  ELC, based in Newark, New Jersey, is a nonprofit organization founded in 1973 that pursues justice and equity for public school students by enforcing their right to a high-quality education in safe, equitable, non-discriminatory, integrated, and well-funded learning environments.  SPLC, based in Montgomery, Alabama, is a nonprofit civil rights organization founded in 1971 that serves as a catalyst for racial justice in the South and beyond, working to advance human rights.  PFPS has participated as *amicus curiae* before numerous state and federal courts in matters involving issues similar to those presented in this case.

**The National Education Association** ("NEA") is the largest union in the country, representing three million educators who serve our nation's students in public schools, colleges, and universities.  Since its founding over a century and a half ago, NEA has worked to create, expand, and strengthen the quality of public education available to all children.  NEA is committed to ensuring a strong public education system as the foundation of our vibrant, multiracial democracy.

Consistent with NEA's commitment that public schools prepare every student to succeed in a diverse and interdependent world, NEA frequently appears as *amicus* in support of the rights of all students to fair treatment.

**The American Federation of Teachers** ("AFT"), an affiliate of the AFL-CIO, was founded in 1916 and today represents 1.8 million members in more than 3,500 local affiliates nationwide. Since its founding, the AFT has been a major force for America's democracy and for preserving and strengthening America's commitment to public education and to educational opportunity for all. AFT's K-12 members are committed to providing their students with the highest quality public education consistent with the standards set by the local, state, and federal government. AFT frequently submits amicus briefs in cases that directly impact public school education.

**The National School Boards Association** ("NSBA"), founded in 1940, is a nonprofit organization ensuring that each student everywhere has access to excellent and equitable public education governed by high-performing school board leaders and supported by the community. NSBA regularly represents its members' interests before Congress and federal courts, and has participated as *amicus curiae* in numerous cases addressing public schools.

**American Atheists** is a national civil rights organization dedicated to equality for atheists and other nonreligious people. We protect the rights of atheists, advance

social inclusion, and empower nonreligious people through advocacy, education, and community building. American Atheists defends the right of every student to receive a secular public education and seeks to end discrimination and stigma against nonreligious students.

**The Council of Parent Attorneys and Advocates** ("COPAA") is a nonprofit organization for parents of children with disabilities, their attorneys, and their advocates. COPAA believes that effective educational programs for children with disabilities can be developed and implemented only with collaboration between parents and educators. To make this happen, COPAA provides resources, training, and information to help parents, advocates, and attorneys get the free, appropriate public education that the law guarantees to children with disabilities.

**Disability Rights Maine** ("DRM") is the agency designated by the Governor of Maine under federal law to protect and advocate for the rights of individuals with disabilities in the state of Maine. DRM represents many students each year to enforce their rights to equal educational opportunity. As such, the population we represent has a direct interest in what is at stake in this case—a request by a school receiving federal funding to be exempt from laws prohibiting discrimination, including discrimination based on disability.

**The Freedom From Religion Foundation** ("FFRF") is a nationally recognized 501(c)(3) nonprofit with the purposes to educate the public about

nontheism and to preserve the constitutional principle of separation between religion and government. FFRF has about 40,000 U.S. members, including more than 200 members in Maine and a Maine chapter. As a secular organization that promotes freedom of conscience for those who do not practice religion, FFRF opposes the erosion of our secular public education systems and preferential treatment of religious organizations by the government.

**In the Public Interest** ("ITPI"), founded in 2010, is a project of PowerSwitch Action (a 501(c)(3) nonprofit organization) that focuses on strengthening, protecting, and expanding access to a broad array of public goods. ITPI conducts research and develops policy ideas to ensure public control over important public goods and services. ITPI also advocates for creating a high-quality, equitable public education system that is available for every child in the country, and that is an essential bedrock of a healthy democracy. ITPI has produced a wide-ranging series of studies, briefs, and fact sheets on how school vouchers create obstacles to achieving those goals.

**The Network for Public Education** ("NPE") is a nonprofit advocacy group whose mission is to preserve, promote, improve, and strengthen public schools for both current and future generations of students. NPE has 350,000 members and coordinates more than 200 Grassroots groups. It resists the expansion of publicly funded alternatives that divert funding and students from public schools; believes

that all publicly funded schools must include all students; and strongly opposes all discrimination in school entry requirements, regardless of rationale.

**Pastors for Children** is a nationwide network of faith leaders and community partners dedicated to school service and fair and equitable public school funding. Pastors for Children believes that God desires a quality education for every child. Pastors for Children also believes that we must keep government out of private and church schools.

**The Maine Education Association** ("MEA") represents over 24,000 educators in Maine's public schools, town academies, and institutions of higher education. MEA's mission is to advocate for education professionals and to unite educators with citizens of Maine to fulfill the promise of public education. Consistent with this commitment, MEA maintains expertise in the funding of public education and stands for the principle that schools receiving public funds should not discriminate against any student.

## CERTIFICATE OF COMPLIANCE

I certify that his brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6492 words, excluding the parts of the brief exempted by Rule 32(f).    I further certify that this brief complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word Version 16.88 in 14-point Times New Roman font, a proportionally spaced typeface.

DATED:    November 14, 2024

*/s/ Adam J. Hunt*
Adam J. Hunt
250 West 55th Street
New York, NY  10019-9601
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
AdamHunt@mofo.com

*Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on November 14, 2024.

I hereby certify that all participants in the case are registered CM/ECF users and that services will be accomplished by the appellate CM/ECF system.

DATED:    November 14, 2024          */s/ Adam J. Hunt*
                                      Adam J. Hunt
                                      250 West 55th Street
                                      New York, NY 10019-9601
                                      Telephone:    (212) 468-8000
                                      Facsimile:     (212) 468-7900
                                      AdamHunt@mofo.com

                                      *Counsel of Record for Amici Curiae*