No. 24-1739

## UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

ST. DOMINIC ACADEMY, d/b/a Roman Catholic Bishop of Portland,
a corporation sole; ROMAN CATHOLIC BISHOP OF PORTLAND; KEITH
RADONIS, on their own behalf and as next friend of children K.Q.R., L.R.R., and
L.T.R.; VALORI RADONIS, on their own behalf and as next friend of children
K.Q.R., L.R.R., and L.T.R.,
*Plaintiffs-Appellants*,

v.

A. PENDER MAKIN, in their personal capacity and official capacity as the
Commissioner of the Maine Department of Education; JEFFERSON ASHBY, in
their personal capacity and official capacity as the Commissioner of the Maine
Human Rights Commission; EDWARD DAVID, in their personal capacity and
official capacity as the Commissioner of the Maine Human Rights Commission;
JULIE ANN O'BRIEN, in their personal capacity and official capacity as the
Commissioner of the Maine Human Rights Commission; MARK WALKER, in
their personal capacity and official capacity as the Commissioner of the Maine
Human Rights Commission; THOMAS L. DOUGLAS, in their personal capacity
and official capacity as the Commissioner of the Maine Human Rights
Commission,
*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Maine
(Case No. 2:23-cv-00246-JAW)

## BRIEF OF GLBTQ LEGAL ADVOCATES & DEFENDERS AND LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC. AS *AMICI CURIAE* SUPPORTING DEFENDANTS-APPELLEES AND AFFIRMANCE

GARY D. BUSECK
MARY L. BONAUTO
GLBTQ Legal Advocates
 & Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
617-426-1350
gbuseck@glad.org
mbonauto@glad.org

KAREN L. LOEWY
KENNETH D. UPTON, JR.
Lambda Legal Defense and Education
 Fund, Inc.
111 K Street N.E., 7th Floor
Washington, DC 20002
202-804-6245
kloewy@lambdalegal.org
kupton@lambdalegal.org

*Counsel for Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Amici curiae are nonprofit entities operating under § 501(c)(3) of the Internal Revenue Code. Amici are not subsidiaries or affiliates of any publicly owned corporations and do not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to amici's participation.

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................. 1

BACKGROUND AND SUMMARY OF THE ARGUMENT ................................. 3

ARGUMENT ......................................................................................... 5

I.  THE SUPREME COURT'S DECISION IN CARSON V. MAKIN NEITHER
    CONTROLS THIS CASE NOR DICTATES THE AUTOMATIC
    APPLICATION OF STRICT SCRUTINY. .............................................. 5

    A.  The Supreme Court's Free Exercise Cases Require Strict Scrutiny for
        Targeted Exclusions of Religious Entities and Thus Do Not Apply to the
        MHRA .................................................................................. 6

    B.  Appellants Misperceive the Meaning of *Carson*. ......................... 10

    C.  The Amici Engage in Serious Overreach in a Bald Attempt to Avoid and
        Undermine *Smith*. ................................................................. 11

II. THE MHRA WOULD SURVIVE STRICT SCRUTINY BECAUSE IT IS
    NARROWLY TAILORED TO MAINE'S COMPELLING GOVERNMENT
    INTERESTS. .............................................................................. 15

    A.  Maine Has A Compelling Interest In Ensuring Equal Educational
        Opportunity For LGBTQ Students. ............................................. 16

    B.  Maine Has A Compelling Interest In Furthering Its Constitutional
        Obligation To Provide Free And Equal Public Education. .................. 23

    C.  Maine has a Compelling Interest in Ensuring that it is Neither Funding nor
        Facilitating Discrimination. ..................................................... 25

    D.  Requiring Compliance With The MHRA By Schools In The State
        Tuitioning Program Is The Most Narrowly Tailored Means Of Furthering
        Maine's Compelling Interests. .................................................. 26

CONCLUSION ................................................................................... 27

CERTIFICATE OF COMPLIANCE ......................................................... 29

CERTIFICATE OF SERVICE ............................................................... 29

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982) ................................................................16

*Beckett v. Roderick*,
    251 A.2d 427 (Me. 1969) .........................................................23

*Blount v. Dep't of Educ. & Cultural Servs.*,
    551 A.2d 1377 (Me. 1988) ........................................................24

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983) ................................................................16

*Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*,
    347 U.S. 483 (1954) ................................................................24

*Burton v. Wilmington Parking Auth.*,
    365 U.S. 715 (1961) ................................................................26

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ......................................................... 15, 27

*Carson v. Makin*,
    596 U.S. 767 (2022) ..................................... 4, 5, 8, 9, 10, 11, 12, 13, 14

*Carson v. Makin*,
    979 F.3d 21 (1st Cir. 2020) .......................................................9

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) ................................................................26

*Dallas v. Stanglin*,
    490 U.S. 19 (1989) .................................................................16

*Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518 (3d Cir. 2018) ......................................................17

*Emilee Carpenter, LLC v. James*,
    107 F.4th 92 (2d Cir. 2024) ......................................................17

*Employment Division, Dep't of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990) ...................................... 4, 5, 6, 11, 12, 13, 14

*Equal Emp. Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty.,
    Georgia*, 590 U.S. 644 (2020)................................................................27

*Espinoza v. Mont. Dep't of Revenue*,
    591 U.S. 464 (2020)........................................................ 7, 8, 9, 12, 14

*Fulton v. City of Philadelphia, Pa.*,
    593 U.S. 522 (2021)............................................................ 14, 16, 17

*Gilmore v. City of Montgomery*,
    417 U.S. 556 (1974)................................................................25

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022)............................................................. 15, 26

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
    584 U.S. 617 (2018)................................................................16

*Norwood v. Harrison*,
    413 U.S. 455 (1973)............................................................. 25, 26

*Palmore v. Sidoti*,
    466 U.S. 429 (1984)................................................................26

*Plyler v. Doe*,
    457 U.S. 202 (1982)................................................................16

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)................................................................16

*Sawyer v. Gilmore*,
    109 Me. 169, 83 A. 673 (1912)................................................23

