# United States Court of Appeals
## For the First Circuit

No. 24-1739

ST. DOMINIC ACADEMY, d/b/a Roman Catholic Bishop of Portland, a
corporation sole; ROMAN CATHOLIC BISHOP OF PORTLAND, a
corporation sole; KEITH RADONIS, on their own behalf and as next
friend of children K.Q.R., L.R.R., and L.T.R.; VALORI RADONIS,
on their own behalf and as next friend of children K.Q.R.,
L.R.R., and L.T.R.,

Plaintiffs, Appellants,

v.

A. PENDER MAKIN, in the personal capacity and official capacity
as Commissioner of the Maine Department of Education; JEFFERSON
ASHBY, in the personal capacity; MEGAN SANDERS,* in the official
capacity as Commissioner of the Maine Human Rights Commission;
EDWARD DAVID, in the personal capacity and official capacity as
Commissioner of the Maine Human Rights Commission; JULIE ANN
O'BRIEN, in the personal capacity and official capacity as
Commissioner of the Maine Human Rights Commission; MARK WALKER,
in the personal capacity and official capacity as Commissioner
of the Maine Human Rights Commission; THOMAS L. DOUGLAS, in the
personal capacity and official capacity as Commissioner of the
Maine Human Rights Commission,

Defendants, Appellees.

---

\* Plaintiffs originally named Jefferson Ashby as a defendant
in both his personal capacity and his official capacity as a
Commissioner of the Maine Human Rights Commission. Sometime around
February 2024, Megan Sanders replaced Jefferson Ashby on the Maine
Human Rights Commission. Commissioners, Me. Hum. Rts. Comm'n,
https://www.maine.gov/mhrc/about/commissioners
[https://perma.cc/AQ4H-47JF] (last visited Apr. 28, 2026). As to
the claims against Ashby in his official capacity, we substitute
Sanders pursuant to Federal Rule of Appellate Procedure 43(c)(2).
The claims against Ashby in his personal capacity remain.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

———————

Before

Montecalvo and Kayatta,[**]
Circuit Judges.

———————

Adèle Auxier Keim, with whom Mark L. Rienzi, Benjamin A. Fleshman, Michael J. O'Brien, Amy Ren, The Becket Fund for Religious Liberty, James B. Haddow, and Petruccelli, Martin & Haddow LLP were on brief, for appellants.

Michael C. Gilleran and FisherBroyles LLP on brief for Seymour Institute for Black Church and Policy Studies and Religious Freedom Institute as amici curiae supporting appellants.

Edward M. Wenger, Jonathan P. Lienhard, and Holtzman Vogel Baran Torchinsky & Josefiak PLLC on brief for Herzog Foundation as amicus curiae supporting appellants.

Thomas M. Fisher, Bryan Cleveland, and EdChoice Legal Advocates on brief for EdChoice, Inc. as amicus curiae supporting appellants.

Mark A. Lippelmann, Jeremiah Galus, Ryan Tucker, David A. Cortman, and Alliance Defending Freedom on brief for Christian Schools International, American Association of Christian Schools, Association for Biblical Higher Education, International Alliance for Christian Education, and Cardinal Newman Society as amici curiae supporting appellants.

Joshua Blackman, Josh Blackman, LLC, John S. Whitman, and Richardson, Whitman, Large & Badger on brief for Jewish Coalition for Religious Liberty as amicus curiae supporting appellants.

John A. Meiser, Meredith Holland Kessler, Lindsay and Matt Moroun Religious Liberty Clinic, Nicole Stelle Garnett, and Notre Dame Education Law Project on brief for National Council of Young Israel and Notre Dame Education Law Project as amici curiae supporting appellants.

Christopher C. Taub, Chief Deputy Attorney General of Maine, with whom Aaron M. Frey, Attorney General of Maine, and Sarah A.

———————

[**] Judge Selya heard oral argument in this case and participated in the initial semble thereafter. His subsequent death ended his involvement in this case. The remaining two panelists issued this opinion pursuant to 28 U.S.C. § 46(d).

Forster, Assistant Attorney General of Maine, were on brief, for appellees.

Karen L. Loewy, Kenneth D. Upton, Jr., Lambda Legal Defense and Education Fund, Inc., Gary D. Buseck, Mary L. Bonauto, and GLBTQ Legal Advocates & Defenders on brief for GLBTQ Legal Advocates & Defenders and Lambda Legal Defense and Education Fund, Inc. as amici curiae supporting appellees.

Michelle Fraling, Aditi Fruitwala, Daniel Mach, Heather Weaver, American Civil Liberties Union Foundation, Carol Garvan, Zachary L. Heiden, Anahita Sotoohi, American Civil Liberties Union of Maine Foundation, Alex J. Luchenitser, Alexandra Zaretsky, and Americans United for Separation of Church and State on brief for American Civil Liberties Union, American Civil Liberties Union of Maine, and Americans United for Separation of Church and State as amici curiae supporting appellees.

Adam J. Hunt, Tamara Wiesebron, Jenny Xin, Justin Kareem Rezkalla, Morrison & Foerster LLP, Robert Kim, Jessica Levin, Wendy Lecker, Education Law Center, Kristen L. Hollar, and National Education Association on brief for Public Funds Public Schools, National Education Association, National School Boards Association, American Federation of Teachers, In the Public Interest, Freedom from Religion Foundation, American Atheists, Inc., Council of Parent Attorneys and Advocates, Inc., Network for Public Education, Pastors for Children, Disability Rights Maine, and Maine Education Association as amici curiae supporting appellees.

---

July 2, 2026

---

KAYATTA, **Circuit Judge**.  The State of Maine ("Maine" or the "State") subjects in-state K-12 schools to a set of antidiscrimination rules codified in the Maine Human Rights Act (MHRA), which is enforced by the Maine Human Rights Commission (MHRC) and by private litigants.  Primarily, these rules apply only to those schools that receive public funding.  Two lawsuits challenge these rules as applied to religious schools, taking issue with the MHRA's impact on school policies that draw lines based on religious identity or expression or that discriminate based on sexual orientation or gender identity.

In one suit -- the one on appeal here -- St. Dominic Academy (a Catholic school), the Roman Catholic Diocese of Portland (which runs St. Dominic Academy), and Keith and Valori Radonis (on behalf of their children, who intended to attend St. Dominic Academy) sought, as relevant here, declaratory and injunctive relief against the Commissioner of the Maine Department of Education and the five Commissioners of the MHRC (collectively, the "Commissioners").  In the other suit, Crosspoint Church ("Crosspoint"), which runs a Christian K-12 school, sought similar relief against the same defendants.  The district court denied injunctive relief in both suits, prompting two separate appeals. We heard oral argument in both cases on the same day.

The two appeals turn on similar facts and, for the most part, warrant similar resolutions.  Because the briefing in the

- 4 -

case at bar raises more preserved arguments than does Crosspoint's briefing, we use this case to analyze the legal issues shared by the two cases.  In our opinion in Crosspoint's appeal -- which we issue simultaneously with this opinion -- we resolve two final arguments unique to Crosspoint.  Our resolution of Crosspoint's appeal otherwise largely relies upon the reasoning of this opinion.

As the remainder of this opinion explains, we affirm in part and reverse in part the district court's order denying plaintiffs' motion for a preliminary injunction.

## I. Statutory Background

Plaintiffs' constitutional challenge aims at the intersection of two of Maine's statutory frameworks.  The first of these statutes is the State's tuition-assistance program, codified in Title 20-A of the Maine Revised Statutes, which allows children to attend private elementary and secondary schools at public expense under certain circumstances.  See Me. Stat. tit. 20-A, §§ 5203(4), 5204(4).  The second of these statutes is the MHRA, contained in Title 5 of the Maine Revised Statutes, which prohibits discrimination on certain grounds in employment, housing, education, and other areas.  See Me. Stat. tit. 5, §§ 4551-4634.  Because the MHRA's education provisions only apply to a school if it receives public funding, see id. § 4553(2-A), a private school in the State that forgoes tuition assistance may operate -- for

- 5 -

the most part[1] -- free of the MHRA's strictures.  By contrast, a private school that accepts tuition assistance will be subject to the MHRA's antidiscrimination provisions.  We begin by describing each of these two statutory frameworks.

### A. Maine's Tuition-Assistance Program

Under State law, a school administrative unit "that neither maintains a [public] school nor contracts for [public] school privileges . . . shall pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student is accepted."  Me. Stat. tit. 20-A, § 5204(4) (addressing secondary schools); see also id. § 5203(4) (same for elementary schools).  As of the 2024-25 school year, the program allowed a maximum tuition of $12,066.94 for in-state elementary schools and $14,080.88 for in-state and out-of-state secondary schools.[2]  See id. §§ 5804-5806, 5808 (setting tuition rates at roughly the average cost of educating a student in the State).

---

[1]  For example, certain employment provisions of the MHRA apply regardless of public funding.  See infra Section I.B.1.

[2]  Tuition Rates, Me. Dep't of Educ., https://www.maine.gov/doe/funding/reports/tuition [https://perma.cc/2XMY-9LRB] (last visited July 24, 2025).  The Maine Department of Education website does not indicate whether any out-of-state elementary schools received tuition-assistance payments in the 2024-2025 school year and, if so, at what tuition rate.

To participate in the program, a private school need not be located in Maine, id. § 5808,[3] but it must comply with basic requirements concerning, among other things, academic achievement, health and safety, and records maintenance. See id. § 2951. In 1981, the State legislature made it a requirement that participating schools be "nonsectarian." An Act to Revise the Education Laws, Me. Pub. L. 1981, ch. 693, sec. 5, 1981 Me. Laws 2063, 2177 (codified at Me. Stat. tit. 20-A, § 2951(2) (2018)).

In 2018, three couples, the parents of school-aged children in Maine, challenged this nonsectarian requirement in federal court. Complaint, Carson v. Makin, 401 F. Supp. 3d 207 (D. Me. 2019). Both the district court and this court rejected their challenge. Carson, 401 F. Supp. 3d at 212, aff'd, 979 F.3d 21 (1st Cir. 2020). In February 2021, they sought review in the Supreme Court. Petition for Writ of Certiorari, Carson v. Makin, 596 U.S. 767 (2022). The Court granted certiorari in July 2021, Carson v. Makin, 141 S. Ct. 2883 (2021) (mem.), and held in June 2022 that the nonsectarian requirement violated the First Amendment's Free Exercise Clause, thus reversing this court's decision, Carson, 596 U.S. at 789. Consequently, the State could

---

[3] As of the 2024-25 school year, Maine was paying tuition to four out-of-state schools, as compared to twenty-five in-state private secondary schools, along with at least another eight in-state private elementary schools (not counting those seemingly affiliated with secondary schools already included in the count). Tuition Rates, supra.

no longer enforce the nonsectarian requirement, and, in May 2025, the State legislature repealed that requirement.  An Act to Update the Laws Regarding Education, Me. Pub. L. 2025, ch. 112, sec. 5, 2025 Me. Laws 305, 306 (codified at Me. Stat. tit. 20-A, § 2951(2)).  Other than this alteration, the relevant portions of the tuition-assistance program have remained substantively unchanged since 2018.

### B. The Maine Human Rights Act

The MHRA comprises the State's statutory nondiscrimination regime.  Broadly speaking, it prohibits discrimination on certain grounds in employment, housing, education, public accommodations, and the extension of credit.  We first outline the MHRA's coverage and enforcement, then address a recent set of amendments to the MHRA, and finally describe the specific provisions at issue here.

### 1. Coverage and Enforcement

As originally enacted in 1971, the MHRA barred "discrimination in employment, housing or access to public accommodations on account of race, color, religion, ancestry or national origin."  Maine Human Rights Act, Me. Pub. L. 1971, ch. 501, § 1, 1971 Me. Laws 1001, 1001 (codified at Me. Stat. tit. 5, § 4552 (1972)).  Over the years, the State expanded the MHRA to cover discrimination in education. An Act to Insure State Enforcement of Equal Opportunity in State-supported Educational

- 8 -

Programs, Me. Pub. L. 1983, ch. 578, sec. 2, 1983 Me. Laws 2259, 2260 (codified at Me. Stat. tit. 5, § 4553(10)(F)).[4] It also added sex, disability, sexual orientation, and gender identity[5] as prohibited grounds of discrimination. An Act to Prevent Sex Discrimination under Human Rights Act, Me. Pub. L. 1973, ch. 347, sec. 1, 1973 Me. Laws 631, 631 (codified as amended at Me. Stat. tit. 5, § 4552); An Act to Prevent Physical Handicap Discrimination under Human Rights Act, Me. Pub. L. 1973, ch. 705, sec. 1, 1973 Me. Laws. 76, 76 (codified as amended at Me. Stat. tit. 5, § 4552); An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation, Me. Pub. L. 2005, ch. 10, secs. 1, 3, 2005 Me. Laws 70, 70-71 (codified as amended at Me. Stat. tit. 5, §§ 4552, 4553(9-C)).

---

[4] At some point, the legislature added the "extension of credit" as another realm protected by the MHRA. Me. Stat. tit. 5, § 4552. The parties essentially ignore the MHRA provisions regarding public accommodations and credit, so we do the same.

[5] Gender identity was originally included as part of the statutory definition of sexual orientation. See An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation, Me. Pub. L. 2005, ch. 10, sec. 3, 2005 Me. Laws 70, 71 (codified at Me. Stat. tit. 5, § 4553(9-C)) (2005)). In 2021, sexual orientation and gender identity were separated into distinct classifications. See An Act to Improve Consistency in Terminology and within the Maine Human Rights Act, Me. Pub. L. 2021, ch. 366, 2021 Me. Laws 761 (codified as amended in scattered sections of Me. Stat. tit. 5). Although Maine law now recognizes them as distinct bases, for ease of reference, we use the term "sexual orientation and gender identity discrimination" when talking about these statutory protections.

A covered entity that violates the MHRA exposes itself to civil liability.  "Any aggrieved person" or "any employee of the [MHRC]" may file a complaint of discrimination with the MHRC. Me. Stat. tit. 5, § 4611.  The MHRA requires the MHRC to investigate such complaints, id. § 4612(1)(B), and empowers it to file suit if it "finds reasonable grounds to believe that unlawful discrimination has occurred," id. § 4612(4)(A).  Alternatively, aggrieved persons may file suit on their own behalf.  Id. § 4621. For violations of the education provisions, available remedies include injunctive relief and civil monetary damages up to $100,000 for repeat violators.  Id. § 4613(2)(B)(1), (7).  Similar remedies exist for employment-discrimination actions against employers with more than fourteen employees.  Id. § 4613(2)(B)(1), (8).

The MHRA does not apply to all schools.  In particular, the MHRA's education provisions apply only to "any public school or educational program," "any public postsecondary institution," and "any private school or educational program approved for tuition purposes."   Id. § 4553(2-A).   In  other  words,  the  MHRA's nondiscrimination-in-education regime covers only schools that receive public funding.  In contrast, the MHRA's employment provisions generally apply to all employers regardless of public funding, though with carveouts for religious employers, discussed below.  See id. § 4553(4) (defining "employer" without regard to public funding).

- 10 -

Two further caveats are relevant to our description of Maine's reticulated statutory scheme. First, the MHRA's educational provisions do not apply to private postsecondary institutions (i.e., colleges, universities, and technical schools), including those that receive public funds. Id. § 4553(2-A). So while the State offers Maine undergraduate students attending Maine postsecondary institutions need-based grants of up to $2,500 per year paid directly to the students' institutions through the Maine State Grant Program, Me. Stat. tit. 20-A, §§ 11611-11620,[6] such institutions are not bound by the MHRA's provisions regarding educational discrimination.

Second, the parties agree that the MHRA does not have extraterritorial reach. See Judkins v. Saint Joseph's Coll. of Me., 483 F. Supp. 2d 60, 65-66 (D. Me. 2007) (noting the MHRA's lack of extraterritorial reach). Thus, the MHRA does not empower suits against out-of-state schools that participate in the tuition-assistance program. In fact, one such school (Massachusetts's Dana Hall School) bars boys from attending, a

---

[6] Maine State Grant Program, Fin. Auth. of Me., https://www.famemaine.com/affording-education/pay-for-school/maine-grant-tuition-programs/maine-state-grant-program/ [https://perma.cc/8BRK-WEVE] (last visited July 24, 2025).

- 11 -

practice that would violate the MHRA if Dana Hall were located in Maine and continued to accept tuition-assistance funds.[7]

### 2. The 2021 Amendments

In May 2021, before the Supreme Court acted on the Carson certiorari petition, the MHRC submitted to the Maine legislature a bill to amend the MHRA, entitled "An Act to Improve Consistency within the Maine Human Rights Act" (the "2021 Amendments"). S.P. 544, 130th Leg., 1st Spec. Sess., 2021 Me. Laws. 761 (enacted).[8]  The proposed bill touched many parts of the MHRA, including its policy statement, definition of familial status, and provisions governing discrimination in employment, housing, public accommodations, credit, and education.  See generally id.  The summary included in the bill stated that the amendments would "address[] inconsistencies" in the MHRA, including by "[c]larifying the scope of the Maine Human Rights Act['s] application in education."  Id.