*Sch. Admin. Dist. No. 1 v. Comm'r, Dep't of Educ.*,
    659 A.2d 854 (Me. 1995)........................................................24

*Shaw v. Small*,
    124 Me. 36, 125 A. 496 (1924)................................................23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)................................................................23

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017)........................................................ 6, 8, 9, 12, 14

**Constitutional Provisions**

Me. Const. Art VIII, pt. 1, §1 ...................................................................23

**Laws and Statutes**

5 M.R.S. § 4551 *et seq* ..........................................................................3

5 M.R.S. § 4553 ......................................................................................4

5 M.R.S. § 4602 ..................................................................................4, 11

5 M.R.S. § 4602(1)..................................................................................24

20-A M.R.S. § 5203(4).........................................................................3, 25

20-A M.R.S. § 5204(4).........................................................................3, 25

Pub. L. 2019, ch. 464 § 1(5-C) ...............................................................10

Pub. L. 2019, ch. 464 § 1(10)(G) ............................................................10

Pub. L. 2021, ch. 366 § 19(5)(C) ............................................................10

**Rules**

Fed. R. App. P. 26.1..................................................................................i

Fed. R. App. P. 29(a)(4)(E) ......................................................................1

Local Rule 29(a)(2)...................................................................................1

**Other Authorities**

Ctrs. For Disease Control, *Inclusive Practices Help All Students Thrive*
    (June 27, 2022), https://www.cdc.gov/healthyyouth/safe-supportive
    environments/LGBTQ-policies-practices.htm............................................. 21, 22

Jennifer Pearson et al., *State-Level Policy, School Victimization, and
    Suicide Risk Among Sexual Minority Youth*, 21 Sexual and Gender
    Minority Health: Advances in Med. Sociology 65 (2021).................... 21, 22

Joseph G. Kosciw, et al., *The 2021 National School Climate Survey*,
    GLSEN (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-
    Full-Report.pdf...............................................................................17

Me. Dep't of Educ. & Me. Dep't of Health & Hum. Servs., *Maine Integrated Youth Health Survey*, 145 (Oct. 13, 2023),
https://www.maine.gov/miyhs/sites/default/files/2023_Reports/Detailed_Reports/HS/MIYHS2023_Detailed_Reports_HS_State/Maine%20High%20School%20Detailed%20Tables.pdf................................................................................... 18, 20, 21

Robert Abreu, et. al*., LGBTQ student experiences in schools from 2009-2019: A systematic review of study characteristics and recommendations for prevention and intervention in school psychology journals*,
59(1) Psych. in the Schs. 116 (Jan. 2022) ..........................................................18

Shoshana K. Goldberg, et al., *2023 LGBTQ+ Youth Report*,
Hum. Rts. Campaign Found. (Aug. 2023),
https://reports.hrc.org/2023-lgbtq-youth-report....................................................18

Tecelli Domínguez-Martínez & Rebeca Robles, *Preventing Transphobic Bullying and Promoting Inclusive Educational Environments: Literature Review and Implementing Recommendations*,
50 Archives of Med. Rsch. 543 (Nov. 2019)......................................................19

The Trevor Project, *Anti-LGBTQ+ School Policies and LGBTQ+ Young People*,
(Aug. 21, 2024), https://www.thetrevorproject.org/research-briefs/anti-lgbtq-school-policies-and-lgbtq-young-people/ ...........................................................20

The Trevor Project, *School-Related Protective Factors for LGBTQ Middle and High School Students* (Aug. 24, 2023),
https://www.thetrevorproject.org/research-briefs/school-related-protective-factors-for-lgbtq-middle-and-high-school-students-aug-2023/ ...........................21

Wojciech Kaczkowski, et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*,
9(1) LGBT Health 43 (Jan. 2022)......................................................................20

Xavier Fields & Christine Min Wotipka, *Effect of LGBT Anti-Discrimination Laws on School Climate and Outcomes for Lesbian, Gay, and Bisexual High School Students*, 19(3) J. of LGBT Youth 309 (2022)............................................21, 22

## INTEREST OF AMICI CURIAE[1]

*Amicus curiae* GLBTQ Legal Advocates & Defenders (GLAD Law) is New England's leading public interest legal organization dedicated to creating a just society free of discrimination based on gender identity and expression, HIV status, and sexual orientation. GLAD Law's federal court litigation to advance the rights of LGBTQ people and people living with HIV includes *Obergefell v. Hodges*, 576 U.S. 644 (2015); *Bragdon v. Abbott*, 524 U.S. 624 (1998); *Gill v. Office of Pers. Mgmt.*, 682 F.3d 1 (1st Cir. 2012); *Rosa v. Park W. Bank*, 214 F.3d 213 (1st Cir. 2000); *Abbott v. Bragdon*, 107 F.3d 934 (1st Cir. 1997); and *Brown v. Hot Sexy, & Safer Prods., Inc.*, 68 F.3d 525 (1st Cir. 1995). GLAD Law also advocates for strong, safe and positive school environments to advance student learning and well-being. Regionally, GLAD Law has represented parties in, *e.g.*, *Doe v. RSU 26*, 2014 ME 11; *Doe v. Brockton Sch. Comm.*, No. 2000-J-638, 2000 Mass. App. LEXIS 1128 (Nov. 30, 2000); *Walker v. Merrimack Sch. Dist.*, No. 1:96-cv-87 (D.N.H. dismissed Jun. 17, 1996); and *Hot, Sexy & Safer Prods.*, and amicus in, *e.g.*, *Doe v. Manchester Sch. Dist.*, 2024 NH 48; *L.M. v. Town of Middleborough*,

---

[1] The parties have consented to the filing of this *amicus curiae* brief. *Amici* confirm that no party or counsel for any party authored this brief in whole or in part; that no party or counsel for any party contributed any money to fund the preparation or submission of this brief; and that no person other than *amici* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E); Local Rule 29(a)(2).