In support of the bill, the MHRC submitted testimony to the legislature stating that, because "its provisions have been amended in a piecemeal fashion," "the scope of the MHRA's

---

[7]  Tuition Rates, supra; About Dana Hall, Dana Hall Sch., https://www.danahall.org/about [https://perma.cc/AY4Y-HRCV] (last visited Apr. 22, 2026).

[8]  A largely identical set of amendments had been proposed in 2019 but were not enacted into law.  H.P. 1218, 129th Leg., 1st Reg. Sess. (Me. 2019).

protection varies based on which area of its jurisdiction is invoked." Hearing on Leg. Doc. 1688 Before the J. Standing Comm. on the Judiciary, 130th Leg., 1st Spec. Sess. 1 (Me. 2021) (statement of Amy M. Sneirson, Exec. Dir., Me. Hum. Rts. Comm'n, & Barbara Archer Hirsch, Comm'n Couns., Me. Hum. Rts. Comm'n). As relevant here, the MHRC opined that "[t]he MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act." Id. at 5.

The legislature enacted the 2021 Amendments into law in June 2021, shortly before the Supreme Court granted certiorari in Carson. An Act to Improve Consistency in Terminology and within the Maine Human Rights Act, Me. Pub. L. 2021, ch. 366, 2021 Me. Laws 761 (codified as amended in scattered sections of Me. Stat. tit. 5).

### 3. The Challenged Rules

At issue in this case are four rules imposed by the MHRA. Below, we describe these rules in turn, as well as the effect of the 2021 Amendments on each.

### a. The Employment Rule

We begin with the first challenged rule, which we refer to as the "Employment Rule." Subject to three important carveouts explained below, it bars employment discrimination based on "race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or

familial status." Me. Stat. tit. 5, § 4572(1). This rule predates the 2021 Amendments and the Carson litigation, as do its three carveouts.[9]  Compare Me. Stat. tit. 5, §§ 4553(4), 4553(10), 4572(1), 4573-A(2) (2026), with Me. Stat. tit. 5, §§ 4553(4), 4553(10), 4572(1), 4573-A(2) (2018).

First, section 4553(4) excludes from the definition of "employer" any nonprofit "religious or fraternal corporation or association . . . with respect to employment of its members of the same religion, sect or fraternity, except for purposes of disability-related discrimination."  This carveout insulates religious entities whether or not they receive public funds.

Second, section 4573-A(2) allows any religious organization to "giv[e] preference in employment to individuals of its same religion to perform work connected with the carrying on . . . of its activities" and to "require that all applicants and employees conform to [its] religious tenets."  This carveout likewise covers religious entities regardless of whether they receive public funds.

---

[9]  The 2021 Amendments did explicitly add familial status, and, as relevant here, gender identity to the list of enumerated protected characteristics.  2021 Amendments sec. 5 (codified at Me. Stat. tit. 5, § 4572).  However, prior to the 2021 Amendments, gender identity was a protected characteristic via the statutory definition of sexual orientation.  See supra note 5.

Third, section 4553(10)(G) expressly exempts from the Employment Rule's sexual orientation and gender identity provisions religious entities that do not receive public funds.

### b. The Religious Expression Rule

We next turn to the second challenged rule, which we refer to as the "Religious Expression Rule."  Entirely new when adopted as part of the 2021 Amendments, this rule provides that the MHRA does not "[r]equire[] an educational institution to participate in or endorse any religious beliefs or practices" but that, "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing."  2021 Amendments sec. 19 (codified at Me. Stat. tit. 5, § 4602(5)(D)).  Like the rest of the MHRA's education provisions, this rule only applies to a private elementary or secondary school in Maine if it receives public funding.  Me. Stat. tit. 5, § 4553(2-A).

### c. The Religious Nondiscrimination Rule

We refer to the third of the challenged rules as the "Religious Nondiscrimination Rule."  As relevant here, and as the parties agree, this rule bars schools from discriminating on the basis of religion in "academic, extracurricular, research, occupational training or other program[s] or activit[ies]," "athletic programs," "admission[s]," "recruitment," or "financial assistance."  Me. Stat. tit. 5, § 4602(1).

This bar on religious discrimination was added by the 2021 Amendments. 2021 Amendments sec. 19 (codified at Me. Stat. tit. 5, § 4602(1)). Prior to 2021, including in 2018 when the Carson litigation began, the MHRA barred discrimination in education on the basis of race, sex, sexual orientation (or gender identity),[10] physical or mental disability, or national origin. Me. Stat. tit. 5, § 4602 (2018). The 2021 Amendments added to this prohibition actions taken on the basis of color, ancestry, and -- most relevant here -- religion. 2021 Amendments sec. 19 (codified at Me. Stat. tit. 5, § 4602(1)). This extension aligned the MHRA's education provisions with its employment and housing provisions, which already covered discrimination on those grounds. Me. Stat. tit. 5, §§ 4571, 4581 (2018). This rule also only applies if a school receives public funding. Me. Stat. tit. 5, § 4553(2-A).

### d. The Sexual Orientation and Gender Identity Nondiscrimination Rule

Finally, we refer to the fourth challenged rule as the "Sexual Orientation and Gender Identity Nondiscrimination Rule." This rule mirrors the Religious Nondiscrimination Rule's scope but

---

[10] Contrary to language in plaintiffs' opening brief, the prohibition on gender-identity discrimination in education predated the 2021 Amendments, which merely separated sexual orientation and gender identity into distinct classifications. See supra note 5.

bars instead actions taken on the basis of sexual orientation or gender identity.  Me. Stat. tit. 5, § 4602(1).[11]

---

[11]  The Religious Nondiscrimination Rule and the Sexual Orientation and Gender Identity Nondiscrimination Rule are actually part of the same provision, section 4602(1).  In full, that provision reads:

> 1.  Unlawful educational discrimination.  It is unlawful educational discrimination in violation of this Act, on the basis of sex, sexual orientation or gender identity, physical or mental disability, ancestry, national origin, race, color or religion, to:
> > A.  Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity;
> > B.  Deny a person equal opportunity in athletic programs;
> > C.  Apply any rule concerning the actual or potential familial status or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity;
> > D.  Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or
> > E.  Deny a person financial assistance availability and opportunity.

Me. Stat. tit. 5, § 4602(1).  We follow St. Dominic's lead and treat section 4602(1)'s bars on religious discrimination and sexual orientation and gender identity discrimination separately. See Me. Stat. tit. 1, § 71(8) (providing for severability of statutory provisions and applications).

Prior to the 2021 Amendments, the MHRA exempted from this prohibition on sexual-orientation and gender-identity discrimination "any education facility owned, controlled or operated by a bona fide religious corporation, association or society." Me. Stat. tit. 5, § 4602(4) (2018). This exemption applied regardless of whether a religious school received public funding. The 2021 Amendments revised this exemption to read, "Nothing in this section . . . [r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." 2021 Amendments sec. 19 (codified at Me. Stat. tit. 5, § 4602(5)(C)); see also id. sec. 3 (codified at Me. Stat. tit. 5, § 4553(10)(G)). In other words, the MHRA now exempts from the Sexual Orientation and Gender Identity Nondiscrimination Rule only those religious schools that do not receive public funding. In this regard, the amendments again aligned the MHRA's education provisions with its employment and housing provisions, which already exempted from similar rules against discrimination on the basis of sexual orientation and gender identity only those religious entities that did not receive public funds. Me. Stat. tit. 5, § 4553(10)(G) (2018). In any case, as part of the MHRA's education provisions, the Sexual Orientation and Gender Identity Nondiscrimination Rule only applies to schools that receive public funding. See Me. Stat. tit. 5, § 4553(2-A).

- 18 -

### C. Summary

To summarize:  Maine previously barred parents from using publicly funded tuition-assistance payments at sectarian religious schools.  A pair of families challenged that nonsectarian requirement in federal court.  As that case was being litigated, the State amended the nondiscrimination laws applicable to all Maine elementary and secondary schools receiving public funding. The Supreme Court then struck down the nonsectarian requirement, allowing parents to direct public funds to religious schools via the tuition-assistance program.  Now, a religious school in Maine may receive publicly funded tuition assistance, but if it does so, it must comply with most of the State's nondiscrimination laws or else face investigation by the MHRC and potential civil liability.

### II. Case Background

### A. Facts[12]

St. Dominic Academy is a private Catholic school operated by the Roman Catholic Diocese of Portland.  The school offers education from pre-kindergarten through eighth grade.[13]  It

---

[12]  In reciting the following facts, "[w]e look at the allegations in the plaintiffs' complaint[] and the evidence from the preliminary injunction proceedings." Doe v. Trump, 157 F.4th 36, 47 (1st Cir. 2025).

[13]  When it filed this lawsuit, St. Dominic offered grades nine through twelve, as well.  After oral argument on this appeal, though, the Diocese decided to close St. Dominic's high school operations.

does not currently receive tuition assistance, but the school states -- and the Commissioners do not dispute -- that it "meets or is capable of meeting the requirements to become approved for tuition purposes." Keith and Valori Radonis are parents of school-aged children who, at the time of filing this lawsuit, wished to send their children to St. Dominic using the tuition-assistance program.

As a Catholic school, St. Dominic is "part of the Catholic Church's evangelizing mission." Its "primary purpose" is "to assist Catholic parents in providing their children with a Catholic education," and as such, the school "gives preference in both admission and financial aid to Catholic students." Although Diocesan policy provides that "[s]tudents of other religious beliefs should be admitted whenever possible," St. Dominic admits only students who "understand, accept, and [are] willing to support the mission and goals of the school" and "agree to attend religion classes, Mass, and other religious activities." Every student at St. Dominic "must agree to uphold 'Catholic Christian morals.'" Similarly, St. Dominic requires all employees to "[l]ive personal lives in such a way that fundamental teachings of the Catholic Church are upheld."

St. Dominic does not "inquire about a student's sexual orientation or gender identity at the time of admission." The school's leaders do, however, believe that "[t]he right and duty

of parents to educate their children are primordial and inalienable." Accordingly, the school objects to being required by the State to facilitate "a student's efforts to change his or her gender identity" without parental consent. The school also suggests it would not "discipline staff and students who have a religious or conscientious objection to using a student's preferred pronouns if they do not correspond to the student's biological sex."

According to St. Dominic, its foregoing policies violate, to one extent or another, the Employment Rule, the Religious Expression Rule, the Religious Nondiscrimination Rule, and/or the Sexual Orientation and Gender Identity Nondiscrimination Rule. Were it not for these rules, the school says, it would seek and receive approval for the tuition-assistance program.

### B. Procedure

In March 2023, Crosspoint Church -- which operates a private, religious K-12 school unaffiliated with the plaintiffs in this case -- sued the Commissioners in the District of Maine, seeking relief on First Amendment grounds from the Employment Rule, the Religious Expression Rule, the Religious Nondiscrimination Rule, and the Sexual Orientation and Gender Identity Nondiscrimination Rule. Crosspoint Church v. Makin, 719 F. Supp. 3d 99, 103-04, 104 n.1 (D. Me. 2024). In June 2023, St. Dominic

Academy, the Roman Catholic Diocese of Portland, and Keith and Valori Radonis (on behalf of their school-aged children) filed this similar suit against the same defendants in the same court. The plaintiffs in both suits moved for preliminary injunctive relief.

In February 2024, the district court denied Crosspoint's motion for a preliminary injunction. Id. at 126. In June 2024, the court, upon joint motion of the parties to that suit, converted that order into an order denying a permanent injunction and entered final judgment for the Commissioners. Crosspoint Church v. Makin, No. 23-cv-00146, 2024 WL 2830931, at *4 (D. Me. June 4, 2024). In August 2024, in this suit, the district court denied plaintiffs' motion for a preliminary injunction. St. Dominic Acad. v. Makin, 744 F. Supp. 3d 43, 84 (D. Me. 2024). The plaintiffs in both suits timely appealed, and we consider the latter case here.

During the pendency of this appeal, plaintiffs informed us that the Radonises' claim for injunctive relief was moot. This development moots the parental-rights claim for injunctive relief, which was asserted only on behalf of the Radonises. We therefore remand that claim and order its dismissal without prejudice. See White v. Gittens, 121 F.3d 803, 807 (1st Cir. 1997).[14] The upshot

---

[14] In supplemental notices of authority submitted after the Radonises' parental-rights claim became moot, St. Dominic nevertheless argues that the Supreme Court's parental-rights

- 22 -

is that we consider, here, only the appeal of St. Dominic Academy and the Roman Catholic Diocese of Portland (collectively, "St. Dominic").

### III. Analysis

When ruling on a motion for a preliminary injunction, a district court must consider four factors: (1) "the movant's likelihood of success on the merits"; (2) "whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief"; (3) "the balance of relative hardships"; and (4) "the effect, if any, that an injunction or the lack of one may have on the public interest." Russomano v. Novo Nordisk Inc., 960 F.3d 48, 52 (1st Cir. 2020) (citation modified). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006). That said, "the four factors are not entitled to equal weight in the decisional calculus; rather, likelihood of success is the main bearing wall of the four-factor framework." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9–10 (1st Cir. 2013) (citation modified).

"We review the district court's ruling on a motion for a preliminary injunction for abuse of discretion. Within that

---

caselaw supports its own entitlement to relief. We address that argument below. See infra Section III.A.4.b.iii.

framework, we examine legal questions de novo, findings of fact for clear error, and the balancing of the four factors for abuse of discretion." Russomano, 960 F.3d at 53 (citation modified).

## A. Likelihood of Success on the Merits

We consider first St. Dominic's likelihood of success on the merits in its challenges to the Employment Rule, the Religious Expression Rule, the Religious Nondiscrimination Rule, and the Sexual Orientation and Gender Identity Nondiscrimination Rule, in that order. As we will explain, we conclude that St. Dominic has not shown that the Employment Rule would prohibit any of its preferred policies. In contrast, we find that St. Dominic has shown a likelihood of success as to the Religious Expression Rule. However, St. Dominic has not established a likelihood of success as to any contested application of the Religious Nondiscrimination Rule. Finally, St. Dominic is not likely to succeed in its challenge to the Sexual Orientation and Gender Identity Nondiscrimination Rule.

## 1. The Employment Rule

St. Dominic argues that the Employment Rule "threatens to intrude on" its "hiring rights," which "are rooted in longstanding protections that stem from both Religion Clauses" of the First Amendment. We read the MHRA differently and thus see no live controversy concerning St. Dominic's employment practices.

"Article III [of the Constitution] confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021); see also U.S. Const. art. III., § 2, cl. 1.  In other words, "federal courts do not adjudicate hypothetical or abstract disputes" or "issue advisory opinions."  TransUnion, 594 U.S. at 423-24.  This means that, to invoke our power, a plaintiff must first and foremost establish standing.  Id. at 423.  Standing, in turn, requires a plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  Id.  Here, we focus on the first requirement, injury in fact.  When a plaintiff brings a pre-enforcement challenge to a statute on First Amendment grounds, this requirement is satisfied if "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the statute, and there exists a credible threat of prosecution." N.H. Right to Life Pol. Action Comm. v. Gardner, 99 F.3d 8, 14 (1st Cir. 1996) (citation modified).[15] As the party invoking the federal

---

[15]  While New Hampshire Right to Life confined this standard to situations in which the plaintiff challenged a statute carrying criminal penalties, 99 F.3d at 14, we have more recently cited this standard in a case involving a school board policy with no apparent criminal penalties, McBreairty v. Miller, 93 F.4th 513, 518 (1st Cir. 2024).  In this case, where the MHRA grants a

judicial power, St. Dominic bears the burden of "demonstrat[ing] standing for each claim that [it] press[es] and for each form of relief that [it] seek[s]."  TransUnion, 594 U.S. at 431.[16]

St. Dominic has failed to carry this burden as regards the Employment Rule because that rule does not proscribe the school's hiring practices.  While the rule generally bars schools from employment discrimination based on religion, sexual orientation, or gender identity, the MHRA contains two specific carveouts for religious schools that apply regardless of whether a school participates in the tuition-assistance program.  First, section 4553(4) expressly protects a religious school's ability to discriminate "with respect to employment of its members of the same religion, sect or fraternity."  Me. Stat. tit. 5, § 4553(4). Second, section 4573-A(2) allows a religious school to "require that all applicants and employees conform to [its] religious tenets."  Id. § 4573-A(2).

The district court held that these provisions fully protect St. Dominic's religious hiring autonomy.  See St. Dominic,

_____

government body civil enforcement powers and imposes substantial financial liability for violations, we assume a similar standard governs.