103 F.4th 854 (1st Cir. 2024); *Foote v. Town of Ludlow*, No. 22-30041, 2022 U.S. Dist. LEXIS 236102 (D. Mass. Dec. 14, 2022), *appeal docketed*, No. 23-1069 (1st Cir. argued Sep. 13, 2023); *Doe v. Hopkinton Pub. Schs*., 19 F.4th 493 (1st Cir. 2021); and *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008).

**Lambda Legal Defense and Education Fund, Inc.** ("Lambda Legal") is the nation's oldest and largest legal organization working for the full civil rights of lesbian, gay, bisexual, and transgender people and everyone living with HIV through impact litigation, education, and policy advocacy. *See, e.g., Obergefell v. Hodges*, 576 U.S. 644 (2015); *Lawrence v. Texas*, 539 U.S. 558 (2003); *Romer v. Evans*, 517 U.S. 620 (1996). Throughout its history, Lambda Legal has worked to ensure that students are not deprived of equal educational opportunity as a result of discrimination because of their sexual orientation or transgender status. *See*, *e.g.*, *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024); *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022); *Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996). Lambda Legal has also participated in numerous cases involving claims that generally applicable antidiscrimination requirements, including those applicable to recipients of government money, infringe First Amendment rights. *See, e.g., 303 Creative, LLC v. Elenis*, 600 U.S. 570 (2023); *Fulton v. City of Philadelphia, Pa.*, 593 U.S. 522 (2021); *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617

(2018); *Rogers v. McMaster*, 696 F. Supp. 3d 193 (D.S.C. 2023); *Marouf v. Azar*, 391 F. Supp. 3d 23 (D.D.C. 2019).

*Amici curiae* have a strong interest in the robust and consistent application of nondiscrimination protections to ensure that LGBTQ young people can learn and grow freely and equally in publicly funded educational settings. This includes when private schools are being funded by taxpayer dollars to fulfill the state's promise of public education. *Amici* offer their expertise to the Court to underscore the importance and neutrality of ensuring nondiscrimination in education and to highlight the unique vulnerability of LGBTQ students to discrimination and harassment, which laws like the Maine Human Rights Act were designed to prevent and redress.

## BACKGROUND AND SUMMARY OF THE ARGUMENT

For students in towns that do not have a public school available for its residents to attend, Maine established a program permitting families to pay for an approved public or private school with town tuition dollars. *See* 20-A M.R.S. §§ 5203(4); 5204(4) (hereafter, "tuitioning program"). The Maine Human Rights Act, 5 M.R.S. § 4551 *et seq*. ("MHRA"), prohibits schools receiving those tuition dollars from discriminating on the basis of sex, sexual orientation or gender identity, physical or mental disability, ancestry, national origin, race, color or religion, including by denying a student admission, excluding a student from

3

programs or activities, or subjecting a student to harassment. 5 M.R.S. §§ 4553; 4602.

Appellants challenge the MHRA's nondiscrimination requirements, claiming that they run afoul of the Supreme Court's opinion in *Carson v. Makin*, 596 U.S. 767 (2022). Yet neither Appellants nor their *amici curiae* can explain how the MHRA, which applies evenhandedly to all Maine K-12 schools receiving public funds—whether secular or religious—amounts to a targeted exclusion of sectarian schools from the tuitioning program. That is because it does not. That a nondiscrimination law may impact religious exercise does not transform the law into an exclusion *based on* religious exercise triggering strict scrutiny. On the contrary, the MHRA is a neutral law of general applicability, and under the binding precedent of *Employment Division, Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990), only warrants rational basis review, which it easily survives.

Even if the Court were to subject the MHRA to strict scrutiny, however, it could withstand that level of review as well. The MHRA's nondiscrimination requirements for schools participating in the tuitioning program further multiple compelling governmental interests. First, they are justified by Maine's interest in shielding LGBTQ students from discrimination that deprives them of equal educational opportunity, particularly given its prevalence and harm. Second, they further Maine's constitutional commitment to providing free public education to all

of Maine's students. Finally, they further Maine's Equal Protection obligations not to fund or facilitate private discrimination against a class of students. Enforcing these requirements is the most narrowly tailored way to fulfill the state's commitment to providing K-12 students throughout Maine with publicly funded, nondiscriminatory education.

## ARGUMENT

## I.     THE SUPREME COURT'S DECISION IN CARSON V. MAKIN NEITHER CONTROLS THIS CASE NOR DICTATES THE AUTOMATIC APPLICATION OF STRICT SCRUTINY.

Appellants assert, in rather summary fashion, that *Carson v. Makin*, 596 U.S. 767 (2022), controls this case and requires a ruling in their favor. Appellants' Br. at 20-21. At the same time, one of their amici briefs argues that the "*Carson* principle" itself requires strict scrutiny in this case.

> The district court's *Smith* analysis was superfluous, and the court erred by suggesting that St. Dominic's exclusion based on religious exercise was not itself sufficient to trigger strict scrutiny.

Br. of Assoc. of Christian Schools Int'l, et al., at 5 (hereinafter "ACSI Brief").

Neither argument has any merit, as each seeks to transform any law with any impact on religious exercise into a targeting of that exercise. Neither *Carson* itself nor any of the other cases they cite requires this outcome, which would directly violate the binding authority of *Smith*. These arguments deliberately conflate the *effect* of the MHRA's neutral and generally applicable requirements on Appellants

5

with a *purpose* of religious exclusion in an attempt to evade the relevant analysis under *Smith*. The MHRA ensures that all K-12 schools in the state that participate in the tuitioning program are subject to the exact same nondiscrimination requirements. *See* Appellees' Br. at 34-38. As such, rational basis review is all that is required, which the MHRA easily survives.

### A. The Supreme Court's Free Exercise Cases Require Strict Scrutiny for Targeted Exclusions of Religious Entities and Thus Do Not Apply to the MHRA.

Appellants and their *amici curiae* distort the implications of the Supreme Court's Free Exercise case law by characterizing the MHRA as singling out religious schools for disfavored status. But the laws at issue in the cases cited by Appellants and their *amici* differ significantly from a broad nondiscrimination requirement that applies to every participant in a program that receives state funding.