[16]  "We assume, favorably to [St. Dominic], that a plaintiff's standing to seek a preliminary injunction should be judged on the sufficiency of the allegations of the complaint, with any preliminary hearing evidence favorable to the plaintiffs on standing treated as additional allegations of the complaint." McBreairty, 93 F.4th at 518 n.2 (citation modified).

744 F. Supp. 3d at 68. Specifically, the court explained that the provisions "clearly protect[]" St. Dominic's ability "to limit employment to individuals who conform with the Catholic faith." Id. On appeal, the Commissioners concede -- as they did below, id. at 67 -- that these provisions allow St. Dominic to "limit employment to members of its religion and require all applicants [for employment] and employees to conform to its religious tenets."

These concessions notwithstanding, St. Dominic insists that the Employment Rule still threatens its hiring practices. It argues that the rule exposes it to liability if it refuses to employ persons who do not comply with the school's religious tenets concerning sexual orientation and gender identity.

But the rule's above-quoted carveouts -- which apply regardless of whether St. Dominic accepts tuition assistance -- clearly allow St. Dominic to hire only co-religionists and to ensure that all employees, even non-Catholic ones, conform to the school's understanding of Catholic teachings -- including those concerning sexual orientation and gender identity. These exceptions may well provide the school with greater leeway than the Constitution requires. See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 188 (2012) (recognizing "ministerial exception," which "precludes application of [employment] legislation to claims concerning the employment relationship between a religious

institution and its ministers"); see also Union Gospel Mission of Yakima Wash. v. Brown, 162 F.4th 1190, 1197 (9th Cir. 2026) (extending church-autonomy doctrine to protect "the decision to hire co-religionists for non-ministerial roles if that decision is based on the organization's sincerely held religious beliefs"). It therefore matters not that the third carveout from the Employment Rule -- section 4553(10)(G) -- offers no redundant protection for schools that take tuition-assistance payments. See Me. Stat. tit. 5, § 4553(10)(G).

St. Dominic cites several extrinsic sources to support its view that the MHRC might nevertheless try to use the Employment Rule to interfere with St. Dominic's hiring practices. Most notably, St. Dominic points out that, during the Carson litigation, the State (on behalf of Commissioner Makin) contended that if religious schools "receive public funds, the [MHRA] will prohibit them from considering sexual orientation in their employment decisions." Carson, 401 F. Supp. 3d at 209. But with the statutory text, the district court's decision, and the Commissioners' appellate briefing in this case all pointing plainly in the opposite direction, those abandoned contra-textual assertions made in litigation nearly a half-decade ago or more carry no weight. Through its legislation and the Commissioners' concessions in this litigation, the State has twice made clear

- 28 -

that St. Dominic already has what it claims to seek.   And our ruling so stating should add belt to suspenders.

St. Dominic also highlights the Commissioners' suggestion that, under certain circumstances, the Employment Rule might prevent a religious school from firing someone in a same-sex union.   But the Commissioners do not argue that St. Dominic cannot fire a teacher who enters a same-sex union for failing to "conform to [St. Dominic's] religious tenets."   Rather, the Commissioners suggest that there may be circumstances in which a religious school might refuse to employ a person in a same-sex union for reasons other than noncompliance with that school's religious tenets.   And if the position is non-ministerial, the Commissioners speculate, such a situation might trigger the Employment Rule.[17]   However, we need not delve into this hypothetical.   So long as St. Dominic views same-sex unions as "[in]compatible with [Catholic] teaching," as St. Dominic assures us it does, the Commissioners' hypothetical will never apply to the school.

In sum, it is clear that the Employment Rule does not credibly threaten to injure St. Dominic, so the question whether

---

[17]   In such a case, the Commissioners say, "a court would need to decide whether the action was based on the employee's conformance with [the school's] religious tenets."   We note that, in such an inquiry, it would not be "within the judicial function and judicial competence to inquire" whether the school "correctly perceived the commands" of its faith.   Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 716 (1981).

the rule would be unconstitutional if it did pose such a threat is a purely hypothetical question not presented by any controversy between the parties. See Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) ("The basic inquiry is whether the conflicting contentions of the parties present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." (citation modified)), overruled on other grounds by 442 U.S. 936 (1979); Whitmore v. Arkansas, 495 U.S. 149, 157 (1990) ("[The] alleged injury is too speculative to invoke the jurisdiction of an Art. III court."). As such, the district court was without power under the Constitution to issue St. Dominic's requested injunction against the Employment Rule.

### 2. The Religious Expression Rule

We turn next to St. Dominic's challenge to the Religious Expression Rule, which provides that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." Me. Stat. tit. 5, § 4602(5)(D). St. Dominic primarily contends that this rule violates the school's free-exercise rights because it would require the school to "allow students to express dissenting religious views, even when doing so is contrary to the school's

religious mission."  As we explain, we conclude that St. Dominic has shown a likelihood of success on the merits of this challenge.[18]

### a. Justiciability

The Commissioners argue, first, that we should not reach the merits of St. Dominic's challenge to the Religious Expression Rule.  In so arguing, they point to the doctrines of ripeness, see Abbott Lab'ys v. Gardner, 387 U.S. 136, 148-49 (1967) (subsequent history omitted), and Pullman abstention, see R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 501 (1941).  For the following reasons, we conclude that neither doctrine bars St. Dominic's challenge to the Religious Expression Rule.

### i. Ripeness

The Commissioners insist that St. Dominic's claims are not ripe for judicial review.  The district court found St. Dominic's challenge to the Religious Expression Rule ripe, St. Dominic, 744 F. Supp. 3d at 61-65, a determination we review de novo, Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 327 (1st Cir. 2016).

Ripeness doctrine derives from the same Article III case-or-controversy requirement as standing doctrine.  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 n.5 (2014); see also

---

[18] Accordingly, we need not reach St. Dominic's other arguments against the rule and do not address them in the analysis that follows.

<u>supra</u> Section III.A.1.  Whereas standing trains on who may sue, ripeness asks when they may sue.  <u>R.I. Ass'n of Realtors, Inc.</u> v. <u>Whitehouse</u>, 199 F.3d 26, 33 (1st Cir. 1999).  The latter inquiry aims "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  <u>Abbott Lab'ys</u>, 387 U.S. at 148.  To determine the ripeness of a dispute, we must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  <u>Id.</u> at 149.  In this pre-enforcement context, fitness demands that St. Dominic "have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity," while hardship demands "[a] showing that the challenged statute, fairly read, thwarts implementation of the plan."  <u>Whitehouse</u>, 199 F.3d at 33.

St. Dominic satisfies both the fitness and the hardship prongs.  First, St. Dominic has clearly "articulated a concrete plan to violate the" Religious Expression Rule, <u>Thomas</u> v. <u>Anchorage Equal Rts. Comm'n</u>, 220 F.3d 1134, 1139 (9th Cir. 2000) (citation modified), including by continuing to allow and encourage students to engage in Catholic expression while limiting any attempts to engage in analogous non-Catholic religious expression.  Second, the rule would thwart those plans by requiring St. Dominic to either limit Catholic expression by students or allow non-Catholic expression on an equal footing.  In essence, absent "prompt

- 32 -

judicial review," St. Dominic might be "forc[ed] . . . to choose between refraining from core [First Amendment activities] on the one hand, or engaging in [those activities] and risking costly" punishment on the other. Susan B. Anthony List, 573 U.S. at 167-68; see also Whitehouse, 199 F.3d at 34 (describing "the direct and immediate dilemma of choosing between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [plaintiff] believe[s] to be constitutionally protected activity" (citation modified)).

The Commissioners primarily rejoin that St. Dominic's claim is not ripe absent "a credible threat of prosecution" directed at the school. Whitehouse, 199 F.3d at 33.[19] True enough. But, in the First Amendment context, so long as the challenged statute "facially restrict[s] expressive activity by the class to which the plaintiff belongs," we "assume a credible threat of prosecution in the absence of compelling contrary evidence." N.H. Right to Life, 99 F.3d at 15. Here, St. Dominic plans to continue engaging in conduct that would flatly violate the rule's text were it to accept tuition assistance. As such, we see no reason to think it "imaginary or wholly speculative," Babbitt, 442 U.S. at 302-03, that either the MHRC or a private plaintiff would bring an

---

[19] Ripeness shares this requirement with standing doctrine in this pre-enforcement posture. Whitehouse, 199 F.3d at 33.

MHRA action if application of the Religious Expression Rule to St. Dominic is not precluded.

The Commissioners also argue that St. Dominic's claims are not ripe because enforcement turns on the actions of third parties -- i.e., St. Dominic will only face an enforcement action if a discriminated-against student complains.  But parties can sometimes satisfy ripeness even where their claims are contingent on uncertain future events, including those involving third parties.  See, e.g., Stern v. U.S. Dist. Ct. for Dist. of Mass., 214 F.3d 4, 12 (1st Cir. 2000) (allowing a suit predicated on the nonparty Department of Justice approving an application for a subpoena).  Moreover, because the MHRA empowers MHRC employees to file complaints themselves, Me. Stat. tit. 5, § 4611, St. Dominic could face an enforcement action even if no student complains. And the probability of such an action, should St. Dominic violate the Religious Expression Rule, is sufficiently great that we will not force St. Dominic to risk a suit for damages in order to clarify its rights.

We therefore conclude that St. Dominic's challenge to the Religious Expression Rule is ripe.

### ii. **Pullman** Abstention

The Commissioners separately argue that we should rely on Pullman to abstain from adjudicating St. Dominic's claims because of uncertainty surrounding the Religious Expression Rule's

meaning.    The district court rejected this argument, St. Dominic, 744 F. Supp. 3d at 60-61.  We review the district court's rejection de novo.  See Brooks v. N.H. Sup. Ct., 80 F.3d 633, 637 (1st Cir. 1996).[20]

Under Pullman, "declining to exercise jurisdiction is warranted where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." Batterman v. Leahy, 544 F.3d 370, 373 (1st Cir. 2008).  We apply Pullman abstention only where a "statute is of an uncertain nature[] and is obviously susceptible of a limiting construction."  Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 237 (1984) (quoting Zwickler v. Koota, 389 U.S. 241, 251 n.14 (1967)).

The Commissioners contend that a state court might read the Religious Expression Rule to not reach any of St. Dominic's religiously motivated practices.  But should St. Dominic accept

---

[20]  In Brooks, we reviewed a district court's decision to abstain under Younger v. Harris, 401 U.S. 37 (1971), rather than Pullman.  Brooks, 80 F.3d at 637.  But other circuits similarly apply a de novo standard to the question of "whether the requirements for Pullman abstention are satisfied." Am. Encore v. Fontes, 152 F.4th 1097, 1109 (9th Cir. 2025) (citation modified); see also id. ("If [those requirements] are not [satisfied], the district court has little or no discretion to abstain; if they are, we review the decision to abstain for an abuse of discretion." (citation modified)).  Because, here, we concern ourselves only with the preliminary requirements for Pullman abstention, we proceed with de novo review.

tuition-assistance funds, the Religious Expression Rule would clearly force St. Dominic to allow non-Catholic religious proselytizing unless it barred all forms of religious expression -- including, as pertinent here, the Catholic expression that is central to the school's self-described role as "part of the Catholic Church's evangelizing mission."[21]  In short, the Religious Expression Rule is not so uncertain that state-court intervention would "obviate the need to resolve a significant federal constitutional question."  Batterman, 544 F.3d at 373.

### b. Level of Scrutiny

We turn now to the level of scrutiny we should apply to St. Dominic's free-exercise challenge to the Religious Expression Rule.  The Free Exercise Clause, as incorporated against the states, bars any law "prohibiting the free exercise" of religion.  U.S. Const. amend. I.  Pursuant to the traditional framework applied to free-exercise claims, propounded in Employment Division v. Smith, 494 U.S. 872 (1990), "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally

---

[21]  The Commissioners also briefly argue that St. Dominic cannot press its claims because the 2021 Amendments "would not require St. Dominic to change its educational practices."  Whether we construe this as an Article III injury-in-fact argument or a First Amendment argument, we reject the Commissioners' contention as to the Religious Expression Rule for the reasons given in this section and the following section, infra.

applicable." <u>Fulton</u> v. <u>City of Philadelphia</u>, 593 U.S. 522, 533 (2021). Because we conclude the Religious Expression Rule burdens St. Dominic's religious exercise and is not neutral, we subject the rule to strict scrutiny without reaching the issue of its general applicability. Our reasoning follows.

At the outset, the Commissioners seem to argue <u>Smith</u>'s framework does not apply here at all because the Religious Expression Rule does not burden St. Dominic's religious exercise. To support this argument, the Commissioners urge a narrow interpretation of the Religious Expression Rule. According to the Commissioners, the language, "to the extent an educational institution permits religious expression," refers solely to permitting religious expression by students. Under this proposed interpretation, that St. Dominic requires students to attend Mass but does not provide imam-led prayer services is irrelevant. What matters, say the Commissioners, is to what extent students may engage in Catholic religious expression and whether the school allows students to engage in non-Catholic religious expression to the same extent. In this way, the Commissioners contend, "requiring schools to allow religious expression by students does not regulate the religious practices of the schools themselves."

Assuming the Commissioners' interpretation is correct, the rule would still implicate St. Dominic's religious exercise. St. Dominic, as part of its religious mission, requires students

- 37 -

to attend religion classes, Mass, and other religious activities. These activities necessarily entail some degree of student participation. Even under the Commissioner's reading of the Religious Expression Rule, then, if a preacher at a school-mandated Mass permits students to say "Amen" in order to signify agreement, St. Dominic would then be required to allow expressions of disagreement. And in the classroom, inculcation often solicits -- indeed encourages -- affirmation, for example in the form of an iterative exchange of expression. Few would teach the Lord's Prayer without having the students recite it; and under the Religious Expression Rule that recitation would, in turn, appear to require the school to allow the reciting of, for example, the Hare Krishna Mahā mantra. And while such an example may seem fanciful,[22] the point is that the Religious Expression Rule would inevitably interfere with a religious school's ability to foster an expressive environment consistent with its religious mission.

---

[22] Or perhaps not, once one considers the tendency of some students to look for opportunities (much less state-provided soapboxes) to test and provoke their schools. See Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 677–78 (1986) (discussing high school student's nomination speech as "part of a school-sponsored educational program in self-government," in which student "referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor"); Morse v. Frederick, 551 U.S. 393, 397–98 (2007) (explaining how student, at an off-campus event, held up fourteen-foot banner displaying phrase "BONG HiTS 4 JESUS").

Having determined that the Religious Expression Rule would burden St. Dominic's religious exercise, we move on to the question of neutrality.  "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."  Fulton, 593 U.S. at 533.  A law can lack neutrality under Smith in one of two ways: facially or nonfacially.  See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533-34 (1993).  We can start -- and end -- our analysis of the Religious Expression Rule with facial neutrality.

"A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context."  Id. at 533.  For example, a tuition-assistance program that permits recipients to pursue a degree in every area of study except devotional theology is not facially neutral.  Locke v. Davey, 540 U.S. 712, 715 (2004); see also id. at 731 (Scalia, J., dissenting) (describing such a program as engaging in "facial discrimination against religion").  By contrast, ordinances barring the "ritual sacrifice[]" of animals are facially neutral, even though "[t]he words 'sacrifice' and 'ritual' have a religious origin," because "current use [of those words] admits also of secular meanings."  Lukumi, 508 U.S. at 527, 533-34; see also Trinity Lutheran Church of Columbia, Inc. v.

Comer, 582 U.S. 449, 461 (2017) (describing Lukumi as concerning "facially neutral" ordinances).

Here, the Religious Expression Rule is facially nonneutral because it singles out "religious expression."  Me. Stat. tit. 5, § 4602(5)(D).  Unlike ritual sacrifice, it is difficult to see how religious expression can have anything but a religious meaning.  And the Religious Expression Rule draws a line that separates religious expression from other forms of expression -- including other forms of identity-based expression, such as ethnicity-based expression (e.g., hosting events for Italian-American students) and sexual-orientation-based expression (e.g., participating in a Pride parade).

The Religious Expression Rule thus burdens St. Dominic's religious practice.  And, in singling out religious expression as opposed to other forms of expression, the rule lacks facial neutrality.

### c. Strict Scrutiny

"A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny."  Lukumi, 508 U.S. at 546.  To survive that scrutiny, the law must "advance[] interests of the highest order" and be "narrowly tailored to achieve those interests."  Fulton, 593 U.S. at 541 (citation modified).

Here, the Commissioners point to Maine's interest in combatting discrimination in publicly funded Maine schools but offer no argument why this general interest justifies the Religious Expression Rule specifically.  The district court fairly inferred a particular interest in "protecting students' rights to free expression."  St. Dominic, 744 F. Supp. 3d at 77.  But, in light of Carson, 596 U.S. 767, an interest in potentially protecting students' free-speech and free-exercise rights cannot justify presently infringing schools' free-exercise rights.