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), involved a church that applied for a state grant, available to "qualifying nonprofit organizations," to assist with the cost of resurfacing a playground. *Id.* at 453-454. Grants were not available to all applicants because of limited resources and, therefore, applicants were scored on a number of criteria. *Id.* at 455. Although Trinity Lutheran ranked fifth among 44 applicants, it was deemed "categorically ineligible" because it was a church. *Id.* at 456. In ruling in favor of Trinity

Lutheran, the Court found that "[t]he Department's policy *expressly* discriminates against *otherwise eligible* recipients by disqualifying them from a public benefit *solely because of their religious character*" (emphasis added). *Id.* at 462. Put another way, though the Court expressly declined to address "religious uses of funding or other forms of discrimination," the Court stated, "The rule is simple: No churches need apply." *Id.* at 465, n.3.

Three years later, in *Espinoza v. Mont. Dep't of Revenue,* 591 U.S. 464 (2020), the Court considered a state program of tuition assistance to parents sending their children to private schools. *Id.* at 467-468. The tuition assistance was available to any "'qualified education provider' – that is, any private school that meets certain accreditation, testing and safety requirements." *Id.* at 469. Three parents, whose children attended a private religious school that met the state's qualifications, were nonetheless denied that state scholarship funds because use of the funds was prohibited to any school "owned or controlled in whole or in part by any church, religious sect, or denomination." *Id.* at 470. In short, the Montana constitution's "no-aid" provision expressly excluded any church-owned school.

In finding a Free Exercise Clause violation, the Court noted that religious schools were barred "from public benefits solely because of the religious character of the schools," something "apparent from the plain text" of the constitutional

7

provision as well as its title— "Aid prohibited to sectarian schools." *Id.* at 476.

The Court applied a "straightforward rule": "When *otherwise eligible* recipients

are disqualified from a public benefit '*solely* because of their religious character,'

we must apply strict scrutiny," quoting *Trinity Lutheran,* 582 U.S. at 462 (emphasis

added). *Espinoza,* 591 U.S. at 484.

Following on and applying *Trinity Lutheran* and *Espinoza*, the Court

decided *Carson,* 596 U.S. 767, which addressed a wholly different iteration of the

Maine tuition assistance program currently before this court. In *Carson*, the Court

considered a program that provided tuition assistance to "approved" private

schools that met certain eligibility requirements "so long as they are

'nonsectarian'." *Id.* at 773-74. The "nonsectarian" requirement focused on what a

school taught. Affiliation with a church or religious institution was not dispositive

on the question. *Id.* at 775. The plaintiffs in *Carson* sent their children to schools

that were accredited and approved for attendance purposes by the state. *Id.* at 776.

However, because they were "sectarian," neither was eligible to receive tuition

payments. *Id.*

This Court upheld that program, distinguishing *Espinoza* on the grounds that

the Maine program looked to religious use and not religious status and that Maine's

goal was to provide an equivalent to a secular public education. *See generally*

*Carson v. Makin,* 979 F.3d 21 (1st Cir. 2020).  The Supreme Court disagreed,

rejecting the use versus status distinction and stating:

> The "unremarkable" principles applied in *Trinity Lutheran* and *Espinoza* suffice to resolve this case.  Maine offers its citizens a benefit: tuition assistance payments for any family whose school district does not provide a public secondary school.  Just like the wide range of nonprofit organizations eligible to receive playground resurfacing grants in *Trinity Lutheran*, a wide range of private schools are eligible to receive Maine tuition assistance payments here.  And like the daycare center in *Trinity Lutheran*, [the two school here] are disqualified from this generally available benefit "solely because of their religious character."

*Carson*, 596 U.S. at 780 (quoting *Trinity Lutheran*).

> Referring to *Espinoza*, the Court noted:

> There, as here, we considered a state benefit program under which public funds flow to support tuition payments at private schools.  And there, as here, that program specifically carved out private religious schools from those eligible to receive funds.  While the wording of the Montana and Maine provisions is different, their effect is the same: to "disqualify some private schools" from funding "solely because they are religious."

*Carson,* 596 U.S. at 780 (quoting *Espinoza*).

In short, *Carson* ended up as a straightforward application of *Trinity Lutheran* and *Espinoza*: if you are otherwise eligible for a public benefit, you cannot be expressly and categorically excluded from that benefit solely because you are a religious entity.

Quite obviously, the current Maine program makes no such express or categorical exclusion of any religious schools, having come into full compliance

9

with the Supreme Court's holding in *Carson*.[2] Thus, *Carson* is in no way

determinative of this case.

### B.     Appellants Misperceive the Meaning of *Carson*.

Appellants make a brief argument about *Carson*.  (Appellants' Br. at. 20-21).

While properly noting its holding—"that religious organizations may not be

'disqualified from [a] generally available benefit "solely because of their religious

character,"'"—*id*. at 20 (quoting *Carson*, 569 U.S. at 780), the remainder of their

argument neglects to identify any way that the MHRA fails this test.   First, they

note the unexceptional proposition that *Carson* rejected the status/use distinction.

*Id.*  They fail to indicate how the MHRA turns on either status or use, however, as

---

[2] Appellants' attempts to portray amendments to the MHRA as a targeted exclusion
of schools based on their religious expression ignore their stated purpose and
context within the larger statute.  Maine enacted two extensive laws in 2019 to
clarify and update its provisions in the Human Rights Act and improve its
administration. Among other things, Public Laws 2019, ch. 464, "An Act To
Clarify Various Provisions of the Maine Human Rights Act," added a definition of
"gender identity," § 1(5-C). It also retained the pre-existing exemption from
Human Rights Act compliance in employment, housing and education for "a
religious corporation, association or organization that does not receive public
funds." Ch. 464, § 1(10)(G).