In Carson, the Supreme Court found that the tuition-assistance program's prior nonsectarian requirement failed strict scrutiny.  Id. at 781.  Although Maine asserted an interest in the separation of church and state, the Court explained that allowing religious schools to participate in the program would not violate the Establishment Clause of the First Amendment.  Id.  In other words, the Constitution did not require Maine to pursue its antiestablishment interest via the nonsectarian requirement.  As such, Maine's "interest in separating church and state more fiercely than the Federal Constitution" could not be compelling "in the face of the infringement of free exercise."  Id. (quotation marks omitted) (quoting Espinoza v. Mont. Dep't of Revenue, 591 U.S. 464, 484-85 (2020)).

The Court's Espinoza decision points in the same direction.  There, Montana argued that a similar bar on tuition

assistance to religious schools "protect[ed] the religious liberty of taxpayers by ensuring that their taxes [were] not directed to religious organizations, and . . . safeguard[ed] the freedom of religious organizations by keeping the government out of their operations." Espinoza, 591 U.S. at 485. The Court found those interests insufficient because it had previously upheld "government programs that spend taxpayer funds on equal aid to religious observers and organizations." Id. And, the Court explained, "[a]n infringement of First Amendment rights . . . cannot be justified by a State's alternative view that the infringement advances religious liberty." Id.

Similarly, here, Maine seeks to protect the free-speech and free-exercise rights of students, but it has not argued that such protection is required by the Constitution. As a result, that goal cannot justify infringing the free-exercise rights of religious schools by conditioning equal access to tuition assistance on such schools acting not like religious schools, but instead like theological debate fora in which all religious views warrant equal treatment.

Absent any cogent argument that the State has a compelling interest behind the Religious Expression Rule's facial nonneutrality, the rule cannot survive strict scrutiny. We

therefore conclude that St. Dominic is likely to prevail on its Free Exercise Clause challenge to the Religious Expression Rule.[23]

### 3. The Religious Nondiscrimination Rule

We focus next on the Religious Nondiscrimination Rule, which bars subject schools from discriminating on the basis of religion in admissions, financial aid, academics, extracurriculars, athletics, and the like. Me. Stat. tit. 5, § 4602(1). We begin by addressing threshold questions of justiciability, finding St. Dominic's claims justiciable in part. We then consider the level of scrutiny to apply to the rule under St. Dominic's various claims. Determining that St. Dominic has not established that any form of heightened scrutiny should apply, we subject the rule to rational basis review, which it survives. We therefore conclude that St. Dominic has not shown a likelihood of success on the merits of its challenge to the Religious Nondiscrimination Rule.

### a. Justiciability

As with the Religious Expression Rule, the Commissioners contend that St. Dominic's challenge to the Religious

---

[23] The Commissioners argue that if we "conclude[] that [the Religious Expression Rule] violates any of St. Dominic's rights, [we] should only enjoin [the Religious Expression Rule] and not any other MHRA provisions." St. Dominic does not challenge this severability argument, which we adopt. See Leavitt v. Jane L., 518 U.S. 137, 139 (1996) ("Severability is of course a matter of state law."); Me. Stat. tit. 1, § 71(8) ("The provisions of the statutes are severable.").

Nondiscrimination Rule is nonjusticiable under the doctrines of ripeness and Pullman abstention.

St. Dominic identifies only two types of practices in which it currently engages that it contends the Religious Nondiscrimination Rule would forbid were it to accept tuition assistance. First, although the school welcomes students of any or no faith, it gives preference to Catholic students in admissions and financial aid, a practice we call its "Catholic preference." Second, in general, the school only admits those students who "agree to attend religion classes, Mass, and other religious activities," and to support the school's mission and goals, which include "evangelizing," "uphold[ing] 'Catholic Christian morals,'" and "assist[ing] Catholic parents in providing their children with a Catholic education." We refer to these practices collectively as St. Dominic's "mission-oriented admissions practices." We focus our justiciability analysis on these two sets of practices.

### i. Ripeness

To the extent the Religious Nondiscrimination Rule would bar St. Dominic's Catholic preference were the school to accept tuition assistance, we find St. Dominic's claims ripe for much the same reasons its claims as to the Religious Expression Rule are ripe. See supra Section III.A.2.a.i. Specifically, the school's Catholic preference is an "arguably proscribed activity," such that the rule would "thwart[] implementation of [St. Dominic's]

- 44 -

plan" to participate in the tuition-assistance program. Whitehouse, 199 F.3d at 33. Given that clear conflict, we find it likely that St. Dominic faces "a credible threat of prosecution" if it does accept program funding. Babbitt, 442 U.S. at 298.

In contrast, we find no case or controversy -- let alone a ripe one -- concerning St. Dominic's mission-oriented admissions practices.[24] The rule does not arguably proscribe those policies and, consequently, St. Dominic does not face a credible threat of enforcement. The rule prohibits discrimination on the basis of religion, but requiring all students to support the school's mission does not necessarily treat students differently on the basis of their religious beliefs.

Nevertheless, St. Dominic asserts that the rule "makes it unlawful for St. Dominic to require its admitted students to agree to support the school's Catholic mission." St. Dominic

---

[24] The Commissioners couch their argument against reaching the merits of the Religious Nondiscrimination Rule in terms of ripeness. Nevertheless, our conclusion with respect to St. Dominic's mission-oriented admissions practices sounds in both standing and ripeness. See In re Fin. Oversight & Mgmt. Bd. for P.R., 110 F.4th 295, 314 (1st Cir. 2024) (noting federal courts' "independent obligation" to consider standing). We have recognized before that "standing and ripeness issues in a case can boil down to the same question." Jensen v. R.I. Cannabis Control Comm'n, 160 F.4th 18, 24 (1st Cir. 2025) (citation modified). In this pre-enforcement context, both doctrines require St. Dominic to show that its planned course of conduct is "arguably proscribed" by the statute and that it faces a "credible threat of prosecution." Whitehouse, 199 F.3d at 33 (ripeness); N.H. Right to Life, 99 F.3d at 14 (standing).

- 45 -

provides no support for this interpretation in the statute's text, the canons of statutory construction, or MHRA caselaw.  Unlike in its challenge to the Sexual Orientation and Gender Identity Nondiscrimination Rule, St. Dominic points to no agency guidance establishing such an application.  See infra Section III.A.4.a. Without any enforcement history, judicial construction, or agency guidance, moreover, we lack clarity as to how the Religious Nondiscrimination Rule would be applied to St. Dominic's mission-oriented admissions practices.  It would be difficult to determine whether, for example, the hypothetical ban on these practices that St. Dominic reads into the rule would be a neutral application of the rule or a targeting of the school's religious exercise.  If the MHRC issued guidance stating, "No school may require students to support its mission in a way that infringes students' sincerely held religious beliefs," such guidance might equally apply to a secular school that required a student to support its mission of fostering inclusion of transgender perspectives even if that student objected on religious grounds. But if the guidance held, "No school may require students to support a religious mission," that might more readily be understood as targeting only those schools that have religious missions, i.e., religious schools.  But St. Dominic gives us no reason to think that the Religious Nondiscrimination Rule would be applied in that way.

The Commissioners -- comprising the body tasked with enforcing the rule -- disavow such an interpretation. They maintain that "the only conduct that is arguably proscribed by [the Religious Nondiscrimination Rule] is St. Dominic's practice of giving preference to Catholics in admissions and financial aid," and that "there is no evidence in the record that [the rule] would force St. Dominic to admit students it does not want."[25] The Commissioners are not simply saying they do not intend to enforce the rule against St. Dominic's mission-oriented admissions practices in their sole discretion; rather, they are saying no person could so enforce the rule because it does not prohibit those practices. Blum v. Holder, 744 F.3d 790, 798 (1st Cir. 2014) ("Particular weight must be given [in the standing inquiry] to the Government['s] disavowal of any intention to prosecute on the basis of the Government's own interpretation of the statute and its rejection of plaintiffs' interpretation as unreasonable.").

_____

[25] The district court stated that the Commissioners "do not contest that these policies and practices may violate the MHRA." St. Dominic, 744 F. Supp. 3d at 63 (citing Defs.' Opp. to Pls.' Mot. Prelim. Inj. 8-9, Dkt. No. 25). We see no such concession in the Commissioners' opposition below. Rather, in arguing that St. Dominic's claims were not ripe, the Commissioners noted that "St. Dominic apparently does not discriminate in admissions" because "it admits students of any faith or no faith at all" and "does not claim to discriminate based on any other protected class." Defs.' Opp. to Pls.' Mot. Prelim. Inj. 8-9 (citation modified). As the issues of standing and ripeness we consider here are pure matters of law subject to de novo review, we owe no deference to the district court's construction of the Commissioners' arguments below.

Still, St. Dominic insists, the Commissioners "admit[] that the MHRA <u>may</u> require St. Dominic to . . . [u]ndergo [MHRC] investigation if it declines to admit a student who will not promise to support its religious mission, uphold Catholic moral teaching in his personal life, and fully participate in the religious life of the school."  But that is not quite right.  All the Commissioners say is that "[i]t is possible that the MHRC might have to investigate whether, for example, a student was denied admission based on being a member of a protected class."  That is, the MHRC would only investigate if St. Dominic were using its mission-oriented admissions practices as a pretext for denying students admission on a basis prohibited by the MHRA.[26]  Nothing in the record before us indicates that St. Dominic does so, and, even if it fears an unfounded investigation chilling its religious freedom, "[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  <u>Blum</u>, 744 F.3d at 796 (citation modified).

In sum, St. Dominic has failed to show that the Religious Nondiscrimination Rule would arguably proscribe its

---

[26]  Notably, this point is not limited to a claim of religious discrimination.  The same would hold true if St. Dominic used its mission-oriented admissions practices as a pretext for discrimination on the basis of race, sex, disability, or any other prohibited ground, yet St. Dominic makes no argument that an investigation on those bases would violate its rights.

mission-oriented admissions practices were it to accept tuition assistance. And while we "assume a credible threat of prosecution in the absence of compelling contrary evidence" in First Amendment cases, that assumption only applies where the challenged statute "facially restrict[s]" a plaintiff's conduct. N.H. Right to Life, 99 F.3d at 15. Here, the Religious Nondiscrimination Rule does not so restrict St. Dominic's mission-oriented admissions practices, and the Commissioners have "affirmatively represented that [the MHRC] does not intend to prosecute such conduct because [they] do[] not think it is prohibited by the [rule]." Blum, 744 F.3d at 798. St. Dominic thus faces no credible threat of enforcement.

Absent conduct arguably proscribed by the rule and a credible threat of enforcement, we find no present case or controversy to confront regarding St. Dominic's mission-oriented admissions practices. This should hardly be bad news for St. Dominic. As matters now stand, the school would be free to continue requiring students to attend religion classes and Mass, support the school's mission and goals, and "uphold 'Catholic Christian morals,'" even if it joins the tuition-assistance program. And if the MHRC later reverses course and attempts to construe the Religious Nondiscrimination Rule as barring those mission-oriented admissions practices as such (rather than as pretext for prohibited discrimination), the school may well have

a viable judicial-estoppel argument.  See Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010) (noting that judicial estoppel "operates to prevent a litigant from taking a litigation position that is inconsistent with a litigation position successfully asserted by him in an earlier phase of the same case or in an earlier court proceeding").  And while that estoppel may not apply to a private litigant who is not a party to this suit, the hypothetical harm of a private litigant suing St. Dominic for discrimination on a ground the MHRC itself says is not covered by the MHRA does not rise to the level of injury required to establish standing.  See Lujan, 504 U.S. at 560 (explaining that standing requires plaintiff's injury to be "actual or imminent, not conjectural or hypothetical" (citation modified)).

### ii. **Pullman Abstention**

The Commissioners alternatively argue that we should abstain under Pullman because it is not clear whether a state court would find that any of St. Dominic's policies violate the Religious Nondiscrimination Rule.  But, at the very least, St. Dominic's complaint plainly states that the school "give[s] preference to Catholic students in admissions."  As suggested by our ripeness analysis, there is no "substantial uncertainty" that preferring one applicant over another because of the applicants' differing religious beliefs would conflict with the Religious Nondiscrimination Rule.  Batterman, 544 F.3d at 373; see Finnemore

v. _Bangor Hydro-Elec. Co._, 645 A.2d 15, 17 (Me. 1994) (defining operative question under MHRA's employment religious-nondiscrimination provision as "whether [action] occurred _because of_ an individual's religious beliefs or would not have occurred _but for_ the individual's religion"). Because St. Dominic's Catholic preference likely falls within the rule's prohibition, we find _Pullman_ abstention unavailable here.

We proceed, therefore, with St. Dominic's challenge to the Religious Nondiscrimination Rule whittled down to the rule's application to its preference for Catholic students in admissions and financial aid.

### b. Level of Scrutiny

Having found St. Dominic's challenge to the Religious Nondiscrimination Rule justiciable only as to the rule's application to the school's Catholic preference, we next consider what level of scrutiny to apply to that challenge. We evaluate, in turn, St. Dominic's arguments for heightened scrutiny under (1) _Carson_'s interpretation of the Free Exercise Clause, (2) _Smith_'s interpretation of the Free Exercise Clause, (3) the church-autonomy and religious-entanglement doctrines, (4) the expressive-association doctrine, and (5) the unconstitutional-conditions doctrine.

### i. Free Exercise: Carson Analysis

We begin with St. Dominic's argument that the Religious Nondiscrimination Rule should receive strict scrutiny under the Free Exercise Clause. To make this free-exercise claim, St. Dominic first leans on the Supreme Court's line of cases dealing with the exclusion of religious actors from generally available benefits, which culminated most recently in the Court's Carson decision. See 596 U.S. 767; Espinoza, 591 U.S. 464; Trinity Lutheran, 582 U.S. 449. These cases make clear that strict scrutiny applies if Maine tries to "disqualify some private schools" from the tuition-assistance program "solely because they are religious." Carson, 596 U.S. at 780 (quoting Espinoza, 591 U.S. at 487).[27] This rule holds regardless of whether the exclusion hinges on a school's "religious status" or on the "religious use" to which a school proposes to put state-provided funds. Id. at 786 (quoting Espinoza, 591 U.S. at 477). Along those lines, St. Dominic insists that its preference for Catholic students in

---

[27] We read this principle as a derivative of Smith's facial neutrality framework: Where a school is "disqualified from [a] generally available benefit 'solely because of [its] religious character,'" Carson, 596 U.S. at 780 (quoting Trinity Lutheran, 582 U.S. at 462), the government has definitionally failed to act neutrally under Smith. See id. at 781 ("[T]here is nothing neutral about Maine's program. The State pays tuition for certain students at private schools -- so long as the schools are not religious."); Fulton, 593 U.S. at 533 ("Government fails to act neutrally when it . . . restricts practices because of their religious nature."). Nevertheless, because St. Dominic addresses its Carson-based argument separately from its Smith analysis, we do the same.

admissions and financial aid is one of several "examples of protected 'religious uses' that together make up [its] 'religious character,'" such that prohibiting this preference in the tuition-assistance program effectively excludes St. Dominic solely based on its religious character.[28]

As we suggested in finding St. Dominic's challenge to the Religious Nondiscrimination Rule ripe, the rule does indeed burden St. Dominic's religious exercise by prohibiting the school, if it accepts tuition assistance, from continuing its Catholic preference.  That burden, in turn, requires that we scrutinize the Religious Nondiscrimination Rule under the traditional free-exercise framework of Smith, as we do in the next section of this opinion.  Contrary to what St. Dominic argues, though, the mere fact that the rule imposes a burden on St. Dominic's free exercise does not by itself require that we subject the rule to strict scrutiny under Carson.  Unlike the nonsectarian requirement

---

[28] As far as we can tell, the Religious Nondiscrimination Rule does not directly exclude any school from the tuition-assistance program.  In its complaint, St. Dominic suggests -- without pointing to any statutory or regulatory support -- that compliance with the MHRA is "a prerequisite to being 'approved for tuition purposes.'"  We need not determine whether that is so, though, because in keeping with the Supreme Court's free-exercise doctrine, we analyze the Religious Nondiscrimination Rule as if the rule does directly exclude schools that engage in religious discrimination.  See Carson, 596 U.S. at 778 ("The Free Exercise Clause of the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 450 (1988))).

at issue in Carson, the Religious Nondiscrimination Rule does not exclude schools solely because they are religious schools.

In Carson, the Court invalidated Maine's prior nonsectarian requirement, which excluded from the tuition-assistance program a school if it "promote[d] the faith or belief system with which it [was] associated and/or present[ed] the material taught through the lens of this faith." 596 U.S. at 775 (quoting Carson, 979 F.3d at 38). Because such faith-based instruction was a "religious use" of funds uniquely tied to "the mission of a private religious school," the Court explained, the nonsectarian requirement effectively targeted religious schools as such. Id. at 787 (quoting Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 754 (2020)).