A bill to fill gaps and improve consistency, including for protected classes,
did not move forward in 2019-20, but a largely similar version was later enacted,
entitled "An Act to Improve Consistency in Terminology and within the Maine
Human Rights Act." Public Laws 2021, ch. 366. Among the gaps filled was a
provision addressing application of the Human Rights Act, which clarified that all
K-12 schools in Maine receiving public funds were subject to its requirements,
notwithstanding their status as public or private, religious or secular. Pub. L. 2021,
ch. 366, § 19(5)(C).  *See* Appellees' Br. at 10-12.

they make no case that Maine is excluding any schools from its tuitioning program because they provide a religious education. And, indeed, they could not.

Rather, Appellants pivot to a question of entanglement, citing *Carson* for the proposition that any attempt to enforce a religious use restriction would raise entanglement concerns. *Id.* Again, unexceptional and irrelevant to the present case where Maine makes no effort any longer to exclude sectarian schools, and instead applies uniform requirements to all participants in the tuitioning program.

Finally, Appellants then conjure up a hypothetical that, with tuition funding, Maine would gain "broad entangling authority over its religious policies." *Id.* at 21. Frankly, this is pure fantasy. What accepting tuition funding entails is being required to comply with the MHRA with respect to educational opportunity. 5 M.R.S. §4602. That means nothing if a school remains in compliance with the law. And if, hypothetically, a future claim were asserted against the school for a violation of 5 M.R.S. §4602, the school would be free to raise any constitutional concerns they might have regarding the circumstances of that claim and would have available whatever defenses theoretically exist. However, nothing in that scenario conjures up a current Free Exercise violation under the teaching of *Carson*.

### C.    The Amici Engage in Serious Overreach in a Bald Attempt to Avoid and Undermine *Smith*.

As noted above, the ACSI amicus brief asserts that *Carson* directs this court

11

to apply strict scrutiny without any application of *Smith's* neutrality and general applicability criteria because "St. Dominic's exclusion [was] based on religious exercise [and] was [ ] itself sufficient to trigger strict scrutiny." ACSI Brief, at 5. This assertion mischaracterizes both the facts of this case and the law.

At the outset, several things are worth noting. As a factual matter, St. Dominic has not applied for the Maine tuitioning program and, thus, has not been excluded. Its self-assessment that it is not otherwise eligible for the tuition program cannot be attributed to the state. *See* Appellees' Br. at 23-25. As a legal matter, nothing in Maine law expressly excluded St. Dominic—or any religious school in Maine—from the tuitioning program because of their exercise of religion, which is the only thing directly prohibited by *Carson*.

Further, as the Supreme Court recognized in *Trinity Lutheran*, *Espinoza* and *Carson*, public benefit programs can maintain eligibility criteria for inclusion and participation. That is precisely the role the MHRA plays here. Maine applies the MHRA's nondiscrimination requirement across the board to every K-12 school in the state that receives taxpayer funding. It does not single out anyone—religious or otherwise—for disfavored treatment. *Trinity Lutheran*, 582 U.S. at 460-61. It creates no "'special disabilities on the basis of religious views or religious status.'" *Id.* (quoting *Smith*, 494 U.S. at 877). Simply put, the eligibility requirement of compliance with the Maine Human Rights Act is strictly education-driven and not

religion-driven.  And Maine is certainly in compliance with *Carson* with this requirement.

Nonetheless, ACSI asserts that the Maine Human Rights Act triggers strict scrutiny without further analysis, *i.e.*, without applying *Smith*, "by excluding St. Dominic from the tuitioning program based on its religious exercise." They explicitly state that it does not matter whether a provision even mentions religion and argue that strict scrutiny applies any time a law implicates a religious entity's ability to carry out its faith-based policies. ASCI Br. at 10-11.

This patently misstates the law.  If St. Dominic is ever excluded, it might be because it became ineligible for failing to act in compliance with a neutral and generally applicable law designed to ensure an optimal educational environment for *all* students in schools supported by public funds. Maine, however, does nothing that categorically excludes religious schools, which is exactly—and only—what *Carson* forbids.  As the State has noted, a Maine Jesuit Catholic high school currently participates in the tuitioning program. *See* Appellees' Br. at 5, 13-14.

Yet ACSI now would like the law to be different: if a religious school feels it cannot comply with a neutral and generally applicable law because of its religious beliefs, then the law must violate *Carson* and the Free Exercise Clause. But that cannot be. *Carson* certainly says no such thing. To accept ACSI's position is to gut

13

*Smith* of all meaning—which of course is precisely what ACSI desires. But it cannot simply pretend that that is the law of *Carson*. Despite multiple entreaties to the Supreme Court to overturn *Smith*, it remains the law in cases like this. *See, e.g.*, *Fulton v. City of Philadelphia, Pa.*, 593 U.S. 522 (2021).

Not satisfied that otherwise eligible religious schools are now free of any categorical exclusion from public benefit programs, they now seek to be free from being treated *the same* as any other school receiving public funds—to categorically avoid obligations—such as nondiscrimination requirements—that every other publicly funded school must fulfill. *Trinity Lutheran, Espinoza* and *Carson* mandated equal treatment, not preferential treatment.

Appellants' and ACSI's novel argument is akin to a Trojan horse. Having developed the law that permits religious schools to participate in a taxpayer-funded tuition program, the religious schools now would leverage their participant status to challenge the applicable rules of the program so that they can discriminate against and deny students the very educational benefits the program was enacted to provide them. The irony is not lost. But Maine's generally applicable nondiscrimination requirements are not transformed into a categorical exclusion targeting religious practice just because these religious schools have now been given permission to participate in the program. The MHRA remains applicable to every single K-12 school in Maine that is approved to receive government funds

14

under the tuitioning program, and as such, receives only rational basis review in the face of Appellants' challenge.

## II. THE MHRA WOULD SURVIVE STRICT SCRUTINY BECAUSE IT IS NARROWLY TAILORED TO MAINE'S COMPELLING GOVERNMENT INTERESTS.