In contrast, religious discrimination is not a uniquely religious practice. Whereas religious instruction is necessarily religiously motivated, a school may engage in religious discrimination against a student for religious or secular reasons. For example, the school may so discriminate motivated not by its own religious tenets but by negative stereotypes about followers of the student's religion. Such discrimination, though based on the student's religious beliefs, would not be based on the school's religious beliefs. It would be, from the school's perspective, entirely secular. In this way, religious discrimination is not inherently a religious use of tuition-assistance funds.

- 54 -

Similarly, St. Dominic has not shown that religious discrimination is solely a practice of religious schools. Secular schools -- like all institutions -- are equally capable of discriminating against students on the basis of students' religious beliefs and equally subject to the Religious Nondiscrimination Rule. See Youth 71Five Ministries v. Williams, 160 F.4th 964, 979 (9th Cir. 2025) ("Government agencies, secular corporations, and religious ministries alike might engage in religion-based employment discrimination."), pet. for cert. filed, No. 25-776 (Dec. 23, 2025). As such, the rule's prohibition on that discrimination does not inevitably target only religious schools.

Nor is this a case where the State is saying, in practical effect, that religious schools must surrender their status as religious schools in order to obtain public tuition assistance. Cf. Trinity Lutheran, 582 U.S. at 462 ("[T]he Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution."). St. Dominic, specifically, does not even attempt to show that the school would be unable to retain its religious character if it made admissions and financial aid decisions without regard to individual students' religious affiliations. Rather, the school touts that it welcomes students of all religions and does not allege that non-Catholic students

- 55 -

would make up a significantly greater share of its student body without the preference.  Neither does it provide any evidence that, without the Catholic preference, any enrolled Catholic student or any prospective Catholic applicant would be deprived of financial aid they would otherwise receive.  Likewise, St. Dominic has not developed a record suggesting that, generally, Maine religious schools restrict admissions by religion.  Cheverus High School, a non-Diocesan Catholic school unaffiliated with St. Dominic, for one, participates in the tuition-assistance program and does not evidently discriminate against students on the basis of religion.  And Crosspoint, in this case's companion, alleges no policy as explicit as St. Dominic's Catholic preference.  Cf. Complaint ¶ 31, Crosspoint, 719 F. Supp. 3d 99 (No. 23-cv-00146) (describing admissions policy of Bangor Christian School).[29]

The foregoing shows that the Religious Nondiscrimination Rule does not exclude any school solely because of its religious character.  Rather, the rule excludes a school because it discriminates against students on the basis of the students'

---

[29] Our discussion of these other schools should not be understood to express a preference for one religious denomination's practices over another.  See Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n, 605 U.S. 238, 247-48 (2025) (explaining First Amendment "principle of denominational neutrality").  We note Cheverus and Crosspoint only to point out that, just as secular schools are not inherently immune to the Religious Nondiscrimination Rule, religious schools are not invariably censured by the rule, either.

religion, a practice that is neither uniquely religious nor uniquely tied to religious schools. See Kim v. Bd. of Educ., 93 F.4th 733, 749 (4th Cir. 2024) (finding no Carson violation where county "d[id] not let any private schools, religious or nonreligious, participate in selecting the board of education student member," reasoning that "[t]he process d[id] not exclude students because of their religious exercise," "it exclude[d] students who cho[]se not to attend public school for whatever reason"). In short, the State is simply saying that a school in Maine, whether religious or not, cannot accept public funds while simultaneously putting up, for example, a "No Protestant Children Need Apply" sign.

We therefore do not find that Carson renders the Religious Nondiscrimination Rule per se not neutral. To find otherwise would, in essence, be to hold that any state practice imposing any burden on a religious school's religious practices necessarily imposes a burden solely because the school is religious -- and therefore triggers strict scrutiny. Such a ruling would, in all but theory, eliminate the allowance for neutral, generally applicable laws that incidentally burden religious practice recognized by Smith, 494 U.S. at 878-82, and applied in the cases that underpin Carson itself. See Trinity Lutheran, 582 U.S. at 460; Lukumi, 508 U.S. at 546. As discussed below, we are not free to discard Smith based on an overly expansive

interpretation of Carson, especially without any clarity as to what, exactly, would replace Smith.[30]

### ii. Free Exercise: Smith Analysis

We turn to applying Smith. As explained above, the traditional Smith framework for free-exercise challenges provides that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." Fulton, 593 U.S. at 533. We conclude that the Religious Nondiscrimination Rule is likely both neutral and generally applicable and, therefore, not subject to strict scrutiny under Smith.

### (1) Neutrality

As to facial neutrality, the Religious Nondiscrimination Rule proscribes not a religious practice but rather "educational discrimination" "on the basis of . . . religion" in academics, extracurriculars, research activities, occupational training, athletic programs, admissions, financial aid, and the like. Me. Stat. tit. 5, § 4602(1). Unlike the Religious Expression Rule, then, the Religious Nondiscrimination Rule does not facially

---

[30] In fact, during the pendency of this appeal, the Supreme Court expressly declined to consider the question of "[w]hether Employment Division v. Smith should be overruled," in granting certiorari in a case concerning a Colorado sexual-orientation and gender-identity nondiscrimination rule as applied to religious preschools receiving public funds. St. Mary Cath. Par. v. Roy, No. 25-581, 2026 WL 1052111 (U.S. Apr. 20, 2026) (mem.); Petition for Writ of Certiorari, St. Mary, 2026 WL 1052111.

target "a religious practice without a secular meaning." Lukumi, 508 U.S. at 533; see St. Mary Cath. Par. in Littleton v. Roy, 154 F.4th 752, 766 (10th Cir. 2025) (finding facially neutral nondiscrimination rule that "does not mention religion except to prohibit discrimination based on religious affiliation"), cert. granted sub nom. St. Mary Cath. Par. v. Roy, No. 25-581, 2026 WL 1052111 (U.S. Apr. 20, 2026) (mem.). As discussed above, discrimination on the basis of religion can be motivated by either religious or secular considerations. Consequently, a law prohibiting such discrimination across the board does not improperly "infringe upon or restrict practices because of their religious motivation." Lukumi, 508 U.S. at 533.

Nevertheless, St. Dominic argues that the Religious Nondiscrimination Rule lacks facial neutrality because it "subject[s] religious schools to a ban on 'religious discrimination'" in admissions and financial aid. But the rule subjects secular schools to the same ban: It protects students of any or no religious faith from discrimination by any publicly funded Maine school, religious or secular. Under the rule, a secular school may not deny admission to a student merely because that student's religious beliefs conflict with the school's secular philosophy, just as a religious school may not deny admission to a student merely because that student's religious

beliefs conflict with the school's religious doctrine.[31]  Cf. Loe v. Jett, 796 F. Supp. 3d 541, 569 (D. Minn. 2025) (finding ban on schools requiring students to sign faith statements not facially neutral because it "'restricts' [schools'] admissions practices only 'because of their religious motivation'" (quoting Lukumi, 508 U.S. at 533)).[32]

Moreover, prohibiting religious discrimination is an entirely proper -- and secular -- subject of legislation.  Boyajian v. Gatzunis, 212 F.3d 1, 5 (1st Cir. 2000) ("Prohibition of religious discrimination is unquestionably an appropriate, secular legislative purpose."); see also Williams v. California, 764 F.3d 1002, 1012 (9th Cir. 2014) (similar).  Numerous antidiscrimination laws bar religious discrimination.  E.g., 42 U.S.C. § 2000a(a) (banning "discrimination or segregation on the ground of . . . religion" in public accommodations).[33]    Under St. Dominic's

---

[31]  Similarly unavailing is St. Dominic's argument that the rule lacks facial neutrality because "[s]ecular [private] schools may impose many different kinds of admission criteria: financial, academic, athletic, family legacy, and ability to advance the school's mission."  Religious schools may impose each of these criteria to the same extent as secular schools.

[32]  The plaintiffs in Loe also challenged a similar nondiscrimination rule, but the court expressly declined to reach that rule's own constitutionality, instead finding the rule inseverable from the constitutionally infirm faith-statement ban and invalidating it on that ground alone.  Loe, 796 F. Supp. 3d at 578 n.57.

[33]  Even before the 2021 Amendments, the MHRA barred religious discrimination in other realms, including public accommodations.  Me. Stat. tit. 5, § 4591 (2018).  Indeed, it is possible this bar

argument, all such laws would trigger strict scrutiny simply by including the words "religion" or "religious." Cf. United States v. Skrmetti, 605 U.S. 495, 512 (2025) ("This Court has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny."); Tuan Anh Nguyen v. I.N.S., 533 U.S. 53, 64 (2001) ("Just as neutral terms can mask discrimination that is unlawful, gender specific terms can mark a permissible distinction.").

The Religious Nondiscrimination Rule's application to St. Dominic's Catholic preference is also nonfacially neutral. In determining whether a facially neutral law is nevertheless nonneutral, courts must "survey meticulously the circumstances of" government action to ferret out "governmental hostility [that] is masked." Lukumi, 508 U.S. at 534 (citation omitted). St. Dominic advances four arguments on this front, none of which is likely to succeed.

First, St. Dominic argues that the Religious Nondiscrimination Rule constitutes a religious gerrymander. A religious gerrymander arises where a law "target[s] [a plaintiff] and their religious practices," such that "the burden of [the

---

on religious discrimination in public accommodations did then (and does now) apply to schools regardless of participation in the tuition-assistance program. See id. § 4553(8)(J) (defining "place of public accommodation" to include a "nursery, elementary, secondary, undergraduate or postgraduate school or other place of education").

law], in practical terms, falls on [religious] adherents but almost no others." Lukumi, 508 U.S. at 535-36. In St. Dominic's view, the Religious Nondiscrimination Rule is a religious gerrymander because it "punish[es] religious schools when they pursue their religious missions but leave[s] secular private schools free to pursue their missions without fear." However, as discussed above, the rule does not proscribe St. Dominic's mission-oriented admissions practices as such. See supra Section III.A.3.a.i. We deal here only with the rule's application to the distinct practice of preferring (as among applicants who agree to support the school's mission) one applicant over another in admissions and financial aid based on that applicant's religion. And as to that practice, the rule erects the same barriers for religious and secular schools alike, with no indication that its burden "in practical terms, falls on" religious schools "but almost no others." Lukumi, 508 U.S. at 536. Although this application of the rule "may end up having greater consequence for religious [schools] . . . inasmuch as they are more likely than their secular counterparts to wish to exclude students of particular faiths," Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 700 (2010) (Stevens, J., concurring), that, alone, does not prove a gerrymander, see Lukumi, 508 U.S. at 535 ("[A]dverse impact will not always lead to a finding of impermissible targeting.").

Second, St. Dominic points to the timing of the 2021 Amendments -- enacted while the Supreme Court was considering whether to grant certiorari in Carson -- to argue that the State designed the 2021 Amendments as what it calls an "end-run" around Carson by creating a "poison pill" that will deter religious schools from accepting state tuition funds.  The timing does suggest that the Carson litigation spurred the amendments.[34]  That does not mean, however, that the amendments were motivated by religious animus or intended as an impermissible workaround to an anticipated Supreme Court decision.  We, like the district court, St. Dominic, 744 F. Supp. 3d at 74-75, are convinced that the Maine legislature added religion as a prohibited ground for discrimination in education in order to align the MHRA's education provisions with its employment and housing provisions, which already protected individuals in Maine from religious discrimination.  Me. Stat. tit. 5, §§ 4571, 4581 (2018).  The original bill and MHRC testimony in support thereof buttress this conclusion.  See supra Section I.B.2.  Contrary to St. Dominic's assertion, then, this is not a case where a government actor's "repeated changes in position" as to the application of a policy to a particular individual indicate that the actor is targeting

---

[34]  Though only in part; the amendments reached far beyond the scope of matters relevant to Carson.  See, e.g., 2021 Amendments secs. 4, 5 (codified at Me. Stat. tit. 5, §§ 4571, 4572(1)) (adding "familial status" as a prohibited classification in employment).

that individual's beliefs.  Meriwether v. Hartop, 992 F.3d 492, 515 (6th Cir. 2021).  It is, instead, a case of the State seeking, through the full legislative process, to align its protections for students' religious freedom with previously enacted protections for workers and tenants.  Cf. id. (finding changes in university's basis for disciplining individual, "along with the alleged religious hostility [in decisionmakers' statements]," allowed for "plausible inference" of religious targeting at motion-to-dismiss stage).

Third, and relatedly, St. Dominic contends that the 2021 Amendments were likely motivated by hostility toward religion -- i.e., "a negative normative evaluation" of the specific religious practices at issue here.  Masterpiece Cakeshop v. Colo. C.R. Comm'n, 584 U.S. 617, 639 (2018) (citation modified).  In support of this narrative, St. Dominic points to three statements made in the year-plus following the 2021 Amendments' June 2021 passage:

**2021 Frey Statement:**  On December 8, 2021 -- the day the Supreme Court heard oral argument in Carson -- Maine Attorney General Aaron Frey stated that "[s]chools that require students to undergo religious instruction are excluded [from the tuition-assistance program] because the education they provide is not equivalent to a public education."  He also described the schools involved in Carson as "want[ing] to continue to

- 64 -

discriminate against individuals based on their status in a protected class."

**2022 Frey Statement:** On June 21, 2022 -- the day the Court released its Carson decision -- Frey issued a statement expressing his disappointment with the decision. He said:

> The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household.

He continued by explaining that the 2021 Amendments "would require some religious schools to eliminate their current discriminatory practices" and expressed interest in further "statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry."

**2022 Fecteau Statement:** On June 25, 2022, in response to a tweet reading, "Maine just changed the guidelines to exclude schools that discriminate against LGBTQ+ students," Maine House Speaker Ryan Fecteau tweeted, "Sure did. Anticipated the ludicrous decision from the far-right [Supreme Court]."[35]

---

[35] The acronym LGBTQ+ stands for "'lesbian, gay, bisexual, transgender and queer' with a '+' sign to recognize the limitless sexual orientations and gender identities used by members of the LGBTQ+ community." MacRae v. Mattos, 106 F.4th 122, 128 n.5 (1st

St. Dominic argues that the above statements evince hostility toward religious practices or religious schools per se. In so arguing, St. Dominic appears to conflate animus toward a practice -- discrimination -- with animus toward a religious group that engages in that practice. We do not believe government actors must avoid criticizing any practice in which any religious group engages or else be accused of harboring impermissible religious animus. See Polk v. Montgomery Cnty. Pub. Schs., 166 F.4th 400, 414 (4th Cir. 2026) (framing neutrality inquiry as whether law "was enacted 'because of' and not 'in spite of' its effect on religion." (citation modified)). And the record does not suggest that Fecteau or Frey find the discrimination in question any less distasteful when motivated by secular rather than religious reasons or when practiced by secular rather than religious schools. We need not determine if that is so, though, because St. Dominic's hostility argument fails for the more straightforward reason that whatever subjective states of mind one might infer in Frey and Fecteau as individuals, their three post-enactment statements provide little probative value in determining why the State government as a whole adopted the 2021 Amendments. In enacting laws, Maine speaks and acts through its entire elected legislature and its elected governor. Me. Const. art. IV, §§ 1, 2. Attorney

---

Cir. 2024) (citation modified), cert. denied, 145 S. Ct. 2617 (2025) (mem.).

General Frey, who is neither a legislator nor the governor, had no vote at all in enacting the 2021 Amendments.[36]  And while Fecteau did have a role as a legislative leader, "[w]hat motivates one legislator to [tweet] about a statute is not necessarily what motivates scores of others," so courts must "eschew guesswork" based on one-off statements by individual legislators.  United States v. O'Brien, 391 U.S. 367, 384 (1968).

Attempting to buttress its hostility argument, St. Dominic points to Mid Vermont Christian School v. Saunders, 151 F.4th 86 (2d Cir. 2025), but that case is inapposite.  Mid Vermont focused on an enforcement action taken against a religious school shortly after the official overseeing the enforcement action expressed hostility toward that specific school's religious views.  Id. at 89-90, 93-94.  So, of course, the official's statements provided direct insight into why that same official subsequently took action against the school.  Id. at 94.  Here, we have no such alignment of expression and actor -- nor any enforcement action at all.  Cf. Masterpiece Cakeshop, 584 U.S. at 634-36 (finding civil rights enforcement order against bakery violated Free Exercise Clause where members of enforcement body

---

[36]  Although the 2022 Frey Statement referred to "statutory amendments to address the Court's decision," this statement came roughly a year after passage of the 2021 Amendments.  It nowhere implies Frey had any role in that earlier enactment.

expressed hostility toward bakery owner's religious beliefs during hearings leading up to action).