Even if the Court were to apply strict scrutiny to the MHRA, it would nonetheless easily survive that heightened level of review because it is "justified by a compelling state interest and . . . narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). The MHRA furthers multiple compelling governmental interests: (1) it safeguards against the unique vulnerabilities of LGBTQ students to discrimination and harassment that deprive them of equal educational opportunity; (2) it furthers Maine's constitutional obligation to provide free and equal public education to all of Maine's students; and (3) it furthers Maine's constitutional obligation not to fund and facilitate discrimination against a class of students. Enforcement of these nondiscrimination requirements against all schools participating in the state tuitioning program is the most narrowly tailored means of fulfilling each of those interests. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) (nondiscrimination laws are "precisely tailored to achieve th[e] critical goal" of ensuring equal opportunity).

15

A.    **Maine Has A Compelling Interest In Ensuring Equal Educational Opportunity For LGBTQ Students.**

Appellees thoroughly lift up states' compelling interests in eradicating discrimination along a range of invidious lines. Appellees' Br. at 39-46 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982) (ethnicity); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (sex); *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) (race).[3] As the Supreme Court has recognized, these principles apply with equal force to a government's interest in protecting LGBTQ people from discrimination. *See Fulton*, 593 U.S. at 542 (noting city's "weighty" interest in "the equal treatment" of LGBTQ prospective foster parents and foster children); *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 631 (2018) (noting that LGBTQ people "cannot be treated as social outcasts or as inferior in dignity and worth" and that "[t]he exercise of their freedom on terms

---

[3] *Amici* take unusual umbrage that the "evils of invidious discrimination," as used in *Roberts* and *Snapp*, could be leveled at St. Dominic. ACSI Br. at 18. Their offense seemingly arises from the misunderstanding that *invidious* discrimination requires malice or evil intent on the part St. Dominic, rather than describing the wholly arbitrary character of the resulting discrimination itself. *See Dallas v. Stanglin*, 490 U.S. 19, 27 (1989). The unfair or unjust *effect* on students who are turned away is what is invidious. Thus, *Amici's* attempt to distinguish *Roberts* and *Snapp* is misguided. Indeed, protecting equal access for all students who are the intended beneficiaries of the law against such arbitrary exclusions is legally required by equal protection principles. *See Plyler v. Doe*, 457 U.S. 202, 221–22 (1982) ("denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit.").

equal to others must be given great weight and respect by the courts."); *see also Emilee Carpenter, LLC v. James*, 107 F.4th 92, 111 (2d Cir. 2024) (prohibiting sexual orientation discrimination is a compelling state interest); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 527-28 (3d Cir. 2018) ("preventing discrimination against transgender students" is a compelling government interest).[4]

This interest is particularly compelling in the context of education given the unique vulnerability of LGBTQ young people to discrimination and harassment in schools. The GLSEN National School Climate Survey for 2021 found that 8 in 10 students surveyed reported feeling unsafe at school because of their sexual orientation or gender identity.[5] Nearly 60% of respondents had experienced LGBTQ-related discriminatory policies or practices at school.[6] These findings are

---

[4] Appellants attempt to use *Fulton* to suggest that Maine's interest in ensuring that publicly funded educational institutions do not discriminate is not sufficiently specific. Appellants' Br. at 30. While a general commitment to nondiscrimination may not have sufficed to justify denying a religious agency an exemption from a nondiscrimination requirement when exemptions were granted for secular reasons, *Fulton*, 593 U.S. at 541-42, it is more than sufficient here. Where the law being challenged is neutral and generally applicable and there are no exemptions at all, the relevant question is about Maine's compelling interest in the nondiscrimination requirements writ large. An interest in ensuring nondiscriminatory education, particularly when being funded with tax dollars, is sufficiently specific and compelling.

[5] Joseph G. Kosciw, et al., *The 2021 National School Climate Survey*, GLSEN 129 (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf ("2021 NSCS").

[6] *Id*. at 32.

17

borne out by other researchers as well. One study found that in 2020, 81% of LGBTQ students reported verbal harassment, 26% reported physical harassment, and 11% reported assault.[7] A 2023 report by the Human Rights Campaign found that nearly 57% of LGBTQ youth had been verbally or physically harassed at school within the previous 30 days.[8]

LGBTQ students in Maine are not spared from these trends. The most recent Maine Integrated Youth Health Survey ("MIYHS") showed that over 40% of Maine high school students who identified as LGBTQ reported that they were targeted by offensive comments or attacks at school based on perceived sexual orientation, with nearly 65% of those identifying as gay or lesbian, 39% of those identifying as bisexual, and 23% of questioning students having experienced this type of verbal and physical harassment.[9] For transgender students, 65.2% reported

---

[7] Robert Abreu, et. al*, LGBTQ student experiences in schools from 2009-2019: A systematic review of study characteristics and recommendations for prevention and intervention in school psychology journals*, 59(1) PSYCH. IN THE SCHS. 115, 116 (Jan. 2022).

[8] Shoshana K. Goldberg, et al., *2023 LGBTQ+ Youth Report*, Hum. Rts. Campaign Found. (Aug. 2023), https://reports.hrc.org/2023-lgbtq-youth-report.

[9] Me. Dep't of Educ. & Me. Dep't of Health & Hum. Servs., *Maine Integrated Youth Health Survey*, 145 (Oct. 13, 2023), https://www.maine.gov/miyhs/sites/default/files/2023_Reports/Detailed_Reports/HS/MIYHS2023_Detailed_Reports_HS_State/Maine%20High%20School%20Detailed%20Tables.pdf ("MIYHS").

comments and attacks based on perceived gender identity.[10]  LGBTQ students

reported nearly twice the incidence of being bullied or  being threatened or injured

with a weapon on school property in the last twelve months and more than twice as

likely to have offensive sexual comments made to them at school than heterosexual

and cisgender students.[11] Over 15% of LGBTQ high school students reported

missing at least one day of school in the previous thirty days because they felt

unsafe at school.[12]

Discriminatory policies and practices harm LGBTQ students deeply and

prevent them from fully and completely participating in the school community.[13]

They can also have serious consequences both for students' academic success and

their general well-being.[14]

> LGBTQ+ students who experienced frequent harassment and assault
> based on their sexual orientation or gender expression reported missing
> more days of school, having lower GPAs, lower educational aspirations,
> and higher rates of school discipline than students who were harassed
> less often. In addition, students who experienced higher levels of

---

[10] *Id*. at 150.