Finally, St. Dominic makes one last argument regarding nonneutrality, pointing to a 2023 amendment of the MHRA's definition of "educational institution."  Prior to 2023, single-sex schools had been excluded from that definition and thereby exempted from the MHRA's education provisions.  Me. Stat. tit. 5, § 4553(2-A) (2022).  In its initial complaint in this case's companion, Crosspoint alleged this preferential treatment of single-sex schools showed that Maine was not treating religious schools fairly.  Complaint ¶¶ 79, 105, 112, Crosspoint, 719 F. Supp. 3d 99 (No. 23-cv-00146).  The Maine legislature then acted to eliminate the single-sex exemption, making the MHRA apply to single-sex schools on the same terms as all other schools.  An Act to Amend the Definition of "Educational Institution" Under the Maine Human Rights Act to Include Single-sex Educational Institutions, Me. Pub. L. 2023, ch. 188, 2023 Me. Laws 370 (codified at Me. Stat. tit. 5, § 4553(2-A)).

This change, St. Dominic implies, evidences "Maine's determination to exclude disfavored religious schools."  We cannot see how.  While "repeated changes in position" and "an evolving policy" in a single case may give rise to a "plausible inference" of pretext, Meriwether, 992 F.3d at 515, they do not inexorably do so.  Here, St. Dominic does not allege the amendment altered the

MHRA's treatment of religious schools in any way. And even assuming the 2023 amendment was in direct response to Crosspoint's complaint, no adverse inference arises. A litigant pointed out a potential gap in the MHRA, and the State responded by eliminating that gap so that the MHRA now applies to every primary or secondary school in Maine that receives public funds. That evinces not hostility but rather a preference for consistency in the MHRA's application within Maine's borders and a willingness to listen to litigants' complaints. See St. Mary, 154 F.4th at 767 (finding no evidence of hostility in removal of exception to nondiscrimination rule where change came in response to religious schools' complaints).

We thus find the MHRA's bar on religious discrimination to be neutral both facially and nonfacially, at least to the extent it prohibits a school from giving outright preference to one student over another in admissions and financial aid based on the students' religious beliefs.

### (2) General Applicability

We find the Religious Nondiscrimination Rule generally applicable, as well. A law is not generally applicable when it "in a selective manner impose[s] burdens only on conduct motivated by religious belief." Lukumi, 508 U.S. at 543. As relevant here, one way a law may lack general applicability is if it "prohibits religious conduct while permitting secular conduct that undermines

the government's asserted interests in a similar way." Fulton, 593 U.S. at 534.[37]   Invoking this principle, St. Dominic argues that the Religious Nondiscrimination Rule lacks general applicability because, if St. Dominic were to accept tuition assistance, the rule would apply to St. Dominic, a private, in-state, religious K-8 school, but not to two sets of supposed comparators: (1) private, out-of-state, secular K-12 schools participating in the tuition-assistance program; and (2) private, secular postsecondary institutions receiving public funding through student grants.  We consider each in turn.

St. Dominic first stresses that the Religious Nondiscrimination Rule does not apply to out-of-state, private, secular K-12 schools that accept Maine students underwritten by the State's tuition-assistance program.  True.  But neither does it apply to an out-of-state, religious school participating in the program.[38]  That geographical limitation on the rule's coverage has

---

[37] A law may also evince a lack of general applicability where it provides "a mechanism for individualized exemptions." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 526 (2022) (quoting Fulton, 593 U.S. at 533).   St. Dominic does not contend the Religious Nondiscrimination Rule provides for any such exemptions.

[38] At least one school that St. Dominic identifies as a religious school -- Cardigan Mountain School -- is an out-of-state school that has received tuition assistance. 2015-16 Tuition Rates for Private Schools, Me. Dep't of Educ., https://www.maine.gov/doe/sites/maine.gov.doe/files/inline-files/FY16_PrivateSchoolsApprovedTuition_14Jan2019.pdf [https://perma.cc/2GRS-NZW8] (last visited Mar. 13, 2023).

nothing at all to do with the secular or religious nature of the schools.  Rather, the MHRA as a whole does not apply to conduct outside of Maine.  Judkins, 483 F. Supp. 2d at 65-66.  In this respect, Maine treats secular schools and religious schools that accept tuition assistance exactly alike:  If they are in Maine, the MHRA applies; if they are outside Maine, it does not apply.

St. Dominic responds by encouraging us to analyze general applicability through the blueprint drawn by Tandon v. Newsom, 593 U.S. 61 (2021) (per curiam).  There, in a per curiam opinion, the Supreme Court granted plaintiffs seeking to hold at-home religious gatherings an emergency injunction pending appeal against a California COVID-19 regulation that limited the size of private gatherings in homes -- including for religious purposes -- to three households.  Tandon, 593 U.S. at 62-63.  The Court found the regulation likely not generally applicable because it allowed larger, secular gatherings at "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants." Id. at 63. In doing so, the Court explained that the government may not "treat any comparable secular activity more favorably than religious exercise."  Id. at 62.  Whether secular conduct is comparable to the religious exercise at issue, the Court stated, must be judged according to "the asserted government interest that justifies the regulation at issue."  Id.  If two activities -- one secular and

one religious -- effectuate or undermine the asserted government interest(s) in the same manner, then those two activities are comparators.  See id.

In Tandon, the "religious exercise at issue" was the in-home religious gathering of more than three households.  Id. The California regulation prohibited all such exercise; no similar religious exercise fell on the unregulated side of the line.  Here, the religious exercise at issue is private, religious education. But unlike in Tandon, the State does not put all private religious schools -- or any particular form of private religious schooling -- on the regulated side of its lines.  Rather, the exact same religious exercise -- private religious schooling -- may be regulated or unregulated, depending on a school's location.

In any event, even by Tandon's measure, St. Dominic's general-applicability argument fails in light of the interests served by the MHRA.  It is not the Commissioners' burden to prove that the State's interests make out-of-state schools and postsecondary institutions inappropriate comparators for St. Dominic's religious exercise.  Rather, because St. Dominic retains the burden to show that the challenged rules are not neutral and generally applicable, Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 525 (2022), we must determine whether St. Dominic has demonstrated that religious discrimination at out-of-state

schools undermines the State's interests to the same degree as religious discrimination at in-state schools.[39]

Under that framework, St. Dominic has failed to establish comparability. As we have noted, the 2021 Amendments sought to align the MHRA's education provisions with its other provisions. See supra Section I.B.2. Implicit throughout the MHRA is a limited interest in combatting discrimination within Maine specifically. Judkins, 483 F. Supp. 2d at 65–66. For example, the MHRA's employment provisions apply to out-of-state employers only if they "employ[] any number of employees whose usual place of employment is in this State." Me. Stat. tit. 5, § 4553(4). Likewise, the MHRA limits the MHRC's jurisdiction to in-state conduct. See id. § 4566 (granting MHRC jurisdiction to "investigat[e] all conditions and practices within the State which allegedly detract from the enjoyment, by each inhabitant of the State, of full human rights and personal dignity"). There is no evidence that, in enacting the 2021 Amendments, the legislature had or pursued any interest in extending the jurisdiction of the MHRC to include activity in other states. Rather, its interests in combatting discrimination generally and state-funded

---

[39] We recognize that, after Tandon, there has been some uncertainty in the lower courts about who bears the burden of showing comparability. See William T. Sharon, Religious and Secular Comparators, 30 Geo. Mason L. Rev. 763, 767, 803–19 (2023). However, we read the Kennedy opinion as squarely placing that burden on the plaintiff. See 597 U.S. at 525.

discrimination specifically in education were, from the start, qualified by the general and pre-existing jurisdictional limitation that qualifies all interests that the MHRC is charged with pursuing. The MHRA's focus on conduct within Maine's borders is hardly unusual and implies no improper purpose or effect relevant to our inquiry. See Healy v. Beer Inst., Inc., 491 U.S. 324, 336 (1989) (parsing Commerce Clause claim and cautioning against "the application of a state statute to commerce that takes place wholly outside of the State's borders" (citation modified)). In the words of the Commissioners' brief on appeal, "Maine's interest in stopping entities outside of Maine from discriminating is simply not the same as its interest in stopping entities inside Maine from doing so."

St. Dominic separately points to private, secular postsecondary institutions receiving public funding as supposed comparators that are not subject to the MHRA's education provisions. Me. Stat. tit. 5, § 4553(2-A). Again, though, St. Dominic misperceives the line that Maine has drawn between those schools subject to the rule and those not subject. The MHRA's education provisions do not apply to any private postsecondary institution, whether secular or religious. Indeed, private, postsecondary institutions are not a part of the tuition-assistance program; if they receive public funding at all, they do so through a separate system of student grants. Contrast

Me. Stat. tit. 20-A, §§ 5203, 5204 (establishing tuition-assistance programs for elementary and secondary students), with id. § 11612 (establishing the Maine State Grant Program for post-secondary students). The line here is drawn based on grade level, not religion.

Looking to the interests at play, that line makes sense. As the Commissioners document, unlike K-12 schooling, postsecondary school "is entirely voluntary," "relies primarily on the student and their family for funding," and educates older students who are "more able than their younger counterparts to determine what instruction is appropriate for them or consistent with their knowledge and beliefs." Tandon explained that "[c]omparability is concerned with the risks various activities pose." 593 U.S. at 62. Self-evidently, schools that primarily educate adults do not pose the same risk of undermining the State's interest in "preventing educational discrimination against children," as schools that primarily educate children. See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 746-47 (2007) (stressing costs of race-based discrimination in primary and secondary schools in particular). Additionally, Maine's interest in "preventing public funds from being used to fund discrimination" carries significantly more salience in the context of K-12 schools (which can receive between approximately $12,000 and $14,000 per student per year) than private

postsecondary schools (which can receive only $2,500 per student per year).[40] Finally, because postsecondary institutions generally enjoy a more robust right to academic freedom under the First Amendment than primary or secondary schools, Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla, 490 F.3d 1, 11 n.6 (1st Cir. 2007), Maine's power to regulate is more circumscribed -- and its antidiscrimination interests consequently less robust -- at the postsecondary level.

In sum, the MHRA's coverage separates schools along two innocuous lines: (1) a line between in-state and out-of-state schools and (2) a line between K-12 schools and postsecondary schools. In both cases, concerns unrelated to religion -- location and grade level -- separate the regulated from the unregulated. And in both cases, there are both religious and secular schools on each side of the line. We are at a loss to see how these lines, entirely unrelated to religious exercise, somehow "in a selective manner impose burdens only on conduct motivated by religious belief." Lukumi, 508 U.S. at 543.

These lines also comport with how the Supreme Court has approached the general-applicability inquiry. In Roman Catholic Diocese of Brooklyn v. Cuomo, for instance, the Supreme Court

---

[40] Compare Tuition Rates, supra (elementary and secondary schools), with Maine State Grant Program, supra (postsecondary schools).

preliminarily enjoined a COVID-19-related executive order in New York that "impose[d] very severe restrictions on attendance at religious services in areas classified as 'red' or 'orange' zones." 592 U.S. 14, 15-16 (2020) (per curiam).  The order lacked general applicability,[41] the Court found, because it treated religious conduct worse than secular conduct within the same zone.  See id. at 17 ("In a red zone, while a synagogue or church may not admit more than 10 persons, businesses categorized as 'essential' may admit as many people as they wish."); id. ("The disparate treatment is even more striking in an orange zone.").  These within-zone comparisons suggest that we should similarly compare the treatment of in-state, religious K-12 schools in the tuition-assistance program to their geographical and program peers: in-state, secular K-12 schools in the tuition-assistance program.

Where, as here, the government draws a line (or lines) along innocuous contours, in a manner consistent with the underlying government interests at play, we will not subject that innocuous line to heightened scrutiny simply because some religious actors -- along with some secular ones -- fall on one side of that line, while some secular actors -- along with some

---

[41] Although the Court in Roman Catholic Diocese -- and in Tandon, for that matter -- did not clearly delineate between neutrality and general applicability in its analysis, we have treated both cases as concerning primarily general applicability. See, e.g., Brox v. Woods Hole, 164 F.4th 37, 44-45, 47 (1st Cir. 2026).

religious ones -- fall on the other.  Cf. Skrmetti, 605 U.S. at 517-19 (upholding an allegedly discriminatory line on the basis that it was drawn based on medical use, rather than between genders or sexes, even though individuals with certain gender identities fell disproportionately on the disfavored side of the line).  A contrary holding would largely eviscerate Smith's accommodation of neutral, generally applicable laws.  For example, under St. Dominic's approach, a party could challenge Title VII's employment discrimination protections on the grounds that they offend Tandon by exempting "all small employers -- religious and secular alike," while covering some large, religious employers. McMahon v. World Vision, Inc., 704 F. Supp. 3d 1121, 1142-43 (W.D. Wash. 2023) (emphasis omitted), rev'd on other grounds, 147 F.4th 959 (9th Cir. 2025).  Indeed, at least one plaintiff has already filed such a challenge, which a court in the Western District of Washington rejected, explaining that the proper comparison is between "small religious employers" and "small secular employers." Id. at 1142.

In its opening brief, St. Dominic "preserve[s] the argument that Smith was wrongly decided for Supreme Court review." St. Dominic remains free to seek such review through a writ of certiorari.  But St. Dominic rightly recognizes that it cannot press such an argument here. And, just as the Constitution forbids us from expressly overruling Supreme Court precedent, the

Constitution also forbids us from attempting such an overruling sub silentio. See U.S. Const. art. III, § 1 (placing the Supreme Court above lower courts); Arias v. Herzon, 150 F.4th 27, 42 (1st Cir. 2025) ("[A]s a lower court, we are required to follow the Court's precedents, not treat them as but shells of their former selves."). As with St. Dominic's Carson argument, we therefore will not -- indeed, cannot -- adopt St. Dominic's preferred interpretation of Tandon in a manner that would extinguish a Supreme Court precedent that the Court has regularly applied for thirty-five years. See, e.g., Mahmoud v. Taylor, 606 U.S. 522, 564-65 (2025); Kennedy, 597 U.S. at 525-26; Fulton, 593 U.S. at 533; Trinity Lutheran Church, 582 U.S. at 460; Christian Legal Soc'y, 561 U.S. at 694 n.24, 697 n.27;[42] Lukumi, 508 U.S. at 531; Smith, 494 U.S. at 881; see also St. Mary, 2026 WL 1052111, at *1 (granting certiorari but declining to consider whether Smith should be overruled).

We thus hold that the application of the Religious Nondiscrimination Rule to prevent St. Dominic, if it accepts tuition assistance, from giving preference to Catholic students in admissions and financial aid does not warrant heightened scrutiny under Smith.

---

[42] In Christian Legal Society, the Court rejected a free-exercise challenge to an "all-comers" nondiscrimination policy based on Smith. 561 U.S. at 697 n.27.

### iii. Church Autonomy and Religious Entanglement

St. Dominic alternatively asserts that the Religious Nondiscrimination Rule likely warrants strict scrutiny because it violates the school's church-autonomy rights under the First Amendment by impermissibly entangling the State in the school's internal religious affairs.

The "church autonomy doctrine," on which St. Dominic relies, "protect[s] the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion." Our Lady of Guadalupe Sch., 591 U.S. at 746 (citation modified). This "limit[s] the role of civil courts in the resolution of religious controversies that incidentally affect civil rights." Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich, 426 U.S. 696, 710 (1976). For example, "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." Jones v. Wolf, 443 U.S. 595, 602 (1979).

Here, assuming religious schools possess church-autonomy rights, the Religious Nondiscrimination Rule's bar on a school giving preference to one student over another in admissions and financial aid based on the two students' religious affiliations does not infringe those rights. The rule would not require any material or entangling judicial inquiry into matters of faith or doctrine. As we have explained, the prohibition on discrimination

on the basis of a student's religion does not hinge on the school's doctrinal reasons for doing so.  Rather, the question is solely "whether [the discrimination] occurred because of an individual's religious beliefs or would not have occurred but for the individual's religion."  Finnemore, 645 A.2d at 17.  The inquiry required by the rule is a question of civil rights that incidentally affects religious exercise, not vice versa.  Cf. Milivojevich, 426 U.S. at 720 (applying doctrine to state-court order "to reinstate as Bishop one who espoused views regarded by the church hierarchy to be schismatic"); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 115 (1952) ("This controversy concerning the right to use St. Nicholas Cathedral is strictly a matter of ecclesiastical government . . . .").