[11] *Id.* at 92, 155, 160.

[12] *Id.* at 95.

[13] 2021 NSCS at 33.

[14] *See* Tecelli Domínguez-Martínez & Rebeca Robles, *Preventing Transphobic Bullying and Promoting Inclusive Educational Environments: Literature Review and Implementing Recommendations*, 50 ARCHIVES OF MED. RSCH. 543 (Nov. 2019) (noting serious, long-term consequences of anti-LGBTQ discrimination, harassment, and bullying for a student's educational outcomes, including poorer academic performance and absenteeism).

victimization felt less connected to their school community and had poorer psychological well-being, including a higher likelihood of suicidal ideation. LGBTQ+ students who reported experiencing anti-LGBTQ+ discrimination at school also had worse educational outcomes, including missing more days of school, lower GPAs, and lower educational aspirations, and were more likely to be disciplined at school, than students who did not experience anti-LGBTQ+ discrimination. Furthermore, students who experienced anti-LGBTQ+ discrimination also felt less connected to their school community and had poorer psychological well-being.[15]

Stress from discrimination, bullying, harassment, and violence heighten the already disproportionate risks experienced by LGBTQ youth of being victims of violence, using risky substances, and of suicide and poor mental health outcomes.[16] This is borne out by the MIYHS, which found that LGBTQ youth are more than three times more likely to have seriously considered or attempted to take their own lives in the last 12 months as compared to non-LGBTQ youth, with nearly 30% of

---

[15] 2021 NSCS at 130; *see also* The Trevor Project, *Anti-LGBTQ+ School Policies and LGBTQ+ Young People* (Aug. 21, 2024), https://www.thetrevorproject.org/research-briefs/anti-lgbtq-school-policies-and-lgbtq-young-people/ (finding that LGBTQ students at schools with policies hostile to them are more likely to be chronically absent, to experience anxiety and depression, and to experience suicidal ideation or attempt suicide) ("Trevor Project 2024").

[16] Wojciech Kaczkowski, et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, 9(1) LGBT HEALTH 43 (Jan. 2022).

Maine's transgender high school students having attempted suicide in the last year, compared to 6.6% of their cisgender peers.[17]

Ensuring nondiscrimination and supportive environments for LGBTQ students can have a dramatic effect on their well-being.[18] LGBTQ youth in school districts with affirming policies report more school belonging, more support from staff, and the students are more likely to report any harassment.[19]  Research shows that LGBTQ students whose schools protect them in some way experience a 26% reduction in suicidality.[20]  Nondiscrimination laws and other protective policies for LGBTQ youth at the state level have a similar effect.[21]  More generally, schools and school districts with inclusive policies have been shown to provide better environments for all students to thrive.[22] According to the Centers for Disease

---

[17] MIYHS at 190, 198.

[18] The Trevor Project, *School-Related Protective Factors for LGBTQ Middle and High School Students* (Aug. 24, 2023), https://www.thetrevorproject.org/research-briefs/school-related-protective-factors-for-lgbtq-middle-and-high-school-students-aug-2023/.

[19] Xavier Fields & Christine Min Wotipka, *Effect of LGBT Anti-Discrimination Laws on School Climate and Outcomes for Lesbian, Gay, and Bisexual High School Students*, 19(3) J. OF LGBT YOUTH 309, 314 (2022).

[20] Trevor Project (2024).

[21] Jennifer Pearson et al., *State-Level Policy, School Victimization, and Suicide Risk Among Sexual Minority Youth*, 21 SEXUAL AND GENDER MINORITY HEALTH: ADVANCES IN MED. SOCIOLOGY 65 (2021).

[22] Ctrs. For Disease Control, *Inclusive Practices Help All Students Thrive* (June 27, 2022), https://www.cdc.gov/healthyyouth/safe-supportive-environments/LGBTQ-policies-practices.htm.

Control, schools that implement LGBTQ-affirmative policies see benefits for all students, including less harassment, less suicidality, and less distress overall.[23]

At the state level, nondiscrimination laws play a critical role in supporting the wellbeing of LGBTQ youth by creating the foundation for antidiscrimination policies at the school and district level to flourish. These laws decrease the incidence of bullying and discrimination, helping to set the ground rules that recognize LGBTQ youth as full members of the school community and improving mental health outcomes, especially for students attending schools that do not have school-level antidiscrimination policies.[24]  These laws communicate that LGBTQ students belong and deserve equal treatment at school just like others, making students feel safer and improving their academic outcomes.[25]

The MHRA's protections were enacted to prevent and redress discrimination in schools that rob Maine's students of equal educational opportunity. Barring discrimination by and in schools participating in the tuitioning program furthers

---

[23] *Id.*

[24] Pearson, at 70, 95.

[25] *Id*. at 95-96; Fields, at 320-322.

Maine's interest in protecting all students, including LGBTQ students from the harms of discrimination in educational settings.[26]

**B.    Maine Has A Compelling Interest In Furthering Its Constitutional Obligation To Provide Free And Equal Public Education.**

The state's commitment to ensuring equal educational opportunity for LGBTQ students is further supported by its express constitutional obligation to support and maintain public schools—an obligation that recognizes that a "general diffusion of the advantages of education" is "essential to the preservation of the rights and liberties of the people." Me. Const. Art VIII, pt. 1, §1. This is a compelling interest to be assured for all Mainers. *See Beckett v. Roderick*, 251 A.2d 427, 432 (Me. 1969) (Art VIII establishes "the fundamental public policy" of ensuring access to education); *Shaw v. Small*, 124 Me. 36, 125 A. 496, 498 (1924) (Art. VIII means "that free public school privileges should be somewhere open to all children living in any town in the state"); *Sawyer v. Gilmore*, 109 Me. 169, 83 A. 673, 679 (1912) ("No subject was dearer to the hearts of the framers of our Constitution than that of education, recognizing as they did that it lies at the very foundation of good government.").