While St. Dominic asserts that "a religious school's religious admissions criteria, just like a church's membership criteria, are entirely protected from government intrusion," it struggles to marshal any support for such a sweeping statement of law.  Instead, it cites only to (1) a Supreme Court case concerning the defrocking of a Serbian orthodox bishop stemming from a church schism, Milivojevich, 426 U.S. at 698-99, 706, 709, 713-14; (2) our own decision affirming dismissal of a priest's tort suit against the church for which he had been working at the time of his alleged injuries, Dowd v. Soc'y of St. Columbans, 861 F.2d 761, 763-64

(1st Cir. 1988); and (3) a decision from a Texas state court collecting cases from other Texas state courts, a Michigan state court, a Pennsylvania state court, and the Eastern District of Pennsylvania, In re St. Thomas High Sch., 495 S.W.3d 500, 512 & n.1 (Tex. App. 2016).  While the Supreme Court has separately, under the "ministerial exception" doctrine, provided protection for "the employment relationship between a religious institution and its ministers," Hosanna-Tabor, 565 U.S. at 188, the Court has not, to date, extended this doctrine to religious school students, and St. Dominic has not clearly presented any argument, let alone a developed one, as to why we should independently do so now.[43] Accordingly, we treat the issue as waived for purposes of this particular appeal.  See Igartúa v. United States, 626 F.3d 592, 603 (1st Cir. 2010) ("An argument raised in a perfunctory or not serious manner is waived.").[44]

---

[43]  Moreover, it is not clear the ministerial exception as it currently stands can even be used as the basis of a claim, rather than as a defense.  See Hosanna-Tabor, 565 U.S. at 195 n.4 (describing the ministerial exception as "an affirmative defense to an otherwise cognizable claim"); Youth 71Five, 160 F.4th at 983-84 (concluding that the ministerial exception cannot form the basis for a standalone claim under 42 U.S.C. § 1983).

[44]  One amicus to this case insists that the "ministerial exception" should extend to church congregants, but "[a]mici cannot interject into a case issues which the litigants have chosen to ignore."  Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 205 n.3 (1st Cir. 1999).

St. Dominic's claim also relies heavily on a single sentence from Carson, which warned that "scrutinizing whether and how a religious school pursues its educational mission would . . . raise serious concerns about state entanglement with religion and denominational favoritism." 596 U.S. at 787. But -- as with the rest of Carson -- we do not read this language as creating a new test for whether government action violates the religion clauses. Instead, the Court was simply explaining why "use-based discrimination is [no] less offensive to the Free Exercise Clause" than "status-based discrimination." Id. at 787-88. That is, the government cannot escape strict scrutiny simply by reformulating a status-based exclusion (e.g., schools that are Catholic) as a use-based exclusion (e.g., schools that promote Catholicism). See id.

St. Dominic instead reads Carson as "forbid[ding]" states from "examin[ing religious schools'] admission policies, codes of conduct, and practices" and using such examination to enforce laws against religious schools. But that reasoning would apply equally to the MHRA's prohibition on race, sex, or disability discrimination, provisions that even St. Dominic does not contend violate its rights. See Christian Legal Soc'y, 561 U.S. at 702-03 (Stevens, J., concurring) (noting similar lack of limiting principle). What is more, that interpretation of Carson ignores Smith's accommodation of neutral, generally applicable laws. That

is perhaps why, in addition to excerpting a single sentence from Carson and a single sentence from an employment case, see Our Lady of Guadalupe Sch., 591 U.S. at 746, St. Dominic relies for its argument primarily on a quartet of pre-Smith cases. See Kedroff, 344 U.S. at 115; Milivojevich, 426 U.S. at 713-14; NLRB v. Cath. Bishop of Chi., 440 U.S. 490, 502 (1979); Dowd, 861 F.2d at 764.

In short, we find no interference with St. Dominic's church-autonomy rights in the Religious Nondiscrimination Rule's application to the school's Catholic preference and decline St. Dominic's invitation to expand significantly the Supreme Court's religious-entanglement caselaw to forbid a state from enacting a neutral, generally applicable law that comports with Smith and other key precedents.

### iv. Expressive Association

We turn next to St. Dominic's argument that the Religious Nondiscrimination Rule likely interferes with its First Amendment right to expressive association and, as such, deserves strict scrutiny.[45] The Supreme Court has characterized this right as follows: "[A] regulation that forces [a] group to accept members it does not desire . . . may impair the ability of the original members to express only those views that brought them

---

[45] St. Dominic also raises a First Amendment challenge to the MHRA on compelled-speech grounds; that challenge, however, is directed solely at the Religious Expression Rule, so we need not consider it further.

together.  Freedom of association therefore plainly presupposes a freedom not to associate." Roberts v. U.S. Jaycees, 468 U.S. 609, 623 (1984).  A law that infringes that freedom will be unconstitutional unless it withstands strict scrutiny.  Id.  To determine whether a law infringes the freedom of association, we must ascertain whether "the presence of [the unwanted persons] affects in a significant way the group's ability to advocate public or private viewpoints." Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000); see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 548-49 (1987) (upholding the application of a state nondiscrimination law that barred private Rotary Clubs from excluding women from full membership because the challenged law did not "affect in any significant way the existing members' ability to carry out their various purposes").

St. Dominic devotes three pages of its opening brief and another three of its reply to arguing that "forcing [it] to allow unwanted members or expression violates [its] expressive-association rights if it 'affects in a significant way the [school's] ability to advocate public or private viewpoints.'" But St. Dominic offers nary a word to support any suggestion that precluding it from preferencing Catholic students in admissions or financial aid will somehow burden its expressive-association rights.  To the contrary, St. Dominic admits that it "welcomes non-Catholics 'willing to learn in a thoroughly Catholic

educational environment.'"  See Jaycees, 468 U.S. at 627 (finding no expressive-association violation where group already allowed unwanted members -- women -- to participate in much of its activities); Rotary Int'l, 481 U.S. at 549 n.8 (same).

To support the claimed burden on its expressive-association rights, St. Dominic points instead to its complaint that the MHRA would force it to accept students who do not support its mission and to allow competing religious expression.  But we have already found that the Religious Nondiscrimination Rule does not prohibit St. Dominic's mission-oriented admissions practices and that the Religious Expression Rule may not force St. Dominic to permit competing religious expression.  All we consider here is the Religious Nondiscrimination Rule's application to St. Dominic's preference for Catholic students in admissions and financial aid.  And St. Dominic has made no showing that requiring the school to evaluate non-Catholic applicants on an equal footing with Catholic applicants would itself significantly hinder "the group's ability to advocate public or private viewpoints." Dale, 530 U.S. at 648; see also Runyon v. McCrary, 427 U.S. 160, 176 (1976) (rejecting schools' expressive-association claim where "there is no showing that discontinuance of the discriminatory admission practices would inhibit in any way the teaching in these schools of any ideas or dogma" (citation modified)).  In short, on this record, we find

no burden on St. Dominic's associational rights.  See Dale, 530 U.S. at 653 ("[A]n expressive association can[not] erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message.").

### v. Unconstitutional Conditions

St. Dominic lastly contends that strict scrutiny applies because the Religious Nondiscrimination Rule runs afoul of the unconstitutional-conditions doctrine. The unconstitutional-conditions doctrine prohibits the government, in certain situations, from conditioning the grant of a benefit on the surrender of a constitutional right. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013).  In other words, it limits the government's ability to argue that, although it could not constitutionally impose a restriction on an entity directly, it can nevertheless impose the same restriction as a condition of that entity's voluntary acceptance of public funds.  Rumsfeld v. F. for Acad. & Institutional Rts., Inc. (FAIR), 547 U.S. 47, 59 (2006).  Here, though, the Commissioners make no such argument.  Rather, in defending the Religious Nondiscrimination Rule, the Commissioners have treated the rule as an attempted direct restriction on the school's conduct -- and we have done the same.  We have found that the Religious Nondiscrimination Rule does not require the school to surrender

its free-exercise rights to receive tuition assistance. And we have found that St. Dominic has failed to articulate any burden on its right to expressive association from the rule. We have, in short, analyzed the rule as a direct restriction and found no constitutional infirmity to be immunized by the acceptance of state funds. Because "a funding condition cannot be unconstitutional if it could be constitutionally imposed directly," id. at 59-60, St. Dominic's unconstitutional conditions theory does not change our conclusion.

### c. Rational Basis Review

Concluding that St. Dominic has not demonstrated heightened scrutiny should apply, we employ rational basis review, under which a law survives if "rationally related" to a "legitimate end." Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 339 (1987). Under this forgiving standard, the Religious Nondiscrimination Rule passes muster.

Maine's aim to expand the definition of unlawful educational discrimination covered by the MHRA certainly qualifies as a legitimate end. St. Dominic claims that a government can have no legitimate interest in barring religious discrimination by religious schools. But, as we have noted, "[p]rohibition of religious discrimination is unquestionably an appropriate, secular legislative purpose." Boyajian, 212 F.3d at 5. And the Supreme

- 88 -

Court has found not only a legitimate, but a "compelling," "fundamental, overriding interest" in "eradicating racial discrimination in education," even where the discriminatory practices in question derived from the subject school's sincerely held religious beliefs. Bob Jones Univ. v. United States, 461 U.S. 574, 604 (1983); see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 609 (1982) ("This Court has had too much experience with the political, social, and moral damage of discrimination not to recognize that a State has a substantial interest in assuring its residents that it will act to protect them from these evils."). Though not dispositive, we also note that, here, Maine pursues not only a general antidiscrimination interest but also an interest in preventing publicly funded discrimination specifically. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 492 (1989) (plurality opinion) ("[A]ny public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."); Norwood v. Harrison, 413 U.S. 455, 463 (1973) ("That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination.").

The Religious Nondiscrimination Rule thus plainly serves legitimate government ends. And St. Dominic does not contest that

the Religious Nondiscrimination Rule -- which withholds public funding from, or subjects to liability, those who discriminate based on religion -- rationally relates to those ends.

## 4. The Sexual Orientation and Gender Identity Nondiscrimination Rule

We come now to the Sexual Orientation and Gender Identity Nondiscrimination Rule, which prohibits any in-state primary or secondary school receiving public funding from discriminating against students and applicants on the basis of sexual orientation or gender identity.  Me. Stat. tit. 5, § 4602(1).[46]  We start by addressing the Commissioners' threshold ripeness and Pullman arguments as applied to the Sexual Orientation and Gender Identity Nondiscrimination Rule.  We then turn to the merits, concluding first that the Sexual Orientation and Gender Identity Nondiscrimination Rule does not trigger heightened scrutiny and second that the rule survives rational basis review.  Thus, St. Dominic's challenge to the Sexual Orientation and Gender Identity Nondiscrimination Rule fails.

### a. Justiciability

Before reaching the merits, we address justiciability. As with the Religious Expression Rule and the Religious

---

[46]  The rule provides a specific carveout for religious schools that do not receive public funding, Me. Stat. tit. 5, § 4602(5)(C), but, given that the MHRA's education provisions do not apply to schools that do not receive public funding anyway, id. § 4553(2-A), this carveout is largely superfluous.

Nondiscrimination Rule, the Commissioners urge us to avoid the merits of this dispute on ripeness and <u>Pullman</u> grounds.

St. Dominic, relying on a 2016 memorandum authored by Commission Counsel for the MHRC, points to two potential applications of this rule that allegedly violate the school's constitutional rights. <u>See</u> Memorandum from Barbara Archer Hirsch, Comm'n Couns., Me. Hum. Rts. Comm'n, to Amy Sneirson, Exec. Dir., Me. Hum. Rts. Comm'n, 3-4 (Jan. 13, 2016), https://www.maine.gov/mhrc/sites/maine.gov.mhrc/files/inline-files/20160113_g.pdf [https://perma.cc/594V-BCS7] [hereinafter "2016 MHRC Memorandum"]. First, St. Dominic says, the rule would require the school to "facilitate a student's gender transition over the objection of their parents," by using the student's preferred pronouns and name and allowing the student to dress in clothing consistent with their gender identity.[47] Second, according to St. Dominic, the rule would mandate that the school "discipline other students and staff who object to using a student's preferred pronouns." We refer to these two applications, collectively, as the Sexual Orientation and Gender Identity Nondiscrimination Rule's "Gender Presentation Policy." St. Dominic does not inquire about a student's sexual orientation

---

[47] Although St. Dominic uses the expansive term "facilitate" in describing this requirement, the relevant portion of the 2016 MHRC Memorandum addresses only a student's chosen name, preferred pronouns, and dress. 2016 MHRC Memorandum, <u>supra</u>, at 3-4.

or gender identity in admissions or allege any other practice in which it intends to engage that might be construed as discrimination on those grounds, so we focus only on the Gender Presentation Policy in our analysis.[48]

---

[48] In its reply brief, St. Dominic refers in passing to a supposed admission by the Commissioners that the Sexual Orientation and Gender Identity Nondiscrimination Rule would require publicly funded schools to "[a]ccept an enrolled student's assertion of their gender identity, including when the student sincerely holds a 'fluid' gender identity that shifts with changing athletic seasons," and "[a]llow students to use 'toilet, locker room, and shower facilities' that correspond to their asserted gender identity, regardless of whether other students or staff object because of their own religious beliefs (for example about modesty)." St. Dominic does not clarify whether any school policies would violate these alleged requirements. In any event, St. Dominic did not mention these requirements below or raise them in its opening brief. We therefore deem any arguments relating to these requirements waived. See Álamo-Hornedo v. Puig, 745 F.3d 578, 582 (1st Cir. 2014) ("[I]n the absence of exceptional circumstances, arguments presented for the first time in an appellant's reply brief are deemed waived."); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

St. Dominic's reply brief also attempts to introduce as evidence a 2022 draft rulemaking that interprets the Sexual Orientation and Gender Identity Nondiscrimination Rule as requiring schools to treat all sexual orientations and gender identities "as equally valid" in any "[h]uman sexuality courses." But even if we assume that St. Dominic properly introduces this evidence and that it bears relevance to St. Dominic's claims, this draft rulemaking is just that: a draft. St. Dominic adduces no evidence indicating that the State intends to finalize the proposal, the Commissioners' briefing indicates that the MHRC does not plan to enforce the Sexual Orientation and Gender Identity Nondiscrimination Rule in such a way, and the rule's plain text does not suggest that it contains such a requirement.

### i. Ripeness

We find St. Dominic's claims against the Sexual Orientation and Gender Identity Nondiscrimination Rule ripe but only to the extent those claims challenge the Gender Presentation Policy. As we have stated, ripeness in this pre-enforcement context requires St. Dominic to show that it has "concrete plans to engage immediately (or nearly so) in an arguably proscribed activity," and that "the challenged statute, fairly read, thwarts implementation of the plan." Whitehouse, 199 F.3d at 33.

Here, St. Dominic alleges that it would refuse to comply with "a student's efforts to change his or her gender identity" without the consent of that student's parents and would not discipline other students or faculty who refused to use pronouns consistent with that student's gender identity. Although the Commissioners contend it is not clear that this would violate the Sexual Orientation and Gender Identity Nondiscrimination Rule, it is at least "arguably proscribed" by the rule. After all, the 2016 MHRC Memorandum establishing the Gender Presentation Policy shows that the MHRC believes the rule would prohibit St. Dominic's conduct. And, during the pendency of this appeal, the MHRC filed a complaint against five public school districts for violations of the Sexual Orientation and Gender Identity Nondiscrimination Rule in athletics and private spaces, in which it cited the same 2016 MHRC Memorandum, albeit a different section. Complaint ¶ 16, Me.

- 93 -

Hum. Rts. Comm'n v. Me. Sch. Admin. Dist. 70, No. 25-188 (Me. Super. Ct. Kennebec Cnty. Nov. 17, 2025).[49]   This recent enforcement activity supports the idea that St. Dominic faces a credible threat of prosecution for that arguably proscribed activity.  We therefore conclude that St. Dominic's challenge to the Sexual Orientation and Gender Identity Nondiscrimination Rule is ripe to the extent that it targets the Gender Presentation Policy.

Before proceeding, though, we note the limited scope of this conclusion.  We address here only those applications of the Sexual Orientation and Gender Identity Nondiscrimination Rule actually challenged by St. Dominic: the Gender Presentation Policy's requirement that a school receiving public funding use a transgender student's preferred name and pronouns, encourage staff and students to do the same, and allow the student to dress in accord with their gender identity.  It strikes us that other applications of the rule are hopelessly uncertain at this time. We are aware of only one case construing the MHRA's bar on gender-identity discrimination in education, and in that case, the

---

[49] The alleged violations in that complaint concern the restriction of athletic opportunities and private spaces by biological sex.  See generally Complaint, Me. Sch. Admin. Dist. 70, No. 25-188.  We are not here called to address the constitutional implications of the rule's possible application to such practices, other than to acknowledge that the complaint lends credence to St. Dominic's contention that the MHRC continues to read the rule in accord with the 2016 MHRC Memorandum.

Maine Supreme Judicial Court stressed the fact-sensitive nature of "[d]ecisions about how to address students' legitimate gender identity issues" under the MHRA. Doe v. Reg'l Sch. Unit 26, 86 A.3d 600, 606-07 (Me. 2014) (finding MHRA violation where school barred transgender student who identified as girl from using girls' bathroom, contrary to plan "carefully developed over several years" and "designed to sensitively address [her] gender identity issues" in light of fact that "[t]he school, her parents, her counselors, and her friends all accepted that [she] is a girl"). We therefore express no opinion regarding the constitutionality of applications of the Sexual Orientation and Gender Identity Nondiscrimination Rule not before us.