---

[26] Given the prevalence of this discrimination against LGBTQ students in schools and the improvements in school environments and educational outcomes where protections are in place, Maine's compelling interest here is both "measurable and concrete." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 217 (2023).

Maine's "interest is not simply an interest in education but an interest in the quality of education." *Blount v. Dep't of Educ. & Cultural Servs.*, 551 A.2d 1377, 1381 (Me. 1988); *id*. ("It would eviscerate the State's interest in education to restrict it to assuring the mere physical presence of school children in some facility purporting to be a classroom"). To that end, Maine has an interest—indeed, a compelling one—to see that its taxpayer funds are used to create and maintain school environments that are conducive to the best educational learning experience for every student, regardless of race, color, sex, disability, national origin, ethnicity, religion, sexual orientation and gender identity. See 5 M.R.S. §4602(1). Permitting discrimination in the context of the program designed to carry out this constitutional commitment would deprive some students of the same range of publicly-funded educational opportunities their peers can access and could "result[] in [] students receiving an inadequate education." *Sch. Admin. Dist. No. 1 v. Comm'r, Dep't of Educ.*, 659 A.2d 854, 857 (Me. 1995). As described above and as recognized by countless courts, subjecting students to discrimination because of an aspect of their identity diminishes the quality of education and "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 494 (1954).

Maine's interest in ensuring free and equal education for all students is particularly acute in the context of a program that explicitly turns on the lack of availability of a public school in the place where these students live. The tuitioning program is intended to fill the gaps only when local school administrative units do not operate a public school and have not contracted with another school for that child's grade. *See* 20-A M.R.S. §§5203(4); 5204(4). The students participating in this program—particularly those in more isolated areas—already lack the most straightforward paths to accessing publicly funded K-12 education. The state's interest in ensuring that discrimination does not limit other paths is undoubtedly compelling.

### C.    Maine has a Compelling Interest in Ensuring that it is Neither Funding nor Facilitating Discrimination.

Finally, Maine has an independent obligation under the Equal Protection Clause to ensure that taxpayer dollars are not being used to exclude a class of citizens from a public program. Because "the Constitution does not permit the State to aid discrimination" by private entities, a State may not provide financial aid "if that aid has a significant tendency to facilitate, reinforce, and support private discrimination." *Norwood v. Harrison*, 413 U.S. 455, 465–66 (1973). *See also Gilmore v. City of Montgomery*, 417 U.S. 556, 568–69 (1974) ("tangible state assistance" to private organizations engaging in discrimination "is constitutionally prohibited" as Equal Protection requires the state "'to steer clear…of giving

25

significant aid to institutions that practice racial or other invidious discrimination.'") (quoting *Norwood*, 413 U.S. at 466). Maine is constrained by Equal Protection principles from "directly or indirectly" giving effect to private biases. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

The MHRA's nondiscrimination requirements for schools receiving taxpayer dollars ensure that Maine does not "place[] its power, property, and prestige behind [] admitted discrimination." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961) (by leasing property to discriminatory entity, city unconstitutionally "place[d] its power, property and prestige behind the admitted discrimination"). They unquestionably further Maine's "compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989).

> **D.      Requiring Compliance With The MHRA By Schools In The State Tuitioning Program Is The Most Narrowly Tailored Means Of Furthering Maine's Compelling Interests.**

Having established the compelling interests that justify the MHRA's nondiscrimination requirements for schools approved to receive tax dollars in the tuitioning program, the next inquiry is whether the MHRA is narrowly tailored in pursuit of those interests. *Kennedy*, 597 U.S. at 525. It unquestionably is. Enforcing the MHRA is the most precise way to further Maine's interests. "Where

the government has developed a comprehensive scheme to effectuate its goal of eradicating discrimination…, it makes sense that the only way to achieve the scheme's objectives is through its enforcement." *Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 596 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020). Maine need not show more when, as Justice Alito wrote in *Hobby Lobby*, 573 U.S. at 733, "prohibitions on [] discrimination are precisely tailored to achieve th[e] critical goal" of "providing an equal opportunity to participate" in Maine's publicly funded K-12 schools.

## CONCLUSION

When a state permits private entities to receive taxpayer dollars to fulfill the state's commitment to providing free public education, applying nondiscrimination requirements is not only neutral and generally applicable, but critical. The MHRA's application to all schools participating in the state's tuitioning program in no way targets religious schools for exclusion. Instead, it fulfills Maine's promise of equal educational opportunity to all students across the state, including LGBTQ students, and ensures that Maine is not funding or facilitating discriminatory learning environments. For the reasons set forth herein, Amici urge the Court to affirm the district court's order denying Appellants' request for a preliminary injunction.

Dated: November 14, 2024

Respectfully submitted,

s/ Karen L. Loewy

GARY D. BUSECK
Bar Number 14402
MARY L. BONAUTO
Bar Number 68959
GLBTQ Legal Advocates &
Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
617-426-1350
gbuseck@glad.org
mbonauto@glad.org

KAREN L. LOEWY
Bar Number 98898
KENNETH D. UPTON, JR.
Bar Number 1194475
Lambda Legal Defense and Education
Fund, Inc.
111 K Street N.E., 7th Floor
Washington, DC 20002
202-804-6245
kloewy@lambdalegal.org
kupton@lambdalegal.org

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 6,437 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman 14-point type.

Dated: November 14, 2024                 Respectfully submitted,

                                         s/ Karen L. Loewy
                                         KAREN L. LOEWY
                                         *Counsel of Record for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2024, I electronically filed this Amici Curiae Brief with the Clerk of Court using the CM/ECF system, which will send notifications of such filings to all counsel of record.

Dated: November 14, 2024                 Respectfully submitted,

                                         s/ Karen L. Loewy
                                         KAREN L. LOEWY
                                         *Counsel of Record for Amici Curiae*