### ii. **Pullman** Abstention

As to St. Dominic's challenge to the MHRC's Gender Presentation Policy, Pullman abstention is not appropriate because no "substantial uncertainty exists over the meaning of" that policy specifically. Batterman, 544 F.3d at 373. Although other applications of the Sexual Orientation and Gender Identity Nondiscrimination Rule are uncertain at this time, we have in the Gender Presentation Policy a specific interpretation promulgated by the body tasked with administering the MHRA and issuing regulations thereunder. Me. Stat. tit. 5, § 4566(7). That interpretation would require St. Dominic, if it accepted tuition assistance, to use a transgender student's chosen name and pronouns

and mandate that employees and other students do the same.   In response to St. Dominic's concerns about those requirements, the Commissioners argue that "a state court might not agree with" the 2016 MHRC Memorandum that lays out the Gender Presentation Policy. But the fact that a state court "might" not read the Sexual Orientation and Gender Identity Nondiscrimination Rule as expansively as does the MHRC does not create the "substantial uncertainty" required for Pullman abstention.   See Midkiff, 467 U.S. at 237 ("[T]he relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary.").   Without any material ambiguity regarding the Gender Presentation Policy, we do not believe abstention is appropriate in this case, where First Amendment rights are at stake.   See Mangual v. Rotger-Sabat, 317 F.3d 45, 64 (1st Cir. 2003) ("[T]he delay involved in abstention is especially problematic where First Amendment rights are involved.").

### b. Level of Scrutiny

Moving to the merits, St. Dominic makes only three arguments with respect to the Sexual Orientation and Gender Identity Nondiscrimination Rule specifically: (1) that the rule triggers strict scrutiny under Smith, (2) that the rule violates St. Dominic's church-autonomy rights, and (3) that the rule implicates parental rights under the Free Exercise Clause.

- 96 -

St. Dominic did not argue in the district court that the Sexual Orientation and Gender Identity Nondiscrimination Rule interferes with the school's free-speech or expressive-association rights in any way, nor has it attempted to do so on appeal. Any such argument is therefore waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). As we will explain, none of the arguments St. Dominic does present persuade us that heightened scrutiny should govern application of the Sexual Orientation and Gender Identity Nondiscrimination Rule's Gender Presentation Policy to St. Dominic should it decide to participate in the tuition-assistance program.

### i. Free Exercise

St. Dominic primarily contends that the Sexual Orientation and Gender Identity Nondiscrimination Rule should receive heightened scrutiny under the Free Exercise Clause.

We do not understand St. Dominic to contend that the rule triggers strict scrutiny under Carson's interpretation of the Free Exercise Clause on the ground that it "disqualif[ies] some private schools" from the tuition-assistance program "solely because they are religious." Carson, 596 U.S. at 780 (quoting Espinoza, 591 U.S. at 487). Even if St. Dominic did mean to raise that argument, we are unpersuaded. As mentioned, the MHRC is currently pursuing an action against several secular schools for conduct that the MHRC asserts violates the rule. Complaint, Me.

- 97 -

Sch. Admin. Dist. 70, No. 25-188.  And the record does not suggest that religious schools, by their nature, engage in sexual-orientation or gender-identity discrimination.  See Polk, 166 F.4th at 415 ("[B]ecause Polk herself is a Christian who believes that there are only two sexes does not mean that all Christians believe the same thing, and that non-Christians inherently believe otherwise.").  Simply put, barring sexual orientation and gender identity discrimination does not exclude religious schools from the tuition-assistance program solely based on their religious character.  See St. Mary, 154 F.4th at 763-65 (finding similar nondiscrimination rule as applied to Catholic preschools did not trigger strict scrutiny under Carson).  St. Dominic does separately argue that the Sexual Orientation and Gender Identity Nondiscrimination Rule raises entanglement concerns under Carson, which we address below.  See infra Section III.A.4.b.ii.

Proceeding thus under Smith's "neutral and generally applicable" framework, we begin with general applicability.  In so doing, we see no reason to depart from our conclusion, with respect to the Religious Nondiscrimination Rule, that the MHRA's education provisions are generally applicable.  See supra Section III.A.3.b.ii(2).  Nor does St. Dominic present any unique case for why the Sexual Orientation and Gender Identity

Nondiscrimination Rule specifically falters on this prong of the Smith test.

That leaves only neutrality. St. Dominic makes no argument that either the Sexual Orientation and Gender Identity Nondiscrimination Rule as whole or the Gender Presentation Policy in particular is facially nonneutral. Rather, as to this rule, St. Dominic's neutrality challenge rests entirely on nonfacial nonneutrality. Nonfacial nonneutrality, as we have noted, refers to "governmental hostility [that] is masked." Lukumi, 508 U.S. at 534. But St. Dominic cannot argue that the Maine legislature enacted the Sexual Orientation and Gender Identity Nondiscrimination Rule itself -- or that the MHRC instituted the Gender Presentation Policy -- out of hostility to religious schools. After all, the bar on sexual-orientation and gender-identity discrimination was added to the MHRA in 2005, when the nonsecular requirement generally excluded religious schools from the MHRA's coverage. The same holds true for the Gender Presentation policy, which established in 2016, two years before the Carson litigation began. Instead, St. Dominic's arguments center on recent amendments to the Sexual Orientation and Gender Identity Nondiscrimination Rule. The bulk of these arguments -- regarding the Frey and Fecteau Statements and the single-sex exemption -- fail here for the same reasons they failed

- 99 -

with regard to the Religious Nondiscrimination Rule.  See supra Section III.A.3.b.ii(1).

St. Dominic's one remaining argument narrows in on the 2021 Amendments' impact on the Sexual Orientation and Gender Identity Nondiscrimination Rule's carveout for religious schools. Previously, the rule exempted all religious schools, but with the amendments, the rule now exempts only those religious schools that do not receive public funding.  2021 Amendments sec. 19 (codified at Me. Stat. tit. 5, § 4602(5)(C)).  St. Dominic argues that this change was born of hostility to religious schools.

For two reasons, we find no such hostility here.  First, this amendment simply aligned the MHRA's education provisions with its employment and housing provisions, which already limited their religious exemptions from similar prohibitions on sexual-orientation and gender-identity discrimination to entities that did not receive public funding.  Me. Stat. tit. 5, § 4553(10)(G) (2018).  Second, the pre-amendment exemption was essentially meaningless since the MHRA only applies to a religious school if it receives public funding and, prior to Carson, no religious school could receive public funds for tuition. Me. Stat. tit. 20-A, § 2951(2) (2018).[50]  Thus, before the 2021 Amendments,

---

[50]  St. Dominic argues that this is not precisely accurate. The nonsectarian requirement challenged in Carson did not bar all religious schools from the tuition-assistance program, only those that were "associated with a particular faith or belief system"

the Sexual Orientation and Gender Identity Nondiscrimination Rule applied to all Maine K-12 schools that received public funding. The legislature's decision to ensure that, post-Carson, the Sexual Orientation and Gender Identity Nondiscrimination Rule continued to apply to all Maine K-12 schools that receive public funding evinces no hostility toward religious schools as such.

Because the Sexual Orientation and Gender Identity Nondiscrimination Rule is both neutral and generally applicable, the rule's application to St. Dominic, should it accept tuition assistance, does not warrant heightened scrutiny under the Free Exercise Clause.

### ii. Church Autonomy and Religious Entanglement

St. Dominic applies its church-autonomy and religious-entanglement argument to the Sexual Orientation and Gender Identity Nondiscrimination Rule's Gender Presentation Policy, too. See supra Section III.A.3.b.iii. In its view, the policy would allow the MHRC to "dictate what students may wear and

---

and "promote[d] [that] faith or belief system . . . and/or present[ed] the material taught through the lens of this faith." Carson, 596 U.S. at 775 (citation modified). However, the pre-amendment religious exemption also did not exempt all religious schools, only those that were "owned, controlled or operated by a bona fide religious corporation, association or society," Me. Stat. tit. 5, § 4602(4) (2018). While St. Dominic identifies at least one nonsectarian religious school that participated in the program prior to Carson, it has not shown that that school qualified for the pre-amendment exemption. On this record, then, we see no room between the nonsectarian requirement and the pre-amendment exemption.

be called at school, whether parents' wishes will be honored, and when and whether students and staff must be disciplined for failing to follow the Commission's guidance about these matters."[51]  Of course, the text of the Sexual Orientation and Gender Identity Nondiscrimination Rule itself contains no such language.  Rather, the rule simply prohibits a school from discriminating on the basis of a student's sexual orientation or gender identity if the school accepts public funding.  Even the Gender Presentation Policy does not give the MHRC power to dictate students' names and dress; rather, it gives students that power, instructing schools to honor the requests of individual students regarding their own names, pronouns, and dress.  And, as with the Religious Nondiscrimination Rule, enforcement of this policy would not require the MHRC or courts to inquire into the religious motivations for allegedly discriminatory practices or decide matters of church doctrine.  Thus, for substantially the same reasons that this argument falters as to the Religious Nondiscrimination Rule, we do not see either the church-autonomy doctrine or St. Dominic's conception of a religious-entanglement doctrine as providing an independent basis to apply strict scrutiny.

---

[51]  St. Dominic does not contend that such discipline for staff might include termination or otherwise implicate the ministerial exception under Hosanna-Tabor, 565 U.S. at 188.

### iii. Parental Rights

Finally, in two notices of supplemental authority, St. Dominic asks us to reverse based on the Supreme Court's recent decisions in Mahmoud v. Taylor, 606 U.S. 522 (2025), and Mirabelli v. Bonta, 607 U.S. 492 (2026).  Both decisions reaffirmed "the rights of parents to direct the religious upbringing of their children."  Mahmoud, 606 U.S. at 547 (citation modified); see also Mirabelli, 607 U.S. at 496–97.  But neither case concerned schools' rights.  As such, these cases do not provide reason for us to find a violation of St. Dominic's rights.[52]

We focus our attention on Mirabelli, the more recent and apposite of the two cases.  There, several teachers and parents challenged, on grounds including a free-exercise claim, California policies that barred schools "from telling [parents] about their children's efforts to engage in gender transitioning at school unless the children consent[ed] to parental notification" and required schools to "use children's preferred names and pronouns regardless of their parents' wishes."  Mirabelli, 607 U.S. at 493.  After the Ninth Circuit stayed the district court's permanent

---

[52] St. Dominic does not clearly confine its parental-rights argument to its challenge to the Sexual Orientation and Gender Identity Nondiscrimination Rule.  Because Mahmoud and Mirabelli both address sexual-orientation and gender-identity policies, we tackle the issue here.  Nevertheless, our conclusion applies equally to St. Dominic's challenges to the MHRA's other education provisions.

injunction against the policies, the Supreme Court vacated the stay with respect to the parent-plaintiffs.  Id. at 498.  As relevant here, the Court explained that the parents held "sincere religious beliefs about sex and gender," and "California's policies violate[d] those beliefs," imposing an impermissible "burden on religious exercise."  Id. at 496 (quoting Mahmoud, 606 U.S. at 550).  On this ground, the Court found it likely that the policies "substantially interfere[d] with the 'right of parents to guide the religious development of their children.'"  Id. (quoting Mahmoud, 606 U.S. at 559); see also Mahmoud, 606 U.S. at 545-46 (finding likely violation of parental rights in school board policy requiring use of LGBTQ+-inclusive storybooks in elementary school classrooms with no notice or opt-out for parents who objected on religious grounds).

St. Dominic correctly points out that this case parallels Mirabelli to an extent.  As with the policies in Mirabelli, the Sexual Orientation and Gender Identity Nondiscrimination Rule's Gender Presentation Policy would require subject schools to use a transgender student's preferred name and pronouns over a parent's objection -- though nothing before us suggests the rule would bar a school from informing parents of their child's gender transitioning.  However, no party remaining in this suit is a parent asserting a parental-rights claim, and the Mirabelli Court did not indicate that a party other than a

parent could generally assert such a claim.  In fact, the Court declined to vacate the stay as to the teacher-plaintiffs, suggesting that, even if the policies violated the parents' rights, they might not violate the teachers' rights.  Mirabelli, 607 U.S. 498; see also Mahmoud, 606 U.S. at 540-42 (addressing claims of parents and an unincorporated association of parents and teachers); cf. Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-36 (1925) (finding private religious school deprived of property without due process by compulsory public-education law because law unconstitutionally interfered with parental right to direct the education of children); Runyon, 427 U.S. at 175 n.13, 176-77 (allowing private school to argue civil rights statute violated "a parent's right to direct the education of his children," grounded in substantive due process, but finding no such violation).

It is "a fundamental restriction on our authority that in the ordinary course, a litigant must assert his or her own legal rights and interest, and cannot rest a claim to relief on the legal rights or interests of third parties."  Hollingsworth v. Perry, 570 U.S. 693, 708 (2013) (citation modified).  This general principle does admit of a "limited" exception, but that exception requires the party asserting rights on behalf of another to justify its third-party standing.  Kowalski v. Tesmer, 543 U.S. 125, 130 (2004).  Here, St. Dominic has put forth no reason why it should be allowed to litigate on behalf of the Radonises or any other

- 105 -

parents not party to this suit.  Because, "[i]n our adversarial system of adjudication, . . . [t]he parties frame the issues for decision, while the court serves as neutral arbiter of matters the parties present," <u>Clark</u> v. <u>Sweeney</u>, 607 U.S. 7, 9 (2025) (citation modified), we need proceed no further down the path of parental rights.  We thus set <u>Mahmoud</u> and <u>Mirabelli</u> aside for the limited purpose of determining St. Dominic's own entitlement to relief.

### c. Rational Basis Review

As St. Dominic has not demonstrated that strict scrutiny should apply,[53] we employ rational basis review of the Sexual Orientation and Gender Identity Nondiscrimination Rule and its Gender Presentation Policy.   Just as combatting religious discrimination qualifies as a legitimate governmental pursuit, so too combatting sexual-orientation and gender-identity discrimination rises to the level.  <u>Telescope Media Grp.</u> v. <u>Lucero</u>, 936 F.3d 740, 777 (8th Cir. 2019) (Kelly, J., concurring in part and dissenting in part) ("If eradicating discrimination based on race or sex is a compelling state interest, then so is [a state's]

---

[53]  To the extent St. Dominic also argues for strict scrutiny of the Sexual Orientation and Gender Identity Nondiscrimination Rule under the unconstitutional-conditions doctrine, that argument fails for the same reason it failed with respect to the Religious Nondiscrimination Rule:  St. Dominic has not shown that the Sexual Orientation and Gender Identity Nondiscrimination Rule would unconstitutionally infringe its free-exercise rights if the rule were a direct restriction, so the rule is not unconstitutional as a funding condition.  <u>FAIR</u>, 547 U.S. at 59–60.

interest in eradicating discrimination based on sexual orientation."). And the imposition of liability for sexual-orientation or gender-identity discrimination on those schools that accept public funding rationally relates to those antidiscrimination goals, as does the requirement that such schools respect students' expression of their gender identity. We thus find that St. Dominic has not demonstrated a likelihood of success on the merits of its limited challenge to the Sexual Orientation and Gender Identity Nondiscrimination Rule.

## B. Remaining Factors

With our likelihood-of-success-on-the-merits discussion complete, we turn to the other three preliminary injunction factors. Beginning with St. Dominic's challenges to the Employment Rule, the Religious Nondiscrimination Rule, and the Sexual Orientation and Gender Identity Nondiscrimination Rule, we note that St. Dominic "does not argue on appeal that the other three factors mandate an injunction even if its claims are not likely to succeed on the merits," so we "rest [our] affirmance[s] solely on [our] unlikelihood-of-success holding[s]." Becky's Broncos, LLC v. Town of Nantucket, 138 F.4th 73, 78 (1st Cir. 2025) (citation modified).

As to the Religious Expression Rule, St. Dominic has satisfied the other three factors. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." <u>Roman Cath. Diocese</u>, 592 U.S. at 19 (quoting <u>Elrod</u> v. <u>Burns</u>, 427 U.S. 347, 373 (1976) (plurality opinion)).  And the balance of equities and public interest also favor St. Dominic -- after all, the Commissioners can hardly justify a religiously discriminatory provision on the ground that the provision is necessary to combat religious discrimination.

## IV. Conclusion

For the foregoing reasons, we <u>affirm</u> in part and <u>reverse</u> in part the district court's order denying St. Dominic's motion for a preliminary injunction.  Specifically, we <u>affirm</u> the order insofar as it determined that no case or controversy exists with respect to the Employment Rule and that St. Dominic has not shown a likelihood of succeeding on the merits of its claims against the Religious Nondiscrimination Rule and the Sexual Orientation and Gender Identity Nondiscrimination Rule.  And we <u>reverse</u> the order insofar as it determined that St. Dominic has not demonstrated its entitlement to a preliminary injunction against the Religious Expression Rule.  We thus <u>remand</u> the case for further proceedings consistent with this opinion, including the timely entry of a preliminary injunction against the Religious Expression Rule as applied to St. Dominic.  No costs are allocated.